MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 014082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * * *

RAYMOND GARCIA, as a member, and on behalf of CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION dba NEVADA SERVICE EMPLOYEES UNION aka SEIU LOCAL 1107; RAY LIEPINS, as a member of LOCAL 1107, the LOCAL 1107 Executive Board, and Vice President of the Las Vegas Convention and Visitor Authority Non-Supervisory Collective Bargaining Unit on behalf of SEIU LOCAL 1107; MILES RODELA, as a member of LOCAL 1107, the LOCAL 1107 Executive Board, and Vice President of the Las Vegas Convention and Visitor Authority Supervisory Collective Bargaining Unit and on behalf of SEIU LOCAL 1107; KARLA NOLAN, as a member of LOCAL 1107, and Steward of the Las Vegas Convention and Visitor Authority Non-Supervisory Collective Bargaining Unit, and on behalf of SEIU LOCAL 1107; LOCAL 1107, a non-profit cooperative corporation,

Plaintiff,

vs.

SERVICE EMPLOYEES INTERNATIONAL UNION, a nonprofit cooperative corporation; LUISA BLUE, in her official capacity as trustee; MARY K. HENRY, in her official capacity as Union President; EXECUTIVE BOARD OF THE NEVADA SERVICE EMPLOYEES UNION, in official capacity; STEVE URY, individually; DOES; and ROE CORPORATIONS 1-20, inclusive,

Defendants.

CASE NO.: 2:17-cv-01340-APG-NJK

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO AMEND**

COME NOW Plaintiffs, by and through their attorney, MICHAEL J. MCAVOYAMAYA, ESQ., and hereby submit *Plaintiffs' Reply in Support of Motion to Amend Complaint.*

Dated this 28th day of September, 2017.

/s/ Michael J. Mcavaoyamaya

MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. ARGUMENT

Defense counsel and proposed Defendant Glenn Rothner's Opposition to Plaintiffs' Motion to Amend Plaintiffs' First Amended Complaint is a long-winded sob story about how he and his client will be supremely prejudiced when their fraud, conspiracy, extortion, and self-dealing comes to light in this case. The fact is that the legal standard for amending complaints is liberal, and "leave to amend 'shall be freely given when justice so requires;' this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (U.S. Dec. 3, 1962). "In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'" *Id.* The district court has the discretion to grant or deny a motion to amend, however, the court must heed the mandate in FRCP 15 that leave to amend be freely given. *Liberty Mut. Ins. Co. v. Hurricane Logistics Co.*, 216 F.R.D. 14, 16, 2003 U.S. Dist. LEXIS 10231, *4 (D.D.C. June 19, 2003).

Because of this liberal standard, this Court should grant Plaintiffs' Motion to Amend and if these claims turn out to be frivolous, Defendants can move for summary judgment. As for the discovery deadlines, Plaintiffs will move to stay or in the alternative extend discovery deadlines shortly. Rothner's standing argument is similarly meritless, as Plaintiffs are members of Local 1107 and may assert the rights of the local union to which they pay dues to similar to a derivative suit. *See Phillips v. Osborne*, 403 F.2d 826, 831 (9th Cir. 1968).

In any event, Plaintiffs' Complaint is properly plead with sufficient specificity to survive summary jurdment. Plaintiff's last minute filing of the Amended Complaint was not

in any way a dilatory tactic, but rather an effort to preserve these issues, which were discovered shortly before the deadline to Amend. To alleviate any concern about the credibility of the new claims, Plaintiffs will summarize some of the conduct and supporting evidence used to support these allegations.

**A. <u>THE RACKET</u>**

SEIU is well known for their use of extortion and malicious defamatory tactics to enforce their will on employees, employers and politicians. A prime example of these tactics was unearthed in *SEIU, Local 5 v. Prof'l Janitorial Serv. of Houston [“PJS”]*, 415 S.W.3d 387, 390, 2013 Tex. App. LEXIS 11701, *1. In *PJS*, the plaintiff alleged that SEIU Texas engaged in malicious organizing tactics including making false, defamatory statements about PJS to its employees and customers 2007 and 2013:

> PJS became the target of the union's "Justice for Janitors" campaign. PJS alleges that, as a result of its refusal to agree for its employees to be represented by the union outside of a secret ballot election sanctioned by the National Labor Relations Board, the union began publishing defamatory statements about PJS to its customers, tenants of buildings cleaned by PJS, and other third parties. The union published its statements about PJS on the union's website and in flyers, handbills, letters, reports, emails, newsletters, and speeches. Most of the union's statements accused PJS of violating wage-and-hour and other labor laws. The union's admitted goal in publishing these accusations to PJS's customers and others was to cause PJS to lose business to union contractors.

*Id.* at *1-2.

A Texas jury found that SEIU Texas had targeted PJS with malicious intent to collapse its business by defaming PJS to its employees, customers, and partners, causing $5.3 million dollars in damages, plus over $2 million in prejudgment interest. *See* Houston Chronicle Article, attached as **Exhibit “1.”** SEIU Texas subsequently filed for bankruptcy in federal court in Corpus Christi, Texas, and SEIU International disputed liability. *Id.* So why is SEIU Texas’s illegal conduct in Texas related to the case at bar? Because the SEIU IEB was laundering millions of dollars through Local 1107 to fund the illegal conduct in Texas.

In 2004, Defendant Stern appointed an operative from SEIU Intl., Defendant Jane McAlevey, to be Executive Director of Local 1107. *See* HP Article "Bidding Adieu to SEIU: Lessons for Young Labor Organizers?," attached as **Exhibit "2,"** at 4; *see also* Local 1107 Fin. Stat. 2004, attached as **Exhibit "3,"** at 17. As Executive Director, McAlevey had access to Local 1107's financial accounts. The year after McAlevey was appointed to be Executive Director of Local 1107, $43,529.00 was diverted from Local 1107 to Texas. *See* Local 1107 Fin. Stat. 2005, attached as **Exhibit "4,"** at 18-23.

In 2006, the SEIU IEB sent Local 1107 $1,139,786.00 in subsidies for the membership. *See* Local 1107 Fin. Stat. 2006, attached as **Exhibit "5,"** at 23. That year, $53,368.00 was diverted to Texas out of Local 1107's coffers. *Id.* at 24-33. Numerous other payments relevant to this action were made from Local 1107's coffers including $32,171.00 to Chicago Press Corp for "**Unite to Win** mailers," and $190,019.00 to numerous entities in California. That year a reputable California law firm, Weinberg Roger & Rosenfeld ("WRR"), was reported as "representing" Local 1107 receiving $80,459.00. *Id.* at 24. Plaintiffs could not find any cases involving WRR representing Local 1107 during this time. WRR was, however, representing the SEIU in California against a members' challenge of a trusteeship over SEIU-UHW. Rothner was also attorney of record. *See Smith v. SEIU United Healthcare Workers W.*, 2006 U.S. Dist. LEXIS 52606, *2; *see also Nat'l Union of Healthcare Workers v. Kaiser Found. Health Plan, Inc.*, 13 F. Supp. 3d 1044, 1046 2014 WL 457670.

In 2007, the SEIU IEB sent Local 1107 $465,187.00 in subsidies and $741,340.00 in "structural relief" funds. *See* Local 1107 Fin. Stat. 2007, attached as **Exhibit "6,"** at 27. That year, $127,483.00 was diverted from Local 1107's coffers to Texas. *Id.* at 28-38. Fiscal year 2007 was also the first year defense counsel Rothner began receiving money from Local 1107. *Id.* In 2006 and 2007, Defendant McAlevey campaigned to unseat longtime Local 1107 Incumbent President Vicky Hedderman. Defendant McAlevey lost the unusually

contentious election for Local 1107 President in 2007. Bitter from the loss, McAlevey began aggressively disrupting meetings of the Local 1107 Executive Board, which eventually culminated in President Hedderman filing charges against McAlevey with the Department of Labor ("DoL") for attempting to rig the election. *See* DoL Order 2007 Election, attached as **Exhibit "7,"** at 1. The DoL found that Stern and McAlevey's "Members **United to Win** slate of candidates used union funds to promote certain candidates," accepted money from SEIU Local 1199 WV KY OH and from employers to fund her "Members **United to Win** slate of candidates," and was permitted to use the "**St. Rose Siena campus**" for campaigning in each violations of LMRDA 401(g). *Id.* at 1-3 (emphasis added.) Essentially, McAlevey had misappropriated union funds, and made back alley deals with one of the union's employers to gain a competitive advantage in the Local 1107 election. *Id.* The money she received from Local 1199 was authorized by SEIU IEB VP Dave Regan, the President of Local 1199 OH. *See* 1199 OH Fin. Stat. 2007, attached as **Exhibit "8,"** at 1.

Defendant Stern subsequently sent a representative down to Local 1107 to negotiate President Hedderman's resignation, rather than McAlevey's resignation. *See* LV Sun article "Toxic feud at SEIU's top ends with resignations," attached as **Exhibit "9,"** 1-2. Hedderman refused to resign unless McAlevey resigned as well, and both officials resigned in 2008. *Id.* In 2008, the DoL monitored a special election and the SEIU IEB's candidate, Defendant Eleazar "Al" Martinez, won. *See* Local 1107 Fin. Stat. 2008, attached as **Exhibit "10,"** at 1. With Martinez at the helm, Local 1107 continued to receive millions of dollars in subsidies, as reflected in Plaintiff's complaint, and hundreds of thousands of dollars were diverted from Local 1107's coffers to TX during the defamation campaign, CA during the SEIU-UHW trusteeship, and elsewhere. Local 1107 also paid one of their employers, **St. Rose Dominican Hospital**, $7,893.00 for "representational activities," the same employer who allowed McAlevey to use their campus to campaign in violation of the LMRDA. *Id.* at 29. Rothner

received $287,072.00 in compensation that year, and WRR received $13,945.00. *Id.* at 28.

This pattern continued throughout Martinez's two terms as President, and his additional compensation from the local union grew exponentially, as did expenditures in TX, CA, and elsewhere. *See* Local 1107 Fin. Stat. 2009, attached as **Exhibit "11,"** at 24. In 2009, $56,105.00 from Local 1107's coffers was diverted to Texas. *Id.* at 26-32. Rothner received $311,255.00. Local 1107 also began paying legal fees to another prominent California law firm, Bush, Gottlieb, Singer ("BGS"). *Id.* at 25. Plaintiff could not find a single case where BGS represented Local 1107. However, BGS was representing SEIU-UHW in a dispute over their purchase of several hospitals in CA. *See* BGS Demand Letter, attached as **Exhibit "12."** This dispute culminated in a RICO lawsuit against UHW. *Prime Healthcare Servs. v. Servs. Emples. Int'l Union*, 97 F. Supp. 3d 1169, 1174, 2015 U.S. Dist. LEXIS 43548, *2.

In 2010, Stern became a person of interest in a scandal involving his paying a former CA local union president, Alejandro Stephens, for allegedly performing no work. *See* CBS article "FBI Investigating Former SEIU Leader Andy Stern," attached as **Exhibit "13,"** at 1. Stephens's local union had been merged with several others to create "mega local" SEIU Local 6434. *Id. see also* Stern Letter of Appointment RE: Freeman, attached as **Exhibit "14,"** at 1. At the same time, the DoL and FBI were investigating Stern's handpicked appointees to run Local 6434, Tyrone Freeman and Amanda Figueroa, for embezzlement of union funds and fraud. *See* **Ex. "13."** Figueroa was removed as Sec. Treas. of Local 6434 in 2009, and Freeman was removed, indicted and convicted of numerous counts of embezzlement and mail fraud. *United States v. Freeman*, 585 Fed. Appx. 516, 517, 2014 U.S. App. LEXIS 20550, *2; *see also* Local 6434 Fin. Stat. 2009, attached as **Exhibit "15,"** at 1. Interestingly, despite being removed from office for being complicit of Freeman's embezzlement of $600,000.00 of Local 6434's money, the trustee over Local 6434, John Ronches, and subsequent President of Local 6434, Lephonza Butler, kept Figueroa on the payroll as an employee. *See* **Ex. 15,** at 16.

In 2010, Defendant Henry took over as SEIU President, and the funneling of money from Local 1107 to Texas, California and other states continued. *See* Local 1107 Fin. Stat. 2010, attached as **Exhibit "16,"** at 25. Local 1107 received a "reimbursement" of $65,493.00 from SEIU-UHW, which was never reported as being paid to UHW. *Id.* The appointed trustees over UHW were Eliseo Medina and Dave Regan. *See* UHW Trusteeship Order, attached as **Exhibit "17,"** at 1. Regan was the same guy from 1199 who used his local union's dues money to fund Stern and McAlevey's Unite to Win candidates. *See* **Ex. 7,** at 1-2. Rothner received $447,103.00. *See* **Ex. "16,"** at 25. BGS received $67,777.00 in legal fees in 2010. *Id.* at 26. Martinez donated $5,000.00 to his own founded charity, Nevadans for Nevada. *Id.* at 30. There were $95,877.00 in payments to Texas, including $9,312.00 to "Alta Bayside" apartments in Corpus Christi, Texas, where SEIU Texas filed bankruptcy. *Id.*

In 2011, the SEIU IEB sent Local 1107 $859,104.00 in subsidies. *See* Local 1107 Fin. Stat.s 2011, attached as **Exhibit "18,"** at 25. That year $168,483.00 was spent in Texas, including $7,813.00 to the Camden South Bay apartments in Corpus Christi. *Id.* at 27-31. BGS received $112,964.00 in legal fees, and Rothner received $304,059.00 in legal fees. *Id.* at 26-27. Additionally, significant amounts of Local 1107 money was sent to CA, GA and AZ, including a whopping $61,000.00 to Mi Famillia Vota in Arizona, and a $10,000.00 donation to Martinez's nonprofit, Nevadans for Nevada. *Id.* Local 1107 President Al Martinez was also appointed by Henry to a position on the SEIU IEB that year. *See* SEIU HQ Fin. Stat. 2011, attached as **Exhibit "19,"** at 19. Martinez gave himself a generous $34,599.00 in compensation from Local 1107 in addition to his county salary that year. *See* **Ex. "18,"** at 17. In 2012, the same trend occurs: $771,549.00 in subsidies from SEIU, $74,025.00 in legal fees to BGS, $356,191.00 to Rothner, $130,445.00 was spent in Texas, and significant payments went to CA, GA, DC, AZ etc. *See* Local 1107 Fin. Stat. 2012, attached as **Exhibit "20,"** at 26-31. In 2012, Martinez ran on Henry's slate of IEB candidates, winning an elected term as

IEB member. *See* SEIU HQ Fin. Stat.s 2012, attached as **Exhibit "21,"** at 19.

In 2013, Martinez lost the Local 1107 election to former Local 1107 President Martin Bassick. *See* Local 1107 Fin. Stat. 2013, attached as **Exhibit "22,"** at 1. Bassick had no connections to the SEIU IEB. *Id.* at 25. SEIU sent Local 1107 $39,793.00 in reimbursements, and SEIU-UHW sent Local 1107 $12,799.00 in reimbursements. *Id.* at 25. As soon as the SEIU IEB member, Martinez, was no longer in charge, the subsidies to Local 1107 ceased, financially compromising the local union with too much debt and not enough money to cover both debt payments and the additional staff that was being paid by subsidy money. *Id.* As such, the political and representational activities at Local 1107 began to cease, compromising Bassick's effectiveness as a union leader. Rothner and BSB also stopped representing Local 1107 in 2013, after the IEB no longer had control, and the payments going to other states began to stop that year well. *Id.* at 26.

A few months after the 2013 election, on or about August 2013, SEIU President Henry made a personal visit to Local 1107. *See* Mancini Declaration, attached as **Exhibit "23,"** at 1. After this visit, President Henry sent Defendant Marry Grillo and Defendant Steve Ury to assist Local 1107. *See* Grillo 1107 Emails, attached as **Exhibit "24."** Grillo is an SEIU staff employee. *See* SEIU HQ Fin. Stat. 2013, attached as **Exhibit "25,"** at 41. It would appear, however, that Grillo's appointment to a position at Local 1107 was off the books, as she does not appear on any of Local 1107's Statements, despite attending board meetings and appointing SEIU employees, Brian Shepherd and Grace Vegara, to assist in running Local 1107. *Id.* at 65; *see also* **Ex. "23,"** at 2; *see also* Grillo Emails, attached as **Exhibit "24."**

Interestingly, Defendants Ury and Grillo have a direct connection to SEIU Texas when the illegal defamatory conduct against PJS was going on. Ury was appointed President of SEIU Texas in 2012, and in 2013 Grillo was appointed SEIU Texas's Sec. Treas. by Henry. *See* SEIU Local 5 Texas Fin. Stat. 2012, attached as **Exhibit "26,"** at 1; *see also* SEIU Texas

Fin. Stat. 2013, attached as **Exhibit "27,"** at 15. In 2014, Martin Bassick initiated civil and DoL complaints against former Local 1107 President and IEB member Al Martinez for misappropriation of Local 1107's funds. Martinez's case is currently pending trial, Case Number A-14-710725-C.

In 2015, former Local 1107 President Bassick submitted his letter of resignation stating that "[m]y reason for resigning is due to an unhealthy and often toxic work environment." *See* Article Review Journal Article "SEIU president resigns in Vegas, cites 'toxic environment,'" attached as **Exhibit "28,"** at 1; *see also* Local 1107 Fin. Stat. 2015, attached as **Exhibit "29,"** at 1; *see also* **Ex. "23,"** at 2. The entire staff that came in with Bassick resigned their posts at the union as well, leaving Local 1107 with almost no administrative staff. *See* Review Journal Article "Fight within SEIU Local 1107 shows no sign of slowing down," attached as **Exhibit "30,"** at 3. Because of the lack of staff, Grillo, Shepherd and Ury began assisting in Local 1107's operations. *See* **Ex. 23,** at 1; *see also* **Ex. 24.** In 2015, with Grillo assisting in daily operation of the union, Local 1107 received $150,000.00 in subsidies from the SEIU IEB. *See* **Ex. "29,"** at 24. Expenditures from Local 1107 to Texas were $77,038.00. *Id.* 25-31.

The PJS case revealed some rather disturbing revelations. For example, a memo dated February of 2005, right around when money started flowing from Local 1107 to Texas, which outlined "Leverage Highlights." *See* PJS Salting Memo, 2/20/2005, attached as **Exhibit "31,"** at 1. In the memo, these officers talk about the various ways to take down an uncooperative employer. One such strategy is "Salting: . . . Planting a salt [employee] in a PJS building may allow us the chance to obtain additional information regarding PJS' commercial work," which seems mighty similar to SEIU's appointments of McAlevey and Grillo at Local 1107. *Id.* Emails and memos from SEIU representative Bill Regan and others reference funding the operations through subsidies from SEIU, collapsing PJS's business by coercing its business

partners to divest from the company, and recruiting PJS's employees for frivolous lawsuits. *See generally* PJS Emails and Memos, attached as **Exhibit "32."**

Mancini took over as full-time Local 1107 President on November 1, 2015. One of Mancini's first decisions as President was to bar Grillo's SEIU staff, Grace Vegara and Brian Shepherd from further involvement in Local 1107's operations, due to concerns they were "pursuing self-serving interests." *See* **Ex. "23,"** at 1. Mancini won the 2016 election and took office on July 1, 2016 for her first elected term. One of Mancini's first priorities as President was to address Local 1107's financial problems, including the renegotiation of Defendant Michael Urban's contract with Local 1107. *Id.* at 1.

A month later, Mancini departed to Hawaii for a vacation she had scheduled over a year prior. *See* **Ex. "23,"** at 2. While she was on vacation, the county member who ran with her as EVP, Sharon Kisling, at the direction of Grillo and Ury, called a special meeting of the executive board to discuss charges against Mancini, whom she just finished running for office with in June 2016. *See* **Ex. "24."** Kisling then contacted Grillo, Ury, and Urban to request that Urban, whose contract with the union was doubt because of Mancini, put together a memo supporting charges against Mancini. *Id.* Despite objections about conflicts of interest by numerous Local 1107 Executive Board members, Urban accepted the request, which he was paid for, and put together a memorandum with several hundred pages of exhibits in support of charges against newly and duly elected President Mancini. *See* Urban Memorandum, 10/26/2016, attached as **Exhibit "34,"** at 1. This self-serving memo by Urban became the basis for the charges against Mancini, and Grillo personally ensured that Henry asserted original jurisdiction over the charges. *See* Grillo Email RE: Gayton Charges, attached as **Exhibit "35."** Urban is still representing Local 1107.

In sum, the SEIU IEB, from 2004 to present, ensured that Local 1107 was controlled by an agent of the SEIU IEB, starting with the appointment of McAlevey as Executive

Director. McAlevey was forced to resign because she misappropriated union funds in an attempt to rig the 2007 election. To ensure Local 1107 would not fall into the hands of an unfriendly party, Stern sent an agent of the SEIU IEB to negotiate the duly elected President Hedderman's resignation, paving the way for the IEB's good ol boy, Al Martinez. Martinez continued to misappropriate Local 1107 funds and permit the IEB to funnel money through Local 1107 to fund illegal operations in Texas and to fund the trusteeship in California, which Martinez did in exchange for SEIU's blind eye to his personal use the local's funds, including receiving a double dipping salary from Local 1107 while being paid by the county, and donations to his personal nonprofit. Martinez was ousted in 2013 and is subsequently sued for misappropriation of union funds. Two months after the IEB's guy is ousted at Local 1107, Henry visited Local 1107, and appointed Local Texas's appointed Secretary Treasurer, Mary Grillo, to monitor Local 1107, and Local 1107's money continued to flow to Texas to fund the illegal defamation campaign against PJS. Literally every single time the IEB has placed their people in leadership positions at Local 1107, those individuals commit fraud and misappropriation of union funds, and conspiracy continues today.

There are other examples of SEIU's scheme as well. One such example is Local 6434, led by Laphonza Butler, after Freeman was removed for embezzling $600,000.00 in member dues money paid for his legal defense by Mayer Brown LLP (15th largest law firm in US) from Local 6434's coffers, in addition to keeping Figueroa on the payroll. *Freeman*, 585 Fed. Appx. at 516; *See* Local 6434 Fin. Stat.s 2008, attached as **Exhibit "36,"** at 67; *see also* **Ex. "15,"** at 51; *see also* Local 6434 Fin. Stat.s 2010, attached as **Exhibit "37,"** at 44. Butler later became the Henry appointed President of Local 2015, and one year later was appointed as emergency trusteeship hearing officer over Local HCMI. *See* Local 2015 Fin. Stat. 2015, attached as **Exhibit "38,"** at 1; *see also* Local HCMI Notice of Trusteeship Hearing, attached as **Exhibit "39,"** at 1. Local 2015 is the same union Defendant April Verrett hails from, and

she was also appointed by Henry to be Local 2015's EVP, received a $40,000.00 raise, and was then appointed as hearing officer in the present case. Verrett, in concert with Rothner, denied Local 1107, his client, due process by denying them the right to counsel, right to present evidence and right to call and cross-examine witnesses as guaranteed by the SEIU Constitution and the LMRDA.

Another example is an email from Bill Regan, the same person who directed illegal operations in Texas, which lists proposed methods of taking over SEIU-UHW. These included "imploding" the local union, "trusteeship," and funding candidates for elections, all three methods successfully used against Local 1107 to undermine the democratic process Local 1107 in SEIU's favor. *See* Bill Regan Email RE: Implosion, attached as **Exhibit "40,"** at 1.

All the same players are involved in SEIU's schemes and whenever they get busted, SEIU plays dumb, blames local union bad actors and pays for their legal defense so they don't talk to authorities. This is only a fraction of the evidence Plaintiffs' have uncovered, which support the new allegations, and more will be revealed with additional filings, discovery, and investigation into this case. Any lack of specificity in the Second Amended Complaint was due to Plaintiffs discovering this fraud only a couple days before the deadline to amend. Plaintiffs will be moving to extend all discovery deadlines, including the deadline to amend, as this case will take much longer than originally anticipated. Plaintiffs respectfully request this Court grant their Motion to Amend, and if, after discovery, Plaintiffs have not presented sufficient evidence for some of those claims, Defendants can move for summary judgment.

//

//

//

//

## II. CONCLUSION

Based on the foregoing, Plaintiffs respectfully requests that this Court enter an Order allowing Plaintiffs to amend their Complaint to add Defendants, and to add the causes of action against Defendant.

Dated this 28th day of September, 2017.

/s/ Michael J. Mcavoyamaya

MICHAEL MCAVOYAMAYA, ESQ.
Nevada Bar No.: 014082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of June, 2017, the undersigned served the foregoing REPLY IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT on all counsel herein by causing a true copy thereof to be filed with the Clerk of Court using the CM/ECF system, which was served via electronic transmission by the Clerk of Court pursuant to local order.

CHRISTENSEN JAMES & MARTIN
EVAN L. JAMES, ESQ. (7760)
KEVIN B. ARCHIBALD, ESQ. (13817)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Facsimile: (702) 255-0871
Email: elj@cjmlv.com, kba@cjmlv.com
Attorneys for Defendants

ROTHNER, SEGALL & GREENSTONE
GLENN ROTHER (PRO HAC VICE)
JONATHAN COHEN (10551)
510 South Marengo Avenue
Pasadena, CA 91101-3115
Tel: (626) 796-7555
Facsimile: (626) 577-0214
Email: grothner@rsglabor.com, jcohen@rsglabor.com
Attorneys for Defendants

Dated this 28th day of September, 2017.

/s/ Michael J. Mcavoyamaya

______________________________

MICHAEL MCAVOYAMAYA, ESQ.
Nevada Bar No.: 014082
4539 Paseo Del Ray
Las Vegas, NV, 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*