MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

*** * * ***

RAYMOND GARCIA, as a member,

Plaintiff,

vs.

SERVICE EMPLOYEES INT'L UNION ("SEIU"), a nonprofit cooperative corporation;

Defendants.

CASE NO.: 2:17-cv-01340-APG-NJK

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ENDING THE TRUSTEESHIP AND REINSTATING PLAINTIFF MANCINI AS PRESIDENT OF Local 1107**

**(Hearing Requested)**

COME NOW, Plaintiffs, by and through their attorney of record, MICHAEL MCAVOYAMAYA, ESQ., and hereby moves this Court for a Preliminary Injunction on Order Shortening Time, pursuant to FRCP 65, granting the following relief for Plaintiffs against Defendants, as well as their officers, agents, servants and employees, and all persons in active concert or participation with them:

- Ending the trusteeship, and enjoining and restraining Defendants from further directing, managing, and controlling the affairs of L1107, or interfering with L1107's right of self-governance, and for an order mandating that the trustee immediately restore all property, rights, powers and control of L1107 to the Board.
- Enjoining the discipline imposed on Plaintiff Cherie Mancini and reinstating her to her position as L1107 President.

This motion is made and based upon the complaint on file herein, the memorandum of points and authorities submitted herewith, and the affidavits and exhibits attached hereto.

Dated this 8th day of November, 2018.

/s/ Michael J. Mcavaoyamaya

MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Michael.mcavoyamaya@gmail.com
*Attorney for Plaintiffs*

**ORDER SHORTENING TIME**

Based on the above Declaration of Counsel, and finding that good cause exists to shorten the time of the hearing of the above Motion,

IT IS HEREBY ORDERED, that the hearing on *Plaintiffs' Application for Temporary Restraining Order and Motion for Preliminary and Permanent Injunction* be shortened and scheduled for hearing before the above-entitled Court on the ___ day of August 2017, at the hour of ___ a.m. of said day, or as soon thereafter as counsel may be heard.

DATED this ___, day of August, 2017.

______________________________________
DISTRICT COURT JUDGE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. SUMMARY OF FACTS AND EVIDENCE.

As this Court is aware, Plaintiffs previously filed two Motions for Preliminary Injunction in 2017, which were both denied because Plaintiffs did not meet the clear and convincing evidence standard to overcome the presumption of validity for this trusteeship. *See* Hearing Transcript, attached as **Ex. 1,** at 1. The presumption is now expired, and there is clear and convincing evidence that Defendants imposed this trusteeship in violation of federal labor law in bad faith.

### A. Despite Conflict On The L1107 EBd L1107 Was Governing Itself.

During the period between November 2015 when Mancini took over as L1107 President, and April 26, 2017, all but one L1107 Executive Board ("EBd") meeting had a quorum and all or substantially all business was conducted. This Court can easily confirm this fact by comparing the meeting agenda with the minutes from the L1107 EBd meetings. *See generally* Agendas and Minutes, **Ex."2;"** *see also* Grillo Deposition, **Ex."3,"** at 50:1-51:1-22: 52:1-53:1-15; 71:9-78:1-25; 81:7-82:1-7; 89:23-92:1-25; 94:13-97:1-21; 151:6-156:1-17; 157:9-159:1-15; 194:1-197:1-25.[1] Only the August 31, 2016 L1107 EBd meeting was intentionally denied a quorum by the Clark County ("CC") and UMC officers causing disruptions at L1107. *Id.* This further supported by numerous reports from SEIU Int'l Representative ("IR") Mary Grillo, who reported to SEIU Int'l on L1107. *See* Grillo Reports, **Ex."4,"** at SEIU12314 ("The Board did have a quorum…[at the] December meeting and was able to pass a budget"); SEIU5468 ("The [EBd] met that evening. It went relatively smoothly. Cherie is in the process of filling the vacant Board seats."); SEIU6465 ("There was a good turnout for the meeting last night, 28/37 showed up"); SEIU6466 ("the meeting was reasonably calm"); SEIU7517 ("The executive board meeting was well attended…most business had been concluded.").

Under the "Serious Breakdown in Internal Union Governance and Democratic Procedures" section of Internal Needs ("IN") Hearing Officer Carol Nieters' report, Nieters conclude that "[t]he hearing record indicates that Local 1107's Executive Board meetings regularly deteriorate into

[1] Plaintiffs missed the bates numbers for the December 2015, and February, March and April 2017 minutes when requesting a Declaration of good faith. Due to urgency, Plaintiffs will file this motion and supplement the exhibit once the declaration is received.

chaotic, bitter confrontations; indeed, name calling and shouting matches appear to be commonplace," and that EBd officers were intentionally trying to deny the L1107 EBd quorums. *See* IN/IC Reports, **Ex. "5,"** at SEIU7617. According to Nieters, "[t]his pattern not only hobbles the governance of the Local but also deprives Local 1107 members of meaningful participation in the business of their union." *Id.* Nieters based this conclusion on the testimony of Brenda Marzan, Sheila Grain, Pat Greaux and Cherie Mancini. *Id.* at SEIU7617-19. Nieters' conclusion was predicated on the testimony of three biased witnesses, and mischaracterizing the testimony of Mancini. Greaux, Grain, and Marzan each signed on to numerous letters both before and after the October 2016 hearings demanding that Defendants impose this trusteeship, and at times threatening to go to the media and to push drop and decertification. *See* CC/UMC Officer Letters RE: Req. Trust., **Ex."6,"** at SEIU6666-70, 6626-28, 12393-95. Marzan testified at deposition that she helped the UMCBT "with the language in the letter." *See* Marzan Depo, **Ex."7,"** at 227:5-14.

These witnesses were biased and intentionally disrupting L1107 EBd meetings at the direction of Defendants to lay the pretext for this trusteeship, and as such, their testimony was unreliable. Nieters' reliance on to Mancini's testimony also supports the fact that L1107 was still getting business done despite the intentional interruptions of the meetings by the CC and UMC officers. Nieters acknowledged that Mancini testified that at the hearing that the October 2016 EBd meeting still had a quorum despite the CC and UMC officers trying to deny the meeting a quorum. *See* **Ex. 5,** at SEIU7619. Only one meeting, "the August 31, 2016 Meeting was not adjourned by motion…and collapsed due to" conflict. *Id.* Thus, the only evidence of a breakdown of democratic procedures was a single L1107 EBd meeting disbanding before business was conducted. Nieters' false conclusion was also parroted by Emergency Trusteeship Hearing Officer April Verrett who concluded that "serious breakdowns in union governance and basic democratic procedures in the local, resulting in the local's inability to conduct even routine union business, such as completing local Executive Board meetings." *See* TH Report, **Ex."8,"** at SEIU11977.

Verrett based this conclusion on Marzan's testimony, and the "Minutes of Local 1107 Executive Board meetings." *Id.* at SEIU11966. Plaintiffs reviewed Marzan's cited testimony in the Verrett report and contrasted it to the minutes of L1107 EBd meetings with Verrett at her

deposition. *See* Verrett Depo, **Ex.“9,”** at 134:3-164:1-16. Though defense counsel would not allow Verrett to testify whether Marzan’s testimony that “'[h]alf the time we couldn't even . . . approve the agenda to move forward [with meetings]” was truthful, Verrett did testify that the agenda was approved at every meeting, and only one, the August 31st meeting, disbanded prior to the business on the agenda being conducted. *Id.* at 143:20-144:1- 23. The conclusion that L1107 was hobbled by dysfunction and could not get business done was objectively false.

**B. <u>L1107 Met All Collective Bargaining Obligations.</u>**

Nieters’ IN Report next concluded that “[t]he leadership conflicts in the Local are at the root of a pattern of instability and uncertainty that interferes with Local 1107's ability to carry out its most basic collective bargaining responsibilities properly and effectively.” *See* **Ex. 5,** at SEIU7619. Nieters based this conclusion entirely on “President Mancini's supervision of bargaining at UMC.” *Id.* Nieters concluded that “[t]he testimony showed that in July 2016, when Local 1107 members working at UMC were preparing to ratify the renewal of their collective bargaining agreement, President Mancini, who had not actively participated in the months-long bargaining process in spite of her constitutional obligation to do so, nonetheless abruptly and unilaterally canceled the ratification vote,” posting the cancelation on a public website without consulting the UMCBT “damaging their reputations” and delaying implementation of raises and bonuses for the UMC membership. *Id.* at SEIU7619-20. Every single part of Nieters conclusion was false, and contradicted by the evidence, which is why Nieters based this conclusion entirely on the testimony of the biased UMCBT officers. *Id.*

First, Mancini had repeatedly attempted to keep apprised of the UMC bargaining. The UMC bargaining began in late June or early July 2016, as the June 2016 L1107 EBd minutes indicate that the UMCBT was angry that [redacted] *See* **Ex. 2,** at 5952-53; *see also* SB241, **Ex. 10,** at 3. Initially, Mancini appointed the UMCBT’s requested L1107 organizer as chief spokesperson for L1107 at the bargaining sessions. *See* Angel Emails, **Ex.“11,”** at SEIU907, 6619, 3-4. The L1107 Constitution permits the L1107

President to designate a chief spokesperson for the bargaining sessions. *See* L1107 Const., **Ex.“12,”** at SEIU968. When Mancini discovered that Angel was not keeping minutes or a bargaining book, she reassigned Angel and appointed L1107 organizer Lanita Troyano to be the chief spokesperson. *See* **Ex. 11,** at 3-4; *see also* UMC bargaining emails, **Ex.“13,”** at SEIU775. Greaux refused to permit Lanita to attend the bargaining sessions. Mancini then demanded a copy of the UMC tentative agreement. *See* **Ex. 11,** at 3-4; *see also* **Ex. 13,** at SEIU905. Greaux refused to provide information on what had been bargained. *Id.* Mancini then attended the UMC bargaining session unannounced, and Greaux again refused to give information on what had been bargained.

Greaux initially scheduled the UMC ratification vote without consulting Mancini or the L1107 staff. *See* **Ex. 13,** SEIU895-904. Mancini informed Greaux that the ratification vote needed to be supervised by L1107, and scheduled the vote for July 28, 2016. *Id.* at SEIU899. As soon as L1107 sent out the notification to the UMC membership of the ratification vote, the UMC members began emailing the union hall complaining that they were not told what was bargained, the UMCBT was not give them copies of the contract, and that wages and benefits were lower. *See* UMC Transparency Emails, attached as **Ex. “14,”** at 1-29. Mancini then personally went to UMC to get the tentative agreement, and when Mancini saw that the UMCBT had isolated the UMC membership from L1107, and gave up valuable concessions in members’ wages and benefits to keep their union bank time leave, she canceled the ratification vote. *Id. see also* UMC Contract, **Ex. 15,** at SEIU1806-08. Mancini ultimately allowed the ratification vote to proceed due to pressure from Defendants, and a misleading member petition collected by the UMC officers. *See* **Ex. 5,** at SEIU7620l *see also* **Ex. 6,** at SEIU6670. After Mancini canceled the UMC ratification vote, the UMCBT sent a letter to Defendants requesting trusteeship. *See* **Ex. 6,** at SEIU6666-70. UMCBT member Michael Collins gave an official statement corroborating these facts. *See* Collins Statement, **Ex. 16,** at SEIU3993. The UMC nursing unit felt the brunt of the concession that UMCBT had negotiated, and collected a petition of hundreds of members requesting that they “have a separate collective bargaining agreement-from ancillary staff moving forward.” *See* UMC Nurses’ Petition, **Ex. 17,** at SEIU4002-09.[2]

[2] This petition was 32 pages long. Plaintiffs did not include all the signature pages to avoid unnecessary excessive pages.

The facts outlined above were also entirely corroborated by the testimony at the IN hearing. *See* IN Hear. Trans., **Ex."18,"** at 1. Maria Diaz, a UMC nursing member and Steward, testified that the UMCBT was not representing the UMC nurses and engaged in misconduct during the bargaining. *Id.* at 8:1-11:1-10. UMC and CC officers that asked for trusteeship on July 31st testified against Mancini and/or in favor of trusteeship at the hearing: Sheila Grain (*Id.* at 1:20-14:1-19); Pat Greaux (*Id.* at 21:23-23:1-22); John Gutierrez (*Id.* at 19:12-21:1-21); Gwen Stevens (*Id.* at 23:23-25:1-26); Theresa McGowan (*Id.* at 25:27-27:1-4); Diane Gargano (*id.* at 27:5-14); Elizabeth Bolhouse (*Id.* at 27:15-28:1-17); Brenda Marzan (*Id.* at 35:11-37:1-24); and Clara Thomas. *Id.* at 37:25-40:1-21; *see also* **Ex. 6.** Kisling testified that she was not in favor of trusteeship, did not think L1107 could not function, and noted that it appeared that other officers that attended the hearing were already "knowledgeable about trusteeship." 15:24-17:1-24.

The rest of the witnesses testified in favor of Mancini and against trusteeship, including Veronica Dunn-Jones, a nurse at UMC, who testified that the nursing unit at UMC was not being represented by UMCBT officers, expressed support for Mancini, and criticized the UMCBT over their lack of transparency, that the nurses were not given a copy of the contract until after Mancini cancelled the vote at their request. *Id.* at 40:22-46:1-28. Dunn-Jones ended her testimony by stating that the bargaining updates the UMCBT were putting in the UMC magazine did not inform members of what was negotiated, and that the bargaining sessions were "closed-door." *Id.* Collins testified against trusteeship and in favor of Mancini, that Mancini consistently tried to stay informed of the UMC bargaining but denied information and access by UMC Chief Steward Pat Greaux, and that Greaux and the other UMCBT members denied the UMC membership access to the contract. *Id.* at 50:21-54:1-9. Collins then testified that when the UMC CBA went before the CC Commissioner's for approval, Marzan, former L1107 President Bassick and the UMCBT members were wearing non-SEIU colors in protest of L1107. *Id.* Collins further testified that the UMC and CC officers were pushing drop and decertification campaigns at CC and UMC. *Id.* Alfredo Serrano, L1107 Trustee, testified in favor of Mancini, against trusteeship, and that UMC ratification vote cancelation was justified based reports of the UMC nurses. *Id.* at 55:14-58:1-12. The testimony at the IN and IC Hearings overwhelmingly demonstrated that L1107 was governing

itself fine despite intentional disruptions of the CC and UMC officers. The testimony also supported the overwhelming evidence that demonstrates that the CC and UMC officers were engaging in egregious misconduct that was threatening L1107. The UMC CBA had an effective date in September 2016, meaning no benefits were delayed. *See* **Ex. 15,** at SEIU1798.

### C. <u>The Grillo Reports Clearly Demonstrate That SEIU Int'l Was Concerned Over Dues Revenue, Nevada Politics, And Controlling L1107 Operations.</u>

The Grillo reports to SEIU Int'l were remarkably consistent. Defendants were concerned over three primary issues: (1) having SEIU Int'l staff run the day to day operations of L1107; (2) having L1107 allocate the majority of its resources to organizing new members to increase SEIU Int'l's dues revenue and push its political program in Nevada; and (3) after the cancelation of the ratification vote, thwarting drop and decertification campaigns at CC and UMC. In her October 12, 2015 report, Grillo noted that Bassick was going to resign, that he had been working a full time job at CC while also serving as President, and that SEIU Int'l Representatives ("IR") Brian Shepherd and Grace Vergara were running L1107's operations. *See* **Ex. 4,** at SEIU12318-20. This is further supported by an audit request from Mancini to Defendants that month because "Local 1107 was under the supervision of international staff who directed the day-to-day activities." *See* Mancini Audit Letter, **Ex. 19,** at 1-3. In her January 14, 2016 report, Grillo noted that Mancini and the L1107 EBd had requested that Vergara and Shepherd be expelled from L1107 but remained in in Nevada to run SEIU's political plan. *See* **Ex. 4,** at SEIU12314, 3579-80.

Grillo's reports also repeatedly referenced L1107's failure to allocate twenty (20) percent of its dues revenue to organizing to increase SEIU Int'l's dues revenue. *Id.* at SEIU12315, 3579-80, 6466, 7517. Grillo also repeatedly expressed concern that L1107 was focusing on "internal operation of the union" and providing services to existing members instead of organizing and growing the membership. *Id.* at SEIU12320, 12315. Grillo's reports also repeatedly discussed SEIU Int'l's political campaigns in Nevada. *Id.* at SEIU12320, 12315, 3579-80, 5514-16. After the UMC ratification, Grillo's reports began focusing on the drop and decertification campaigns in the [redacted] units. *Id.* at SEIU3577-78, 5469-70, 5512-13, 7517. Not once did Grillo indicate any specific matter demonstrating that L1107 not governing itself. Rather, the reports simply state the local was having problems governing itself without any examples, then discuss

Defendants' actual concern over organizing, politics, drop and decertification, and having SEIU Int'l officials run L1107. In her September 21, 2016 report, Grillo noted that the union was growing its membership, Mancini had a plan for the drop month, and was averaging three meetings a day. *Id.* at SEIU3577. Grillo also acknowledged the misconduct of the UMCBT [redacted]. *See* **Ex. 4,** at SEIU3577.

In her September 29th report Grillo states that EBd meeting went "smoothly," then focused on drop and decertification campaigns going on in the [redacted] units. *Id.* at 5469-70. Grillo reported that it was very important to have Mancini agree to give SEIU Int'l staff [redacted] to [redacted], and that someone needed to "assess whether the board can govern the local." *Id.* Grillo recommended that someone have "serious conversation with Cherie" to "make it clear that as President, she is responsible for making the Local function, and that we do not view it as functioning." *Id.* Not once did Grillo mention any actual breakdown in union governance.

SEIU Executive Vice President ("EVP") Neal Bisno sent Mancini a letter in October 2016 that outlined Defendants' actual concerns. *See* Bisno Concerns Letter, **Ex. 20,** at SEIU5392-97. Bisno broadly references members expressing concerns "about the ability of the local to function democratically and to protect the bargaining rights," and then moved the urgent "reported decertification threat." *Id.* Bisno had that conversation with Mancini and the CC and UMC officers Grillo recommended. *See* Bisno Call Notes, **Ex. 21,** at SEIU5387. Again, Defendants real concern was the "threat of drop/decert threat in public units," not governance. *Id.* at SEIU5387, 3567-68, 5648, 5666-68, 5520-21. Bisno also wanted Mancini to agree to allow SEIU Int'l personnel run L1107's organizing campaigns, which Mancini expressed concern over her prior bad experience with "Grace [Vergara] and Brian [Shepherd]." *Id.* at SEIU5388-89.

No evidence better exemplifies Defendants bad faith motive for imposing this trusteeship than the December 14, 2016, L1107 EBd meeting minutes. *See* **Ex. 2,** at SEIU6144. At this meeting [redacted]

[redacted] When questioned about this comment, both Henry and Grillo testified that SEIU Int'l was concerned over [redacted]. *See* Henry Deposition, **Ex. 22,** at 209:9-22; **Ex. 3,** at 198:1-10. When questioned about her presentation to the EBd at the December 2016 meeting, Grillo testified that while the [redacted]. *See* **Ex. 3,** at 199:1-17.

In Grillo's December 14, 2016, email report, she notes that she informed L1107 [redacted] *See* **Ex. 4,** at SEIU6466. In her last report to SEIU Int'l on January 26, 2017, Grillo discusses the decert campaigns and that [redacted] but that EBd meeting was "reasonably calm" and "most of the business had been concluded." *Id.* at SEIU7517. As indicated above, all the Grillo reports to SEIU demonstrate a singular concern, getting L1107 to focus its resources on organizing and thwarting drops to increase Defendants' dues revenue, pushing SEIU"s political program, and allowing SEIU Int'l staff run L1107. Defendants were so concerned about the projected [redacted] *See* **Ex. 2,** at SEIU6144. L1107 had quorums and conducted union business at all the L1107 EBd meetings in 2017. *See generally id.*

**D. <u>SEIU Int'l Directed The CC/UMC L1107 Officers To File Charges Against Mancini.</u>**

There are two fact witnesses that state that Defendants were working with the CC/UMC officers to secure imposition of this trusteeship. In a text message between Kisling and Mancini after they were removed from office, Mancini asked Kisling if she knew if Marzan was assisting SEIU Int'l with securing the trusteeship. *See* Mancini Text Messages, **Ex. 23,** at RG16864. Kisling responded that she knew that Marzan "was in communication with Julie and Mary Grillo from day 1 because she would always disclose daily communication with them." *Id.* Kisling also stted that

Marzan told her that Defendants were going to ask the EBd to vote for trusteeship at the April 26, 2017 EBd meeting prior to the meeting. *Id.* Kisling also told Mancini that Marzan "was telling me that Mary and Julie were telling her what charges to file and who to send stuff to at International." *Id.* at RG16865. Former L1107 President, Vicky Hedderman, attests that she was told similar things from the UMCBT officers prior to imposition of the trusteeship. *See* Hedderman Affidavit, **Ex."24,"** at 4-5. Hedderman was working for the UMC budget department in 2016. *Id.* at 1. According to Hedderman, UMC officers Greaux and Gwen Stevens "came to me and told me that they were working with SEIU International to secure a trusteeship." *Id.* at 5. The evidence disclosed in discovery overwhelmingly supports Kisling and Hedderman's accounts.

On September 1, 2016, the day after this August 2016 EBd meeting that disbanded without a quorum, Kisling sent an email to Grillo, the L1107 EBd, and L1107 counsel Michael Urban stating that Grillo recommended that Kisling bring her unfounded allegations presented to the EBd at the August EBd meeting to Urban to be investigated. *See* Urban Investigation Emails, attached as **Ex. 25,** at SEIU2502. In response, Urban states that he would only investigate "IF I am directed to do so by the EBd." *Id.* Urban also suggested that the CC and UMC officers "review the language in Articles 18-21 of the SEIU L1107 Constitution as they relate to the statements and **charges you presented**." *Id.* This is the first mention of "charges" related to the matters going on at L1107, as Clara Thomas indicates in her email response. *Id.* at SEIU2490. Urban's citation to "Articles 18-21 of the L1107 Constitution" is also worth noting. Article 19 relates to the recalling of L1107 elected officers. *See* **Ex. 12,** at SEIU973-74. Article 21 relates to the filing of charges against members and officers of L1107. *Id.* at SEIU976. Kisling responded to Urban's email asking: "[s]o how do you suggest I get that direction from the EBd as I'm just following up on Ms. Grillo's recommendation." *See* Kisling Response to Urban Investigation, attached as **Ex. 26,** at 1. The CC and UMC officers repeatedly referenced that it was Grillo that recommended the investigation, and Grillo even admitted that she told Kisling to bring the "charges" to Urban for investigation. *See* **Ex. 25,** at SEIU2490-91, 2494-95.

On September 9, 2016, just eight (8) days after Grillo recommended that Kisling take her "concerns" to Urban for an investigation, and Urban recommended that they review Article 21

with regards to Kisling's "charges," Kisling and Thomas filed formal charges against Mancini and other L1107 EBd members. *See* Charges Documents, attached as **Ex. 27,** at SEIU9333-38. On September 13, 2016, just twelve (12) days after Grillo recommended that Kisling take her "concerns" to Urban, and Urban recommended they review Article 21 with regards to Kisling's "charges," Marzan filed formal charges against Mancini. *Id.* at SEIU9339-41. On September 20, 2016, just nineteen (19) days after Grillo recommended that Kisling take her "concerns" to Urban, and Urban recommended they review Article 21 with regards to Kisling's "charges," the UMC officers that requested trusteeship on July 31st filed charges against Mancini. *Id.* at SEIU123-24. At her deposition, Marzan testified that in October of 2016, her Kisling were circulating a petition to recall Mancini pursuant to Article 19. *Id.* at SEIU2039-42; *see also* **Ex. 7,** at 106:12-107:1-23. In Grillo's September 29th report, one week after all the charges by the UMC and CC officers had been filed directly with SEIU Int'l at Grillo and Urban's direction, Grillo sent a report sent to Bisno stating that "[t]here are multiple charges that have been filed between various board members in which there has been a request for the IU to take original jurisdiction," that the L1107 EBd could not handle the charges, and SEIU Int'l should take original jurisdiction over the charges and schedule a hearing. *See* **Ex. 4,** at SEIU5468. Grillo noted, however, that there was no emergency, and that "the hearing doesn't have to take place immediately." *Id.* at SEIU5470-71.

Nieters' IC Report also demonstrates that Defendants were working with Marzan to secure imposition of this trusteeship. The IC Report states that it sustained two charges against Mancini: (1) Mancini's supposed failure to submit employment and services contracts to the L1107 EBd for approval in violation of Article 8, Section 2(C) of the L1107 Constitution; and (2) violation of Articles 7 and 16 of the L1107 Constitution and Article XVII of the SEIU Constitution because Mancini "widely disseminated unfounded, grossly disloyal, and disparaging allegations against the members of the [UMC bargaining] Committee." *See* **Ex. 5,** at SEIU7613. Nieters' report states that the first charge sustained was brought by Kisling and Thomas, and the second charge sustained was brought by Marzan. *Id.* However, Kisling and Thomas never brought any changes against Mancini for a violation of Article 8, Section 2(C) of the L1107 Constitution. *See* **Ex. 27,** at SEIU9333-38. Rather, it was Marzan that brought the charge. *Id.* at SEIU9340.

Grillo recommended the investigation by Urban, Urban, whose contract was not renewed by Mancini, suggested that Kisling and the UMC and CC officers review the Articles 19 (recalls) and 21 (charges) regarding the "charges" Kisling made against Mancini. Shortly thereafter, Kisling, Marzan and the UMCBT brought formal charges against Mancini and requested SEIU Int'l take jurisdiction. Kisling and Marzan then circulated a recall petition in accordance with Article 21. Kisling and Hedderman stated that Marzan and the UMC officers were assisting Defendants with securing this trusteeship, and that Marzan was being coached by Grillo on what charges to bring. Grillo recommended that Henry take jurisdiction over the charges right after they were filed, circumventing the L1107 EBd. Both charges against Mancini that were sustained by Nieters were from the Marzan charges. Nieters concealed this fact in her report.

**E. <u>Since Imposition Of The Trusteeship Defendants Have Focused L1107's Resources On Organizing And Politics To The Detriment Of L1107.</u>**

Since imposition of this emergency trusteeship, SEIU Int'l appointed IRs Shepherd and Vergara as co-trustees of L1107, and allocated substantially all of L1107's resources to SEIU's organizing campaigns and political plan. *See* **Ex. 22,** at 72:17-73:1-7. Immediately after the imposition of the emergency trusteeship, rather focusing on remedying the supposed governance issues at L1107, the SEIU Int'l trustees began implementing the "Together We Rise" ("TWR") organizing campaign, which was intended to "Reach Every Member [and] Sign-up Fee Payers," and to "Win" by "Turn[ing] the tide in elections." *See* TWR Campaign, attached as **Ex. 28,** at SEIU203.[3] According to the memo from Manteca, the TWR campaign is intended to sign up "3640" new members at L1107, and get 1921 members to put money in to the SEIU political action "COPE" fund. *Id.* at SEIU207. The memorandum goes on to state that L1107 agreed to launch the campaign on August 16, 2017, right after imposition of the trusteeship. *Id.* at SEIU207.

Since imposition of this trusteeship, the Defendants have focused substantially all of L1107's resources to TWR. In the March 2016 L1107 financial report, just prior to imposition of the trusteeship, L1107 was just [redacted] in debt and its organizing budget was [redacted]. *See* L1107 Financial Reports, attached as **Ex. 29,** at SEIU6322. As of August 31, 2018, L1107 is now

[3] Note, the documents in this exhibit were not produced in the discovery in this case. These documents were produced in Javier Cabrera's NLRB case.

[redacted] in debt, and its organizing budget was [redacted]. *Id.* at SEIU13235, 13237. What is more, SEIU Int'l has only recently begun the process to amend the L1107 Constitution. This trusteeship was imposed over Defendants dues revenue and political agenda, which are not a permissible basis for imposition of trusteeships. *See* 29 U.S.C. § 462. The minutes, coupled with the reports from Grillo, and SEIU Int'l communications clearly indicate that L1107 was governing itself just fine despite the conflict on the EBd.

## II. <u>LEGAL ARGUMENT.</u>

In considering a preliminary injunction, the Ninth Circuit utilizes the "sliding-scale" standard, which looks at the degree of irreparable harm and the degree of likely success on the merits. *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127 (9th Cir. 2011); *Winter v. NRDC, Inc.* 555 U.S. 7, 51, 129 S. Ct. 365, 392 (2008); *see also Klinke v. Bannister*, 2013 U.S. Dist. LEXIS 165156, *9 (D. Nev. Oct. 30, 2013). In determining there is a likely risk of irreparable harm, the instant motion "requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Id.*

### A. <u>Plaintiffs Have A Reasonable Likelihood Of Success On The Merits These Claims.</u>

Imposing a trusteeship is "an extraordinary intrusion into the affairs of a local union." *Retail Clerks Union v. Retail Clerks Int'l Asso.*, 479 F.2d 54, 55 (9th Cir. 1973). Trusteeships must be established and administered "in accordance with the constitution and bylaws of the organization" and only for the "purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization." 29 U.S.C. § 462. To prove bad faith a plaintiffs must prove an "interested or sinister motive." *See Pape v. Local 390 of Intern. Broth. of Teamsters*, 315 F. Supp. 2d 1297 (S.D. Fla. 2004); *Int'l Broth. of Teamsters v. LOCAL 810*, 19 F. 3d 786, 796 (2nd Cir. 1994). In the Ninth Circuit, "[u]nion self-preservation" in an attempt to thwart drops in membership or

decertification…is not sufficient to justify imposition of a trusteeship." *See Benda v. GRAND LODGE OF INTERN. ASS'N, ETC.*, 584 F.2d 308, 317 (9th Cir. 1978).

***1. Defendants Cannot Shelter Behind The Presumption Of Validity.***

There is a presumption of validity of a trusteeship so long as the trusteeship is administered in accordance with the Int'l constitution and "authorized or ratified after a fair hearing," which is valid for eighteen (18) months. 29 U.S.C. 464(c). If the presumption of validity expires "[a] presumption of invalidity" attaches to the trusteeship, which may "be rebutted only by clear and convincing proof" that it must continue. *Hodgson v. UMW*, 473 F.2d 118, 122 (D.C. Cir. 1972); *Ross v. Hotel Employees and Restaurant Employees*, 266 F.3d 236, n.10 (3d Cir. 2001); *Thompson v. Opeiu*, 74 F.3d 1492 (6th Cir. 1996); *Tam v. Rutledge*, 475 F. Supp. 559 (D. Haw. 1979).

On October 29, 2018, the presumption of validity of this trusteeship expired, and the presumption of invalidity attached to this trusteeship. *Id*. There is overwhelming evidence that this trusteeship was imposed in bad faith for improper purposes. Defendants cannot establish that the by clear and convincing evidence that this trusteeship must continue. Thus, this Court must enjoin this trusteeship.

***2. Defendants' Asserted A Bad Faith Emergency Situation To Justify This Trusteeship.***

"Emergency conditions" defined as the "necessity for immediate action" is a prerequisite to imposing an emergency trusteeship before a hearing can be held. *Higgins v. Harden*, 644 F.2d 1348, 1352 (9th Cir. 1981); *Retail Clerks*, 479 F.2d at 55; *Hotel & Rest. Emps. & Bartenders Int'l Union v. Rollison*, 615 F.2d 788, 792 (9th Cir. 1980).

This Court asserted that it was "somewhat in agreement" with Defendants' assertion that there was an emergency situation at L1107 but that there was not a "trigger pull" to impose this trusteeship until the Nieters' reports issued. *See* **Ex. 1,** at 40:4-13. There is an overwhelming amount of evidence in this case that demonstrates that this excuse was false, and made in bad faith. Grillo's September 29th report, when discussing SEIU Int'l taking jurisdiction over the charges noted that the hearing did not "have to take place immediately," and the main concern was for SEIU Int'l to appear attentive to the issues. *See* **Ex. 4,** at SEIU5471. Defendants did not believe there was an emergency at L1107 when the majority of the conflict supposedly supporting

this trusteeship occurred. *Id.* at SEIU5468-69. Just one day after the IN and IC hearings, Defendants discussing "how the local's EBd would break on a question like voluntary trusteeship." *See* SEIU Int'l Comm., **Ex. 30,** at SEIU13240-41. On January 30, 2017 Fitzpatrick sent Bisno an email that included a "L1107 Contingency Planning Summary." *Id.* at SEIU7552-4. The summary stated that going [redacted] *Id.* at SEIU7553. If it was an option to go to L1107's EBd on January 30th [redacted] Defendants cannot argue that there was emergency in April of 2017.

Defendants failed to attend any of the L1107 EBd meetings to request voluntary trusteeship from December 2016 to April 2017, despite clearly planning to do so as early as October 31, 2016. *See* **Ex. 3,** at SEIU3280-84, 3272-78; *see also* **Ex. 30,** at SEIU13240. Defendants did not wait to impose this trusteeship over L1107 because of the Nieters reports. *See* **Ex. 1,** at 40:9-11. Defendants waited for the reports because they knew L1107 would never vote for voluntary trusteeship while Mancini was still in office. Defendants' legal team needed time to come up with a believable excuse to remove Mancini from office to present to the L1107 EBd that their removal of L1107's "top two" officers was a [redacted] that made L1107 unable to function. *See* **Ex. 30,** at SEIU7989-10; 7996.

Bisno was the SEIU Int'l officer tasked with making "the case for voluntary, emergency trusteeship," and his presentation outline demonstrates Defendants bad faith. *Id.* at SEIU7553. On April 18, 2017, prior to the Nieters reports being issued, Bisno and other SEIU Int'l officials already knew that Nieters was going to recommend that Henry remove "Mancini and Sharon Kisling" from office for one year, and place L1107 "into an emergency trusteeship." *Id.* at SEIU7988-90. Bisno told the L1107 EBd that "[i]t is difficult to imagine how you can operate this local without the top two roles filled, and your constitution…does not provide for a clear path of governance." *Id.* Bisno then went over all the threats L1107 was facing and the resources SEIU Int'l expended in Nevada. *Id.* at SEIU7991-95. Bisno told the L1107 EBd that Mancini and Kisling's removal was a [redacted] *Id.* at SEIU7996. Bisno gave L1107

[redacted]. *Id.* at SEIU7996-98. The documents disclosed in discovery demonstrate that Defendants did not believe there was an emergency at L1107, discussed over and over options for asking the L1107 EBd to vote for voluntary trusteeship prior to April 26th, and decided not to do so in order to create an "emergency situation" they could use to threaten and coerce the L1107 EBd. There was no emergency situation and this Court's Order was predicated on misrepresentations of Defendants. As such, this Court must enjoin this trusteeship.

***3. The IN, IC, And Emergency Trusteeship Hearings Were Not Full Or Fair.***

"The LMRDA's due process guarantee includes the right to a hearing before an unbiased committee" or finder of fact. *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 342 (3d Cir. 2006); *see also Savage v. Tweedy*, 2012 U.S. Dist. LEXIS 179191, *12, 2012 WL 6618184 (D. Or. Dec. 13, 2012); *Myers v. Affiliated Property Craftsmen Local No. 44*, 667 F.2d 817, 820 (9th Cir. 1982). "[A] union tribunal may be found to be biased only when the plaintiff has offered specific allegations demonstrating 'actual bias' or a 'significant risk of actual bias,'" and prejudice. *Johnson v. Holway*, 2005 U.S. Dist. LEXIS 34787, *41, 2005 WL 3307296 (2005) *citing Wildberger v. American Fed. of Gov't Employees*, AFL-CIO, 86 F.3d 1188, 1196 (D.C. Cir. 1996). Evidence of "the existence of a predetermined outcome" violates the fair hearing requirement. *Pape v. Local 390 of Intern. Broth. of Teamsters*, 315 F. Supp. 2d 1297, 1316 (S.D. Fla. 2004); *Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004). Where there is an "overlap of investigative, prosecutorial, and adjudicatory functions" vested in a single person who is the ultimate finder of fact, due process is held to be violated. *Wildberger*, 86 F.3d at 1195.

*a. Defendants Planned To Trustee L1107 As Early As August 2016.*

The reason Defendants did not request voluntary trusteeship prior to April 26th was because they knew the L1107 EBd would not vote for trusteeship while Mancini was still President. Thus, Defendants implement an elaborate, detailed, and methodical conspiracy to

remove Mancini and trustee L1107. On August 5, 2016, Grillo sent Ury and Fitzpatrick an email that "[t]hings are breaking down in 1107 again," and that the UMC/CC officers were circulating petitions requesting trusteeship. *See* **Ex. 30,** at SEIU7661. In response to this email, Ury asks "whether there is a [redacted] angle to consider" at L1107. *Id.* This is a direct reference to the trusteeship over SEIU-UHW in 2009, which Plaintiffs argued was relevant at the October 18, 2017 hearing. *Id.*; *see also* UHW Trusteeship Docs, **Ex. 31,** at 1-4; *see also* **Ex. 1,** at 17:1-18:16. Grillo and Urban recommended the CC/UMC officers file charges against Mancini, and coached Marzan on what charges to file.

On September 2, 2016, one day after Grillo and Urban recommended that the CC/UMC officers bring charges against Mancini, Fitzpatrick noted that she had already made a recommendation to Henry about how to deal with L1107. *See* **Ex. 30,** at SEIU13239; *see also* **Ex. 1,** at 18:22-25. In this same email, Fitzpatrick discusses the trusteeship over [redacted] which Plaintiffs also argued was relevant. *Id.* One day After the IN/C hearings, Fitzpatrick wrote Henry an email stating that "it was 'hard to get a sense just from the hearing of how the local's EBd would break on a question like voluntary trusteeship." *Id.* at SEIU6584. Bisno responded that they already made a recommendation on how to deal with L1107. *Id.* at SEIU13241. On January 30, 2017, Fitzpatrick sent the contingency planning summary to Bisno, which included the option of going to [redacted]. *Id.* at SEIU7552-54. In an updated version of that document sent to Bisno the next day, Fitzpatrick added [redacted] indicating that defendants were trying determine how the L1107 EBd would break on the voluntary trusteeship question. *Id.*

Before March 31, 2017, [redacted]e. *Id.* at SEIU12310; *see also* Henry Deposition, **Ex. 22,** at 117:20-118:1-120:1-11. On On April 3, 2017, Fitzpatrick wrote Heather Conroy and email entitled "Mote Woes at SEIU Local 1107 that stated that [redacted]

[redacted] corroborating that Henry was talking with Laphonza Butler about trusteeing L1107. *See* **Ex. 30,** at SEIU13366. On April 14, 2017, Fitzpatrick wrote Henry an email on the [redacted] which told Henry to request Martin Manteca to be deputy trustee over L11107 [redacted] *Id.* at SEIU13668. [redacted] *Id.* On April 19th SEIU EVP Kathy Eddy sent Bisno an email including his outline for the April 26th EBd meeting, and noted that "[t]he only pieces missing are the final decision (covering both. charges and internal needs) and **resolution the Board would need to adopt**. That is **getting finalized by Legal**." *Id.* at SEIU7531. The outline included the conclusions and recommendations in the Nieters reports that Henry would remove Mancini and Kisling from office, and present their simultaneous removal as a [redacted] making L1107 impossible to govern unless the EBd voted for trusteeship. *Id.* at SEIU7988-90.

On April 25, 2017, Eddy sent another email outlining the plan for Wednesday, April 26th. *Id.* at SEIU3754-56. [redacted]

[redacted] *Id.* at SEIU7732.

Defendants executed this plan with remarkable precision. At 3:19 pm EST, 12:19 pm PDT, Henry sent Mancini an email entitled "Decision of the Int'l Union President," which included the Nieters' reports, and Henry's letter to L1107. *See* Henry Email RE: Decision, **Ex. 32,** at SEIU9364. Henry's letter announced Henry's final ruling on the charges and but did not address the recommendation on internal needs. *Id.* at SEIU7586-87. In addition, the letter appointed Ury and Eddy as Monitors to L1107. *Id.* at SEIU7587. Henry's letter announced that she had sent Bisno and Fitzpatrick to L1107 to attend the EBd meeting to discuss the future of the local, not trusteeship. *Id.* At the meeting, Bisno made the case for voluntary trusteeship. However, before the L1107 EBd could actually hold a vote on voluntary trusteeship, it the issue needed to be on the agenda for the meeting. The L1107 Constitution requires agendas to be provided to L1107 officers fifteen days in advance, and issues not on the agenda cannot be addressed. *See* **Ex. 12,** at SEIU933; 938; *see also* **Ex. 2,** at SEIU6105.

The Verrett report states that two weeks prior to the Nieters reports being issued, Marzan "had already reserved time on the agenda of the meeting…to request a trusteeship." *See* **Ex. 8,** at SEIU11975. Marzan testified that she did, indeed, place on the agenda for the April 26th the voluntary trusteeship vote two weeks prior to the meeting where Defendants coerced the EBd to vote for emergency trusteeship. *See* **Ex. 7,** at 251:13-252:1-21. According to Marzan, while she placed the matter on the agenda knowing it was to be used to request voluntary trusteeship, the agenda item "wasn't stated as trusteeship," rather, Marzan labeled the agenda item "as something like health of the union or something to that effect….[i]t wasn't obvious…that I was going to ask

for trusteeship." *Id.* Indeed, the April 26th meeting agenda includes an agenda item: "Union Affairs-Brenda Marzan." *See* **Ex. 2,** at SEIU6279.

Marzan putting the trusteeship vote on the agenda corroborates Kisling's account that Brenda told her SEIU Int'l coming to the April 26th meeting to push for trusteeship. *See* **Ex. 23,** at RG16864. Marzan maintained at the deposition that her placing the vote on the agenda the same day Defendants attended the meeting was just a coincidence. *See* **Ex. 7,** at 252:22-255:1-25. When Marzan was questioned if Defendants reached out to her prior to the meeting, Marzan testified that she did not recall meeting with Defendants prior to the meeting. *Id.* At the April 26th meeting Marzan and Thomas moved to hold the meeting in "Executive Session." *See* **Ex. 2,** at SEIU2. Thomas and Grian moved to have SEIU place L1107 in voluntary trusteeship, and the motion carried. *Id.* According to Defendants, the seventeen (17) L1107 officers that requested trusteeship back in mid-2016 were "[t]he 17 members of the SEIU L1107 EBd who voted for voluntary trusteeship at" the April 26th meeting. *See* Defs' Resp. 3rdRPD, **Ex. 33,** at 8:21-9:1-5. Defendants conspired with Marzan to execute their [redacted] ensuring that all the officers that requested trusteeship before any charges were filed would attend. *See* **Ex. 30,** at SEIU7732, 3755; **Ex. 33,** at 8:21-9:1-5; **Ex. 7,** at 251:13-252:1-21; **Ex. 23,** at RG16864.

The evidence clearly demonstrates a conspiracy by the SEIU Int'l top leadership, Marzan, Greaux and Stevens to secure this emergency trusteeship over L1107 for improper purposes prior to the Nieters' reports being issued. This inescapable conclusion is further corroborated by Hedderman's sworn affidavit that she was told by the Greaux and Stevens that they were working with SEIU Int'l to secure imposition of this trusteeship. *See* **Ex. 24,** at 5:1-10. The IN, IC and Emergency Trusteeship hearings were held to project the illusion of a fair process that did not exist. There was no objective and independent review of the evidence, and the decision to trustee L1107 was made prior to the October 29-30, 2016 hearings. *See* **Ex. 30,** at SEIU13240-41. Mancini and L1107 were denied due process in bad faith and the Court must enjoin this trusteeship.

*b. SEIU IP Henry Was Vested With An Overlap of Investigative, Prosecutorial, and Adjudicatory Functions That Undermined Due Process.*

In *Wildberger*, the Court held that while it saw nothing wrong with the Int'l union's Constitution authorizing the IP "to determine probable cause, prefer the charge, appoint a trial committee, and then make the ultimate decision based on the committee's recommendations." 86 F.3d at 1195-96. However, because there was evidence that cast "doubt on the partiality of the President, the combination of prosecutorial and adjudicatory functions in a single person can present due process concerns." *Id.* Because there was evidence of bias on the part of the IP, the Court could "no longer assume" that the Constitutional procedures provided a full and fair hearing, and the Court reversed the decision.

The evidence in this case is well beyond what was present in *Wildberger*. The evidence demonstrates a clear pattern of Mancini ejecting and refusing to allow SEIU Int'l officials run L1107, disinterest in pushing the program of SEIU Int'l and to allocate L1107's resources to organizing, Defendants dissatisfaction with Mancini's defiance and dissent, and trusteeship swiftly followed. The SEIU Constitution vests investigatory, prosecutorial and adjudicative power in the SEIU IP Henry. *See* SEIU Int'l Const., attached as **Ex."34,"** at SEIU2409-12. Like in *Wildberger*, SEIU IP Henry was vested with authority to assume jurisdiction over the charges recommended by Grillo, appoint a hearing officer, and make "the decision upon the record taken at the hearing and the report of the hearing officer." *Id.* at SEIU2411. Similarly, the SEIU IP is permitted to impose the emergency trusteeship, appoint the trusteeship hearing officer, and make the final decision on the merits. *Id.* at SEIU2393. There is also evidence that the SEIU legal department and other SEIU Int'l officials actually wrote the Nieters and Verrett reports, not the hearing officers. *See* **Ex. 30,** at SEIU7531; *see also* Defendants' Privilege logs, **Ex. 35,** at 1-9. There is indisputable evidence of bias and bad faith in this case, and in concert with the SEIU Constitution's overlap of investigatory, prosecutorial and adjudicative authority in the SEIU IP, the Constitutional procedures cannot be said to have accorded Mancini or L1107 due process.

*c. Mancini's Discipline Was Part Of A Scheme To Suppress Dissent*

Union discipline should be overturned if a plaintiff presents evidence that the discipline was "part of a scheme to suppress dissent within the union, in retaliation for any union-related speech, or for any other improper purpose such that otherwise lawful charges might violate the

LMRDA." *Kofoed v. INT'L BROTH. OF ELEC., LOCAL*, 237 F.3d 1001, 1005 (9th Cir. 2001) *citing Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 383 (3d Cir.1999); *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1452 (9th Cir.1995); *Bise v. IBEW, AFL-CIO Local 1969*, 618 F.2d 1299, 1304 (9th Cir.1979); *see also* **Ex. 1,** at 46:1-20.

This emergency trusteeship and Mancini's discipline was imposed over Mancini's refusal to allow Defendants to control L1107 and its finances, and repeated expulsion of SEIU Int'l representatives from working at L1107 because she was not interested in pushing the program of SEIU Int'l. Defendants used Mancini's justified cancellation of the UMC ratification vote to remove her from office along with Kisling, instead of disciplining the UMCBT, so that Bisno could present to the L1107 EBd that their removal was a "constitutional crisis" that supported emergency trusteeship, and the UMC and CC officers engaging in that misconduct could vote for trusteeship at a meeting Defendants intentionally sought to influence turnout. Mancini's discipline was part of an overall scheme to suppress dissent, and this Court should overturn that discipline.

**B. <u>Plaintiffs Have Suffered And Will Continue To Suffer Irreparable Harm.</u>**

The next element this Court must consider is irreparable harm. *Winter*, 129 S. Ct. at 375-76. "Union members' rights under the LMRDA 'deserve[] vigorous protection.'" *Savage v. Tweedy*, 526 Fed. Appx. 765, 767 (9th Cir. 2013). 29 USCS § 464 expressly authorizes injunctions to prevent maintenance of an illegal trusteeship. 29 U.S.C. § 464(a). *See Retail Clerks*, 479 F.2d at 55; *Hotel & Rollison*, 615 F.2d at 793. Discipline of a union officer for exercising their free speech rights guaranteed by the LMRDA is considered an irreparable harm for which money damages are not an adequate remedy. *Savage*, 526 Fed. Appx. at 767.

Defendants came into Nevada to steal democracy from the members of L1107 and install its own staff to run the local. Defendants removed Mancini to suppress dissent and sided with the CC/UMC officers they believed would allow them to run L1107 during and after the trusteeship. There is a substantial risk of chilling free speech at L1107 from Defendants discipline of Mancini, imposition of this trusteeship, and disregard for the minority UMC and CC officers' egregious misconduct that intentionally disrupting L1107 to lay pretext for imposing this trusteeship indicating Defendants clear disregard for the democratic process. If this injunction is not granted

now, Defendants are going to hold an election to moot the claims and will once again get away with this fraudulent scheme to suppress dissent. This scheme is being applied all over the SEIU network of local unions. Since imposition of the trusteeship the SEIU Int'l trustees' zealous pursuit for dues revenue has incurred five times more debt to L1107 than prior to the trusteeship, and their have opened L1107 to liability for wrong termination, breach of contract and punitive damages.

Finally, according to former L1107 President Vicky Hedderman, this is not the first time SEIU Int'l has imposed a trusteeship over L1107. *See* **Ex. 24,** at 1:8-28. In 1995 or 96, SEIU Int'l imposed a trusteeship over L1107 over infighting on the L1107 EBd. *Id.* SEIU Int'l then amended the L1107 constitution to create an "'Executive Director' model for SEIU local unions" at L1107. *Id.* "Under the Executive Director model, the day to day operations of the local union were controlled by the Executive Director, which SEIU International" would appoint, subject to approval by the EBd. *Id.* at 2:1-11. SEIU Int'l appointed McAlevey to be L1107's Executive Director in 2007. *Id.* From that moment McAlevey "tried to take complete control over Local 1107, and began excluding" Hedderman and the EBd from the day to day operations. *Id.* Like Shepherd and Vergara, McAlevey began focusing all L1107's resources on organizing and politics. *Id.* SEIU Int'l also forced L1107 to accept a new dues structure to increase SEIU Int'l's dues revenue. *Id.* When Hedderman expressed dissent, Defendants illegally influenced the 2007 election to unseat her. *Id.* at 3-4. Hedderman will testify that "SEIU International cares about one thing, its dues revenue," and imposes these trusteeships for that purpose. *Id.* In 2016, when Hedderman saw that tensions on the L1107 EBd were rising, she "believed that SEIU International would try to trustee Local 1107" and gave the UMC officers the affiliation agreement hoping they would stop Defendants. *Id.*

Hedderman's sworn affidavit is remarkably consistent with the evidence presented in this case. It is also consistent with the sworn affidavit of SEIU Int'l Organizer, Barry Roberts. *See* Roberts Affidavit, **Ex. 36,** at 1-5. Roberts, a twelve (12) year employee of SEIU Int'l, voluntarily left employment with SEIU over their undemocratic practices. *Id.* at RG16834. According to Roberts, in 2009, after Hedderman resigned and Martinez took over as L1107 President, Roberts'

salary was paid by L1107 despite performing no work for L1107. *Id.* Roberts states that during his time in Texas, it was apparent that a significant amount of the funding for organizing in Texas was "being funded by SEIU Local 1107" despite those efforts not being for the benefit of the L1107. *Id.* This continued until Bassick was elected, who let Shepherd and Vergara control L1107's finances and run its day to day operations. *Id.*

Like Hedderman, it was Roberts' experience that SEIU Int'l imposes trusteeships to control a "local union's finances and organizing operations." *Id.* "When a local union pushes out SEIU [IRs] attempting to direct local union operations, the SEIU International leadership imposes a trusteeship to install trusted SEIU [IRs] as the local union's governing body." *Id.* at 3:1-12. As the evidence in this case demonstrates, Roberts was assigned to L1107 in 2016 to assist with organizing. *Id.* "Like the trusteeship over SEIU-UHW, the trusteeship over Local 1107 appeared to be motivated by SEIU International 's desire to control Local 1107's finances and organizing operations rather than any problem with democratic governance." *Id.* at 3:22-28. Shepherd and Vergara are now co-trustees over L1107. *See* **Ex. 22,** at 73:16-74:1-4. Defendants are now compromising the financial condition of this local union in zealous pursuit of compensating for the dues revenue it has lost from the *Janus* case.

Plaintiffs' counsel also attempted to brief this Court on the trusteeship SEIU Int'l imposed over SEIU Local 99 at the October 18, 2017 hearing. *See* **Ex. 1,** at 14-25. After imposition of that trusteeship, Defendants amended the Local 99 Constitution to vest "100 percent of the union's governance and power in the executive director of that union," and the trustee, Bill Lloyd, became the executive director." *Id.* at 14:1-15:1-5. Indeed, Local 99's 2007 Constitution provides that "[t]he Administration of this Local Union is vested in the Executive Director." *See* 2007 Local 99 Constitution, **Ex. 37,** at 18.

Defendants will never allow L1107, or any other local union in the SEIU network to have democratic governance. Defendants will try to revert L1107 back to the Executive Director model to maintain control of this union after this trusteeship has ended if this injunction is not granted. Anytime an officer is elected that wants to return the local to a member "service based model,"

and refuses to allocate L1107's resources to organizing and politics, Defendants will send SEIU IRs to sow discord between factions in the union to engineer dysfunction, unlawfully influence L1107 elections, or both. They did it 1995. They did again during the 2008 election. They have done it here with imposition of the trusteeship over L1107 in 2017. They will do it again, and again, and again until a federal court decides to enforce the LMRDA. This Court must enjoin this trusteeship and return control of L1107 back to Mancini and the L1107 EBd before more irreparable harm is done. If this Court does not enjoin this trusteeship now, Defendants will hold an election to moot the claims, the L1107 membership will again lose their right to democratic governance, and Defendants will continue to get away with this scheme to suppress democracy and dissent. Mancini and the L1107 EBd's three year terms has not concluded. No election is required to be held. This Court should enjoin this trusteeship.

**C. <u>The Balance Of Equities And Public Interest Both Tip In Plaintiffs' Favor.</u>**

The third factor when considering injunctive relief "requires the court 'to balance the interests of all parties and weigh the damage to each.'" *United Food & Commer. Workers Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1127 (D. Ariz. Sept. 23, 2011) *citing L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The fourth factor for determining whether an injunctive is whether it would be in the public interest. *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

When passed the LMRDA, "Congress [found] that, **<u>in the public interest</u>**, it continues to be the responsibility of the Federal Government to protect employees' rights to organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection." 29 U.S.C. § 401. LMRDA rights are currently, and persistently being violated by Defendants, their discipline of Mancini has suppressed dissent at L1107, and they have compromised L1107 financially, and failed to return L1107 to democratic governance despite the presumption of validity expiring. Defendants' interest in their fraudulent scheme to suppress dissent cannot overcome L1107 and the public's interest in union democracy, and this Court should enjoin this trusteeship. This is only a fraction of the overwhelming evidence.

## IV.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court GRANT Plaintiffs' Motion for Preliminary Injunction on Order Shortening Time and enter an order enjoining the trusteeship and reinstating Mancini.

Dated this 7th day of November 2017

/s/ Michael J. Mcavoyamaya

MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, NV, 89121
Telephone: (702) 299-5083
Michael.mcavoyamaya@gmail.com
*Attorney for Plaintiffs*

**NO BOND OR ONLY A MINIMAL BOND SHOULD BE REQUIRED**

SEIU suffers no real harm from having to turn over control of L1107 to the EBd. Courts have repeatedly refused to require bonds when there is no realistic likelihood of harm:

> The Ninth Circuit has held that it [FRCP Rule 65] "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Courturier*, 575 F.3d 1067, 1086 (9th Cir. 2009). A district court need not require a bond "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

*United Food & Commercial Workers v. Brewer*, USDC Ariz. Case No. No. CV-11-921-PHX-GMS (Sept. 23, 2011).

Moreover, even if somehow the SEIU could show some financial harm, the parties' continuing relationship provides SEIU with a ready means of recoupment, also warranting no bond here:

> As a result of the parties' ongoing financial relationships, the bond requirement is also properly waived since defendants are capable of recouping any costs or damages resulting from the wrongful issuance of the injunction. See e.g. *United States v. Bedford Assocs*., 618 F.2d 904, 916–17 (2nd Cir.1980) (holding that where the defendant is able to receive compensation for costs or damages, resulting from the wrongful issuance of the injunction, by virtue of amounts it owes the plaintiff through the parties' ongoing financial relationship, no security is required).

*California Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E. D. Cal. 2011).

Finally, a significant bond here would prevent the harm to Plaintiffs and L1107 from being cured, as Plaintiffs' association is a small one without significant assets, and this suit is currently being funded out of pocket by the members. See *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review").

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 8th day of November, 2018, the undersigned served the foregoing **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME** on all counsel herein by causing a true copy thereof to be filed with the Clerk of Court using the CM/ECF system, which was served via electronic transmission by the Clerk of Court pursuant to local order.

CHRISTENSEN JAMES & MARTIN
EVAN L. JAMES, ESQ. (7760)
KEVIN B. ARCHIBALD, ESQ. (13817)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Facsimile: (702) 255-0871
Email: elj@cjmlv.com, kba@cjmlv.com
Attorneys for Defendant Service Employees Int'l Union

ROTHNER, SEGALL & GREENSTONE
GLENN ROTHER (PRO HAC VICE)
JONATHAN COHEN (10551)
510 South Marengo Avenue
Pasadena, CA 91101-3115
Tel: (626) 796-7555
Facsimile: (626) 577-0214
Email: grothner@rsglabor.com, jcohen@rsglabor.com
Attorneys for Defendant Service Employees Int'l Union

Dated this 8th day of November, 2018.
/s/ Michael J. Mcavoyamaya

______________________________
MICHAEL MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, NV, 89121
Telephone: (702) 299-5083
Michael.mcavoyamaya@gmail.com
*Attorney for Plaintiffs*