# EXHIBIT F
# Part 1

Consolidated Hearing Transcript

SEIU LOCAL 1107

NEEDS AND INTERNAL CHARGES

HEARING - DAY 1

BEFORE HEARING OFFICER CAROL NIETERS

SATURDAY, OCTOBER 29, 2016

CIRCUS CIRCUS LAS VEGAS HOTEL AND CASINO

2880 LAS VEGAS BOULEVARD SOUTH

LAS VEGAS, NEVADA 89109

STEPHANIE COPP GUANKO
CSR NO. 13746

PAGES 1 - 270

LAS VEGAS, NEVADA, SATURDAY, OCTOBER 29, 2016

10:15 A.M.

THE HEARING OFFICER: MY NAME IS CAROL NIETERS, AND I AM THE EXECUTIVE DIRECTOR OF SEIU LOCAL 284 IN MINNESOTA. AND WE'RE GOING TO START THE INTERNAL NEEDS HEARING. I HAVE BEEN APPOINTED BY SEIU PRESIDENT MARY KAY HENRY TO CONDUCT A HEARING TODAY AND TOMORROW ON RELATED BUT SEPARATE AREAS.

FIRST, PURSUANT TO HER AUTHORITY UNDER ARTICLE VIII, SECTION 7G OF THE SEIU CONSTITUTION, PRESIDENT HENRY HAS TASKED ME WITH TAKING EVIDENCE ON INTERNAL NEEDS OF LOCAL 1107 AND TO MAKE RECOMMENDATIONS TO HER ON WHAT, IF ANY, REMEDIAL ACTION SHOULD BE UNDERTAKEN BY THE LOCAL.

SECOND, IN ADDITION TO THE INTERNAL NEEDS SECTION, PRESIDENT HENRY HAS APPOINTED ME AS THE HEARING OFFICER PURSUANT TO HER AUTHORITY UNDER ARTICLE 17, SECTION 2F OF THE SEIU CONSTITUTION TO CONDUCT A HEARING ON INTERNAL UNION CHARGES AGAINST A NUMBER OF LOCAL 1107 OFFICERS AND MEMBERS OVER WHICH PRESIDENT HENRY HAS ASSUMED ORIGINAL JURISDICTION.

IN ADDITION, SHE HAS CONSOLIDATED THE MULTIPLE CHARGES SO THAT I CAN HEAR THEM ALL IN THIS PROCEEDING ALONG WITH THE INTERNAL NEEDS MATTERS. WE WILL BEGIN WITH THE INTERNAL NEEDS HEARING, AND IMMEDIATELY FOLLOWING THE CONCLUSION OF THAT PHASE OF THE HEARING, WE WILL TURN TO THE INTERNAL CHARGES. WE WILL CONTINUE

TODAY AND TOMORROW AS NEEDED TO TAKE EVIDENCE ON THE INTERNAL CHARGES.

I WILL BE ASSISTED THIS MORNING BY COUNSEL MARNIE WALFOORT AND LA RELL PURDIE WHO ARE WITH ME HERE AND BY LORNA ABRAHAM, SEIU LEGAL OPERATIONS MANAGER WHO IS AT THE DESK WHERE YOU SIGNED IN. FOLLOWING THE HEARING, I WILL MAKE MY RECOMMENDATION TO PRESIDENT HENRY ON THE LOCAL'S INTERNAL NEEDS, AND SHE WILL MAKE A FINAL DECISION ON THE LOCAL'S INTERNAL NEEDS PURSUANT TO ARTICLE 8, SECTION 7G.

I WILL MAKE A REPORT AND RECOMMENDATIONS TO PRESIDENT HENRY ON HOW I BELIEVE THE INTERNAL CHARGES SHOULD BE HANDLED BY HER, AND SHE WILL MAKE THE FINAL DECISION ON EACH OF THE CHARGES PURSUANT TO ARTICLE 17, SECTION 2F. AT THIS TIME, I WILL REVEAL THE RULES OF PROCEDURE THAT APPLY TO BOTH PHASES OF THIS HEARING.

THIS IS AN INFORMAL INTERNAL UNION HEARING TO EXAMINE ISSUES RAISED ABOUT THE HEALTH AND DIRECTION OF THE LOCAL AND HEAR CHARGES MADE BY AND AGAINST MEMBERS OF THE LOCAL. ATTENDING WILL BE THE INTERNATIONAL UNION STAFF WHO HAVE BEEN ASSIGNED TO WORK AT THIS HEARING, MY COUNSEL, THE COURT REPORTER AND MYSELF.

THERE ARE NO FORMAL RULES OF EVIDENCE. DURING THIS PHASE OF THE HEARING, LOCAL 1107 MEMBERS WHO HAVE REQUESTED TO BE HEARD AND WHO ARE PRESENT MAY STATE THEIR VIEWS ON THE INTERNAL NEEDS OF THE UNION BY SPEAKING ON THE RECORD FOR NO MORE THAN THREE MINUTES PER MEMBER. NOW, WE MAY BE ABLE TO ALLOW FOR ADDITIONAL TIME WHERE

NEEDED.

COUNSEL AND I MAY HAVE QUESTIONS THAT WE WILL ASK THE SPEAKERS. AND OCCASIONALLY, YOU MAY SEE ME CONSULT WITH COUNSEL EITHER AT THE TABLE OR DURING A BREAK. EACH SUCH MEMBER WHO WANTS TO SPEAK MUST SIGN UP ON THE SPEAKER LIST AND IDENTIFY HIMSELF OR HERSELF AT THE BEGINNING OF HIS OR HER PRESENTATION. I HAVE DISCRETION TO ALLOW MEMBERS TO SPEAK FOR LONGER THAN THREE MINUTES, AS I SAID, IF I DEEM IT APPROPRIATE. BUT I AM GOING TO TRY MY BEST TO STAY ON SCHEDULE. WE HAVE A GREAT DEAL OF INFORMATION TO COVER, AND THE HOPE IS WE'RE -- AND WE ARE PLANNING TO CONCLUDE ON SUNDAY.

I WANT TO REMIND YOU THAT ALL PERSONS PRESENT IN THE HEARING ROOM WERE ASKED TO SIGN IN ON THE DESIGNATED SHEET WHERE THEY ENTERED THE ROOM. SO IF YOU HAVE NOT TAKEN CARE OF THAT -- AND I'M ASSUMING EVERYONE HAS -- YOU WOULD NEED TO DO THAT RIGHT NOW.

IF PARTIES WANT ME TO CONSIDER ANY DOCUMENTS, THOSE MAY BE SUBMITTED AS WELL. PLEASE PROVIDE FOUR COPIES OF ANY SUCH DOCUMENTS. HOWEVER, I ALREADY HAVE THE NECESSARY COPIES OF THOSE DOCUMENTS THAT I WILL ENTER INTO THE RECORD OF THIS HEARING IN JUST A MOMENT. SO YOU WILL NOT NEED TO SUBMIT ANY ADDITIONAL COPIES OF THOSE DOCUMENTS.

A COURT REPORTER WILL RECORD ALL TESTIMONY AND MAKE AN OFFICIAL TRANSCRIPT OF THE PROCEEDINGS. PARTIES MAY OBTAIN A COPY OF THE TRANSCRIPT AT THEIR OWN COST BY MAKING ARRANGEMENTS WITH THE COURT REPORTER DIRECTLY. NO

OTHER MEANS OF AUDIO OR VIDEO WILL BE ALLOWED. IN ORDER TO HAVE A COMPLETE AND FULL RECORD UPON WHICH TO BASE MY RECOMMENDATIONS TO PRESIDENT HENRY, I WANT TO HEAR FROM AS MANY LOCAL 1107 MEMBERS AS I POSSIBLY CAN.

I'M ASKING THAT WE RESPECT EACH OTHER'S VIEWS AND OPINIONS AND THE RIGHT TO EXPRESS THEM. I WILL NOT TOLERATE ANY DISRESPECT OF OUR MEMBERS OR ANY DISRUPTIONS IN TODAY'S PROCEEDINGS. I WANT EVERYONE TO BE ON NOTICE THAT I AM PREPARED TO CALL IN THE SERGEANT OF ARMS TO HELP ME MAINTAIN ORDER IN THE HEARING ROOM SO THAT WE CAN ACCOMPLISH OUR PURPOSE HERE TODAY.

I KNOW THAT YOU HAVE A KEEN INTEREST IN THESE PROCEEDINGS, AND YOU SHOULD. HOWEVER, IF THERE ARE ANY DISRUPTIONS, I WILL NOT HESITATE TO CLEAR THE ROOM OF EVERYONE EXCEPT THE INDIVIDUALS WHOSE PRESENCE AND PARTICIPATION IN THE HEARING ROOM ARE NECESSARY TO COMPLETE THE WORK TODAY AND TO CALL MEMBERS WHO WANT TO MAKE STATEMENTS ON THE RECORD ONE PERSON AT A TIME SO THEY WILL NOT BE DISTURBED OR INTERRUPTED BY OTHERS. I HOPE SUCH MEASURES WILL NOT BE NECESSARY.

AFTER WE CONCLUDE PHASE 1 TODAY, I WILL LEAVE THE RECORD OPEN UNTIL FRIDAY, NOVEMBER 4TH, TO PERMIT LOCAL 1107 MEMBERS TO SUBMIT WRITTEN STATEMENTS NO LONGER THAN TWO PAGES REGARDING THE INTERNAL NEEDS OF THE LOCAL. FOLLOWING THE CONCLUSION OF THE INTERNAL NEEDS PHASE OF THE HEARING, I WILL BEGIN IMMEDIATELY TO TAKE EVIDENCE ON PHASE 2, THE INTERNAL CHARGES. I MAY ALSO CONSIDER RELEVANT EVIDENCE THAT I RECEIVE IN CONNECTION WITH THE

INTERNAL CHARGES PHASE OF THE HEARING IN FORMULATING MY RECOMMENDATIONS TO PRESIDENT HENRY ON LOCAL 1107'S INTERNAL NEEDS. PRESIDENT HENRY WILL MAKE A FINAL DECISION ON THE LOCAL'S NEEDS.

ARE THERE ANY QUESTIONS ON THE RULES THAT I HAVE JUST SUMMARIZED? AND CAN YOU STAND? AND MAYBE FOR PURPOSES OF THE COURT REPORTER AND TO MAKE IT EASIER, YOU'RE GOING TO HAVE TO COME TO THE MIC, STATE YOUR NAME AND SPELL IT AND THE WORK SITE YOU'RE FROM. CAN YOU DO THAT?

UNIDENTIFIED SPEAKER: I JUST WANTED TO ASK A QUESTION ABOUT THE PROCEDURE. WHEN DO YOU WANT US TO SUBMIT OUR FOUR COPIES? AT THE BEGINNING OR AT THE END?

THE HEARING OFFICER: I THINK WHEN YOU COME UP, YOU CAN SUBMIT THE COPIES AT THAT TIME. SO BRING THEM WITH YOU.

UNIDENTIFIED SPEAKER: THANK YOU.

THE HEARING OFFICER: ANY OTHER QUESTIONS?

UNIDENTIFIED SPEAKER: SO WHEN SHOULD WE EXPECT A RESPONSE AFTER THIS?

THE HEARING OFFICER: PRESIDENT HENRY, I THINK, WILL FORMULATE A RESPONSE AS SOON AS SHE ABSOLUTELY CAN, UNDERSTANDING WE'RE KEEPING THE RECORD OPEN UNTIL NOVEMBER 4TH.

UNIDENTIFIED SPEAKER: OKAY.

THE HEARING OFFICER: THE FOLLOWING EXHIBITS RELATIVE TO THE INTERNAL NEEDS HEARING WILL BE ENTERED INTO THE RECORD: EXHIBIT 1, SEIU 2012 INTERNATIONAL

CONSTITUTION AND BYLAWS; EXHIBIT 2, SEIU NEVADA LOCAL 1107 2012 CONSTITUTION AND BYLAWS; THEN EXHIBIT 3, NOTICE OF HEARING ON INTERNAL NEEDS, APPOINTMENT OF THE HEARING OFFICER AND RULES OF PROCEDURE, ISSUED BY SEIU INTERNATIONAL PRESIDENT, MARY KAY HENRY, ON OCTOBER 17TH, 2016.

(EXHIBITS ADMITTED.)

THE HEARING OFFICER: I WOULD LIKE TO HEAR BRIEF PRESENTATIONS, AGAIN, OF NO MORE THAN THREE MINUTES -- IF WE HAVE TIME OR NEED TO, WE CAN EXTEND -- FROM ANY LOCAL 1107 MEMBERS WHO WISH TO SPEAK ON THE INTERNAL NEEDS OF THE LOCAL. YOU ALL SIGNED IN ON A LIST AND CHECKED IF YOU WISH TO SPEAK. IF YOU CHECKED THAT YOU WISH TO SPEAK, PLEASE COME TO THE SIDE AND LINE UP, AND WE WILL BRING FOLKS TOGETHER ONE PERSON AT A TIME TO SPEAK AT THE MIC, SO ANYBODY THAT EXPRESSED THAT. IF YOU DID NOT EXPRESS AN INTEREST TO SPEAK AND WE HAVE TIME, OBVIOUSLY, WE WILL HAVE THAT DOCUMENTED AND THEN HAVE YOU JOIN AS WELL. OKAY?

I NEED TO MAKE ONE CLARIFICATION. THIS IS GOING TO BE HEARING OFFICER EXHIBIT 4, CLARIFICATION OF HEARING NOTICES ISSUED BY INTERNATIONAL UNION. THAT WAS SENT ON OCTOBER 26TH.

(EXHIBIT ADMITTED.)

THE HEARING OFFICER: SO IF THE FIRST PERSON COULD PLEASE COME FORWARD. SO IF YOU COULD STATE YOUR NAME, SPELL YOUR NAME, ALONG WITH WHERE YOU WORK, FOR THE RECORD.

MS. DIAZ: MY NAME IS MARIA THERESA F. DIAZ, SPELLED M-A-R-I-A T-H-E-R-E-S-A F. D-I-A-Z. I WORK AT UMC, AND I'M THE CURRENT VICE PRESIDENT AT UMC.

THE HEARING OFFICER: VERY GOOD.

MS. DIAZ: OKAY. I JUST WANT YOU GUYS TO KNOW THAT I STARTED AS A STEWARD AT UMC BEFORE JERRI STASSER, WHO IS OUR FORMER CHIEF NURSING STEWARD. SHE ASKED ME IF I CAN RUN AS THE CHIEF. AND DURING THAT TIME, I WAS PLANNING TO LEAVE UMC, SO I SAID, "NO, I'M NOT GOING TO RUN, BUT I WILL CONTINUE TO BE A STEWARD." THEN, THE REASON FOR THAT IS BECAUSE I DON'T WANT POLITICS. I NOTICE THAT UMC HAS BEEN DIVIDED SINCE AL MARTINEZ WAS OUR PRESIDENT. BUT THINGS HAVE CHANGED BECAUSE OF WHAT HAPPENED TO ME.

BEFORE I BECAME THE VICE PRESIDENT, AS I TOLD YOU, I WAS JUST A STEWARD. AND I WAS FIGHTING ADMINISTRATION FOR PATIENT SAFETY AND NURSE-PATIENT RATIO IN 1400 FOR THE TRANSPLANT PATIENTS. I KNOW DURING THAT TIME THAT HR DON'T APPRECIATE ME WITH ALL OF THE COMPLAINTS I E-MAILED TO THEM. I'M ONE OF THE VOICE OF THE NURSES ON THE FLOOR, 1400 MED-SURG TRANSPLANT, LABOR AND DELIVERY AND OTHER FLOORS.

LAST MARCH 7TH, I WAS ON VACATION, AND I HAD TO COME BECAUSE ONE OF MY COWORKERS CALLED ME AND TOLD ME THERE WAS A MEETING, AND I HAVE TO ATTEND THE MEETING. SO THE FIRST MEETING WAS A WEEK BEFORE. AND THEN I WENT TO THE NEXT MEETING WHICH IS MARCH 7TH. AND WHEN I WAS GOING TO THAT ROOM, JAMES MUMFORD STOPPED ME AND TOLD ME

HE DOESN'T THINK I SHOULD GO INTO THE MEETING. AND I ASKED HIM WHY. AND THEN HE LOOKED AT GWEN, WHICH IS OUR VICE PRESIDENT AT THAT TIME, AND ASKED GWEN IF I CAN GET INTO -- ATTEND THE MEETING. AND GWEN NODDED, SO I WAS ABLE TO ATTEND THE MEETING.

DURING THE MEETING, THEY WERE TALKING ABOUT HARASSMENT, PEOPLE FIGHTING ON THE FLOOR. BUT IT'S ALL FOCUSED ON MY FLOOR, MED-SURG 1400. AND AFTER THAT, THEY WANTED ME TO SIGN A PAPER, WHICH I REFUSED TO SIGN. BECAUSE I TOLD THEM, "THIS IS HAPPENING ALL OVER THE HOSPITAL. THIS ISN'T JUST IN MED-SURG. IF YOU WANT ME TO SIGN TO THE PAPER, YOU SHOULD PUT IT FOR THE GENERAL HOSPITAL, UMC, NOT JUST 1400." BECAUSE I SAID THE PROBLEM IS NOT AT UMC.

GWEN WAS SITTING, NOT SAYING A WORD. SO I REFUSED TO SIGN. BECAUSE I REFUSED TO SIGN, THEY TOLD ME I HAVE TO GO WITH THEM TO HR. SO I WAS ESCORTED TO HR BY JAMES MUMFORD. GWEN, OUR VICE PRESIDENT, WAS WITH ME, AND SHE WAS QUIET THE WHOLE TIME. THE CNO WAS THERE AND DAVE, MY MANAGER.

IN HR OFFICE, THEY TOLD ME I WOULD BE TRANSFERRED TO 4 NORTH. THAT IS AN ORTHOPEDIC FLOOR. I REFUSED TO TRANSFER, AND I TOLD THEM I DON'T HAVE EXPERIENCE WITH ORTHO. FROM THE VERY START, I WORKED IN 1400 MED-SURG TRANSPLANT. YOU CAN ASK ME ANYTHING TRANSPLANT, I CAN TELL YOU. BUT WHEN IT COMES TO ORTHO, I DON'T KNOW ANYTHING ABOUT IT.

THE CNO TOLD ME THAT BECAUSE --

THE HEARING OFFICER: MARIA, YOU ARE BEYOND YOUR THREE MINUTES. SO I DO WANT TO ASK YOU ONE CLARIFICATION QUESTION WHICH IS WHAT IS THE PURPOSE OF THE PAPER? OR WHAT WAS THE PAPER YOU WERE BEING ASKED TO SIGN? I'M NOT CLEAR WHAT THAT WAS.

MS. DIAZ: THE PAPER IS ABOUT THE -- THERE IS A FIGHT, THAT IT HAS TO STOP AND THAT YOU CANNOT TALK ABOUT THIS TO ANYBODY. I GAVE THE PAPER TO MIKE URBAN. AND THE REASON I'M TELLING YOU THIS IS BECAUSE I WANT YOU TO UNDERSTAND THAT THIS HAPPENED TO ME, AND I'M A STEWARD. AND MY VICE PRESIDENT WAS SITTING NEXT TO ME AND DID NOT HELP ME.

AND WHEN I ASKED THEM WHAT DID THE UNION HALL DO ABOUT THIS, BECAUSE I KNOW THAT THE TWO OF THEM TALKED AND GWEN KNOWS ABOUT IT, THEY TOLD ME NOT TO CALL THE UNION HALL. AND THEY GAVE ME THE NUMBER TO MIKE URBAN WITH THE INSTRUCTION TO CALL HIM IN THE AFTERNOON. NOT IN THE MORNING BUT IN THE AFTERNOON, BECAUSE GWEN HAS TO TALK TO MIKE URBAN FIRST.

HOW FAIR IS THAT? I'M A UNION MEMBER, AND THEY DID NOT EVEN CONSIDER MY SENIORITY, AND THEY DON'T WANT THE UNION HALL TO KNOW ABOUT IT.

THE HEARING OFFICER: OKAY. AND DO YOU HAVE -- IS THERE A -- THAT YOU COULD SAY IN A VERY SHORT AMOUNT OF TIME? IN THE INTERNAL NEEDS, WHAT I'M TRYING TO DO IS EXPLORE WHAT CAN PRESIDENT HENRY DO TO HELP ENSURE THAT THE LOCAL UNION IS RUNNING AS EFFECTIVELY AS POSSIBLE TO REPRESENT ITS MEMBERS AND DO WHAT IT CAN TO ENSURE THAT

IT CAN WIN FOR ITS MEMBERS. AND SO THAT'S WHAT I NEED TO HEAR.

YOU ARE ABLE TO SUBMIT A TWO-PAGE STATEMENT, IF YOU WISH, ON THE STORY. BUT I NEED TO KNOW WHAT WE CAN DO.

MS. DIAZ: OKAY. WHAT PRESIDENT HENRY CAN DO IS TO MAKE SURE THAT MEMBERS ARE REPRESENTED WISELY AND EFFECTIVELY. AND THAT THE OFFICERS SHOULD NOT BE WORKING FOR THE ADMINISTRATION. THEY SHOULD BE WORKING FOR THEIR MEMBERS.

THE HEARING OFFICER: OKAY. THANK YOU, MARIA. I HEARD THAT.

NEXT PERSON?

MS. GRAIN: MY NAME IS SHEILA GRAIN, AND I AM THE CURRENT TREASURER OF SEIU 1107. I WORK AT THE DEPARTMENT OF AVIATION. I'VE BEEN A MEMBER FOR OVER 10 YEARS.

THE HEARING OFFICER: CAN YOU SPELL YOUR NAME, PLEASE?

MS. GRAIN: FIRST NAME IS SHEILA, S-H-E-I-L-A. LAST NAME IS GRAIN, G-R-A-I-N.

THE HEARING OFFICER: THANK YOU.

MS. GRAIN: JUST AS A SIDE NOTE BEFORE I START MY REPORT, IN ADDITION TO BEING A CLARK COUNTY EMPLOYEE AND THE ELECTED TREASURE OF SEIU 1107, I'VE ALSO BEEN A CERTIFIED PUBLIC ACCOUNTANT LICENSED IN CALIFORNIA SINCE 1998. THANK YOU.

I HAVE BROKEN MY REPORT INTO TWO SEPARATE

SECTIONS. THE FIRST SECTION IS UNION MEMBER SERVICES IMPEDED OR PREVENTED. ON SEPTEMBER 19TH, 2016, CHERIE MANCINI SENT OUT A SEIU NEWS LETTER BY THE CLARK COUNTY E-MAIL SYSTEM TO OFFICIALLY NOTIFY ALL MEMBERS THAT THEIR FIRST POINT OF CONTACT IS NOW ANDREA BOND. I'VE ATTACHED A COPY FOR THE RECORD.

AS A RESULT, MEMBERS FORFEITED THEIR WEINGARTEN RIGHTS WHEN THEY WERE NOTIFIED OF INVESTIGATORY MEETINGS BECAUSE THEY DID NOT WANT TO CALL THE HALL FOR REPRESENTATION. SOME MEMBERS DID CALL THE HALL AND EXPERIENCED LAST-MINUTE CANCELLATIONS AND HAD TO ATTEND THESE MEETINGS WITHOUT REPRESENTATION. UNION MEMBERS WERE DEPRIVED OF THEIR WEINGARTEN RIGHTS FOR WEEKS DUE TO THIS NEWSLETTER FROM PRESIDENT CHERIE MANCINI.

SECOND, I SUBMITTED A REQUEST TO ANDREA BOND ON SEPTEMBER 28, 2016 -- I HAVE HANDED YOU A COPY FOR YOUR REFERENCE -- FOR A LIST OF ALL OF DOA EMPLOYEES WHO REQUESTED REPRESENTATION FROM THE HALL AFTER THIS NEWSLETTER WENT OUT. AS OF TODAY, I HAVE RECEIVED NO RESPONSE FROM ANDREA BOND TO MY INQUIRY.

THIRDLY, REGARDING UNION MEMBER SERVICES IMPEDED OR PREVENTED, CHERIE MANCINI HAS SENT OUT CLARK COUNTY STEWARD MEETING OFFICIAL INVITATIONS WITHOUT ALL ACTIVE CLARK COUNTY STEWARDS ON THE INVITATIONS. SHE HAS ALSO CHANGED THE MEETING LOCATION WITHOUT NOTIFYING ALL UNION SHOP STEWARDS. THIS ACTION PREVENTED SHOP STEWARDS FROM PARTICIPATING IN MONTHLY MEETINGS AS REQUIRED BY SEIU CONSTITUTION AND BYLAWS.

MY SECOND SECTION IS THE INABILITY OF SEIU 1107 TO SELF-GOVERN. CHERIE MANCINI HAS COLLUDED BEFOREHAND WITH TRUSTEES ALFREDO SERRANO AND DEBORAH SPRINGER TO INTERFERE WITH THE COMPLETION OF THE BUSINESS OF THE LOCAL AND TO CREATE CHAOS DURING EXECUTIVE BOARD AND FINANCE COMMITTEE MEETINGS. THIS HAS RESULTED IN SHOUTING AND HIGHLY EMOTIONAL INTERACTIONS BETWEEN BOARD MEMBERS, FAILURE TO FOLLOW ROBERT'S RULES OF ORDER AND DISRUPTION OF EXECUTIVE BOARD BUSINESS SUCH AS FAILURE TO REVIEW AND APPROVE THE FINANCIAL REPORTS AND DUPLICATION OF THE ELECTION OF A FINANCED COMMITTEE CHAIR.

THE HEARING OFFICER: THIRTY SECONDS, SHEILA.

MS. GRAIN: OKAY.

CHERIE MANCINI HAS DIRECTED ALL OF HER PRESIDENTIAL RESPONSIBILITIES TO HALL STAFF AND DIRECTORS AND NO LONGER MAINTAINS ANY LEVEL OF ACCOUNTABILITY. SHE INSTRUCTED ALL STAFF IN WRITING TO PARTICIPATE IN HER EFFORTS TO CONTROL ALL INFORMATION RECEIVED BY EXECUTIVE BOARD MEMBERS ON JULY 14, 2016. SEE THE URBAN FINDINGS EXHIBIT 10.

AS A RESULT OF CHERIE MANCINI'S ACTIONS, THE FOLLOWING SEIU LOCAL 1107 GOVERNANCE AND BUSINESS ACTIONS HAVE BEEN IMPAIRED OR PREVENTED: ONE, EMPLOYEES HAVE NOT RECEIVED LEGAL AND REASONABLE PREEMPLOYMENT SCREENING IN ORDER TO PROTECT MEMBERS' ASSETS AND SENSITIVE AND FINANCIAL POSITIONS AS IN PRIOR YEARS AND UNDER PRIOR PRESIDENTS. THE FINANCIAL REPORTS WERE NOT PRESENTED AT THE JULY 2016 MEETING BECAUSE THE MEETING -- CHERIE

MANCINI FAILED TO KEEP THE MEETING IN ORDER TO COMPLETE BOARD BUSINESS.

AT THE SEPTEMBER FINANCE COMMITTEE MEETING, CHERIE MANCINI IN COLLUSION WITH TRUSTEES DEBORAH SPRINGER AND ALFREDO SERRANO EXCLUDED FINANCE COMMITTEE FROM PARTICIPATING AND ELECTED A SECOND CHAIR OF THE FINANCE COMMITTEE DESPITE COMPLETION OF THIS ITEM OF BUSINESS AT THE FIRST MEETING OF THIS COMMITTEE AFTER INTERNAL ELECTIONS. THIS RESULTED IN CHAOS. AND A REVIEW OF THE FINANCIALS WAS NOT COMPLETED.

AT THE OCTOBER EXECUTIVE BOARD MEETING, THE REVIEW OF THE FINANCIAL REPORTS WAS INTERRUPTED BY AN IMPROMPTU SUBSTITUTION OF THE NET INCOME STATEMENT BY TRUSTEE ALFREDO SERRANO WHICH HAD NOT BEEN PRESENTED TO THE TREASURER AND WAS OBTAINED BY TRUSTEE SERRANO BY HIS OWN ACCOUNT DURING A PRIVATE MEETING WITH THE FINANCE DIRECTOR AFTER THE OCTOBER 2016 FINANCIAL COMMITTEE MEETING HAD BEEN CONCLUDED. THE FINANCIAL REPORTS WERE NOT --

THE HEARING OFFICER: EXCUSE ME FOR A SECOND. YOU SUBMITTED A LETTER, I BELIEVE THAT WE HAVE, THAT'S DATED SEPTEMBER 8, 2016 IN REGARDS TO FINANCIAL MISMANAGEMENT. DO YOU HAVE THAT WITH YOU?

MS. GRAIN: I SUBMITTED THAT LETTER?

THE HEARING OFFICER: IT WAS IN ONE OF THE CHARGES WE RECEIVED.

MS. GRAIN: I DON'T HAVE POSSESSION OF THAT LETTER. AND I'M ALMOST FINISHED. I'LL HURRY.

THE FINANCIAL REPORTS WERE NOT APPROVED BY THE BOARD AT THIS MEETING DUE TO CHAOS AND CONFUSION THAT FOLLOWED TRUSTEE SERRANO'S ACTIONS. CHERIE MANCINI FAILED TO MAINTAIN ORDER AT THIS MEETING IN ORDER TO CONDUCT THE BUSINESS OF THE LOCAL.

PRESIDENT CHERIE MANCINI HAS FAILED TO EXERCISE THE LEVEL OF CARE WHICH A REASONABLE AND PRUDENT PERSON WOULD USE TO CARRY OUT THE DUTIES OF PRESIDENT OF SEIU LOCAL 1107. SHE HAS BEEN GROSSLY NEGLIGENT IN THE PERFORMANCE OF HER DUTIES, AND ALL OF HER ACTIONS, WHICH HAVE RESULTED IN FRAUD AGAINST UNION MEMBERS UNDER STATE AND FEDERAL TORT LAWS. SHE HAS FAILED IN ALL RESPECTS TO PERFORM THE DUTIES OF PRESIDENT.

I RESPECTFULLY REQUEST THAT SEIU INTERNATIONAL TRUSTEE SEIU LOCAL 1107 IN ORDER TO ELECT A PRESIDENT WHO IS CAPABLE OF PERFORMING THE DUTIES OF PRESIDENT WITH INTEGRITY AND ACCOUNTABILITY IN ORDER TO PROTECT ITS MEMBERS AND THE ASSETS OF THE LOCAL.

EXCUSE ME, I'M GETTING UPSET.

THE HEARING OFFICER: THANK YOU.

MS. GRAIN: THANK YOU VERY MUCH.

THE HEARING OFFICER: NEXT MEMBER, STATE YOUR NAME AND SPELL IT.

MS. KISLING: MY NAME IS SHARON KISLING, S-H-A-R-O-N K-I-S-L-I-N-G. I'M THE CURRENT EXECUTIVE VICE PRESIDENT, AND I WORK WITH CLARK COUNTY, THE SUPERVISORY BARGAINING UNIT. AND I THINK MANY OF US FEEL LIKE WE'VE EXHAUSTED ALL REMEDIES WHICH HAVE LED TO A LOT

OF FORMAL CHARGES BASED ON THE INTERNATIONAL CONSTITUTION AND BYLAWS. I FEEL LIKE OUR LOCAL AND THE EXECUTIVE BOARD HAVE NOT BEEN GIVEN THE RESOURCES, SUPPORT AND TRAINING, NOR THE OPPORTUNITY TO ENSURE SUCCESSFUL OPERATIONS.

UNFORTUNATELY, WE HAVE ELECTED, DUE TO LIMITED CANDIDACY, PRESIDENTS LACKING THE KNOWLEDGE, SKILL, ABILITY AND HUMILITY TO PROVIDE ADEQUATE LEADERSHIP AND GUIDANCE. I DO NOT AGREE THAT WE CANNOT GOVERN OURSELVES. I ASSERT THAT WE HAVE INADEQUATE BYLAWS AND LACK OF POLICY AND PROCEDURES AND STANDARD OPERATING PROCEDURES FOR THE ORGANIZATION TO SELF-GOVERN WITH THE PRESIDENTIAL MOTTO.

THE ISSUE AT CURRENT IS THE RECENTLY ELECTED PRESIDENT, CHERIE MANCINI, VIOLATION OF BYLAWS AND HER REFUSAL TO FACILITATE A PROCESS TO REMEDY THE AFOREMENTIONED ISSUES. SHE HAS INTERPRETED THE BYLAWS TO BENEFIT HER SELF-INTEREST, I.E., REIMBURSEMENT OF WAGES, IN LIEU OF CHANGING THE CBAS TO ALLOW BENEFIT FOR ALL.

THERE IS NO DEMOCRATIC PROCESS. SHE OPENLY RETALIATES AND VERBALIZES VINDICTIVE BEHAVIOR. I, AS THE EXECUTIVE VICE PRESIDENT, HAVE REACHED OUT TO INTERNATIONAL FOR ASSISTANCE WITH NO REMEDY EXCEPT NOW, BUT TO PURSUE CHARGES AND AWAIT OUTCOME, AS ANY OTHER REMEDY COULD ONLY BE MADE AVAILABLE AT THE REQUEST OF THE PRESIDENT.

INTERNATIONAL REPRESENTATIVE JULIE HAS BEEN THE FIRST INTERNATIONAL REP TO REACH OUT AND INITIATE A

CONVERSATION ONE ON ONE TO DISCUSS THE NEEDS AND PROVIDING FEEDBACK THAT APPEARS CONSISTENT WITH THE REPORTED OBSERVATION AND CONCERNS OF ELECTED LEADERS AND MEMBERSHIP.

IT APPEARS THAT THERE ARE SOME INDIVIDUALS OF THE EXECUTIVE BOARD THAT ARE KNOWLEDGEABLE ABOUT TRUSTEESHIP. HOWEVER, WITH THE AMOUNT OF MONEY THAT WAS SPENT ON THE RECENT ELECTION, I FEEL LIKE IF INDIVIDUALS DO NOT WANT A LEADERSHIP ROLE AND DO NOT WANT TO CONTINUE THEIR COMMITMENT, THEN THEY SHOULD STEP DOWN AND NOT BE ALLOWED TRUSTEESHIP.

INDIVIDUALS, MEMBERS WANT REMEDY. OUR LOCAL SHOULD BE PROVIDED WITH THE LEAST RESTRICTIVE. MANCINI HAS CHOSEN NOT TO TAKE DIRECTION. AND DUE TO HER POOR LEADERSHIP AND INSTIGATION OF INTERNAL CONFLICT AND CHAOS AMONGST E-BOARD MEMBERS, SHOULD BE REMOVED AND ADMONISHED FOR ALL THE HARM SHE HAS CAUSED.

I, MYSELF, HAVE BEEN THE VICTIM OF A RETALIATORY ACT AS I HAVE TRIED TO BRING CONCERNS AND VIOLATIONS OF BYLAWS TO LIGHT AS HAVE OTHER ELECTED OFFICERS. THERE IS SOME GREAT TALENT, DEDICATED AND COMMITTED OFFICERS WHO WANT TO MOVE THIS LOCAL FORWARD, CONSIDERING THE INTEREST OF BOTH THE PUBLIC AND PRIVATE SECTOR. AND I HOPE WE HAVE THE OPPORTUNITY TO DO SO.

MS. HARDING: THANK YOU. VICTORIA HARDING, V-I-C-T-O-R-I-A H-A-R-D-I-N-G. I AM CHIEF STEWARD FOR THE SOUTHERN NEVADA HEALTH DISTRICT. AND I'VE BEEN WITH THE UNION FOR EIGHT YEARS NOW.

I'M HERE IN SUPPORT OF WHAT YOU WOULD CALL THE DIFFERENT SIDES THAT ARE HERE. I SUPPORT MY PRESIDENT. I SUPPORT MY EXECUTIVE VICE PRESIDENT. I SUPPORT EVERY PERSON ON THE EXECUTIVE BOARD AND ALL OF THE MEMBERS THAT ARE HERE. I HAVE HAD THE ABILITY -- I THINK IT'S NICE THAT I'M ABLE TO SPEAK WITH BOTH SIDES. I CALL IT "SIDES." I DON'T THINK THEY'RE REALLY SIDES.

IF YOU TALK TO THEM, THEY ARE REALLY SO TOGETHER ON EXACTLY WHAT IT IS THAT IT'S IMPORTANT, WHICH IS THEY ARE PASSIONATE ABOUT TAKING CARE OF MEMBERSHIP. THEY DON'T AGREE NECESSARILY ON HOW TO DO THAT. AND THEY NEED TO HAVE THE CONVERSATIONS, GET PAST THE PERSONAL ASPECT OF IT AND SIT DOWN AND DEAL WITH THE PROBLEMS. BECAUSE THIS IS WHAT WE DEAL WITH IN OUR SHOPS ALL THE TIME, NOT BEING ABLE TO SIT DOWN AND DEAL WITH PROBLEMS.

WE HAVE TO LEARN HOW TO BE ABLE TO DO THAT TO BRIDGE THOSE GAPS. AND I AGREE WITH SHARON IN THAT WE DO NEED POLICIES, AND WE NEED TO BE ABLE TO SELF-GOVERN. I DON'T THINK WE NEED TO BE TRUSTEED. I BELIEVE AND I HAVE FULL FAITH AND RESPECT IN ALL OF THE MEMBERS THAT WERE ELECTED.

AND I WILL SAY, THOUGH, I DO THINK WE HAVE A PROBLEM WITHIN THE UNION. AND THAT IS OUR DIRECTOR OF ORGANIZING, WHO IS PETER NGUYEN. AND THE REASON I SAY THAT IS BECAUSE IT'S BAD ENOUGH WHEN WE HAVE A DIVISION AMONGST THE MEMBERS AND ELECTED OFFICERS. WHEN YOU HAVE AN EMPLOYEE -- ESPECIALLY AN EMPLOYEE IN A POSITION LIKE THAT -- WHO IS PURPOSELY FOR HIS OWN AGENDA SITTING IN

THE MIDDLE, MAKING PEOPLE CHOOSE SIDES, HE IS INTERFERING WITH THE BUSINESS OF THE MEMBERSHIP. AND I DON'T THINK IT'S HEALTHY FOR THE DISTRICT OR FOR THE UNION.

THAT, I DO HAVE ISSUES. I HAVE SPOKEN TO THE PRESIDENT. SHE KNOWS MY FEELINGS ON THAT. AND THAT IS UP TO HER WHETHER OR NOT SHE WANTS TO DO THAT. I DO ASK THAT WE NOT BE TRUSTEED. BUT I DO ASK FOR SOME HELP WITH THE INTERNATIONAL ON HELPING US TO FORM WAYS OF BETTER SPEAKING ABOUT THE ISSUES AND DEALING WITH THEM.

THANK YOU.

THE HEARING OFFICER: THANK YOU.

MR. GUTIERREZ: GOOD MORNING. MY NAME IS JOHN GUTIERREZ. I'VE BEEN A UNION MEMBER SINCE '92. AND YOU KNOW, I'M HERE BASICALLY TO TELL YOU A LITTLE EXPERIENCE THAT WE FELT BEING PART OF THE BARGAINING TEAM THIS LAST TIME; AND KNOWING THAT WE SPENT A LOT OF HOURS TRYING TO NEGOTIATE CONTRACTS AND TRYING TO DO THE BEST FOR THE HOSPITAL FOR BOTH SIDES, FOR OUR MEMBERS AND FOR ALL OF US, SO WE CAN KEEP GETTING PAID AND EVERYTHING.

DURING THE WHOLE SESSIONS, WE HAD OUR PRESIDENT SHOW UP TWICE. LESS THAN, I THINK, 20 MINUTES THROUGH ALL NEGOTIATIONS AND EVERYTHING. NEVER HAD ANY OTHER REPRESENTATION TO COME DOWN TO HELP AND TRY TO FIND OUT WHAT WAS GOING ON WITH OUR CONTRACT BEING NEGOTIATED BY US AND EVERYTHING.

SHORTLY AFTERWARDS, SHE PUT OUT -- I THINK IT WAS JULY 25TH, PUT OUT AN SEIU -- USED THE SEIU WEBSITE, AND CANCELED THE RATIFICATION FOR THE VOTES AND STUFF AND

BASICALLY BLAMING US FOR MISREPRESENTING, FOR NOT BARGAINING FOR THE MEMBERS THE WAY WE SHOULD HAVE. I DON'T REMEMBER THE EXACT VERBIAGE. I WAS TRYING TO BRING IT UP ON MY PHONE, BUT I CAN'T.

HOWEVER, THE ONLY BAD THING I HAVE TO SAY IS SHORTLY AFTERWARDS, SHE WANTED TO BE ABLE TO BRING IN MEMBERS THROUGH THE HOSPITAL. SO AS WE DID THAT -- IT WAS FOR LIKE TWO DAYS, I THINK. WE WENT DOWN THERE. ONE OF THE DAYS, I HAPPENED TO SHOW UP FOR IT TO TRY AND HELP CLARIFY WHAT WAS GOING ON. SHE WAS GIVING A PRESENTATION TO SOME OF THE STAFF BY TELLING THEM THAT THEY WERE AN -- AN ARTICLE THAT HAPPENED TO DO WITH ATTENDANCE.

BASICALLY: IF YOUR MOTHER WAS TO BREAK HER LEG, AND EVERYTHING, AND YOU WERE TO SIT THERE AND ACCRUE AN ATTENDANCE POLICY AND EVERYTHING, HOW WOULD YOU BE ABLE TO TAKE YOUR MOTHER TO THE HOSPITAL, TO THE DOCTOR? YOU ARE GOING TO GET A BUNCH OF ABSENCES AND BE TERMINATED BECAUSE OF THAT?

MY REPLY TO THAT WAS OBVIOUSLY YOU CAN GET FMLA BECAUSE SINCE YOU LIVE IN THE UNITED STATES, FROM EAST COAST TO WEST COAST, NORTH AND SOUTH. HELL, IT'S IN THE FEDERAL LAW THAT YOU CAN GET FMLA TO TAKE YOUR MOTHER TO THE DOCTORS OR WHATEVER.

HER REPLY TO THAT WAS, "NO, YOU CAN'T. YOU CANNOT GET THAT," AND EVERYTHING.

SO BEFORE I EVEN GOT TO SAY ANYTHING, LADIES THAT WERE FROM THE BUSINESS OFFICE HAPPENED TO STEP UP AND SAID, "YEAH, YOU CAN GET THAT."

SHE'S LIKE, "REALLY? YOU CAN GET FMLA FOR THAT?" I'M LIKE, "WELL, I DON'T KNOW WHERE YOU CAME FROM. BUT HERE, IN THE UNITED STATES, WE'RE ABLE TO DO THAT, GET FMLA TO TAKE YOUR PARENTS OR KIDS OR YOURSELF OR WHATEVER TO THE DOCTORS AND NOT ACCRUE ABSENCES JUST BY USING FMLA."

SO SHE WAS PONDERED ABOUT THAT. MY WHOLE THING IS: SHE DIDN'T KNOW THAT. IF YOU DON'T KNOW THAT, WHAT ARE YOU DOING BEING OUR PRESIDENT? WHY ARE YOU ALWAYS TRYING TO COME DOWN ON US? WHY ARE YOU USING OUR SEIU WEBSITE AGAINST US, AGAINST OUR BARGAINING TEAM? SOME ARE NOT EVEN STEWARDS, SO THEY'RE DOING THIS JUST TO HELP THEMSELVES AND HELP THE HOSPITAL AND HELP THE OTHER MEMBERS.

BUT HERE, YOU CAN BADMOUTH US AND PUT EVERYTHING OUT THROUGH OUR SEIU WEBSITE? EVERYBODY IS GETTING THAT. EVERYBODY IS GETTING IT, EVEN IF YOU DON'T WORK AT THE HOSPITAL. IF YOU WORK DOWN AT THE CONVERSATION CENTER, YOU'RE GETTING THAT. THAT'S A SMACK IN THE FACE. I'M SORRY. I WAS A LITTLE PISSED OFF ABOUT ALL THAT. THAT'S IT.

THE HEARING OFFICER: THANK YOU.

MS. GREAUX: MORNING. MY NAME IS PATRICIA, P-A-T-R-I-C-I-A GREAUX, G-R-E-A-U-X. I'M CURRENTLY CHIEF STEWARD OF ANCILLARY AT UMC. THIS MY THIRD TERM. I'VE BEEN A MEMBER OF SEIU SINCE 1986. I JOINED BECAUSE I BELIEVE IN UNIONS. AND I RAN FOR CHIEF STEWARD BECAUSE I WANTED TO MAKE A DIFFERENCE. AND I FOUND AS CHIEF

STEWARD, I HAVE MADE A DIFFERENCE, AND BEING PART OF THE BARGAINING TEAM. AND I'VE ALREADY SUBMITTED TO YOU ALL ABOUT WHAT CHERIE GAVE TO US. AND THAT'S THE MAIN REASON WHY I'M HERE TODAY IS BECAUSE SHE WAS ALLOWED WITH MALICE AND INTENT TO PUT SOMETHING OUT ON SOCIAL MEDIA.

NOT ONLY DID SHE DAMAGE US AS MEMBERS, SHE DAMAGED THE SEIU LOCAL 1107. BECAUSE WE WEREN'T THE ONLY ONES. THIS IS A PUBLIC WEBSITE THAT EVERYBODY COULD READ THAT WANTED TO SEE WHAT WAS GOING ON. SO IF THEY WANTED TO JOIN LOCAL 1107, HOW WOULD THEY JOIN WHEN YOU HAVE A PRESIDENT OF A UNION TALKING ABOUT HER OWN MEMBERS? AND FRANKLY, SHE TALKING ABOUT HERSELF ALSO. BECAUSE SHE IS THE PRESIDENT OF SEIU.

AND I THINK AS E-BOARD MEMBER, THIS IS MY FIRST TIME. I'VE BEEN WITH AL; I'VE BEEN WITH MARTIN. HAVE WE HAD ARGUMENTS? OF COURSE. WE'RE NOT ALL GOING TO AGREE. IT WOULDN'T MAKE SENSE FOR EVERYBODY TO AGREE. THAT'S WHAT MAKES US ALL DIFFERENT. BUT AT THIS E-BOARD, IT'S BEEN TOTALLY UNPROFESSIONAL.

YOU HAVE PEOPLE WANTING TO FIGHT EACH OTHER, CUSSING EACH OTHER OUT, IN EACH OTHER'S FACES, WHICH IS TOTALLY UNPROFESSIONAL. AND YOU HAVE THE PRESIDENT OF LOCAL 1107 ALSO PARTICIPATING IN THAT TYPE OF BEHAVIOR. HOW CAN SHE RUN ANY LOCAL WHEN SHE'S PART OF THAT PROBLEM ALSO? I HAVE HAD TO GET IN THE MIDDLE OF HER AND SOMEONE ELSE WHEN THEY WERE FACE TO FACE. YEAH, I SPLIT IT UP. AND I GOT PUSHED BACK ALSO.

THE HEARING OFFICER: PATRICIA, I JUST WANT TO

ASK YOU. THIS ISN'T NECESSARILY THE EVIDENCE PORTION OF THE HEARING. THAT WILL COME WITH THE CHARGES. BUT IF YOU HAVE A CLAIM, IF YOU HAVE EVIDENCE WITH YOU SUPPORTING THAT CLAIM, I.E., THE EXECUTIVE BOARD ACTING UP, THAT SHOULD BE REFLECTED IN THE MINUTES, THEN THAT WOULD BE HELPFUL TO HAVE THOSE, AS AN EXAMPLE.

MS. GREAUX: WE'LL DEFINITELY GET THOSE. BUT THIS IS THE TYPE OF BEHAVIOR GOING ON AT LOCAL 1107. YOU SHOULD BE MADE AWARE OF THAT. AND THAT'S ANOTHER REASON WHY WE'RE NOT ABLE TO GOVERN OURSELVES.

THE HEARING OFFICER: SO WHAT CAN I DO TO HELP?

MS. GREAUX: TRUSTEE THE LOCAL.

THE HEARING OFFICER: THAT'S WHAT YOU ARE ASKING?

MS. GREAUX: THAT IS EXACTLY WHAT I'M ASKING FOR. AND PEOPLE FAIL TO REALIZE THAT THIS IS A MEMBER-DRIVEN UNION, AND WE HAVE LOST OUR WAY. AS E-BOARD MEMBERS, WE HAVE FORGOTTEN THAT WE WERE THE ELECTED OFFICIALS TO REPRESENT EVERY SHOP THAT IS PART OF LOCAL 1107. AND THAT'S WHY I'M ASKING FOR THIS TO BE TRUSTEED FROM THE INTERNATIONAL. THANK YOU.

THE HEARING OFFICER: THANK YOU.

MS. STEVENS: HELLO. MY NAME IS GWEN STEVENS, G-W-E-N S-T-E-V-E-N-S. I WORK AT UMC. I'VE BEEN WORKING THERE 24 YEARS. I'VE BEEN INVOLVED WITH THE UNION THE WHOLE TIME. I'M THE FORMER VICE PRESIDENT OF UMC. I JUST WANT TO COME BACK ON SOME OF THE THINGS THERESA DIAZ, THE VICE PRESIDENT, SAID. WHAT HAPPENED ON 1400,

THEY CALL THAT FLOOR THE TOWER OF DEATH. THE REASON WHY THEY CALL IT, THESE PEOPLE TREAT PATIENTS BADLY. A LOT OF THE NURSES, A LOT OF THE STAFF DO. THEY CAN'T EVEN GET ALONG WITH EACH OTHER. NUMEROUS MEETINGS OF VIOLENCE IN THE WORKPLACE, FOR THEM TO STOP FIGHTING EACH OTHER, STOP BEHAVING BADLY ON THE FLOOR.

THEY HAD MEETINGS AND TALKED AND EVERYTHING. MS. DIAZ AND OTHER EMPLOYEES WERE E-MAILING THE CNO, CHIEF NURSING OFFICER, EVERY TIME I TURNED AROUND. HER REMEDY WAS TO MOVE THEM. I ASKED HER NOT TO MOVE THEM. SHE WENT AHEAD AND DID IT. YOU CAN'T STOP ADMINISTRATION FROM DOING WHAT THEY WANT TO DO. I JUST WANT TO CLEAR THE RECORD ON THAT.

AND I DID TRY TO TALK FOR HER. BUT YOU CAN'T TALK FOR SOMEONE THAT'S CONSTANTLY SENDING E-MAILS ABOUT OTHER EMPLOYEES TO THE CNO AND THINKING NOTHING'S GOING TO HAPPEN. THAT'S WHAT HAPPENED. THAT'S WHAT HAPPENED WITH ALL OF THAT. THAT'S WHY THEY PURSUED IT AND GOT AN ATTORNEY AND ALL OF THAT OTHER STUFF.

NOW I WANT TO TALK ABOUT THE NEGOTIATING TEAM. WHEN MS. MANCINI SENT OUT THE E-MAIL OVER THE PHONES TO EVERYBODY TO GET, EVERYBODY IN THE HOSPITAL WAS IN AN UPROAR. BECAUSE WHEN SHE DID THAT, THAT HELD UP LONGEVITY; THAT HELD UP PEOPLE'S RAISES; THAT HELD UP A LOT OF STUFF THAT PEOPLE HAD TO WAIT. BECAUSE REMEMBER, WE HAVE TO GO BEFORE THE COUNTY COMMISSIONER TO GET IT APPROVED. SO THAT SET US BACK. WHEN THAT SET US BACK, EVERYBODY WAS UPSET. BECAUSE WE HAD RATIFIED IT.

MS. MANCINI HAD PLENTY OF OPPORTUNITIES TO COME UP IN OUR NEGOTIATIONS. ONE TIME SHE DID. SHE WALKED IN, WANTED TO KNOW WHAT WAS WE NEGOTIATING. I GAVE HER MY BOOK, MY WHOLE BOOK. THEY TOOK IT TO KINKOS AND MADE COPIES OF IT. SO AS FAR AS PEOPLE NOT KNOWING, SHE COULD HAVE SAT THERE AT ANY GIVEN TIME. BUT CHERIE MANCINI SHOWED NO INTEREST UNTIL AFTER SHE SAW THE BARGAINING CONTRACT AND SOME THINGS IN THERE SHE DIDN'T LIKE.

I DON'T UNDERSTAND WHAT'S GOING ON WITH OUR UNION. I'VE NEVER SEEN IT -- IN ALL THIS TIME, IT'S BEEN BAD. BUT NEVER THIS BAD AS NOW. IT'S A LOT OF THINGS RIGHT NOW WE'RE NOT UNDERSTANDING AND FEEL LIKE THE INTERNATIONAL IS NOT PAYING ANY ATTENTION TO WHAT WE'RE TRYING TO SAY ABOUT OUR LOCAL UNION.

WE HAVE A PRESIDENT THAT'S GOING ROGUE. ANY TIME SHE FEELS SHE WANTS TO PUT ANYTHING ON THE INTERNET, SHE DO IT. AND SHE SENDS IT TO CERTAIN PEOPLE. THEN THEY CUT BACK ON THE JOB.

THE HEARING OFFICER: SO I'M GOING TO ASK THE SAME QUESTION, GWEN. WHAT CAN I DO TO HELP? WHAT DO YOU WANT DONE?

MS. STEVENS: I WANT THE LOCAL TO BE TRUSTEED TO WATCH OUT FOR OUR MONEY AND TO MAKE SURE THAT OUR SEIU NEVADA CAN BE STRONG AGAIN. AND WE NEED SOMEBODY WATCHING OVER US. BECAUSE OBVIOUSLY WE CAN'T WATCH OVER OURSELVES.

THE HEARING OFFICER: THANK YOU, GWEN.

MS. MC GOWAN: I'M THERESA T-H-E-R-E-S-A R

M-C-G-O-W-A-N, SEIU STEWARD ENVIRONMENTAL SERVICES AID AT UMC. I'M ON THE BARGAINING TEAM. I HAVE BEEN FOR THE PAST SIX YEARS AND A STEWARD FOR SEVEN. I'VE BEEN A MEMBER OF THE UNION SINCE I WALKED IN THE DOOR 2003 AT UMC. WHETHER I WAS A PER DIEM OR NOT, IT WAS SOMETHING I WAS PROUD TO BE A PART OF.

AND WHEN GWEN SUGGESTED THAT I START BECOMING STEWARD, I COULDN'T BE MORE PROUD. THIS PAST YEAR, I DON'T EVEN SAY "SEIU." I SAY "STEWARD." BECAUSE IT'S NOT THE SAME. IT'S CHANGED. CHERIE MANCINI PUT OUT NEGATIVITY, ESPECIALLY ON THE BARGAINING TEAM. AND IT WAS A DISGRACE HOW WE'VE BEEN TREATED. WE DID INTEREST-BASED BARGAINING SO THAT WE WOULD HAVE TRANSPARENCY. WE TOOK IT BACK TO THE MEMBERS EACH TIME WE BARGED TO LET THEM KNOW THIS IS WHAT WE'RE BARGAINING ABOUT. CERTAIN THINGS, WE COULDN'T MENTION AT THE TIME. BUT IT WAS TRANSPARENT. WE DID NOTHING THAT WAS BACK-DOOR OR ILLEGAL.

WE WERE TRANSPARENT. AND SHE RAISED AMBIGUITY. THE EMPLOYEES CAME TO US QUESTIONING US, "WHAT DID YOU ALL DO?" WHEN WE WERE TRYING TO GET THE CONTRACT RATIFIED. SHE HAS TRIED TO BLOCK US. I FEEL SHE SHOULD BE WORKING WITH US AND NOT AGAINST US.

WE DID A GOOD JOB FOR UMC EMPLOYEES. AND SHE SHOULD HAVE UPHELD THAT AND RESPECTED THAT INSTEAD OF DISRESPECTING US AND PUTTING NEGATIVITY ON SOCIAL MEDIA. IT WAS APPALLING. IT WAS DISRESPECTFUL AND ALMOST UNFORGIVABLE. THAT'S ALL I WANT TO SAY. THANK YOU.

MS. GARGANO: I'M DIANE GARGANO, ONE OF THE EMPLOYEES AT UMC. BEEN AN EMPLOYEE FOR 16 YEARS.

THE HEARING OFFICER: CAN YOU SPELL YOUR NAME, PLEASE, FOR THE RECORD?

MS. GARGANO: D-I-A-N-E G-A-R-G-A-N-O. I JUST WANT TO PIGGYBACK ON SOMETHING FOR A LITTLE BIT, NOT LONG, ON WHAT GWEN SAID ON 1400. I WAS INVOLVED IN THAT CASE WITH THERESA. AND SHE WAS VERY UNPROFESSIONAL. AND A LOT OF WHAT SHE WAS SAYING ABOUT GWEN IS UNTRUE. WE GOT MOVED BECAUSE OF HER UNPROFESSIONAL. AND THE NURSES ON 1400 ARE BULLYING TO EMPLOYEES AND PATIENTS AS WELL.

NOW, WHAT I'M ASKING FOR YOU GUYS IS TO HAVE A TRUSTEE IN OUR LOCAL 1107. THAT'S IT.

THE HEARING OFFICER: THANK YOU.

MS. BOLHOUSE: HELLO. MY NAME IS ELIZABETH BOLHOUSE, E-L-I-Z-A-B-E-T-H B-O-L-H-O-U-S-E. I'M THE CURRENT CHIEF NURSING STEWARD AT UMC, NEWLY ELECTED IN AUGUST. I'VE BEEN A UNION MEMBER ABOUT 2004 AND A STEWARD ABOUT 2014. AROUND 2014, '15-ISH, I ATTENDED SOME GENERAL STEWARD TRAINING. AND MARTIN WAS THE PRESIDENT AT THE TIME. AND IT WAS ALSO A FEMALE ATTORNEY GIVING STEWARD TRAINING. AND I FELT VERY CONFIDENT IN HOW THE UNION WAS BEING LED.

AND THEN MARTIN RESIGNED AND THE ATTORNEY RESIGNED. AND IN HER LETTER, SHE SAID SHE RESIGNED BECAUSE THE UNION WAS TURNING ON ITSELF. INSTEAD OF DEFENDING MEMBERS, SHE WAS SPENDING MORE TIME DEFENDING UNION OFFICERS AGAINST EACH OTHER, UNION REPRESENTATIVES.

AT THAT TIME, I QUESTIONED BEING A STEWARD. BECAUSE I DIDN'T WANT TO BE PART OF A LITIGIOUS ENVIRONMENT. BUT I'VE BEEN VERY FOCUSED ON UMC ONLY, NOT THE LOCAL AT LARGE. AND I KNOW THERE IS A NEED FOR A STRONG NURSING STEWARDSHIP AT UMC. SO I RAN FOR CHIEF STEWARD, AND I WON.

NOW THAT I'M ON THE E-BOARD, I FEEL THAT THE LOCAL LEADERSHIP IS VERY LITIGIOUS. I FEEL PART OF THAT MAY BE -- I'M NOT SURE HOW CHERIE MANCINI CAME INTO POWER THROUGH THE MARTIN TRANSITION. I DON'T KNOW THAT HISTORY. I DON'T KNOW IF CHERIE HIRED PETER NGUYEN OR HOW HE CAME IN THE UNION. BUT I FEEL HE'S VERY LITIGIOUS. HE HAS A JURIS DOCTORATE. SO DOES BRUCE YARWOOD. BUT I BELIEVE HE USES HIS JURIS DOCTORATE TO BULLY MEMBERS AND STEWARDS, WHEREAS BRUCE YARWOOD USES HIS LEGAL KNOWLEDGE TO ASSIST STEWARDS.

I ALSO HAVE A JD, AND I'M A NEVADA LICENSED ATTORNEY AS WELL. WHEN I WAS ON THE NEGOTIATION TEAM, I BELIEVE THERE WAS AN E-MAIL SENT OUT SAYING THAT THE UMC NEGOTIATION TEAM HAD A BREACH OF FIDUCIARY DUTY AND FAILURE TO REPRESENT. THOSE ARE LEGAL CAUSES OF ACTION, AND THAT MADE ME NERVOUS AS A STEWARD, THAT I AM A PART OF THIS ORGANIZATION.

BECAUSE NO ONE CAME TO US AND SAID, "WE HAVE ISSUES. WE HAVE CONCERNS." NO ONE DISCUSSED ANY OF THESE POSSIBLE FAILURES OR BREACHES OF DUTY. IT WAS JUST A PUBLIC ANNOUNCEMENT TO EVERYONE AT LARGE, WHICH WAS AN EMBARRASSMENT TO ME AND ALSO DEFAMED ME. BECAUSE WE DID

A VERY GOOD JOB AT THE NEGOTIATION. THERE WAS NO MAL-INTENT. AND NOW WHEN I REPRESENT SOMEBODY AT THE TABLE WITH A SUPERVISOR, I HAVE A CROWN OF SHAME ABOUT ME. BECAUSE I HAVE THIS PUBLIC ANNOUNCEMENT THAT I HAD A FAILURE TO REPRESENT, BREACH OF DUTY.

SO WHAT I'M ASKING IS THIS UNION NEEDS LEADERSHIP THAT WILL NOT -- THAT'S NOT LOOKING TO EAT ITS YOUNG, NOT LOOKING TO EAT ITS OWN. I'M NOT LOOKING TO BULLY PEOPLE, BE LITIGIOUS. WE NEED A LEADERSHIP THAT WILL UNITE US. AND QUITE FRANKLY, IF THAT DOES NOT HAPPEN, I WILL RESIGN. BECAUSE I'M HERE TO PROTECT NURSES.

I'M FULLY HERE TO TAKE CARE OF PATIENTS. BUT IN ORDER TO DO THAT, I'M ALSO CHIEF NURSING STEWARD TO HELP NURSES TAKE CARE OF PATIENTS. BUT IF THIS UNION CAN'T TURN ITSELF AROUND, I WILL LEAVE THE BALL GAME.

THE HEARING OFFICER: THANK YOU.

MS. SHEN: HI. MY NAME IS KRYSTAL SHEN. I'M THE CHIEF STEWARD AT DIGNITY HEALTH. I COME FROM THE SAME SHOP AS CHERIE MANCINI. I'VE BEEN A STEWARD ABOUT TEN YEARS, CHIEF STEWARD ABOUT FIVE.

THE HEARING OFFICER: CAN YOU SPELL YOUR NAME?

MS. SHEN: YES. KRYSTAL, K-R-Y-S-T-A-L S-H-E-N. SO IT'S PRETTY MUCH THE SAME COMPLAINTS THAT I HAVE HAD FOR SO LONG, A LACK OF COMMUNICATION. I ACTUALLY FIND OUT MORE FROM MY MEMBERS THAN I DO FROM MY UNION. THE INFORMATION COMES TO THE UNION. IT'S THEIR RESPONSIBILITY TO LET US KNOW, AND IT'S JUST NOT

HAPPENING.

WHEN I COMPLAIN, I'M MET WITH HOSTILITY AND RETALIATION. IT GOT SO BAD WHERE I ACTUALLY STARTED SENDING MEMBERS TO THE HALL TO LET THEM TELL THEIR STORY BECAUSE THEY DIDN'T WANT TO LISTEN TO ME. I EVEN HAD TO HAVE A MEETING WITH MEMBERS PRESENT TO LET THEM KNOW WHAT WAS GOING ON WITH ONE OF THE STAFF MEMBERS IN WHICH A ROOMFUL OF MEMBERS CAME TO THAT MEETING WITH PREVIOUS PRESIDENT, MARTIN, TO TELL THEM THAT THERE WAS NO SUPPORT.

ONE OF THE STAFF MEMBERS, THEY ACTUALLY HAD -- WELL, THEY NOMINATED SOMEBODY TO RUN AGAINST ME. AND THE STAFF MEMBER ACTUALLY CAME TO MY SHOP AND TOLD A MEMBER THAT THEY WANTED ME OUT, TO VOTE FOR THIS OTHER PERSON. IT'S TOTALLY WRONG. I'M TIRED OF THE RETALIATION. I'M TIRED OF THE HOSTILITY.

THEY'RE LEGITIMATE COMPLAINTS. I HAVE MEMBERS BEHIND ME TO VALIDATE WHAT'S GOING ON, BUT NOBODY SEEMS TO LISTEN. I'M LEFT AT MY SHOP BASICALLY WITH NO HELP. I CAN'T GET ANY HELP FROM PEOPLE AT THE UNION. I DON'T GET A CALL BACK. IF I WRITE AN E-MAIL OR COMPLAINT, I GET NO RESPONSE. SO I'VE BEEN LEFT TO PRETTY MUCH JUST WRITE GRIEVANCE AFTER GRIEVANCE AFTER GRIEVANCE.

THEY KEEP HIRING MORE AND MORE STAFF AT THE HALL. BUT THE ISSUE IS NOTHING SEEMS TO GET BETTER. AND INSTEAD, WHEN I DO SAY SOMETHING, I'M THROWN UNDER THE BUS. THERE IS ACTUALLY AN E-MAIL FROM ONE OF THE STAFF MEMBERS BASICALLY TRYING TO BLAME ME FOR THEM NOT LETTING

ME KNOW THERE WAS A MEETING.

IT'S GOTTEN TO THE POINT WHERE THERE IS NO TRUST. I HAVE NO TRUST IN ANYBODY AT THE HALL. THE ONLY PERSON THAT REACHED OUT TO GIVE ME A HAND WAS SHARON KISLING WITH THE COUNTY, WHO ACTUALLY AGREED TO COME TO MY SHOP AND HELP ME WORK THROUGH THESE GRIEVANCES.

SO I DON'T KNOW WHAT THE ANSWER IS, BUT I WOULD LIKE TO SEE SOME ACCOUNTABILITY. YOU KNOW, WHEN YOU HAVE VALIDITY TO THE COMPLAINTS, SOMETHING NEEDS TO BE DONE. I MEAN, THERE'S PAPER TRAILS, BUT THEY DON'T GO ANYWHERE. AND INSTEAD, WE'RE JUST LEFT BY OURSELVES, NOT ABLE TO GIVE A PRESENTATION TO THE MEMBERS BECAUSE WE HAVE NO SUPPORT.

THE HEARING OFFICER: THANKS, KRYSTAL, JUST A FOLLOW-UP QUESTION. I HAVEN'T HAD A CHANCE TO LOOK AT YOUR EXHIBIT, BUT DO YOU HAVE WITHIN THAT EVIDENCE AROUND LIKE WHERE YOU COMMUNICATED OR DIDN'T RECEIVE SOMETHING AND GOT IT FROM SOMEBODY ELSE OR E-MAILS TO THE UNION OFFICE WHERE YOU DIDN'T GET A RESPONSE, PHONE RECORDS, THINGS LIKE THAT? BECAUSE THOSE ARE THE THINGS THAT HELP US LOOK AT WHAT'S HAPPENING OR NOT HAPPENING.

MS. SHEN: YEAH. THERE'S THINGS IN THERE.

THE HEARING OFFICER: OKAY.

MS. WALFOORT: KRYSTAL, CAN I ASK YOU, THIS IS ALL ONE EXHIBIT, RIGHT, ONE COPY OF EVERYTHING?

MS. SHEN: YEAH. THEY'RE E-MAILS. SOME OF THEM FROM MEMBERS. SOME OF THEM ARE MY OWN.

MS. WALFOORT: WE GENERALLY ASK FOR FOUR

COPIES. WOULD YOU BE ABLE TO PROVIDE THREE MORE COPIES TO US OF THIS PACKET?

MS. SHEN: NOT TODAY. I DON'T HAVE A PRINTER. I JUST PRINTED THEM FROM MY E-MAIL. I COULD GET MORE.

MS. WALFOORT: COULD YOU DO IT TOMORROW?

MS. SHEN: OR JUST FAX THEM OR SOMETHING?

THE HEARING OFFICER: YOU CAN E-MAIL THEM. AND LA RELL WILL BE TAKING DOCUMENTATION AFTER THE HEARING UP UNTIL NOVEMBER 4TH.

MS. SHEN: OKAY. I CAN GET THEM FOR YOU.

MR. BERGTHOLDT: GOOD MORNING. MY NAME IS MARK BERGTHOLDT, M-A-R-K B-E-R-G-T-H-O-L-D-T. I WOULD LIKE TO THANK ALL OF YOU FOR COMING TO THIS HEARING. I'M SURE YOU'D LIKE TO BE SOMEWHERE ELSE DOING IMPORTANT WORK FOR YOUR UNION AT YOUR HOME SHOP.

I'M FRUSTRATED THAT I'M HERE TODAY. WITH THE ELECTION ONLY DAYS AWAY AND EARLY VOTING IN PROGRESS HERE IN NEVADA, THIS IS AN IMPORTANT TIME FOR OUR NATION, FOR NEVADA, AND FOR NEVADA CITIES AND COUNTIES. I WOULD RATHER BE KNOCKING ON DOORS AND GETTING OUT THE VOTE. BUT I BELIEVE STRONGLY THAT THE UNION DOES HAVE THE SKILLS AVAILABLE TO STAND ON ITS OWN WITH SOME HELP FROM THE INTERNATIONAL.

FIRST, I WOULD SUGGEST THAT THE ETHICS COMMITTEE THAT IS PART OF THE BYLAWS AND CONSTITUTION OF THE SEIU 1107 BE STOOD UP IMMEDIATELY WITH THE HELP OF INTERNATIONAL. THAT COULD BE ABLE TO ADDRESS SOME OF THE ISSUES THAT HAVE BEEN BROUGHT UP TO YOU TODAY ABOUT THIS

ISSUE HERE.

DURING MY FOUR YEARS ON THE BOARD -- LET ME GO BACK. I'VE ACTUALLY BEEN AN SEIU MEMBER SINCE 2000, WHEN I FIRST SIGNED ON AT SNHD AS AN ENVIRONMENTAL SPECIALIST. I'M NOW VICE PRESIDENT OF THE SUPERVISORY UNIT OF SOUTHERN NEVADA HEALTH DISTRICT. BUT I'VE BEEN AN E-BOARD MEMBER FOR THE PAST FOUR YEARS. AND IT TOOK ME A NUMBER OF MONTHS TO FIGURE OUT WHO WAS ON FIRST THERE WITHIN THE E-BOARD.

THERE WAS A HUGE TURNOVER THERE. THERE IS IN STAFF. THERE IS A HUGE TURNOVER AS WE SEE IN BOARD MEMBERS AND EXECUTIVE BOARD. SO I REALLY THINK THAT ONE THING ELSE THAT CAN BE DONE IS WE CAN HAVE AN IMPARTIAL PARLIAMENTARIAN FUNDED BY SEIU INTERNATIONAL TO ASSIST IN THE RUNNING OF THE ORGANIZATION OF THE E-BOARD. I FIND WHEN I'M THERE THAT THERE IS A LOT OF USE OF ROBERT'S RULES OF ORDER THAT REALLY AREN'T ROBERT'S RULES OF ORDER SUCH AS FRIENDLY AMENDMENT. IF YOU LOOK AT ROBERT'S RULES, THERE IS NO SUCH THING. SO I'M CONCERNED ABOUT THAT.

BUT I THINK A PARLIAMENTARIAN JUST TO BE THERE TO HIRE IMPARTIAL WOULD GO A LONG WAY TO IMPROVING OUR CONDITIONS THERE. I ALSO BELIEVE THAT THERE SHOULD BE A MANDATORY BOARD ORIENTATION FOR ANY NEW BOARD MEMBERS THAT COME ONBOARD. BECAUSE IT TOOK ME 6, 8, 12, 24 MONTHS TO FIGURE OUT WHAT THE HECK'S GOING ON THERE, WHAT THE REPORTS ARE, WHAT THE VARIOUS POSITIONS ARE. IT DOESN'T NEED TO BE ANYTHING LONGER THAN AN HOUR BEFORE OR

AFTER THE FIRST E-BOARD, TAUGHT BY A MEMBER OF INTERNATIONAL AND POSSIBLY PEOPLE ON THE EXECUTIVE BOARD THERE AT THE SEIU.

AND ALSO, THERE APPEARS TO BE A LACK OF FORMAL POLICIES THAT DESCRIBE THE VARIOUS FUNCTIONS AND PROCESSES THAT THE UNION IS TO TAKE CARE OF TO GOVERN THE UNION. SO THOSE ARE MY SUGGESTIONS ON IMPROVING HERE. I'VE HEARD A LOT OF PROBLEMS BEING BROUGHT UP TODAY. BUT I REALLY WANT TO BRING UP SOME SOLUTIONS TO THE ISSUES THAT THE LOCAL HAS HERE.

I WILL BE FOLLOWING UP WITH SEIU DIRECT IN E-MAIL. IT'S A WRITTEN STATEMENT. BECAUSE MY THOUGHTS ARE NOT SO COHERENT TODAY FOR SOME REASON. THANK YOU.

MS. WALFOORT: COULD I ASK YOU ONE THING? WHAT DID YOU SAY -- IS THERE AN EXISTING ETHICS COMMITTEE AND YOU SAID YOU WANTED THAT SUPPORTED?

MR. BERGTHOLDT: THERE IS A COMMITTEE IN THE CONSTITUTION AND BYLAWS, BUT IT'S NEVER BEEN CALLED UP AND USED. AND IT COULD HAVE BEEN USED TO HEAR THE ISSUES WITHIN THE SEIU LOCAL 1107. SO I THINK THAT WE SHOULD HAVE SOMETHING IN PLACE. AND WHEN THERE ARE CONFLICTS OF INTEREST, THAT THERE ARE OUTLETS TO ADDRESS THOSE CONFLICTS OF INTEREST IN THE ETHICS COMMITTEE.

SO THAT IF THERE'S A MEMBER OF THE ETHICS COMMITTEE BEING BROUGHT UP ON CHARGES OR BEING ALLEGED TO HAVING HARM DONE TO THEM, THAT THEY EXCUSE THEMSELVES FROM THAT COMMITTEE AND ANOTHER PERSON IS APPOINTED TO HAVE A FAIR HEARING ON IT.

AND ALSO, I WANT TO ADD ONE THING. I AM HERE BECAUSE I STRONGLY BELIEVE IN UNIONS. WHEN I WAS NOT AN E-BOARD MEMBER, I WAS TARGETED BY MY EMPLOYER. AND I FELT IT IMPORTANT TO HAVE. BECAUSE I'M A SUPERVISOR, I'M PUT BETWEEN A ROCK AND A HARD PLACE AT TIMES. I FELT IT IMPORTANT TO HAVE A VOICE ON THE UNION SIDE OF IT SO WE COULD SUPPORT OUR SUPERVISORS WHO ARE PUT BETWEEN MANAGEMENT AND STAFF.

SO THANK YOU FOR YOUR SERVICE, AND THANK YOU FOR BEING HERE. I APPRECIATE IT.

MS. MARZAN: GOOD MORNING. MY NAME IS BRENDA MARZAN, B-R-E-N-D-A M-A-R-Z-A-N. I HAVE BEEN A UNION MEMBER WITH THIS LOCAL SINCE 1988. BACK THEN, WE WERE A VERY SMALL ASSOCIATION. I HAVE WATCHED THIS LOCAL GO THROUGH MANY CHANGES OVER THE YEARS. IT SADDENS ME TO SAY THIS IS THE WORST I HAVE EVER SEEN. THE INABILITY TO GET THROUGH OUR MONTHLY EXECUTIVE BOARD MEETINGS ARE PREVENTING US FROM DOING THE BUSINESS OF THE LOCAL.

THE MEETINGS HAVE BECOME ABUSIVE. THERE IS PROFANITY, NAME CALLING ACROSS THE TABLE, INTERRUPTIONS THROUGHOUT EACH REPORT AND SUCH A TUG-OF-WAR ON EACH ITEM THAT WHAT SHOULD BE A SIMPLE DISCUSSION AND VOTE TURNS INTO A 30-MINUTE WAR. I DO NOT BELIEVE THAT OVER THE LAST YEAR WE'VE GOTTEN THROUGH AN ENTIRE AGENDA. THIS DEMONSTRATES OUR INABILITY TO GOVERN OURSELVES.

THE MEMBERS' NEEDS ARE NOT BEING FULFILLED. WE ARE IN THE MIDDLE OF AN ELECTION THAT CAN MAKE US OR BREAK US. I, FOR ONE, AM SPENDING SO MUCH TIME ON THESE

HEARINGS, E-MAILS, TRYING TO TAKE CARE OF UNION BUSINESS, COVERING THE BUTT OF THE LOCAL, INCITING WITH OTHER MEMBERS OF THE LOCAL AND STAFF, THAT I EXTEND NO TIME PHONE BANKING, WALKING FOR CANDIDATES, CANVASSING, ET CETERA. THIS IN ITSELF IS A DISSERVICE TO THE WORKING CLASS. WE ARE NOT PROTECTING OUR MEMBERSHIP.

I, BEING THE PUBLIC SECTOR, HAVE HUGE FIGHTS COMING UP IN THE NEXT LEGISLATION, FIGHTS THAT ARE CONSTANTLY FOUGHT. BUT BECAUSE OF THE LAST ELECTION WHERE WE LOST SO MANY SEATS IN THE LEGISLATION, CAUSED A LOT OF PROBLEMS FOR NOT ONLY THE GOVERNMENT SECTOR BUT UNIONS ACROSS NEVADA.

OUR LACK OF A POLITICAL PROGRAM IS A GRAVE CONCERN FOR ME. WITH US HAVING TO REACH OUT TO OUR BROTHERS OR SISTERS IN CALIFORNIA TO DO THE WORK FOR US SHOWS HOW UNORGANIZED WE ARE. WE HAVE A PRESIDENT THAT CONTINUOUSLY BADMOUTHS OUR UNION BANK TIME. SHE HAS SAID MANY TIMES PUBLICLY THAT THE ELECTED OFFICIALS OF THE PUBLIC SECTOR ARE ABUSING THIS NEGOTIATED BENEFIT.

HER LACK OF UNDERSTANDING OF HER ACTIONS HAS CAUSED SCRUTINY WITHIN THE PUBLIC SECTOR. THIS SAME ACTION I AM SURE WILL BE TAKEN BY OUR ENEMIES TO LEGISLATION AND WILL NOW HAVE TO BE FOUGHT THROUGH NEVADA POLICY.

THIS HAS TO STOP. WE CANNOT CONTINUE TO PUBLICLY PUT EACH OTHER DOWN, ADD MANAGEMENT TO E-MAILS TO TRY TO INTIMIDATE EACH OTHER, GO BEHIND EACH OTHER'S BACKS TO GET WHAT WE WANT, FILE RESTRAINING ORDERS TO

PREVENT THOSE WE DISLIKE FROM BEING ABLE TO BE AT THE HALL, HAVE ITEMS REMOVED FROM THAT AGENDA IN HOPES THEY WILL NOT REAPPEAR. THIS IS JUST A SHORT LIST OF THINGS GOING ON AT LOCAL 1107.

WE HAVE MEMBERS ON THE EXECUTIVE BOARD THAT SHOULD NO LONGER BE ON THE BOARD, BUT OFFICERS THAT WERE AWARE OF THE CHANGES OF BOARD MEMBERS CHOSE TO IGNORE THEM. THIS IS PUTTING THE LOCAL IN A POSITION WHERE NOT ONLY CAN CHARGES BE FILED WITHIN OUR CONSTITUTION AND BYLAWS, BUT OPENS US UP FOR CHARGES WITH THE DEPARTMENT OF LABOR.

WHEN WE ARE NOT FULFILLING THE OBLIGATION OF THE REPRESENTATION TO OUR MEMBERS AND HUMAN RESOURCES AND MANAGEMENT REACH OUT TO THE OFFICERS ASKING FOR OUR HELP, IT IS A VERY BAD DAY. WHEN OVER 50 PERCENT OF THE HEARINGS ARE RESCHEDULED DUE TO THE INABILITY TO COMMUNICATE BETWEEN THE HALL AND ELECTED OFFICIALS AND STEWARDS, WE'RE DOING AN INJUSTICE, AND NOT ONLY TO THE MEMBER NEEDING OUR HELP, BUT TO THE LOCAL AS WELL.

I HAVE NEVER BEEN INVOLVED WITH A MORE UNPROFESSIONAL ORGANIZATION. I'M BEGGING FOR HELP. UNFORTUNATELY, I HAVE LOOKED A LOT AT TRUSTEESHIP, AND I THINK THAT'S THE ONLY ANSWER TO THIS AT THIS POINT. THANK YOU.

MS. THOMAS: GOOD MORNING. MY NAME IS CLARA THOMAS, C-L-A-R-A T-H-O-M-A-S. I AM ONE OF THREE TRUSTEES OF SEIU LOCAL 1107. TODAY, I THANK YOU FOR HAVING THIS MEETING. BECAUSE AS YOU CAN SEE, WE WERE

ABLE TO GET A LOT OF THINGS OFF OUR CHEST, AND I APPRECIATE YOU BEING HERE AND ALLOWING US TO -- FOR YOU TO HEAR OUR VOICES.

THE ISSUE THAT I HAVE -- AND I JUST WANT TO SAY THAT I DO HAVE AN ISSUE. BUT WITH THAT ISSUE, I ALSO HAVE A SOLUTION. AND I THINK THAT THAT'S VERY IMPORTANT FOR US TO PUT ACROSS TODAY. THAT ISSUE IS WE HAVE A PRESIDENT THAT DOES NOT RELY ON HER AT-LARGE MEMBERS -- OFFICERS, I'M SORRY. AND IN THE PAST, I HAVE TRIED TO EXPLAIN THAT I THINK THAT IT WOULD BE TO HER BENEFIT TO USE US. AND SHE HAS ELECTED TO USE PETER NGUYEN.

AND PETER, I FEEL, IS A VERY DIVISIVE PERSON BECAUSE OF THE THINGS THAT I SEE THAT I CAN ATTRIBUTE TO HIM. PETER, FOR EVERY UNION THAT HE HAS WORKED FOR, HE HAS SUED. AND THAT HAS OPENED UP 1107 TO LIABILITY. AND I SAY THAT BECAUSE JUST LAST TUESDAY, PETER SENT AN E-MAIL TO MICHAEL URBAN, WHO IS OUR ATTORNEY AT 1107 INDICATING HIS INTENTIONS, WHEN YOU READ BETWEEN LINES, WAS TO DO JUST THAT.

AND I FEEL THAT THIS COULD HAVE BEEN -- PETER'S EMPLOYMENT COULD HAVE BEEN PREVENTED IF WE WOULD HAVE DONE THE JOB THAT OUR MEMBERS EXPECT US TO DO.

THE HEARING OFFICER: CAN I ASK A CLARIFYING QUESTION, CLARA?

MS. THOMAS: YES.

THE HEARING OFFICER: IS THIS EVIDENCE --

MS. THOMAS: YES, IT IS.

THE HEARING OFFICER: -- RELATED TO PETER'S

WORK HISTORY INCLUDED IN HERE?

MS. THOMAS: YES, IT IS.

THE HEARING OFFICER: OKAY. THANK YOU.

MS. THOMAS: I THINK THAT IT IS IMPORTANT -- THE TAB IS IN THERE WITH PETER'S NAME AND EVERYTHING, SO YOU CAN THUMB THROUGH IT.

BUT ANYWAY, WHEN PETER WAS HIRED AND AFTER HIS HIRING -- BECAUSE I WASN'T THERE WHEN HE WAS HIRED. I WILL ADMIT TO THAT, BUT I EXPLAINED TO PRESIDENT MANCINI THAT I FELT THAT PETER WAS STARTING TO HIRE PEOPLE IN KEY POSITIONS IN OUR ORGANIZATION THAT WERE FRIENDLY TO HIM. AND I TOLD HER THAT I THOUGHT THAT WAS SOMETHING WE SHOULD LOOK INTO, THAT IT WAS NOT CONDUCIVE TO OUR ORGANIZATION TO HAVE PEOPLE THAT ARE SURROUNDING HIM.

HE'S THE NUCLEUS. AND BY HIM HIRING OTHER PEOPLE, AND THAT IS -- AT FIRST, IT WAS OUR POLITICAL ORGANIZER, WHO TURNED DOWN THE JOB DUE TO ILLNESS. THEN HE HIRED A COORDINATOR. SORRY, HER TITLE JUST SLIPPED OUT OF MY HEAD. BUT THE SECOND ONE, WHICH I WAS REALLY, REALLY CONCERNED ABOUT WAS OUR FINANCIAL DIRECTOR.

AND WHEN YOU READ THE EVIDENCE THAT I HAVE COLLECTED IN THERE, YOU WILL SEE THAT ROBERT CLARKE IS ALSO LISTED IN THE SUIT THAT PETER HAS RAISED AGAINST OUR BROTHERS OR SISTERS IN CALIFORNIA, LOCAL 1. SO IF WE WOULD HAVE DONE A BACKGROUND INVESTIGATION, WE WOULD HAVE NOTICED THAT HE SUED -- WHAT IS IT S-A-G -- SAG. AND WE WOULD HAVE BEEN ABLE TO CONTACT HIS PREVIOUS EMPLOYER, AND JUST ASK THE SIMPLE QUESTION, WHETHER OR NOT THEY

WOULD REHIRE HIM. AND I'M SURE THEY WOULD HAVE TOLD US THE ANSWER TO THAT.

THOSE ARE THE THINGS THAT I FEEL THAT HAVE BEEN EGREGIOUS TO THE MEMBERSHIP RIGHT NOW. AND I'M ASKING FOR -- NOT TO BE TRUSTEED. I DON'T BELIEVE THAT WE SHOULD BE. I THINK THAT IF WE REMOVE THE CANCER THAT IS GROWING IN OUR UNION, THAT THAT WOULD HELP OUR UNION TO FLOURISH LIKE IT SHOULD BE. WHEN WE RAN FOR OFFICE, WE RAN ON "WE ARE ONE." AND IT HAS TURNED TO BE "WE ARE ONE." AND I THINK THAT THAT RIGHT THERE IS EGREGIOUS, THAT ONE PERSON CANNOT RUN THIS UNIT. IT TAKES, AS HILLARY CLINTON WOULD SAY, A VILLAGE. THANK YOU.

MS. PURDIE: COULD YOU WALK US THROUGH WHAT'S IN THE BINDER REALLY QUICKLY?

MS. THOMAS: I HAVE AN INDEX THERE. AND I DIDN'T BRING MY BINDER UP, BUT THE INDEX IS THERE.

MS. PURDIE: AND YOU MENTIONED AN E-MAIL FROM PETER TO --

MS. THOMAS: I DID NOT INCLUDE THAT, BUT I WILL BRING IT TOMORROW.

MS. PURDIE: THANK YOU.

MS. DUNN-JONES: EXCUSE ME. I'M A LITTLE HOARSE THIS MORNING. MY NAME IS VERONICA DUNN-JONES, V-E-R-O-N-I-C-A D-U-N-N-J-O-N-E-S. I'M A REGISTERED NURSE AT UNIVERSITY MEDICAL CENTER, AND I HAVE BEEN A MEMBER OF THE UNION SINCE 2005. I'M COMING TO SPEAK TO YOU TODAY ON MY EXPERIENCES WITH THE UNION. I CAN'T SPEAK TO THE INDIVIDUAL INSTANCES THAT ARE GOING ON IN

THE HALL. BUT I CAN SPEAK TO YOU ABOUT MY EXPERIENCES BEING A NURSE AND PART OF THE UNION AT UMC.

WHEN I FIRST GOT INTO THE UNION, I WAS VERY EXCITED. I BELIEVE IN THE PRINCIPLES OF THE UNION, FIGHTING FOR MEMBERS FOR BENEFITS, FOR PAY, MAKING SURE THAT WE WERE GETTING EQUAL REPRESENTATION WITH ADMINISTRATION. AND I WAS EVEN PART OF A BARGAINING COMMITTEE EARLY ON IN MY YEARS AT UMC.

HOWEVER, FOR THE LAST SEVERAL YEARS, I'VE SEEN THE DECLINE OF OUR UNION REPRESENTATION IN OUR HOSPITAL. BACK IN 2008, I BELIEVE -- I'M NOT GOOD WITH DATES -- WE WERE CONSIDERING THE NURSES SECEDING FROM THE UNION AND GOING TO THE CNA. A LOT OF NURSES STILL FEEL THAT WAY.

EARLIER THIS YEAR, WE WERE HIT WITH RESTRUCTURE OF THE NURSING ORGANIZATION AT UMC HOSPITAL. OUR NURSES ARE VERY UPSET. BECAUSE WE FEEL WE DO A GOOD JOB, AND BASICALLY OUR JOBS WERE ON THE LINE. THEY WERE GOING TO HAVE NURSES GO IN THE LAYOFF POSITION. BUT BASICALLY, CHARGE NURSES WOULD HAVE TO REBID FOR POSITIONS AND GET INTO THIS NEW STRUCTURE OF NURSING.

A LOT OF US WERE VERY UPSET AT THIS AND CAME TOGETHER AND DECIDED TO HAVE A MEETING TO DISCUSS WHAT WE CAN DO. BECAUSE WE DIDN'T FEEL WE WERE BEING REPRESENTED BY OUR MEMBERS IN THE UNION. THE TERMINOLOGY WE USE, "GHOST," WHICH MEANS THEY ARE NOT AROUND. AND WE DIDN'T FEEL THEY WERE REPRESENTING US FULLY. NO ONE CAME AND SAID, "HEY, THIS RESTRUCTURING IS GOING ON. WHAT DO YOU GUYS WANT TO DO? HERE'S THE INFORMATION."

AND THERE IS A HUGE DIVISION WITH NURSES AND ANCILLARY STAFF. WE HAD LITTLE TO NO REPRESENTATION FOR NURSING IN THE UNION FOR SEVERAL YEARS. AND THIS IS NOT TO THROW ANYBODY UNDER THE BUS, I KNOW IT'S A DIFFICULT JOB. IT'S HARD TO GET PEOPLE TOGETHER. IT'S HARD TO ORGANIZE. BUT WHEN YOU HAVE A PROBLEM, IF YOU HAVE A CUT, YOU JUST DON'T LET IT BLEED. YOU DO SOMETHING ABOUT IT. AND THAT WAS NOT BEING DONE.

SO EARLIER THIS YEAR, A BUNCH OF NURSES GOT TOGETHER AND HELD A MEETING. AT THE MEETING, WE DISCUSSED WHAT DO WE WANT OUR FUTURE TO BE AS MEMBERS OF THE SEIU? NURSES HAVE BEEN DROPPING THE UNION FOR SEVERAL YEARS BECAUSE OF THE LACK OF REPRESENTATION. AND WE EVEN PUT TOGETHER A PETITION SAYING THAT WE WERE CONCERNED ABOUT THE DIRECTION THAT OUR UNION WAS GOING IN. WE GOT CLOSE TO 750 SIGNATURES TO INCLUDE THE MAIN HOSPITAL AND THE QUICK CARES OF NURSES IN THEIR CONCERN ABOUT HOW THE UNION IS RUN.

IN THAT MEETING, WE INVITED SEVERAL UNION MEMBERS. AND FROM WHAT I CAN SAY, ONLY THREE UNION MEMBERS SHOWED UP, MICHAEL COLLINS, THERESA DIAZ AND CHERIE MANCINI. WE HAD A SECOND MEETING. AND IT WAS AT ANDREA KOVALCHECK'S HOUSE THAT WE HELD THESE MEETINGS. AND WE WERE TOLD AT THAT MEETING THAT IT WOULD BE A BAD IDEA FOR US TO SECEDE FROM THE UNION -- EXCUSE ME -- THAT WE NEEDED TO NOT SECEDE FROM THE UNION, THAT IT WOULD BE A BAD IDEA. IT WOULD BE BAD FOR US. IT WOULD BE BAD FOR THE HOSPITAL AS A WHOLE. SO WE JUST DECIDED TO PULL BACK

FROM THAT AND SIT AND WAIT.

IN THE MEANWHILE, GRIEVANCES WERE FILED ON OUR BEHALF BY CHERIE MANCINI AND THE UNION SUPPORTING THE NURSES DURING RESTRUCTURING SO THAT WE CAN HAVE THAT INFORMATION: WHAT IS THIS RESTRUCTURE? WHAT EXACTLY DOES IT MEAN FOR THE NURSES? WHAT EXACTLY IS THE PROCESS FOR THE RESTRUCTURING? SEVERAL MEETINGS HAVE BEEN HAD SINCE THEN, AND WE HAVE KIND OF PUT TOGETHER A PLAN WITH ADMINISTRATION FOR BETTER COMMUNICATION WITH NURSING, ADMINISTRATION AND SEIU.

IN THE MEANWHILE, CONTRACT NEGOTIATIONS ARE GOING ON. WHEN THEY SAY "TRANSPARENCY," I'M NOT SURE WHAT THAT MEANS. BECAUSE WHEN SOMEBODY NEGOTIATES MY BENEFITS AND MY PAY, I WANT TO KNOW WHAT'S BEING NEGOTIATED, NOT THAT IT'S BEING TALKED ABOUT. I CAN SIT HERE AND SAY TO YOU, "I WENT TO A MEETING WITH SEIU BECAUSE WE WERE HAVING A HEARING." BUT WHAT WAS TALKED ABOUT AT THE HEARING? WHAT WAS DISCUSSED? WHAT WAS PLANNED?

THERE WAS SEVERAL PEOPLE, INCLUDING A LOT OF THE NURSES, WHO WANTED TO KNOW WHEN THE CONTRACT CAME OUT, "WHAT ARE WE VOTING FOR? WHAT EXACTLY ARE WE VOTING FOR?" AND IT WASN'T UNTIL THE E-MAIL CAME OUT TO STOP THAT. WE ACTUALLY HAD A HALL MEETING WITH CHERIE MANCINI TO SAY, "HEY, THIS IS WHAT YOU'RE VOTING FOR. THIS IS WHAT'S IN THE CONTRACT."

I'M NOT SAYING SHE'S THE BEST PRESIDENT IN THE WORLD. I'M NOT SAYING SHE'S THE WORST PRESIDENT IN THE

WORLD. WHAT I'M SAYING IS SHE'S SUFFERING FROM THE OBAMA EFFECT. SHE CAME INTO THE PRESIDENCY, AND SHE HAD A CONGRESS THAT WILL NOT WORK WITH HER. I THINK EVERYONE NEEDS TO BE RESPONSIBLE FOR THEIR LACK OF RESOURCES, THEIR LACK OF ACCOUNTABILITY, THEIR LACK OF COMMUNICATION WITH ALL MEMBERS. NOT JUST MEMBERS IN THEIR DEPARTMENT, BUT ALL MEMBERS, INCLUDING THE NURSES.

I HEARD SOMEBODY SAYING THAT THE NURSES OF 1400 TREAT PEOPLE BAD. THAT IS AN UNFAIR STATEMENT. ONE OR TWO NURSES, THREE NURSES MAYBE. BUT TO SAY ALL OF THOSE NURSES TREAT PATIENTS BAD IS A SLAP IN THE FACE TO ME.

THE HEARING OFFICER: YOU'RE OVER YOUR TIME. BUT I DO HAVE CLARIFICATION QUESTIONS ON THINGS YOU SAID. AT THE BEGINNING OF YOUR STATEMENT, YOU HAD SAID SOMETHING ALONG THE LINES THAT YOU HADN'T FELT REPRESENTATION FOR SEVERAL YEARS.

MS. DUNN-JONES: YES.

THE HEARING OFFICER: AND THEN LATER ON, YOU SAID THAT CHERIE FILED SOME GRIEVANCES. AND SO I FIRST HEARD NOT --

MS. DUNN-JONES: THAT WAS THIS YEAR.

THE HEARING OFFICER: OKAY.

MS. DUNN-JONES: THAT WAS AFTER WE GOT TOGETHER AND PUT TOGETHER THE MEETINGS AND HAD PUT THE PETITIONS OUT TO BE SIGNED THAT ALL OF THIS CAME TOGETHER. SHE WAS CALLED BY ONE OF THE MEMBERS. WHEN ELIZABETH SPOKE TO HER -- AND I'M SORRY SHE'S NOT HERE. BECAUSE SHE CAN GIVE A BETTER TIMELINE. SHE WAS THE MAIN COMMUNICATOR

WITH CHERIE. SHE WAS COMMUNICATING WITH CHERIE: THIS IS WHAT'S GOING ON. THIS IS WHAT THE NURSES ARE DOING.

AND THAT'S HOW THE BALL KEPT ROLLING FOR THIS.

THE HEARING OFFICER: ANYTHING YOU CAN DO TO PROVIDE DOCUMENTATION OF THAT PROCESS WOULD BE HELPFUL ALONG WITH THE PETITION THAT YOU REFERRED TO WITH THE SIGNATURES. BUT THE -- I'M CURIOUS ABOUT THE RATIFICATION PROCESS. IT SOUNDS LIKE -- YOU SAID THAT YOU WEREN'T INFORMED ABOUT THE TENTATIVE AGREEMENT OR VOTE. IS THERE A POLICY AND PROCESS FOR A RATIFICATION THAT IS MAILED TO ALL MEMBERS? OR HOW DOES THAT WORK?

MS. DUNN-JONES: I DON'T KNOW. THAT'S THE ISSUE. AND THAT'S NOT JUST ONE PERSON'S FAULT. WHEN THEY WENT INTO BARGAINING, BASICALLY, WE HAVE THE PULSE AT UMC. THE PULSE IS THE MAIN MAGAZINE THAT'S SUPPOSED TO TELL EVERYBODY THE BARGAINING MEETING HAPPENED AND WHAT HAPPENED AT THAT MEETING. IT WAS LITERALLY A PARAGRAPH OF NOTHING.

I ALONG WITH ELIZABETH, ANDREA AND SEVERAL OTHER MEMBERS ASKED, "CAN WE SIT IN ON THESE MEETINGS?" BECAUSE WHEN I SAT IN A BARGAINING COMMITTEE, IT WAS TRADITIONAL BARGAINING, NOT THIS CLOSED-DOOR. WHERE AT LEAST WE WERE ABLE TO SIT THERE AND SAY, "OKAY, I HEARD THESE MEMBERS FIGHT FOR ME. I HEARD WHAT WAS SAID."

THAT WAS NOT DONE THIS TIME. SO NOBODY HAS A CLUE UNLESS YOU WERE ACTUALLY IN THE MEETING, WHICH IS A VERY SMALL GROUP, OF WHAT HAPPENED IN THESE BARGAINING MEETINGS.

THE HEARING OFFICER: AND IS THERE A SPECIFIC ASK THAT YOU -- "THIS IS WHAT I WOULD LIKE YOU TO DO"?

MS. DUNN-JONES: MY ASK IS THAT -- I DON'T WANT TO GET ANYBODY IN TROUBLE. I THINK EVERYBODY IS WORKING HARD. EVERYBODY HAS GOOD INTENTIONS. THEY WANT THE UNION TO WORK. PUT YOUR PERSONAL BS TO THE SIDE, AND REMEMBER IT'S NOT ABOUT YOU AND YOUR PERSONAL AGENDA. REMEMBER, IT'S ABOUT THAT UNION AS A WHOLE. YOU'RE REPRESENTING A BODY OF PEOPLE, NOT YOURSELF AND NOT YOUR PERSONAL AGENDA.

SO COMMUNICATE WITH EVERYONE. SEEK OUT THE LEADERS ON EACH UNIT, AND MAKE THEM REPRESENTATIVE -- NOT REPETITIVES, BUT GIVE THEM THE INFORMATION THAT THEY NEED TO TALK TO THEIR UNIT MEMBERS, TO TALK TO THE STAFF THEY WORK WITH.

AN EXAMPLE OF THIS, AND I HAVE A PICTURE ON MY PHONE, SOMEBODY CAME IN THE OTHER DAY AND CLEARED OUT OUR SEIU BOARD. THERE'S NOTHING ON IT. THERE'S NO INFORMATION, NO PHONE NUMBERS, NOTHING. SO I ASKED ELIZABETH BOLHOUSE ABOUT IT AND SAID, "HEY, OUR BOARD IS CLEARED. THERE IS NO INFORMATION. WHAT'S GOING ON?"

"OKAY. WE'LL GET SOMEBODY UP THERE AND DO THAT."

THE HEARING OFFICER: I MADE A NOTE ABOUT COMMUNICATION. BUT WE'RE GOING TO HAVE TO MOVE ON.

MS. DUNN-JONES: OKAY. THANK YOU.

THE HEARING OFFICER: THANK YOU.

MR. HODGSON: MY NAME IS RICHARD HODGSON,

H-O-D-G-S-O-N. I'M THE FORMER CHIEF UNION STEWARD FOR NON-SUPERVISORY UNIT OF THE DEPARTMENT OF AVIATION. I'M A PUBLIC SECTOR CLARK COUNTY EMPLOYEE. I HAVE A MEMBER, NOW FORMER MEMBER, THAT WANTED ME TO PRESENT FOR HIM, ON HIS BEHALF. HE ATTENTIONED IT TO MARY KAY HENRY. SO I WOULD HOPE THAT MARY KAY HENRY WILL HAVE THE OPPORTUNITY TO REVIEW THIS BRIEF LETTER OF A RECENT VISIT THAT PRESIDENT MANCINI HAD IN ONE OF THE SHOPS AT THE DEPARTMENT OF AVIATION. I WILL REDACT HIS NAME AS I READ, BUT IT IS PROVIDED IN THE DISCOVERY.

"ATTENTION SEIU INTERNATIONAL PRESIDENT, MARY K. HENRY. I WAS A 12-YEAR SEIU MEMBER AND SERVED TWO YEARS AS A SHOP STEWARD FOR CLARK COUNTY DEPARTMENT OF AVIATION. MY MEMBERSHIP ENDED OCTOBER 2016. I'M ALSO AN IBEW LOCAL 213 JOURNEYMAN ELECTRICIAN. I'VE BEEN IN THE TRADE FOR OVER 25 YEARS.

"I'M SAD TO INFORM YOU OF MY RECENT DECISION TO DROP MY MEMBERSHIP OF SEIU 1107. SEVERAL WEEKS AGO, 1107 PRESIDENT, CHERIE MANCINI, CONDUCTED A SHOP VISIT IN WHICH SHE INTRODUCED HERSELF AND SHARED HER VISION OF THE LOCAL. SHE ALSO SHARED SOME VERY MALICIOUS COMMENTS OF RICHARD HODGSON" -- I'M RICHARD HODGSON -- "WHO ALSO RAN AGAINST HER IN OUR RECENT LOCAL UNION-WIDE ELECTIONS.

"IN ALL MY YEARS AS A UNION MEMBER OF TWO DIFFERENT UNIONS, IBEW, SEIU, I HAVE NEVER OBSERVED A PRESIDENT COME INTO MY SHOP AND ATTACK THE CHARACTER AND INTEGRITY OF A FORMER UNION OFFICER. THIS CONDUCT IS

UNBECOMING OF A PRESIDENT OF A LOCAL UNION, AND I CAN NO LONGER SUPPORT A UNION THAT HAS A PRESIDENT OF SUCH LOW CHARACTER.

"FORMER 12-YEAR MEMBER."

IN ADDITION TO THIS, SEVERAL OTHER LONG-TERM SEIU 1107 MEMBERS HAVE DROPPED THEIR MEMBERSHIP IN THIS RECENT DROP MONTH OF OCTOBER 2016. EACH ONE ASSURED ME THAT WHEN CHERIE MANCINI IS REMOVED FROM PRESIDENT AND WE GET SOME PROPER LEADERSHIP, THEY WILL COME BACK.

THANK YOU.

MS. SPRINGER: I HAVE TO READ THIS BECAUSE I DIDN'T HAVE TIME TO PUT IT ON THE TELEPROMPTER. MY NAME IS DEBBIE SPRINGER, D-E-B-B-I-E S-P-R-I-N-G-E-R, JUST LIKE MY UNCLE JERRY.

THANK YOU FOR HOLDING THIS INTERNAL MEETING. I'VE LISTENED AS --

THE HEARING OFFICER: DEBBIE, WHERE DO YOU WORK AT?

MS. SPRINGER: OH, CLARK COUNTY DISTRICT ATTORNEY OFFICE, FAMILY SUPPORT. I'M ALSO A TRUSTEE IN SHARE OF THE PAC COMMITTEE.

THE HEARING OFFICER: VERY GOOD.

MS. SPRINGER: OKAY. I HAVE LISTENED TO A FEW PEOPLE HERE HAVE CONCERNS ABOUT THE LACK OF IMPLEMENTING POLICIES AND PROCEDURES THAT STEM FROM THE CONSTITUTION AND BYLAWS. I WOULD LIKE TO ASK THE E-BOARD MEMBERS ATTENDING THIS MEETING THAT HAVE SERVED ON THE E-BOARD FOR MANY YEARS WHY THEY HAVE NOT TAKEN THE OPPORTUNITY TO

WRITE THOSE POLICIES AND PROCEDURES. I KNOW THE FIRST E-BOARD MEETING I ATTENDED AS A TRUSTEE ABOUT THREE AND A HALF YEARS AGO, I ASKED ABOUT POLICIES AND PROCEDURES. I GOT EYE ROLLS AND MOSTLY BLANK STARES.

WE NEED TO SOMEHOW WORK TOGETHER. THERE IS WAY TOO MUCH AT STAKE IN THE COMING WEEKS. NAMELY, THE SUPREME COURT, THE CONGRESS AND CHANGING THE MAKEUP OF THE STATE LEGISLATURE. BECAUSE IF WE DON'T, WE CAN BE ASSURED THAT COLLECTIVE BARGAINING AND PERS WILL BE NONEXISTENT AT THE END OF THE LEGISLATIVE SESSION. AND YOU KNOW ONCE THE PUBLIC SECTOR IS GUTTED AND FALLS, THE PRIVATE SECTOR WILL NOT BE FAR BEHIND.

THANK YOU FOR YOUR TIME. AND MY SUGGESTIONS FOR IMPROVEMENT: BROTHER MARK'S IDEAS. THANK YOU.

THE HEARING OFFICER: THANK YOU.

MS. ERRINGTON: HELLO. MY NAME IS COURTNEY ERRINGTON, C-O-U-R-T-N-E-Y E-R-R-I-N-G-T-O-N. MY UNIT IS THE SOUTHERN NEVADA REGIONAL HOUSING AUTHORITY, SNRHA, IF YOU WILL. I'VE BEEN A MEMBER OF LOCAL 1107 FOR 12 YEARS, EVER SINCE I WAS ELIGIBLE TO BECOME A MEMBER. I HAVE SERVED IN VARIOUS CAPACITIES DURING THAT TIME PERIOD AS STEWARD, CHIEF STEWARD FOR MY UNIT, TREASURER, PARLIAMENTARIAN. AND FOR 10 OF THOSE 12 YEARS OF MEMBERSHIP, I WAS ON THE EXECUTIVE BOARD.

I THINK THAT WHAT WE NEED IS SOME UNDERSTANDING OF WHAT IT IS THAT WE ARE ACTUALLY TASKED TO DO AS NOT JUST E-BOARD MEMBERS, BUT MEMBERS AS A WHOLE. I THINK THAT ONE OF THE PLACES WE HAVE FALLEN SHORT IS THAT WE

HAVE NOT ADEQUATELY TRAINED AND EDUCATED OUR MEMBERS OR OUR E-BOARD MEMBERS. I THINK THE TRAINING SHOULD INCLUDE A MULTITUDE OF THINGS. AND THIS LIST IS NOT AL-INCLUSIVE, I'M SURE, BUT MAYBE STARTING WITH A LITTLE LABOR HISTORY. PERHAPS A LITTLE HISTORY ABOUT OUR VERY OWN LOCAL.

WE LACK STRUCTURE IN OUR LOCAL. OUR INFRASTRUCTURE, IF YOU WILL. AND WHAT WE COULD USE, ASSISTANCE IN ESTABLISHING THE POLICIES AND PROCEDURES INCLUDING HIRING PRACTICES, THE CONNECTIONS BETWEEN OUR PRIVATE AND PUBLIC SECTORS. WE NEED TO ESTABLISH BOUNDARIES IN TERMS OF WHAT IS THE STAFF'S ROLE, WHAT IS THE OBLIGATION AND RESPONSIBILITIES OF THE EXECUTIVE BOARD MEMBERS AND MEMBERS ALSO. BECAUSE I THINK THAT A LOT OF US DON'T UNDERSTAND THAT IT IS ACTUALLY THE MEMBERS THAT ARE SUPPOSED TO DO THE WORK. AND THE STAFF IS SUPPOSED TO SUPPORT US.

I THINK A LOT OF E-BOARD MEMBERS DON'T UNDERSTAND THAT THOSE POSITIONS ARE POSITIONS NOT OF POWER, BUT OF SERVICE TO THE MEMBERSHIP AND TO THE COMMUNITY. AND I DON'T THINK THAT PEOPLE UNDERSTAND THAT WE ARE A SOCIAL JUSTICE ORGANIZATION AND FIGHTING FOR THE GREATER GOOD OF ALL.

I THINK THAT WE ALSO NEED TO HAVE SEVERAL ORIENTATIONS. ONE SHOULD BE A PRE-ELECTION ORIENTATION. AND IN FACT IT SHOULD IT COME BEFORE NOMINATION SO PEOPLE UNDERSTAND WHAT IT IS THEY'RE BEING NOMINATED FOR AND WHAT IT IS THEY'RE ACCEPTING. OF COURSE, AFTER THE

ELECTION, THERE SHOULD BE ORIENTATION AND TRAINING FOR THE MEMBERS, THE E-BOARD MEMBERS, INCLUDING FINANCE TRAINING FOR ALL, LEADERSHIP TRAINING.

AND THEN WE ALSO NEED TO -- I DON'T KNOW HOW YOU TRAIN THIS, BUT AT LEAST HAVE PEOPLE LEARN TO BE MORE RESPECTFUL OF OTHER MEMBERS AND DIFFERENCES OF OPINION, DIFFERENCES OF LIFESTYLES. I'VE HEARD AND SEEN PEOPLE WHO WERE RUNNING AND SOME WHO ARE NOW ON THE EXECUTIVE BOARD THAT MAKE SOME PRETTY CAUSTIC REMARKS IN REGARDS OF PEOPLE'S ETHNICITY, SEXUAL PREFERENCE, GENDER IDENTITY AND THOSE THINGS. AND I BELIEVE THEY HAVE ABSOLUTELY NO PLACE IN AN ORGANIZATION SUCH AS OURS.

ALSO, I THINK THAT WE NEED TO WORK ON A COMMUNICATION PLAN, AND WE NEED TO WORK ON A PLAN FOR OUR LOCAL IN TERMS OF WHERE WE ARE AND HOW WE NEED TO GET -- MOVE POSITIVELY FORWARD.

THE HEARING OFFICER: AND YOU'RE AT YOUR THREE-MINUTE TIME FRAME.

MS. ERRINGTON: JUST ABOUT RIGHT. I'M DONE.

THE HEARING OFFICER: VERY GOOD.

MR. COLLINS: GOOD MORNING. MY NAME IS MICHAEL COLLINS, M-I-C-H-A-E-L C-O-L-L-I-N-S. I'M A REGISTERED NURSE AT UNIVERSITY MEDICAL CENTER. I'M A FORMER TRUSTEE. I SERVED TWO TERMS. I'VE BEEN A LOCAL MEMBER SINCE 1989. I'M ALSO A MEMBER OF THE LEADERSHIP COUNCIL OF THE SEIU NURSE ALLIANCE. I HEARD A LOT OF THINGS HERE. I'VE HEARD SOME THINGS THAT I AGREE WITH, SOME THINGS THAT I THINK WILL BE VERY BENEFICIAL TO US GOING

FORWARD.

I DO NOT THINK IT WOULD BE GOOD FOR OUR LOCAL TO BE TRUSTEED AT THIS TIME. I'M HERE TO SUPPORT ALL OF SEIU LOCAL 1107, AND I STAND HERE TO AFFIRM THAT CHERIE MANCINI IS THE ELECTED PRESIDENT OF OUR LOCAL AND SHOULD REMAIN IN THAT POSITION. I WAS A MEMBER OF THE BARGAINING TEAM FOR UNIVERSITY MEDICAL CENTER DURING THIS LAST CONTRACT NEGOTIATION, AND I HAD A DIFFERENT EXPERIENCE THAN THE OTHER BARGAINING TEAM MEMBERS.

WHAT OCCURRED WAS THAT CHERIE MANCINI WAS BLOCKED FROM RECEIVING INFORMATION FROM OUR BARGAINING PROCESS. AND WHEN SHE SENT STAFF THAT THE BARGAINING TEAM MEMBERS WERE NOT FAMILIAR WITH, THE STAFF WAS ASKED TO LEAVE. SO DURING THE CONTRACT NEGOTIATIONS, I WAS STILL A TRUSTEE. AND I WAS VERY AWARE OF THE ATTEMPTS THAT PRESIDENT MANCINI MADE TO PARTICIPATE IN OUR PROCESS. AND AGAIN SHE WAS BLOCKED.

THE HEARING OFFICER: CAN YOU GIVE ME EXAMPLES OF WHAT THAT WAS, MICHAEL, OR EVIDENCE OF IT?

MR. COLLINS: EVERY WEEK, DURING THE CONTRACT NEGOTIATIONS, I HAD CONVERSATIONS WITH CHERIE MANCINI. BECAUSE THE MEMBERSHIP WANTED TO KNOW WHAT WAS GOING ON IN THE PROCESS. SHE TOLD ME THAT SHE HAD CONTACTED PAT GREAUX, WHO WAS TAKING THE LEADERSHIP ROLE IN THAT PROCESS. AND PAT WAS NOT PROVIDING HER ANY INFORMATION.

WE HAD AN ORGANIZER FROM THE HALL THAT HAD BEEN ASSIGNED OTHER DUTIES. WHEN A NEW ORGANIZER WAS BROUGHT IN TO OBSERVE THE PROCESS, SHE WAS TOLD TO LEAVE. WHEN

PRESIDENT MANCINI HERSELF CAME TO THE BARGAINING PROCESS, SHE WAS ASSURED THAT EVERYTHING WAS GOING ALONG IN AN ACCEPTABLE MANNER. SHE WAS FINALLY GIVEN A COPY OF THE DOCUMENTATION OF WHAT HAD TAKEN PLACE TO THAT DATE. AND SHE LEFT.

AFTER THE NEGOTIATIONS WERE COMPLETED, NOBODY, INCLUDING THE BARGAINING TEAM, HAD ACCESS TO WHAT WE HAD BARGAINED. AND SOMEHOW OR ANOTHER, THE MEMBERSHIP GOT AHOLD OF A DOCUMENT THAT STARTED TO CIRCULATE THAT ROUGHLY WAS A CLEAR REPRESENTATION OF WHAT WE HAD BARGAINED. I WAS CONTACTED, I BELIEVE IT WAS JULY THE 28TH, BY THE THEN VICE PRESIDENT GWEN STEVENS AND ASKED TO FAX THAT INFORMATION TO CHERIE MANCINI.

WHEN CHERIE MANCINI SAW IN THE DOCUMENT THAT WAS TO BECOME OUR RATIFIED CONTRACT THAT A PROVISION WAS PUT INTO THE CONTRACT THAT NO MEMBER FROM THE SEIU LOCAL COULD ACCESS UMC WITHOUT FIRST GIVING 24 HOURS' NOTICE TO THE CHIEF STEWARDS AT UMC AND TO HR, SHE BEGAN TO VOICE SOME SERIOUS CONCERNS ABOUT THAT. THE WAY SHE HANDLED THAT SITUATION, I PROBABLY WOULD NOT HAVE. BUT I REALLY UNDERSTAND WHAT HER CONCERNS ARE.

THE HEARING OFFICER: CAN I ASK FOR MY OWN CLARIFICATION HERE, SO THAT WAS IN A DOCUMENT? DO YOU HAVE THAT DOCUMENT? AND THEN DID IT END UP IN A FINAL DOCUMENT?

MR. COLLINS: THAT INFORMATION ALL ENDED UP IN THE FINAL DOCUMENT. WHEN WE WENT FOR THE RATIFICATION VOTE BY THE CLARK COUNTY COMMISSIONERS, I WORE THE PURPLE

OF SEIU. I WALKED INTO THE COMMISSIONERS' HEARING ROOM. I SAW THE PURPLE, AND WENT OVER TO THE PURPLE, AND IT WAS JUST UNION STAFF. I SAID, "WHERE IS THE UMC BARGAINING TEAM?" THEY THEN SAID THEY WERE OVER THERE. THEY WERE ALL WEARING BLUE. I WENT OVER TO THEM AND ASKED WHY THEY WERE ALL WEARING BLUE. THEY SAID BECAUSE THIS IS A UMC BARGAINING TEAM. THIS IS A UMC CONTRACT.

BRENDA MARZAN AND FORMER PRESIDENT MARTIN BASSICK JOINED THEM IN THEIR PROTEST IN FRONT OF THE COUNTY COMMISSIONERS, IN FRONT OF THE PUBLIC AND THE WORLD THAT THEY WERE -- I DON'T KNOW WHAT THAT WAS ALL ABOUT REALLY. BUT I DO KNOW THAT SINCE THAT TIME, THERE HAVE BEEN MEMBERS OF OUR LOCAL THAT HAVE BEEN CONTACTED BY SOME OF THE OFFICERS THAT ARE IN THIS ROOM TODAY ABOUT JOINING A COUNTY ASSOCIATION AND LEAVING SEIU.

I WORK ON 1400 AT UNIVERSITY MEDICAL CENTER. I HAVE WORKED VERY HARD TO TRY TO KEEP NURSING TOGETHER AT UMC, BUT I HAVE NOT IN A POSITION OF AUTHORITY TO DO THAT.

FINALLY, I HAVE THREE CONCERNS. AS A MEMBER OF THE SEIU NURSE ALLIANCE, I'M WORKING ON SOME PROJECTS TO TRY TO DO SOME EXTERNAL ORGANIZING TO INCREASE OUR NUMBERS THROUGHOUT OUR LOCAL. AND I'VE RECENTLY SEEN SOME LITERATURE SHOWING UP IN OUR BREAK ROOM FROM THE CALIFORNIA NURSES ASSOCIATION. THIS IS VERY DISTURBING TO ME. I WANT THAT ADDRESSED.

DURING THE LAST LEGISLATIVE SESSION, WE DID NOT HAVE THE MEANS TO FIGHT THE 1033 EGREGIOUS (INAUDIBLE)

BILLS THAT WERE SENT TO OUR LEGISLATURE TO DESTROY COLLECTIVE BARGAINING AND TO AFFECT OUR RETIREMENT SYSTEM. SO WE NEED HELP FROM THE INTERNATIONAL ON THESE KINDS OF MATTERS. WE NEED HELP IN TERMS OF HELPING US TO DEFINE OUR GOVERNANCE PROCESS AND TO IMPLEMENT SOME OF THE STRUCTURE THAT NEEDS TO BE PUT IN PLACE. BUT EVERY MEMBER IN THIS ROOM NEEDS TO TAKE RESPONSIBILITY FOR WHAT THEY DID TO CREATE THIS CHAOTIC SITUATION.

THANK YOU.

MR. SERRANO: MY NAME IS ALFREDO SERRANO. I'M A REGISTERED NURSE AT UMC. AND I'M CURRENTLY TRUSTEE --

THE HEARING OFFICER: CAN YOU SPELL YOUR NAME, PLEASE?

MR. SERRANO: A-L-F-R-E-D-O S-E-R-R-A-N-O.

MS. WALFOORT: CAN YOU ADJUST THE MICROPHONE A LITTLE BIT HIGHER?

MR. SERRANO: SURE.

A LOT OF THE CONCERNS THAT YOU WILL NOTICE HERE ARE FROM THE UMC BARGAINING. THIS IS THE OPEN STATEMENT. THERE IS A LOT OF THE MAJORITY OF THE PEOPLE SPEAKING AGAINST CHERIE MANCINI AND ASKING FOR TRUSTEESHIP ARE OF THAT BARGAINING TEAM. THE NOTICE THAT WENT OUT FROM CHERIE MANCINI REGARDING THAT HAS OFFENDED THE BARGAINING TEAM. IF CHERIE -- IN MY OPINION, IF CHERIE FELT THAT THERE WAS CONCERNS WITH THE BARGAINING, IT WAS HER RESPONSIBILITY TO HOLD THAT ELECTION AND MAKE SURE THAT THEY INVESTIGATE THOSE CONCERNS BEFORE THE ELECTION GOES ON. BECAUSE ONCE THE ELECTION GOES ON AND THE MEMBERS

VOTE TO ACCEPT THE BARGAINING TEAM'S CONTRACT, THEN THERE IS NO GOING BACK ON IT.

UNFORTUNATELY, THERE IS A COUPLE OF THINGS AS MICHAEL SPOKE OF THAT DID HAPPEN IN THAT BARGAINING THAT HAVE HURT THE MEMBERS OF UMC. I HAVE A DAUGHTER-IN-LAW WHO WORKS THERE. AND ONE OF THE THINGS THAT THEY SPOKE OF -- SHE TALKED TO ME ABOUT FLYERS THAT WERE GOING OUT ABOUT -- I BELIEVE IT'S ANOTHER UNION THAT THEY WERE TRYING TO BRING IN AT UMC. AND SHE CALLED AND ME AND ASKED ME --

THE HEARING OFFICER: WHAT I WANT TO ASK THOUGH, ALFREDO, IS IF YOU CAN SPEAK TO WHAT YOU KNOW. BECAUSE IF SOMEBODY ELSE HAS A CONCERN, THEY HAVE TO BE HERE TO RAISE IT.

MR. SERRANO: I DO HAVE COPIES OF THE LETTER. BUT MY CONCERN THERE IS THAT WHEN I CALLED THE UNION HALL TO SAY THERE IS FLYERS GOING OUT AND, I BELIEVE, EVIDENCE ON SOME OF THE CHARGES, I CALLED THE HALL AND THEY TOLD ME IN THE NEW CONTRACT THAT THE UNION STAFF COULD NOT GO INTO THE UMC HOSPITAL WITHOUT 24 HOURS' NOTICE AND WITHOUT BEING ESCORTED BY ONE OF THE LEADERS FROM UMC.

THAT WAS CONCERNING TO ME. AND ESPECIALLY RIGHT AFTER THE CONTRACT WAS SIGNED AND RATIFIED, THAT THERE WAS FLYERS GOING OUT AGAINST, ASKING PEOPLE TO LEAVE SEIU AND GO WITH THIS OTHER UNION THAT DOESN'T EVEN EXIST AND FLYERS GOING OUT BADMOUTHING CHERIE MANCINI. AND MY SUSPICION WAS THEN, AND I'M NOT --

THE HEARING OFFICER: DO YOU HAVE AN IDEA OF

WHERE THEY WERE ORIGINATED FROM?

MR. SERRANO: WE DON'T KNOW THAT. I DON'T HAVE EVIDENCE. I JUST KNOW THAT THEY WERE OUT THERE.

THE HEARING OFFICER: AND DO YOU HAVE COPIES OF THEM AT ALL?

MR. SERRANO: I HAVE COPIES ON MY PHONE.

THE HEARING OFFICER: OKAY.

MR. SERRANO: SO THIS WAS CONCERNING. I'M NOT A CONSPIRACY KIND OF GUY, BUT I WAS WONDERING, OKAY, WAS THIS A PLAN THAT THEY ACTUALLY DIDN'T WANT THE STAFF MEMBERS FROM THE HALL TO BE ABLE TO GO IN THERE TO PULL THESE FLYERS SO THAT SOMEBODY COULD MOVE FORWARD WITH THIS OTHER UNION? AGAIN, I DON'T KNOW WHO PUT THE FLYERS OUT THERE. I KNOW THAT THE FLYERS ARE OUT THERE. AND I KNOW THAT THE NEW CONTRACT HAD LANGUAGE IN IT THAT PREVENTED THE STAFF FROM GOING AND ACTING ON THIS IMMEDIATELY.

THE HEARING OFFICER: AND WHAT DO YOU WANT US TO DO?

MR. SERRANO: THE OTHER CONCERNS THAT I'M TELLING YOU, NUMBER ONE IS THAT A LOT OF PEOPLE THAT ARE HERE AND ARE AGAINST CHERIE ARE FROM THAT BARGAINING TEAM. I UNDERSTAND HOW THEY COULD -- EVEN THOUGH SHE SENT IT OUT SAYING -- BECAUSE SHE HAD A RESPONSIBILITY TO INVESTIGATE IT BEFORE THE CONTRACT WAS SIGNED. I UNDERSTAND HOW THEY TAKE IT PERSONALLY. I'VE BEEN ON A BARGAINING TEAM FOR THE LAST 14 YEARS FOR THE HOSPITAL, AND I KNOW IT'S HARD WORK, AND I KNOW THAT PEOPLE PUT

THEIR HEARTS INTO IT. SO I UNDERSTAND HOW THEY'RE OFFENDED.

BUT TO USE THIS AND TO FOLLOW-UP ON THESE OTHER CHARGES AND ASK FOR A TRUSTEESHIP IS JUST RETALIATORY, AGAIN, IN MY OPINION. THE FIGHT BETWEEN THE E-BOARD STARTED WITH ALLEGATIONS AND CONCERNS THAT WERE BROUGHT UP AT AN EMERGENCY MEETING. AND THOSE ARE BEING BROUGHT UP IN THE CHARGES ALSO, SO I DON'T NEED TO GO INTO THOSE. BUT THAT'S WHERE IT STARTED IN THE BOARD, WHEN SHARON KISLING BROUGHT UP THE CONSERVATOR CONCERNS.

THE HEARING OFFICER: OKAY. THANK YOU.

MR. SERRANO: THANK YOU.

MS. SMITH-SYMES: HI. MY NAME IS TANISA SMITH-SYMES, SMITH-S-Y-M-E-S. TANISA, T-A-N-I-S-A. I WORK AT SOUTHERN HILLS HOSPITAL. I'M THE VP THERE. I JUST WANT TO TALK ABOUT A COUPLE OF MY CONCERNS. AND ONE OF MY CONCERNS IS THIS PACKET THAT I GAVE YOU THAT I PRINTED OFF THE INTERNET. IT SEEMS LIKE PEOPLE ARE TRYING TO DISMEMBER THE SEIU, AND THAT'S REALLY CONCERNING TO ME. I THINK WE HAVE HAD SOME PROBLEMS, A LOT OF DIVIDE IN THE LOCAL PERTAINING TO PRIVATE AND PUBLIC.

BUT THIS PACKET RIGHT HERE TAKES IT TO A WHOLE NOTHER LEVEL. BECAUSE IT'S NOT JUST IN THE LOCAL; IT'S, LIKE, THE WHOLE SEIU. AND TO ME, THAT'S VERY SERIOUS. BECAUSE I BELIEVE IN THE UNION, AND I BELIEVE WE SHOULD WORK AS A TEAM. I'M NOT SAYING I DON'T HAVE FAULTS. I MEAN, WE ALL ARGUE. IT'S LIKE A BIG FAMILY. BUT WHEN

YOU'RE TRYING TO DISMEMBER THE SEIU AS AN ORGANIZATION, I THINK THAT'S SOMETHING TO LOOK AT. AND I GOT THIS OFF THE INTERNET ON THIS WEBSITE.

AND THE ONE THING THAT WAS VERY CONCERNING TO ME IS THE OATH. I MEAN, WE TAKE AN OATH WHEN WE ARE SWORN IN TO BE OFFICERS. AND FOR THEM TO BASH THE OATH THAT COMES FROM THE INTERNATIONAL, I THINK IS A BIG DEAL. I MEAN, WHY ARE WE HERE IF NOT TO WORK TOGETHER AS A TEAM?

I HAVE BEEN HERE ABOUT FOUR YEARS IN THE UNION. AND ONE OF THE THINGS THAT I NOTICE WHEN I FIRST CAME IS THAT IT WASN'T AS STRONG AS I THOUGHT IT COULD BE. COMING FROM CALIFORNIA, WORKING AT KAISER, IT'S A WHOLE DIFFERENT PICTURE THAN WHEN I MOVED HERE. SO I DECIDED TO GET INVOLVED. IF YOU SEE A PROBLEM, WELL, JUMP IN THERE AND SEE WHAT YOU CAN DO. SO I DID THAT. I GOT INVOLVED.

WHEN CHERIE BECAME PRESIDENT, I NOTICED THERE WAS A LOT OF CHANGES. BEFORE, WE DIDN'T HAVE ANY TRAINING. I MEAN IT WAS RANDOM, RANDOM TRAININGS. I MEAN, YOU WERE KIND OF THROWN OUT THERE ON YOUR OWN. I MEAN, I KIND OF HAD TO LEARN AS I WENT. BUT WHEN CHERIE BECAME PRESIDENT, WE STARTED HAVING TRAININGS TWICE A MONTH, WHICH WAS HUGE.

A LOT OF THE MEMBERS WOULD TELL ME THAT, YOU KNOW, "I NEVER HEAR FROM THE UNION." WHEN CHERIE BECAME PRESIDENT, SHE STARTED HAVING THE ORGANIZERS CALL THE NEW MEMBERS WITHIN THE FIRST 30 DAYS. AND THEN AFTER THAT,

THEY CHECK IN WITH THEM BY E-MAIL WITHIN THE NEXT 30 DAYS, WHICH WAS HUGE.

ANOTHER CONCERN THAT WAS COMING FROM MY SHOP WAS THAT WE GET NO COMMUNICATION. WE DON'T KNOW WHAT'S GOING ON. SO THEY CREATED THIS LITTLE MAGAZINE THAT WENT OUT TO THE MEMBERS. AND LET ME TELL YOU, IT WAS SUCH A GREAT REACTION. BECAUSE THE MEMBERS WERE VERY EXCITED THAT THEY WERE HEARING WHAT'S GOING ON IN THE UNION. THEY FELT A PART OF. AND I'M ACTUALLY STARTING TO GET PEOPLE TO PARTICIPATE IN MY GROUP, MEANING AT MY HOSPITAL.

SO MY CONCERN IS ALL THIS TIME THAT'S BEING WASTED IS VERY CONCERNING TO ME. BECAUSE THERE IS A LOT OF WORK THAT NEEDS TO BE DONE LIKE ELECTING HILLARY CLINTON RIGHT NOW AS PRESIDENT. I MEAN, WE COULD BE KNOCKING ON DOORS RIGHT NOW. BUT INSTEAD, WE'RE HERE. AND I JUST DON'T UNDERSTAND.

IT SEEMS LIKE FOR ME, WHEN IT WAS A TICKET FOR CHERIE TO RUN FOR PRESIDENT AND SHARON TO RUN FOR VICE PRESIDENT, I COME FROM THE HOSPITAL, WHICH IS A PRIVATE, NOBODY KNEW WHO SHE WAS. BECAUSE SHE'S FROM THE COUNTY. SO THEY WERE COMING TO ME, AND THEY WERE LIKE, "WELL, WHO DO I VOTE FOR?" AND I WAS RECOMMENDING THAT SHE WOULD BE A GOOD PERSON, AND I THOUGHT THAT SHE WOULD.

AND TWO DAYS AFTER SHE GOT ELECTED, I MEAN HER WHOLE ATTITUDE CHANGED. AND I'M JUST NOT SURE WHAT HAPPENED THERE. I KNOW CHERIE WENT ON VACATION. AND SHE HAD -- CHERIE WAS DUE TO COME BACK THE NEXT DAY. THE DAY

BEFORE SHE CAME BACK, SHE HAD AN EMERGENCY MEETING, A BOARD MEETING. AND IT WAS TO BRING ALL OF THESE ALLEGATIONS AND ALL THESE CHARGES. AND I WAS REALLY BAFFLED. BECAUSE I WAS THINKING, WELL, WHY WOULDN'T YOU BRING THIS TO HER? IT JUST SEEMED KIND OF UNDERHANDED. IT SEEMED KIND OF SNEAKY, AND BACKHANDED TO ME.

SO MY CONCERN WOULD BE -- IS TO MAKE SURE THIS LOCAL COMES TOGETHER AND KEEP CHERIE AS PRESIDENT. BECAUSE SINCE SHE'S BEEN HERE, THINGS HAVE BEEN CHANGING.

THE HEARING OFFICER: CAN I JUST -- FOR THE RECORD AND MY OWN CLARIFICATION, YOU HAD MENTIONED THAT CHERIE WAS ON VACATION. THEN YOU ALSO FOLLOWED THAT WITH CHERIE CALLED A SPECIAL MEETING. SO I'M TRYING TO FIGURE OUT WHO WE'RE TALKING ABOUT HERE.

MS. SMITH-SYMES: I'M SORRY. CHERIE IS THE PRESIDENT, AND SHARON IS THE VICE PRESIDENT.

THE HEARING OFFICER: OKAY.

MS. MANCINI: SO I WAS ON VACATION.

THE HEARING OFFICER: AND I THINK THERE MAY BE SOMETHING IN SOME OF THE CHARGES. I JUST WANTED TO MAKE SURE IT'S THE SAME THING THAT I'VE ALREADY READ PRETTY THOROUGHLY THROUGH. THANK YOU.

MS. SMITH-SYMES: SO MY CONCERN IS JUST TO COME TOGETHER. AND IF THEIR TRUE INTENT IS TO DISMEMBER THE SEIU, I DON'T THINK THAT THEY HAVE A PLACE IN THIS ORGANIZATION. WE'RE TRYING TO WORK TOGETHER AS A TEAM. WE'RE TRYING TO GET THINGS DONE. AND I JUST DON'T KNOW. I JUST DON'T EVEN KNOW WHAT TO SAY ABOUT THIS PACKET.

IT'S SO EMBARRASSING. IT'S SO DEGRADING, AND IT PUTS DOWN THE ORGANIZATION AS A WHOLE.

MS. WALFOORT: CAN I ASK YOU, JUST TO KEEP THE RECORD STRAIGHT, I'M GOING TO KEEP A FULL COPY, CALLING IT EXHIBIT 1. COULD YOU TAKE IT BACK AND MAKE SURE BEFORE WE'RE DONE TO GET THREE MORE COPIES?

MS. SAVOY-DURISSEAU: SURE.

MS. WALFOORT: THAT WOULD BE GREAT.

THE HEARING OFFICER: ANY MORE WITNESSES?

MS. SAVOY-DURISSEAU: HELLO. MY NAME IS SHARON SAVOY-DURISSEAU.

THE HEARING OFFICER: CAN YOU SPELL YOUR NAME AND THEN YOUR WORK PLACE?

MS. SAVOY-DURISSEAU: SURE. FIRST NAME IS SPELLED S-H-A-R-O-N. LAST NAME IS SPELLED S-A-V-O-Y-D-U-R-I-S-S-E-A-U.

THE HEARING OFFICER: AND YOU WORK AT?

MS. SAVOY-DURISSEAU: I WORK AT BOTH HOSPITALS.

THE HEARING OFFICER: OKAY. GO AHEAD.

MS. SAVOY-DURISSEAU: I WORK AT ST. ROSE HOSPITAL. I'M THE VICE PRESIDENT OF THAT CHAPTER. ALSO I WORK AT UMC HOSPITAL.

THE HEARING OFFICER: VERY GOOD. GO AHEAD.

MS. SAVOY-DURISSEAU: OKAY. I WAS COMING TODAY BECAUSE WHEN I FIRST BECAME VICE PRESIDENT OVER THERE AT DE LIMA LABORATORIES, OF THE WHOLE -- OF ALL THREE ROSES CAMPUSES, I WAS EXCITED. BECAUSE OF THE FACT IS I WAS GOING TO BECOME IN AN ORGANIZATION THAT WAS SUPPOSED TO

BE POWERFUL AND STRONG. BECAUSE I'M ONLY COMING ABOUT WHAT I HAVE SEEN WITHIN THE LAST 12 YEARS SINCE I'VE BEEN WORKING AT THE ROSES. AND ALL I KNOW IS THAT WE'RE VERY, VERY, VERY STRONG. WE'RE AT LIKE 90 OR 94 PERCENT WITH OUR UNION MEMBERS BECAUSE OF OUR UNITY.

SO BY ME GOING AND JOINING THE E-BOARD, I THOUGHT I WAS GOING TO COME INTO SOME THINGS THAT WOULD HAVE BEEN A LEARNING EXPERIENCE, A GREAT EXPERIENCE, BECAUSE OF WHAT I HAVE SEEN BECAUSE OF THE PAST LEADERS THAT WE'VE HAD. OUR PAST LEADERS THAT I'VE SEEN WITHIN THE PAST YEARS IS MAURICE PARKER, WHICH HE WENT ON TO OTHER THINGS, ALSO CHERIE MANCINI.

SO ALL I KNOW IS THAT WE HAD STRONG UNITY. BUT I STEPPED INTO WHAT I CALL CHAOS, A MESS. AND THAT WAS FROM DAY ONE WHEN I WALKED IN ON THAT E-BOARD. IT HAS BEEN VERY, VERY, VERY SURPRISING. I DID NOT KNOW THAT AN E-BOARD WAS BROUGHT -- BUT CHERIE WASN'T THE PRESIDENT AT THAT TIME.

IT WAS MARTIN AT THAT TIME. EVERYTHING WAS FIGHTING. EVERYTHING WAS FIGHTING. I WAS LIKE, "OH, MY GOD, SO THIS IS WHAT IT'S GOING TO BE LIKE." SO WHEN I WAS TALKING TO OTHER MEMBERS THAT WAS ON THE E-BOARD BEFORE, I SAID, "IS THIS WHAT IT'S LIKE ALL THE TIME?"

SO THEY SAID, "YEAH. YOU JUST GO IN AND WAIT A MINUTE." SO I SAID, "OKAY, WELL, PROBABLY SOME CHANGES WILL COME." AS SOON AS I GOT ELECTED AS VICE PRESIDENT OF OUR CHAPTER BY THE ROSES -- MIND YOU I STILL WORK AT UMC AT THE SAME TIME. SO I'M THINKING, OKAY -- I

HEARD -- PROBABLY LIKE AFTER THE FIRST E-BOARD, PROBABLY THREE DAYS LATER, I HEARD THE PRESIDENT HAD STEPPED DOWN. SO THAT MEANS CHERIE AUTOMATICALLY TOOK HIS SPOT. BECAUSE BY DEFAULT, BECAUSE HE STEPPED DOWN.

SO I SAID, "OKAY. WELL, PROBABLY SOME CHANGES WILL COME ALONG." SO THEN AS TIME PROGRESSED AND STUFF LIKE THAT, CHANGES WAS COMING ALONG. SO I THOUGHT WE WAS DOING KIND OF GOOD. SO THEN THE ELECTION CAME, SO I SAID, OKAY, TWO POWERFUL WOMEN. BECAUSE I HEARD HER, AND THEN I WOULD HEAR SHARON KISLING AND THE REST OF THE LADIES AT THE E-BOARD MEETINGS. HALF THE TIME WAS AN ARGUMENT, BUT I COULD SEE SOME CHANGES IN BETWEEN.

SO I SAID, OKAY, THESE ARE GOING TO BE TWO POWERFUL LADIES THAT ARE GOING TO GO AHEAD AND RUN OUR UNION ORGANIZATION TOGETHER. BECAUSE, ME, REGARDLESS OF MAN OR WOMAN, I BELIEVE IN WOMAN POWER. PUT IT LIKE THAT, OKAY.

SO, ME, I'M CAMPAIGNING FOR THESE TWO LADIES TO GO AHEAD AND BECOME ONE. SO WHEN THE ELECTION CAME UP, EVERYTHING WAS FINE. THEY WON. THEN ALL OF A SUDDEN, WE HEAR ALL OF THIS BAFFLING AGAIN. SO I'M SAYING, WHAT'S GOING ON? THEN ALL OF A SUDDEN, I HEAR AN EMERGENCY MEETING GOING ON.

SO, ME, I WAS LIKE THERE IS TWO SIDES TO EVERY STORY THAT GOES ON. BUT THE ONE THAT WAS PRESENTED, THINGS LIKE THAT, THAT'S NOT THE PERSON THAT I KNOW OF.

MS. WALFOORT: YOU HAVE THREE MINUTES, SO YOU'RE ALMOST DONE.

THE HEARING OFFICER: IF YOU COULD TELL US OTHERWISE, SHARON, WHAT'S THE ASK THAT YOU HAVE?

MS. SAVOY-DURISSEAU: WHAT I'M ASKING IS TO GO AHEAD AND KEEP CHERIE MANCINI AS PRESIDENT. BECAUSE I KNOW FOR A FACT THAT CHANGE CAN COME, CHANGE WAS GOING TO BE DONE. AND LIKE I SAY, EVEN THOUGH -- LIKE I SAID, I DON'T KNOW WHAT'S GOING ON, BUT ALL I KNOW IS WHAT MY EXPERIENCE HAS BEEN WITH CHERIE MANCINI. AND IT HAS BEEN GREAT.

THE HEARING OFFICER: OKAY. THANK YOU.

MS. SAVOY-DURISSEAU: THANK YOU.

THE HEARING OFFICER: AND MAKE SURE TO GET US THE COPIES THAT YOU HAD.

MS. SAVOY-DURISSEAU: OKAY.

THE HEARING OFFICER: IF I COULD ASK, HOW MANY MORE SPEAKERS DO WE HAVE? JUST TWO? OKAY GOOD.

MS. ELLIS: HI, THERE. MY NAME IS REGENA ELLIS, R-E-G-E-N-A E-L-L-I-S. I WORK AT THE SOUTHERN NEVADA HEALTH DISTRICT, AND I'M THE VICE PRESIDENT THERE. SO I JUST WANT TO COME IN TODAY AND TALK WITH YOU ABOUT MY EXPERIENCE AND SOME OF THE THINGS THAT I'VE SEEN. SO MOSTLY FOR ME, MY EXPERIENCE HAS BEEN WITH CHERIE MANCINI. SHE STEPPED IN WHEN WE DID NOT HAVE A PRESIDENT AT THE TIME. SHE STEPPED INTO THAT ROLE. AND THEN SHE WAS ELECTED PRESIDENT OF THIS BARGAINING UNIT.

I HAVE FOUND HER TO BE OPEN, AVAILABLE TO DISCUSS THINGS, ANYTHING THAT -- ANY CONCERNS THAT I THINK THE MEMBERS OF OUR LOCAL HAVE HAD. I FEEL VERY

COMFORTABLE TALKING TO HER. SHE'S ACCESSIBLE. SHE RETURNS THE CALLS. SHE TALKS TO US. I SEE THE HIRING OF THE DIRECTOR OF ORGANIZING AS A POSITIVE THING. WE HAVE TRAININGS. MEMBERS ARE BEING EDUCATED ABOUT THEIR RIGHTS. WE'RE GOING TO HAVE MORE TRAININGS ABOUT COLLECTIVE BARGAINING. WE HAVE A COMPLIANCE OFFICER. SO FAR, FOR ME, I THINK THAT'S A VERY POSITIVE MOVE.

ON BEHALF OF CHERIE, I THINK THAT STEPPING INTO THIS ROLE, WHEN YOU STEP FROM WORKING AT A HOSPITAL OR AN ENTITY AND THEN YOU BECOME A PRESIDENT AND MOVE INTO THAT ROLE, IT'S VERY DIFFERENT FROM BEING AN EMPLOYEE. AND THE RESPONSIBILITIES THAT YOU HAVE FOR HIRING STAFF, A BUDGET, THAT'S VERY DIFFERENT FROM BEING IN A WORK ENVIRONMENT.

SO I THINK REALLY THERE NEEDS TO BE SOMEONE AVAILABLE FROM THE INTERNATIONAL FOR GUIDANCE, SO TO SPEAK, ESPECIALLY IN THE BEGINNING PARTS OF THAT POSITION. BECAUSE THE RESPONSIBILITIES THAT YOU ARE FACING ARE VERY DIFFERENT.

FOR THE MOST PART, I HAVE VERY POSITIVE VIEWS OF THE WORK THAT CHERIE AND THE TEAM ARE DOING. WE NOW HAVE AN ORGANIZER AVAILABLE TO US THAT COMES ON A REGULAR BASIS. THE MEMBERS ARE VERY HAPPY ABOUT THAT. WE ALSO ARE HAVING MORE DISCUSSION ABOUT REPRESENTATION ISSUES. AND WE ARE HAVING A LOT MORE ACTIVITY. I PERSONALLY DON'T HAVE ANY PROBLEM WITH ANYBODY THAT'S INVOLVED. I HAVEN'T HAD ANY NEGATIVE INTERACTIONS WITH ANYONE. SO I JUST WANT TO OFFER THAT ALSO. I AM SATISFIED WITH WHAT'S

GOING ON. I THINK WE'RE MOVING IN A POSITIVE DIRECTION. AND I WANT FOR US TO CONTINUE TO MOVE THAT WAY.

I THINK THAT IF ANYONE IS DISSATISFIED WITH THE LOCAL BARGAINING UNIT, I THINK AS AN OFFICER, THEY SHOULD REMOVE THEMSELVES IF THEY'RE INTERESTED IN MOVING IN ANY OTHER DIRECTION AND NOT DO ANY HARM TO THE MEMBERS THAT THEY WORK WITH CURRENTLY. SO I THINK THAT'S SOMETHING THAT REALLY NEEDS TO BE ADDRESSED.

BUT I'M OFFERING MY SUPPORT FOR CHERIE. I WOULD LIKE TO SEE HER STAY. BECAUSE I THINK THE WORK SHE'S DOING IS VERY GOOD.

THE HEARING OFFICER: THANK YOU.

MS. MANCINI: GOOD MORNING. I'M CHERIE MANCINI C-H-E-R-I-E M-A-N-C-I-N-I, AND I'M THE PRESIDENT OF 1107. FIRST AND FOREMOST, I GAVE YOU -- IN YOUR PACKET TODAY, YOU WILL SEE SOME PICTURES. THOSE ARE PICTURES OF PEOPLE AT THE UMC CAFETERIA DURING THE TIME THAT THE ELECTIONS WERE GOING ON.

FIRST AND FOREMOST, LET ME BACK UP A SECOND. I AM THE FIRST PRIVATE SECTOR PRESIDENT EVER OF THIS LOCAL. AND MY OPPONENT, RICHARD HODGSON, WHO CAME UP HERE AND SPOKE EARLIER, RAN ON THE PREMISE OF "YOU DESERVE A FREE PRESIDENT." BECAUSE THE CONSTITUTION AND BYLAWS OF OUR LOCAL STATES THAT -- AND THE CONTRACT WITH CLARK COUNTY STATES THAT IF YOU BECOME THE PRESIDENT, THEY CONTINUE TO PAY YOUR SALARY.

BUT ALSO IN OUR CONSTITUTION, IT STATES THAT NO MEMBER SHALL BE PROHIBITED FROM RUNNING FOR OFFICE. IT

IS OUR INTENT TO GET THAT LANGUAGE INTO THEIR CONTRACT, THAT NO ONE SHOULD BE PROHIBITED OR SUFFER FINANCIAL HARM FOR BECOMING THE PRESIDENT. SO I JUST WANT TO PUT THAT OUT THERE. SO THAT WAS A BIG THING.

UMC, ALL OF THE OFFICERS COLLECTIVELY RAN -- THEY RAN A SLATE AGAINST ME. AS YOU CAN SEE THE SLATE, WHICH I CAN GET -- I'LL GET YOU MORE INFORMATION ON THE NAMES. WHICH THE PEOPLE WHO WERE RUNNING THAT, THEY HAD PEOPLE WHO WERE NONMEMBERS. THEY HAD EX-SEIU STAFF CAMPING FOR THEM IN THOSE PICTURES. ALSO RICHARD HODGSON, I CAN GET A STATEMENT AS WELL, HE DECIDED HE WANTED TO GO OUT AND SAY SOME DEROGATORY THINGS LIKE, "THAT DYKE DOESN'T KNOW ANYTHING ABOUT COUNTY. YOU SHOULDN'T LISTEN TO HER."

I'VE BEEN -- I'VE SENT OUT SOMETHING FOR THE ORLANDO SHOOTING, AND IN RETURN, OUR TREASURER SENT SOMETHING BACK SAYING, "REALLY, REALLY? ARE THOSE OUR MEMBERS?" WHICH YOU WILL SEE ATTACHED IN THE PACKET AS WELL. I'VE HAD NEGATIVE FEEDBACK IN REGARDS TO THE LAVENDER CAUCUS. YOU WILL SEE ON THE FRONT PAGE OF THAT THAT THAT'S A COPY FROM THE WEBSITE. IT'S UMC-CCCPEA, WHICH IS UMC CLARK COUNTY PUBLIC EMPLOYEE ASSOCIATION. YOU WILL READ ON THE FRONT OF THAT THAT THEY DON'T BELIEVE IN THE IDEOLOGICAL THOUGHTS OF THE INTERNATIONAL, WHICH INCLUDE LAVENDER CAUCUS, WHICH INCLUDE IMMIGRATION RIGHTS, WHICH INCLUDES GUN CONTROL.

AND ALSO THE THREE PEOPLE: MYSELF, DEBBIE SPRINGER AND ALFREDO SERRANO, IT'S QUITE IRONIC THAT ALL

THREE OF US HAVE AN ALTERNATIVE LIFESTYLE. SO NUMBER ONE, THAT HAS BEEN PUT OUT FROM THE BEGINNING.

LIKE I SAID, NUMBER TWO, THE THING IS "YOU DESERVE A FREE PRESIDENT." SO I FEEL LIKE BECAUSE OF THE FACT THAT I DID WIN -- THE MAJORITY OF OUR TICKET DID WIN, THE ONLY PERSON FROM THEIR TICKET THAT WON THE TREASURER, SHEILA GRAIN -- I BELIEVE THAT THEY'RE DISGRUNTLED. THEY'RE DISGRUNTLED.

AND ALL OF THE UMC PEOPLE HERE TODAY, I WILL TALK TO YOU LATER ABOUT THAT. BECAUSE I KNOW I HAVE CHARGES AGAINST ME IN REGARDS TO THE BARGAINING, SO I WON'T BRING THAT UP NOW. THE E-BOARD MEETINGS, I HAVE ALL OF THE MINUTES. I CAN PROVIDE EVERY -- FROM THE TIME I TOOK OFFICE.

I TOOK FULL-TIME OFFICE NOVEMBER OF 2015. I BASICALLY HAD NO STAFF. I HAD NOT ONE SINGLE DIRECTOR. I HAD TWO EXPERIENCED STAFF. THE REST OF THE PEOPLE WERE BASICALLY HIRED OFF CRAIGSLIST. AND SO WE HAD TO REBUILD. AND THERE WAS A LOT OF REBUILDING, AND THERE WAS A LOT OF AFTERMATH THAT I HAD TO TAKE CARE OF.

THERE WERE A LOT OF THINGS THAT WERE MENTIONED HERE TODAY IN REGARDS TO PETER NGUYEN AND ABOUT THE WHOLE INCIDENT THAT HAPPENED WHILE I WAS ON VACATION IN HAWAII. PEOPLE HAVE TO TAKE RESPONSIBILITY FOR THEIR ACTIONS. JUST BECAUSE YOU ARE AN OFFICER OF THE UNION DOES NOT GIVE YOU THE RIGHT TO COME INTO A WORKPLACE AND SCREAM AT PEOPLE, THREATEN PEOPLE, GET IN PEOPLE'S FACES, WHEN THEY ARE EMPLOYEES OF THAT LOCAL UNION.

I UNDERSTAND WE GET HOTHEADED SOMETIMES IN THE MIDDLE OF E-BOARD MEETINGS. BUT TO GO IN AND TO DO THAT TO EMPLOYEES, THAT'S BEEN A LONG STANDING HISTORY OF THIS LOCAL, AND I WILL NOT STAND FOR IT.

I WAS NOT THERE. I DID NOT SEE IT. I WAS 3,000 MILES AWAY IN HAWAII. SO IN REGARDS TO SOMEONE FILING A RESTRAINING ORDER AGAINST ONE OF THE OFFICERS, WELL, THAT'S THEIR PERSONAL RIGHT. IF THEY FELT THAT THEY WERE THREATENED, I GUESS I'M LUCKY THAT THEY AREN'T SUING US. SO THE JUDGE DETERMINED THAT THAT WAS A WARRANTED TPO. I HAVE NO CONTROL OVER THAT.

AND ALSO, JUST TO LET YOU KNOW, PRIOR TO WHEN I BECAME PRESIDENT, I HAD NO VICE PRESIDENT. SO IN THE CONSTITUTION AND BYLAWS, IT STATED THAT I MUST CONFER WITH THE VICE PRESIDENT TO HIRE AND FIRE. AND IN TURN, I USED THE OFFICERS AT-LARGE. I COMMUNICATED WITH THEM DIRECTLY AND SAID, "HEY, YOU KNOW WHAT, I WANT TO MAKE SURE THAT I'M DOING THIS RIGHT. I WANT TO MAKE SURE THAT I HAVE PEOPLE HERE THAT CAN PARTICIPATE WITH ME TO MAKE SURE THAT I'M DOING THE RIGHT THING AS FAR AS HIRING."

SHARON PARTICIPATED IN THE INTERVIEW WITH PETER. SHE ADVOCATED TO HIRE PETER. SHE HAD ABSOLUTELY NO PROBLEM. WE HAD FULL DISCUSSION, FULL DISCLOSURE. SHE KNEW EVERYTHING ABOUT HIM. AND WE ALSO KNEW ABOUT CHARGES THAT HE HAD, WHATEVER THE ISSUES WERE, THE LOCAL IN CALIFORNIA. THAT WAS ALL DISCLOSED.

CURRENTLY, WE ARE DOING GREAT WORK. I BELIEVE THAT THE PROBLEM IS THAT THE PEOPLE WHO HAVE BEEN AROUND

FOR A LONG TIME, I HAVE COME IN AND I'VE IMPLEMENTED A LOT OF CHANGE. I'VE VISITED ALMOST EVERY SINGLE WORK SITE IN CLARK COUNTY. AND I'VE ACTIVELY ENGAGED WITH MEMBERSHIP. WE HAVE TRAININGS NOW THAT ARE BEING ATTENDED BY 40 TO 50 MEMBERS, WHICH BEFORE WE WOULD BE LUCKY IF WE GOT 5. WE'VE GOT MEMBERSHIP ENGAGED IN WANTING TO BE IN THE CLARK COUNTY BARGAINING PROCESS. BUT IN TURN, WE ALREADY HAVE A BARGAINING TEAM.

SO THEY WANT TO STAY WITH THE STATUS QUO. THEY WANT TO STAY WITH THEIR LITTLE GROUP. THEY'RE NOT WILLING TO LET PEOPLE COME IN. AND THEY DON'T LIKE CHANGE.

THE HEARING OFFICER: CHERIE, I DO HAVE A FOLLOW-UP QUESTION.

MS. MANCINI: SURE.

THE HEARING OFFICER: DO YOU HAVE ANY MORE INFORMATION RELATED TO THE RESTRAINING ORDER? DO YOU HAVE THAT WITHIN THE DOCUMENTS THAT YOU PROVIDED?

MS. MANCINI: I DID NOT PROVIDE THAT, NO. I HAVE ACCESS TO IT.

THE HEARING OFFICER: IT WOULD BE HELPFUL IF YOU WOULD SUBMIT THAT AS WELL.

MS. WALFOORT: AND IT WILL BE INCLUDED IN THE CHARGES.

MS. MANCINI: OKAY.

MS. WALFOORT: AND CHERIE, CAN I ASK YOU, AFTER WE BREAK BETWEEN THE HEARINGS, WE'LL MAYBE FIGURE OUT WHAT PARTS OF THE EXECUTIVE BOARD MEETINGS WE COULD USE.

AND IF YOU COULD PROVIDE US THE MINUTES OF THE ONES --

MS. MANCINI: YEAH. I HAVE THE MINUTES FROM OCTOBER 2015 ALL THE WAY THROUGH SEPTEMBER 2016. AND AS YOU WILL SEE IN THE MINUTES, WE HAVE -- WE'RE MOVING TO A NEW BUILDING. WE APPROVED MOVING TO A NEW BUILDING. WE HAVE GONE THROUGH, AND WE'VE MADE MOTIONS, AND WE'VE PASSED THINGS. WE ARE NOT AT A STANDSTILL IN ANY WAY, SHAPE OR FORM.

THE HEARING OFFICER: OKAY. SO YOUR INTENT IS TO PROVIDE ALL OF THOSE MINUTES; IS THAT ACCURATE?

MS. WALFOORT: YOU KNOW, IT MIGHT BE EASIER, CHERIE, IF WE COULD GET -- SINCE YOU SAID YOU HAVE MINUTES BACK TO OCTOBER 2015 --

MS. MANCINI: RIGHT. I HAVE THEM ALL HERE. I ONLY HAVE A SINGLE SET OF ONE OF THE WHOLE THING. SO IT'S UP TO YOU, IF YOU WANT ME TO JUST COPY ONE SINGLE SET. OR DO YOU WANT TO LOOK THROUGH TO SEE WHAT YOU WANT?

MS. WALFOORT: NO. I THINK IF YOU COULD JUST DO FOUR COPIES OF THE WHOLE SET. THAT'LL PROBABLY BE EASIEST. IT'S A LOT, RIGHT? YOU DON'T HAVE TO DO IT TODAY.

MS. MANCINI: OKAY. THAT'S WHAT I WAS GOING TO SAY. YEAH, I CAN PROVIDE THAT. THAT'S NOT A PROBLEM.

ALSO, I WANTED TO TOUCH ON ONE LAST THING, THE GENTLEMAN THAT WAS HERE, RIGHT HERE (INDICATING), I HAVE A STATEMENT FROM THE THERESA DIAZ THAT SHE ASKED HIM WHETHER HE WAS PUSHING THE DECERTIFICATION, AND HE

BASICALLY TOLD HER, "I DON'T WANT A GAY RUNNING MY UNION." SO LIKE I SAID, THERE IS SOME REALLY UGLINESS GOING ON HERE.

(SIMULTANEOUS SPEAKERS.)

THE HEARING OFFICER: WE HAVE TO RESPECT EVERYBODY THAT'S VOICING. WE'RE GOING TO GET TO THE INTERNAL CHARGES THAT WILL GET DEEPER INTO THIS.

MS. MANCINI: AND I WILL TELL YOU THAT I WILL GIVE YOU PROOF THAT BANK TIME IS BEING ABUSED BY PEOPLE. I WILL GIVE YOU PROOF OF THAT. THERE WAS BRENDA UP HERE TODAY TELLING YOU THAT SHE DOESN'T HAVE TIME TO GO PHONE BANKING OR DOING ALL THE THINGS, BUT SHE SHOWED UP TO THE FALL FEST, WHICH WE HAD LAST WEEK, TO DO EARLY VOTING, WHICH WAS A GREAT EVENT. WE HAD E-BOARD MEMBERS SHOW UP TO JUST BASICALLY HAND OUT THAT COPY THERE WHICH I'VE COPIED.

THE HEARING OFFICER: I'M GOING TO HAVE TO HAVE YOU WRAP UP, CHERIE. SO IF THERE IS A PARTICULAR ASK YOU HAVE OF ME, THAT WOULD BE HELPFUL.

MS. MANCINI: THE PARTICULAR ASK IS THAT WE ARE DYSFUNCTIONAL. WE HAVE DYSFUNCTION. DO I THINK THAT THE ENTIRE BOARD IS DYSFUNCTIONAL, NO. BECAUSE THE LAST E-BOARD MEETING, WHEN THE PEOPLE WHO STOOD UP HERE AND TALKED DIDN'T LIKE WHAT THE HEARD, THEY DECIDED THEY WOULD GET UP AND LEAVE. BUT YOU KNOW WHAT, WE STILL HAD QUORUM, AND WE STILL DID VOTE. SO IT'S NOT THE MAJORITY.

THE HEARING OFFICER: OKAY. THANK YOU.

MS. MANCINI: THANK YOU.

THE HEARING OFFICER: ALL RIGHT. SO I TRIED TO ALLOW LATITUDE SO EVERYBODY WAS HEARD. AND I THINK IT GIVES US SORT OF A LITTLE BEARING ON SOME OF THE CHARGES THAT WE HAVE ALL READ FAIRLY THOROUGHLY AND HAD SOME CONVERSATION ABOUT ALREADY. SO IT SETS A LITTLE MORE CONTEXT IN THAT. BUT IF ANY OF THE WITNESSES HERE WANT TO SUBMIT A STATEMENT AT ALL FOR THE RECORD, YOU NEED TO GET THAT IN CARE OF LA RELL PURDIE BY NOVEMBER 4TH, NO MORE THAN TWO PAGES. AND SHE WILL GET CONTACT INFORMATION TO YOU.

NOW, ON MY NOTES, I HAVE FOUR PEOPLE THAT PROVIDED TESTIMONY HERE THAT ARE GOING TO BE PROVIDING ADDITIONAL INFORMATION AND COPIES. AND I JUST WROTE DOWN SOME FIRST NAMES. SO KRYSTAL, WE NEED THREE MORE COPIES OF SOME INFORMATION. CLARA IS BRINGING IN AN E-MAIL, TO MY UNDERSTANDING, FOUR COPIES OF THAT. AND I THINK -- IS IT SHARON IS GOING TO BRING IN ANOTHER COPY. AND THEN CHERIE. THAT'S WHO I HAVE. I DON'T KNOW IF I'M MISSING ANYTHING ELSE.

MS. WALFOORT: MR. HODGSON, WERE YOU GOING TO SUBMIT AN EXHIBIT? MR. HODGSON, YOU WEREN'T PLANNING ON SUBMITTING ANYTHING MORE TO US FOR THIS HEARING?

MR. HODGSON: YES. FOR THE SECOND PART, I DO HAVE --

MS. WALFOORT: OKAY. FOR THE CHARGES?

MR. HODGSON: YES. WELL, NOT MY CHARGES.

THE HEARING OFFICER: THAT, WE'LL TAKE LATER ON WHEN WE GET TO THE HEARING.

MR. HODGSON: NOTHING REGARDING THIS.

THE HEARING OFFICER: OKAY. SO I WANT TO THANK EVERYBODY FOR YOUR TIME AND ATTENTION TO GO THROUGH ALL OF THE --

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: OH, OKAY.

I WAS JUST NOTIFIED THAT VERONICA WAS GOING TO SUBMIT THE PETITION. SO WE HAVE FIVE THAT WE'RE NOTING.

BUT THANK YOU ALL FOR YOUR TIME AND ATTENTION ON THE REALLY IMPORTANT ISSUES THAT ARE RAISED HERE IN THE HEARING THIS MORNING. SINCE MY UNDERSTANDING IS THERE ARE NO OTHER QUESTIONS OR COMMENTS, I'M GOING TO CLOSE PHASE 1 OF THE HEARING.

SO WE'RE GOING TO TAKE A BREAK NOW. WE'RE GOING TO RECONVENE FOR THE HEARING OF CHARGES AT 1:30, AND I WANT TO STICK TO THAT. WE HAVE A LOT OF CHARGES TO GO THROUGH, AND I WANT TO MAKE SURE WE HAVE PLENTY OF TIME TO GIVE THEM THE DUE PROCESS THAT THEY REALLY NEED TO BE HEARD AND EXAMINED.

I ALSO WANT TO RAISE HERE THAT THE LIKELIHOOD THAT WE WILL GO BEYOND 5:30, WHICH IS IN THE NOTICE IS LIKELY. AND SO PEOPLE SHOULD BE PREPARED TO STAY LATER. OKAY? WE HAVE TO COMPLETE THIS HEARING BY THE CLOSE OF SUNDAY, TOMORROW. AND SO I WANT TO MAKE SURE WE GET THROUGH A CHUNK OF THE CHARGES TODAY SO THAT AT LEAST WE'RE HALFWAY THROUGH AND SET UP TOMORROW TO COMPLETE THIS. SO WE'RE GOING TO CONVENE.

(BREAK TAKEN.)

THE HEARING OFFICER: SO I'LL JUST SAY, THIS MORNING'S PORTION OF THE HEARING, EVERYBODY WAS VERY RESPECTFUL OF EVERY OTHER PERSON'S VOICE WITH VERY LITTLE PARTICIPATION FROM ME ENGAGING WITH FOLKS THAT WERE HERE LISTENING WHILE OTHERS WERE TESTIFYING. SO I APPRECIATE IT.

I'M GOING TO GO THROUGH THE DIRECTIONS IN THE START OF THE AFTERNOON. BECAUSE WE MAY HAVE MORE PEOPLE THAT COME. SO YOU'RE GOING TO HAVE TO SIT THROUGH SOME OF THE SAME; I'M WARNING YOU AHEAD OF TIME. BUT IT'S IMPORTANT THAT EVERYBODY'S VOICE IS HEARD. EVERY MEMBER IS IMPORTANT AND EVERY EXPERIENCE IS PERSONAL TO THEM. SO THANK YOU ALL, AND WE'LL SEE YOU AT 1:30.

(EXHIBITS ADMITTED.)

(LUNCH BREAK TAKEN.)

THE HEARING OFFICER: ALL RIGHT. GOOD AFTERNOON, EVERYONE. WE'RE GOING TO GET STARTED. AGAIN, FOR ANYONE THAT WASN'T HERE THIS MORNING I'M GOING TO GO THROUGH SOME OF WHAT I SAID EARLIER. MY NAME IS CAROL NIETERS, AND I'M THE EXECUTIVE DIRECTOR OF SEIU'S LOCAL 284 IN MINNESOTA. AND WE'RE BEGINNING A CONTINUATION OF THE HEARING I CONDUCTED THIS MORNING ON THE INTERNAL NEEDS OF SEIU NEVADA LOCAL 1107.

THE SECOND PHASE OF THIS HEARING WILL FOCUS ON INTERNAL CHARGES AGAINST OFFICERS AND MEMBERS OF THIS LOCAL. I REPEAT FOR THE SAKE OF THOSE WHO WERE NOT PRESENT EARLIER THE PURPOSE AND RULES GOVERNING THE SECOND PHASE OF THIS HEARING.

SO I'VE BEEN APPOINTED BY SEIU PRESIDENT MARY KAY HENRY PURSUANT TO HER AUTHORITY UNDER ARTICLE 17 SECTION 2F OF THE SEIU CONSTITUTION AS THE HEARING OFFICER CONDUCTING THE HEARING TODAY AND TOMORROW ON INTERNAL UNION CHARGES FILED AGAINST A NUMBER OF LOCAL 1107 OFFICERS AND MEMBERS OVER WHICH PRESIDENT HENRY HAS ASSUMED ORIGINAL JURISDICTION.

IN ADDITION, SHE HAS CONSOLIDATED THE MULTIPLE CHARGES SO THAT I CAN HEAR THEM ALL IN THIS PROCEEDING. I'LL BE ASSISTED IN THE INTERNAL CHARGES PHASE OF THIS HEARING BY COUNSEL MARNIE WALFOORT AND LA RELL PURDIE, SITTING NEXT TO ME, AND ALSO BY LORNA ABRAHAM, THE SEIU OPERATIONS MANAGER, WHO WAS AT THE DESK WHERE YOU SIGNED IN.

FOLLOWING THE CONCLUSION OF THE HEARING, I WILL GIVE MY RECOMMENDATIONS TO PRESIDENT HENRY ON HOW I BELIEVE THE INTERNAL CHARGES SHOULD BE HANDLED BY HER. BUT THE FINAL DECISION ON EACH OF THE CHARGES WILL BE HERS PURSUANT TO ARTICLE 17 SECTION 2F.

THIS IS AN INFORMAL INTERNAL UNION HEARING TO HEAR CHARGES MADE BY AND AGAINST MEMBERS OF THE LOCAL. ATTENDING WILL BE INTERNATIONAL UNION STAFF ASSIGNED TO WORK AT THIS HEARING, MY COUNSEL, THE COURT REPORTER AND MYSELF. IN ADDITION, ANY NON-MEMBER WITNESSES THAT WILL BE CALLED ARE ASKED -- AND ARE WAITING OUTSIDE IN THE HALL AND WILL BE BROUGHT IN AT THE TIME THEIR TESTIMONY IS REQUIRED.

ALL WITNESS TESTIMONY WILL BE GIVEN UNDER OATH,

BUT THERE ARE NO FORMAL RULES OF EVIDENCE. I WILL TAKE EVIDENCE TODAY AND TOMORROW ON THE INTERNAL CHARGES. I MAY SET REASONABLE TIME LIMITS ON THE PRESENTATION OF EVIDENCE AND MAY MAKE ANY OTHER RULINGS THAT I THINK ARE NECESSARY FOR A FAIR AND ORDERLY PROCEEDING. WE HAVE A SUBSTANTIAL AMOUNT OF WORK TO ACCOMPLISH BETWEEN NOW AND TOMORROW NIGHT. AND TO ALLOW ME TO MAKE SURE THAT WE HAVE A COMPLETE FULL RECORD UPON WHICH TO BASE MY RECOMMENDATION TO PRESIDENT HENRY, I HOPE THAT I CAN HAVE YOUR COOPERATION IN MOVING AS EFFICIENTLY AND FAIRLY AS WE CAN.

IN ADDITION, I ASK THAT WE RESPECT EACH OTHER'S VIEWS AND OPINIONS AND THE RIGHT TO EXPRESS THEM. I WILL NOT TOLERATE ANY DISRESPECT OF OUR MEMBERS OR ANY DISRUPTION IN TODAY'S PROCEEDINGS. AND I WANT EVERYONE TO BE ON NOTICE THAT I'M PREPARED TO CALL ON THE SERGEANT OF ARMS TO HELP ME MAINTAIN ORDER IN THE ROOM SO WE CAN ACCOMPLISH OUR PURPOSE TODAY. AND THE SERGEANT IN ARMS IS STEVE.

I KNOW THAT YOU HAVE A STRONG INTEREST IN THESE PROCEEDINGS, AS YOU SHOULD. HOWEVER, IF THERE ARE ANY DISRUPTIONS, I WILL NOT HESITATE TO CLEAR THE ROOM OF EVERYONE EXCEPT THE INDIVIDUALS WHOSE PRESENCE AND PARTICIPATION IN THE HEARING IS NECESSARY TO COMPLETE THE WORK TODAY AND TO CALL ON THE PARTS ONE AT TIME TO PROSECUTE AND/OR DEFEND THE INTERNAL CHARGES WITH WHICH THEY ARE DIRECTLY INVOLVED SO THEY WILL NOT BE DISTURBED OR INTERRUPTED BY OTHERS IN PRESENTING THEIR CASE.

AND I HOPE THAT IS NOT NECESSARY. AND I WANT TO REAFFIRM HOW IT WAS REALLY GREAT HOW FOLKS LISTENED TO THE TESTIMONY GIVEN RESPECTFULLY, AND I WOULD HOPE THAT WE HAVE THAT THE REST OF TODAY AND TOMORROW.

ALL PERSONS PRESENT IN THE HEARING ROOM WERE ASKED TO SIGN IN AT THE DESIGNATED SHEET. SO IF SOMEBODY DIDN'T DO THAT -- I THINK WE WERE PRETTY GOOD ABOUT MAKING SURE NOBODY GOT THROUGH WITHOUT IT -- PLEASE DO SO RIGHT NOW.

THE CHARGING PARTIES WILL PROCEED FIRST, AND THE CHARGED PARTIES WILL PROCEED NEXT. THEY MAY MAKE OPENING AND CLOSING STATEMENTS. WE NORMALLY WOULD TAKE CHARGES IN THE ORDER THEY WERE SUBMITTED IN THIS CASE. HOWEVER, BECAUSE THERE IS SOME OVERLAP BETWEEN THE CHARGES, IT MAKES MORE SENSE TO HEAR THOSE CHARGES TOGETHER. SO I RESERVE THE RIGHT TO REORDER THE CHARGES TO MOVE THE HEARING ALONG EFFICIENTLY. THE ORDER OF THE CHARGES DOES NOT SPEAK TO THE IMPORTANCE OR SUBSTANCE OF THE CHARGE.

ALSO, AS THE NOTICE WAS SET THAT WE WOULD END AT 5:30, AS I SAID EARLIER, THAT MAY NOT BE THE CASE. WE NEED TO REEVALUATE LATER THIS AFTERNOON HOW FAR WE HAVE GOTTEN THROUGH THE CHARGES BECAUSE WE NEED TO GET THROUGH THEM ALL BY TOMORROW EVENING. SO WE MAY STAY LATER.

IF PARTIES WANT ME TO CONSIDER ANY DOCUMENTS, THOSE MAY BE SUBMITTED AS WELL, PLEASE PROVIDE FOUR COPIES OF ANY SUCH DOCUMENTS. I HAVE NECESSARY COPIES OF THE DOCUMENTS THAT I WILL ENTER INTO THE RECORD IN A

MOMENT, AND PARTIES DO NOT HAVE TO PROVIDE ADDITIONAL COPIES OF THESE DOCUMENTS TO ME.

A COURT REPORTER WILL RECORD ALL TESTIMONY AND MAKE AN OFFICIAL TRANSCRIPT OF THESE PROCEEDINGS, AND PARTIES MAY OBTAIN A COPY OF THE TRANSCRIPT AT THEIR OWN COST BY MAKING ARRANGEMENTS WITH THE COURT REPORTER DIRECTLY. NO OTHER MEANS OF AUDIO OR VIDEO RECORDING WILL BE ALLOWED.

FOLLOWING THE CLOSURE OF THE RECORD, I WILL ISSUE MY REPORTS AND RECOMMENDATIONS TO PRESIDENT HENRY ON THE INTERNAL CHARGES. BASED ON MY RECOMMENDATIONS AND THE HEARING RECORD, PRESIDENT HENRY WILL MAKE THE FINAL DECISION ON THE INTERNAL CHARGES.

ANY QUESTIONS ON THE RULES AS I HAVE JUST SUMMARIZED THEM?

OKAY. SO AT THIS TIME, I WANT TO ALLOW A LITTLE BIT FOR EVERYBODY TO TURN OFF CELL PHONES OR OTHER ELECTRONIC DEVICES SO THE HEARING IS NOT INTERRUPTED IN ANY WAY. SO PLEASE DO SO NOW. IN THE MEANTIME, I'M GOING TO ENTER INTO THE RECORD THE FOLLOWING EXHIBITS RELATIVE TO THE INTERNAL CHARGES, WHICH WILL BE HEARD IN THE FOLLOWING ORDER UNLESS I DECIDE TO SHIFT THE ORDER BASED ON REQUEST OF THE PARTIES OR THE DEMANDS OF TIME.

SO EXHIBIT 1 IS GOING TO BE THE SEIU 2012 CONSTITUTION AND BYLAWS, HEARING OFFICER. I'M GOING TO ENTER EXHIBIT 2, THE SEIU NEVADA LOCAL 1107 2012 CONSTITUTION AND BYLAWS, WHICH IS DIRECTLY UNDER THERE. AND THEN IN ADDITION, I ENTER THE FOLLOWING INTO THE

RECORD: EXHIBIT 3, ASSUMPTION OF ORIGINAL JURISDICTION OVER INTERNAL CHARGES, NOTICE OF CONSOLIDATED HEARING ON INTERNAL CHARGES, APPOINTMENT OF THE HEARING OFFICER AND RULES OF PROCEDURE ISSUED BY SEIU PRESIDENT MARY KAY HENRY ON OCTOBER 17TH, 2016, WHICH I HAVE HERE IN FRONT OF ME.

MS. WALFOORT: AND IF ANY OF THE CHARGING OR CHARGED PARTIES DIDN'T GET SOMETHING AND WANT A COPY, WE CAN MAKE THOSE AVAILABLE TO YOU, SO LET US KNOW.

THE HEARING OFFICER: EXHIBIT 4 IS ASSUMPTION OF ORIGINAL JURISDICTION OVER INTERNAL CHARGES, AMENDED NOTICE OF CONSOLIDATED HEARING ON INTERNAL CHARGES, AND AMENDED RULES OF PROCEDURE ISSUED BY SEIU PRESIDENT MARY KAY HENRY ON OCTOBER 20TH, 2016, WHICH IS HERE AS WELL. AND THEN ALL OF THE CHARGES WILL BE ENTERED BY THE CHARGING PARTY. AND I MISSED EXHIBIT 5, WHICH IS CLARIFICATION TO THE HEARING NOTICES ISSUED BY INTERNATIONAL UNION ON OCTOBER 26, 2016.

SO AT THIS TIME, I'M GOING TO CALL ALL THE NAMES OF THE CHARGING PARTIES AND ASK YOU JUST FROM WHERE YOU ARE TO RAISE YOUR HAND, SO WE'RE SURE THAT EVERYBODY'S HERE:

JAMES KIRKPATRICK? ALL RIGHT.

SHARON KISLING?

CLARA THOMAS?

AMELIA GAYTON?

BRENDA MARZAN?

AND IF I'M ABUSING ANY OF YOUR NAMES, I'M GOING

TO APOLOGIZE NOW.
AND CHERIE MANCINI?
AND I'M GOING TO NOW ASK TO SEE IF THE CHARGED PARTIES ARE HERE AS WELL. CHERIE, I KNOW YOU ARE; YOU HAVE RAISED YOUR HAND ALREADY.
ALFREDO SERRANO?
DEB SPRINGER?
MS. SPRINGER: HERE.
THE HEARING OFFICER: SHARON, ARE YOU IN THE ROOM NOW?
AND PATRICIA GREAUX?
SINCE SHARON IS NOT HERE, I'M GOING TO ASK CLARA THOMAS TO COME FORWARD AS A CHARGING PARTY.
MS. WALFOORT: MR. HODGSON, YOU ARE A CHARGED PARTY?
MR. HODGSON: YES.
MS. WALFOORT: SINCE THE CHARGING PARTY IS NOT HERE, WE ARE JUST GOING TO HOLD YOU UNTIL WE SEE IF MR. KIRKPATRICK COMES IN. IS THAT ALL RIGHT?
MR. HODGSON: NO, BUT I GUESS.
MS. WALFOORT: NOT MUCH ELSE WE CAN DO.
MS. THOMAS: SINCE SHARON AND I ARE BOTH -- AND SHE'S ON HER WAY, WOULD IT BE -- CAN YOU TAKE IT OUT OF ORDER?
MS. WALFOORT: DO YOU KNOW HOW LONG IT'S GOING TO BE BEFORE SHE GETS HERE?
UNIDENTIFIED SPEAKER: I JUST TEXTED HER AND TOLD HER YOU'RE LOOKING FOR HER.

MS. THOMAS: I WOULD SAY ANOTHER 10 MINUTES.

THE HEARING OFFICER: ALL RIGHT. WE'RE GOING TO MOVE BRENDA, CHARGING PARTY BRENDA MARZAN, UP FIRST AND GO THROUGH THAT CHARGE.

MS. MARZAN: SO I ACTUALLY THOUGHT I WAS TOMORROW, AND I DIDN'T BRING ALL OF MY STUFF WITH ME. I LEFT IT ON MY DESK AT HOME.

THE HEARING OFFICER: ALL RIGHT. I'M GOING TO TRY THIS AGAIN. WE'RE GOING TO HEAR CHERIE MANCINI, THE CHARGING PARTY, AND CHARGED, PATRICIA GREAUX. SO IF BOTH PARTIES COULD COME FORWARD.

MS. WALFOORT: CHERIE, ONE MINUTE, IF YOU DON'T MIND.

MS. MANCINI: SURE.

MS. WALFOORT: THE FIRST EXHIBIT THAT'S ALREADY MARKED IS THE ACTUAL CHARGE OF CHERIE MANCINI AGAINST PATRICIA GREAUX. DO YOU HAVE A COPY AT THIS TIME, PATRICIA?

MS. GREAUX: NO, I DON'T.

(EXHIBIT ADMITTED.)

MS. WALFOORT: LET'S GIVE THIS TO YOU NOW. AND THEN WE'RE GOING TO GET A COUPLE MORE COPIES.

MS. MANCINI: YES.

THE HEARING OFFICER: AND LET ME ASK TO MAKE SURE, CHERIE, ARE YOU PREPARED TO GO FORWARD? BECAUSE ORIGINALLY, THIS CHARGE WAS ON SCHEDULE FOR TOMORROW.

MS. MANCINI: YES, I AM.

THE HEARING OFFICER: AND PATRICIA, ARE YOU

PREPARED TO GO ON TODAY? BECAUSE, AGAIN, THIS CHARGE WAS ON FOR THE HEARING TOMORROW.

MS. GREAUX: SURE. I HAVE NO IDEA WHAT THE CHARGES WERE. GO FOR IT.

THE HEARING OFFICER: OKAY. SO I'M GOING TO HAVE THE CHARGING PARTY FIRST IDENTIFY YOURSELF AND SPELL YOUR NAME AGAIN FOR THE RECORD. WE'RE IN ANOTHER PHASE OF THE HEARING. AND THEN THE CHARGED PARTY WILL GO NEXT, DOING THE SAME THING.

MS. MANCINI: HANG ON, SORRY. I'M TRYING TO FIGURE OUT WHICH I'M USING FOR CHARGING AND WHICH ONES I'M USING FOR BEING CHARGED. OKAY.

THE HEARING OFFICER: CAN YOU STATE YOUR NAME FOR THE RECORD AND SPELL IT AS WELL?

MS. MANCINI: CHERIE MANCINI, C-H-E-R-I-E, MANCINI, M-A-N-C-I-N-I.

THE HEARING OFFICER: AND THEN PATRICIA, CAN YOU DO THE SAME?

MS. GREAUX: PATRICIA, P-A-T-R-I-C-I-A, GREAUX, G-R-E-A-U-X.

THE HEARING OFFICER: AND CHERIE, DO YOU WISH TO MAKE AN OPENING STATEMENT?

MS. MANCINI: YES.

THE HEARING OFFICER: YOU CAN GO AHEAD. AND PATRICIA, YOU WILL HAVE THE SAME OPPORTUNITY.

MS. MANCINI: BASED UPON THE FACT THAT I HAVE BEEN NOTIFIED BY THE VICE PRESIDENT, THERESA DIAZ, THAT THERE HAD BEEN SOME DECERTIFICATION NOTICES FLOATING

AROUND UMC AND ALSO -- THERE WERE DECERTIFICATION AND ALSO FORM DROP -- LIKE DROP FORMS, SAYING "WE WANT TO GET OUT OF SEIU," THAT ARE ACTUALLY LINKED TO THIS WEBSITE, UMC-CCPEA.

MS. WALFOORT: SO THE COURT REPORTER IS NOT GOING TO KNOW WHAT YOU'RE REFERRING TO UNLESS YOU DESCRIBE IT.

MS. MANCINI: OKAY. SO IT'S A WEBSITE. I PRINTED OFF THE WEBSITE, UMC-CCPEA.COM.

MS. WALFOORT: SORRY, CHERIE, IS THAT WHAT'S ATTACHED TO YOUR CHARGE?

MS. MANCINI: YES.

MS. WALFOORT: OKAY. SO WE HAVE IT IN EVIDENCE?

MS. MANCINI: YES.

SO ON THIS WEBSITE WHICH IS SPECIFICALLY GEARED TOWARDS UMC, NUMBER ONE, LIKE I SAID, THERESA DIAZ, AS THE VICE PRESIDENT OF UMC, BROUGHT THIS TO MY ATTENTION RIGHT AWAY AND WAS VERY CONCERNED ABOUT WHAT WAS GOING ON. SO AS I WAS FINALLY ABLE TO GET A COPY OF THE DECERTIFICATION NOTICE, I WAS ABLE TO GET THE WEBSITE AND GO ONTO THE WEBSITE. AND ON THIS WEBSITE, THERE ARE -- THERE IS A SECTION ABOUT MISCONDUCT IN REGARDS TO -- IN REGARDS TO THE RATIFICATION VOTE OF UMC AND A PETITION THERE WITH PATRICIA GREAUX'S NAME ON THE TOP OF THAT PETITION. AND THE REST OF THE BARGAINING TEAM ARE ALSO ON THAT PETITION. IS IT ON THERE?

THE HEARING OFFICER: UH-HUH.

MS. MANCINI: OKAY. AND BASED UPON THAT FACT, I HAVE NOT ONCE AT THIS TIME HAD PATRICIA GREAUX CONTACT ME ONE SINGLE TIME ABOUT THIS DECERTIFICATION WHICH I'VE BEEN TOLD IS RAMPANT THROUGHOUT THE ENTIRE HOSPITAL. AND AS THE CHIEF ANCILLARY STEWARD WHO KNOWS WHAT'S GOING ON IN HER HOSPITAL AND HAS BEEN THERE FOR QUITE SOME TIME -- I KNOW IN MY HOSPITAL WHERE I WORK, AS SOON AS SOMETHING LIKE THAT COMES OUT, I HAVE PEOPLE TEXTING ME AND TELLING ME AND ALL OF THOSE THINGS.

SO BASED ON THAT FACT THAT THE PETITION AS WELL AS HER NAME BEING ON THE TOP, AND I'M PRETTY SURE SHE IS THE ONE THAT SUBMITTED THAT TO MARY KAY HENRY --

MS. WALFOORT: CAN WE BACK UP FOR A MINUTE? I KNOW IT'S A LITTLE CONFUSING FOR EVERYBODY. BUT ARE YOU REFERRING NOW TO THE LAST TWO PAGES OF YOUR CHARGE?

MS. MANCINI: IS THAT THE ONE THAT HAS --

MS. WALFOORT: IT'S JULY 31ST, 2015 "TO MARY KAY HENRY" FROM UMC BARGAINING COMMITTEE?

MS. MANCINI: CORRECT. A PETITION AS WELL.

MS. WALFOORT: WHY DO YOU REFER TO IT AS "DECERTIFICATION"?

MS. MANCINI: IT'S ON A DECERTIFICATION WEBSITE.

MS. WALFOORT: THIS DOCUMENT IS REALLY CALLING SOMETHING ELSE, NOT DECERTIFICATION, RIGHT?

MS. MANCINI: BUT IT'S ON THE DECERTIFICATION WEBSITE. YES, THAT PARTICULAR PETITION IS ASKING FOR MARY KAY HENRY TO INTERVENE. AND AS POSTED ON THE

WEBSITE, IT BASICALLY SAYS "MARY KAY DOESN'T CARE ABOUT OUR CONCERNS AT UMC."

MS. WALFOORT: AND REFERRING TO WHERE IT SAYS "PRESIDENT MARY KAY CHOSE TO COMPLETELY IGNORE UMC."

MS. MANCINI: CORRECT.

MS. WALFOORT: OKAY. I WANT TO MAKE SURE WE ARE ALL ON THE SAME THING. AND YOU CAN CHARACTERIZE IT THE WAY YOU WANT.

MS. MANCINI: ABSOLUTELY, THANK YOU.

I HAVE SOME WITNESSES THAT WILL BE ABLE TO COME IN AND TELL YOU THAT THERE ARE OTHER PREVIOUS OFFICERS WHO HAVE BEEN SEEN TALKING ABOUT DECERTIFICATION TO MEMBERSHIP. I FIND IT HARD TO BELIEVE -- AND I ALSO HAVE A WITNESS WHO WILL TELL YOU THAT THEY WORK THERE AND THAT DECERTIFICATION INFORMATION IS ALL OVER THE HOSPITAL. SO THERE IS NO WAY THAT IT COULD NOT HAVE BEEN BROUGHT UP.

SO AS AN OFFICER OF THE UNION, YOU HAVE A DUTY TO REPORT THIS AND TAKE CARE OF IT. AS SOON AS I FOUND OUT, I PUT OUT AN E-MAIL TO PEOPLE TELLING THEM EXACTLY WHAT THIS WEBSITE WAS AND EXACTLY WHAT IT MEANT AND WHAT THIS ORGANIZATION WAS NOT, WHICH IT IS NOT EVEN AN ORGANIZATION.

THE HEARING OFFICER: AND DO YOU HAVE A COPY OF THAT?

MS. MANCINI: OF?

THE HEARING OFFICER: THE E-MAIL.

MS. MANCINI: THE E-MAIL OF WHAT? I'M SORRY?

MS. WALFOORT: THE E-MAIL YOU JUST REFERENCED.

YOU SAID YOU PUT OUT AN E-MAIL.

MS. MANCINI: OH, I CAN GET IT FOR YOU.

MS. WALFOORT: THANK YOU.

MS. MANCINI: YEAH.

THE HEARING OFFICER: ANYTHING ELSE YOU WISH TO SHARE IN THE OPENING STATEMENT?

MS. MANCINI: NO.

THE HEARING OFFICER: OKAY. PATRICIA, DO YOU HAVE AN OPENING STATEMENT?

MS. GREAUX: NOT REALLY. BESIDES, YES, I DID. BUT NOT ONCE HAD SHE SPOKEN TO ME EITHER. AND DO I NEED TO? THERESA IS THE ONE THAT TOLD ME SHE TALKED TO CHERIE. SO IF SHE TALKED TO CHERIE, THERE WAS NO NEED FOR ME TO. AND NOT ONLY THAT, OUR RELATIONSHIP ISN'T THAT. SHE'S THE PRESIDENT; SHE COULD HAVE CONTACTED ME JUST AS EASILY AS I COULD HAVE CONTACTED HER. WE DON'T HAVE THAT TYPE OF A RELATIONSHIP.

THE HEARING OFFICER: OKAY. AND THEN FOR THE CHARGING PARTY -- CHERIE, HOW MANY WITNESSES ARE YOU EXPECTING TO HAVE?

MS. MANCINI: I HAVE THREE.

THE HEARING OFFICER: PATRICIA, HOW MANY WITNESSES ARE YOU EXPECTING TO BRING?

MS. GREAUX: I HAVE TWO HERE NOW.

THE HEARING OFFICER: OKAY. SO THE CHARGING PARTY WILL GO FIRST.

MS. GREAUX: CAROL, I CAN HAVE FOUR.

THE HEARING OFFICER: FOUR, OKAY. CHARGING

PARTY WILL GO FIRST.

SO CHERIE, CALL YOUR FIRST WITNESS.

MS. GREAUX: OH, THE OTHER EXHIBITS THAT SHE PRESENTED, I NEED A COPY OF THAT ALSO.

MS. WALFOORT: EVERYTHING WE TALKED ABOUT IS THERE. IT'S RIGHT IN THERE.

MS. GREAUX: JUST THESE THREE PAGES, THAT'S IT?

MS. WALFOORT: WELL, IT'S DOUBLE-SIDED.

MS. GREAUX: OH, OKAY.

SHARON SAVOY-DURISSEAU,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: AND PLEASE STATE YOUR NAME AND SPELL IT FOR THE RECORD.

THE WITNESS: SHARON, S-H-A-R-O-N, SAVOY-DURISSEAU, S-A-V-O-Y-D-U-R-I-S-S-E-A-U.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. MANCINI:

Q DID YOU SEE THE DECERTIFICATION INFORMATION AT UMC? OR I'M SORRY, DO YOU WORK AT UMC?

A YES.

Q DO YOU -- WHERE DO YOU WORK AT?

A I WORK IN A LAB.

Q DID YOU SEE ANY INFORMATION BEING DISSEMINATED

IN REGARDS TO THE DECERTIFICATION?

A YES, I HAVE. WELL, WHEN I SEEN THE DECERTIFICATION LETTERS, I THREW IT -- I TOOK IT FROM OFF OF A BOARD. BECAUSE ONE OF THE BOARDS -- BECAUSE I USUALLY GO IN THE DIFFERENT BREAK ROOMS EITHER TO GO WASH MY HANDS OR GO DO SOMETHING. SO SOMEBODY SHOWED IT TO ME ON TOP OF THE BOARD.

SO BASICALLY I WENT IN THEIR BREAK ROOM AND I TORE IT DOWN. I CAME BACK AND I TOLD HER. I SAID THEY GOT DECERTIFICATION. ALSO, TOO, I HEARD FROM ONE OF THE OTHER UNION MEMBERS THAT THEY WAS TRYING TO GO AHEAD AND DISMEMBER THE UNION OVER THERE.

THE HEARING OFFICER: DO YOU HAVE A COPY OF THE DECERTIFICATION?

MS. SAVOY-DURISSEAU: NO. I TORE THEM DOWN. I JUST THREW IT AWAY.

MS. MANCINI: I HAVE THEM.

THE HEARING OFFICER: OKAY.

MS. MANCINI: THAT'S ALL.

THE WITNESS: THAT'S IT?

MS. MANCINI: YES. THANK YOU.

MS. WALFOORT: HOLD ON. STAY THERE FOR A MINUTE, SORRY.

THE HEARING OFFICER: MY QUESTION, DO YOU KNOW HOW THE DECERTIFICATION GOT THERE?

THE WITNESS: NO, I DON'T. I JUST SEEN IT UP THERE ON THEIR BULLETIN BOARD.

THE HEARING OFFICER: OKAY. AND THE FIRST

NOTIFICATION YOU HAVE, THAT WAS -- DO YOU KNOW ROUGHLY WHEN AND BY WHO?

THE WITNESS: NO. I COULDN'T TELL YOU. I COULD NOT TELL YOU.

THE HEARING OFFICER: OKAY. ALL RIGHT. PATRICIA, DO YOU HAVE QUESTIONS FOR SHARON?

MS. GREAUX: YES.

HAVE YOU EVER SPOKEN TO ME ABOUT THE DECERT? OR HAVE I SPOKEN TO YOU?

THE WITNESS: NO.

THE HEARING OFFICER: ANY OTHER QUESTIONS?

MS. GREAUX: NO. THAT'S IT.

THE HEARING OFFICER: OKAY. SO YOU MAY STEP DOWN.

MS. MANCINI: I CALL -- HE'S OUTSIDE -- JAVIER.

THE HEARING OFFICER: JAVIER, THE COURT REPORTER WILL SWEAR YOU IN. AND THEN AFTER THAT, I'LL HAVE YOU STATE YOUR NAME AND SPELL IT.

JAVIER CABRERA,

THE WITNESS HEREIN, AFTER HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: STATE AND SPELL YOUR NAME FOR THE RECORD.

THE WITNESS: MY NAME IS JAVIER, J-A-V-I-E-R, CABRERA, C-A-B-R-E-R-A.

THE HEARING OFFICER: GO AHEAD, CHERIE.

EXAMINATION

BY MS. MANCINI:

Q WHAT IS YOUR OCCUPATION?

A I'M A UNION ORGANIZER.

Q CAN YOU TELL ME IF YOU'VE EVER BEEN ON OCCASION TO GO TO DO WORK AT UMC?

A YES, I HAVE.

Q HAVE YOU EVER HEARD ANYONE SPEAKING ABOUT A PETITION OR ANYTHING TO THE EFFECT OF DECERTIFICATION?

A I HAVE OBSERVED THAT.

Q CAN YOU TELL ME WHEN AND WHERE AND WHO?

A IT DIDN'T HAPPEN AT UMC ABOUT THE DECERTIFICATION PETITION. IT HAPPENED AT THE COUNTY. LAST STEWARD MEETING, DON'T REMEMBER THE DATE, SECOND TUESDAY OF THE MONTH.

Q AND WHO WAS SPEAKING OF IT?

A I NOTICED SHARON KISLING AND BRENDA MARZAN TALKING TO ANOTHER STEWARD.

Q OKAY. DID YOU ON OCCASION HEAR ANYONE FROM UMC SPEAK ABOUT A PETITION?

A NOT ABOUT THAT PETITION, ABOUT DECERTIFICATION PETITION, NO.

Q OKAY. THAT'S IT.

THE HEARING OFFICER: CAN I JUST ASK, WHO WERE THE NAMES THAT YOU MENTIONED? I WAS NOT ABLE TO CATCH THEM WHEN YOU SAID THAT OF THE DECERTIFICATION THAT YOU HAD HEARD ABOUT AT THE COUNTY LEVEL.

THE WITNESS: IT WAS BRENDA MARZAN, SHARON

KISLING.

THE HEARING OFFICER: AND THEN DO YOU HAVE A COPY OF THE DECERTIFY PETITION THAT YOU SAW?

THE WITNESS: NOT WITH ME.

THE HEARING OFFICER: OKAY. AND YOU HAD SAID IT WAS THE SECOND TUESDAY OF THE MONTH. WHAT MONTH ARE YOU REFERRING TO?

THE WITNESS: THIS WOULD BE OCTOBER.

THE HEARING OFFICER: OKAY. OKAY. ANY OTHER QUESTIONS?

MS. MANCINI: NO.

THE HEARING OFFICER: WOULD YOU LIKE TO CROSS-EXAMINE?

MS. GREAUX: SURE.

HAVE YOU EVER BEEN TO UMC AND HEARD ME TALK ABOUT THE DECERTIFICATION?

THE WITNESS: NOT ABOUT THE DECERTIFICATION.

MS. GREAUX: THAT'S IT.

MS. MANCINI: I DON'T HAVE ANYTHING ELSE.

THE HEARING OFFICER: OKAY. AND JAVIER, I'M GOING TO HAVE TO ASK YOU TO LEAVE THE ROOM AGAIN. ONLY MEMBERS ARE PARTICIPATING IN THIS PORTION OF THE HEARING. THANK YOU.

PATRICIA, DO YOU WANT TO CALL YOUR FIRST WITNESS?

MS. GREAUX: SURE. I'LL CALL GWEN STEVENS.

THE HEARING OFFICER: ALL RIGHT, GWEN, THE COURT REPORTER WILL SWEAR YOU IN. AND AFTER THAT, PLEASE

STATE YOUR NAME AND SPELL IT FOR THE RECORD.

GWEN STEVENS,
THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: GWEN STEVENS, G-W-E-N S-T-E-V-E-N-S.

MS. WALFOORT: GWEN, LEAN IN A LITTLE AND PICK UP YOUR VOICE.

THE HEARING OFFICER: ALL RIGHT. GO AHEAD, PATRICIA.

EXAMINATION

BY MS. GREAUX:

Q GWEN, ARE YOU AWARE OF THIS DECERT PETITION GOING AROUND?

A NO.

Q WHAT ARE YOU AWARE OF?

A OF THE RECALL PETITION.

Q AND A RECALL PETITION IS WHAT?

A RECALL PRESIDENT CHERIE MANCINI.

MS. GREAUX: OKAY. THAT'S IT.

THE HEARING OFFICER: SURE. CHERIE, CROSS-EXAMINE?

EXAMINATION

BY MS. MANCINI:

Q SO YOU ARE SAYING THAT YOU NEVER HAVE SEEN ANYTHING IN REGARDS TO DECERTIFICATION?
A I SAW PAPERS ON DECERTIFICATION. THAT'S WHAT I'M TELLING YOU ALL.
Q OH, MAYBE I'M CONFUSED. I THOUGHT YOU SAID YOU WEREN'T AWARE OF IT.
A THAT'S NOT WHAT I SAID.
Q I'M TRYING TO GET CLARIFICATION. SO YOU'VE SEEN THE DECERTIFICATION INFORMATION?
A I'VE SEEN A LOT OF PAPERS, YES.
Q OKAY. HAVE YOU SPOKEN TO ANY NUTRITION OR EVS PEOPLE IN REGARDS TO THIS?
A NO. ABOUT RECALL, YES. TO RECALL YOU, YES.
MS. MANCINI: OKAY.
THE WITNESS: ALL RIGHTY.
THE HEARING OFFICER: SO THE CLARIFICATION, GWEN, IS THAT YOU FIRST SAID THAT YOU NEVER SAW THE DECERTIFICATION AND NOW THAT YOU HAVE SEEN THE DECERTIFICATION OR A LOT OF PAPERS, CAN YOU JUST BE CLEAR ABOUT WHAT YOU ACTUALLY SAW IN DOCUMENTATION?
MS. STEVENS: I SAW THE DECERTIFICATION ON THE UNION BOARD.
THE HEARING OFFICER: OKAY. ANY OTHER --
MS. MANCINI: THAT'S FINE. THANK YOU.
MS. GREAUX: THAT'S IT. I DON'T NEED ANYBODY ELSE.
THE HEARING OFFICER: ALL RIGHT. SO DO EITHER OF THE PARTIES WISH TO MAKE A CLOSING STATEMENT?

CHARGING PARTY GOES FIRST.

MS. MANCINI: YES.

BASED UPON THE LANGUAGE THAT WAS NEGOTIATED IN THE CONTRACT AT UMC, WHICH WAS PROPOSED ON THE VERY FIRST DAY OF BARGAINING, WHICH IS THAT THE UNION ACCESS BE CHANGED FROM GIVING REASONABLE NOTICE TO 24 HOURS' NOTICE FOR BOTH HR AND THE CHIEF STEWARDS AND FOR ANY EMPLOYEE OF THE UNION HALL TO HAVE TO BE ESCORTED BY A STEWARD ANYWHERE IN THE FACILITY THAT WAS PROPOSED ON THE VERY FIRST DAY OF BARGAINING, WHICH IN TURN CRIPPLED THE UNION IN TERMS OF EVEN GETTING INTO THE FACILITY TO EVEN KNOW WHAT WAS HAPPENING AS FAR AS A DECERTIFICATION WAS CONCERNED;

WE HAVE NOTICE -- AND I'LL PROVIDE THIS TO YOU. I HAVE E-MAILS THAT HAVE BEEN SENT OUT TO THE CHIEF STEWARD THERE, WITH NO RESPONSE FOR ACCESS. IT SEEMS TO ME THAT THIS WAS A CONCERTED EFFORT TO MAKE SURE THAT THE UNION COULD NOT GET IN AND THAT A DECERTIFICATION COULD BE RUN.

MS. WALFOORT: CHERIE, DO YOU HAVE ANYTHING THAT WE SHOULD KNOW ABOUT THAT TELLS YOU WHETHER PATRICIA GREAUX OR ANYBODY ELSE IS RESPONSIBLE FOR THAT PETITION?

MS. MANCINI: I'VE SHOWED YOU THE INFORMATION ON THE WEBSITE WHICH WAS INITIATED BY ONE OF THE CHIEF NEGOTIATING OFFICERS, WHICH IS PAT GREAUX. SO WHERE DID THAT COME FROM TO GET ONTO THAT WEBSITE?

MS. WALFOORT: RIGHT. BUT DO YOU KNOW WHERE THAT CAME FROM?

MS. MANCINI: NO.

MS. WALFOORT: THANK YOU.

THE HEARING OFFICER: PATRICIA, DO YOU WANT TO MAKE A CLOSING STATEMENT?

MS. GREAUX: SURE.

THE REASON THAT THAT ACCESS WAS CHANGED TO 24 HOURS, US AS STEWARDS, WE ALSO HAVE TO BE GIVEN 24 HOURS' NOTICE. THIS IS A MEMBER-DRIVEN UNION. THE MEMBERS WANTED THIS DUE TO THE FACT THAT NOW WE HAVE TO CLOCK IN AND OUT FOR OUR LUNCHES. THE EMPLOYEES AT UMC FEEL THAT THEY SHOULD BE ABLE TO HAVE THEIR 30 MINUTES LUNCH UNINTERRUPTED BY ANYBODY.

THEY DIDN'T WANT ORGANIZERS; THEY DIDN'T WANT ME; THEY DIDN'T WANT THE STEWARDS INTERRUPTING THEM AT THEIR LUNCHTIME. SO THIS IS ONE OF THE REQUESTS THAT THEY ASKED FOR. WE HAVE TO GIVE 24 HOURS' NOTICE, EVERYBODY ELSE SHOULD BE ABLE TO GIVE 24 HOURS' NOTICE ALSO. WE WOULD BE MORE THAN HAPPY TO ESCORT EVERYBODY AND ANYBODY.

AND CHERIE'S OWN WORDS, SHE DON'T KNOW. I DIDN'T DO THIS. I DIDN'T PUT IT ON THE WEBSITE. AND WHEN WE RECEIVED 400 SIGNATURES FROM PEOPLE IN FOUR HOURS, THAT WAS THEIR RIGHT TO GET A COPY OF EVERYTHING THEY SIGNED. THAT'S WHAT WE TELL OUR EMPLOYEES, "IF YOU SIGN ANYTHING, YOU HAVE A RIGHT TO IT." BUT I GUESS SHE DIDN'T GET THE PETITION ON THIS. BUT IT'S IN MINE THAT I SENT OVER.

EMPLOYEES HAVE RIGHTS. AND HOW CAN YOU CHARGE

ME WITH SOMETHING THAT YOU HAVE NO IDEA WHO PUT IT ON THE WEBSITE? AND YOU NEVER CONTACTED ME EITHER TO ASK ME IF I DID. SO I THINK ALL OF THESE CHARGES NEED TO BE DROPPED. THANK YOU.

THE HEARING OFFICER: ALL RIGHT. SO WE'RE TRYING TO GET EVERYTHING TOGETHER TOO. THIS WASN'T NECESSARILY THE PLAN FOR THE DAY, SO WE'RE TRYING TO FIGURE IT OUT. WE WANT TO MAKE SURE THERE IS NOT CONFUSION IN THE ROOM ABOUT WHAT THE CHARGE IS. SO FOR PURPOSES OF THAT, I'M GOING TO READ THROUGH THE FIRST PART OF THE CHARGE, SO FOLKS UNDERSTAND WHAT THE CHARGE IS WE'RE TALKING ABOUT RIGHT NOW:

"SO I CHERIE MANCINI, HEREBY CHARGE PAT GREAUX WITH ADVOCATING AND ENGAGING IN UNIONISM OR SUCCESSION," ARTICLE 21, SECTION 3, NUMBER 7, OF THE SEIU 1107 CONSTITUTION AND BYLAWS.

"I WAS NOTIFIED BY THE UMC VICE PRESIDENT, THERESA DIAZ ON 10/4/16 THAT A DECERTIFICATION FORM WAS BEING CIRCULATED AROUND UMC AND WHAT WE WERE GOING TO DO ABOUT IT. TO THIS DAY, I, CHERIE, HAVE HAD NO COMMUNICATION WITH THE CHIEF ANCILLARY STEWARD, INDICATING THAT SHE HAS SEEN THIS DECERTIFICATION NOTICE." AND THAT IS ATTACHED.

AND THEN ALSO A FORMAL COMPLAINT THAT WAS SENT FROM THE UMC BARGAINING TEAM, WHICH PAT WAS ONE OF THE PRIMARY OFFICERS IN CHARGE OF THE COMMITTEE TO MARY KAY HENRY WAS POSTED ON THE ANTI-SEIU WEBSITE WITH DEFAMING COMMENTS ABOUT MARY KAY AND HER LACK OF RESPONSE,

ATTACHED. AND THAT'S ALSO ATTACHED FOR THE PURPOSES OF THIS.

AND THE ONLY QUESTION I HAVE JUST TO FOLLOW UP IS: GENERALLY -- AND THIS IS MY EXPERIENCE AS A UNION LEADER OR ALMOST 30-YEAR UNION MEMBER AS WELL -- IS THAT WE DON'T EVER WANT TO GIVE UP UNION ACCESS TO A WORK SITE. I'LL SAY THAT'S A BIG CONCERN. AND THERE ARE AREAS OF THE BYLAWS THAT, I THINK, SPEAK TO THAT.

WHAT WAS THE THOUGHT BEHIND LIMITING ACCESS TO ANY UNION STAFF OR ELECTED LEADER?

MS. GREAUX: THAT WE CAN ESCORT THEM -- IT WAS THE EMPLOYEES THAT COMPLAINED DUE TO THE FACT THAT WE HAVE TO CLOCK IN AND OUT FOR LUNCH. THAT WAS SOMETHING NEW THAT WENT AROUND DUE TO THE FACT OF DEPARTMENT OF LABOR. AND WE HAD SEVERAL COMPLAINTS FROM OUR HR DEPARTMENT THAT EMPLOYEES WERE BEING INTERRUPTED DURING THEIR LUNCH.

THEY DIDN'T WANT STEWARDS THERE NOR DID THEY WANT PEOPLE FROM OUTSIDE INTERRUPTING THEM DURING THEIR LUNCH. BECAUSE IT STATES THAT YOU CAN ONLY SPEAK TO EMPLOYEES IN THAT BREAK ROOM. THEY WANTED TO BE ABLE TO EAT LUNCH IN PEACE. THAT'S WHAT THEY STATED ON THE FORMS THAT THEY PUT IN FOR CONTRACT.

THE HEARING OFFICER: OKAY. SO THAT WAS ALL PART OF SURVEY RESPONSE?

MS. GREAUX: CORRECT.

THE HEARING OFFICER: MY QUESTION IS WOULD IT BE POSSIBLE TO GET THAT? IT WOULD BE HELPFUL TO SEE

DOCUMENTATION OF WHERE THIS FIRST BIRTHED, CAME FROM. AND IF OUT OF A CONTRACT BARGAINING SURVEY, THAT WOULD BE HELPFUL TO KNOW, AND I WOULD APPRECIATE --

MS. GREAUX: I CAN, SURE.

MS. MANCINI: CAN I MAKE ONE MORE CAVEAT TO ACCESS?

THE HEARING OFFICER: SURE.

MS. MANCINI: WE'RE DENIED ACCESS TO ORIENTATION AS WELL BY THE NEW LANGUAGE OF THE CONTRACT.

MS. WALFOORT: CHERIE, BEFORE WE LEAVE THIS PART AND MOVE ONTO THE NEXT ONE, THIS DOCUMENT YOU GAVE US WITH TWO COPIES --

MS. MANCINI: I THINK THAT'S THE WRONG ONE. WHICH ONE IS THAT?

MS. WALFOORT: IT SAYS UMC (INDICATING). DO YOU WANT US TO CONSIDER THIS AS PART OF THE CHARGE?

MS. MANCINI: I NEED TO SEE IT. HANG ONTO IT FOR JUST A SECOND.

MS. WALFOORT: THANK YOU.

MS. GREAUX: THAT'S PART OF THE CHARGES AGAINST ME?

MS. WALFOORT: I THINK CHERIE'S SAYING SHE'S NOT SURE YET.

THE HEARING OFFICER: IF IT IS, YOU'LL HAVE A COPY OF IT.

MS. GREAUX: YEAH, I WAS JUST MAKING SURE.

THE HEARING OFFICER: SO I THINK WE'RE COMPLETE ON THIS CHARGE AND CAN MOVE ONTO THE NEXT. SO I'M GOING

TO CONFER WITH MY TEAM BEFORE WE MOVE ON.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: IS JAMES KIRKPATRICK HERE?

NO?

WE'RE GOING TO WAIT A MINUTE AND GO BACK TO CHARGE TWO. SINCE JAMES ISN'T HERE, WE'RE GOING TO SKIP CHARGE ONE RIGHT NOW. WE'LL RECONVENE IN A MINUTE.

(PAUSE IN PROCEEDINGS.)

THE HEARING OFFICER: GIVEN THAT MARY WAS ABLE TO REACH OUT AND SPEAK WITH JAMES KIRKPATRICK, HE IS NOT GOING TO BE HERE IS WHAT HIS STATEMENT IS, TODAY OR TOMORROW. HE IS WORKING. IS THAT CORRECT, OR IS THERE ANYTHING YOU'D LIKE TO SHARE?

UNIDENTIFIED SPEAKER: THAT IS WHAT HE SAID.

THE HEARING OFFICER: SO IN RESPECT FOR RICHARD, HE'S BEEN HERE THE WHOLE TIME READY TO GO, WE'RE GOING TO START ACTUALLY WITH CHARGE 1 AND ALLOW YOU, RICHARD, TO RESPOND AS THE CHARGED PARTY. AND I'LL READ THE CHARGES OUT SO EVERYBODY IN THE ROOM IS CLEAR ABOUT THE CHARGES AND THE ARTICLES OF THE CONSTITUTION AND BYLAWS THAT ARE NAMED AS BEING VIOLATED.

SO WE'RE GOING TO GO THROUGH THIS, RICHARD, SIMILAR TO THE LAST CASE WITH THE EXCEPTION THE CHARGING PARTY IS NOT HERE. SO YOU WILL BE ABLE TO MAKE AN OPENING STATEMENT. IF YOU HAVE WITNESSES, LET ME KNOW HOW MANY. THEY WILL BE SWORN IN. YOU'LL HAVE AN OPPORTUNITY TO MAKE AN OPENING STATEMENT. DOES THAT MAKE

SENSE?

MR. HODGSON: YES.

THE HEARING OFFICER: OKAY. SO ARE YOU OKAY IF I GO AHEAD?

OKAY. SO THERE ARE TWO CHARGES THAT ARE FILED. ONE IS INTERFERING WITH ACCESS TO THE WORKPLACE. AND THE AREAS OF THE BYLAWS, CONSTITUTION AND BYLAWS, VIOLATED ARE ARTICLE 6, SECTION 3; ARTICLE 7, SECTION 12B AND ARTICLE 7, SECTION 12C OF THE LOCAL 1107 CONSTITUTION AND BYLAWS.

AND THEN THE SECOND CHARGE IS DIRECT BARGAINING WITH THE EMPLOYER THAT CHANGES THE MAKEUP OF THE BARGAINING UNITS. AND THE ARTICLES THAT ARE NAMED AS VIOLATED ARE ARTICLE 17, SECTION 1 OF THE SEIU CONSTITUTION -- SO THAT'S OUR NATIONAL BYLAWS -- 1, 2, 3, 4, 5 AND 6. AND THEN IN ADDITION OF THE LOCAL 1107 CONSTITUTION AND BYLAWS, IT'S ARTICLE 7, SECTION 6 AND 10A; ARTICLE 14, SECTION 1 AND ARTICLE 15, SECTION 1A SUB 1 AND THEN SUB 3 THROUGH 12 AND 16.

MR. HODGSON: ACTUALLY, I DON'T HAVE THOSE. I'M READING IT FROM THE LETTER FROM THE INTERNATIONAL, THE ASSUMPTION OF ORIGINAL JURISDICTION.

MS. WALFOORT: DO YOU NEED A COPY OF THAT, MR. HODGSON?

MR. HODGSON: WHAT'S THE DATE?

THE HEARING OFFICER: OCTOBER 17TH, 2016. IT'S ON THE LAST PAGE OF THE DOCUMENT.

MR. HODGSON: OH, THE LAST PAGE?

THE HEARING OFFICER: YEAH. IT'S MARKED AS HEARING OFFICER EXHIBIT 3.

MR. HODGSON: OH, I DIDN'T PRINT THAT.

THE HEARING OFFICER: OKAY. YOU SHOULD HAVE IT.

MS. PURDIE: IS THIS ENTIRE FOLDER FOR ONE EXHIBIT?

MR. HODGSON: IT'S ONE.

MS. PURDIE: IT'S ONE EXHIBIT?

MR. HODGSON: IT'S ONE. FOUR COPIES, AS I WAS INSTRUCTED.

THE HEARING OFFICER: READY TO GET STARTED?

MR. HODGSON: I'M READY. JUST FOR FORMALITIES, CAN WE BRIEFLY GO OVER THE PACKET I'VE PROVIDED? I PUT IT IN ORDER, SO THEY SHOULD MATCH EACH OTHER. I JUST WANT TO MAKE SURE THAT I DIDN'T MISS ANY INFORMATION.

MS. WALFOORT: CAN YOU PULL THE MIC A LITTLE CLOSER TO YOU?

MR. HODGSON: I'LL TALK LOUDER.

SO WHAT YOU SHOULD HAVE IN YOUR PACKET, THE FIRST PAGE SHOULD BE A MAY 30TH, 2013, LOCAL 1107 SEIU LETTERHEAD. AND IT'S "DEAR MR. HODGSON" AND IT'S REFERENCING THE DECISION FROM THE ARBITRATION COMMITTEE. ON THE BOTTOM OF THE PAGE, IT SAYS "CHERYL BUNCH, ADMINISTRATOR OF LEGAL AFFAIRS." DO YOU HAVE THAT?

MS. WALFOORT: YES.

MR. HODGSON: THE SECOND SHOULD BE A COPY OF THE NRS 288.150. THE SECOND SHOULD BE ARTICLE 6 OF THE

CLARK COUNTY SEIU CBA MANAGEMENT RIGHTS, TWO PAGES.

THE HEARING OFFICER: UH-HUH.

MR. HODGSON: THE SECOND IS A SCREEN SHOT AND AT THE HEADING "FACILITY STAFFING REVIEW." DO YOU HAVE THAT?

THE HEARING OFFICER: YES.

MR. HODGSON: AND THEN THERE IS A SNAPSHOT OF A MEETING NOTICE DATED FEBRUARY 11TH, 08:30. AFTER THAT, IT SHOULD BE A SCREEN SHOT OF A TEXT CONVERSATION. THE TOP SHOULD SAY "RICHARD THE TALKING (SIC) OUR SHOP." DO YOU HAVE THAT?

THE HEARING OFFICER: YES.

MR. HODGSON: THE NEXT SHOULD BE CLARK COUNTY, NEVADA, OFFICE OF HUMAN RESOURCES. IT'S A STEP 2 CLASS ACTION DECISION BY THE CLARK COUNTY HR DIRECTOR. NEXT, IT SHOULD SAY "RICHARD HODGSON." IT WAS AN E-MAIL THAT WAS SENT TO ME BY THE FACILITIES MANAGER. IT SHOULD BE DATED -- THE ORIGINAL 5/5/2016.

THE HEARING OFFICER: YEP.

MR. HODGSON: NEXT, THERE SHOULD BE A "NEW AT SHIFT BID" OR "NEW LAT SHIFT BID" SOMETHING. IT SAYS "BM FSS SHOP STAFFING PLAN."

THE HEARING OFFICER: YES, IT DOES.

MR. HODGSON: AND THE LAST SHOULD BE THE OFFICE OF THE COUNTY MANAGER, CLARK COUNTY, NEVADA. AND IT'S A COPY OF PERSONNEL PROCEDURE NUMBER 7 OUT OF CLARK COUNTY MERIT PERSONNEL.

THE HEARING OFFICER: YES.

MR. HODGSON: YOU HAVE THAT?

THE HEARING OFFICER: YES.

MR. HODGSON: DO YOU ALSO HAVE A COPY OF THE ORIGINAL CHARGES FILED BY BROTHER JAMES KIRKPATRICK?

THE HEARING OFFICER: DATED MARCH 9TH, 2016?

MR. HODGSON: CORRECT.

THE HEARING OFFICER: YES.

MR. HODGSON: I'M GOING TO REFERENCE ALL THE DOCUMENTS. I'M GOING TO GO OFF THE ORIGINAL CHARGES AND GO STEP BY STEP. THAT'S WHAT I ACTUALLY HAD THE OPPORTUNITY TO DISCUSS WITH THE SUPPORTING DOCUMENTATION. SO THEY'RE NOT IN ANY SPECIFIC ORDER, RANDOM ORDER, SO WE MAY BE JUMPING AROUND.

BROTHER KIRKPATRICK ACCUSED ME IN THE FIRST SENTENCE:

"IN A PHONE CONVERSATION WITH RICHARD HODGSON, HE SAID 'I'M NOT ALLOWING SEIU 1107 ORGANIZERS ON AIRPORT PROPERTY. BECAUSE THEY MIGHT CAMPAIGN FOR CHERIE MANCINI.'"

I DO NOT RECALL HAVING THAT CONVERSATION WITH HIM, AND I NEVER SAW ANY EVIDENCE PRESENTED BY BROTHER KIRKPATRICK THAT THAT HAD ACTUALLY OCCURRED OR HAD TAKEN PLACE. HE REFERENCED ARTICLES, BUT I'VE NEVER -- I DON'T RECALL THAT CONVERSATION.

ON MARCH 23, 2016, HE REFERS TO A TEXT CONVERSATION WITH "RICHARD HODGENSON." WELL, HE SPELLED MY NAME WRONG.

"I ASKED WHAT KNOWLEDGE HE HAD ABOUT A

RUMOR THAT MANAGEMENT WAS SPLITTING UP THE HVAC SHOP."

THAT'S HEATING VENTILATION AIR CONDITION SHOP. HE STATED:

"IF MANAGEMENT DECIDES THEY WANT TO DO THIS, THEY CAN."

HE'S BASICALLY QUOTING ME.

"I INTERPRET THIS TO MEAN NOTHING WAS HAPPENING."

SO IN THE PACKET, IF YOU REFER TO IT LOOKS LIKE THE TEXT SCREEN SHOTS. THIS IS THE ACTUAL CONVERSATION, THE TEXT MESSAGE CONVERSATION, THAT I HAD WITH BROTHER KIRKPATRICK. AND LET ME -- I WANT TO ADDRESS, THERE ARE SEVERAL THINGS THAT I THINK ARE RELATIVE.

MS. WALFOORT: AND JUST FOR THE COURT REPORTER, THIS IS THE 6TH DOCUMENT IN HIS EXHIBIT.

MR. HODGSON: YEAH, I APOLOGIZE FOR THAT. BECAUSE I WAS RUSHING TIME.

MS. WALFOORT: IT'S FOR STEPHANIE'S SAKE. WE HAVE TO LET HER KNOW WHAT DOCUMENT.

MR. HODGSON: SO THE FIRST PAGE, RICHARD IS -- THIS IS KIRKPATRICK. AND ON SOME OF THE PAGES, IT ACTUALLY HAS HIS CELL PHONE NUMBER WITH HIS NAME, SOMEWHERE IN THE BACK. IT'S ON ONE SOMEWHERE. AT LEAST I THOUGHT I SAW ONE. SO LET ME BEGIN BY READING:

"RICHARD THE TALK OF OUR SHOP IS THAT DOUG MC MAHON IS GOING TO MOVE SOME PEOPLE TO THE PLUMBING SHOP AND TAKE OUR FIRE CERTIFICATION AWAY. SOUNDS LIKE BULL."

SO LET ME JUST GIVE YOU SOME PROSPECTIVE OF WHAT WAS GOING ON. THROUGHOUT CLARK COUNTY, SINCE 2008, THE RECESSION, THERE HAS BEEN MAJOR REORGANIZATION GOING ON THROUGHOUT THE COUNTY. THE DEPARTMENT OF AVIATION FOR ONE, HAS -- REORGANIZING SOME OF THE WORK GROUPS AND THE ASSETS.

SO WHAT WAS HAPPENING IN THE FACILITIES DIVISION, ASSETS WERE BEING MOVED UNDER WHAT WE'LL REFER TO AS "COST CENTERS." AND COST CENTERS ARE HOW THE EMPLOYER IDENTIFIES WHICH WORK GROUPS WORK WITH CERTAIN ASSETS, WHAT FUNDS ARE AVAILABLE FOR THOSE ASSETS FOR MAINTENANCE, PURCHASING. IT'S HOW THEY ARE TRACKED. AND WORK GROUPS ARE ASSIGNED TO CERTAIN ASSETS.

MR. KIRKPATRICK, BROTHER KIRKPATRICK, IS AN HVAC MECHANIC. AND THE FACILITIES MANAGER WAS REASSIGNING ASSETS UNDER A DIFFERENT COST CENTER. SO THIS IS THE CONVERSATION. SO HE'S REFERRING TO RUMORS.

"AWAY -- SOUNDS LIKE BULLSHIT TO ME. WHAT DO YOU THINK?" I BELIEVE IT'S PART OF OUR CONTRACT. THEREFORE, IT WOULD BE HARD TO REMOVE, JIM KIRKPATRICK."

WHAT HE'S REFERRING TO, IN THE CBA BETWEEN SEIU 1107 AND CLARK COUNTY, HVAC MECHANICS, ELECTRICIANS, PLUMBERS RECEIVE WHAT IS REFERRED TO AS CERTIFICATION PAY. THE HVAC WORK GROUP HAS WHAT'S REFERRED TO AS THE G-CARD WHICH ALLOWS THEM TO PERFORM MAINTENANCE, REPAIRS, INSTALLATION OF FIRE SUPPRESSION SYSTEM EQUIPMENT, MAINLY THE PLUMBING PART OF IT. SO THIS IS WHAT THAT CONVERSATION IS. AND I'M GOING TO REFERENCE SOME OTHER

AREAS HERE.

MY RESPONSE:

"IF THERE IS NO NEED FOR CERT PAY, THEY CAN. SOME ELECTRICIANS MAY BE IN THAT CATEGORY."

PRIOR TO THIS, THERE WAS A REASSIGNMENT OF EMPLOYEES, ELECTRICIANS, INTO A NEWLY CREATED WORK GROUP WHICH WERE REFERRED TO THE "BAGGAGE HANDLING SYSTEM." AND IN THE BAGGAGE HANDLING SYSTEM, THE ELECTRICIANS AREN'T WORKING ON AN F-CARD, FIRE ALARM. THAT EQUIPMENT DOESN'T EXIST IN THE BAGGAGE HANDLING SYSTEM. AND WHAT I WAS REFERRING TO, IN OUR -- IF YOU REFER TO -- LET ME FIND IT. JUST ONE MOMENT.

WHAT I WAS REFERRING TO, AND I DIDN'T SPECIFY, BUT IF YOU LOOK AT PERSONNEL PROCEDURE NUMBER 7, OFFICER OF THE COUNTY MANAGER -- LET ME ALSO GIVE --

MS. WALFOORT: HOLD ON ONE MINUTE. THAT'S THE LAST DOCUMENT OF THE EXHIBIT?

MR. HODGSON: SO IN CLARK COUNTY, WE HAVE IN OUR STATUTE, NEVADA REVISED STATUTE 288 THAT GOVERNS RELATIONS BETWEEN GOVERNMENT AND PUBLIC EMPLOYEES, CLARK COUNTY HAS A MERIT PERSONNEL SYSTEM. AND WE ALSO HAVE COLLECTIVE BARGAINING AGREEMENTS AND ALL TYPES OF ADMINISTRATIVE DIRECTIVES AND FINANCE DIRECTIVES, AND THE LIST GOES ON AND ON.

SO I HAVE A WEALTH OF KNOWLEDGE AND EXPERIENCE IN ALL THE VARIOUS ASPECTS OF THOSE DOCUMENTS, HOW THEY APPLY TO OUR CONTRACT, HOW THEY APPLY IN THE WORKPLACE.

SO IF YOU LOOK UNDER "SUBJECT, CERTIFICATION

PAY," WE'RE TALKING ABOUT CERTIFICATION PAY SO WHEN HE SAYS, "HEY, THEY'RE TRYING TO REMOVE OUR CERTIFICATION PAY," WELL, CLARK COUNTY HAS ALREADY FIGURED OUT -- THEY'RE VERY THOROUGH -- A LOT OF PEOPLE, ESPECIALLY NEW STEWARDS, NEW PRESIDENTS, PARTICULARLY THAT MAYBE HAD THEIR BACKGROUND IN PRIVATE SECTOR WORK, MAY NOT BE THAT FAMILIAR WITH ALL OF THE INTRICATE COMPONENTS THAT MAKE UP THIS MASSIVE ENGINE OF CLARK COUNTY.

AND IF YOU LOOK UNDER SECTION 3, UNDER "PROCEDURES," IT TELLS YOU HOW THE COUNTY WILL DETERMINE WHO GETS CERTIFICATION PAY, IF IT'S A REQUIREMENT, AND WHO DOES NOT. SO WHEN I REFERENCED, "HEY, IF THERE'S NO NEED FOR THE CERT PAY, GUESS WHAT, MANAGEMENT HAS THAT RIGHT TO ELIMINATE THAT FROM THE WORK GROUP."

THIS IS SIGNIFICANT. BECAUSE CERTIFICATION PAY IS PAID AT A RATE OF FOUR PERCENT OF YOUR BASE SALARY. SO MOST OF THE TRADES THAT RECEIVE CERTIFICATION PAY, THAT'S AN ADDITIONAL $4,000 A YEAR OF INCOME THAT ALSO GOES TO OUR PUBLIC EMPLOYEE RETIREMENT SYSTEM, PERS. SO THAT'S SIGNIFICANT.

HOWEVER, IF YOU LOOK UNDER "PROCEDURE" -- AND I DIDN'T MARK IT UNFORTUNATELY, SORRY.

MS. WALFOORT: MS. HODGSON, CAN I BACK YOU UP ONE MOMENT?

MR. HODGSON: YES.

MS. WALFOORT: SO WHAT YOU'RE SAYING IN THIS PART OF YOUR PRESENTATION, YOU'RE SAYING THIS ACCUSATION THAT YOU BARGAINED DIRECTLY WITH MANAGEMENT, WHICH WOULD

ALLOW CHANGES IN THIS UNIT, ARE YOU EXPLAINING WHY YOU WERE --

MR. HODGSON: BASICALLY --

MS. WALFOORT: WAIT, HOLD ON. ARE YOU EXPLAINING WHY YOU DID NOT BARGAIN DIRECT WITH MANAGERS OR WHY IT WAS OKAY TO MAKE THESE CHANGES?

MR. HODGSON: YOU ARE SOMEWHAT JUMPING AHEAD OF ME.

MS. WALFOORT: BUT IS THAT THE CONTEXT WE'RE IN?

MR. HODGSON: CORRECT. YOU'RE RIGHT ON IT.

SO BASICALLY CERTIFICATION PAY IS NOT A MANDATORY SUBJECT TO BARGAINING. LET'S GET TO THE POINT. SO WHEN YOU LOOK AT NRS 288.150, NEGOTIATIONS BY EMPLOYER -- OH, I'M SORRY NRS 288 IS A COPY OF NEVADA REVISED STATUTE.

MS. WALFOORT: OKAY.

MR. HODGSON: SO LET ME GIVE YOU PERSPECTIVE. SO YOU HAVE AN INDIVIDUAL THAT HAS A LARGE SCOPE IN UNDERSTANDING OF HOW LABOR WORKS WITHIN CLARK COUNTY. AND THEN YOU HAVE INDIVIDUALS THAT HAVE VERY LIMITED KNOWLEDGE AND UNDERSTANDING OF HOW IT WORKS. SO I WAS NEVER GIVEN THE OPPORTUNITY TO EXPLAIN IT. BECAUSE HE DIDN'T WANT TO TALK TO ME. I WAS NEVER CONTACTED BY ANYONE FROM THE LOCAL, PRESIDENT MANCINI. NO ONE ASKED ME WHAT'S GOING ON.

IT WAS JUST ASSUMED THAT THEY KNEW. BUT THEY WERE ACTUALLY LACKING A LOT OF KNOWLEDGE IN NEVADA

REVISED STATUTE, MERIT PERSONNEL AND OF THE CBA. SO WHEN YOU LOOK AT NRS 288.150, THIS ACTUALLY DESCRIBES MANDATORY SUBJECTS OF BARGAINING, WHAT LOCAL GOVERNMENTS, PUBLIC EMPLOYEES, WHAT ARE MANDATORY SUBJECTS. SO IF YOU LOOK UNDER PARAGRAPH 2 A THROUGH W, IT ITEMIZES ALL THE MANDATORY SUBJECTS OF BARGAINING.

PART OF THE ASSET -- AND I'M GOING TO DIGRESS TO A DIFFERENT AREA, JUST FOR UNDERSTANDING. PART OF -- IN ADDITION TO ASSETS THAT THE MANAGEMENT REASSIGNED ASSETS TO A DIFFERENT COST CENTER, THERE WAS ALSO A REASSIGNMENT OF EMPLOYEES. ACCORDING TO NRS 288, UNDER 3B -- EXCUSE ME, UNDER 3. I'M SORRY, IF YOU CAN SEE PARAGRAPH THREE:

"THE SUBJECT MATTERS WHICH ARE NOT WITHIN THE SCOPE OF MANDATORY BARGAINING AND WHICH ARE RESERVED TO THE LOCAL GOVERNMENT EMPLOYER WITHOUT NEGOTIATIONS INCLUDE,"

AND IF YOU GO TO 3, UNDER 3A.

"EXCEPT AS OTHERWISE PROVIDED IN PARAGRAPH U OF SUBSECTION 2, MANAGEMENT RESERVES THE RIGHT TO HIRE, DIRECT, ASSIGN OR TRANSFER AN EMPLOYEE BUT EXCLUDING THE RIGHT TO ASSIGN OR TRANSFER AN EMPLOYEE AS A FORM OF DISCIPLINE."

SO BROTHER KIRKPATRICK FELT THAT -- I WAS CALLED TO A MEETING WITH OUR HR DIRECTOR, DEPUTY DIRECTOR OF THE DIVISION, ALSO THE FACILITIES MANAGER, SOME OF THE HR PEOPLE. SO I RECEIVED AN E-MAIL. SO IF YOU LOOK AT THE FACILITY STAFFING REVIEW, I RECEIVED AN E-MAIL NOTICE

FROM THE HR -- THE ASSISTANT DIRECTOR OF THE DEPARTMENT AVIATION, HR, HER SECRETARY, FOR MEETING NOTICE.

SO ONE OF THE THINGS THAT BROTHER KIRKPATRICK CLAIMED IS THAT I HAD KNOWLEDGE OF SOME CHANGES AND THAT THERE WAS A MEETING AND THAT I SHOULD HAVE CONTACTED HIM SINCE HE WAS A STEWARD IN THAT WORK GROUP. AT THAT TIME, BROTHER KIRKPATRICK WAS ALSO A TRUSTEE OF THE LOCAL. I WAS THE CHIEF STEWARD OF THE DEPARTMENT OF AVIATION AT THAT TIME. SO WHAT I'M PROVIDING IS THAT MANAGEMENT SAID, "HEY, WE'RE HAVING A FACILITY STAFFING REVIEW," LOCATION, FOLLOWED BY THE TIME.

SO AT THIS TIME, I'M STILL WORKING. I WAS WORKING GRAVE SHIFT, GRAVEYARD SHIFT. BROTHER KIRKPATRICK WAS WORKING SECOND SHIFT OR SWING SHIFT. I RECEIVED THIS NOTICE. I KNEW IT WAS REGARDING FACILITIES. WHAT EXACTLY, I HAD NO IDEA. ONE OF OUR STEWARDS AT THE DEPARTMENT OF AVIATION THAT WORKS FROM 8:00 A.M. TO 5:00 P.M. -- I KNEW THAT SHE STARTS AT 8:00 IT'S AN 8:30 MEETING. LET ME CONTACT THE STEWARD. I'M NOT MEETING WITH MANAGEMENT BY MYSELF.

SO I CONTACTED STEWARD SHEILA GRAIN, WHO'S NOW TREASURER SHEILA GRAIN, TO ATTEND THIS MEETING. I CALLED HER BY PHONE. "I DON'T KNOW WHAT THE MEETING IS ABOUT, BUT IT'S SOMETHING TO DO WITH FACILITIES. I NEED YOU TO BE AVAILABLE TO GO IN WITH ME." WE WENT TO THE MEETING.

REMEMBER, REASSIGNING OF STAFF OR ASSETS IS A MANAGEMENT RIGHT. THEY DIDN'T CALL ME INTO THAT MEETING TO ASK FOR MY AUTHORIZATION OR PERMISSION. THEY DID IT

AS A COURTESY FROM A WORKING RELATIONSHIP THAT I HAVE HAD. I'M PART OF THE FACILITIES WORK GROUP. BEING A CHIEF STEWARD, IT WAS TO INFORM ME, "HEY, WE'VE GOT SOME CHANGES COMING."

AT THE MEETING, THE MANAGER OF THE FACILITY DIVISION WAS BASICALLY LAYING OUT TO HIS BOSS, THE DEPUTY DIRECTOR AND THE HR ASSISTANT DIRECTOR WHAT HIS PLANS WERE. SO WE WERE ALL HEARING FOR THE FIRST TIME WHAT FACILITATED THIS NEED TO MOVE ASSETS FROM ONE WORK GROUP INTO ANOTHER WORK GROUP AND HOW MANY STAFF HE'S GOING TO NEED TO REASSIGN IN ORDER TO MAINTAIN THESE ASSETS. SO DURING THE HEARING, I ASKED SEVERAL QUESTIONS.

I'M GOING TO REFER TO ANOTHER DOCUMENT. THE TOP SAYS "RICHARD HODGSON," AND IT IS AN E-MAIL THAT WAS SENT TO ME BY THE FACILITY MANAGER.

MS. PURDIE: CAN YOU CLARIFY WHO FROM THE UNION (INAUDIBLE)?

MR. HODGSON: SHEILA GRAIN.

MS. PURDIE: YOU AND SHEILA?

MR. HODGSON: CORRECT.

MS. WALFOORT: AND THESE TWO RELATE TO EACH OTHER? SO YOU'VE GOT THE NOTICE ON FEBRUARY 3RD AND THE MEETING WAS FEBRUARY 11TH?

MR. HODGSON: CORRECT.

SO WE MET. THE FACILITY MANAGER LAID OUT WHY HE NEEDS TO MOVE THESE ASSETS FROM ONE WORK GROUP TO ANOTHER WORK GROUP AND THAT HE ALSO NEEDS TO REASSIGN SOME EMPLOYEES. REMEMBER THIS IS A MANAGEMENT RIGHT.

THEY'RE NOT ASKING ME FOR PERMISSION. THEY'RE SHARING WITH ME SOME UPCOMING EVENTS. AFTER HEARING, I ASKED BASIC QUESTIONS. "WELL, HOW MANY EMPLOYEES ARE BEING REASSIGNED?"

"WE DON'T KNOW THAT AT THAT POINT."

"WHEN ARE YOU PLANNING TO REASSIGN THESE EMPLOYEES?"

"WE HAVEN'T GOT THAT FAR YET."

I SAID, "OKAY." WE'RE A 2/47 OPERATION. WE HAVE A SHIFT BID." THIS WAS IN FEBRUARY, AND WE HAVE SHIFT BID IN JUNE.

"IS THIS GOING TO BE BEFORE SHIFT BID? IS THIS GOING TO BE AFTER SHIFT BID?"

"I DON'T KNOW."

SO WHAT I WAS INFORMED BY OUR FACILITIES MANAGER AND THE DEPUTY DIRECTOR, SEVERAL THINGS. PRIOR TO REASSIGNING OF ANY EMPLOYEES, THEY'RE GOING TO MEET WITH THE AFFECTED EMPLOYEES. AND THEY'RE GOING TO ALLOW THE CHIEF STEWARD OR STEWARD, WHOEVER, TO BE PRESENT. SO WHEN WE LEFT THE MEETING, I SAID, "OKAY. WELL, KEEP ME POSTED."

THE MANAGEMENT TEAM AT THAT POINT ASKED THAT THIS MEETING BE CONFIDENTIAL. BECAUSE IT WAS A LITTLE PREMATURE TO START TELLING THE WORK GROUPS. BECAUSE THEY HAVEN'T EVEN -- DIDN'T HAVE THE NUMBER OF EMPLOYEES THAT THEY WERE GOING TO REASSIGNED. THEY DIDN'T HAVE THE NAMES OF THE EMPLOYEES THEY WERE GOING TO REASSIGN. AND AT THAT POINT, THEY DIDN'T EVEN KNOW WHEN THEY WERE GOING

TO ACTUALLY PLAN FOR THE REASSIGNING. SO THE E-MAIL IS RUMORS THAT HE'S HAVING -- EXCUSE ME, THE TEXT MESSAGE.

SO LET'S JUST BOUNCE THIS BACK AND FORTH. SO THAT'S THE BASIS OF THIS TEXT MESSAGE, "HEY, I'M HEARING RUMORS." SO IN THE FIRST CHARGE FROM BROTHER KIRKPATRICK, IT STATES THAT I HAD LIED TO HIM. I INTERPRETED THE -- THIS TO MEAN NOTHING WAS HAPPENING.

HE TALKS ABOUT CERTIFICATION PAY. HEY, MY RESPONSE, "IF THERE IS A NEED FOR CERT PAY -- IF THERE'S NO NEED FOR CERT PAY, THEY CAN," MEANING THAT THEY CAN REMOVE IT AS A REQUIREMENT FOR THAT CLASSIFICATION. SOME OF THE ELECTRICIANS MAY ALSO BE IN THAT CATEGORY.

"WE ALL DO SPRINKLER WORK IN MY DEPARTMENT. THE RUMOR IS THEY'RE GOING TO SPLIT UP THE DEPARTMENT AND TAKE DESERT" --

I'M NOT SURE WHAT --

"THE UNION WILL BE JUST LIKE ELECTRICAL SHOP AT 95 PERCENT UNION SHOP WILL BECOME PROBABLY CLOSE TO ZERO."

HE'S REFERRING TO HIS SHOP, HVAC SHOP, THE 95 PERCENT MEMBERSHIP. SO HE'S SAYING, "HEY, IF THEY DO THIS, WE COULD BECOME ZERO." AND THEN HE REFERS TO, "HEY, I JUST GOT DONE" -- THIS IS MARCH 25TH, 2016. THE MEETING THAT I HAD WAS FEBRUARY 11TH.

SO WHY DIDN'T I APPROACH THE HVAC STEWARD IN THAT WORK GROUP? WELL, THERE WAS SEVERAL REASONS. IT WAS PREMATURE. I DIDN'T HAVE ALL THE INFORMATION. YOU HAVE -- WITH SUPERVISORS AND LEADS AND MECHANICS, YOU

HAVE 60, 65 EMPLOYEES IN THE WORKGROUP. AS A YOUNG STEWARD, I'VE DONE THAT BEFORE. IT WORKED UP A BUNCH OF PEOPLE, AND I HAD NO INFORMATION TO GIVE THEM.

SO WHEN YOU LOOK AT THE LETTER, THE ORIGINAL MARCH 5TH, IT SAYS "SUBJECT, KIRKPATRICK IMPROMPTU MEETING, REFERENCE HVAC." THIS IS THE MANAGER OF THE FACILITIES DIVISION SENDING ME AN E-MAIL OF AN IMPROMPTU -- DO YOU HAVE THAT?

MS. WALFOORT: GOT IT.

MR. HODGSON: ORIGINAL, MAY 5TH, SENDS ME AN E-MAIL, GIVES ME A HEADS-UP:

"JIM KIRKPATRICK CAME BY ASKING IF I COULD SUBSTANTIATE RUMORS ABOUT THE UPCOMING ORGANIZATIONAL CHANGE TO THE HVAC TO REALLOCATE THE FSS" -- THAT'S THE FIRE SUPPRESSION SYSTEM -- "ASSETS INTO BM SECTION" -- WHICH IS THE BUILDING MAINTENANCE SECTION -- "SINCE I FEEL CONFIDENT HAVING SUCCESSFULLY BRIEFED EMPLOYEE SERVICES MANAGEMENT" --

THAT IS THE HR FUNCTION OF THE AIRPORT. ACCORDING TO CLARK COUNTY, THERE IS ONLY ONE HR. ALL OF THE OTHER DEPARTMENTS, THEY DON'T PERFORM HR FUNCTION. THEY PERFORM EMPLOYEE SERVICES MANAGEMENT FUNCTION.

-- "AND YOU ABOUT THE TENTATIVE PLAN I DIDN'T HAVE AN ISSUE JUST GIVING HIM A GENERAL GIST OF IT ALL SINCE HE SEEMED TO KNOW ABOUT MOST OF ALREADY . HE SAID THERE WAS A LOT OF UNREST IN THE HVAC SHOP ABOUT IT AND HE WOULD LIKE TO PUT THEM AT EASE ABOUT IT, WHICH I CAN COMPLETELY UNDERSTAND AND AGREE WITH NOW THAT IT IS

APPARENTLY OUT THERE. I'M NOT SURE IF YOU'VE HAD THE OPPORTUNITY TO BRIEF JIM YET, BUT NO BIG DEAL AND HOPE YOU DON'T MIND. AT THIS JUNCTURE, IT WOULD HAVE BEEN DISINGENUOUS TO ASSERT ANYTHING TO THE CONTRARY. HE WAS APPRECIATIVE AND SAID HE WOULD LIKE TO RELAY AND ALLY WHAT HE COULD WITH GENERALITIES AT THIS POINT. AS YOU KNOW, WE ARE STILL WORKING THROUGH MANY LOGISTICAL ISSUES OF THE TRANSITION. SO I TOLD HIM WE HAVEN'T COMPLETELY ARRIVED AT SPECIFICS YET."

HE'S TELLING HIM THE SAME THING HE TOLD ME, "I DON'T HAVE THIS INFORMATION. I DON'T HAVE SPECIFICS, ACTUAL NAMES OF THOSE SELECTED TO BE REASSIGNED ET CETERA.

"BUT I WAS ABLE TO ALLEVIATE MOST OF THE CONCERNS HE SAID THE RUMORS WERE GENERATING. GOAL IS NO CHANGE TO SHIFT OR DAYS OFF" --

THAT'S ONE OF THE THINGS I DISCUSSED: YOU'RE GOING TO REASSIGN THESE PEOPLE. IF IT'S PRIOR TO SHIFT BID, YOU DON'T CHANGE THEIR SHIFT. YOU DON'T -- THEY KEEP EVERYTHING THE SAME.

-- "SELECTED AT THE TIME OF REASSIGNMENT, MAINTAIN RELATIVE SENIORITY, KEEP G-CARD."

REMEMBER $4,000 A MONTH (SIC) FOR A SHIFT -- FOUR PERCENT TO YOUR BASE SALARY FOR CERTIFICATION PAY.

"I WAS CLEAR TO HIM THAT ONCE THE PLAN WAS OFFICIALLY FINALIZED AND FULLY DEFINED, JUST AS I HAVE DONE WITH OTHER SUCCESSFUL REORGANIZATIONS IN THE PAST, I WILL HAVE ONE-ON-ONE BRIEFINGS WITH THOSE DIRECTLY

AFFECTED."

THAT WAS COVERED IN THE MEETING THAT I HAD WITH THE FACILITY MANAGER, THAT ALL AFFECTED EMPLOYEES -- WE DIDN'T KNOW THE NAMES AT THAT TIME -- WILL BE NOTIFIED IN ADVANCE IN ONE-ON-ONE MEETINGS. THOSE MEETINGS DID TAKE PLACE. I WAS NOT -- I WAS INVITED INITIALLY. BUT DURING KIRKPATRICK -- AFTER HE HAD THIS MAY 5TH MEETING, HE INVOLVED CHERIE MANCINI.

MANCINI WAS CORRESPONDING WITH THE AIRPORT. I WANTED TO SET UP MEETINGS. I DON'T KNOW IF THEY EVER MET. I WAS TOLD THAT IF THERE WAS MEETING, THAT I WOULD BE INVITED. I WAS NEVER INVITED TO A MEETING, SO I DON'T KNOW IF IT HAPPENED OR NOT.

MS. WALFOORT: SO MS. HODGSON, MAY I INTERRUPT YOU? I THINK I'M UNDERSTANDING THAT WHAT THIS DISPUTE IS ABOUT AND WHAT I'M THINKING IS AS TO THE PART YOU LYING TO HIM, YOU'VE GOT PRETTY MUCH MR. MC MAHAN --

MR. HODGSON: I DIDN'T LIE TO HIM.

MS. WALFOORT: I THINK HE SUPPORTS WHAT YOU'RE SAYING, THAT YOUR REPRESENTATION IS CONSISTENT WITH HIS.

MR. HODGSON: CORRECT. AND I DID NOT DIRECT DEAL. THIS IS NOT A MANDATORY SUBJECT OF BARGAINING. THERE WAS NO NEGOTIATION. IT WAS INFORMING ME OF AN UPCOMING.

MS. WALFOORT: AND IN THAT SENSE, YOU COULDN'T HAVE APPROVED IT BECAUSE IT WASN'T YOUR ROLE TO APPROVE. SO IT SORT OF TAKES CARE OF --

MR. HODGSON: HERE'S THE THING. I FEEL GREAT

OF MYSELF. CLARK COUNTY IS ONE OF THE WEALTHIEST COUNTIES IN THE NATION, ONE OF THE TOP TEN. FOR ME TO BE AN EMPLOYEE OF CLARK COUNTY AND A CHIEF STEWARD, THAT THEY WOULD COME AND ASK ME PERMISSION TO REASSIGN PEOPLE THAT THEY HAVE A MANAGEMENT RIGHT TO, THAT NRS NEVADA REVISED STATE STATUTE GIVES THEM THAT RIGHT, OUR CBA GIVES THEM THAT RIGHT, I THINK -- I'M NOT THAT GREAT. I'M GOOD, BUT NOT THAT GOOD. I'M GOOD, BUT NOT THAT GOOD.

THE HEARING OFFICER: RICHARD, SO WHAT YOU ARE SAYING -- THIS IS WHAT I'M UNDERSTANDING. I NEED TO CHECK IT OUT. SO THE REASSIGNMENT ACTUALLY DID NOT HARM A MEMBER, DID NOT CHANGE THEIR TERMS AND CONDITIONS NOR DID IT ALTER THE MAKEUP OF THE BARGAINING UNIT; IS THAT CORRECT?

MR. HODGSON: ABSOLUTELY CORRECT. IT'S NOT DIRECT DEALING.

THE HEARING OFFICER: I FEEL LIKE THAT ANSWERS THAT CHARGE.

MR. HODGSON: WELL, LET ME JUST SHARE WITH YOU: YOU HAVE AN INDIVIDUAL THAT'S HIGHLY SKILLED, MYSELF. AND YOU HAVE CERTAIN INDIVIDUALS THAT AREN'T AS HIGHLY SKILLED. AND SINCE THEY DON'T HAVE THAT SCOPE OF KNOWLEDGE AND UNDERSTANDING, THEY SEE SOMETHING AND RUN WITH IT BECAUSE THEY ARE NOT PROPERLY EDUCATED IN THE PROCESS. AND THIS IS WHAT HAPPENED.

BUT I WANT TO BRING UP -- BECAUSE THERE IS SOME VERY VALID THINGS AS FAR AS THE STEP 2 THAT I WANT TO GET

TO -- BUT IF YOU HAVE OTHER QUESTIONS.

MS. WALFOORT: I THINK YOU'VE GIVEN A PERFECTLY GOOD UNDERSTANDING OF WHY YOU ACTED THE WAY YOU DID, WHEN YOU DID, HOW YOU DID.

MR. HODGSON: BECAUSE I KNOW I'M NOT -- WE COULD HAVE REASSIGNED SOME PEOPLE. THAT'S BASICALLY MY ROLE AT THAT POINT. IT'S NOT TO NEGOTIATE A REASSIGNMENT.

THE HEARING OFFICER: I THINK YOU RESPONDED TO THE FIRST CHARGE FULLY. AND I THINK WITH THE DOCUMENTATION YOU'VE PROVIDED, IT SUPPORTS WHAT YOU ARE SAYING. BUT I DON'T THINK YOU NEED TO MAKE IT ANY STRONGER. BECAUSE I THINK YOU HAVE ENOUGH HERE.

MR. HODGSON: OKAY.

THE HEARING OFFICER: JUST BEING HONEST.

MS. WALFOORT: THERE IS A PIECE OF ADVICE THAT WHEN SOMEONE'S SIGNALING, "WE HAVE GOT ENOUGH," YOU PROBABLY DON'T WANT TO KEEP GOING. YOU DON'T WANT TO HIT ON ISSUES THAT HE HASN'T GRAZED.

THE HEARING OFFICER: IS THERE ANY OTHER INFORMATION YOU WANT TO PRESENT WITH THE EXCEPTION OF THE LAST --

MR. HODGSON: I HAVE SOMETHING THAT I THINK IS VERY RELEVANT, JUST BRIEFLY. AND IT HAS TO DO WITH THE STEP 2. AND I WANT TO BRING THIS TO ATTENTION BECAUSE I THINK THE INTERNATIONAL NEEDS TO BE AWARE OF THIS.

MS. WALFOORT: HOW IS THIS RELEVANT TO WHAT WE JUST TALKED ABOUT?

MR. HODGSON: IT LENDS TO NOT NECESSARILY THE OVERALL CHARGES, BUT IT LENDS TO THE CONDITION OF THE LOCAL. SO THERE IS A --

MS. WALFOORT: BUT THAT IS NOT REALLY RELEVANT TO THE CHARGES, WHICH IS WHAT WE'RE TALKING ABOUT NOW. THE CONDITION OF THE LOCAL IS WHAT WE WERE TALKING ABOUT THIS MORNING. I DON'T THINK IT'S RELEVANT TO THE CHARGES AND COUNTS THOUGH.

MR. HODGSON: OKAY.

SO I DIDN'T LIE. YOU HAVE THE FULL CONTEXT OF THE CONVERSATION.

MS. WALFOORT: I JUST HAVE ONE FOLLOW-UP ON THE FIRST PART. YOU SAID YOU DIDN'T RECALL ANY CONVERSATION WITH HIM WHEN YOU SAID --

MR. HODGSON: I'VE NEVER KEPT ANY -- I'M PRO-UNION, ALWAYS BEEN. AND I WILL NEVER STOP OUR LOCAL --

MS. WALFOORT: IT'S NOT ONLY YOU DON'T RECALL THE CONVERSATION --

MR. HODGSON: IT NEVER HAPPENED.

MS. WALFOORT: OKAY.

MR. HODGSON: I DO WANT, JUST BRIEFLY, ON THE JUNE 22ND STEP 2 DECISION FROM CLARK COUNTY, I WANT TO MAKE THIS CLEAR. THE MEETING THAT I HAD, THIS EVIDENCE, FEBRUARY 11TH, 2016, THEY MET WITH THE AFFECTED EMPLOYEES THAT WERE GOING TO BE REASSIGNED. IT'S IN THE STEP 2 DECISION ON APRIL 25TH AND 28TH, 2016.

THE LAST -- IF YOU GO TO THE LAST PARAGRAPH OF

THE STEP 2 DECISION, I JUST WANT YOU TO BE AWARE THAT THE STEP 2 DECISION WAS THAT THE GRIEVANCE THAT -- BECAUSE THERE WAS A GRIEVANCE FILED.

I DID NOT FILE THE GRIEVANCE. I'M NOT SURE. I DIDN'T GET A COPY OF THE ORIGINAL. BUT I JUST WANT YOU TO BE AWARE. WHEN YOU TALK ABOUT CAUSING HARM TO MEMBERSHIP, THE GRIEVANCE WAS DENIED ON A TIMELINE VIOLATION. AND I WANT TO JUST POINT THAT OUT. IT WAS REPRESENTED BY THE LOCAL.

THE HEARING OFFICER: RICHARD, I SEE THAT ON THE SECOND PAGE. BUT IT REALLY DOES NOT NEED TO BE PART OF THE RECORD BASED ON THE CHARGES. THAT'S A WHOLE SEPARATE ISSUE NOT BROUGHT INTO THE CHARGES.

MR. HODGSON: OKAY. JUST SO YOU'RE AWARE, TIMELINE VIOLATION.

THE HEARING OFFICER: THANK YOU FOR THE INFORMATION THAT YOU PROVIDED. THAT WAS REALLY HELPFUL AND CLEAR.

MR. HODGSON: I'M GOING HOME TO GO TO SLEEP. I WORKED GRAVE SHIFT. I'VE BEEN UP ALL NIGHT. I APPRECIATE YOUR TIME. THANK YOU.

THE HEARING OFFICER: THANK YOU.

(DISCUSSION HELD OFF THE RECORD.)

MS. WALFOORT: JUST BEFORE WE ENTER THE NEXT, WE'RE GOING TO ENTER THE CHARGE 1, CHARGING PARTY, KIRKPATRICK'S CHARGE, INTO THE RECORD. AND THEN WE HAVE GOT MR. HODGSON'S RESPONSE, WHICH YOU HEARD ABOUT. SO WE HAVE GOT CHARGE 1 NOW. AND WE'LL MOVE ON TO CHARGE

NUMBER 2.

(EXHIBITS ADMITTED.)

THE HEARING OFFICER: ALL RIGHT. WE'RE GOING TO GO TO CHARGE 2. AND THAT IS WITH SHARON KISLING AND CLARA THOMAS AS CHARGING PARTY. AND THEN SHARON MANCINI, ALFREDO SERRANO AND DEB SPRINGER AS THE CHARGED PARTY. SO IF THEY WANT TO COME FORWARD, THAT WOULD BE HELPFUL.

A SUMMARY OF THE CHARGES:

"ON DECEMBER 9, 2016, LOCAL 1107 EXECUTIVE VICE PRESIDENT, SHARON KISLING, AND LOCAL 1107 TRUSTEE CLARA THOMAS, FILED INTERNAL CHARGES WITH THE SEIU UNION AGAINST 1107 PRESIDENT CHERIE MANCINI, LOCAL 1107 TRUSTEES ALFREDO SERRANO AND DEB SPRINGER. THE CHARGES ACCUSE PRESIDENT MANCINI AND TRUSTEES SERRANO AND SPRINGER OF VIOLATING THE FOLLOWING SUBSECTIONS AND ARTICLE 17, SECTION 1 OF THE SEIU CONSTITUTION:

"1, VIOLATION OF ANY SPECIFIC PROVISION OF THE SEIU CONSTITUTION OR OF THE CONSTITUTION AND BYLAWS OF THE LOCAL UNION,

"2, VIOLATION OF AN OATH OF OFFICE,

"3, GROSS DISLOYALTY OR CONDUCT UNBECOMING A MEMBER,

"4, IF AN OFFICER, GROSS INEFFICIENCY WHICH MIGHT HINDER AND IMPAIR THE INTERESTS OF THE INTERNATIONAL UNION OR THE LOCAL UNION,

"5, FINANCIAL MALPRACTICE,

"6, ENGAGING IN CORRUPT OR UNETHICAL PRACTICES OR RACKETEERING.

"IN ADDITION, THE CHARGES ACCUSE PRESIDENT MANCINI AND TRUSTEES SERRANO AND SPRINGER WITH VIOLATING THE FOLLOWING PROVISIONS OF THE LOCAL 1107 CONSTITUTION: ARTICLE 7, SECTION 6 AND 10A; ARTICLE 14, SECTION 1 AND ARTICLE 15, SECTIONS 1A, PARAGRAPH 1, SUBPARAGRAPH 3 THROUGH 12 AND 16."

AND SO I THINK WE'RE ALL UP HERE.

MS. WALFOORT: SO WHAT WE'RE GOING TO DO IS JUST PUT THE CHARGE OF CHARGE 2 INTO THE RECORD NOW. I'M ASSUMING THE CHARGING PARTIES HAVE A COPY, I'M ASSUMING, OF THAT. OKAY. THANK YOU.

(EXHIBIT ADMITTED.)

THE HEARING OFFICER: AND THEN WE WILL HAVE THE CHARGING PARTIES IDENTIFY THEMSELVES FIRST AND SPELL THEIR NAMES. AND THEN WE'LL GO TO THE CHARGED PARTY.

MS. KISLING: SHARON KISLING, K-I-S-L-I-N-G.

MS. THOMAS: CLARA THOMAS, C-L-A-R-A T-H-O-M-A-S.

THE HEARING OFFICER: OKAY.

MS. MANCINI: CHERIE MANCINI, C-H-E-R-I-E M-A-N-C-I-N-I.

MR. SERRANO: ALFREDO SERRANO, A-L-F-R-E-D-O S-E-R-R-A-N-O.

MS. SPRINGER: DEBBIE SPRINGER, D-E-B-B-I-E S-P-R-I-N-G-E-R.

THE HEARING OFFICER: AND THE NUMBER OF WITNESSES FOR THE CHARGING PARTY?

MS. THOMAS: IT'S A LONG LIST.

THE HEARING OFFICER: WHILE YOU GET THAT TOGETHER, I'LL ASK THE CHARGED PARTY THE NUMBER OF WITNESSES.

MS. MANCINI: I THINK THERE MAY BE A COUPLE.

THE HEARING OFFICER: TWO?

MS. MANCINI: YES.

MS. THOMAS: I WOULD LIKE TO ENTER THIS MEMORANDUM FROM MICHAEL URBAN BECAUSE IT IS PERTINENT TO OUR CASE. AND SEVERAL OTHER CHARGE PARTIES WILL BE USING THE SAME THING. I CAN BRING ADDITIONAL COPIES.

THE HEARING OFFICER: HOW MANY COPIES DO YOU HAVE THERE?

MS. THOMAS: THIS IS ONE.

THE HEARING OFFICER: THE CHARGED PARTY HAS TO HAVE A COPY.

MS. MANCINI: WE DO.

MS. WALFOORT: WE NEED COPIES.

THE HEARING OFFICER: SHARON, ARE YOU PUTTING TOGETHER THE LIST OF WITNESSES?

MS. THOMAS: AT THIS TIME, SHE HAS SEVEN.

THE HEARING OFFICER: SEVEN, VERY GOOD. AND THEN AS THE CHARGING PARTY, DO YOU WISH TO MAKE OPENING STATEMENTS?

MS. THOMAS: YES, MA'AM.

THE HEARING OFFICER: GO AHEAD.

MS. THOMAS: SEIU CONTRACTS NOT REVIEWED AND APPROVED BY THE EXECUTIVE BOARD -- BEFORE I GO ON, JUST TO PREFERENCE THIS. I'M GOING FIRST. THERE ARE THINGS

THAT WILL BE OUT OF ORDER, JUST SO THAT YOU KNOW.

THE HEARING OFFICER: OKAY.

MS. THOMAS: OKAY. AS STATED BY THE URBAN LAW FIRM MEMORANDUM, ARTICLE 8 OF SEIU LOCAL 1107 CONSTITUTION PROVIDES THAT THE EXECUTIVE BOARD IS THE GOVERNING BODY OF THE LOCAL, AUTHORIZED AND EMPOWERED TO TAKE ALL LAWFUL ACTIONS. SECTION 2 OF THE ARTICLE PROVIDES THAT THE EXECUTIVE BOARD IS TO APPROVE THE COMPENSATION, TERMS AND CONDITIONS OF EMPLOYMENT FOR THE STAFF OF THE LOCAL UNION.

MS. WALFOORT: CLARA, ARE YOU REFERRING TO A SECTION OF YOUR CHARGE?

MS. THOMAS: YES, MA'AM.

MS. WALFOORT: CAN YOU CALL OUR ATTENTION? IT'S OKAY TO JUMP AROUND. BUT IT WOULD BE NICE TO KNOW WHAT YOU'RE REFERRING TO.

MS. THOMAS: I APOLOGIZE. I THOUGHT I DID THAT, ARTICLE 8.

MS. WALFOORT: DO YOU HAVE A PAGE NUMBER?

MS. THOMAS: NO. I DIDN'T GIVE A PAGE ON THAT. I CAN ACTUALLY START WITH ARTICLE 14, SECTION 1, COMMITTEES.

MS. WALFOORT: I DIDN'T MEAN TO MAKE YOU CHANGE YOUR ORDER. I JUST WANTED TO FOLLOW BY SEEING WHERE IN YOUR CHARGE YOU ARE REFERRING TO.

MS. THOMAS: I JUST WANT TO READ THE STATEMENT. AND THEN I CAN GIVE A CONCLUSION, YOU KNOW, TO GO BACK. SO I CAN -- THIS IS EASY.

MS. WALFOORT: OKAY.

MS. THOMAS: ARTICLE 14, SECTION 1, COMMITTEES, STATES THAT ALL COMMITTEES OF THE LOCAL UNION SHALL BE ADVISORY TO THE LOCAL UNION EXECUTIVE BOARD. NO ACTION SHALL BE TAKEN BY ANY COMMITTEE WITHOUT PRIOR AUTHORIZATION FROM THE EXECUTIVE BOARD.

THE HIRING COMMITTEE DID NOT PRESENT HIRED EMPLOYEES TO THE BOARD. PRESIDENT MANCINI PRESENTED THESE NEW EMPLOYEES TO THE EXECUTIVE BOARD ONLY AFTER THEY HAD BEEN HIRED. NO DISCUSSION NOR APPROVAL OF SALARIES WERE PRESENTED TO THE BOARD FOR THESE AT-WILL EMPLOYEES.

WHEN THIS PRACTICE WAS PRESENTED TO TRUSTEE ALFREDO SERRANO AND DEBORAH -- DEBBIE SPRINGER, THEIR RESPONSE WAS THAT THE FINAL DECISION BELONGS TO PRESIDENT MANCINI AS IT IS HER RESPONSIBILITY TO HIRE AND FIRE WITH NO REGARD TO THE EXECUTIVE BOARD. THIS IS A CLEAR VIOLATION TO THE LOCAL'S BYLAWS AND CONSTITUTION, IN WHICH THEY TOOK THE OATH OF OFFICE TO UPHOLD THE UNION CONSTITUTION.

FROM THE ONSET OF BEING ON THE INTERVIEWING COMMITTEE, I HAD ASKED PRESIDENT MANCINI IF THE SELECTED APPLICANTS WOULD BE VETTED. SHE INDICATED TO ME THAT THEY WOULD IN FACT BE VETTED UPON SELECTION. I HAVE SINCE FOUND OUT THAT NONE OF THE CURRENT EMPLOYEES SELECTED FOR HIRE RECENTLY HAVE BEEN VETTED, WHICH WOULD HAVE INCLUDED BACKGROUND CHECKS AND/OR PREVIOUS EMPLOYMENT VARIATIONS.

CASE IN POINT, PETER NGUYEN, DIRECTOR OF ORGANIZATION -- ORGANIZING, I'M SORRY. IF PRESIDENT MANCINI WOULD HAVE DONE A BACKGROUND CHECK, WE WOULD HAVE KNOWN THAT HE HAD SUED HIS PREVIOUS UNION EMPLOYERS, OUR FELLOW BROTHERS OR SISTERS. PERHAPS WITH THIS INFORMATION, THE EXECUTIVE BOARD COULD HAVE GIVEN AN UP OR DOWN VOTE AS TO HIS EMPLOYMENT. WE'RE NOW IN A PRECARIOUS SITUATION IN WHICH WE NOW MAY OR MAY NOT BE IN THE POSITION OF LIABILITY AT THE BEHEST OF PETER NGUYEN SUING LOCAL 1107.

SISTER CHERIE SAID EARLIER THAT SHE KNEW ABOUT PETER'S LAWSUITS. AND MY QUESTION TO THAT IS OUR FELLOW BROTHER AND SISTERS IN THE UNION WERE NOT GIVEN A CHANCE FOR TRANSPARENCY WITH HIS EMPLOYMENT. MR. NGUYEN HAS A PROPENSITY TO CLAIMS OF DISCRIMINATION, DEFAMATION, RETALIATION AND HARASSMENT, TO NAME A FEW. PERHAPS IF PRESIDENT MANCINI COULD OR WOULD HAVE CONFERRED WITH THE EXECUTIVE BOARD AS STATED IN THE CONSTITUTION, WE, LOCAL 1107, WOULD NOT BE IN A POSITION THAT MAY RENDER US LIABLE IN A LAWSUIT.

PRESIDENT MANCINI ON A REGULAR BASIS REFERS TO PETER NGUYEN ABOUT ALL MATTERS CONCERNING THE LOCAL. SHE, PER THE CONSTITUTION, SHOULD BE REFERRING MOST IMPORTANT MATTERS AND DECISIONS THAT AFFECT THE LOCAL TO THE BOARD. AS PREDICTED, I HAVE NOTICED A DIVISIVE ATMOSPHERE AMONG THE STAFF. THEY'RE LOYAL TO PETER. AT ONE POINT, IN THE HALL, I WOULD HEAR DISCUSSION ABOUT MEMBERSHIP. NOT ANY LONGER. IT'S BECOME ALL ABOUT

PETER.

THEY ARE TOLD NOT TO DO ANYTHING OR ANSWER ANY QUESTIONS FROM ELECTED OFFICIALS UNLESS PRESIDENT MANCINI OR PETER GIVES PERMISSION. SOME OF THE MEMBERS OF THE BOARD HAVE BEEN SUBJECTED TO PETER'S TOTAL DISRESPECT OF E-BOARD MEMBERS AND THE LOCAL MEMBERSHIP.

AS A MEMBER OF THE INTERVIEWING COMMITTEE, I ALSO ASKED PRESIDENT MANCINI TO STOP ALLOWING PETER TO KEEP HIRING HIS FRIENDS. SHE ASKED ME WHAT WAS WRONG WITH HIRING HIS FRIENDS. I EXPLAINED TO HER THAT IT WOULD CREATE AN ATMOSPHERE OF THOSE FRIENDS BEING LOYAL TO PETER INSTEAD OF THE MEMBERSHIP OF OUR LOCAL. I ASKED PRESIDENT MANCINI TO INCLUDE OTHER CANDIDATES THAT WE COULD INTERVIEW, BUT TO NO AVAIL. PETER HAD GONE OVER THE APPLICANTS AND DECIDED WHICH ONES WOULD GO UP AGAINST HIS FRIENDS, AND THAT WAS THAT.

I ASKED PRESIDENT MANCINI ON ONE OCCASION DURING INTERVIEWS FOR THE DIRECTOR OF FINANCE IF WE COULD INTERVIEW MORE THAN THE INITIAL THREE CANDIDATES SELECTED. AT FIRST SHE SAID "YES," BUT LATER SAID "NO," AS SHE HAD SELECTED ROBERT CLARKE FOR THE POSITION. THIS CANDIDATE WAS NEVER VETTED. IF SO, WE WOULD HAVE FOUND OUT THAT HE WAS LISTED IN PETER'S LAWSUIT OF OUR BROTHERS AND SISTERS IN CALIFORNIA, LOCAL 1.

PRESIDENT MANCINI DID THE SAME HIRING TACTICS FOR ANDREA BOND AND THE E-BOARD WAS ADVISED BY MICHAEL URBAN'S LAW FIRM THAT WE NEEDED TO HIRE A PARALEGAL AS OUR COORDINATOR TO RECORD IMPORTANT LITIGATION REGARDING

OUR MEMBERS AND MANAGEMENT. AGAIN, PETER'S FRIEND ANDREA BOND WAS NOT VETTED. AND THE BOARD DIDN'T GET TO SEE IF SHE IN FACT HAS EARNED A CERTIFICATE AS A PARALEGAL.

THE BACKGROUND CHECKS VETTING CANDIDATES ARE IMPORTANT ACTIONS AS EACH OF THE RECENT HIRED POSITIONS ARE EXTREMELY IMPORTANT TO OUR LOCAL. AND A LITTLE BACKGROUND CHECK AT THE LEAST IS REQUIRED. THIS LOCAL OWES IT TO THE MEMBERSHIP TO PROVIDE THE BEST CANDIDATE THAT WILL NOT POSE A LIABILITY TO SEIU AND THE LOCAL 1107.

AND IF YOU DON'T MIND, I CAN GO BACK TO MY PREVIOUS STATEMENT:

AS STATED BY THE URBAN LAW FIRM, ARTICLE 8 OF SEIU LOCAL 1107 CONSTITUTION PROVIDES THAT THE EXECUTIVE BOARD IS THE GOVERNING BODY OF THE LOCAL, AUTHORIZED AND EMPOWERED TO TAKE ALL LAWFUL ACTION. SECTION 2 OF THIS ARTICLE PROVIDES THAT EXECUTIVE BOARD IS TO APPROVE THE COMPENSATION, TERMS AND CONDITIONS OF EMPLOYMENT OF THE STAFF OF THE LOCAL UNION AND APPROVAL OF ALL CONTRACTS FOR SERVICES RENDERED SUCH AS LEGAL, AUDIT, PAYROLL SERVICES, BENEFIT PROGRAMS OR OFFICE LEASES.

AND MY CONCLUSION, I WANT TO SAY THANK YOU FOR HEARING MY CONCERNS. I BELIEVE AS A TRUSTEE WE SHOULD BE CONCERNED AND VOICE THAT CONCERN TO THE PRESIDENT OF LOCAL 1107. I HAVE CONCLUDED THAT TRUSTEE ALFREDO SERRANO AND DEBBIE SPRINGER HAVE VIOLATED THEIR OATH OF OFFICE BY NOT QUESTIONING THE CURRENT HIRING PRACTICE. THEY HAVE SUPPORTED THE NOTION THAT PRESIDENT MANCINI

HIRES AND FIRES WITHOUT QUESTION EVEN THOUGH SECTION 2, ARTICLE 8 HAS BEEN BROUGHT TO THEIR ATTENTION. AGAIN, THANK YOU VERY MUCH.

THE HEARING OFFICER: DO YOU HAVE AN OPENING STATEMENT?

MS. KISLING: NO.

THE HEARING OFFICER: OKAY. OPENING STATEMENTS?

MS. MANCINI: YES.

WE ARE PREPARED TO LET YOU KNOW THAT EVERYTHING THAT HAS HAPPENED HAS BEEN IN ACCORDANCE WITH THE BYLAWS. WE HAVE DOCUMENTATION TO SHOW THAT SHARON KISLING HAD, WHILE I WAS ON VACATION, PRIVATE MEETINGS WITH MIKE URBAN TO CONFER AS TO WHAT HER RIGHTS WERE IN REGARDS TO ACTING AS PRESIDENT WHILE I WAS NOT THERE.

WHICH IS WHY IN TURN SHE CALLED AN EMERGENCY BOARD MEETING TO BRING UP ALL OF THESE CONCERNS, WHICH IS THIS GIGANTIC PACKET, AND IN TURN AS WELL HAVING AN E-MAIL VOTE OF THE EXECUTIVE BOARD TO HAVE OUR LEGAL ATTORNEY INVESTIGATE CHARGES ON ME, WHICH IS COMPLETELY, IN MY OPINION, UNETHICAL AS HE REPRESENTS THE ENTIRE UNION.

WE WILL PROVE TO YOU THAT THERE IS NOTHING EGREGIOUS THAT HAS HAPPENED. THANK YOU.

MR. SERRANO: AS FAR AS THE CHARGES ON MYSELF, MY NAME ACTUALLY ON THE CHARGES IS ONLY MENTIONED IN ONE OR TWO AREAS. I BELIEVE THAT MYSELF AND DEBBIE SPRINGER WERE JUST INCLUDED TO KEEP US FROM DOING OUR DUTIES. I

TOOK ACTION FROM THE ONSET. I MADE RECOMMENDATIONS FROM THE ONSET. I WAS OPPOSED TO MANY THINGS, AND I WAS OPPOSED ON E-MAILS. AND I TOOK ACTION.

I HAD RECOMMENDATIONS ON WHERE THIS LIST OF CONCERNS, HOW THEY SHOULD BE VETTED TO THE APPROPRIATE PLACES, AND NOBODY REALLY LISTENED TO ME. THEY WORKED AROUND IT AND DIDN'T CONSIDER THE AVENUES THAT I HAD SUGGESTED. ALL YOU CAN DO IN CERTAIN SITUATIONS IS MAKE SUGGESTIONS.

I LOOKED UP THE ONE REFERENCE THAT SHE MAKES TO THE PRESIDENT MAKING THE DECISIONS ON HIRING AND FIRING. I LOOKED IT UP IN THE CONSTITUTION AND BYLAWS. I DON'T HAVE IT MEMORIZED. I LOOKED IT UP, AND IT SAID THE PRESIDENT MAKES DECISIONS ON HIRING AND FIRING. ARTICLE 15, I'M SURE YOU HAVE IT. AS FAR AS WHERE -- THE REASON THAT THESE THINGS WERE BROUGHT UP, I DIDN'T BELIEVE THAT AN EMERGENCY MEETING WAS NECESSARY. I BELIEVE IT WAS DONE VERY CONVENIENTLY THE MINUTE THE PRESIDENT WAS OUT OF THE OFFICE.

SHE WAS NOT -- I HAD BEEN IN CONTACT WITH HER SEVERAL TIMES DURING THIS TIME FRAME SURROUNDING THIS WHILE SHE WAS ON VACATION. SHE RESPONDED TO TEXT MESSAGES. SO THE MEETING WAS INTENTIONALLY CALLED WHILE SHE WAS OUT OF TOWN SO THAT THEY COULD TRY AND GET THIS AGENDA THAT THEY WANTED TO MOVE FORWARD WITH.

THE HEARING OFFICER: DEB, DID YOU HAVE AN OPENING STATEMENT?

MS. SPRINGER: I DO HAVE A PACKAGE FOR YOU. IF

YOU WANT IT NOW, I CAN GIVE IT TO YOU NOW. OR WE CAN DO IT LATER.

THE HEARING OFFICER: AS PART OF THE EVIDENCE?

MS. SPRINGER: YES.

THE HEARING OFFICER: DO YOU HAVE FOUR COPIES?

MS. SPRINGER: I DO.

THE HEARING OFFICER: AND CAN YOU GIVE ONE TO THE CHARGING PARTY AS WELL?

MS. SPRINGER: I CAN DO THAT. THAT WOULD BE IT. I'M DONE. THANK YOU.

MS. WALFOORT: WE'RE MARKING WHAT YOU JUST OFFERED AS CHARGED PARTY EXHIBIT 1, CHARGE 2.

(EXHIBIT ADMITTED.)

THE HEARING OFFICER: THE CHARGING PARTY WILL GO FIRST, CALLING YOUR FIRST WITNESS.

MS. KISLING: CALL BRENDA MARZAN.

THE HEARING OFFICER: THE COURT REPORTER IS GOING TO SWEAR YOU IN. AND THEN IF YOU CAN STATE AND SPELL YOUR NAME FOR THE RECORD.

BRENDA MARZAN,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: BRENDA MARZAN, B-R-E-N-D-A, MARZAN, M-A-R-Z-A-N.

THE HEARING OFFICER: GO AHEAD.

MS. KISLING: THIS IS A COPY OF OUR BYLAWS I'M

GOING TO LEAVE HERE FOR ALL THE WITNESSES JUST IN CASE WE NEED TO REFERENCE THEM. I THINK YOU SAID THAT YOU HAVE THEM EARLIER.

THE HEARING OFFICER: YES.

MS. WALFOORT: SO THAT'S HEARING OFFICER EXHIBIT 2 THAT YOU WILL BE SHOWING THE WITNESS.

EXAMINATION

BY MS. KISLING:

Q I WANT TO FIRST TOUCH ON OUR CONCERN ABOUT VIOLATION. SO IT'S THE VIOLATION OF SPECIFIC PROVISIONS OF THE --

THE HEARING OFFICER: YOU MIGHT HAVE TO SIT DOWN JUST SO YOU ARE BY THE MICROPHONE.

MS. KISLING: OKAY. WELL, HOW AM I GOING TO SHOW HER? I NEED TO SHOW HER THINGS.

THE HEARING OFFICER: YOU CAN POINT TO IT. DO YOU HAVE ANOTHER COPY IN FRONT OF YOU?

MS. KISLING: OKAY. THAT'S FINE.

MS. PURDIE: SHARON, WHEN YOU REFER TO THE EXHIBIT, THAT'S CHARGING EXHIBIT 2. CAN YOU STATE THAT SO THE COURT REPORTER KNOWS WHAT YOU ARE LOOKING AT? THAT'S HEARING OFFICER EXHIBIT 2 (INDICATING). BECAUSE IT COMES IN DIFFERENTLY. THIS IS YOUR CHARGING PARTY EXHIBIT 2 (INDICATING).

BY MS. KISLING:

Q OKAY. I'M GOING TO ASK YOU A COUPLE OF QUESTIONS TO SUPPORT THE VIOLATION OF SPECIFIC PROVISIONS

OF THE CONSTITUTION AND BYLAWS OF OUR LOCAL, ARTICLE 14, SECTION 1, COMMITTEES STATE --

THE WITNESS: ARTICLE 14?

MS. KISLING: UH-HUH. SECTION 1, COMMITTEES.

THE WITNESS: WHAT PAGE?

THE HEARING OFFICER: CAN YOU REFERENCE THE PAGE TOO?

MS. MANCINI: 39.

BY MS. KISLING:

Q "ALL COMMITTEES OF THIS LOCAL UNION SHALL BE ADVISORY TO THE LOCAL UNION'S EXECUTIVE BOARD. NO ACTION SHALL BE TAKEN BY ANY COMMITTEE WITHOUT PRIOR AUTHORIZATION FROM THE EXECUTIVE BOARD."

NOW, THE MINUTES FROM EXECUTIVE BOARD MEETING DATED 10/28/15 INDICATE THAT NEW BUSINESS, THAT TWO COMMITTEES, STAFF BARGAINING CONTRACT COMMITTEE AND STAFF HIRING INTERVIEW COMMITTEE WERE ESTABLISHED. MEMBERS OF THAT COMMITTEE WERE IDENTIFIED.

I WOULD LIKE YOU TO LOOK AT CHARGING PARTY EXHIBIT 2, EXHIBIT 1. THIS IS AN AGREEMENT WITH KROME IT SOLUTIONS.

A CORRECT.

Q JUST FOR THE RECORD, HOW LONG HAVE YOU BEEN A MEMBER OF THE EXECUTIVE BOARD?

A THIS WILL BE MY SECOND TERM. SO GOING INTO MY FOURTH YEAR.

Q SO ON MARCH 9TH, 2016, YOU WERE A MEMBER?

A YES, I WAS.

MS. WALFOORT: SHARON, SORRY TO INTERRUPT. YOU KNOW, WE'RE GOING TO HAVE TO MAKE A COPY SO WE CAN FOLLOW ALONG WITH YOU.

MS. KISLING: SHE HAS IT IN THE CAR.

THE HEARING OFFICER: HOW LONG WOULD IT TAKE TO GET IT? CAN WE TAKE LIKE A 10-MINUTE BREAK? LET'S TAKE A 10-MINUTE BREAK AND RECONVENE WITH ADDITIONAL COPIES.

UNIDENTIFIED SPEAKER: CAN WE USE YOUR COPY?

THANK YOU.

BY MS. KISLING:

Q SO WE WERE LOOKING AT THE KROME IT SOLUTIONS.

A YES.

Q SO TO REITERATE, YOU SAY YOU WERE SITTING ON THE EXECUTIVE BOARD MARCH 9, 2016. DO YOU REMEMBER THIS AGREEMENT COMING TO THE EXECUTIVE BOARD FOR APPROVAL?

A NO.

Q WERE YOU AWARE THAT THIS AGREEMENT EXISTED?

A NOT UNTIL DURING ONE OF THE MEETINGS THAT WE WERE TALKING ABOUT FOR THE RELOCATION COMMITTEE. IT WAS BROUGHT UP THAT THERE WAS A CURRENT CONTRACT WITH KROME FOR OUR IT.

Q DO YOU KNOW AROUND WHEN THAT WAS? APPROXIMATE MONTH?

A AUGUST.

Q OKAY. IF WE GO TO THE NEXT CONTRACT, THERE IS AN INDEPENDENT CONTRACTOR AGREEMENT WITH MARLENE LOCKARD.

A YES.

THE HEARING OFFICER: EXCUSE ME FOR A SECOND,

SHARON. WHAT'S THE TOTAL OF THAT CONTRACT? WHAT'S THE TOTAL OF THAT CONTRACT?

MS. KISLING: THIS IS 3 PAGES. IS THAT WHAT YOU MEAN?

THE HEARING OFFICER: IS THAT A PAYMENT OF THE SERVICES FOR $2,000?

THE WITNESS: THAT WAS PER MONTH, I BELIEVE, SORRY.

MS. KISLING: NO. THIS WAS A MONTHLY -- I DON'T KNOW TO BE HONEST. THIS WAS A TWO-PAGE DOCUMENT.

THE HEARING OFFICER: THE COURT REPORTER IS PROBABLY NOT HEARING YOUR RESPONSE, SHARON.

MS. KISLING: IT LOOKS LIKE THERE ARE PAGES MISSING FROM THAT DOCUMENT. SO LET ME SEE IF I HAVE IT. BECAUSE THAT'S WHAT WAS PUT TOGETHER BY URBAN LAW FIRM.

MS. THOMAS: JUST FOR CLARIFICATION, YOU ARE ASKING FOR THE DOLLAR AMOUNT OF THE CONTRACT?

THE HEARING OFFICER: WELL, I'M INTERESTED AT THE SAME TIME -- SO I'M NOT AS FAMILIAR UPFRONT WITH YOUR CONSTITUTION AND BYLAWS. BUT I DID READ THEM ENTIRELY. AND SO YOUR CONSTITUTION AND BYLAWS CONFLICTS IN SOME PLACES. IN ONE AREA AROUND THE PRESIDENT'S ROLE AND RESPONSIBILITIES, IT HAS CONFERRING WITH PEOPLE AND APPROVAL OF THE BOARD. AND I DON'T EVEN THINK IT SAYS "APPROVAL," IT'S SOMETHING ELSE.

BUT IN ANOTHER AREA, THE PRESIDENT HAS THE RIGHT TO HIRE AND FIRE AS LONG AS IT'S WITHIN THE BUDGET APPROVED, IT SAYS IN ONE AREA, AND A NUMBER OF STAFF. SO

YOU CAN'T TAKE ONE ARTICLE AND SAY, "I'M GOING TO APPLY THIS TO EVERYTHING." YOU ACTUALLY HAVE TO TAKE YOUR CONSTITUTION AND BYLAWS AS A WHOLE.

AND WHEN I DO THAT, IT SAYS TO ME THAT THE PRESIDENT HAS THE RIGHT TO HIRE AND FIRE AS LONG AS IT'S WITHIN THE BUDGET OR ANOTHER AREA OF THE BUDGET THAT CONFLICTS. AND I THINK THAT GETS TO SOME OF THESE CONTRACTS POSSIBLY -- I DON'T KNOW -- THAT THE ONLY THING THAT HAS TO GO TO THE BOARD IS EXTRAORDINARY EXPENSES. SO IF A CONTRACT WOULD BE NOMINAL, A COUPLE OF THOUSAND DOLLARS.

SO IF THIS IS 2,000, AS I WAS LOOKING AT IT, THAT WOULD BE SOMETHING I WOULD THINK, BASED ON YOUR CONSTITUTION AND BYLAWS, THAT WOULD HAVE TO GO TO THE BOARD.

SO I WOULD WANT YOU TO POINT OUT EXACTLY WHERE IT SAYS THAT EVERY SINGLE CONTRACT MUST BE APPROVED BY THE BOARD. BECAUSE I DIDN'T SEE THAT. SO FOR CLARITY PURPOSES, THAT'S WHAT I'M HOPING FOR. I WILL SAY THAT WHEN I READ YOUR CONSTITUTION AND BYLAWS, I FOUND CONFLICTING AREAS IN MANY PLACES. AND I FEEL THAT'S PART OF WHY WE'RE HERE. SO WHERE IT COMES UP, I DO WANT TO RAISE IT. BECAUSE YOU SHOULD BE THINKING ABOUT THAT.

MS. THOMAS: WELL, I THINK BASED ON OUR ATTORNEY, WHICH IS MICHAEL URBAN, HE LOOKED AT THOSE ISSUES BECAUSE HE DID BRING THAT TO OUR ATTENTION. AND HE, I GUESS, LEGALLY LOOKED AT IT. AND THAT'S WHAT I READ EARLIER IN ARTICLE 8, SECTION 2, I BELIEVE.

MS. MANCINI: THE CONSTITUTION AND BYLAWS? IT'S NOT THE ATTORNEY THAT INTERPRETS --

THE HEARING OFFICER: HANG ON. CHERIE, YOU'RE GOING TO GET AN OPPORTUNITY TO REBUT. BUT IT'S BETTER IF YOU ALLOW THE CHARGING PARTY TO GO FIRST.

MS. WALFOORT: SO, CLARA, YOU HAVEN'T MADE ANY ALLEGATION THAT ANY OF THESE THINGS EXCEEDED THE OVERALL BUDGET SET BY THE BOARD, ARE YOU? YOU'RE SAYING THESE WEREN'T APPROVED INDIVIDUALLY BY THE BOARD. BUT YOU'RE NOT SAYING THERE WAS AN EXCEEDING OF THE BUDGET; ARE YOU OR AREN'T YOU?

MS. THOMAS: WELL, IN SOME AREAS.

MS. KISLING: I THINK WE'RE TALKING ABOUT TWO THINGS. ONE IS WHERE IT SAYS THAT CONTRACTS -- SO WHAT THE PAST PRACTICE HAS BEEN IS THAT ALL CONTRACTS COME BEFORE THE BOARD. SO THIS IS A CONTRACT, A MONTHLY CONTRACT, AN AGREEMENT THAT WAS ENTERED IN THAT DID NOT COME BEFORE THE BOARD FOR IT SERVICES. SO IT'S NOT A ONE-TIME PAYMENT. IT'S A MONTHLY PAYMENT. MAYBE THE TREASURER -- I DON'T KNOW IF SHE'S PREPARED TO SPEAK TO THAT -- CAN SAY HOW MUCH WE HAVE BEEN PAYING THIS KROME IT SOLUTIONS ON A MONTHLY BASIS.

MS. THOMAS: I BELIEVE $3,000.

MS. KISLING: SO THAT'S ON A MONTHLY BASIS. SO THIS DID NOT COME BEFORE THE BOARD. WHEN IT COMES TO INDIVIDUAL STAFF, YOU WILL SEE THAT IN THE BYLAWS, WHICH WE REFER TO ARTICLE 14, IT TALKS ABOUT THE COMMITTEES ARE ADVISORY TO THE EXECUTIVE BOARD. SO WHEN A COMMITTEE HAS

BEEN IDENTIFIED TO DO THE HIRING, THEN THE RECOMMENDATION GOES TO THE BOARD, AND THE BOARD CONSIDERS THE RECOMMENDATION AND SAYS WHETHER WE HIRE A PARTY.

SO IN THAT, WE ACTUALLY DO NOT HAVE WHERE IT SAYS THE PRESIDENT HIRES AND FIRES IN CONSULTATION WITH EXECUTIVE VICE PRESIDENT. BECAUSE THAT'S WHAT THE LANGUAGE ACTUALLY SAYS, WHICH WOULD BE US. SO I COULD SAY THERE WAS NO AGREEMENT IN TERMS OF WHEN WE GET TO CERTAIN INDIVIDUALS IN TERMS OF THE HIRING OR FIRING. AND I COULD ALSO SAY IN TERMS OF TAKING THESE TO THE BOARD, I HAVE ASKED THAT THESE GO BEFORE THE BOARD, AND THEY HAVE NOT.

THE HEARING OFFICER: OKAY. I HEAR WHAT YOU ARE ALLEGING.

MS. KISLING: OKAY.

THE HEARING OFFICER: OKAY. SO DO YOU HAVE THE PAGES MISSING FROM THE KROME IT CONTRACT OR NOT? OR CAN YOU MAKE SURE TO PROVIDE THEM? OTHERWISE WE'LL HAVE TO STRIKE THAT ONE.

MS. KISLING: I CAN PROVIDE THEM. BECAUSE I KNOW THAT I HAVE MORE COPIES IN THE BOX BACK THERE.

BY MS. KISLING:

Q SO THE NEXT ONE THEN IS I BELIEVE IT WAS MARLENE LOCKARD. DOES THIS CONTRACT LOOK FAMILIAR TO YOU? IT'S DATED AUGUST 14TH, 2015?

A YES. THIS WAS BROUGHT TO THE BOARD BY MARTIN BASSICK WHEN WE WERE HIRING MARLENE AS OUR LOBBYIST UP AT LEGISLATION FOR THE 2015 LEGISLATION.

Q ARE YOU AWARE IF SHE AS WELL IS RECEIVING A MONTHLY -- OR BASICALLY GIVING US A MONTHLY INVOICE FOR PAYMENT?
A I BELIEVE SHE IS. AT THE LAST FINANCE MEETING, THERE WAS A LINE ITEM ON THE LEDGER.
Q OKAY. SO SHE IS. AND IF I'M CORRECT, DO YOU KNOW THE AMOUNT?
A I DO NOT RECALL.
Q IF I TOLD YOU $2,000 A MONTH, DOES THAT SOUND LIKE SOMETHING YOU MAY HAVE HEARD?
A ABSOLUTELY.
Q THE NEXT ONE, CHERYL NOLAN BUNCH.
A YES.
Q HAVE YOU SEEN THIS CONTRACT, LETTER OF AGREEMENT TO PROVIDE CONSULTANT SERVICES, BEFORE?
A NOT UNTIL I RECEIVED THE PACKET FROM MICHAEL URBAN.
Q SO THIS IS DATED, IT LOOKS LIKE -- OKAY. IT LOOKS LIKE THERE MAY NOT BE A DATE. OKAY. THERE IS NO DATE ON THIS. DO YOU REMEMBER THIS EVER COMING TO THE E-BOARD IN THE LAST THREE YEARS?
A NO.
Q THE NEXT ONE IS FOR DOLORES BODIE. IT SAYS IT'S AN INDEPENDENT CONTRACTOR AGREEMENT. IT HAS MS. BODIE SIGNED 10/28/2015 AND PRESIDENT MANCINI NOVEMBER 5TH, 2015. DO YOU RECALL THIS COMING BEFORE THE E-BOARD FOR APPROVAL?
A NO.

Q NEXT WE HAVE A LETTER FOR SERVICES. AND THIS IS FOR, I BELIEVE, I'M NOT SURE IF HE'S AN ATTORNEY, BUT IT'S TO BARGAIN THREE SUCCESSOR LABOR AGREEMENTS AT DESERT SPRINGS HOSPITAL FOR THE RNS AT DESERT SPRINGS HOSPITAL AND TECHS AT VALLEY HOSPITAL MEDICAL CENTER. AND THEN THIS PERSON IS FOR SERVICES PAID AT A RATE OF THE $150 PER HOUR. ARE YOU FAMILIAR WITH THIS DOCUMENT?
A NO.
Q DO YOU RECALL IT COMING BEFORE THE E-BOARD FOR APPROVAL?
A NO.
Q THE NEXT DOCUMENT IS FOR -- IT SAYS TO EXTEND OFFER OF EMPLOYMENT IN THE CAPACITY OF ORGANIZING DIRECTOR. DOES THIS OFFER LETTER LOOK FAMILIAR TO YOU?
A NO.
Q DO YOU RECALL IT COMING BEFORE THE E-BOARD?
A NO.
Q OKAY. DO YOU KNOW WHO OUR ORGANIZING DIRECTOR IS?
A PETER NGUYEN.
Q DO YOU KNOW IF HE ACTUALLY IS JUST AN ORGANIZING DIRECTOR? OR IS HE REFERRED TO IN A DIFFERENT CAPACITY?
A I KNOW HE ACTS AS DIFFERENT PEOPLE.
Q IF I TOLD YOU THAT HE REPRESENTS ORGANIZING AND REPRESENTATION AS THE DIRECTOR OF BOTH, DOES THAT SOUND FAMILIAR?
A AGAIN, HE ACTS IN THAT CAPACITY. BUT THAT'S

NOT SUPPOSED TO BE HIS JOB FUNCTION.

Q NEXT ONE, DANA GENTRY. DOES THIS LOOK LIKE SOMETHING THAT CAME BEFORE THE E-BOARD?

A NO.

Q AND DATED APRIL 18TH, 2016.

A NO.

Q I ALSO WANT TO -- THERE IS ONE RIGHT BEHIND THAT. AND IF YOU NOTICE, THAT FIRST ONE, DANA GENTRY, IS DATED APRIL 18TH, 2016. THE ONE BEHIND IT IS ALSO DATED APRIL 18TH, 2016. HOWEVER, ON THE FIRST ONE, IT IS 1 THROUGH 5. ON THE SECOND ONE, THERE IS A 6 ADDED. CAN YOU READ NUMBER 6 FOR US?

A "TERMINATION OF THIS EMPLOYMENT AGREEMENT MAY BE INITIATED BY THE SEIU PRESIDENT FOR CAUSE AND IS APPEALABLE TO THE LOCAL'S EXECUTIVE BOARD, WHICH SHALL CONDUCT A FULL AND FAIR HEARING BEFORE REACHING A FINAL DETERMINATION REGARDING YOUR FINAL EMPLOYMENT STATUS."

Q DOES THAT SOUND LIKE LANGUAGE YOU'VE HEARD OR SEEN BEFORE IN A LETTER AUTHORED TO A DIRECTOR?

A NO.

Q NEXT ONE, JOHN ARCHER, DATED DECEMBER 29, 2015, DOES THIS LOOK LIKE AN OFFER LETTER YOU SAW THAT CAME BEFORE THE EXECUTIVE BOARD?

A NO.

Q NEXT ONE, ANDREA BOND, IT'S DATED AUGUST 10TH, 2016. DO YOU RECALL THIS COMING BEFORE THE EXECUTIVE BOARD?

A NO.

Q OKAY. DO YOU REMEMBER THE POSITION BEING APPROVED BY THE EXECUTIVE BOARD FOR COMPLIANCE COORDINATOR?

A THE JOB DESCRIPTION WAS ORIGINALLY APPROVED, AND THEN IT CAME BACK TO THE BOARD BECAUSE OF SOME CONFUSION. THERE WAS ALREADY A JOB POSTING THAT HAD BEEN DONE FOR THAT JOB. SO IT CAME BACK TO THE BOARD. AND THEN WE -- THEN THE BOARD APPROVED MOVING FORWARD WITH THE JOB.

MS. KISLING: YOU GUYS ARE GOING TO HATE ME. I DON'T HAVE FOUR COPIES. I'M GOING TO HAVE HER REFERENCE THIS.

MS. WALFOORT: CAN WE JUST SEE IT, SHARON, FIRST?

BY MS. KISLING:

Q SO I'M GOING TO ASK YOU TO DO SOMETHING. I PROVIDED YOU WITH A RESUME FOR ANDREA BOND.

THE HEARING OFFICER: AND FOR THE COURT REPORTER, WE HAVE MARKED THAT AS CHARGING PARTY, CHARGE 2, EXHIBIT 3.

(EXHIBIT ADMITTED.)

BY MS. KISLING:

Q IN THE OFFER LETTER, IT STATES AN ANNUAL SALARY OF 59,221.39.

A RIGHT.

Q CAN YOU LOOK AT THE -- IT'S TWO PAGES AFTER HER OFFER LETTER. THAT IS THE WAGE SCALE FOR THE BARGAINING UNIT. AND CAN YOU LOOK AT YEAR FIVE.

A YES.
Q SO YEAR FIVE WOULD REPRESENT FIVE YEARS, IF I'M CORRECT, OF LABOR EXPERIENCE?
A CORRECT.
Q $59,221.39?
A CORRECT.
Q SO IS THAT CONSISTENT WITH HER ANNUAL SALARY?
A YES.
Q CAN YOU LOOK AT THE RESUME THAT'S PRESENTED BEFORE YOU AND VERIFY THAT SHE HAS FIVE YEARS OF LABOR EXPERIENCE FOR US, PLEASE?
A IT LOOKS TO ME THAT THERE'S ONLY NOVEMBER 2015 TO PRESENT. SO THAT WOULD BE NO.
Q THANK YOU.
THE HEARING OFFICER: SHARON SINCE I DON'T HAVE THE RESUME IN FRONT OF ME, I JUST WANT TO ASK A FOLLOW-UP QUESTION RELATED TO ANDREA BOND'S PREVIOUS EXPERIENCE. SO THE EXPERIENCE THAT WAS REFERRED TO BY THE WITNESS, IS THAT THE TIME WORKED AT THE LOCAL OR PREVIOUS TO EMPLOYMENT WITH THE LOCAL? I'M JUST CURIOUS.
MS. KISLING: THAT'S PREVIOUS TO EMPLOYMENT WITH THIS LOCAL. THAT WOULD BE HER LABOR EXPERIENCE. SO THE LABOR EXPERIENCE IS WHAT DICTATES HOW MUCH MONEY, WHERE YOU FALL ON THE WAGE SCALE.
MS. WALFOORT: WHEN YOU'RE HIRED?
MS. KISLING: WHEN YOU'RE HIRED BY OUR LOCAL.
THE HEARING OFFICER: ALL RIGHT.
MS. KISLING: SO I'M GOING TO SHOW ONE OTHER

DOCUMENT. AND I'LL HAVE TO MAKE COPIES. I APOLOGIZE.
SO THIS WILL BE CHARGING PARTY EXHIBIT 4, I GUESS. THIS IS THE STAFF UNION CONTRACT, DATED JANUARY 1ST, 2015 THROUGH DECEMBER 31ST, 2018.
MS. WALFOORT: AND THAT'S NOT IN THE PACKET?
MS. KISLING: UNFORTUNATELY, IT'S NOT IN THE PACKET.
BY MS. KISLING:
Q THIS IS ACTUALLY GOING TO BE A QUICK QUESTION. I JUST PROVIDED YOU WITH A STAFF UNION CONTRACT. DOES THAT APPEAR TO BE A DOCUMENT THAT CAME BEFORE THE EXECUTIVE BOARD FOR APPROVAL?
A NO. I ACTUALLY ASKED ABOUT THIS TOO, AND IT NEVER CAME FORWARD.
Q OKAY. DO YOU KNOW IF THERE WAS ANY FISCAL IMPACT BASED ON THAT DOCUMENT BEING SIGNED?
A YES. THERE WAS RETROS THAT WERE DONE DUE TO THIS CONTRACT.
Q DO YOU KNOW AN APPROXIMATE AMOUNT?
A NO IDEA. IT'S PROBABLY A LOT, THREE YEARS.
THE HEARING OFFICER: SO THE STAFF CONTRACT IS GOING TO BE MARKED CHARGE NUMBER 2, CHARGING PARTY EXHIBIT NUMBER 4.
(EXHIBIT ADMITTED.)
BY MS. KISLING:
Q CAN YOU JUST READ THE TITLE OF THAT AGREEMENT I JUST PROVIDED YOU WITH?
A "LEASE AGREEMENT BETWEEN SAHARA RANCHO OFFICE

CENTER, LLC, LANDLORD, AND SEIU LOCAL 1107, TENANTS."

Q DO YOU REMEMBER THAT AGREEMENT COMING BEFORE THE EXECUTIVE BOARD FOR DISCUSSION AND APPROVAL?

A YES.

MS. KISLING: OKAY. THAT'S IT.

MS. WALFOORT: BRENDA, DID YOU SAY YOU REMEMBER IT COMING?

THE WITNESS: YES. THE LEASE AGREEMENT DID COME BEFORE THE BOARD FOR APPROVAL.

THE HEARING OFFICER: SO THE LEASE AGREEMENT IS NAMED CHARGE NUMBER 2, CHARGING PART EXHIBIT NUMBER 5.

(EXHIBIT ADMITTED.)

MS. WALFOORT: SHARON, ARE YOU GOING TO HAVE MORE QUESTIONS ABOUT THE LEASE AGREEMENT, GIVEN SHE SAID IT DID COME BEFORE THE BOARD?

MS. KISLING: NO. WHAT I'M ATTEMPTING TO SHOW IS THAT THERE IS THE AWARENESS OR KNOWLEDGE THAT AGREEMENTS COME BEFORE THE BOARD FOR APPROVAL. SO SOME HAVE COME BEFORE THE BOARD, AND SOME JUST HAVE NOT.

THE HEARING OFFICER: WOULD YOU BE ACCEPTABLE TO US ACCEPTING THE FACT THAT SOME HAVE COME BEFORE THE BOARD. WE DON'T NEED TO SEE A WHOLE BUNCH TO AFFIRM THAT. AND PER THE TESTIMONY, WE HAVE ALSO HEARD SOME HAVE NOT. SO I WOULD SAY WE WOULD NOT HAVE TO HAVE ANY MORE ENTERED.

MS. KISLING: OKAY. OKAY. NOW, I WANT TO GO TO INFORMATION REGARDING SOME OF THE OTHER VIOLATIONS OF THE CONSTITUTION AND BYLAWS FOR SEIU LOCAL 1107.

ARTICLE 7, SECTION 6, THE PRESIDENT SPEAKS TO ACCOUNTABILITY. AND I CAN QUOTE IT IF YOU LOOK UNDER THE CHARGES. OKAY.

"ACCOUNTABILITY STATES THAT 'THE PRESIDENT OF THIS LOCAL UNION SHALL BE ACCOUNTABLE TO ALL THE MEMBERS OF THIS LOCAL UNION AND THE EXECUTIVE BOARD AND SHALL REPORT TO THE EXECUTIVE BOARD.'"

MS. WALFOORT: AND SHARON, YOU'RE READING FROM PAGE 2 OF YOUR CHARGE?

MS. KISLING: YES.

"PRESIDENT WILL NOT ALLOW HERSELF TO BE HELD ACCOUNTABLE NOR PROVIDE ACCOUNTABILITY TO MEMBERS NOR THE EXECUTIVE BOARD. PRESIDENT MANCINI ROUTINELY STATES THAT SHE'S 'THE PRESIDENT' AND REPORTS TO NO ONE; THAT, IN FACT, EVERYONE REPORTS TO HER. PRESIDENT MANCINI IS ROUTINELY AND CONSISTENTLY UNRESPONSIVE TO COMMUNICATION FROM MEMBERS AND EXECUTIVE BOARD MEMBERS.

"PRESIDENT MANCINI INDICATES HER KNOWLEDGE OF B. DUTIES AND THAT ALL DUTIES ARE SUBJECT TO THE POLICIES OF THE EXECUTIVE BOARD AND THE CONSTITUTION AND BYLAWS. HOWEVER, BASED ON THE ABSENCE OF POLICIES, SHE ACCEPTS NO GOVERNANCE AND PRESENTS BARRIERS AND INSTIGATES INTERNAL CONFLICT BETWEEN EXECUTIVE BOARD MEMBERS WHICH ENSURES THE NECESSARY POLICIES ARE NOT PUT IN PLACE."

THE HEARING OFFICER: SHARON, WE HAVE READ THE CHARGES. WE REVIEWED THEM ACTUALLY A COUPLE OF TIMES BEFORE THE HEARING. SO WHAT I WANT YOU TO DO IS PROVIDE THE EVIDENCE TO REINFORCE THE CHARGES. THAT'S WHAT WE

NEED TO SEE.

MS. KISLING: OKAY.

BY MS. KISLING:

Q SO MS. MARZAN, CAN YOU PROVIDE ANY EXAMPLES OR INCIDENTS OF TIMES THAT WOULD SUPPORT THESE CHARGES?

A YES. THERE HAS BEEN MULTIPLE TIMES WHERE DURING OUR COLLECTIVE BARGAINING -- WE'RE IN A HUGE FIGHT FOR SB 241. AND DURING THAT TIME, WHEN WE FINALLY CAME TO AN AGREEMENT WITH THE UNION, WE ASKED THAT THE BARGAINING TEAM BE ABLE TO SEND OUT AN E-MAIL -- SORRY, AN E-MAIL SENT OUT BY THE BARGAINING TEAM. PRESIDENT MANCINI REFUSED TO DO THAT. SHE SAID THAT IT WOULD COME FROM HER AS SHE WAS THE PRESIDENT.

THEN THE SECOND TIME JUST RECENTLY CAME UP WHEN WE WERE DOING STUFF FOR THE MOVE. THERE WAS SOME CONVERSATION THAT WAS GOING ON DUE TO THE FACT THAT A STEWARD MEETING THAT WAS SCHEDULED TO BE HELD AT THE GOVERNMENT CENTER BECAUSE OF THE FACT THAT THERE WAS A TRO AGAINST OUR EXECUTIVE VICE PRESIDENT, WHO NORMALLY ATTENDS THOSE MEETINGS, COULD NOT BE AT THE HALL. SO IT WAS RESCHEDULED TO THE GOVERNMENT CENTER.

THAT MEETING WAS ACTUALLY I'M GOING TO CALL IT HIJACKED. IT WAS TAKEN OVER -- AN E-MAIL WAS SENT TO ALL OF THE STEWARDS EXCLUDING THE OFFICERS, WHICH WERE CLARA, SHEILA , SHARON, AND MYSELF, WERE NOT INCLUDED IN THAT E-MAIL. SO SHARON, SHEILA AND I, SHOWED UP AT THE GOVERNMENT CENTER STILL. BECAUSE WE WERE UNAWARE THAT THE E-MAIL HAD BEEN SENT CHANGING IT BACK TO THE HALL.

DURING THE E-MAIL CONVERSATION BETWEEN SHARON AND CHERIE, AGAIN, IT WAS STATED THAT SHE WAS THE PRESIDENT AND SHE COULD DO WHAT SHE WANTED.

MS. WALFOORT: BRENDA, COULD YOU BACK UP ON THE SB 241?

THE WITNESS: SB 241 WAS PART OF THE NRS. IT WAS SOME OF THE CHANGES THAT TOOK PLACE IN LEGISLATION THAT CAUSED SOME MAJOR TURMOIL WITHIN THE GOVERNMENT SIDE OF THE HOUSE.

MS. WALFOORT: AND DID CHERIE SEND OUT THE E-MAIL THAT SHE SAID SHE WAS SENDING?

THE WITNESS: SHE SENT OUT THE E-MAIL. BUT SHE SENT IT FROM HER. OUR WHOLE POINT WAS WE WERE TRYING TO ATTACH TO OUR MEMBERSHIP AT THAT POINT. BECAUSE THERE IS A LOT OF QUESTIONS GOING ON AND A LOT OF CONFLICT GOING ON, AND WE THOUGHT IT WAS IMPORTANT THAT THE MEMBERSHIP KNEW THAT THEIR FELLOW STEWARDS AND EMPLOYEES WERE STILL FIGHTING FOR THEM AND HAD NOT STOPPED. SO IT WAS IMPORTANT TO THE WHOLE BARGAINING TEAM THAT THAT COME FROM THE BARGAINING TEAM SO THAT THEY UNDERSTOOD THAT.

MS. WALFOORT: THANK YOU.

BY MS. KISLING:

Q OKAY. THIS E-MAIL WAS FORWARDED TO YOU ON OR ABOUT OCTOBER 26, 2016. WOULD YOU PLEASE READ THE E-MAIL?

A YES.

"GOOD MORNING MS. BOND. PURSUANT TO A RECENT DECISION BY CLARK COUNTY MANAGEMENT, ALL NEWLY HIRED

CLERK POSITIONS HAVE BEEN DESIGNATED AS NONUNION ELIGIBLE."

Q SORRY. CAN YOU START WITH ANDREA -- YES.

A OKAY, SORRY. FROM ANDREA BOND TO EDWARD MAY:

"THE ATTACHED MEMO HAS BEEN FORWARDED TO OUR OFFICE TODAY. CAN YOU PLEASE EXPLAIN WHY A MEMO IS BEING ISSUED TO STATE THAT D/F COURTROOM CLERK II IS NOT COVERED IN THE CBA, AS THAT IS NOT ACCURATE."

ED MAY'S RESPONSE TO THAT IS:

"GOOD MORNING MS. BOND, PURSUANT TO A RECENT DECISION BY CLARK COUNTY MANAGEMENT, ALL NEWLY HIRED CLERK POSITIONS HAVE BEEN DESIGNATED AS NON-UNION ELIGIBLE. AT THIS TIME, DISTRICT COURT MANAGEMENT IS EXAMINING WAYS TO RESOLVE THE ISSUE TO ENSURE THAT ALL CLERK POSITIONS ENJOY THE SAME RIGHTS AND BENEFITS. IN AN EFFORT TO BE TRANSPARENT, DISTRICT COURT MANAGEMENT DIRECTED ANDRES MOSES, STAFF ATTORNEY, AND ME TO OPENLY ADDRESS THIS MATTER WITH SEIU LEADERSHIP.

"ON JUNE 13TH, 2016, WE MET WITH SEIU REPRESENTATIVE CHERIE MANCINI, SHARON KISLING AND SHERICE PARISH. WE ADVISED THEM THAT CLARK COUNTY MANAGEMENT HAD MADE A DECISION TO DESIGNATE SOME OF THE COURTS' VACANT POSITIONS AS NON-UNION ELIGIBLE EVEN THOUGH POSITIONS WERE PREVIOUSLY DESIGNATED AS UNION ELIGIBLE. WE STATED WE WEREN'T CERTAIN ABOUT THE REASONS OF THE COUNTY'S DECISIONS. WE STATED THAT EJDC LEADERSHIP IS EXAMINING WAYS TO RESOLVE THE ISSUE TO ENSURE ALL CLERK EMPLOYEES ENJOY THE SAME RIGHTS AND BENEFITS. WE THEN SHARED A

SAMPLE OFFER OF EMPLOYMENT LETTER CONTAINING THIS LANGUAGE. I HOPE THIS RESPONSE SATISFIES YOUR INQUIRY. THANK YOU, ED."

THE HEARING OFFICER: HANG ON FOR A SECOND. THIS IS FOR CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 6, AN E-MAIL FROM EDWARD MAY ON OCTOBER 26, 2016.

(EXHIBIT ADMITTED.)

THE HEARING OFFICER: AND DO YOU HAVE A -- YOU ARE GOING TO GO INTO THE RELEVANCE OF THIS?

MS. KISLING: YES.

BY MS. KISLING:

Q SO MS. MARZAN, CAN YOU TELL US IF YOU AS AN ELECTED OFFICER REPRESENT THE EMPLOYEES THAT ARE BEING DISCUSSED IN THAT E-MAIL?

A ABSOLUTELY.

Q WERE YOU AWARE OF THAT CONVERSATION BACK IN -- I CAN'T REMEMBER WHEN YOU SAID IT WAS -- JUNE 13TH? ONE, WERE YOU AWARE OF THE CONVERSATION? OR WERE YOU AWARE OF THAT INFORMATION?

A ABSOLUTELY NOT.

Q DO YOU KNOW IF THE CHIEF STEWARD OF THE CLARK COUNTY NON-SUPERVISORY UNIT WAS AWARE OF THAT INFORMATION?

A ABSOLUTELY NOT.

MS. WALFOORT: SORRY. BRENDA, YOU WERE ABSOLUTELY NOT AWARE?

THE WITNESS: I JUST RECEIVED THIS. AND I VERIFIED WITH BRENT MILLER WHO IS THE CHIEF STEWARD OF

THE NON-SUPERVISORY AND HE WAS NOT AWARE.

MS. WALFOORT: HE ALSO WAS NOT AWARE. OKAY. THANK YOU.

MS. MANCINI: CAN I ASK A QUESTION? BECAUSE THESE THINGS THAT ARE BEING BROUGHT UP ARE NOT SPECIFIED IN THESE CHARGES.

THE HEARING OFFICER: LET'S SEE.

WHERE, SHARON, ARE YOU SEEING THEM INCLUDED IN YOUR CHARGES?

MS. KISLING: OKAY. SO THESE DOCUMENTS AREN'T INCLUDED IN THE CHARGES BECAUSE THEY'RE JUST SUPPORTING DOCUMENTATION TO, ONE, PRESIDENT ACCOUNTABILITY. WHEN I SPEAK TO ROUTINELY UNRESPONSIVE TO COMMUNICATION FROM MEMBERS OF THE EXECUTIVE BOARD MEMBERS, THERE IS A PLACE WHERE WE DISCUSS HER NOT COMMUNICATING.

SO IT'S UNDER: COOPERATING WITH THE OFFICERS IN THE LOCAL UNION TO ASSIST THEM IN THE PERFORMANCE OF THEIR DUTIES ON MATTERS AFFECTING THE LOCAL UNION INCLUDE BUT NOT LIMITED TO BARGAINING, ORGANIZING ACTIVITIES, POLITICAL ACTION AND COMMUNITY INTERACTION; DOES NOT COOPERATE WITH OFFICERS, ESPECIALLY EVP, TRUSTEE CLARA THOMAS, AND CLARK COUNTY, UMC, ST. ROSE, SAN MARTIN BARGAINING UNIT ELECTED OFFICIALS.

SO THIS SPEAKS TO INFORMATION NOT BEING COMMUNICATED TO THE ELECTED OFFICIALS AND THE BARGAINING UNITS.

MS. MANCINI: THESE CHARGES WERE FILED ON SEPTEMBER 20TH. AND THERE WAS NO SPECIFICITY GIVEN AT

THAT TIME. AND THE DOCUMENTS THAT ARE BEING PROVIDED ARE FROM LIKE TWO DAYS AGO, THREE DAYS AGO.

MS. KISLING: THE MEETING WAS IN JUNE.

MS. WALFOORT: CHERIE, I THINK WHAT SHE WAS DOING IS WHAT SHE WAS ASKED TO DO, WHICH IS GIVE SUPPORTING FACTS AND EVIDENCE TO THE BROAD CLAIMS SHE MADE. YOU CAN ASK THE WITNESS ANY QUESTIONS YOU HAVE WHEN YOU CROSS-EXAMINE. BUT I THINK SHE'S FILLING OUT HER ALLEGATIONS.

MS. MANCINI: OKAY.

BY MS. KISLING:

Q ARE YOU LOOKING OVER IT, MS. MARZAN?

A YES.

Q I WAS GOING TO ACTUALLY DIRECT YOU TO PAGE 7 OF 7, WHICH WOULD BE THE BEGINNING OF THE E-MAIL CHAIN.

A OKAY.

Q AND IF YOU COULD JUST READ WHAT IT IS STATING FROM SANDY JEANTETE. AND ALSO STATE WHO SHE IS, FOR THE RECORD?

MS. WALFOORT: WHERE IS THIS, SHARON?

MS. KISLING: I GAVE TWO DOCUMENTS. ONE IS SEVEN PAGES, SO SEVEN OF SEVEN.

MS. WALFOORT: THERE IS ONE OF THREE AND SEVEN OF SEVEN, SO TWO DIFFERENT ONES.

THE HEARING OFFICER: SO THE E-MAIL FOR CHARGE NUMBER 2, CHARGING PARTY, IS EXHIBIT 7.

(EXHIBIT ADMITTED.)

THE WITNESS: SANDY JEANTETE IS THE DIRECTOR OF

HUMAN RESOURCES AT CLARK COUNTY LAS VEGAS.

BY MS. KISLING:

Q AND IF YOU COULD JUST READ THE E-MAIL?

A "MEETING UPDATE. GOOD MORNING. I JUST WANTED TO LET YOU KNOW I TALKED TO CHRIS SANTIAGO, AND SHE IS GOING TO SET UP A MEETING WITH YOU TO DISCUSS SOME ADDITIONAL INFORMATION SHE HAS RELATED TO THE CONCERNS OF NLV" -- WHICH IS NORTH LAS VEGAS -- "DEPARTMENT OF AVIATION EMPLOYEES. I WILL BE ATTENDING THE MEETING AS WELL. CHRIS AND I ARE BOTH ON VACATION NEXT WEEK. SCHEDULING WILL OCCUR THE WEEK OF 8/11.

"I HAVE TRIED TO REACH OUT TO PETER NGUYEN OVER THE LAST WEEK TO DISCUSS THE ATTACHED LETTER WITH NO LUCK. I WILL CONTINUE TO CALL AND HOPE FOR A RESPONSE. I HAVE YET TO RECEIVE ANY INFORMATION FROM THE ARBITRATION COUNSEL ON THE STATUS OF GRIEVANCES. I WOULD APPRECIATE YOUR HELP ON HAVING SOMEBODY PROVIDE ME WITH A STATUS OF THE GRIEVANCES DISCUSSED. I'M MOVING FORWARD TO SCHEDULE THE ARBITRATION FOR SPARKLE FRENCH BECAUSE I DON'T WANT A REPEAT OF WHAT HAPPENED WITH RUTH TABER. I WOULD ALSO LIKE INFORMATION ASAP IF THE UNION PLANS TO TAKE FRANK REGICHS' TERMINATION TO ARBITRATION. HE WAS ARRESTED AND POSTED BAIL. THANK YOU. SANDY."

Q SO MS. MARZAN, DO YOU KNOW IF THE EMPLOYEES THAT WERE IDENTIFIED IN THIS E-MAIL ARE PART OF YOUR BARGAINING UNITS?

A YES.

Q CAN YOU TELL US WHAT THE CONCERN HAS BEEN IN

TERMS OF THE ARBITRATION COUNSEL?

A THE ARBITRATION COUNSEL IS NOT SENDING OVER THE FINDINGS OF WHAT TOOK PLACE DURING THE ARBITRATION COUNSEL TO THE ATTORNEY, IT'S MY UNDERSTANDING, WHEN PAUL COTSONIS ISN'T THERE AND ALSO OVER TO THE COUNTY, TO HUMAN RESOURCES.

Q CAN YOU NOW GO TO 5 OF 7 OF THE SAME DOCUMENT?

THE HEARING OFFICER: CAN I JUST ASK, HAVE THESE GRIEVANCES BEEN PROCESSED? OR WHAT WAS THE RESULT OF THEM?

MS. KISLING: THEY'RE STILL PENDING, SPARKLE FRENCH, AND THAT WAS A TERMINATION BACK IN MARCH.

THE HEARING OFFICER: SO DO YOU HAVE ANY DOCUMENTATION ON IF THE TIMELINES ARE PAST, AND SO IT'S LACK OF TIMELINESS?

MS. MANCINI: THEY'RE TIMELY.

THE WITNESS: THEY HAVE ACTUALLY REACHED OUT TO ME PERSONALLY, HUMAN RESOURCES. BECAUSE THEY ARE CONCERNED ABOUT THESE THINGS. THE TIMELINES ARE NOT BEING MET. THEY ARE ACTUALLY AT THE POINT NOW WHERE THEY ARE GOING TO START SENDING LETTERS TO CANCEL THESE THINGS BECAUSE THEY ARE GOING FOR SO LONG.

MS. WALFOORT: CHERIE, YOU WILL HAVE A CHANCE TO RESPOND TO THAT.

MS. MANCINI: I WILL HAVE TO REMEMBER WHAT TO RESPOND TO.

MS. WALFOORT: MAKE A NOTE.

BY MS. KISLING:

Q WHERE IT SPEAKS TO "THE FOLLOWING CASES WILL BE HEARD BY OUR COUNSEL ON 8/23," CAN YOU READ UNDER THE CASES, THAT PARAGRAPH?

MS. WALFOORT: IS THAT THE NEXT DOCUMENT?

MS. KISLING: SAME DOCUMENT.

BY MS. KISLING:

Q SO 5 OF 7 IS THE PAGE NUMBER WE'RE ON.

A "ADDITIONALLY, I FIND IT IMPORTANT TO SAY THAT DURING CHERIE AND I'S MEETING WITH SANDY, SHE EXPRESSED HER CONCERN OF UNTIMELY FOLLOW-UP AND HER DIRECTIVE FROM YOLANDA AND DON TO PROCEED IMMEDIATELY ON TERMINATION CASES TO DECREASE THE AMOUNT OF BACK PAY WHICH MAY BE ASSESSED. SHE INDICATED IN CASES WHICH WE DELAY, A REQUEST WILL BE IN FOR SEIU TO ASSIST IN COVERING BACK PAY."

THE HEARING OFFICER: ALL RIGHT. THE NEXT IS FROM CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 8, AN E-MAIL DATED OCTOBER 4TH THAT WAS FROM A PREVIOUS E-MAIL SENT JULY 6TH FROM SEAN MC DONALD.

(EXHIBIT ADMITTED.)

BY MS. KISLING:

Q IF YOU COULD JUST GO AHEAD AND QUICKLY READ THE E-MAIL AND SAY WHO IS IT DIRECTED TO?

A IT'S DIRECTED TO CHERIE MANCINI AND YOURSELF.

Q AND JUST READ IT.

A DO YOU WANT ME TO READ THE WHOLE THING?

MS. WALFOORT: IF YOU CAN PICK THE RELEVANT PARTS.

THE WITNESS: I THINK PROBABLY THE KEY HERE IS IT'S ABOUT THE EXISTING LEASE AND THE TERMS FOR WHICH IF WE NEED TO HOLD OVER THE LEASE, THAT IT WOULD BE 150 PERCENT OF THE THEN EXISTING SPACE RENT.

BY MS. KISLING:

Q AND WHAT DATE IS THAT E-MAIL?

A JULY 2016.

Q CAN YOU TELL US WHY THAT MIGHT BE RELEVANT IN RELATION TO THE RELOCATION COMMITTEE AND SOME CURRENT DISCUSSIONS?

A BASICALLY, THE BUILDING WAS SUPPOSED TO BE DONE OCTOBER 31ST FOR MOVE IN -- WELL, BEFORE NOVEMBER 1ST. SO THIS WOULD HAVE BEEN RELEVANT BECAUSE WHEN WE FOUND OUT A COUPLE OF WEEKS AGO THAT THE BUILDING WASN'T GOING TO BE DONE UNTIL NOVEMBER 15TH, WE NEED TO PUT THIS INTO EFFECT.

MS. THOMAS: AND YOU ARE REFERRING TO THE NEW BUILDING?

THE WITNESS: YES, SORRY.

THE HEARING OFFICER: HOW MUCH LONGER DO YOU THINK YOU ARE GOING TO BE?

MS. KISLING: JUST A FEW MORE MINUTES.

THE HEARING OFFICER: OKAY.

BY MS. KISLING:

Q OKAY. SO MS. MARZAN, DO YOU KNOW HOW LONG HAS CHERIE MANCINI SAT ON THE EXECUTIVE BOARD?

A I HAVE NO IDEA. I'VE ONLY BEEN THERE FOUR YEARS. I KNOW SHE'S BEEN THERE THE WHOLE FOUR YEARS, AND

I BELIEVE SHE WAS THERE PRIOR.

Q DO YOU KNOW IF SHE'S AWARE THAT THERE ARE NO POLICIES TO GOVERN HER?

A YES.

MS. KISLING: OKAY. I THINK THAT'S EVERYTHING. THAT'S EVERYTHING.

THE HEARING OFFICER: OKAY. I'M WONDERING IF WE SHOULD TAKE A DINNER BREAK, A SHORT ONE, AND RECONVENE AND TRY TO SEE IF WE CAN GET THROUGH THIS.

MS. MANCINI: I HAVE QUESTIONS FOR THE WITNESS.

THE HEARING OFFICER: WOULD YOU PREFER TO DO THAT FIRST?

MS. WALFOORT: SHARON, DO YOU HAVE OTHER WITNESSES AFTER THIS?

MS. KISLING: YES.

MS. WALFOORT: ABOUT HOW LONG DO YOU THINK YOU WILL BE?

MS. KISLING: I CAN TRY AND BE 10 MINUTES WITH EACH.

MS. WALFOORT: AND HOW MANY DO YOU HAVE?

MS. KISLING: SO I HAVE DONE ONE, SO SIX MORE.

THE HEARING OFFICER: DO YOU WANT TO DO THE CROSS-EXAM CHERIE? THEN I THINK WE'LL TAKE A BREAK. BECAUSE FOR ANY WITNESS, YOU NEED TO HAVE THE ABILITY TO DO IT. AND THAT WOULD BE QUITE A LONG TIME.

EXAMINATION

BY MS. MANCINI:

Q BRENDA?
A UH-HUH.
Q DO YOU RECALL UNDER PREVIOUS PRESIDENCIES, DO YOU RECALL ANY POLICIES AND PROCEDURES?
A YES.
Q OKAY. I WOULD NEED YOU TO PRODUCE THEM TO ME. BECAUSE THAT'S MORE THAN I WOULD SAY THAT THERE IS AT THE UNION HALL.
A UNDER MARTIN, THERE WERE A COUPLE OF THINGS PUT INTO PLACE. ONE OF THEM, WHICH THE ENTIRE E-BOARD PITCHED A FIT OVER, WAS THE DRESS POLICY. SO THAT ONE WAS IN PLACE.
Q WERE THERE ANY GOVERNANCE POLICIES?
A THERE WAS A POLICY ON RUNNING BACKGROUND CHECKS. THAT WOULD BE POLICY.
Q OKAY. I'VE LOOKED FOR BACKGROUND CHECKS. I HAVE NOT FOUND ONE SINGLE BACKGROUND CHECK ON ONE SINGLE EMPLOYEE IN THE UNION.
A I CAN GET THE POLICY.
Q THAT'S FINE. I'M JUST SAYING, ANYONE THAT'S EVER BEEN EMPLOYED THERE, I CANNOT FIND ONE SINGLE BACKGROUND CHECK.
A SAM HARRIS USED TO DO THEM ALL.
Q WELL THEY'RE NOT IN THE EMPLOYEE FILES. SO THAT'S THE FIRST THING. SECOND THING IS WHEN MARTIN HIRED ALL OF THE PEOPLE HIRED UNDER HIS TENURE, WERE ALL OF THE PEOPLE BROUGHT BEFORE THE EXECUTIVE BOARD?
A I DON'T KNOW THAT HE HIRED ANYBODY. WHO WAS

HIRED UNDER HIM? GIVE ME SOME NAMES, AND I WILL LET YOU KNOW.

Q CATHY POLITO?

A CATHY POLITO WAS.

MS. WALFOORT: ARE YOU ASKING WERE THE CONTRACTS BROUGHT BEFORE THE BOARD FOR APPROVAL?

MS. MANCINI: YES.

THE WITNESS: CATHY POLITO WAS.

BY MS. MANCINI:

Q HER OFFER LETTER WAS?

A I DON'T KNOW IF THE OFFER LETTER WAS. BUT HE DID COME TO THE BOARD, TOLD US WHAT HE WAS OFFERING. WE DID APPROVE THAT, YES.

Q OKAY. CAN YOU TELL ME WHEN THAT WAS?

A NO.

Q OKAY.

THE HEARING OFFICER: SO CAN I JUST ASK FOR CLARIFICATION, DO YOU HAVE EVIDENCE ON WHEN A CONTRACT WAS OFFERED TO CATHY --

MS. MANCINI: I WILL PULL THE MINUTES.

THE HEARING OFFICER: THAT WOULD BE HELPFUL TO SEE HOW THAT WORKS.

BY MS. MANCINI:

Q DO YOU RECALL WHO INITIATED THE MOVE TO THE NEW BUILDING?

A ORIGINALLY, MARTIN BASSICK ORIGINATED THE MOVE.

Q WHO WENT OUT AND GOT THE QUOTES AND FOUND THE OFFICE AND DID ALL OF THOSE THINGS?

A THE FIRST TIME? THE SECOND TIME?
Q UNDER THIS CURRENT LEASE AGREEMENT --
A OKAY.
Q -- WHO ARRANGED THIS?
A THAT WOULD BE THE RELOCATION COMMITTEE WHICH WAS CHAIRED BY SHARON KISLING.
THE HEARING OFFICER: CHARGING PARTY 5.
MS. MANCINI: SORRY, I'M SHOWING THE LEASE AGREEMENT FOR THE BUILDING WE'RE MOVING TO. I'LL PROVIDE MINUTES WITH SHARON KISLING, THAT THE RELOCATION COMMITTEE WAS NOT EVEN FORMED UNTIL AFTER SHARON KISLING GOT INVOLVED.
THE WITNESS: THE RELOCATION COMMITTEE WAS DONE PRIOR. THERE WAS A RELOCATION COMMITTEE DONE DURING THE TENURE OF MARTIN BASSICK. THAT WAS PUT ASIDE DURING THE LEGISLATION, BECAUSE OBVIOUSLY THAT WAS MORE IMPORTANT. WE CAME BACK TO THE RELOCATION ONCE EVERYTHING CALMED DOWN, WHICH WAS PROBABLY LIKE FEBRUARY OF 2016, WHICH I DID SAY WAS CHAIRED BY SHARON KISLING.
BY MS. MANCINI:
Q ARE YOU AWARE THAT THE STAFF HAD NO CONTRACT?
A YES, I WAS.
Q AND HOW LONG HAD IT BEEN SINCE THEY HADN'T HAD A CONTRACT?
A THEY AGREED TO PUT THAT TO THE SIDE BECAUSE OF THE LEGISLATION. I BELIEVE THAT WAS -- BY THE TIME IT GOT SIGNED OFF BY YOU WAS THREE YEARS.
Q OKAY. ARE YOU STATING THAT THERE WAS NEVER ANY

MENTION OF RETRO PAY WITHIN THE E-BOARD FOR THE EMPLOYEES?

A NO. NOT UNTIL IT CAME UP THAT THEY WERE GETTING RETRO AT THE END.

Q ARE YOU AWARE --

A NO.

Q ARE YOU AWARE THAT SHARON KISLING WAS AS WELL ON THE STAFF BARGAINING COMMITTEE?

A YES.

Q AND THAT SHE PARTICIPATED FULL WELL AND SHE WAS ALSO A MEMBER OF THE EXECUTIVE BOARD?

A YES.

Q SO I HAVE -- I'M SO TIRED. THE EXECUTIVE BOARD WAS AWARE THAT THE STAFF CONTRACT WAS UP AND THAT THERE WERE RETRO PAYMENTS TO BE MADE. THERE WAS A DISCUSSION IN REGARDS TO IT. WE TALKED ABOUT HAVING IT SIGNED OFF BEFORE THE ELECTIONS, TRY TO GET IT DONE BEFORE ELECTIONS, SO THAT WE COULD MAKE SURE THAT THE STAFF COULD GET A CONTRACT DONE.

MS. WALFOORT: CHERIE, HERE'S ONE THING, YOU ARE KIND OF NOW TESTIFYING.

MS. MANCINI: THAT'S FINE.

MS. WALFOORT: AND IF YOU'RE GOING TO DO THAT, IT'S ONLY FAIR TO LET SHARON ASK YOU ABOUT THAT. OR YOU WANT TO TESTIFY, YOU CAN. YOU CAN'T DO IT, AND NOT GIVE HER A CHANCE TO ASK YOU ABOUT IT.

MS. MANCINI: THAT'S FINE.

BY MS. MANCINI:

Q WAS EVERYONE UNDER FULL DISCLOSURE IN REGARDS TO THE CURRENT LEASE AGREEMENT AND WHAT WAS TO BE PAID IF WE COULD NOT GET INTO THE BUILDING?
A YES. WE WERE AWARE OF IT, YES.
Q OKAY. SO WHAT IS THE REASON WHY WE CANNOT GET INTO THE BUILDING ON TIME?
A BECAUSE WE DON'T HAVE OCCUPANCY UNTIL, I BELIEVE, THE 15TH.
Q SO THE CONTRACTOR HAS NOT RELEASED THE BUILDING TO BE OCCUPIED?
A CORRECT.
Q AND IN TURN, WE WOULD HAVE TO ABIDE BY OUR LEASE AGREEMENT PER OUR CURRENT LANDLORD?
A CORRECT. I BELIEVE THAT LETTER IS ACTUALLY ASKING TO HAVE THE --
Q THAT'S NOT WHAT I ASKED. I ASKED IF THAT WAS RIGHT. ALSO -- WELL, THESE ARE QUESTIONS FOR SHARON.
BRENDA ARE YOU AWARE OF THE ARTICLE 41 COMMITTEE?
A ABSOLUTELY.
Q OKAY. THEN YOU RECALL AN E-MAIL YOU SENT TO SHARON RIGHT AFTER THIS E-MAIL?
MS. MANCINI: WHICH I CAN PROVIDE COPIES TO YOU. I HAVE FOUR COPIES OF IT. IT'S A COPY OF AN E-MAIL DATED -- FROM CLARK COUNTY COMMISSION -- JULY 15TH.
THE WITNESS: I NEED TO BE ABLE TO SEE IT.
THE HEARING OFFICER: WE'RE MARKING IT. AND YOU'LL GET A COPY OF IT.

THE WITNESS: OKAY.
MS. WALFOORT: JUST LET US MARK IT FIRST.
MS. KISLING: I'M NOT UNDERSTANDING WHAT'S GOING ON. I THOUGHT SHE WAS CROSS-EXAMINING ON QUESTIONS THAT I ASKED.
BY MS. MANCINI:
Q ARE YOU AWARE, BRENDA, THAT IN THE CONSTITUTION AND BYLAWS IT STATES THAT THE LOCAL PRESIDENT OR DESIGNEE SHALL BE THE SPOKESPERSON FOR THE LOCAL UNION AND COLLECTIVE BARGAINING WITH THE EMPLOYERS?
A YES.
Q SO THAT WOULD MEAN THAT I WOULD TECHNICALLY BE PART OF THE BARGAINING TEAM, CORRECT?
A ABSOLUTELY.
Q SO IF I RELEASED INFORMATION, IT WOULD BE COMING FROM SOMEONE FROM THE BARGAINING TEAM, CORRECT?
A CORRECT.
Q THANK YOU. TO ADDRESS THE -- THAT'S TESTIMONY. I CAN'T DO THAT.
THE HEARING OFFICER: JUST FOR MY OWN UNDERSTANDING OF THIS, IS IT THE NORM THAT THE PRESIDENT OF THE LOCAL HAS SENT OUT BARGAINING NOTES OR INFORMATION FOR BARGAINING UNITS?
MS. MANCINI: YES. AND THE OTHER THING IS THAT THERE WAS NO BARGAINING GOING ON AT THAT TIME. THIS WAS AN UPDATE ON THE LEGAL CASE, SB 241, IN REGARDS TO PAYMENT NEEDED TO BE MADE TO EMPLOYEES THAT WERE CAUGHT BETWEEN THE EXPIRATION OF THE CONTRACT AND THE TIME WE

FILED A GRIEVANCE IN REGARDS TO THE ENACTMENT OF SB 241. WHICH STATED THAT AS THE CONTRACT EXPIRED, THE COUNTY HAD NO OBLIGATION TO PAY PEOPLE MERIT AND LONGEVITY. SO THE BARGAINING WAS COMPLETELY DONE.

THE HEARING OFFICER: OKAY.

BY MS. MANCINI:

Q ARE YOU AWARE THAT AT ANY BOARD MEETING, MIKE URBAN BROUGHT FORWARD CONCERNS IN REGARDS TO DOCUMENTATION OF CASES THAT WERE BEING -- GRIEVANCES THAT WERE BEING DONE THROUGH THE HALL? REGARDING JOHN LIGE, I BELIEVE IT WAS O'BANNON ALSO?

A YES -- NO, O'BANNON NEVER CAME TO THE BOARD.

Q SO ON THE LIGE CASE, DO YOU RECALL DISCUSSIONS IN REGARD TO THE LIGE CASE?

A THAT THERE WAS NO DOCUMENTATION TO BE ABLE TO BACK THE CASE AGAINST HIM, SO WE WERE GOING TO DO A SETTLEMENT WITH HIM.

Q OKAY. AND OUT OF THAT CONVERSATION, THERE WAS A RECOMMENDATION FROM MIKE URBAN THAT WE LOOK INTO HAVING SOMEONE BE A CASE MANAGER COMPLIANCE COORDINATOR?

A CORRECT.

Q CORRECT. IT WAS APPROVED BY THE EXECUTIVE BOARD -- I'M SORRY. WAS IT APPROVED BY THE EXECUTIVE BOARD THAT WE SHOULD DEVELOP THAT POSITION?

A ORIGINALLY, THE JOB DESCRIPTION WAS APPROVED, AND IT WAS SUPPOSED TO GO TO SOMEBODY THAT WAS INTERNAL TO THE LOCAL ALREADY. AND THEN IT CAME BACK TO THE E-BOARD, AND IT WAS APPROVED TO MOVE FORWARD TO A HIRING.

Q ON THE FIRST, I BELIEVE IT WAS PROBABLY IN JULY -- IT WAS EITHER JUNE OR JULY, AND I'LL GET THE MINUTES FOR THAT -- I KNOW THAT, REFRESH ME IF YOU RECALL, THAT SHARON KISLING CAME FORWARD AND SAID SOMEONE INTERNALLY SHOULD BE IDENTIFIED TO DO THIS JOB, CORRECT?
A CORRECT.
Q THEN THERE WAS A COMMITTEE PUT TOGETHER TO PUT THIS JOB DESCRIPTION TOGETHER?
A I DON'T RECALL THAT.
Q OKAY. THAT'S FINE. WE'LL TOUCH ON THAT LATER.
A I BELIEVE PETER BROUGHT THE JOB DESCRIPTION IN, SO IT WOULDN'T HAVE BEEN A COMMITTEE.
Q WELL, WE DID. I DON'T WANT TO TESTIFY. I'M JUST TRYING TO ASK A QUESTION.
I KNOW THAT THERE WAS AN E-MAIL DIALOG BETWEEN THE TWO OF US IN REGARDS TO THE POSTING OF THAT JOB. AND DO YOU RECALL WHAT MY RESPONSE WAS WHEN YOU ASKED ME WHY THAT JOB WAS POSTED?
A YOU SAID YOU DIDN'T UNDERSTAND THAT THE BOARD HAD NOT APPROVED THE JOB, THAT IT WAS JUST A JOB DESCRIPTION.
Q AND THAT I HAD SAID IT WAS A MISUNDERSTANDING AND THAT THERE WAS NO DECISIONS THAT WERE BEING MADE?
THE HEARING OFFICER: IF YOU HAVE THE E-MAIL, THAT WOULD BE MORE HELPFUL.
MS. MANCINI: THAT'S FINE. THAT'S FINE.
I THINK THAT'S IT. THANK YOU.
THE HEARING OFFICER: SO WE'RE GOING TO TAKE --

DEBBIE, YOU HAVE A QUESTION?

MS. SPRINGER: YES, I DO.

EXAMINATION

BY MS. SPRINGER:

Q HI, BRENDA. HAVE YOU EVER WRITTEN POLICIES AND PROCEDURES IN YOUR WORK?

A ABSOLUTELY, EVERY DAY. THAT'S MY JOB.

Q SO YOU TESTIFIED THAT WE HAVE TWO POLICIES IN PLACE. DO YOU BELIEVE THAT'S ENOUGH TO COVER THE CONSTITUTION AND BYLAWS?

A I DIDN'T SAY THOSE WERE THE ONLY ONES. THOSE WERE THE ONLY ONES THAT I WAS ALLOWED TO COMPLETE. I CAN'T TELL YOU ALL OF THEM. I DO KNOW THAT SEVERAL WERE BROUGHT TO THE BOARD FOR ADOPTION INCLUDING THOSE THAT I MENTIONED.

Q OKAY.

A AND, NO, IT'S NOT ENOUGH TO GOVERN.

Q SO AS I STATED THIS MORNING --

MS. KISLING: IS THIS A QUESTION?

BY MS. SPRINGER:

Q WHY DON'T YOU THINK THE E-BOARD HAS STEPPED UP TO MAKE POLICIES AND PROCEDURES THAT WOULD GOVERN THE LOCAL WHEN OBVIOUSLY THE BYLAWS CONFLICT EACH OTHER? WHY DO YOU THINK THAT? OR DO YOU THINK THAT THEY SHOULD?

A I BELIEVE IT'S TO THE BENEFIT OF CERTAIN PEOPLE ON THE BOARD.

Q REALLY?

A YES, I DO.
Q AND WHAT WOULD THAT BENEFIT BE?
A THAT THEY CAN ADOPT ANY VARIATION OF THE BYLAWS THAT THEY WISH. SINCE IT SAYS THAT WE CAN INTERPRET THEM THE WAY THAT THE BOARD WANTS TO, IF YOU CAN GET ENOUGH PEOPLE TO AGREE WITH YOU, YOU CAN MOVE FORWARD ON THAT INTERPRETATION.
Q WELL, DON'T YOU THINK THAT WE AS THE E-BOARD SHOULD BE WRITING THESE POLICIES AND PROCEDURES?
A ABSOLUTELY. AND I AM WRITING SOME.
Q AND WHO IS HELPING YOU?
A MYSELF RIGHT NOW. AND WE HAD A MEETING THAT WE TALKED ABOUT CERTAIN ONES THAT WERE VERY IMPORTANT TO US, BEING CLARK COUNTY. SO THE CLARK COUNTY OFFICERS AND I ARE WRITING SOME THAT WOULD BE SPECIFIC TO THE CLARK COUNTY OFFICERS.
Q SO WE HAVE A PUBLIC AND PRIVATE SECTOR, BUT YET YOU ARE JUST WRITING PROCEDURES THAT COULD OR COULD NOT GOVERN THE PUBLIC SECTOR? DO YOU THINK THE PROCEDURES SHOULD COVER BOTH PRIVATE AND PUBLIC?
A I BELIEVE IF YOU TRY TO FIX SOMETHING, YOU START WITH WHAT YOU KNOW AND MOVE THOSE THROUGH FIRST AND HOPE THAT OTHERS WILL ATTACH TO THEM, ADOPT THEM AND MOVE FORWARD.
SO WHAT I'M GOING TO DO IS TAKE WHAT I KNOW, WHICH IS PUBLIC AND WRITE THINGS ABOUT WHAT I KNOW AND HOPE THAT WE CAN SEE POSITIVE CHANGE FROM THOSE AND THAT THE E-BOARD WOULD ADOPT THEM FOR THE REST OF THE E-BOARD.

Q WOULD YOU LIKE TO PUT TOGETHER AN AD HOC COMMITTEE THAT WOULD WRITE POLICIES AND PROCEDURES?
A I ACTUALLY BROUGHT THAT UP A LONG TIME AGO DURING THE CONSTITUTION AND BYLAWS MEETINGS. I OFFERED TO DO A LOT OF THAT. THOSE MEETINGS NEVER TOOK OFF. THE CONSTITUTION AND BYLAWS COMMITTEE HAS NEVER REALLY GOTTEN TOGETHER ON ANYTHING. I UNDERSTAND NOW MARTHA SAID THIS LAST E-BOARD MEETING THAT SHE WAS GOING TO GET TOGETHER AND STARTED MOVING IT FORWARD. BUT THERE HASN'T BEEN ANY MEETINGS SINCE THE LAST CONSTITUTION AND BYLAWS CONVENTION.
MS. SPRINGER: I THINK THAT'S SOMETHING WE SHOULD PROBABLY EXPLORE, AND IT SHOULD BE SOONER RATHER THAN LATER. THANK YOU, BRENDA.
THE WITNESS: SURE.
THE HEARING OFFICER: GO AHEAD, ALFREDO.

EXAMINATION

BY MR. SERRANO:
Q JUST QUICKLY, SPEAKING OF POLICIES THAT YOU MAY KNOW OF, DO YOU KNOW OF ANY POLICIES REGARDING HIRING, HIRING OF STAFF?
A I KNOW THAT BACKGROUND CHECKS USED TO BE DONE. THAT'S ALL I CAN TELL YOU AS FAR AS HIRING.
Q BUT NOT A POLICY? A BACKGROUND CHECK POLICY IS WHAT YOU ARE SAYING EXISTS?
A WELL, I DON'T KNOW IF IT WOULD BE POLICY AND PROCEDURE. BUT THERE WAS BACKGROUND CHECKS DONE ON

ANYBODY HIRED AT LOCAL 1107.

Q BUT WE DON'T HAVE EVIDENCE OF THAT?

A I CAN GET YOU EVIDENCE OF THAT.

Q WHERE WOULD YOU BE GETTING THAT EVIDENCE? WHERE WOULD YOU BE GETTING THAT EVIDENCE? BECAUSE CHERIE'S LOOKED FOR IT, AND I'M ASKING IF YOU HAVE ACCESS TO SOMETHING SHE DOESN'T. BECAUSE SHE'S LOOKED.

A YES. I WILL ASK THE PRIOR PRESIDENTS FOR THAT EVIDENCE. YES, I WILL.

Q OKAY. AND SO DO YOU KNOW IF WE HAVE ANY POLICIES REGARDING WAGES?

A I DON'T BELIEVE THERE IS ANY POLICIES ANY MORE THAT ARE BEING USED AT LOCAL 1107. I CAN TELL YOU THERE IS A STAFF CONTRACT IN PLACE. AND PER THE STAFF CONTRACT, YES, THERE IS A TABLE BASED ON THE NUMBER OF YEARS WITH THE EXPERIENCE FOR UNION, THAT THOSE WAGES ARE BASED ON.

Q SO I'M NOT ASKING ABOUT WAGE SCALES, BUT POLICIES.

A WELL, THAT'S THE BIGGEST POLICY OF ALL. CONTRACT IS THE BIGGEST POLICY OF ALL. SO, YES, THERE'S A POLICY.

Q OKAY. I THINK THAT'S A CONTRACT RATHER THAN A POLICY. IS THERE A POLICY ON COMMUNICATION?

A NOT YET.

Q OKAY. ALL RIGHT. I JUST -- SO LET ME ASK, IF YOU ARE SUGGESTING -- IF THERE'S SUGGESTIONS THAT THE PRESIDENT FOLLOW POLICIES AND THERE IS NOT POLICIES IN

PLACE, DOES THE PRESIDENT -- WHAT DOES THE PRESIDENT FOLLOW?

A I DON'T UNDERSTAND YOUR QUESTION.

Q IF THERE IS SUGGESTIONS THAT THE PRESIDENT WAS NOT FOLLOWING POLICIES, BUT THERE IS NO POLICIES IN PLACE, WHAT WOULD THE PRESIDENT BE FOLLOWING?

A THE CONSTITUTION AND BYLAWS.

Q THE CONSTITUTION AND BYLAWS, THANK YOU. EXACTLY.

THE HEARING OFFICER: ALL RIGHT. WE'RE GOING TO TAKE A BREAK.

MS. KISLING: I JUST WANT TO MAKE SURE THAT I CAN DO CROSS WHEN WE GET BACK. THERE ARE A FEW THINGS --

MS. WALFOORT: CAN WE JUST TAKE A LITTLE BREAK RIGHT NOW AND FIGURE OUT A PROCEDURE FOR THE REST OF THE TIME WE'VE GOT.

THE HEARING OFFICER: SO HOLD TIGHT FOR A FEW MINUTES WHILE I FIND OUT WHAT TIME WE'RE GOING TO RECONVENE. HOLD TIGHT BEFORE ANYBODY DISPERSES.

(BREAK TAKEN.)

THE HEARING OFFICER: THE GOAL IS TO GET THROUGH CHARGE 2 TONIGHT. SO THAT'S AS FAR AS WE'RE HOPING TO GET. SO WE'RE GOING TO FINISH UP THE RECROSS. THE CHARGING PARTIES ARE ALLOWED TO DO THE REDIRECT. THEN WE'RE GOING TO TAKE A BREAK FOR A HALF HOUR. AND THEN WE'RE GOING TO RECONVENE TO GO THROUGH WHAT YOU SAID IS THE FIVE REMAINING WITNESSES; IS THAT CORRECT? AND THEN THE TWO.

MS. KISLING: SIX MORE.

THE HEARING OFFICER: YOU HAVE SIX MORE? AND THEN THE TWO WITNESSES YOU HAVE.

MS. MANCINI: IF THEY'RE STILL HERE.

THE HEARING OFFICER: AND CLOSING STATEMENTS AT THE END AND CLOSE AT THE END OF THAT. NOW, WHILE WE'RE ON DINNER BREAK, ANY OF THE DOCUMENTS THAT YOU DID NOT HAVE ENOUGH COPIES FOR, YOU NEED TO HAVE THEM AVAILABLE SO THAT THEY CAN BE GIVEN TO THE PARTIES AS SOON AS WE RECONVENE.

MS. WALFOORT: SO IT'S ALMOST 5:30. SO WHY DON'T WE RECONVENE AT -- SORRY, WE NEED TO FINISH. SORRY, REDIRECT.

MS. THOMAS: YOU SAID THE COPIES THEY DID NOT GET, THEY HAVE TO BE GIVEN TONIGHT. IS THERE A COPY CENTER HERE?

THE HEARING OFFICER: THERE IS A BUSINESS CENTER.

MS. THOMAS: ALL RIGHT.

MS. WALFOORT: IF YOU STOP AND ASK LORNA ABRAHAM AT THE TABLE, SHE CAN MAKE --

MS. THOMAS: AND WOULD THAT BE THE EXHIBIT THAT WE SAID THAT I WOULD GIVE TODAY? BECAUSE I HAVE IT ON MY PHONE. I JUST DON'T HAVE IT PAPER-WISE.

THE HEARING OFFICER: WHICH EXHIBIT?

MS. KISLING: IT WASN'T NUMBERED. THIS WAS FROM THIS MORNING.

THE HEARING OFFICER: NO. THAT WAS DURING THE

NEEDS. THAT, YOU HAVE UNTIL THE 4TH TO GET IN.

MS. PURDIE: WE WANT THE EXHIBITS THAT YOU HAVE PRESENTED THUS FAR AND ANYTHING ELSE YOU DON'T HAVE ENOUGH COPIES. WE WANT TO MAKE SURE THAT WE HAVE ENOUGH COPIES OF ALL THE EXHIBITS BEFORE WE LEAVE TONIGHT AND FINISH THIS CHARGE.

THE HEARING OFFICER: GO AHEAD.

MS. KISLING: OKAY. I JUST HAVE A FEW QUESTIONS ON REDIRECT.

FURTHER EXAMINATION

BY MS. KISLING:

Q PRESIDENT MANCINI DISCUSSED HIRING. SO ARE YOU AWARE OF ANY CONCERNS THAT THE PREVIOUS EXECUTIVE VICE PRESIDENT HAD COMMUNICATED REGARDING HIRING PRACTICES? AND CAN YOU IDENTIFY WHO THAT WAS?

A ANY PROBLEMS WITH IT?

Q YES. I'M SORRY, LET ME REPHRASE IT. THE PREVIOUS EXECUTIVE VICE PRESIDENT WAS CHERIE MANCINI. ARE YOU AWARE OF ANY CONCERNS SHE HAD REGARDING THE HIRING PRACTICES UNDER THEN PRESIDENT BASSICK?

A YES. SHE SAID THE SAME THING THAT WE'RE SAYING TODAY, THAT THEY'RE NOT BEING BROUGHT TO THE BOARD.

THE HEARING OFFICER: MY QUESTION IS DO YOU HAVE ANY EVIDENCE OF THAT? BECAUSE THAT'S A HE-SAID-SHE-SAID OR HEARSAY.

MS. KISLING: YES. I CAN BRING THE CHARGES SHE FILED LAST YEAR AGAINST PRESIDENT BASSICK.

MS. WALFOORT: CAN YOU DO THAT TONIGHT?
MS. KISLING: YES, I JUST HAVE TO GET IT PRINTED OUT.
BY MS. KISLING:
Q ARE YOU AWARE OF ANY DIRECTION THE ATTORNEY MIKE URBAN PROVIDED TO PRESIDENT MANCINI IN REGARDS TO THE CURRENT LEASE AND LANDLORD?
A YES. HE -- IN AN EXECUTIVE BOARD MEETING, HE ACTUALLY ASKED IF WE WANTED HIM TO HAVE DISCUSSION WITH THE LANDLORD TO DETERMINE A PLAN OF ACTION, IF WE WERE GOING TO GO OVER THE EXPIRATION OF THE LEASE. AND THEN AT THE LAST BOARD MEETING HE WAS AT WHICH WAS TWO E-BOARDS AGO, HE BROUGHT IT UP AGAIN. AND PRESIDENT MANCINI SAID SHE'D HAVE THAT DISCUSSION HERSELF WITH THE LANDLORD.
Q DO YOU KNOW IF SHE HAD THAT DISCUSSION?
A I HAVE NO IDEA.
Q OKAY. PRESIDENT MANCINI SAID THAT SHE WAS PART OF THE BARGAINING TEAM WHEN SHE SENT OUT COMMUNICATION. HOWEVER, THEN STATED THAT BARGAINING WAS COMPLETELY DONE. ARE YOU AWARE IF SHE, IN FACT, WAS ON THE BARGAINING TEAM THAT, I THINK, RELEASED BACK IN 2014?
A NO. THAT WOULD HAVE BEEN UNDER PRESIDENT MARTIN BASSICK.
Q OKAY. SO THERE WAS SOME CONVERSATION ABOUT THE CONCERNS REGARDING DOCUMENTATION OF CASES BEING HANDLED BY THE HALL, WHICH IS WHY WE MOVED TO DO THE COMPLIANCE COORDINATOR. DO YOU KNOW IF, IN FACT, THE BEST APPLICANT

WAS INTERVIEWED AND CHOSEN?

A MY UNDERSTANDING FROM --

MS. MANCINI: SHE WASN'T IN THE INTERVIEWING PROCESS.

THE WITNESS: MY UNDERSTANDING WAS NO. BUT I WAS NOT INVOLVED IN THAT PROCESS. I WAS NOT ON THAT TEAM.

BY MS. KISLING:

Q OKAY. I'LL BRING THAT UP WITH ANOTHER WITNESS.

OKAY. WITH THE CURRENT CLIMATE AT E-BOARD MEETINGS, DO YOU SEE THAT -- THEY MADE A POINT OF STATING THAT E-BOARD HAD A RESPONSIBILITY TO COME TOGETHER TO DEVELOP POLICY. DO YOU SEE THAT OCCURRING? AND IF NOT, WHY?

A BECAUSE THE LOCAL IS SO DIVIDED RIGHT NOW. IT'S BASICALLY A PUBLIC VERSUS PRIVATE FOR THE MAJORITY. THAT'S WHY I'M SAYING THAT IT'S BETTER TO DO WHAT I KNOW, WHICH WOULD BE THE PUBLIC SIDE OF THE HOUSE, GETTING THEM TO ADOPT THOSE POLICIES FOR THAT GROUP OF PEOPLE AND THEN HOPING THAT IT WOULD BE SEEN THAT IT WAS A GOOD THING AND MOVE FORWARD THROUGH THE OTHER SIDE OF THE HOUSE.

MS. KISLING: OKAY. I WASN'T PREPARED TO PROVIDE THIS, BUT IT'S REDIRECT BECAUSE OF A STATEMENT THAT WAS MADE. SO I'M GOING TO SHOW IT TO YOU GUYS AND ASK HER A QUESTION. AND I CAN MAKE COPIES AT THE BREAK AS WELL. IS THAT OKAY?

THE HEARING OFFICER: LET'S LOOK AT IT.

MS. KISLING: THESE WERE THE RESUMES OF ALL

APPLICANTS FOR THE COMPLIANCE COORDINATOR.
(DISCUSSION HELD OFF THE RECORD.)
MS. MANCINI: OKAY. WHAT'S GOING ON?
MS. WALFOORT: WE'RE JUST TRYING TO FIND OUT IF WE NEED TO ADMIT THIS OR NOT. SO JUST HANG ON FOR A MINUTE.
(DISCUSSION HELD OFF THE RECORD.)
MS. WALFOORT: ALL RIGHT. SO WHAT WE'RE DISCUSSING IS THAT AN EXHIBIT IS GOING TO COME IN TO REBUT THE CONTENTION THAT WAS MADE ABOUT THE HIRING OF ANDREA BOND. SO WE'RE GOING TO MARK THIS, AND YOU WILL PROBABLY ONLY HAVE A FEW QUESTIONS ABOUT THAT, RIGHT?
MS. KISLING: YES.
MS. MANCINI: I DIDN'T HEAR WHAT YOU SAID.
THE HEARING OFFICER: WE'RE ENTERING IN AS EXHIBIT 9, SO CHARGE 2, CHARGING PARTY EXHIBIT 9, THE RESUMES OF THREE CANDIDATES FOR THE POSITION OF COMPLIANCE COORDINATOR. AND SHARON'S GOING TO PROVIDE COPIES OF THAT AT THE BREAK.
MS. KISLING: OKAY. SO CLARA WAS SAYING THAT IN THE BINDER SHE PROVIDED YOU WITH THIS MORNING THAT THESE RESUMES WERE PROVIDED.
MS. WALFOORT: OKAY. SO THAT'S IN THE NEEDS HEARING, THE BINDER, ONE OF THE TABS IS ANDREA BOND?
MS. THOMAS: EXACTLY. AND THOSE THREE RESUMES ARE THERE ALSO.
MS. WALFOORT: OKAY. BUT DO YOU NEED TO ASK THIS WITNESS ABOUT THAT?

MS. KISLING: YES.
BY MS. KISLING:
Q SO JUST REVIEWING THOSE THREE RESUMES, I THINK I ASKED PRIOR, DO YOU THINK THE MOST QUALIFIED APPLICANT WAS INTERVIEWED AND/OR HIRED?
THE HEARING OFFICER: SO I'M JUST GOING TO QUESTION -- I'M NOT SURE HOW HELPFUL THAT IS. THAT'S BASED ON HER ASSUMPTION AND WHATEVER HER BELIEF IS. AND THE INTERVIEW PROCESS MAKES A DIFFERENCE. NOT NECESSARILY IS EVERYTHING ON THE PAPER.
BY MS. KISLING:
Q I GUESS, BECAUSE WHEN WE REVIEWED ANDREA BOND'S RESUME, IT SHOWED HER LABOR EXPERIENCE WAS FROM NOVEMBER 2015 UNTIL MAYBE IT WAS AUGUST 2016. AND SO THE FIRST RESUME ITSELF, IF WE COULD JUST LOOK AT THAT ONE, IF YOU CAN JUST TELL ME WHAT DEGREE THAT PERSON HAS AND WHAT THEIR CURRENT JOB IS?
A HE HAS -- HE HAS A LAW DEGREE, IT LOOKS LIKE.
Q AND DOES HE HAVE THE POSITION OF COMPLIANCE COORDINATOR LISTED ON HIS RESUME?
A WHAT?
Q DOES HE HAVE A PREVIOUS EXPERIENCE AS A COMPLIANCE COORDINATOR SPECIFICALLY?
A YES.
Q OR AS THE DIRECTOR OF COMPLIANCE.
A RIGHT, FROM 2008 FORWARD.
THE HEARING OFFICER: SO I'M GOING TO GO BACK TO WHAT I WAS SAYING. I DON'T THINK THIS IS RELEVANT.

SO I WOULD RATHER MOVE ON.

MS. KISLING: OKAY. THAT'S FINE.

MR. SERRANO: I JUST WANT TO MAKE A STATEMENT. IT APPEARS THAT -- WE'RE NOT SUPPOSED TO BE PRESENTING OUR CASE. AND JUST BECAUSE YOU HAVE A WITNESS UP THERE AND YOU GIVE THEM EVIDENCE TO READ THAT THEY HAVE NO KNOWLEDGE ABOUT BEFORE THEY READ IT, THAT DOESN'T MAKE IT A WITNESS STATEMENT. IT JUST MAKES IT PRESENTING EVIDENCE THROUGH A DIFFERENT PERSON.

I MEAN, IT APPEARS THAT THAT'S WHAT HAS OCCURRED HERE. SO BRENDA HAS BEEN READING EVIDENCE AND -- ASKING, "COULD YOU READ THAT?" AND THEN GIVING HER OPINION ON IT, HER INTERPRETATION OF IT.

THE HEARING OFFICER: BRENDA IS AN EXECUTIVE BOARD MEMBER THOUGH. AND SO HER TESTIMONY, AT LEAST AS I'VE BEEN HEARING IT, AND THE ITEMS THAT SHE'S RESPONDED TO, HAVE BEEN RELATED TO HER POSITION ON THE BOARD. NOW, FOR HER TO REVIEW IT WHILE SHE'S UP THERE, I WOULD SAY THAT THAT'S A NORM. BECAUSE TOTAL RECALL FOR ANYBODY OVER A LONG PERIOD OF TIME IS DIFFICULT. BUT THAT HELPS SOMEBODY RECALL.

BUT IT WAS RELATED TO HER ROLE ON THE BOARD DURING THE TIME SHE WAS THERE, SO I WOULD SEE IT AS RELEVANT. AND YOU WILL HAVE THE SAME OPPORTUNITIES IN PRESENTING YOUR CASE WITH THE WITNESSES YOU PRESENT AS WELL.

MS. KISLING: I'M DONE.

MS. MANCINI: CAN I HAVE ONE MORE -- JUST ONE

QUESTION?

DID YOU PARTICIPATE IN ANY OF THE INTERVIEWS OF ANY OF THE CANDIDATES THAT I HIRED?

THE WITNESS: I SAID I WAS NOT INVOLVED IN THE HIRING.

MS. MANCINI: OKAY, THANK YOU. I JUST WANTED TO BE CLEAR.

THE HEARING OFFICER: ALL RIGHT. WE'RE GOING TO TAKE A BREAK NOW. THE NORM IS THAT THE CHARGING PARTY IS GOING TO BE ABLE TO DO THE REDIRECT, GOING FORWARD. AND THAT'S GOING TO BE HELD THE SAME FOR EVERYBODY. YOU WILL HAVE AN OPPORTUNITY FOR A CLOSING STATEMENT. SO IF YOU WANT TO DEAL WITH SOMETHING YOU FEEL LIKE YOU HAVEN'T BEEN ABLE TO RESPOND TO THERE, YOU WOULD BE ABLE TO DO IT IN THE CLOSING STATEMENT. SO WE'RE GOING TO BREAK UNTIL 10 AFTER 6:00.

MS. MANCINI: SO OUR QUESTION IS THIS. BECAUSE WE HAVE WAITED SO LONG TO HAVE TO DEAL WITH THESE CHARGES, I MEAN, DUE TO NON-TIMELINESS, AND PARTIES BEING HERE, HOW LATE ARE WE GOING TO BE HERE? BECAUSE I HAVE PEOPLE WHO DIDN'T EXPECT TO BE HERE ALL DAY AND ALL NIGHT.

THE HEARING OFFICER: SO SHARON, YOU HAD SAID YOU BELIEVE YOU WILL BE ABLE TO KEEP YOUR WITNESS EXAM OF EACH WITNESS TO 10 MINUTES?

MS. KISLING: YES.

THE HEARING OFFICER: SO WE TRIED TO TIME THIS OUT. IF YOU'RE ABLE TO DO THAT AND YOURS IS 10 MINUTES

AS WELL --

MS. MANCINI: THAT'S NOT INCLUDING RECROSS.

THE HEARING OFFICER: RIGHT. AND THEN YOU'RE GOING TO HAVE A FEW. WE SHOULD BE ABLE TO FINISH UP, OUR HOPE IS, AROUND 9:00 OR SO. THERE IS A LOT OF CHARGES HERE, SO I DON'T KNOW HOW TO WADE THROUGH IT. AND I ALSO DON'T WANT TO BE IN A PLACE, UNLESS IT CLEARLY IS, WHERE WE DON'T ALLOW TESTIMONY TO HAPPEN. AND THERE IS A LOT OF SERIOUS CHARGES OUT THERE.

WE'RE GOING TO RECONVENE UNTIL 10 AFTER.

MS. WALFOORT: AND BY THEN WE'LL HAVE EXHIBITS FOR ANYTHING THAT IS MISSING. AND IF YOU WANT TO GO OVER THOSE RIGHT NOW. AND WE'LL RECONVENE AT 10 PAST.

(DINNER BREAK TAKEN.)

THE HEARING OFFICER: I WANT TO START FIRST WITH CHERIE RAISED CONCERNS RELATED TO THIS DOCUMENT. SO I WANTED YOU TO BE ABLE TO PUT THAT ON THE RECORD, IF YOU SO CHOOSE, YOUR CONCERN. AND THEN I WANT TO ASK YOU THOUGH IF -- THIS DOCUMENT IS AND WAS ADDRESSED TO THE SEIU EXECUTIVE BOARD, DATED OCTOBER 2016. HAVE YOU SEEN THIS DOCUMENT BEFORE?

MS. MANCINI: YES. I'VE SEEN IT BEFORE TODAY.

THE HEARING OFFICER: OKAY.

MS. MANCINI: BUT VERY BRIEFLY.

THE HEARING OFFICER: OKAY. SO HERE'S WHAT I'M GOING TO OFFER. WE'RE GOING TO TRY TO WRAP THIS UP TODAY WITH CLOSING. BUT I'M GOING TO TRY TO SET ASIDE SOME TIME TOMORROW, IF YOU NEED IT. IF YOU LOOK THROUGH THIS

THIS EVENING, AND IF THERE IS ANYTHING YOU WANT TO RAISE TOMORROW, WE'LL TRY TO SET ASIDE SOME TIME THAT YOU ARE ABLE TO RAISE THAT ISSUE OR BRING IT UP.

MS. MANCINI: OKAY.

THE HEARING OFFICER: AND THE OTHER PIECE IS THAT TO ENSURE THAT WE FINISH WITH ALL OF THE CHARGES BY THE END OF TOMORROW, BE AS DISCIPLINED AS POSSIBLE TO FOCUS SPECIFICALLY ON THE CHARGES THAT HAVE BEEN FILED AND TRY TO GET TO THE POINT AS QUICKLY AS POSSIBLE SO THAT WE CAN GET THROUGH THEM BY THE END OF TOMORROW.

MS. MANCINI: OKAY.

THE HEARING OFFICER: DOES THAT COVER THE CONCERN THAT YOU HAVE, CHERIE?

MS. MANCINI: AND BEING TIMELY.

THE HEARING OFFICER: AND WE'RE STARTING AT 10:00 A.M. SHARP. SHARON, DO YOU WANT TO CALL YOUR NEXT WITNESS?

THE HEARING OFFICER: WHILE SHARON IS GETTING HER WITNESS, DID YOU WANT TO PUT SOMETHING ON THE RECORD ABOUT --

MS. MANCINI: I DO WANT TO PUT SOMETHING ON RECORD AS FAR AS THAT THE CHARGES THAT WERE FILED AGAINST ME WERE DATED SEPTEMBER 9TH, RECEIVED I THINK BY THE INTERNATIONAL ON THE 20TH. AND THE CONCERN THAT I HAVE IS THAT THERE ARE SOME THINGS IN HERE THAT HAVE NO SPECIFICITY. AND THINGS WERE RAISED HERE TODAY THAT WERE THINGS THAT HAPPENED AFTER SEPTEMBER 9TH OR SEPTEMBER 20TH. AND I DON'T BELIEVE THAT IT IS -- I'M

GETTING MY DUE PROCESS BY NOT HAVING THOSE DOCUMENTS PRIOR TO TODAY.

SO I JUST WANTED TO GO ON THE RECORD, IF THERE WERE OTHER THINGS THAT I NEEDED TO BE CHARGED WITH, I WOULD HAVE THOUGHT THEY WOULD HAVE BEEN CHARGED WHEN THEY HAPPENED. YOU CAN'T CHARGE ME FOR SOMETHING THAT HADN'T HAPPENED AT THE TIME YOU FILED CHARGES.

THE HEARING OFFICER: ARE YOU GOING TO BE SPECIFIC ABOUT WHAT THAT IS? OR ARE YOU GOING TO DO THAT TOMORROW?

MS. MANCINI: THAT'S FINE. I CAN DO IT RIGHT NOW. THAT'S FINE. THE FIRST THING IS IN REGARDS TO THE FIRST PAGE OF THE CHARGES, WHICH STATES THAT -- IT'S ARTICLE 7, SECTION 6, THE ACCOUNTABILITY PIECE:

"ACCOUNTABILITY STATES THAT THE PRESIDENT SHALL BE ACCOUNTABLE TO ALL MEMBERS; SHALL REPORT TO THE BOARD; WILL NOT ALLOW MYSELF TO BE HELD ACCOUNTABLE NOR PROVIDE ACCOUNTABILITY; AND THAT THE PRESIDENT STATES THAT SHE'S THE PRESIDENT REPORTS TO NO ONE AND THAT, IN FACT, EVERYONE REPORTS TO HER; MANCINI ROUTINELY AND CONSISTENTLY IS UNRESPONSIVE" -- THESE ARE ALL GENERALIZED STATEMENTS.

MS. WALFOORT: CHERIE, SORRY. BUT YOU ARE GOING TO HAVE TO SLOW DOWN A LITTLE FOR THE COURT REPORTER.

MS. MANCINI: OH, I'M SO SORRY.

SO BASICALLY WITHIN THIS SECTION, THERE IS NO SPECIFICITY WHATSOEVER OF WHO, WHAT, WHERE. IT'S JUST

GENERALIZED STATEMENTS. AND THOSE WERE THE THINGS THAT WERE RAISED DURING THE PREVIOUS SESSION THAT THINGS WERE BROUGHT UP FROM OCTOBER 26TH.

MS. WALFOORT: SO I THINK WHAT WE'RE ASKING YOU, IS THERE SOMETHING SPECIFICALLY THAT'S HAPPENED AFTER THE CHARGES WERE FILED THAT YOU FEEL YOU ARE BEING BLINDSIDED BY TONIGHT?

MS. MANCINI: THERE WERE E-MAILS THAT WERE BROUGHT UP THAT HAPPENED IN OCTOBER. THIS INCIDENT WITH ED MAY, THE E-MAIL WITH ED MAY, WAS OCTOBER 26TH. THIS WHOLE REPORT IS DATED OCTOBER 26TH.

MS. WALFOORT: BUT YOU DID SEE THAT, YOU SAID.

MS. MANCINI: I SAW IT TWO DAYS AGO. WHICH IF I WOULD HAVE KNOWN IT WOULD HAVE BEEN PART OF THIS, I COULD HAVE PREPARED MYSELF. SO MY PROBLEM IS SPECIFICITY NEEDS TO BE GIVEN. OTHERWISE, I DON'T HAVE A FAIR CHANCE TO RESPOND PRIOR TO WHEN WE'RE ACTUALLY HERE TALKING ABOUT IT. THANK YOU.

MS. KISLING: CAN I JUST SPEAK TO THAT RIGHT QUICK? BECAUSE THEY'RE NOT ACCURATE STATEMENTS.

THE HEARING OFFICER: INSTEAD OF GOING BACK AND FORTH, I WOULD RATHER PROCEED WITH THE WITNESSES. WE'RE GOING TO TAKE THAT INTO ACCOUNT. CHERIE RAISED THAT, SO I WANTED TO ALLOW THAT TO GET INTO THE RECORD. BUT YOU ARE ABLE TO PRESENT YOUR CASE, AND I WOULD PREFER THAT YOU DO THAT.

MS. KISLING: OKAY.

THE HEARING OFFICER: OKAY. DO YOU WANT TO

SWEAR THE WITNESS? AND AFTER THAT, STATE YOUR NAME FOR THE RECORD.

CHRISTINA BREEDEN,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: MY NAME IS CHRISTINA BREEDEN, COMMON SPELLING, C-H-R-I-S-T-I-N-A, BREEDEN, B-R-E-E-D-E-N.

MS. WALFOORT: BE SURE YOUR MIC IS ON. LET ME SEE.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. KISLING:

Q FIRST, I WANT TO START -- NO, LET ME JUST START WITH THIS. CAN YOU KIND OF TELL US JUST HOW YOU WERE HIRED AND ABOUT HOW LONG YOU WORKED FOR SEIU LOCAL 1107?

A I WAS HIRED THROUGH -- FIRST I WENT THROUGH AN INTERVIEW PROCESS. MY INTERVIEW WAS WITH MELODY RASH AND SHARON KISLING. AND THEN I HAD WHAT WAS SUPPOSED TO BE A SKYPE INTERVIEW WITH LA NITA TROYANO THAT WAS SCHEDULED FOR A LATER DATE. THERE WERE PROBLEMS WITH SKYPE, AND WE JUST HAD A TELEPHONE INTERVIEW.

I CAME IN FOR A BRIEF ORIENTATION AND CONTRACT SIGNING ON MAY 9TH OF THIS YEAR, WHICH WAS MY DAUGHTER'S BIRTHDAY. I KNOW THAT DATE. AND THEN I WASN'T ABLE TO

START ACTUALLY WORKING UNTIL -- I BELIEVE IT WAS THE 25TH. IT WAS LATER THAT MONTH. IT WAS A LITTLE LATER THAT MONTH. BUT AT THE ORIENTATION, THERE WAS MYSELF AND SOME OTHER INDIVIDUALS. WE SIGNED PAPERWORK. WE WENT OVER THE CONTRACT. THAT WAS PRETTY MUCH IT WITH THE HIRING.

I WORKED AT SEIU UNTIL AUGUST 10TH OF 2016 WHEN I RECEIVED AN E-MAIL LETTER FROM CHERIE MANCINI THAT SAID THAT I WOULD NO LONGER BE NEEDED AT THE HALL. I WAS ASKED TO DO WORK FOR SHARON KISLING AFTER THAT, WHICH WAS NOT UNCOMMON FOR ME TO DO. AND I DID THAT FOR TWO WEEKS FOLLOWING THAT. I HAVE NOT RECEIVED A TERMINATION LETTER. SO I'M STILL NOT AWARE OF WHAT MY STATUS IS WITH SEIU, AND I HAVE NOT RECEIVED MY LAST CHECK. THAT WAS MY TERM AT SEIU LOCAL 1107.

Q YOU MENTIONED AN E-MAIL YOU RECEIVED. I THINK THAT WAS ONE OF THE DOCUMENTS --

OH, I NEED TO PROVIDE THEM TO YOU.

MS. WALFOORT: CAN YOU SHOW US WHICH ONE?

THE HEARING OFFICER: CHARGING PARTY, CHARGE 2, EXHIBIT 11.

(EXHIBIT ADMITTED.)

BY MS. KISLING:

Q OKAY. CAN YOU TELL ME SOME OF THE CIRCUMSTANCES AROUND THE DAY YOU RECEIVED THE DOCUMENT?

A THIS WAS RECEIVED ON THE DAY THAT THE PERSON IN THE E-MAIL, NATALIE CHANG PROVIDED HER TWO WEEKS' NOTICE. LATER IN THAT DAY, WE RECEIVED THIS E-MAIL. I WASN'T

AWARE THAT THE E-MAIL HAD WENT OUT. NATALIE HAD CALLED ME AND ASKED ME WHAT I THOUGHT ABOUT THE E-MAIL AS I WAS DOING WORK AT THE FRONT DESK. I DIDN'T KNOW ANYTHING ABOUT AN E-MAIL.

I SAW CHERIE LEAVE THE BUILDING ALREADY. I WAS SITTING AT THE FRONT DESK. SO SHE WENT AROUND THE BUILDING; SHE WAS PARKED IN THE FRONT. BUT I READ THE E-MAIL AFTER SHE LEFT. AND IT SAID THAT WE DON'T NEED TO COME BACK TO THE UNION HALL. NO DISCUSSION, IT WAS JUST AN E-MAIL. SO WE TOOK OUR PERSONAL BELONGINGS AND LEFT THAT DAY.

Q CAN YOU TELL ME YOUR EXPERIENCE THE THREE MONTHS YOU WERE THERE AT THE LOCAL IN TERMS OF WORK ENVIRONMENT?

A THE WORK ENVIRONMENT WAS -- I DON'T REALLY KNOW WORDS TO DESCRIBE IT BUT INTERESTING. I WAS NOT SURE AT TIMES WHAT IT WAS THAT I WAS SUPPOSED TO DO. SO I WOULD FIND THINGS TO DO. WHEN THERE WAS DIRECTION GIVEN ON WHAT TO DO, I WOULD DO THOSE THINGS AND TRY TO PUT MY OWN PERSONAL SPIN ON IT. I HAVE TO SAY THAT THERE WAS A FEAR OF NOT HAVING A JOB OR BEING LET GO AS THERE WERE OTHER PEOPLE THERE WHEN I FIRST BEGAN -- AS I STATED, THERE WERE OTHER MEMBERS IN THAT ORIENTATION WITH MYSELF. ONE PERSON WAS LET GO BECAUSE OF HER ATTITUDE OR BECAUSE SHE -- IT WAS PUT TO US BECAUSE OF HER ATTITUDE.

THE HEARING OFFICER: SHARON, WHAT PARTICULAR CHARGE ARE YOU PULLING TESTIMONY FOR?

MS. KISLING: CONDUCT UNBECOMING OF A MEMBER, 3

AND ALSO 6.

MS. WALFOORT: SUBSECTION 3, SUBSECTION 6 IN THE CHARGE?

MS. KISLING: YES, SUBSECTION 3 AND SUBSECTION 6.

THE WITNESS: SHOULD I CONTINUE?

BY MS. KISLING:

Q SO TO BE MORE SPECIFIC, WERE THERE ANY OCCASIONS WHERE -- WERE THERE ANY OCCASIONS WHERE TOPICS WERE DISCUSSED IN FRONT OF YOU AS AN EMPLOYEE THAT YOU MAY OR MAY NOT HAVE CONSIDERED TO BE APPROPRIATE IN REGARDS TO, LET'S SAY, MEMBERS OF THE EXECUTIVE BOARD OR OTHER MEMBERS?

A YES. THERE WAS. KIND OF TIED IN A LITTLE WITH WHAT I WAS SAYING, THAT AFTER THAT EMPLOYEE WAS LET GO, WE ALL JUST TRIED TO HAVE GOOD ATTITUDES OR WHAT WAS PERCEIVED AS GOOD ATTITUDES. SO WE TRIED NOT TO SAY MUCH AND DO AS WE WERE TOLD TO DO. BUT WHEN THERE WERE CONVERSATIONS -- AND I DID ONE TIME TRY TO EXPLAIN A SITUATION THAT WAS HAPPENING WHERE SHARON HAD CALLED ON THE PHONE AND WAS UPSET ABOUT WHAT ANOTHER DIRECTOR THERE WAS DOING OR WAS NOT DOING AND THE HELP THAT SHE NEEDED WITH STUFF OR WHATEVER IT WAS SHE WAS TO DO. IT WAS THE COMMUNICATIONS DIRECTOR, DANA, AND SHE NEEDED HELP WITH SOMETHING, SOME PRETTY BASIC THINGS, AND THEN CHERIE WAS ASKED TO GET ON THE PHONE.

AND BOTH MYSELF AND THE OTHER PERSON UP FRONT, WE WERE SITTING UP FRONT, AND AS I HAD SHARON ON HOLD, I

WAS SAYING TO CHERIE WHO WAS SAYING THAT SHARON IS OVERREACTING, "THIS IS BEING TOO MUCH. SHE'S DOING TOO MUCH. I DON'T UNDERSTAND WHAT THIS IS ABOUT." AND THIS IS AT THE VERY FRONT OF THE BUILDING.

AND I SAID, "WELL, THERE IS A VALID POINT BECAUSE THIS NEEDS TO BE DONE. I COULD SHOW HER HOW TO DO IT." AND I WAS TOLD IMMEDIATELY TO MIND MY OWN BUSINESS. AND AFTER THIS, THAT'S WHEN THINGS STARTED TO -- NOT PROVIDE OFFICERS DIFFERENT DOCUMENTS, INFORMATION. I DID HEAR OTHER NEGATIVE STUFF ABOUT MEMBERS, ABOUT BOARD MEMBERS.

I DON'T THINK THERE WERE A LOT OF THINGS THAT WERE OFF LIMITS THAT WERE THERE. BUT AFTER BEING TOLD TO MIND MY OWN BUSINESS TRYING TO CHIME IN ON SOMETHING OR PROVIDE REASON OR UNDERSTANDING, I JUST DIDN'T SAY ANYTHING ELSE ABOUT ANYTHING.

Q OKAY. ARE YOU AWARE OF A TIME WHERE STAFF WERE DIRECTED TO BREAK INTO AN OFFICE THAT WAS ASSIGNED TO MYSELF, SHARON KISLING?

A YES, I WAS.

Q CAN YOU TELL ME QUICKLY WHAT OCCURRED OR YOU OBSERVED OR HEARD?

A AFTER I WAS MOVED FROM FRONT DESK BACK TO AN OFFICE I SHARED WITH NATALIE, IT WAS IN THE VICINITY OF WHERE SHARON'S OFFICE WAS AT, AND THE DOOR WAS LOCKED, AND I SAW JAVIER TRYING TO GET INTO THE OFFICE AND, LIKE, LOOKING AT THE CEILING, LOOKING AT THE DOOR, LOOKING AT DIFFERENT THINGS AND TRYING TO GET THINGS TO STAND ON TO

DO THINGS. AND I ASKED, "WHAT'S HAPPENING? WHAT'S GOING ON?" AND I KNEW HE WAS TRYING TO GET IN THERE.

AND HE SAID PETER NEEDED SOMETHING FROM THE OFFICE. AND I WENT AND ASKED IF PETER CALLED SHARON OR ANYONE ASKED SHARON FOR THE KEY, OR WHERE WAS THE KEY. BECAUSE WE HAD MASTER KEYS. AND THEY SAID SHARON HAD THE MASTER KEY OR NO ONE ELSE HAD THE KEY.

BUT I WAS ACTUALLY CONCERNED BECAUSE JAVIER WAS GETTING ON A DESK AND TRYING TO STACK THINGS UP. I'M LIKE, "THAT'S DOING A LOT. YOU MIGHT GET HURT DOING THAT. DID ANYONE ASK FOR A KEY OR CALL AND ASK FOR A KEY?" THEY SAID "NO."

BUT IT WAS AROUND THE TIME THAT I HAD TO LEAVE FOR THE DAY, SO AS I WAS LEAVING, THEY WERE STILL TRYING TO GET INTO THE OFFICE. AND I JUST LEFT IT AT THAT. BUT I DID ASK WHY DIDN'T SOMEONE CALL INSTEAD OF GOING THROUGH ALL OF THIS TO TRY TO GET INTO THE OFFICE. THAT WAS MY KNOWLEDGE OF THAT DAY.

Q I HAVE A STATEMENT HERE THAT WAS -- I'M NOT SURE WHICH --

THE HEARING OFFICER: SO I WANT TO ASK THE WITNESS BEFORE WE MOVE ON, WHAT DO YOU KNOW ABOUT WHAT CHERIE KNEW ABOUT THIS? BECAUSE I HAVEN'T HEARD ABOUT THAT.

THE WITNESS: CHERIE WAS IN THE HALL. THERE WAS A COMMON AREA IN THE HALL. PETER WAS THERE. JAVIER WAS THERE. AND THEY WERE DISCUSSING -- BECAUSE I DID GO UP TO PETER AND ASK HIM, "WHAT IS IT YOU'RE TRYING TO GET

OUT OF THERE?" CHERIE WAS IN THE HALL AT THAT TIME, IN THE COMMON AREA. SHE WAS IN THE HALL AT THAT TIME WHEN I WAS ASKING QUESTIONS.

BEING DIRECTLY THERE, ME GOING TO ASK HER, "WHY ARE YOU LETTING PEOPLE DO THIS? WHY ARE PEOPLE ABOUT TO GET HURT?" I DIDN'T DO THAT BECAUSE I WAS TOLD TO MIND MY OWN BUSINESS. BUT WHEN SOMEONE'S SAFETY IS RIGHT THERE, I DID ASK THEM WHY THEY WERE -- THEY WERE STACKING DESK, MOP BUCKET, THINGS LIKE THIS, TRYING TO GET INTO AN OFFICE. SO I ASKED A QUESTION.

PETER WAS IN THE COMMON AREA. JAVIER WENT BACK IN THERE. BUT I ASKED PETER IF HE CALLED HER. HE SAID HE NEEDED SOMETHING IN THERE, AND HE SAID HE LEFT SOMETHING IN THERE, TRYING TO EXPLAIN WHY HE WAS TRYING TO GET IN THERE. BUT HE SAID THAT HE DIDN'T CALL HER. BUT CHERIE WAS THERE IN THE COMMON AREA.

(DISCUSSION HELD OFF THE RECORD.)

MS. WALFOORT: LET'S GO OVER QUICKLY WHAT NUMBERS.

MS. PURDIE: THE TIME SHEET E-MAIL IS CHARGING PARTY EXHIBIT 10, THE UNTIL FURTHER NOTICE E-MAIL IS CHARGING PARTY EXHIBIT 11, AND THE WITNESS STATEMENT DATED AUGUST 17TH, 2016, IS CHARGING PARTY EXHIBIT 12.

(EXHIBITS ADMITTED.)

BY MS. KISLING:

Q OKAY. SO I'M GOING TO ASK YOU TO QUICKLY SUMMARIZE WHAT OCCURRED AS TO WHY YOU MADE THIS WITNESS STATEMENT ON WEDNESDAY AUGUST 17TH.

A I MADE THIS STATEMENT AFTER A SITUATION AT THE UNION HALL WHERE THE POLICE WERE CALLED TO THE UNION HALL THAT DAY. SO I WANTED TO MAKE SURE THERE WAS AN ACCURATE RECORD OF MY VIEW OF THIS.

I'M SORRY? WHAT IS IT THAT YOU ARE ASKING ME TO EXPLAIN?

MS. MANCINI: IS THIS PART OF MY CHARGES?

MS. WALFOORT: IS IT PART OF YOUR CHARGES?

MS. MANCINI: YEAH. I WASN'T EVEN THERE ON THAT DAY, AUGUST 17TH.

THE HEARING OFFICER: THIS IS THE EVENT WITH PETER, THE STAFF ORGANIZING PERSON. SO CAN YOU TELL US WHAT THE RELEVANCY IS OF THIS, SHARON?

MS. KISLING: NOW I'M GETTING MYSELF CONFUSED. WE TALKED ABOUT SUBSECTION 3.

THE HEARING OFFICER: BUT PETER ISN'T CHARGED HERE.

MS. KISLING: NO. IT HAS NOTHING TO DO WITH PETER BEING CHARGED. IT HAS TO DO WITH THE "CONCERNS AND COMPLAINTS PROVIDED BY AT LEAST SEVEN FORMER EMPLOYEES REGARDING THE CONDUCT AND LACK OF PROFESSIONALISM." SO IF WE DON'T NEED HER TO SPEAK TO IT -- BUT THAT'S THE REASON WHY SHE WAS SPEAKING TO THE STATEMENT PROVIDED.

THE WITNESS: MY ONLY --

MS. KISLING: SORRY, HOLD ON ONE SECOND.

SO YOU SEE UNDER SUBSECTION 3, WHERE IT SAYS "STATEMENTS OF CONCERNS AND COMPLAINTS PROVIDED BY AT LEAST SEVEN FORMER EMPLOYEES," THAT'S ONE OF THE

STATEMENTS. SO SHE'S THE PERSON PROVIDING A STATEMENT. SO IF IT'S OKAY THAT IT'S IN THE RECORD -- SHE DOESN'T NEED TO CAPTURE THAT?

THE HEARING OFFICER: I DON'T HAVE A PROBLEM PUTTING IT IN THE RECORD. I'M NOT SURE OF THE RELEVANCE OF IT THOUGH.

MS. WALFOORT: BUT YOU ACKNOWLEDGE THIS IS A STATEMENT YOU MADE?

THE WITNESS: YES. I MADE THE STATEMENT.

MS. KISLING: BECAUSE IT'S CONDUCT UNBECOMING OF A MEMBER, THE BEHAVIOR OF PETER NGUYEN WAS CONDONED.

MS. WALFOORT: SO WE'LL HEAR MORE ON THAT TOMORROW. SO I THINK FOR NOW, YOU CAN SAY IT'S YOUR STATEMENT.

THE WITNESS: YES. IT'S MY STATEMENT. THE ONLY PART I THINK PERTAINED TO CHERIE WAS THAT PETER KEPT SAYING I WAS A TERMINATED EMPLOYEE, AND THERE WAS A LATER E-MAIL THAT CHERIE HAD SENT TO ME THAT ACKNOWLEDGED THAT I WAS STILL AN EMPLOYEE. AND I NEVER HAD AN UNDERSTANDING THAT I WAS NOT AN EMPLOYEE. AND THAT'S WHAT CAUSED A REALLY BIG PROBLEM HERE, THAT PETER STATED THAT I WAS NOT AN EMPLOYEE. THAT'S WHAT REALLY LED TO THIS BIG ESCALATION.

(DISCUSSION HELD OFF THE RECORD.)

BY MS. KISLING:

Q QUICKLY, YOU MENTIONED EARLIER ABOUT NOT RECEIVING PAY FOR WORK. SO THIS E-MAIL CAPTURED, I GUESS YOU SENT SOMETHING OVER TO FINANCE TO GET YOUR LAST PAY,

AND IT WAS A COMMUNICATION BETWEEN CHERIE AND I. SO THAT'S JUST PRESENTED FOR THE RECORD.

A THERE IS A SERIES OF E-MAILS BETWEEN MYSELF AND FINANCE, THE PERSON I KNEW DOING FINANCE, KEN UBANI, FOLLOWING UP ON MY PAY. THIS IS ONE OF THE ONES I SENT TO HIM. THIS WAS A FOLLOW-UP TO A CONVERSATION, AND HE ASKED ME TO PROVIDE THE TIME SHEET FROM THAT WEEK AS HE DIDN'T KNOW WHERE IT WAS OR SOMETHING OF THE SORT. AND THEN THE ONE I HAD GIVEN TO HIM, I ASKED HIM TO SEND ME BACK A COPY OF THAT. BECAUSE I WOULD USUALLY COPY IT. BUT THIS IS ONE OF THE FOLLOW-UPS THAT I MADE CONCERNING PAY.

Q AND DID YOU WORK THE HOURS REPORTED?

A YES.

Q AND HOW DID THAT AFFECT YOU BEING DENIED PAY THAT YOU EXPECTED?

A ONE THING THAT HAPPENED WAS I HAD A VERY LARGE NON-SUFFICIENT FUNDS FEE ON MY ACCOUNT, WHICH CAUSED A DOMINO EFFECT. I WORKED THE HOURS, SO I WAS ANTICIPATING BEING PAID FOR THE HOURS. SO I HAVE THINGS THAT I PAID. SPECIFICALLY THAT WAS FOR CHILD CARE OR OTHER BILLS. BUT THEY HAD TO COME OUT THROUGH AUTOMATIC PAYMENTS. SO IT REALLY DID AFFECT THAT WAY. MY HUSBAND HAD TO WORK EXTRA HOURS AND GET OTHER -- OTHER ELECTION-TYPE STUFF, POLITICAL EMPLOYMENT, AND GO OUT AND DO WALKING TO TRY TO DO MAKE UP FOR THE FUNDS THAT WEREN'T RECEIVED.

I PUT IN -- I THINK THE CLAIM WAS WITH THE BOARD OF COMMISSIONERS FOR THE PAYMENT NOT BEING

RECEIVED. THAT WAS A WHOLE PROCESS. THERE WAS A LOT OF HITTING WALLS WITH THAT, SUBMIT, RESUBMIT, SUBMIT, RESUBMIT. BUT I DID LEARN THAT THEY RECEIVED EVERYTHING ON THE UNION SIDE FROM SPEAKING WITH MR. UBANI, WHICH I DID FOLLOW-UP WITH E-MAIL AS WELL.

BUT IT DID CAUSE ME PROBLEMS BECAUSE I HAVE NOT RECEIVED THE PAY. HALF OF THE PAY WAS RECEIVED. THE OTHER HALF I AM STILL WAITING. IT IS THE END OF OCTOBER.

THE HEARING OFFICER: SHARON, YOU ARE AT ABOUT 15 MINUTES.

MS. KISLING: WE ACTUALLY CUT OFF TWO OF MY WITNESSES. THAT'S WHY -- THEY'LL TAKE A LITTLE MORE TIME.

THE HEARING OFFICER: SO YOU ARE DOWN TO FOUR?

MS. KISLING: RIGHT. LOOK HERE, I'M GOING TO -- IS THIS CHARGING PARTY 2?

MS. PURDIE: THAT BIG ONE, YES.

MS. KISLING: OKAY. AND THEN EXHIBIT 4.

MS. WALFOORT: ARE YOU TALKING ABOUT A DOCUMENT WITHIN THAT DOCUMENT -- OH, I SEE, EXHIBIT 4 WITHIN THAT DOCUMENT. OKAY.

BY MS. KISLING:

Q EARLIER, WE WERE TALKING ABOUT YOUR OBSERVATION OF THE BREAK-IN. CAN YOU READ THAT E-MAIL?

A "EFFECTIVE IMMEDIATELY, MUTUAL RESPECT, CONSIDERATION, AND COURTESY ARE TRADITIONAL AT SEIU AND ARE EXPECTED OF EVERY MEMBER OF ITS STAFF.

"IF YOU NEED SOMETHING OUT OF ANOTHER PERSON'S

OFFICE, YOU NEED TO CONTACT THAT PERSON DIRECTLY AND BE GRANTED PERMISSION BEFORE ENTERING THAT OFFICE.

"IF THE PERSON WHO THE OFFICE BELONGS TO IS NOT AVAILABLE, YOU MAY CONTACT THE PRESIDENT.

"IF YOU HAVE QUESTIONS, PLEASE LET ME KNOW. CHERIE MANCINI."

MS. WALFOORT: AND THAT WAS WHICH EXHIBIT?

MS. KISLING: 4.

THE HEARING OFFICER: AND WHICH PAGE OF 4?

MS. PURDIE: SECOND TO THE LAST PAGE.

MS. WALFOORT: "EFFECTIVE IMMEDIATELY"?

MS. KISLING: YES.

THE HEARING OFFICER: OKAY.

BY MS. KISLING:

Q AS A RESULT OF YOUR EMPLOYMENT, HAVE YOU TAKEN ANY LEGAL ACTION AGAINST SEIU?

A I WENT TO A COUPLE OF BOARDS TO FILE CLAIMS, CHARGES, COMPLAINTS. I'M NOR SURE EXACTLY WHICH BOARDS, WHICH DATES, WHICHEVER WAY. BUT I WENT TO FILE SOME COMPLAINTS. I TRIED TO HOLD OFF ON OBTAINING A LAWYER. I WANTED TO SEE HOW THE BOARDS PURSUE THE SITUATION.

Q SO QUICKLY, SORRY, CHARGING PARTY EXHIBIT 2 AND THIS IS UNDER EXHIBIT 2, EXHIBIT 2, PAGE 3 -- OR NO, STARTS ON PAGE 2, RIGHT? STARTS ON PAGE 2.

MS. MANCINI: EXHIBIT 1, PAGE 2?

MS. KISLING: EXHIBIT 2, PAGE 2.

BY MS. KISLING:

Q SO IS THAT YOUR CHARGE AGAINST THE EMPLOYER,

NLRB?

A YES, IT IS.

Q AND ON PAGE 3, IS THAT A NOTIFICATION OF WAGE CLAIM, OFFICE OF LABOR COMMISSIONER?

A YES.

MS. KISLING: OKAY. I THINK THAT'S EVERYTHING.

MS. MANCINI: IS THAT ALL?

MS. KISLING: YEP.

THE HEARING OFFICER: NO FURTHER QUESTIONS. SO CROSS-EXAMINATION.

EXAMINATION

BY MS. MANCINI:

Q CHRISTINA, CAN YOU TELL ME HOW YOU KNOW SHARON KISLING?

A WORK AT THE COUNTY.

Q ARE YOU IN OTHER OUTSIDE ACTIVITIES TOGETHER?

A WE BOTH BELONG TO AN INTERNATIONAL SORORITY, WHICH THERE ARE HUNDREDS OF THOUSANDS OF MEMBERS. WE'RE NOT IN THE SAME CHAPTER, NOR HAVE EVER BEEN. BUT I DO KNOW HER FROM THE COUNTY. I DID FIND OUT SHE'S A MEMBER OF MY SORORITY AS WELL.

Q IS THERE AN OATH THAT YOU TAKE FOR THAT SORORITY?

A THERE'S AN OATH. IT DOESN'T EXTEND TO OTHER MEMBERS. BUT THERE IS AN OATH.

Q YOU DON'T SWEAR TO PROTECT EACH OTHER?

A I CAN'T RECALL THE OATH SPECIFICALLY, BUT I

DON'T THINK THAT THAT'S --
Q NO PROBLEM. WHEN YOU WERE HIRED, WHAT CAPACITY WERE YOU HIRED IN?
A INTERESTING ENOUGH, THE HIRE LETTER SIGNED BY YOU SAID "ORGANIZER," WHICH I HAD DONE MAYBE ONCE OR TWICE WHILE I WAS THERE. BUT I WAS ACTUALLY INTERVIEWED FOR A NUMBER OF POSITIONS. BUT THE OFFER LETTER SAID "ORGANIZER."
Q WHAT I MEANT, "CAPACITY," I MEANT WERE YOU FULL TIME?
A OH, SORRY. I WAS A PART-TIME EMPLOYEE THEN.
Q PART TIME MEANING -- WERE YOU GUARANTEED ANY HOURS?
A YES, I WAS. THEY TOLD ME THEY WON'T GO OVER 25.
Q BUT YOU WEREN'T GUARANTEED ANY HOURS. IT DIDN'T SAY YOU WOULD HAVE 25 HOURS A WEEK.
A I WOULD HAVE TO LOOK AT MY CONTRACT AGAIN. MY UNDERSTANDING WAS THAT I WOULD WORK 25 HOURS A WEEK DURING MY EMPLOYMENT.
Q OKAY. LET ME REPHRASE --
MS. KISLING: WELL, I'M NOT SURE WHAT THAT HAS TO DO WITH THE SUPPORT SHE WAS GIVING TO --
MS. MANCINI: EXCUSE ME. I'M REBUTTING. I'M ASKING A QUESTION.
MS. WALFOORT: SHARON, YOU REALLY CAN'T INTERRUPT HER.
BY MS. MANCINI:

Q THE QUESTION I HAVE IS WHEN YOU WERE INTERVIEWED, WERE YOU INTERVIEWED FOR A -- I WAS TOLD YOU WERE INTERVIEWED FOR A PART-TIME POSITION. AND IN THE COUNTY, WHAT DOES A PART-TIME POSITION CONSTITUTE?

A A PART-TIME POSITION IN THE COUNTY, NO MORE THAN 20 HOURS. BUT I DIDN'T INTERVIEW FOR THE COUNTY. I INTERVIEWED --

Q RIGHT. BUT SHARON IS THE ONE WHO INTERVIEWED. SHE HAD A PORTION OF THE INTERVIEW.

A IN ALL ACTUALLY, MELODY RASH CONDUCTED MOST OF MY INTERVIEW. SHARON WAS THERE. SHE WAS DOCUMENTING, TAKING NOTES. BUT I WAS INTERVIEWING FOR SEIU. AND IN THE INTERVIEW, THE HOURS WEREN'T REALLY MENTIONED, HOW MANY HOURS IT WOULD BE. A RANGE WAS GIVEN BECAUSE IT WAS PART TIME.

I CAN'T RECALL WHAT THE RANGE WAS IN THE INTERVIEW, BUT UPON RECEIVING A LETTER, IT WAS MY UNDERSTANDING THAT IT WAS NO MORE THAN 25 HOURS.

Q BUT IT WASN'T GUARANTEED 25?

A I DON'T KNOW WHAT THE CONTRACT SAID. I JUST REMEMBER MY UNDERSTANDING. I'M SORRY.

Q OKAY. CAN YOU ALSO TELL ME WHILE YOU WERE THERE, AND I DO RECALL THE INCIDENT WITH DANA, CAN YOU TELL ME PRETTY MUCH WHETHER IT'S TRUE EVERY SINGLE DAY SHARON WOULD CALL YOU AND CALL THE OTHERS TO SEE WHAT WAS HAPPENING IN THE UNION HALL?

A I CAN'T SAY IT HAPPENED EVERY DAY BECAUSE I WASN'T AT THE UNION HALL EVERY DAY. BUT WHILE I WAS

THERE, SHE DID CALL TO CHECK AND SEE IF WE WERE BUSY DOING THING TO ASSIST HER ON THINGS SHE WAS DOING AS WELL.

Q AND THE CONVERSATION WE HAD IN REGARDS TO DANA WAS BASICALLY A CONVERSATION THAT SHARON WAS HAVING -- SHE WAS HAVING DIFFICULTY GETTING WORK DONE FROM DANA. AND IS THAT TRUE?

A I BELIEVE THAT THAT WAS WHAT THE GIST OF THE CONVERSATION WAS ABOUT, YES.

Q OKAY. AND I'M SORRY, YOU WILL HAVE TO REITERATE TO ME EXACTLY WHAT IT WAS I SAID TO YOU.

A AFTER THE CALL?

Q YES.

A YOU TOLD ME TO MIND MY OWN BUSINESS.

Q I BELIEVE I SAID, "DON'T GET INVOLVED," IS WHAT I SAID.

A I THOUGHT IT WAS MIND MY OWN BUSINESS.

Q I'M NOT A PERSON TO SAY, "MIND YOUR OWN BUSINESS." AT ANY RATE, THAT'S AN INTERPRETATION OF CONVERSATION APPARENTLY.

THE BREAK-IN IN PETER'S OFFICE, WERE YOU AWARE THAT WAS PETER'S OFFICE BEFORE SHARON TOOK IT OVER?

A YES, I WAS.

Q AND THAT SHARON HAD MOVED PETER'S THINGS FROM THAT OFFICE?

A I HEARD THAT THINGS WERE MOVED OUT ALREADY BEFORE SHE WENT IN THERE. BUT I WASN'T THERE FOR THINGS BEING MOVED.

Q WERE YOU AWARE THAT HE WAS TRYING TO GO TO A TRAINING THE NEXT DAY IN ELKO AND WAS TRYING TO GET SOME OF HIS THINGS OUT OF THE OFFICE THAT HE DIDN'T KNOW WHERE THEY WERE BECAUSE HE WASN'T NOTIFIED?

A I WAS AWARE THAT PETER WAS LOOKING FOR A LAPTOP CORD THAT HE TOLD ME HE WAS LOOKING FOR.

Q OKAY. IN THE UNION HALL IN THE COMMON AREA, THE OFFICE THAT YOU REFERRED TO AS SHARON'S, CAN IT EVEN BE SEEN FROM OVER PROBABLY THREE QUARTERS OF THE UNION HALL? CAN YOU SEE DOWN THE HALLWAY TO SEE SHARON'S OFFICE?

A IN THE BEGINNING PART OF THE COMMON AREA, YOU CAN. BUT THE CONVERSATION I WAS HAVING WITH PETER WHEN JAVIER WAS THERE WAS IN THE COMMON AREA.

Q DID YOU PHYSICALLY SEE ME WHILE THIS WAS GOING ON?

A YES, I DID. IN THE COMMON AREA.

Q OKAY. SO DID YOU COME TO ME AND TELL ME ANYTHING THAT WAS HAPPENING?

A AS I STATED BEFORE, I DID NOT.

Q OKAY. BUT YOU WERE CONCERNED THAT SOMEONE MIGHT GET HURT?

A I WAS CONCERNED THAT JAVIER WOULD GET HURT. AND THAT'S WHY I WENT TO JAVIER WITH THE CONCERN. AND HE SAID PETER WANTED SOMETHING OUT OF THE OFFICE. AND I ASKED PETER IF HE HAD THE KEY.

Q IN RESPECT TO THE E-MAIL THAT WAS SENT TO YOU ON AUGUST 10TH THAT STATED THAT BOTH YOU AND NATALIE

WOULD NOT NEED TO REPORT TO WORK UNTIL FURTHER NOTICE; IS THAT CORRECT?
A YES.
Q OKAY. WHEN I WAS ON VACATION, VICE PRESIDENT KISLING, DID SHE REQUEST YOU TO COME AND WORK FOR HER?
A SHE DID.
Q FOR THE WEEK THAT YOU WORKED, WERE YOU PAID?
A I WORKED TWO WEEKS.
Q FOR THE WEEK THAT VICE PRESIDENT KISLING CALLED YOU TO WORK, WERE YOU PAID WHILE I WAS ON VACATION?
A NO. AS I WAS SAYING, I WORKED TWO WEEKS.
Q WERE YOU PAID FOR THE WEEK THAT YOU -- WERE YOU PAID FOR THE WEEK THAT VICE PRESIDENT KISLING ASKED YOU TO WORK?
A I'M SORRY? I DON'T UNDERSTAND. BECAUSE THERE WAS TWO WEEKS.
MS. WALFOORT: I THINK SHE'S POINTING OUT THAT SHE --
MS. MANCINI: SHE DID WORK TWO WEEKS.
MS. WALFOORT: ALL RIGHT. SO ARE YOU ASKING HER TO FOCUS ON THE FIRST WEEK?
MS. MANCINI: YES.
BY MS. MANCINI:
Q THE WEEK THAT SHARON ASKED YOU TO WORK WHILE I WAS ON VACATION, WERE YOU PAID FOR THAT?
A WHEN I RECEIVED THE CHECK, IT DID NOT SAY FOR WHICH PAY PERIOD. BUT I KNOW I RECEIVED ONE CHECK, WHICH I SPOKE WITH KEN UBANI ABOUT IT.

Q SO YOU DON'T KNOW WHICH WEEK YOU WERE PAID FOR?
A IT DIDN'T HAVE THE PAY PERIOD ON THE CHECK WHERE THEY USUALLY DO.
Q WERE YOU PAID THROUGH ADP?
A I'M SURE THAT I WAS. THAT'S WHERE THE UNION HALL CHECKS --
Q IT DOESN'T STATE THE PAY PERIOD ENDING, WHICH STATES IT RIGHT HERE?
A MAY I SEE IT? I DID NOT SEE THAT ON THERE.
Q SURE. "PAY PERIOD ENDING" AND "PAY DATE" IS RIGHT ON IT. IT'S RIGHT HERE.
A I'M SORRY, BUT THE DATES WERE IN AUGUST, SO THAT WAS THAT CURRENT WEEK. SO THERE WASN'T THE PAY PERIODS WHEN I WORKED, AND THAT'S WHAT I WAS SAYING.
MS. WALFOORT: I THINK, FOR THE RECORD, WHAT I THINK, CHERIE, YOU ARE SHOWING HER IS A PAYCHECK FROM ADP?
MS. MANCINI: FROM THE UNION HALL.
MS. WALFOORT: FROM THE UNION HALL SHOWING, IN THIS CASE, A PERIOD ENDING AND PAY DATE, BUT NOT ON THE --
THE WITNESS: RIGHT. BUT ON THE CHECK THAT I SAW, THERE WEREN'T THE PAY PERIODS THAT I WORKED. AND I DIDN'T KNOW WHICH IT WAS FOR. I KNEW IT WAS A CHECK THAT WAS SENT OUT, BUT IT WASN'T FOR ANY OF THE WEEKS THAT I WORKED.
BY MS. MANCINI:
Q SO WHEN YOU FILED WITH THE LABOR COMMISSION,

WHICH WEEK DID YOU FILE FOR?
A I FILED FOR BOTH.
Q SO YOU WEREN'T PAID FOR EITHER?
A I WAS PAID FOR ONE.
Q OKAY. SO THE WEEK THAT YOU WERE PAID FOR -- AND I KNOW WHICH WEEK YOU WERE PAID FOR. YOU WERE PAID THE WEEK THAT I WAS ON VACATION AND THAT SHARON KISLING GAVE YOU DIRECTION.
A OKAY.
Q WHEN I CAME BACK FROM VACATION, DID SHARON KISLING CONTINUE TO DIRECT YOU TO DO WORK FOR HER?
A WELL, I WASN'T AT THE HALL WHEN YOU CAME BACK. BUT IF YOU WERE BACK ON THAT --
Q ON THE FOLLOWING WEEK, DID SHE INSTRUCT YOU TO DO WORK FOR HER?
A IF YOU WERE BACK THE FOLLOWING WEEK, THEN, YES, I WAS INSTRUCTED TO DO WORK.
Q OKAY. AND THAT WAS EVEN WITH THE REITERATION OF KNOWING THAT I HAD STATED THAT YOU SHOULD NOT COME BACK TO THE UNION HALL UNTIL FURTHER NOTICE?
A WHAT DO YOU MEAN BY "REITERATION"? SOMETHING ADDITIONAL TO THE E-MAIL?
Q I'LL STRIKE "REITERATION."
EVEN WITH THE E-MAIL THAT WAS SENT TO YOU ON THE 10TH?
A WITH THE E-MAIL SENT TO ME ON THE 10TH, I TOOK IT AS TIMES BEFORE. BECAUSE THERE WERE TWO OTHER TIMES WHERE YOU TOLD ME THAT YOU DIDN'T NEED ME AT THE UNION

HALL, AND THEN SHARON SAID THAT SHE NEEDED ME, AND THEN I WAS THERE. ONE TIME IN SPECIFIC WAS WHEN THE CALL BANKING NEEDED TO BE MADE TO ALL MEMBERS FOR MEMBERSHIP MEETING. AND THE OTHER TIME WAS FOR CALL BANKING FOR UMC.

SO TO ME, THIS WAS SOMETHING THAT WAS COMMONLY DONE AND SOMETHING YOU DIDN'T HAVE A PROBLEM WITH UNTIL I WAS NEEDED BACK AT THE HALL.

Q YOU WERE GIVEN AN OFFICIAL SOMETHING IN WRITING?

A NO. WHEN THE PHONE BANKING NEEDED TO BE DONE, YOU REQUESTED THAT I CALLED YOU ON YOUR PHONE WHEN I WAS HEADED OVER TO WORK WITH SHARON AS YOU HAD ALREADY KNOWN AND TOLD ME THAT I WAS NEEDED BACK AT THE HALL, EVEN THOUGH THE PRIOR DAY, YOU TOLD ME I WAS NOT NEEDED AT THE HALL.

Q SO DID YOU TAKE DIRECTION SPECIFICALLY FROM SHARON?

A MOST OF THE TIME, JUST SOMEONE WAS TELLING ME WHAT IT WAS TO DO, AND I WAS DOING WHAT I NEEDED TO DO OR WHAT I WAS TOLD TO DO.

MS. MANCINI: CAN I ENTER THIS EXHIBIT, AN E-MAIL. I'M NOT SURE IF THIS WITNESS IS AWARE OF IT. BUT IT'S SHARON KISLING ADDRESSING THAT SHE NEEDS TO HAVE AN EXECUTIVE ASSISTANT.

MS. PURDIE: LET'S MARK THEM. GIVE ME A SECOND.

MS. THOMAS: EXCUSE ME. WE HAVE GOT A

QUESTION. IS THIS PERTINENT TO WHAT SHARON HAD ALREADY -- YOU KNOW, IS THIS A CROSS? OR IS THIS NEW CHARGES THAT PRESIDENT MANCINI IS PUTTING FORTH RIGHT NOW?

MS. MANCINI: I'M PROVIDING DOCUMENTATION TO SHOW THIS EMPLOYEE TOOK DIRECTION FROM SHARON KISLING. AND BASED UPON THIS PREVIOUS E-MAIL FROM JULY 15TH, WHICH WAS TWO WEEKS INTO OUR -- AFTER OUR ELECTION, IT WAS BASICALLY STATING THAT SHE NEEDED AN EXECUTIVE ASSISTANT. SO I'M TRYING TO MAKE THE CONNECTION HERE.

MS. THOMAS: THERE IS NO CONNECTION.

MS. WALFOORT: WE CAN'T TESTIFY FOR HER. WE'RE ALL HAVING TROUBLE AT THIS POINT WONDERING HOW FAR THIS IS GOING TO GO. WE'RE GETTING A GENERAL SENSE OF --

MS. MANCINI: ONE LAST QUESTION.

MS. WALFOORT: CHERIE, CAN I FINISH MY THOUGHT?

MS. MANCINI: YES, SORRY.

MS. WALFOORT: -- WHAT WENT ON WITH THIS PARTICULAR EMPLOYEE. AND I DON'T THINK IT'S SO RELEVANT TO WHAT WE'RE DOING HERE THAT WE NEED TO GO ON AND ON. SO MAYBE YOU CAN KIND OF BRING THIS TO A COMPLETION.

BY MS. MANCINI:

Q JUST A REAL QUICK QUESTION. IF THE NRLB FILED CHARGES AGAINST THE UNION HALL FOR SAYING IT WAS RETALIATION AGAINST YOU BASED UPON REDUCING YOUR HOURS DUE TO YOUR PROTECTED ACTIVITY, CAN YOU TELL ME WHAT THAT PROTECTED ACTIVITY IS?

A ON A DAY WHERE I HAD INTERVIEWED FOR A

POSITION, A FULL-TIME POSITION, OPENING AT THE UNION HALL, I WENT -- AFTER THE INTERVIEW, I WENT AND SPOKE WITH MELODY RASH. AND I WAS ASKING HER QUESTIONS ABOUT ANY TYPE OF PROTECTIONS OR ANYTHING THAT'S THERE FOR PART-TIME EMPLOYEES, SINCE I FELT I WAS NOT GOING TO GET A FULL-TIME POSITION OR ANY FULL-TIME POSITION REGARDLESS OF WHAT WAS TOLD TO ME BY PEOPLE AT THE UNION.

SO SHE TOLD ME THAT THERE IS A STAFF UNION, AND THAT THEY DON'T INCLUDE PART-TIME EMPLOYEES, BUT SHE WOULD TALK AND SEE WHAT THEY THOUGHT ABOUT THAT. AND I SAID, "OKAY. BECAUSE I WOULD LIKE TO KNOW WHAT PROTECTIONS PART-TIME EMPLOYEES HAVE. BECAUSE IT DOESN'T SEEM LIKE WE HAVE MANY." AND NOT TOO LONG AFTER THAT, I WAS SENT AN E-MAIL AT THE FRONT DESK, TELLING ME NOT TO RETURN.

Q OKAY. SO DID YOU EVER GET CONFIRMATION THAT A PART-TIMER WOULD BE INCLUDED IN THE UNION?

A I WASN'T ABLE TO FOLLOW BACK UP WITH HER.

Q OKAY. MELODY -- DO YOU KNOW WHO IS THE OFFICERS FOR THE STAFF UNION?

A I DIDN'T KNOW THEN AT THE TIME. BUT I LATER AT THE NLRB, THEY ASKED ME IF JAVIER OR SUSAN -- AND THEN THERE WAS ANOTHER NAME THAT CAME UP THAT I WAS NOT FAMILIAR WITH. BUT I DID TELL THEM THAT I DID KNOW OF JAVIER AND SUSAN, THAT I THINK THEY WERE PART OF THE BARGAINING UNIT, AS I COULD SEE, WITH YOURSELF AND MS. KISLING.

Q BUT YOU WERE NEVER BROUGHT INTO THE BARGAINING?

A NO. I DIDN'T FOLLOW UP WITH HER.
MS. MANCINI: THANK YOU.

EXAMINATION

BY MR. SERRANO:
Q SO YOU ACCEPTED A PART-TIME POSITION?
A YES, I DID.
Q AND WAS THAT PART-TIME POSITION COVERED BY THE UNION?
A IT WASN'T MY UNDERSTANDING AT THE TIME THAT I ACCEPTED --
Q I'M SORRY. I DIDN'T MEAN TO CUT YOU OFF.
A THAT'S OKAY.
Q WAS THERE A PROBATIONARY PERIOD WHEN YOU APPLIED? WERE YOU WITHIN YOUR PROBATIONARY PERIOD?
A I DON'T RECALL THERE BEING A PROBATIONARY PERIOD FOR PART-TIME EMPLOYEES. BUT I'M NOT SURE WHAT IT WAS, IF THERE WAS ONE.
Q HAVE YOU -- WERE YOU TERMINATED FROM THE POSITION?
A I HAVE NOT RECEIVED A LETTER OF TERMINATION. SO I'M NOT SURE.
Q SO YOU'RE STILL ON THE BOOKS THEN?
A I WOULD EXPECT TO BE.
Q OKAY. SO THE ONLY CHARGES THAT YOU FILED WITH THE NLRB ARE CHARGES FOR THE FACTS THAT YOU'VE BEEN GIVEN A PART-TIME POSITION AND YOU THINK THAT IT'S SO THAT YOU WOULDN'T BE REPRESENTED? IS THAT THE GIST OF THE CHARGES

THAT YOU FILED?

A I'M SORRY? I DON'T --

Q YOU FILED CHARGES WITH THE NLRB, AND THOSE CHARGES ARE BECAUSE YOU WERE GIVEN A PART-TIME POSITION, AND YOU FEEL THAT IT WAS SO THAT YOU WOULDN'T BE REPRESENTED BY THE UNION?

A NO.

Q THAT YOUR HOURS WERE REDUCED SO YOU WOULD ONLY BE PART TIME?

A I FELT THEY WERE REDUCED. BUT I ALSO FELT THAT IT CAME AFTER I ASKED ABOUT PART-TIMERS BEING INCLUDED IN THE UNION. THAT WAS ALREADY THERE.

Q OKAY. BUT YOU HAD ACCEPTED A PART-TIME POSITION FROM THE BEGINNING?

A YES.

Q RIGHT? YOU HAD ACCEPTED A PART-TIME POSITION?

A YES. IT WAS A PART-TIME POSITION. I ASKED ABOUT PART-TIMERS BEING INCLUDED IN A UNION. AND THEN SOON THEREAFTER, MY HOURS WERE REDUCED OR CUT OFF OR HOWEVER YOU WOULD LIKE TO CALL IT. AND THAT WAS MY BASIS FOR --

Q YOU WERE NOTIFIED THAT YOU WERE NOT NEEDED UNTIL FURTHER NOTICE?

A YEAH.

Q SO YOU WEREN'T TERMINATED, YOU WERE JUST NOTIFIED THAT YOU WEREN'T NEEDED?

THE HEARING OFFICER: I'M JUST GOING TO SUGGEST, IF YOU HAVE A DIFFERENT QUESTION, I WOULD ASK

YOU TO ASK THAT. BECAUSE THE QUESTION YOU ARE ASKING HAS BEEN ASKED AND ANSWERED. AND WE'RE WAY BEYOND THE TIME LIMIT FOR THIS PARTICULAR WITNESS. AND IF THERE IS SOMETHING RELEVANT THAT NEEDS TO COME OUT, PLEASE ASK IT VERY QUICKLY AND MOVE ON.

MR. SERRANO: I WAS TRYING TO UNDERSTAND. IT JUST WASN'T MAKING SENSE. OKAY.

EXAMINATION

BY MS. SPRINGER:

Q HI, CHRISTINA. I JUST HAVE A COUPLE OF QUICK QUESTIONS. WHO USUALLY SIGNED YOUR TIME CARDS? AND HOW MANY TIME CARDS DID YOU HAVE WHILE YOU WORKED AT SEIU?

A I DON'T KNOW THE EXACT NUMBER OF TIME CARDS. I DID KEEP LOGS OF THEM. SO I COULD GET BACK TO YOU WITH THAT NUMBER, IF YOU WOULD LIKE ME TO.

Q WHO NORMALLY SIGNED?

A LA NITA TROYANO OR CHERIE MANCINI, WHO WERE REGULARLY AT THE HALL, WOULD SIGN MY TIME SHEETS.

Q OKAY. AND WHY LA NITA?

A I THINK LA NITA IS A LEAD. I WAS TOLD THAT I REPORTED TO LA NITA WHEN I FIRST STARTED THERE. BUT IT WAS ACTUALLY VERY CONFUSING ON WHO I ACTUALLY REPORTED TO. I ASKED WHO CAN SIGN IT, AND THEY SAID, OH, THAT PERSON CAN SIGN IT. SO I WENT TO HER. AND THEN CHERIE SIGNED THEM A COUPLE OF TIMES. SHE'S THE PRESIDENT.

Q IS THAT ALL WHO SIGNED YOUR TIME CARDS?

A SHARON SIGNED MY TIME CARD.

Q OKAY. WAS SHARON AUTHORIZED TO SIGN YOUR TIME CARD?

A I'M NOT SURE IF SHE'S AUTHORIZED. BECAUSE THAT WASN'T ANY POLICY AND PROCEDURES GIVEN TO ME ON WHO'S AUTHORIZED TO SIGN THEM.

Q AND HOW MANY OF THESE TIME CARDS DO YOU THINK SHARON SIGNED FOR YOU?

A I KNOW SHE SIGNED THE ONES WHEN CHERIE WAS GONE. SHE SIGNED THAT ONE. AND THEN THE FOLLOWING WEEK WHEN I WAS WORKING FOR HER. BECAUSE I DIDN'T COME BACK INTO THE UNION HALL AFTER THE POLICE INCIDENT.

MS. SPRINGER: JUST FOR THE RECORD, I DO NOT BELIEVE THAT SIGNING A TIME CARD IS PART OF VICE PRESIDENT'S DUTIES. AS EXECUTIVE VICE PRESIDENT, ON PAGE 11, THERE ARE THE DUTIES RIGHT THERE OF OUR CONSTITUTION AND BYLAWS.

MS. THOMAS: SO ARE WE TESTIFYING?

MS. WALFOORT: NO. WE ARE NOT TESTIFYING. YOU REALLY SHOULD PUT THAT IN YOUR CLOSING ARGUMENTS.

BY MS. SPRINGER:

Q I JUST HAVE ONE MORE QUESTION. WHEN YOU WERE AT THE HALL, WERE OFFICES ROUTINELY LOCKED?

A I KNOW THAT HER OFFICE WAS LOCKED. I THINK THAT CHERIE'S OFFICE MAY HAVE BEEN LOCKED WHEN SHE WASN'T THERE. I DON'T HAVE ANY BUSINESS IN THE OFFICE. I DON'T GO INTO THE OFFICE.

THE FINANCE OFFICE HAD LIKE A -- WHAT DO YOU CALL IT -- A SELF-CLOSING LOCK, LIKE AS SOON AS YOU CLOSE

THE DOOR, IT WOULD LOCK. THERE WAS ANOTHER OFFICE IN THE BACK LOCKED. BUT TOWARD THE END OF ME BEING THERE, THE DOORS MIGHT HAVE BEEN LOCKED, CLOSED. I'M SORRY, AM I ANSWERING THE QUESTION?

Q I WOULD JUST LIKE TO KNOW. YOU SAY YOU WERE IN THE COMMON AREA A LOT OF THE TIMES. AND ARE MOST OF THE OFFICES THERE OPEN OR CLOSED AND LOCKED?

A IF THE PERSON IS NOT IN THE OFFICE, THEY'RE MOSTLY CLOSED. I WOULD ASSUME THEY'RE LOCKED. I'M NOT SURE IF THEY WERE LOCKED. I WASN'T GOING TO CHECK IF THEY WERE LOCKED.

Q DO YOU KNOW IF THERE IS A MASTER KEY TO ALL THE DOORS IN THAT UNION HALL?

A I FEEL THAT THERE IS ONE. BECAUSE JENNY WAS ASSIGNED. SHE HAD A KEY IN HER OFFICE THAT OPENED ANOTHER DOOR, IT WASN'T AN OFFICE; IT WAS LIKE A STORAGE ROOM. AND EITHER IT WAS A LOCKBOX THAT HAD TO BE OPENED THAT HAD A NUMBER OF KEYS IN IT. BUT THERE WAS A KEY THAT OPENED -- LIKE, YOU COULD GET A KEY.

Q MY QUESTION WOULD BE, IF JENNY HAD THE KEY, THEN WHY COULDN'T THE KEY BE USED TO GET INTO SHARON'S OFFICE? WAS THERE A KEY -- WAS THERE A KEY AVAILABLE TO USE, IS MY QUESTION?

MS. THOMAS: SHE CAN'T ANSWER THAT. HOW WOULD SHE KNOW THAT?

MS. WALFOORT: OKAY. YOU CAN'T JUST --

MS. THOMAS: I'M SORRY.

THE WITNESS: I GUESS THERE WAS NOT A KEY IF

THEY DIDN'T USE A KEY TO GET IN THERE.

MS. THOMAS: YOU DON'T HAVE TO ANSWER THAT QUESTION.

MS. SPRINGER: I'M DONE.

THE HEARING OFFICER: AND DO YOU HAVE ANY REBUTTAL?

MS. KISLING: I DON'T SEE THAT ANY OF THE QUESTIONS HAD ANYTHING TO DO WITH THE INITIAL QUESTION, SO NO.

(DISCUSSION HELD OFF THE RECORD.)

MALESIA BRITT-WILLIAMS,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: PLEASE STATE YOUR NAME AND SPELL IT FOR THE RECORD.

THE WITNESS: MALESIA BRITT-WILLIAMS, M-A-L-E-S-I-A, B-R-I-T-T, WILLIAMS, W-I-L-L-I-A-M-S.

THE HEARING OFFICER: THANK YOU.

GO AHEAD, SHARON.

MS. WALFOORT: LET'S MARK THEM FIRST, SHARON.

(EXHIBITS ADMITTED.)

EXAMINATION

BY MS. KISLING:

Q SO I JUST PROVIDED YOU WITH A DOCUMENT. IT WAS A STATEMENT TO INCLUDE A STATEMENT PROVIDED ON 8/22. CAN

YOU JUST TALK TO US ABOUT BASICALLY HOW LONG YOU WERE AT SEIU AND WHAT THAT TIME WAS LIKE?

A I STARTED WITH SEIU MAY 2016. I ORIGINALLY CAME INTO THE WORK CAPACITY PART TIME. WHEN I STARTED, IT WAS JUST ADMINISTRATIVE DUTIES, THE FRONT DESK. SO WE WOULD SHARE THE DUTIES BETWEEN THE FOUR OF US. SO WE WOULD ANSWER THE PHONE, MAKE COPIES, FILE CERTAIN THINGS, ADMINISTRATIVE FUNCTIONS.

AT THAT TIME, ONE OF THE LADIES THAT WAS WORKING THERE JUST NO LONGER WAS WORKING THERE. BUT SHE WOULD COME UP TO THE UNION HALL, I WANT TO SAY LIKE TWICE A WEEK, TO FIND OUT IF SHE STILL HAD WORK. BECAUSE NOTHING WAS STATED THAT SHE WAS ACTUALLY TERMINATED. SO SHE WOULD ACTUALLY KEEP SHOWING UP AND ASK US IF WE KNEW ANYTHING. SO WE DIDN'T.

THEN IN JULY, I MOVED TO BE FULL TIME. AT THAT TIME, JULY, ABOUT THE END OF JULY IS WHEN I BECAME FULL TIME WITH THE UNION. I JUST NOTICED THAT THERE WERE A LOT OF THINGS OUT OF PLACE. BUT AS FAR AS THE COMPETITION BETWEEN THE PART-TIME STAFF WAS DIFFICULT. I REMEMBER BEING TOLD THAT, YOU KNOW, IF YOU CAN DO THIS, THEN WE CAN MOVE FORWARD WITH BEING FULL TIME. AND IF YOU CAN'T DO THIS, THEN -- YOU KNOW, THEN YOU WILL HAVE TO FIGURE SOMETHING OUT THAT YOU CAN DO.

AM I JUST SPEAKING TO WHAT I TYPED UP? BECAUSE I TYPED IT UP.

Q OKAY. SORRY. CAN YOU GO TO CHARGING PARTY 2, SO IT'S THAT BIG PACKET IN FRONT OF YOU, AND I BELIEVE

IT'S EXHIBIT 4; PAGE 2. DOES THAT MEMO LOOK FAMILIAR TO YOU? AND WHEN DID IT COME TO YOUR ATTENTION?

A YES. THIS MEMO LOOKS FAMILIAR. I'M JUST TRYING TO -- I BELIEVE I TYPED THIS UP, YEAH. SO IT WAS MADE AWARE THE SAME DAY, AND I BELIEVE I TYPED THAT UP AND SENT THAT OUT.

Q DO YOU KNOW WHY IT WAS SENT OUT, WHAT OCCURRED?

A OH, TWO EMPLOYEES AT THE HALL BROKE INTO SHARON'S OFFICE, THE EXECUTIVE VICE PRESIDENT SHARON KISLING'S OFFICE. BEFORE SHE WAS IN THAT OFFICE, IT WAS ACTUALLY ANOTHER STAFF -- IT WAS A STAFF MEMBER'S OFFICE. AND HE THOUGHT THAT -- I DON'T KNOW. THEY BROKE INTO THE OFFICE, AND SO THIS WAS SENT OUT AFTER.

MS. WALFOORT: OKAY. SO SHARON, WE SEE THAT THIS JUST CAME IN RELEVANT TO THE EVENT THAT WE TALKED ABOUT. WE DON'T NEED TO GO THROUGH THAT AGAIN.

MS. KISLING: NO, NO, WE DON'T. JUST, AGAIN, ANOTHER WITNESS THAT SUPPORTS THIS CHARGE.

BY MS. KISLING:

Q OKAY. CAN YOU SPEAK TO THE LEVEL OF PROFESSIONALISM THAT YOU WITNESSED AT THE HALL? WERE THERE EVER ANY CIRCUMSTANCES WHERE YOU FELT CONVERSATIONS WERE HAD IN FRONT OF STAFF ABOUT EXECUTIVE BOARD MEMBERS OR MEMBERS?

A YES. THE HALL, WHEN I WAS THERE, FROM MAY TO MY TERMINATION DATE, VERY UNPROFESSIONAL. WE TALKED -- THEY TALKED ABOUT EXECUTIVE BOARD MEMBERS IN FRONT OF OTHER EMPLOYEES. I FELT THERE WERE CONVERSATIONS ABOUT

EMPLOYEES IN FRONT OF OTHER EMPLOYEES. DIRECTION CAME FROM JUST ABOUT EVERYONE ELSE THAT WAS FULL TIME. SO AS A PART-TIME STAFF, YOUR DIRECTION CAME FROM EVERYONE. AND YOUR CONSEQUENCES CAME FROM EVERYONE.

I DIDN'T FEEL LIKE THERE WAS A GOVERNING SYSTEM AS FAR AS AN SOP, SO I DIDN'T NECESSARILY KNOW HOW I WAS PROTECTED SO, YEAH.

THE HEARING OFFICER: AND WHO IS THE "THEY" YOU ARE REFERRING TO?

THE WITNESS: THE REST OF THE STAFF.

BY MS. KISLING:

Q YOU WANT TO NAME STAFF?

A EVERYONE THERE BEFORE ME.

THE HEARING OFFICER: MY QUESTION IS RELATED TO YOUR EARLIER RESPONSE, AND "THEY" TALKED ABOUT EXECUTIVE BOARD MEMBERS AND OTHERS. WHO ARE "THEY"?

THE WITNESS: SPECIFICALLY, CHERIE.

BY MS. KISLING:

Q CAN YOU GIVE AN EXAMPLE OF SOME OF THE THINGS THAT WOULD BE SAID?

A SO WORKING UP IN FRONT, LIKE I SAID, I DID ADMINISTRATIVE FUNCTIONS. I WOULD ALSO GET CALLS TO DO THOSE OTHER TASKS ALONG WITH MINE, INCLUDING COPYING AND THINGS LIKE THAT. ANY DIRECTION THAT CAME FROM THE EXECUTIVE VICE PRESIDENT HAD TO GO THROUGH CHERIE. AND SO WHAT SHE SAID WAS THAT "THERE AREN'T ENOUGH INDIANS; EVERYONE WANTS TO BE A CHIEF." AND THEN SHE TALKED ABOUT HOW SHARON THOUGHT SHE WAS THE BOSS.

Q SO YOU SAID YOU WORKED UP AT THE FRONT. WERE THERE TIMES YOU GOT CALLED, BE IT FROM MEMBERS OR OFFICERS, REGARDING THE NEED TO SPEAK TO, LET'S SAY, PRESIDENT MANCINI OR ONE OF THE EMPLOYEES?
A ABOUT?
Q ABOUT ANYTHING.
A YES.
Q SO WERE THERE TIMES WHERE THERE WERE CONCERNS REGARDING RESPONSES OR WERE YOU TAKING PHONE CALLS ABOUT LACK OF RESPONSES?
A YES. THERE WERE -- A LOT OF CALLS THAT I WOULD GET THROUGHOUT THE DAY WOULD BE FOR PRESIDENT MANCINI. AND THEN THEY WOULD ALSO SAY BEFORE THEY GOT OFF THE PHONE AS I'M TAKING THE NOTES OR GETTING THE VOICEMAIL READY FOR HER THAT THEY HAVE TRIED MULTIPLE TIMES AND HAVEN'T BEEN ABLE TO REACH HER, THAT THEY'VE SENT E-MAILS AND NO RESPONSE BACK. I'VE ACTUALLY HAD A LOT OF MEMBERS THAT HAVE SAID THAT ON THE PHONE. I WOULD APOLOGIZE, TAKE THE MESSAGE DOWN, AND THEN FORWARD IT TO HER E-MAIL.
Q CAN YOU TELL US THE CIRCUMSTANCES -- YOU SAID YOU WERE TERMINATED. WHAT WERE THE CIRCUMSTANCES WHEN YOU WERE TERMINATED?
MS. WALFOORT: IS THIS ABOUT THE LAST QUESTION NOW?
MS. KISLING: YES, IT IS.
THE WITNESS: THE CIRCUMSTANCES?
BY MS. KISLING:
Q SO BASICALLY, THERE IS A MEETING ONE DAY IN

WHICH YOU WERE ASKED TO TAKE MINUTES, AND THE NEXT DAY YOU WERE TERMINATED.

A OKAY. SO SPEAK TO THE MEETING AND THEN THE TERMINATION? OR JUST THE TERMINATION?

Q IF YOU CAN SPEAK QUICKLY TO BOTH?

A THE DAY BEFORE I WAS TERMINATED, I WAS ASKED TO BE A NOTE-TAKER IN THE CONFERENCE BETWEEN EXECUTIVE VICE PRESIDENT SHARON KISLING AND PETER NGUYEN. I WAS STRICTLY THERE JUST TO TAKE NOTES. IN THE MEETING, I WAS YELLED AT BY PETER AT THE TIME TO RESUME MY DUTIES AT THE FRONT. HE YELLED AT ME IF I HAD RECEIVED THE E-MAIL THAT WAS SENT OUT FROM PRESIDENT MANCINI AT THE TIME. I STATED THAT I RECEIVED IT, AND I WAS GATHERING UP MY THINGS. AND I WAS TOLD AT THE TIME TO CONTINUE TO TAKE NOTES FROM EXECUTIVE VICE PRESIDENT, SHARON KISLING.

AFTER THAT, WITH ALL OF MY NOTES AND I NEVER SPOKE ONCE. THE NEXT DAY, I RESUMED MY DUTIES AT THE FRONT. IT WAS A STAFF MEETING. I WAS EXCUSED FROM THAT STAFF MEETING. I WENT BACK TO THE FRONT. I WAS EXCUSED BY PRESIDENT MANCINI, NO REASON. I WENT BACK TO THE FRONT TO RESUME MY DUTIES. ABOUT MIDDAY, 12:00 O'CLOCK, I WAS CALLED BACK AND THEN TERMINATED.

Q WERE YOU TYPICALLY INCLUDED IN STAFF MEETINGS?

A YES. I HAD BEEN IN EVERY SINGLE ONE. THAT WAS THE ONLY ONE I WAS EXCLUDED FROM.

MS. WALFOORT: OKAY. I THINK YOU SAID THAT WAS YOUR LAST QUESTION?

MS. KISLING: UH-HUH.

MS. WALFOORT: HOLD ON ONE SECOND.

MS. MANCINI: OKAY.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO WHAT WE WERE CHATTING ABOUT AND I WAS GETTING COUNSEL ON IS THE TESTIMONY OF THIS WITNESS AND THE PRIOR IS MORE ABOUT CAUGHT-IN-THE-MIDDLE OF THINGS THAT ARE HAPPENING WITHIN THE LOCAL. I THINK WE HAVE HEARD SOME OF THE CONDUCT UNBECOMING AND THE CHARGES AROUND THAT.

BUT I WOULD SAY IF YOU'VE GOT MORE WITNESSES THAT IS SIMILAR AS PAST DISGRUNTLED EMPLOYEES, I FEEL LIKE WE HAVE HEARD THAT AND CAN MOVE ON. AND IT'S TANGENTIAL TO SOME OF THE OTHER CHARGES THAT WE STILL HAVE TO HEAR, AND I'M ASSUMING YOU HAVE WITNESSES FOR. AND I THINK IT WOULD BE BETTER IF WE MOVED ON TO THAT. BECAUSE I WORRY ABOUT HOW LATE WE'RE GOING TO GO IF WE CONTINUE ON AND ON.

MS. MANCINI: WE GET TO CROSS THOUGH, RIGHT?

THE HEARING OFFICER: YOU DO. BUT I WOULD SAY REALLY THINK ABOUT WHAT SPECIFICALLY DO YOU WANT TO PULL OUT OF THIS. AND CAN WE MOVE ONTO ANOTHER WITNESS THAT MIGHT BE ABLE TO ADDRESS SOME OF THE ITEMS THAT ARE STILL ARE NOT -- HAVE NOT BEEN SPOKEN TO IN THE CHARGES?

MS. KISLING: SO WHICH ITEMS ARE YOU REFERRING TO? I FEEL LIKE I'VE COVERED A LOT.

MS. WALFOORT: WELL, ARE THERE OTHER THINGS, OTHER ISSUES? NOT JUST OTHER PEOPLE ON THE SAME TOPIC. OTHER ISSUES THAT YOU THINK WE NEED TO GET TO TONIGHT

WITH YOUR WITNESSES? OR DO YOU FEEL LIKE WE HAVE COVERED THEM?

MS. KISLING: NO. I STILL HAVE MORE WITNESSES. BUT I THINK SOME ARE THEM ARE COVERING SOME OF THE SAME THINGS.

MS. WALFOORT: WE GET THE PICTURE THAT YOU'VE SET BEFORE US. SO I DON'T THINK ADDING MORE WOULD AFFECT THINGS VERY MUCH ON THE SAME TOPIC, MEANING PEOPLE WHO ARE NOT HAPPY WITH THE WAY THE OFFICE WAS RUN AND THINK IT WAS UNPROFESSIONAL AND THE THINGS THAT WERE SAID. I DON'T THINK ADDING MORE OF THAT WILL HELP.

MS. KISLING: NO. THIS IS THE LAST ONE OF THAT.

MS. WALFOORT: OKAY. AND THEN CAN YOU JUST GIVE AN OFFER OF WHAT ELSE IS COMING? WHAT OTHER TOPICS ARE YOU GOING TO COVER WITH THE WITNESSES TONIGHT?

MS. KISLING: WELL, I HAVE THE TREASURER. AND THEN I HAVE ANOTHER E-BOARD MEMBER WHO SERVES ON ANOTHER COMMITTEE.

MS. WALFOORT: WHAT CHARGES?

MS. KISLING: THE CHARGES UNDER SUBSECTION 1 AND 2, CHARGES ON SUBSECTION 4, SUBSECTION 5 AND 6.

MS. WALFOORT: WHAT I WOULD ASK, SHARON, IF YOU'VE GOT WITNESSES THAT COULD TALK ABOUT 5 AND 6, THOSE ARE THE ONES WE NEEDS TO HEAR ABOUT, IF YOU CAN CALL OUR ATTENTION TO, BEING A LITTLE MORE SPECIFIC, IF YOU COULD TURN TO THOSE. I MEAN, WE WILL HAVE CHERIE FINISH THE CROSS-EXAMINATION. BUT THEN WE REALLY WANT TO MOVE ONTO

THOSE TOPICS.

MS. KISLING: OKAY.

THE HEARING OFFICER: GO AHEAD, CHERIE.

EXAMINATION

BY MS. MANCINI:

Q MALESIA, CAN YOU TELL ME, ARE YOU FRATERNITY SISTERS WITH SHARON KISLING?

A IT'S A SORORITY.

Q SORORITY, I'M SORRY. I APOLOGIZE.

A YES.

Q YOU ARE? YES?

A YES.

Q YOU WERE HIRED AS A PART-TIMER; IS THAT CORRECT?

A YES.

Q AND THEN YOU ALSO HAVE EXPRESSED THAT I HAD LACK OF RESPONSE FROM SPECIFIC MEMBERS. DO YOU HAVE SPECIFICITY OF THAT?

A THAT WOULD BE IN E-MAILS.

Q OKAY. DO YOU HAVE ANY OF THOSE?

A I DON'T HAVE ACCESS TO IT.

Q OKAY. SO WE DON'T HAVE ANY OF THOSE TO PRODUCE. OKAY. YOU TALKED ABOUT CONSEQUENCES DEPENDING ON WHO GAVE YOU DIRECTION WAS DEPENDENT UPON WHO DOLED OUT CONSEQUENCES. WHAT WERE THE CONSEQUENCES?

A I REMEMBER SITTING IN A MEETING, AND AFTER THE MEETING, IT WAS STATED THAT IF I COULDN'T DO MY JOB WITH

A SMILE, THEN I DIDN'T NEED MY JOB. AND THAT CAME FROM A STAFF MEMBER.

Q DID YOU BRING THAT TO MY ATTENTION?

A NO. AS A PART-TIMER, I WAS UNDER LA NITA TROYANO.

Q AS THE PRESIDENT, DID YOU THINK TO BRING THAT TO MY ATTENTION?

A I DIDN'T DEAL WITH YOU AT THAT TIME. I DEALT WITH LA NITA TROYANO. THAT'S WHERE THE DIRECTION CAME FROM.

Q OKAY, THANK YOU. WHEN YOU RECEIVED YOUR OFFER LETTER, DID IT STATE IN YOUR OFFER LETTER THAT YOU WERE ON SIX-MONTH PROBATION?

A YES.

Q OKAY. BASED ON THAT PROBATION, WERE YOU ELIGIBLE TO BECOME A UNION MEMBER?

A I WOULD HAVE TO LOOK THROUGH THAT LETTER AGAIN. I DON'T HAVE THAT WITH ME. I WOULD HAVE TO LOOK THROUGH IT. BUT IF YOU HAVE IT, I MEAN, I FEEL LIKE YOU CAN ANSWER THAT.

MS. MANCINI: OKAY. THE LETTER STATED A SIX-MONTH PROBATION, I CAN SPEAK TO THAT, AND ALSO IT'S IN THE STAFF CONTRACT AS WELL.

THE HEARING OFFICER: OKAY.

BY MS. MANCINI:

Q BUT YOU NEVER WERE A UNION MEMBER STAFF?

A NO.

Q AND AS A PROBATIONARY-PERIOD EMPLOYEE, WOULD

YOU KNOW IF YOU WERE AN AT-WILL EMPLOYEE OR NOT?
A YES.
Q THANK YOU. SO YOU STATED ALSO THAT YOU WERE TERMINATED ON THE DAY AFTER YOU TOOK MINUTES FOR A MEETING WITH SHARON KISLING?
A YES.
Q AND PETER NGUYEN?
A YES.
Q WAS THAT THE MEETING ON THE 17TH?
A YES.
Q OKAY. SO THEN YOU WERE TERMINATED ON THE 18TH?
A THE 22ND. SO THE MEETING WAS HELD THE 17TH. THE TERMINATION HAPPENED ON THE 22ND.
Q OKAY. SO IT WASN'T DIRECTLY -- YOU STILL FELT IT WAS DIRECTLY CORRELATED TO THAT MEETING?
A YES. IT WAS RETALIATORY.
Q OKAY. AND WHO DID YOUR TERMINATION? DID PETER NGUYEN DO YOUR TERMINATION?
A PETER NGUYEN WAS PRESENT IN MY TERMINATION.
Q WAS HE THE ONE WHO GAVE YOU THE TERMINATION?
A HE WAS PRESENT IN MY TERMINATION.
Q DID HE GIVE -- I GAVE YOU YOUR TERMINATION LETTER; IS THAT CORRECT?
A YES.
Q OKAY, THANK YOU. SO IN TURN THEN, IT WASN'T RIGHT AFTER THAT MEETING? BECAUSE I WAS STILL IN HAWAII, AND I WAS NOT EVEN RETURNED YET?
A RIGHT. YOU HAVE THE DATES.

Q OKAY. WELL, I JUST WANTED TO CLARIFY WITH YOU. BECAUSE YOU HAD SAID IT WAS THE DAY AFTER THAT.

MS. WALFOORT: OKAY. WE HAVE GOT THAT ESTABLISHED. THANK YOU.

MS. MANCINI: OKAY. THAT'S FINE. I THINK I'M GOOD.

DO YOU HAVE ANYTHING?

MS. SPRINGER: I JUST HAVE A REAL QUICK QUESTION. CAN YOU BUILD WEBSITE AND UPDATE THE CONTENT?

THE WITNESS: YES.

MR. SERRANO: DID YOU FILE A COMPLAINT WITH NLRB?

THE WITNESS: YES.

MR. SERRANO: YOU DID? DID ANYBODY ADVISE YOU TO DO THAT?

THE WITNESS: NO.

MR. SERRANO: THANK YOU.

MS. MANCINI: (INAUDIBLE.)

MS. WALFOORT: CHERIE, WAS THAT SUPPOSED TO BE HEARD BY US?

MS. MANCINI: NO, NO.

THE HEARING OFFICER: IS THERE ANYTHING THAT YOU HAVE FOR THE WITNESS?

MS. KISLING: YES.

MS. WALFOORT: JUST A COUPLE OF QUESTIONS THOUGH, OKAY, SHARON?

/////

/////

FURTHER EXAMINATION

BY MS. KISLING:

Q JUST QUICKLY, ARTICLE 15, SECTION 1A, SUBSECTION: "PRESIDENT MANCINI DOES NOT HIRE AND FIRE WITH PRIOR CONSULTATION WITH THE EXECUTIVE VICE PRESIDENT."

THE E-MAIL THAT WAS PROVIDED TO YOU IS ACTUALLY AN E-MAIL -- IF YOU COULD START READING THE FIRST PAGE. THE REST IS JUST SIGNATORY. IT'S FROM MYSELF TO MANCINI WITH THE TRUSTEES, THE AT-LARGE OFFICERS AND THE ATTORNEY. CAN YOU PLEASE READ THAT? OR ACTUALLY, IT STARTS AT THE VERY BOTTOM, WHERE IT SAYS "MONDAY, AUGUST 22ND."

A PRESIDENT MANCINI TERMINATION'S --

MS. WALFOORT: EXCUSE ME FOR A MINUTE. WHAT -- THIS WITNESS CAN'T RESPOND TO THIS DOCUMENT. I MEAN, IF THIS IS SOMETHING BETWEEN YOU AND CHERIE.

MS. KISLING: RIGHT, IN REGARDS TO -- IF YOU LOOK AT THE VERY BOTTOM, SHE SAYS MALESIA BRETT-WILLIAMS HAS BEEN RELEASED FOR NON-COMPLETION OF PROBATION. AND JUST NOW ON -- I GUESS YOU WOULD CALL THAT CROSS-EXAMINE -- SHE SPOKE OF WHETHER OR NOT IT WAS RETALIATORY. SO THAT'S WHAT THIS STATED.

AND THIS IS NOT THE E-MAIL WHERE SHE HAS -- HER RESPONSE TO IT WAS NOTED AND THEN THE TREASURER MADE A STATEMENT IN REGARDS TO IT.

MS. WALFOORT: BUT THE TREASURER IS GOING TO BE ONE OF YOUR WITNESSES, RIGHT? SO THAT WOULD BE MORE

APPROPRIATE.

MS. KISLING: OKAY. THAT'S FINE.

BY MS. KISLING:

Q WERE YOU EVER TOLD THAT YOU WERE NOT DOING YOUR JOB WELL?

A NO.

Q WHAT TYPE OF FEEDBACK WERE YOU ACTUALLY GETTING?

A POSITIVE. WHICH IS WHY I WENT FROM PART TIME TO FULL TIME. THERE WAS ONLY ONE FULL-TIME POSITION THAT WAS OFFERED. I ACTUALLY CAME IN AFTER ALL OF THE OTHER PART-TIMERS. SO I WAS THE LAST PART-TIMER TO BE HIRED ON. I NEVER RECEIVED ANY NEGATIVE FEEDBACK. SO MY TERMINATION CAME AS A SURPRISE.

Q CAN YOU JUST -- HOW LONG WERE YOU FULL TIME?

A FROM THE END OF JULY, THE LAST WEEK OF JULY, TO AUGUST 22ND. I ONLY RECEIVED ACTUALLY ONE FULL -- ONE FULL SALARIED CHECK. SO, YEAH, IT WASN'T LONG.

Q AND WHAT WAS THE -- WHEN YOU WERE LET GO, BECAUSE IT SOUNDS LIKE YOU HAD GOOD FEEDBACK, SO YOU DIDN'T EXPECT THAT, WHAT WAS THE RAMIFICATIONS?

A I'M A PH.D. STUDENT RIGHT NOW, SO I JUST HAD TO MAKE A FEW CUTS.

MS. WALFOORT: THIS IS ACTUALLY KIND OF BEYOND WHAT SHE WAS ASKED ABOUT. I DON'T THINK WE CAN CONTINUE, SHARON.

MS. KISLING: ALL RIGHT.

THE HEARING OFFICER: THANK YOU.

WE'RE GOING TO TAKE A FIVE-MINUTE RESTROOM BREAK.

(BREAK TAKEN.)

THE HEARING OFFICER: YOU READY TO CALL YOUR NEXT WITNESS?

MS. KISLING: YES. IT'S TREASURER SHEILA GRAIN.

SHEILA GRAIN,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: AND STATE YOUR NAME AND SPELL IT.

THE WITNESS: WILL DO. MY NAME IS SHEILA GRAIN, S-H-E-I-L-A G-R-A-I-N.

EXAMINATION

BY MS. KISLING:

Q OKAY. MS. GRAIN, JUST QUICKLY, CAN YOU READ THIS E-MAIL FROM THE BOTTOM UP FOR CHARGING PARTY NUMBER EXHIBIT 14?

MS. SPRINGER: WHY DO WE HAVE TO READ THIS AGAIN?

MS. MANCINI: IS THIS HER E-MAIL?

MS. KISLING: YES, IT IS.

MS. WALFOORT: SHARON, YOU KNOW WHAT, IT'S GENERALLY SUFFICIENT IF SHE TELLS US IT'S HER DOCUMENT.

WE CAN LOOK AT THE DOCUMENT.

MS. KISLING: OKAY. THAT'S FINE.

MS. WALFOORT: THAT WILL SAVE TIME. ANYTHING YOU WANT TO EMPHASIZE, BUT IF SHE TELLS US IT'S HER DOCUMENTS, WE CAN TAKE IT FROM THERE.

MS. KISLING: PERFECT.

BY MS. KISLING:

Q SO IS THIS YOUR DOCUMENT?

A YES. I SENT MY RESPONSE TO YOUR E-MAIL ON AUGUST 22ND, 2006, EXPRESSING, YOU KNOW, MY FRUSTRATION WITH LACK OF COMMUNICATION FROM CHERIE MANCINI.

THE HEARING OFFICER: AND JUST FOR CLARIFICATION, WAS IT 2006 OR 2016?

THE WITNESS: OH, I'M SORRY. 2016, AUGUST 22ND, 2016.

BY MS. KISLING:

Q SO THIS E-MAIL TALKS ABOUT "RECENT TERMINATIONS AND RETALIATION WILL EXPOSE OUR LOCAL TO LIABILITY." HAD YOU COMMUNICATED CONCERNS ABOUT LIABILITY OF OUR LOCAL AS TREASURER?

A YES. I HAD AT AN E-BOARD MEETING PROVIDED EVERY E-BOARD MEMBER WITH A COPY OF OUR OFFICERS LIABILITY INSURANCE POLICY FOR THEIR REVIEW AND CONSIDERATION. BECAUSE IT'S MY OPINION THAT WE SHOULD CONSIDER INCREASING OUR COVERAGE BECAUSE WE HAVE SO MANY LEGAL MATTERS PENDING AGAINST US THIS YEAR.

MS. WALFOORT: AND WHAT EXECUTIVE BOARD MEETING WAS THAT?

THE WITNESS: PROBABLY THE SEPTEMBER MEETING. I PASSED THEM OUT AT THE SEPTEMBER MEETING. NO, THAT'S NOT TRUE. I PASSED THEM OUT AT THE AUGUST MEETING. BECAUSE IT WAS A MEETING WE DIDN'T EVEN GO OVER THE FINANCIALS. AND I HAD COPIES OF THAT POLICY AVAILABLE FOR EACH BOARD MEMBER. AND ALL I COULD DO AT THE END OF THE CHAOS WAS PASS THEM OUT.

MS. WALFOORT: SO THIS WAS THE REGULAR BOARD MEETING ON THE 31ST OF AUGUST?

THE WITNESS: IT'S ON THE LAST WEDNESDAY. I THINK THAT MONTH IT WAS ON THE 31ST.

MS. WALFOORT: OKAY.

THE WITNESS: I WOULD HAVE TO CHECK THE CALENDAR.

MS. WALFOORT: THAT'S GOOD ENOUGH. THANK YOU.

BY MS. KISLING:

Q NOW IN TERMS OF EARLIER -- EARLIER THIS AFTERNOON, THERE WAS CONVERSATIONS ABOUT HIRING PRACTICES. DO YOU HAVE ANY KNOWLEDGE OF EMPLOYEE PREEMPLOYMENT PRACTICES PRIOR TO PRESIDENT MANCINI?

A YES.

Q CAN YOU PLEASE EXPLAIN?

A YES. I HAVE -- AND CHERIE IS AWARE OF THIS AS WELL. I HAVE VOLUNTEERED MY SERVICES TO THE UNION EVEN WHEN I WASN'T AN E-BOARD MEMBER BECAUSE OF MY FINANCE AND ACCOUNTING BACKGROUND. AND WHEN PRESIDENT BASSICK KNEW THAT SAM HARRIS, WHO WAS OUR DIRECTOR OF FINANCE AND HR, WAS GOING TO RETIRE, HE STARTED A SEARCH FOR A

REPLACEMENT FOR HER.

WELL, BECAUSE OF MY FINANCE BACKGROUND, HE SET UP SOME INTERVIEWS FOR HIMSELF, AND I SAT IN WITH HIM AS A VOLUNTEER. AND ONE OF THE THINGS THAT HE WAS CONCERNED ABOUT WAS WE WERE HAVING SOMEONE VERIFY PEOPLE'S EMPLOYMENT DURING THE COURSE OF THE INTERVIEWS. AND THERE WAS SO MUCH MISINFORMATION ON THE RESUMES THAT HE DID NOT FEEL COMFORTABLE MAKING AN OFFER TO ANY OF THOSE CANDIDATES.

SO AFTER THE INTERVIEWS WERE OVER, I SUGGESTED THAT WE GO THROUGH AN ACCOUNTING TEMP AGENCY TO FIND SOMEONE TO FILL IN. BECAUSE WE NEEDED TO BE ABLE TO PAY THE EMPLOYEES AND PAY THE BILLS OF THE LOCAL TO KEEP THE OPERATION RUNNING. AND SO HE AGREED WITH MY SUGGESTION. AND WE CALLED ACCOUNT TEMPS.

DURING THE COURSE OF OUR CONVERSATION WITH THE AGENCY, WE ASKED, "WHAT TYPE OF BACKGROUND VERIFICATIONS, EMPLOYMENT VARIATIONS, DO YOU PERFORM FOR PEOPLE WHO COME TO WORK FOR YOUR ACCOUNT TEMPS AGENCY?" AND THEY TOLD US THEY DO EMPLOYMENT VERIFICATION, CRIMINAL BACKGROUND CHECK, CREDIT CHECK AND DRUG SCREENING. SO BROTHER BASSICK FELT VERY COMFORTABLE THAT WE WOULD BE DOING A THOROUGH INVESTIGATION OF EMPLOYEES PRIOR TO THEM WORKING AT THE HALL.

AND WE HAD THREE PEOPLE WHO CAME THROUGH THERE, CATHY POLITO, CHRIS MULLER AND KEN UBANI, WHO JUST BECAME FULL TIME RECENTLY.

RIGHT, CHERIE?

MS. MANCINI: UH-HUH.

BY MS. KISLING:

Q SO WE NOW HAVE A NEW, I BELIEVE, HR FINANCE DIRECTOR. ARE YOU AWARE OF HIS BACKGROUND CHECK?

A AS FAR AS I KNOW, THERE ARE NO EMPLOYMENT VERIFICATIONS OR CRIMINAL BACKGROUND CHECKS OR CREDIT CHECKS DONE ON ANY EMPLOYEES. AND THERE WASN'T ANY DONE ON ROBERT CLARKE, AS FAR AS I KNOW. AND IF CHERIE HAS DONE THAT, SHE HASN'T SHARED THAT INFORMATION WITH ME.

Q AND WHAT ARE HIS RESPONSIBILITIES?

A HE REPLACED SAM. HE'S THE DIRECTOR OF FINANCE AND HR.

Q SO DOES HE HAVE ACCESS TO MONEY?

A HE HAS ACCESS TO THE UNION'S ASSETS, THAT IS CORRECT. AND HE RUNS REPORTS AND RECORDS FINANCIAL ACTIVITY. HE HAS ACCESS TO ALL UNION RECORDS AND ALL MEMBER RECORDS AND ALL OF THE MEMBERSHIP ASSETS, THAT'S CORRECT.

Q NOW, ALL OFFERS OF EMPLOYMENT ARE TO BE APPROVED BY THE EXECUTIVE BOARD. CAN YOU TELL ME WHAT MR. CLARKE'S SALARY IS?

A NO. I DON'T KNOW. I HAVE NO IDEA. I MEAN I COULD FIND OUT. BUT I HAVEN'T. AND I NEVER -- I WAS IN THE INTERVIEWS WITH MR. CLARKE. HE WAS NOT MY SELECTION BECAUSE OF THE EXPERIENCE THAT HE PRESENTED ON HIS RESUME. THERE WAS A WOMAN THERE WHO WAS EXTREMELY QUALIFIED, AND SHE WAS MY CHOICE.

AND I GOT UP TO USE THE RESTROOM. WHEN I CAME

BACK, I WAS TOLD THAT ROBERT CLARKE HAD BEEN SELECTED. BUT I NEVER SAW AN EMPLOYMENT OFFER FOR MR. CLARKE NOR ANY TYPE OF EMPLOYMENT VERIFICATION OR ANYTHING PRIOR TO HIM BEING OFFERED THE POSITION.

Q CAN YOU LOOK AT CHARGING PARTY -- I THINK IT'S EXHIBIT NUMBER 15? NOW, THIS EXHIBIT IS PRETTY MUCH -- AND I'M GOING TO VERIFY. THIS IS AN E-MAIL BETWEEN -- OKAY. SO THIS IS AN E-MAIL THAT WAS BETWEEN THE TRUSTEES, YOURSELF, MYSELF AND PRESIDENT MANCINI IN TERMS OF THE FINANCE DIRECTOR.

AND IF WE GO TO CHARGING PARTY NUMBER 2, EXHIBIT 3, PAGE 1, THAT'S ON THE BIG BINDER AS WELL.

MS. WALFOORT: EXHIBIT 2?

MS. KISLING: SORRY. EXHIBIT 2, EXHIBIT 3, PAGE 1. CAN YOU CONFIRM THIS IS ALSO AN E-MAIL THAT INCLUDES YOU?

THE WITNESS: THESE ARE CHARGES.

MS. THOMAS: NO, EXHIBIT 3.

THE WITNESS: OH, EXHIBIT 3, SORRY.

BY MS. KISLING:

Q NOW, UNDER THE BOLD "HR FINANCE DIRECTOR," CAN YOU TELL ME IF ROBERT CLARKE'S NAME IS THERE?

A IT DOES NOT APPEAR TO BE ON THIS LIST.

Q OKAY. AND THAT'S A LIST OF ALL THE RESUMES THAT WERE RECEIVED WHEN THAT WAS POSTED. WHAT WAS SOME OF THE REASONING THAT WAS DISCUSSED BETWEEN YOU AND CLARA THOMAS, THE TRUSTEE, IN REGARDS OF THE CONCERNS OF ROBERT CLARKE?

A AS I STATED BEFORE, BECAUSE OF THE EMPLOYMENT EXPERIENCE THAT ROBERT LISTED ON HIS RESUME THAT HE PRESENTED TO US FOR CONSIDERATION FOR THE POSITION, HE DID NOT APPEAR TO HAVE ANY UNION EXPERIENCE OR REALLY ANY FINANCIAL REPORTING EXPERIENCE OR ANY HUMAN RESOURCES EXPERIENCE. IT LOOKS TO ME, IT READ TO ME, WHAT WAS LISTED ON THERE IS HE DID A LOT OF INDIVIDUAL TAX PREPARATION.

MS. WALFOORT: DID HE COME FROM ACCOUNT TEMPS, BY THE WAY?

THE WITNESS: NO, HE DID NOT. HE'S A FRIEND OF PETER'S.

JUST A POINT OF CLARIFICATION, ON EXHIBIT 15, I AM A RECIPIENT OF THIS E-MAIL. HOWEVER, I DID NOT RESPOND. THERE'S NO RESPONSE FROM ME IN THIS E-MAIL CHAIN.

BY MS. KISLING:

Q RIGHT.

YOU'VE HAD CONVERSATIONS WITH OUR ATTORNEY MIKE URBAN. WHAT WERE SOME LEGAL CONCERNS THAT HE MAY HAVE EXPRESSED TO YOU REGARDING MLRB COMPLAINTS, EMRB COMPLAINTS?

A I DON'T REMEMBER HAVING ANY CONVERSATIONS WITH MIKE URBAN ABOUT EMRB COMPLAINTS OR MLRB COMPLAINTS. HOWEVER, ON OCTOBER 14TH IN A CONVERSATION WITH CHERIE MANCINI, SHE TOLD ME THAT SHE HAD A REQUEST FROM THE DEPARTMENT OF LABOR FOR SOME FINANCIAL RECORDS, WHICH IS RELATED TO AN ONGOING INVESTIGATION OF A PAST PRESIDENT

OF SEIU.

AND SHE TOLD ME THAT SHE WAS WORKING ON PUTTING THAT INFORMATION TOGETHER. BECAUSE I TOLD HER I WOULD BE HAPPY TO HELP SINCE IT WAS RELATED TO FINANCE RECORDS. AND I DON'T KNOW IF THAT WAS ACTUALLY RECEIVED BY THE DEPARTMENT OF LABOR OR NOT. SHE TOLD ME SHE WAS GOING TO HAND-DELIVER IT.

BUT AS FAR AS DISCUSSING EMRB COMPLAINTS WITH MIKE URBAN, I DON'T REMEMBER ANY CONVERSATIONS WITH HIM ON THAT. I KNOW THERE ARE SOME OUT THERE BECAUSE I'VE SEEN THEM IN THIS.

Q AS A BOARD MEMBER, DO YOU RECALL IF ALL AGREEMENTS (INAUDIBLE) ARE LISTED IN THIS CHARGING PARTY 2, NUMBER 2, THE LIST OF CONTRACTS, ARE YOU FAMILIAR WITH THEM AND KNOW IF THEY WERE BROUGHT BEFORE THE EXECUTIVE BOARD FOR APPROVAL?

A I THINK THAT SOME OF THESE CONTRACTS PREDATE MY ELECTION AS A BOARD MEMBER SO THAT SOME OF THEM MAY HAVE GONE TO THE BOARD, AND I WASN'T IN THE LOOP FOR THAT. I KNOW THAT SOME OF THESE EMPLOYMENT CONTRACTS SPECIFICALLY DID NOT GO, LIKE ROBERT'S, WHICH IS AFTER I WAS ELECTED TO THE EXECUTIVE BOARD. BECAUSE LIKE I SAID, OTHERWISE I WOULD KNOW WHAT HIS SALARY IS AND ALL OF THAT.

Q ONE OF THE CONCERNS IS THE DISRESPECT THAT PRESIDENT MANCINI HAS BEEN PRESENT FOR, ALLOWED, DIRECTED TO DISRESPECT MEMBERS AND ELECTED OFFICIALS ON THE EXECUTIVE BOARD THROUGH THEIR CONDUCT, ACTIONS AND LANGUAGE. HAVE YOU HAD ANY INCIDENT WITH A DIRECTOR AT

SEIU?

A YES.

Q CAN YOU DESCRIBE IT?

A WHEN WE WERE RATIFYING THE TWO PERCENT FOR THE FINAL COLA IN OUR CURRENT CONTRACT FOR THE GENERAL UNIT OF CLARK COUNTY, I WAS TOLD BY -- A HALL STAFF PERSON CALLED ME AND EXPRESSED CONCERN THAT WE WOULD HAVE COVERAGE IN TERMINAL 1 AND TERMINAL 3 AT MC CARRAN AIRPORT. SO I REACHED OUT TO SOME MEMBERS TO GET THEM TO VOLUNTEER SOME TIME TO MAN THE POLLING PLACES. BECAUSE THEY HAD TO BE MANNED BY A UNION MEMBER AT ALL TIMES.

AND IT WAS ONLY GOING TO BE HODGSON AND MYSELF THAT WERE AVAILABLE. SO WE WANTED TO DO IT IN TERMINAL 1, BUT THEY INSISTED THEY WANTED TERMINAL 3 AS WELL, WHICH IS WHY I REACHED OUT TO OTHER UNION MEMBERS. I CALLED TO CONFIRM WITH NATALIE. THAT'S WHO IT WAS. IT WAS NATALIE HERNANDEZ, IS THAT RIGHT, YES.

NATALIE HAD PHONED ME, AND SO I CALLED HER TO TELL HER, YES, I GOT SOMEONE TO VOLUNTEER, SO WE'LL HAVE PEOPLE TO MAN THE POLLING PLACE IN TERMINAL 3. AND SHE PUT ME ON SPEAKER PHONE, AND PETER NGUYEN PROCEEDED TO SHOUT AT ME FOR ABOUT 12 MINUTES. I DIDN'T SAY ANYTHING. I JUST LET HIM FINISH. AND I SAID, "THANK YOU," AND I HUNG UP.

BUT I DON'T KNOW WHY HE DID THAT. BECAUSE ALL I WAS DOING WAS CALLING TO TELL HIM THAT I HAD CONFIRMED THAT WE HAD UNION MEMBERS AVAILABLE TO VOLUNTEER.

Q AND DID YOU REPORT THIS TO PRESIDENT MANCINI?

A NO, I DID NOT.
Q DID YOU REPORT TO ANY OF THE E-BOARD MEMBERS?
A NO, I DID NOT.
Q DID YOU DESCRIBE THE SITUATION DO YOU REMEMBER WITH MYSELF?
A YES, I DID. I CONFIDED TO SHARON AND SOME OTHERS WHO EXPRESSED FRUSTRATION WITH PETER'S CONDUCT AND HIS TREATMENT OF BOARD MEMBERS.
THE HEARING OFFICER: CAN I JUST STEP IN FOR A SECOND? SO IF YOU HAVE FURTHER QUESTIONS ALONG THE LINES OF ENVIRONMENT, AS IT RELATES TO PETER --
MS. KISLING: NO.
THE HEARING OFFICER: -- OR IF YOU DO AS IT RELATES TO CHERIE IN PARTICULAR, JUST MAKE IT A, "WAS THERE AN ENVIRONMENT CONCERN?"
"YES."
THEN WE HAVE HEARD THAT A COUPLE OF TIMES. WE DON'T NEED TO GO ANY FURTHER.
MS. KISLING: OKAY.
THE HEARING OFFICER: BUT I WOULD SAY, YOU HAVE TWO THINGS IN SUBSECTION 5 IN YOUR COMPLAINT THAT I'M INTERESTED IN HEARING ABOUT AND I HAVEN'T. AND I THINK THIS WITNESS MIGHT BE ABLE TO TESTIFY TO IT, WHICH IS IN SUBSECTION 5, THE THIRD BULLET POINT HAS LM-2 PERIOD 1/1/15 THROUGH 12/31/15, SPEAKS TO TOTAL ASSETS. AND THEN LATER ON, THERE IS A SIGNIFICANT CHANGE TO TOTAL ASSETS.
SO I WOULD BE INTERESTED IN HEARING WHAT THAT

REPRESENTS. AND THEN IF YOU GO DOWN TO THE FIFTH BULLET POINT, THAT IS SPECIFIC TO SHEILA GRAIN, AND I'M INTERESTED IN HEARING ABOUT THAT.

MS. KISLING: THAT'S WHAT I'M GOING TO NEXT, NINE A.

THE HEARING OFFICER: YEP.

MS. MANCINI: I'M SORRY? WHERE ARE WE?

THE HEARING OFFICER: IN THE CHARGES THAT WERE FILED, THE LAST PAGE, BUT NOT THE SIGNATURE PAGE, SUBSECTION 5, THIRD AND FIFTH BULLET POINTS.

BY MS. KISLING:

Q WHEN YOU FIRST STEPPED INTO OFFICE, WERE YOU AWARE OF ANY POLICIES AND PROCEDURES GOVERNING THE WAY MONEY WAS SPENT OR A BUDGET OR ANYTHING?

A HERE IN SUBSECTION 5?

Q YES.

A YES. THE FIFTH BULLET POINT. THIS IS VERY BROAD. AND I DON'T RECALL EXACTLY WHAT MADE ME FEEL A SENSE OF CONCERN ABOUT THE WAY THAT MONEY WAS -- PURCHASES WERE BEING APPROVED AT THE UNION, AT THE HALL.

Q THAT'S WHERE I WAS GOING, IN TERMS OF ASKING YOU WHAT WERE THE POLICIES AND PROCEDURES WHEN YOU TOOK OFFICE?

A WELL, WE DIDN'T REALLY HAVE POLICIES AND PROCEDURES FOR CONTROL OVER ASSETS OR SPENDING. SINCE I HAVE BECOME TREASURER, I HAVE REQUIRED THAT CHERIE MANCINI AS PRESIDENT APPROVE ALL INVOICES PRIOR TO CHECKS BEING CUT TO PAY THOSE INVOICES. AND THAT CHERIE SIGNS

THE CHECKS. AND THEN I COME IN AND REVIEW EVERYTHING AND MAKE SURE IT'S BEEN APPROVED, AND THEN I SIGN IT.

I DID HAVE A GENERAL CONCERN, AND I STILL DO, ABOUT THE FINANCIAL HEALTH OF SEIU 1107. I EXPRESSED THIS AT EVERY E-BOARD MEETING. I EXPRESSED IT AT THE LAST E-BOARD MEETING. WE RECEIVED PAYMENTS FOR ACCOUNT SEIZURES BASED ON COURT ORDERS, GARNISHMENTS AND PAYMENTS TO OUR FRAUD BOND ON EMPLOYEES WHICH WAS REPORTED AS MISCELLANEOUS INCOME IN THE AMOUNT OF OVER $70,000.

WITHOUT THAT INCOME IN THIS CURRENT FISCAL YEAR, WE WOULD BE AT AN OPERATING LOSS OF ABOUT $45,000 FOR THE NINE MONTHS OF 2016. THIS, TO ME, IS A TREND THAT IS OF CONCERN TO ME. WE SHOULD AT NINE MONTHS INTO THE YEAR, WE SHOULD BE ACCUMULATING OUR RESERVES. I PRESENTED AN ANALYSIS AT THE LAST E-BOARD MEETING OF RESTRICTED VERSUS UNRESTRICTED CASH. BECAUSE I FELT AS THOUGH I NEEDED TO PROVIDE CLARIFICATION TO CHERIE AND THE E-BOARD MEMBERS ABOUT HOW MUCH MONEY WE ACTUALLY HAVE AVAILABLE FOR OPERATIONS. BECAUSE IT ISN'T 100 PERCENT OF OUR CASH ON HAND.

SO I PRESENTED MY RESERVES, MY RESTRICTED VERSUS UNRESTRICTED CASH ANALYSIS AND PROVIDED EACH E-BOARD MEMBER WITH A COPY OF THIS REPORT, WHICH WAS CLEARLY LABELED "FOR DISCUSSION PURPOSES ONLY." BECAUSE I'M JUST TRYING TO MAKE THEM AWARE OF OUR TRUE PICTURE OF OUR FINANCES SO THAT WE CAN BE PRUDENT AND CAREFUL IN THE MANAGEMENT OF MEMBERS' MONEY AND THE EXERCISE OF OUR FIDUCIARY RESPONSIBILITY AS EXECUTIVE BOARD MEMBERS.

Q CAN YOU GIVE EXAMPLES OF WHERE YOU FEEL THAT A LEVEL OF CARE REASONABLE AND PRUDENT THE PERSON SERVING AS PRESIDENT WOULD USE TO CARRY OUT DUTIES HAS NOT BEEN USED?

MS. WALFOORT: COULD YOU JUST ASK SPECIFICALLY MISMANAGEMENT, ACTUAL MALFEASANCE OR MISMANAGEMENT, RATHER THAN A GENERAL LEVEL OF CARE?

BY MS. KISLING:

Q OKAY. SO DID YOU SEE -- CHARGING PARTY 2, IF YOU ACTUALLY GO TO NUMBER -- IF YOU ACTUALLY GO TO NUMBER 7, THAT'S THE BIG ONE, "RENO VISIT, RENO OFFICE ISSUES," THE STATEMENT SAYS "VERY SERIOUS, DEPARTMENTS OF LABOR." DO YOU SEE THAT? "NO CURRENT LEASE FOR RENO SPACE, QUESTIONABLE EXPENSES WITHOUT SUFFICIENT DOCUMENTATION OR EXPENSE REPORTS"? IT'S UNDER EXHIBIT NUMBER 5 ACTUALLY.

A OH, IT'S EXHIBITS NUMBER 5?

Q SO I WAS READING FROM EXHIBIT 5.

THE HEARING OFFICER: AND HOW FAR IN ARE YOU?

BY MS. KISLING:

Q WELL, DO YOU KNOW ABOUT THE CONCERNS ABOUT RENO THAT WERE BROUGHT TO THE BOARD?

A YES, I DO. AND I HAVE READ THIS REPORT.

Q OKAY.

A AND I ALSO WAS PRESENT FOR YOUR REPORT WHERE YOU EXPRESSED THESE CONCERNS ORIGINALLY SEVERAL MONTHS AGO.

Q OKAY. DO YOU HAVE CONCERNS ABOUT THE USE OF THE AMERICAN EXPRESS CARD OR THE USE OF JUST IN TERMS OF

RECEIPTS NOT RETURNING TO THE HALL?

A WELL, I HAVE NOT RECEIVED ANY FEEDBACK REGARDING RECEIPTS NOT BEING RETURNED TO THE HALL. IN GENERAL, I DO HAVE A CONCERN ABOUT THE UNION HALL'S USE OF CREDIT CARDS BY EMPLOYEES. AND I HAVE HAD PEOPLE ASK ME SEVERAL TIMES, AND I HAVE NOT HAD AN OPPORTUNITY TO LOOK INTO THE DETAILS OF IT. THERE HAVE BEEN SOME QUESTIONS WHERE PEOPLE HAVE ASKED FOR CONFIRMATION OF WHETHER OR NOT EMPLOYEES OR DIRECTORS WHO RECEIVE CAR ALLOWANCES ARE ALSO USING THEIR CREDIT CARDS TO CHARGE GASOLINE PURCHASES.

WHICH IF IT WERE TRUE, WHICH I HAVE NOT CONFIRMED IF IT'S TRUE OF NOT, WOULD BE DOUBLE-DIPPING. AND SO THAT WOULD BE A PRACTICE THAT WOULD HAVE TO BE DISCONTINUED. AS FAR AS EMPLOYEE THEFT, I CAN'T REALLY TESTIFY TO THAT. BECAUSE I HAVE NOT UNCOVERED ANYTHING LIKE THAT.

Q DO YOU THINK THERE ARE CHECKS AND BALANCES WITHIN THE LOCAL IN TERMS OF THE FINANCES FOR YOU TO BE ABLE TO DETECT THAT EASILY?

A NO. I THINK THAT WE HAVE A LOT OF WORK TO DO IN THAT AREA. AND JUST BASED ON SOME PRELIMINARY DISCUSSIONS THAT I HAD WITH ROBERT CLARKE ABOUT THE BUDGET PROCESS, SEVERAL RED FLAGS WERE RAISED DURING THAT CONVERSATION. SO I NEED TO SPEAK WITH CHERIE AND ROBERT SO THAT WE CAN DRILL THEM ON SOME OF MY QUESTIONS AND MAKE SURE THAT WE'RE ALL ON THE SAME PAGE BEFORE WE PRESENT A BUDGET.

THE HEARING OFFICER: JUST A FOLLOW-UP QUESTION, SHEILA, AS THE TREASURER OF THE UNION, DID YOU SAY THAT YOU HAVE HEARD ABOUT SOMEBODY, POTENTIALLY A STAFF PERSON, DOUBLE-DIPPING OR MISAPPROPRIATION OF FUNDS?

THE WITNESS: I HAVE HAD THE QUESTION POSED TO ME. I HAVE NOT DONE THE RESEARCH IN ORDER TO ANSWER THAT QUESTION. WHAT RAISED THE CONCERN IN THE FIRST PLACE, I DON'T KNOW. BUT I'M CERTAIN I COULD -- THAT ROBERT AND KAREN WILL WORK WITH ME TO RESEARCH THAT.

BY MS. KISLING:

Q WHO RAISED THE CONCERN?

A ACTUALLY TWO OR THREE PEOPLE ASKED ME THAT. SO I DON'T KNOW HOW THE RUMOR GOT STARTED. I DON'T KNOW HOW THE CONCERN WAS CREATED, BUT I WILL LOOK INTO IT. AND I'M SURE CHERIE WILL COOPERATE FULLY.

MS. WALFOORT: CAN I ASK YOU, WAS THIS SORT OF A HYPOTHETICAL? LIKE WOULD IT BE OKAY IF? OR WERE CONCERNS BEING RAISED THAT THIS WAS A PRACTICE GOING ON?

THE WITNESS: THE QUESTION HAS COME UP SEVERAL TIMES. SO, YOU KNOW, WHAT PROMPTED IT, I DON'T KNOW. BUT THE FACT THAT IT KEEPS COMING UP, TO ME, TELLS ME THAT I SHOULD LOOK INTO IT.

BY MS. KISLING:

Q OKAY. DO YOU KNOW IF THERE HAS BEEN REQUESTS FOR SPECIFIC CREDIT CARD STATEMENTS FOR YOU TO BE ABLE TO COMPLETE THAT RESEARCH AND FOR DIFFERENT REPORTS THAT WOULD ASSIST THE E-BOARD AND YOURSELF, SEEING IF THAT'S

AN ISSUE?
A I DON'T ANTICIPATE ANY PROBLEMS DOING RESEARCH.
Q DO YOU KNOW IF I MADE REQUESTS FOR REPORTS TO LOOK INTO THOSE CONCERNS?
A I DO RECALL THAT YOU HAVE BROUGHT THAT UP TO ME. AND I DON'T KNOW IF YOU RECEIVED THE SUPPORTING DOCUMENTATION THAT YOU REQUESTED OR NOT. DID YOU?
Q NO.
A OKAY. WELL, THEN THAT'S AN OPEN ITEM THAT WILL HAVE TO BE RESOLVED.
MS. WALFOORT: OKAY. CAN WE MOVE TO THE THIRD BULLET POINT NOW?
BY MS. KISLING:
Q NOW, THIS IS ABOUT THE LM-2. ARE YOU ARE AWARE OF THE LM-2? I THINK THIS PERIOD, YOU WOULD NOT HAVE BEEN PRESENT FOR THIS. THIS IS THE LM-2 FROM 1/1/15 THROUGH 12/31/15?
A WHICH BULLET POINT IS THIS?
Q I'M SORRY. SUBSECTION 5, BULLET 3. DO YOU SEE THAT?
A I CAN'T REALLY CONFIRM THESE NUMBERS. AND I HAVE NOT LOOKED AT THE LM-2 FOR THIS PERIOD IN MONTHS AND MONTHS AND MONTHS AND MONTHS. HOWEVER, AS I EXPRESSED EARLIER, IF THIS IS RELATED TO THE OVERALL GENERAL FINANCIAL FISCAL HEALTH OF THE UNION AND PROTECTING MEMBERS' ASSETS, THEN AS I SAID, I DO HAVE A CONCERN, AND I HAVE BROUGHT IT TO THE E-BOARD'S ATTENTION.
I CAN GO BACK AND LOOK AT LAST YEAR'S LM-2,

WHICH THAT REPORT DOES CONTAIN A BALANCE SHEET. SO THERE WOULD BE INFORMATION ON THE LM-2 REGARDING THE BEGINNING AND ENDING NET ASSETS OF LOCAL 1107.

MS. KISLING: AND I CAN PROVIDE THAT.

MS. WALFOORT: SHARON, I JUST WANT TO MAKE SURE I'M READING THIS RIGHT. WHAT THIS IS SAYING, WE HAVEN'T REALLY HAD TESTIMONY ON. BUT AM I READING IT RIGHT? AS OF 12/31/15, TOTAL ASSETS WERE 1,153,000 AND SOME CHANGE. AND THEN SIX MONTHS LATER, THE ASSETS WERE 103,625?

MS. KISLING: ACCORDING TO THE REPORTS, YES. AND I HAVE THE LM-2S I CAN PROVIDE. I DON'T KNOW HOW I ENTER THOSE. I CAN JUST PROVIDE THEM, RIGHT? AND THAT WOULD GIVE THE INFORMATION.

MS. WALFOORT: THOSE ARE PUBLICLY AVAILABLE. BUT I JUST WASN'T SURE THAT I WAS READING THAT CORRECTLY. THAT'S WHAT YOUR BELIEF IS? OKAY. I DON'T THINK THIS WITNESS CAN HELP US ON THAT.

MS. KISLING: I THINK -- ANYTHING ELSE?

THE HEARING OFFICER: I DO WANT TO ASK SHEILA A QUESTION. AS THE TREASURER THOUGH, YOU CAN PROBABLY SPEAK TO THE TOTAL ASSETS AS OF JULY 21, 2016; IS THAT RIGHT?

THE WITNESS: I HAVE NOT MEMORIZED THE NUMBER.

THE HEARING OFFICER: DOES IT SOUNDS LIKE THE TOTAL ASSETS OF 1107 ARE JUST SLIGHTLY OVER $100,000?

THE WITNESS: I DON'T BELIEVE THAT THAT IS THE TOTAL NUMBER. IT MAY HAVE BEEN THE NUMBER FOR ONE MONTH. BUT WITHOUT SEEING IT, I REALLY COULDN'T TESTIFY TO IT.

BECAUSE I'M AN ACCOUNTANT. I NEED TO SEE THE NUMBERS BEFORE I TALK ABOUT THEM.

THE HEARING OFFICER: SO THIS IS PROBABLY THE FINANCES FOR ONE MONTH, AND NOT NECESSARILY THE TOTAL ASSETS?

THE WITNESS: I DON'T REALLY KNOW WHAT THAT NUMBER REPRESENTS. AND I WOULDN'T WANT TO BE MISLEADING OR MISCHARACTERIZING IN ANY WAY. SO WITHOUT LOOKING, I DON'T KNOW.

BY MS. KISLING:

Q BUT I DO HAVE A QUESTION. YOU PROVIDE A FINANCIAL REPORT EVERY MONTH THOUGH THAT SHOWS THIS INFORMATION?

A YES, I DO. EVERY MONTH, A -- WELL, WE HAD SOME DISCUSSION ABOUT CHANGING IT AT THE LAST MEETING. BUT FOR YEARS AND YEARS AT SEIU 1107 THE MONTHLY E-BOARD PACKET CONTAINED A BALANCE SHEET FOR THE PRIOR MONTH, AN INCOME STATEMENT FOR THE PRIOR MONTH, A BALANCE SHEET FOR THE YEAR TO DATE OF THE -- ENDING THE PRIOR MONTH, AND AN INCOME STATEMENT FOR THE YEAR TO DATE ENDING ON THE PRIOR MONTH FOR REVIEW AND APPROVAL OF THE E-BOARD AT THE E-BOARD MEETING. WE ALSO REVIEW THESE IN DETAIL AT THE MONTHLY FINANCE MEETING.

MS. PURDIE: SO THE E-BOARD IS PART OF THE MINUTES?

THE WITNESS: YES, IT SHOULD BE.

THE HEARING OFFICER: OKAY. WE'LL GET IT THAT WAY.

MS. WALFOORT: OKAY, SHARON.

THE HEARING OFFICER: ARE YOU COMPLETED WITH YOUR QUESTIONS?

MS. KISLING: YES.

THE HEARING OFFICER: ALL RIGHT. CHERIE?

MS. MANCINI: YES.

EXAMINATION

BY MS. MANCINI:

Q OKAY. SHEILA, YOU HAD SAID THAT YOU -- SHEILA, YOU HAD SAID THAT YOU WORKED WITH MARTIN PREVIOUSLY ON HIRING PRACTICES?

A NO. I DID NOT SAY THAT.

Q I'M SORRY? THEN CAN YOU REITERATE WHAT PART OF THE HIRING PIECE, I GUESS, YOU TALKED ABOUT THAT YOU WERE LOOKING TO DO? POLICY ON BACKGROUND CHECKS AND ALL OF THESE THINGS?

A NO.

Q OKAY. WHAT WAS IT THAT YOU WORKED WITH MARTIN ON THEN?

A MARTIN WAS CONDUCTING INTERVIEWS TO REPLACE SAM HARRIS AND HAD NO ONE ELSE TO SIT IN THE INTERVIEWS WITH HIM. AND SO HE ASKED ME IF I WOULD. SO I DID.

Q OKAY. YOU HAD SAID THAT YOU HAD -- I HAVE WRITTEN DOWN THAT YOU SAID THAT YOU HAD WANTED TO WORK WITH HIM ON SOME OF THE HIRING POLICIES.

A NO. MARTIN WANTED -- HE HAD SOME STAFF PERSON -- AND I DON'T KNOW WHO DID IT -- CALL AND VERIFY

PEOPLE'S EMPLOYMENT THAT THEY LISTED ON THEIR RESUME, EACH OF THE CANDIDATES, AS WE WERE INTERVIEWING THEM, SO THAT HE COULD DETERMINE IF THEIR RESUMES WERE ACCURATE, AND IF THEY WERE BEING HONEST AND FORTHCOMING WITH HIM. AND I DON'T KNOW WHO MADE THOSE CALLS. BUT I KNOW THAT MARTIN WAS NOT SATISFIED WITH ANY OF THOSE CANDIDATES. SO HE DID NOT WANT TO OFFER A JOB TO ANY OF THEM.

Q OKAY. SO YOU DIDN'T DISCUSS ANYTHING FURTHER AS FAR AS -- I THOUGHT YOU HAD SAID ONCE YOU WENT TO THE AGENCY, THAT YOU SAID THAT YOU HAD TALKED ABOUT ESTABLISHING POLICIES TO DO BACKGROUND CHECKS AND CREDIT CHECKS AND ALL OF THESE OTHER THINGS? DID THAT NOT OCCUR?

A WHAT I ACTUALLY SAID WAS BECAUSE SAM WAS RETIRING, HER RETIREMENT WAS IMMINENT AND SO MARTIN WAS IN A DIFFICULT POSITION. HE NEEDED TO BE ABLE TO PAY EMPLOYEES AND PAY THE BILLS AND KEEP THE UNION HALL RUNNING. SO I SUGGESTED HE USE AN AGENCY. AND WE CALLED ACCOUNT TEMPS. AND I ASKED THEM WHAT SERVICES THEY WOULD PROVIDE. BECAUSE MARTIN, AS I SAID, WAS VERY CONCERNED THAT ALL OF THESE CANDIDATES THAT ARE PRESENTING THEMSELVES TO HIM FOR THIS JOB APPLICATION, THAT WHOEVER THE STAFF PERSON WAS, THEY COULDN'T VERIFY THEIR EMPLOYMENT BECAUSE IT WASN'T FACTUAL. SO I ASKED THE AGENCY, "WHAT DO YOU TO FOR EMPLOYMENT VERIFICATION?" AND THEY TOLD ME.

Q OKAY. AFTER YOU FOUND THAT OUT, NO POLICIES WERE EVER DEVELOPED, CORRECT?

A I DON'T KNOW. I WASN'T WRITING ANY POLICIES FOR THE HALL THEN.

Q DURING THE INTERVIEW OF ROBERT CLARKE, YOU STATED THAT HE HAS NO UNION EXPERIENCE?

A NOT THAT I COULD SEE IN HIS RESUME.

Q AND YOU WILL SEE IN EXHIBIT E THAT I HAVE PRESENTED TO YOU, ROBERT CLARKE'S RESUME, THAT HE WORKED IN PUBLIC EMPLOYEE UNION, LOCAL 1.

MS. PURDIE: WHAT EXHIBIT?

MS. MANCINI: IN MY EXHIBITS. SORRY, IT'S JUST THAT WE'RE JUMPING AROUND.

MS. PURDIE: SO YOU ARE REFERRING TO YOUR EXHIBIT E IN THIS PACKET?

THE WITNESS: I MAY BE MISTAKEN. I DIDN'T MEMORIZE IT. I KNOW THAT WHAT STOOD OUT TO ME WAS THE INDIVIDUAL TAX PREPARATION.

MS. WALFOORT: CHERIE, CAN YOU BRING IT TO US FIRST? DO YOU HAVE COPIES?

MS. MANCINI: SURE. THE FIRST EXPERIENCE FOR ROBERT CLARKE. I GAVE YOU FOUR.

MS. WALFOORT: LONG DAY.

MS. MANCINI: NO WORRIES.

MS. WALFOORT: SORRY.

THE WITNESS: MAY I SEE IT NOW, PLEASE?

THE HEARING OFFICER: WE'RE STILL MARKING IT.

THE WITNESS: WELL, NOW THAT I SEE THIS, IT DOES LIST PUBLIC EMPLOYEES UNION, TWO YEARS OF EXPERIENCE ON THERE. BUT I DON'T KNOW WHY -- I HONESTLY DON'T

REMEMBER IF THIS IS THE RESUME THAT I SAW. IT COULD VERY WELL BE, AND I'M JUST MISTAKEN. BUT I DO HAVE A COPY OF HIS RESUME SOMEWHERE. I COULD GO BACK AND LOOK. BUT I COULD JUST BE NOT REMEMBERING THAT FIRST SECTION OF HIS RESUME ACCURATELY OR NOT. I DON'T KNOW.

BY MS. MANCINI:

Q OKAY. SO YOU HAVE HIS RESUME. SO WE'LL MOVE ON FROM HERE.

MS. WALFOORT: OKAY. WE HAVE GOT TO CATCH UP, IF YOU'D GIVE US ONE MINUTE.

(EXHIBIT ADMITTED.)

MS. MANCINI: LET ME KNOW WHEN YOU'RE READY.

MS. PURDIE: YOU CAN GO AHEAD.

BY MS. MANCINI:

Q SHEILA, WHEN YOU TALK ABOUT ACCESS TO ASSETS, CAN YOU TELL ME, IS ROBERT CLARKE A SIGNER ON OUR BANK ACCOUNT?

A AS YOU KNOW, CHERIE, THE SIGNERS ARE CHERIE MANCINI AND SHEILA GRAIN.

Q CORRECT. SO ROBERT IS NOT A SIGNER ON OUR ACCOUNT?

A YOU ARE RIGHT, YAY.

Q OKAY. SO CAN YOU TELL ME AT THE LAST E-BOARD MEETING, YOU DID PRESENT A CASH ANALYSIS, LIKE YOU HAD SAID. AND I RECALL THAT IT SAID THAT -- OR DO YOU RECALL WHAT OUR CASH ON HAND WAS, APPROXIMATELY, AFTER ALL OF --

A DO YOU RECALL?

Q I DO.

A WILL YOU TELL ME?
Q YEAH. JUST OVER 500,000 ON HAND.
A IS THAT THE BEGINNING OR THE ADJUSTED AMOUNT?
Q AFTER THE ADJUSTED AMOUNT.
A AFTER ADJUSTMENTS?
Q WHICH TOOK INTO ACCOUNT THE 515 MONEY, PER CAPS, AND THE MONEY SET ASIDE FOR THE NEW BUILDING AND FURNITURE. SO IT WAS JUST OVER $500,000.
AS TREASURER, YOU DON'T KNOW WHAT THE STAFF SALARIES ARE?
A WE USE ADP PAYROLL TO PAY OUR HALL STAFF. AND I DON'T REVIEW THOSE REPORTS. I CAN IF YOU WOULD LIKE ME TO. I WOULD BE HAPPY TO DO THAT.
Q I MEAN ISN'T IT PART OF THE BUDGETING PROCESS, STAFF PAY?
A YOU ARE ABSOLUTELY RIGHT. AS PART OF THE BUDGETING PROCESS, I WILL HAVE TO REVIEW THOSE WITH ROBERT. BUT AS FAR AS I KNOW, HE'S STILL GATHERING THE -- WHAT I REFER TO AS -- THE WISH LIST FROM PEOPLE, AS FAR AS WHAT THEY WOULD LIKE TO SPEND. AND HE WAS GOING TO CUT THAT OFF BY OCTOBER 31ST. SO MONDAY IS HIS DEADLINE. AND THEN AFTER THAT, WE CAN START TO LOOK INTO THAT.
BUT YOU ARE ABSOLUTELY RIGHT. I WILL BE LOOKING AT STAFF SALARIES IN THE AGGREGATE AT LEAST FOR BUDGETING PURPOSES.
Q THANK YOU. CAN YOU ALSO TELL ME WHAT YOU BELIEVE TO BE THE MOST COSTLY EXPENSE PER MONTH THAT WE

HAVE FOR ONE BILL?
A IT'S PROBABLY WAGES. I MEAN YOU ARE ASKING ME QUESTIONS NOW ABOUT THE FINANCIAL STATEMENTS. AND WITHOUT THE FINANCIAL STATEMENTS IN FRONT OF ME, I HESITATE TO ANSWER ANY SPECULATIVE QUESTIONS.
Q I GOTCHA.
A I KNOW WE DO HAVE SOME OPERATING EXPENSES THAT ARE FAIRLY HIGH BECAUSE WE'RE A LABOR UNION. SO, YES, WE DO.
Q OF THE VENDORS THAT WE PAY, WOULD IT BE SAFE TO SAY THAT THE MOST EXPENSIVE VENDOR IS MIKE URBAN'S BILL, OUR ATTORNEY?
A I DON'T KNOW. I WOULD HAVE TO LOOK. CHERIE, I KNOW EVERYBODY THINKS I MEMORIZE EVERYTHING, AND I DO REMEMBER A LOT OF THINGS, BUT I DON'T --
Q THAT'S FINE. I'LL PROVIDE THE BILL. THAT'S FINE.
A I'M JUST CURIOUS --
Q WELL, I'M TRYING TO GET A GAUGE ON WHAT OUR FINANCIAL HEALTH IS AND WHAT WE'RE SPENDING OUR MONEY ON.
A BUT THAT'S NOT WHAT WE'RE TALKING ABOUT.
MS. WALFOORT: EXCUSE ME. I THINK SHE'S MADE IT CLEAR SHE CAN'T ANSWER THOSE QUESTIONS. BUT WHAT EXAMINATION REALLY WENT INTO WERE TWO THINGS, BACKGROUND CHECK AND EMPLOYMENT VERIFICATION AND WHETHER YOU HAVE THOSE PRACTICES. SO IF YOU WANT TO ASK HER ABOUT THAT, YOU CAN.
MS. MANCINI: BUT WE TALKED ABOUT FINANCIAL

MALPRACTICE AND THE LM-2 THAT SAID WE ONLY HAD $100,000 IN THE BANK.

MS. WALFOORT: BUT SHE'S ALREADY SAID SHE CAN'T ANSWER WITHOUT SEEING THEM.

MS. MANCINI: OKAY. THAT'S FINE.

BY MS. MANCINI:

Q CAN I ASK A QUESTION, SHEILA? DID YOU ASK THE STAFF OUTSIDE IF THEY WERE ON OVERTIME?

A YES.

Q AND WHETHER OR NOT I HAD ASKED THEM TO BE HERE TODAY?

A NO. THEY SAID THEY WERE ALL VOLUNTEERS. AND I TOLD THEM THEY WERE GREAT AND I LOVED THEM.

EXAMINATION

BY MR. SERRANO:

Q BUT YOU DID ASK THEM IF THEY WERE ON OVERTIME?

A I'VE ANSWERED THAT. THANK YOU, ALFREDO.

MS. WALFOORT: LET'S BE PATIENT WITH EACH OTHER.

THE WITNESS: I HAVE ANSWERED THAT THOUGH.

MS. WALFOORT: YES, YOU DID. AND HE ASKED ONE MORE TIME. SO LET'S GO.

BY MR. SERRANO:

Q WHEN YOU WERE WITH MARTIN IN THE INTERVIEW PROCESS, DID YOU DISCUSS HAVING POLICY REGARDING BACKGROUND CHECKS WITH HIM?

A AS FAR AS I RECALL CHERIE ASKED ME THAT, AND I

DID NOT. WHAT DOES THAT MEAN, "HAVING POLICIES"? DO YOU MEAN WRITING POLICIES?

Q WRITING A POLICY. BECAUSE AT THE SAME TIME YOU THOUGHT WE DIDN'T HAVE A POLICY AND WE DIDN'T DO BACKGROUND CHECKS. IS THAT WHAT YOU SAID EARLIER? YOU SAID WE WENT WITH A TEMP AGENCY, AND THEY PROVIDED -- THEY DID THE BACKGROUND CHECKS, BUT WE DIDN'T HAVE BACKGROUND CHECKS DONE BEFORE THAT?

A IT WAS MY UNDERSTANDING THAT SAM HARRIS DID THAT.

Q DID BACKGROUND CHECKS?

A YES. THAT WAS MY UNDERSTANDING, YES, THAT SHE DID THE EMPLOYMENT VERIFICATIONS AND WHAT OTHER TYPES OF BACKGROUNDS CHECKS OR ANYTHING THAT'S SHE DID, I DON'T KNOW THE DETAILS OF IT. I JUST KNOW THAT SHE PERFORMED THAT FUNCTION, AND THAT'S WHY BECAUSE SHE RETIRED, MARTIN DIDN'T HAVE SOMEONE TO DO THAT. AND THAT'S WHAT HE WAS REPLACING SAM IN THOSE INTERVIEWS.

Q AND HOW DO YOU KNOW SHE DID BACKGROUND CHECKS?

A THAT'S WHAT MARTIN TOLD ME.

Q WHEN YOU WERE IN THE INTERVIEW PROCESS WITH ROBERT, ROBERT THE FINANCE DIRECTOR -- WERE YOU IN THE INTERVIEW PROCESS WITH HIM?

A YES.

Q AT THAT TIME, DID YOU BRING UP BACKGROUND CHECKS? DID YOU ASK IF ANYBODY DID A BACKGROUND CHECK ON HIM?

A DURING HIS INTERVIEW?

Q NOT DURING HIS INTERVIEW, BUT WHILE THE INTERVIEW PROCESS WAS GOING IN PLACE -- WAS GOING ON, DID YOU ASK IF ANYBODY DID -- A BACKGROUND CHECK WAS DONE ON ROBERT?

A I DON'T KNOW WHAT YOU WANT ME TO SAY, ALFREDO.

Q I WANT YOU TO SAY WHETHER OR NOT YOU BROUGHT UP THE FACT THAT YOU ASKED IF ANYBODY HAD DONE A BACKGROUND CHECK ON ROBERT WHILE YOU WERE IN THE INTERVIEW PROCESS LOOKING FOR A FINANCE DIRECTOR.

A OKAY. WHEN I WAS IN THE INTERVIEW PROCESS LOOKING FOR A FINANCE DIRECTOR WITH CHERIE AND CLARA, I DID NOT VOTE FOR ROBERT TO BE SELECTED. AND SO I DIDN'T -- AND AFTER THAT, SUBSEQUENT TO THAT, I WAS NOT PROVIDED WITH ANY INFORMATION ABOUT ROBERT. AND I WAS NOT PROVIDED WITH A COPY OF HIS OFFER LETTER. SO I DIDN'T EVEN KNOW WHAT THE TIMING OF HIS START DATE, WHEN HIS START DATE WOULD BE OR OF ANYTHING THAT WOULD HAVE TRIGGERED, IN MY MIND, ASKING THAT QUESTION.

Q WELL, WE'RE BRINGING UP CONCERNS NOW THAT THERE WAS NOT A BACKGROUND CHECK DONE ON ROBERT. I'M ASKING IF YOU HAD -- AND I DON'T THINK YOU ANSWERED THAT.

THE HEARING OFFICER: CAN I JUST ASK A QUESTION? AND MAYBE IT WILL CUT TO CHASE A LITTLE BIT. ARE BACKGROUND CHECKS BEING DONE RIGHT NOW ON EMPLOYEES BEING HIRED?

MR. SERRANO: WHO ARE YOU ASKING? ARE YOU ASKING US? NO. I CAN FIND NO RECORD OF BACKGROUND CHECKS.

THE HEARING OFFICER: DO YOU KNOW OF ANY HISTORY OF BACKGROUNDS CHECKS?

MR. SERRANO: NO, I DO NOT.

THE HEARING OFFICER: SO UNLESS SOMEONE HAS EVIDENCE THAT THEY'VE HAPPENED OVER A PERIOD OF TIME THAT CREATES PAST PRACTICE, I WOULD SAY LET'S MOVE ON. I'VE HEARD THIS.

(SIMULTANEOUS SPEAKERS.)

MR. SERRANO: I KEEP HEARING THAT.

THE HEARING OFFICER: LET'S MOVE ON.

MS. KISLING: I CAN PROVIDE EVIDENCE. BECAUSE THE PRIOR COMMUNICATIONS DIRECTOR, IF THEY GO THROUGH THE EMPLOYEE FILES, THEY WILL SEE WHERE SHE DIRECTS SAM TO RUN BACKGROUND CHECKS ON EMPLOYEES. THE LAST SEEN WAS MICHAEL CUBBIN, WHICH WAS PRIOR TO CHERIE BECOMING PRESIDENT. WE ALSO HAVE LEXISNEXIS, WHICH PRESIDENT MANCINI WANTS TO CANCEL. AND THAT'S USED IN CONDUCTING BACKGROUND CHECKS, LEXISNEXIS.

MR. SERRANO: JUST SO YOU KNOW, THOSE EMPLOYEES HAVE BEEN GONE SINCE JULY 2013.

MS. THOMAS: BUT THERE IS A HISTORY.

MS. WALFOORT: WHAT THE HEARING OFFICER IS SAYING IS IF YOU'VE GOT SOMETHING THAT ACTUALLY SHOWS A HISTORY, BRING IT IN.

MS. KISLING: BUT RIGHT NOW, IT'S NOT HAPPENING. TRUTHFULLY, RIGHT NOW, THAT WOULD BE BEST PRACTICE, TO BE DOING BACKGROUND CHECKS. AND WE HAVE ASKED FOR THAT TO BE DONE.

THE HEARING OFFICER: I'M NOT GOING TO DISPUTE WHAT BEST PRACTICE IS. BUT WE CAN'T ESTABLISH THAT HERE. THAT'S SOMETHING THAT CAN COME OUT OF THIS. BUT UNLESS YOU CAN PROVIDE EVIDENCE THAT BACKGROUND CHECKS HAVE HAPPENED CONSISTENTLY AND OVER A LONG PERIOD OF TIME, BECAUSE THAT'S PAST PRACTICE, THEN WE WOULD HAVE THAT. IF WE DON'T HAVE EVIDENCE, WE DON'T HAVE A PAST PRACTICE. AND I HAVEN'T SEEN ANYTHING.

MS. KISLING: OKAY.

EXAMINATION

BY MS. SPRINGER:

Q HI, SHEILA. JUST A COUPLE QUICK QUESTIONS.

A OKAY, DEB.

Q OKAY. SO YOU TESTIFIED THAT YOU HELPED MARTIN INTERVIEW PEOPLE, AND THAT YOU FINALLY SETTLED ON, WHAT, PEOPLE FROM ACCOUNT TEMPS, RIGHT?

A MARTIN WASN'T SATISFIED WITH ANY OF THE CANDIDATES BECAUSE HE HAD A STAFF PERSON VERIFY THEIR EMPLOYMENT DURING -- THAT DAY, RIGHT AFTER OR DURING THE INTERVIEWS. AND HE WAS NOT SATISFIED. I SAT IN WITH MARTIN BECAUSE AS YOU REMEMBER THERE WERE HARDLY ANY STAFF AT THE HALL.

THE HEARING OFFICER: SHEILA, CAN I JUST STOP? BECAUSE YOU'VE ANSWERED THIS QUESTION THREE TIMES --

(SIMULTANEOUS SPEAKERS.)

MS. SPRINGER: WELL, I HAVE ANOTHER PART.

THE HEARING OFFICER: GET TO THE OTHER PART.

BY MS. SPRINGER:
Q IT WAS YOUR TESTIMONY THAT THROUGH WHATEVER PROCESS THIS WAS, THAT WE HIRED A NEW HR FINANCE DIRECTOR, RIGHT? THAT'S WHAT YOU JUST GOT DONE TELLING US EARLIER, RIGHT?
A HE HIRED A TEMP.
Q BUT YOU CALLED THE PERSON WE HIRED THE HR FINANCE DIRECTOR; IS THAT CORRECT?
A I DON'T KNOW IF THAT WAS ACTUALLY THE TITLE MARTIN GAVE HER. I DON'T KNOW THAT TO A CERTAINTY. SO I CAN'T SAY THAT I DO, DEB.
Q OKAY. WELL, THE LAST QUESTION I HAVE, YOU WORK FOR CLARK COUNTY, RIGHT?
A YES.
Q OKAY. AND AS YOU KNOW, CLARK COUNTY RECEIVES HUNDREDS OF RESUMES EVERY DAY, RIGHT? RIGHT? HUNDREDS OF RESUMES?
A I DON'T KNOW THAT.
Q YOU'VE SEEN POSTINGS WHERE THEY SAID "THE FIRST 250 PEOPLE"; IS THAT CORRECT?
A I'VE SEEN JOB POSTINGS ON THE WEBSITE.
THE HEARING OFFICER: HOW IS THIS RELEVANT?
MS. SPRINGER: IT IS.
THE WITNESS: I'VE SEEN THAT LIMITATION ON JOB POSTINGS ON THE CLARK COUNTY WEBSITE BEFORE.
BY MS. SPRINGER:
Q SO THIS IS THE CRUX OF IT. SO ANYWAY, THESE PEOPLE TAKE INTERVIEWS, RIGHT? AND DO SOMETIMES THESE

PEOPLE WHO ARE INTERVIEWED, ARE THEIR FRIENDS, FAMILY, SISTERS, BROTHERS, WHOEVER HIRED BY THE COUNTY?

MS. WALFOORT: DEBBIE, IS THAT YOUR LAST QUESTION?

THE HEARING OFFICER: VERY GOOD.

MS. WALFOORT: ALL RIGHT. ARE THEY?

THE WITNESS: I DON'T KNOW.

MS. WALFOORT: OKAY. THEN THAT'S THE ANSWER. QUESTION ANSWER, DONE.

THE HEARING OFFICER: DO YOU HAVE REBUTTAL AT ALL?

MS. KISLING: NO.

THE HEARING OFFICER: OKAY. ALL RIGHT, THANK YOU, SHEILA.

ARE WE ABLE TO GET ONE MORE WITNESS IN IN 15 MINUTES? WE HAVE GOT THIS ROOM UNTIL 9:00.

MS. WALFOORT: ONE MORE WITNESS AND CLOSING STATEMENTS. SO IT WOULD GIVE YOU ABOUT FIVE OR SEVEN MINUTES FOR THE WITNESS, BOTH OF YOU. AND THEN CLOSING STATEMENTS.

MS. KISLING: I JUST HATE THAT SHE'S BEEN HERE THIS WHOLE TIME.

MS. WALFOORT: CHERIE, DO YOU HAVE WITNESSES FOR TONIGHT?

THE HEARING OFFICER: HERE IS THE QUESTION. SINCE BOTH CHARGING PARTY -- YOU ARE ALL IN THE ROOM HERE. WE ACTUALLY COULD START THIS PORTION OF THE MEETING EARLIER TOMORROW MORNING, EARLIER THAN 10:00. SO

IF WE STARTED AT 9:00, WE MIGHT BE ABLE TO GET THROUGH AND WRAP IT UP AND GET BACK ON TRACK AT 10:00 WHEN FOLKS SHOW UP FOR THE OTHER CHARGES THAT ARE STILL PENDING. CAN WE DO THAT?

MS. MANCINI: I'M NOT SURE WE CAN GET DONE IN AN HOUR. WE HAVEN'T EVEN HAD AN OPPORTUNITY TO SAY ANYTHING. WE HAVEN'T PRESENTED ANYTHING.

MS. WALFOORT: LET'S DO THIS, LET'S DO ONE MORE WITNESS AT LEAST NOW. AND THEN LET'S ADJOURN AND GET BACK TOMORROW AT 9:00.

THE HEARING OFFICER: WILL 9:00 O'CLOCK WORK FOR EVERYBODY? CAN WE AGREE ON THAT?

MS. KISLING: YOU WANT TO BE FINISHED NOW AND START TOMORROW THEN?

MS. WALFOORT: I THINK YOU SHOULD TAKE YOUR LAST WITNESS.

MS. KISLING: DO YOU REALLY THINK IT'S GOING TO BE 15 MINUTES? I JUST DON'T WANT TO SAY THAT AND THEN EVERYONE IS FRUSTRATED.

MS. PURDIE: LET'S SEE HOW FAR WE GET WITH THE WITNESS.

THE HEARING OFFICER: ALL RIGHT. SO LET'S SWEAR IN THE WITNESS. AND STATE YOUR NAME AND SPELL IT.

VICTORIA HARDING,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: VICTORIA HARDING, V-I-C-T-O-R-I-A H-A-R-D-I-N-G.

THE HEARING OFFICER: READY TO START?

MS. KISLING: YES. FOR THIS WITNESS, I'M JUST GOING TO FOCUS ON CHARGING PARTY NUMBER 2 ON THE INFORMATION REGARDING RENOWN, WHICH IS PRESENTED IN, LET'S SEE, EXHIBIT 5, RECORDS AND LETTERS.

THE WITNESS: YES.

EXAMINATION

BY MS. KISLING:

Q YOU RECENTLY WERE AT A CONFERENCE IN RENO, NEVADA, CORRECT?

A I WAS.

Q WHAT CAN YOU TELL US ABOUT WHAT HAPPENED ON THAT TRIP IN TERMS OF RENOWN? I'LL MAKE IT GENERAL.

A WELL, I KNOW THAT, SHARON, YOU HAD WANTED WHILE WE WERE UP IN THE CONFERENCE, WANTED TO STOP BY RENOWN AND SEE WHAT THEY NEEDED AS FAR AS ORGANIZING. BECAUSE THEIR PERCENTAGE WAS VERY, VERY LOW OF MEMBERSHIP. AND YOU WERE TRYING TO GET OVER TO SEE THE OFFICE, POTENTIALLY SEE THE ORGANIZER WHO IS UP IN RENO AND MAYBE GO OVER TO RENOWN TO SEE IF YOU CAN TALK TO EMPLOYEES.

Q DID YOU KNOW IF I OR ANY OTHER PARTIES ACTUALLY MADE IT UP TO RENOWN?

A I DO. YOU DID, CLARA WAS WITH YOU, KEISHE WAS WITH YOU AND ONE MORE PERSON.

Q WHAT CONCERNS ARE YOU AWARE THAT WE BROUGHT

BACK TO YOU AS AN EXECUTIVE BOARD MEMBER REGARDING THE OFFICE, REGARDING OUR MEETINGS WITH MEMBERS?

A I KNOW THAT THERE WAS NO KEY TO THE OFFICE, WHICH WAS KIND OF A BIG STUMBLING BLOCK OF YOU GETTING A KEY SO THAT YOU COULD GET IN THERE. AND WHEN YOU DID GET IN THERE, IT LOOKED AS THOUGH NO ONE HAD BEEN THERE IN A LONG PERIOD OF TIME. AND THE NEIGHBORS DID NOT KNOW OF US OR ANYTHING ELSE ABOUT US. AND IT JUST SEEMS LIKE THERE WAS NOBODY THERE AT RENOWN.

Q DO YOU REMEMBER IN TERMS OF -- WERE WE ABLE TO MAKE CONTACT WITH MEMBERS IN THE HOSPITAL?

A YOU WERE. YOU GUYS WERE VERY HAPPY THAT YOU WERE ABLE TO GO AROUND AND TALK TO EMPLOYEES, AND THEY WERE VERY WELCOMING TO YOU.

Q NOW, THE ORGANIZER ASSIGNED WAS NATALIE HERNANDEZ. WERE YOU AT THE E-BOARD MEETING THIS PAST WEDNESDAY?

A YES.

Q DO YOU KNOW IF THIS ORGANIZER WAS PRESENT?

A I DO NOT KNOW.

Q OKAY.

A I PROBABLY WOULDN'T KNOW NATALIE IF I SAW HER.

Q OKAY. DO YOU KNOW IF THIS ORGANIZER IS STILL AN EMPLOYEE OF SEIU LOCAL 1107?

A I THINK I RECENTLY JUST HEARD SHE NO LONGER WORKS THERE. I DON'T KNOW. THAT WAS A RUMOR.

Q OKAY. WOULD YOU HAVE CONCERNS IF SHE STILL WORKED HERE?

A I WOULD HAVE SOME CONCERNS IF SHE WAS STILL WORKING HERE AND WE HAD NOT WORKED OUT THE ISSUES OF WHAT WAS GOING ON UP THERE IN RENO, YES.

MS. KISLING: OKAY. THAT'S ALL I'M GOING TO NEED.

EXAMINATION

BY MS. MANCINI:

Q DID YOU ACTUALLY GO TO RENOWN HOSPITAL?

A I DID NOT.

Q YOU DID NOT?

A I WAS ASKED, BUT I DID NOT GO.

Q OKAY. WERE YOU AWARE THAT NATALIE HERNANDEZ SENT AN E-MAIL -- I KNOW THIS IS GOING TO BE -- TELL ME IF I'M OFF TRACK AND THIS IS NOT THE RIGHT THING.

BUT NATALIE WAS CONCERNED. SHE HAD AN E-MAIL FROM A LADY NAMED CHRISTINA, SAYING THAT SHE HAD A NON-MEMBER LIST, AND SHE WAS LOOKING FOR A MEMBER LIST, AND NATALIE HAD STATED TO HER THAT -- SHE TALKED TO HER OVER THE PHONE ONCE OR TWICE, BUT CALLED ASKING FOR HER AVAILABILITY.

AND I'VE SUBMITTED THIS. THIS IS ALREADY IN YOUR PACKET.

MS. WALFOORT: IS THIS ABOUT NATALIE?

MS. MANCINI: YES. WHAT HAPPENED WAS SHE STATED SHE WAS GOING TO BE ON VACATION TO CHRISTINE, WHO IS --

MS. WALFOORT: GO AHEAD.

MS. MANCINI: SO BASICALLY, SHE TOLD THIS PERSON SHE WOULD NOT BE ABLE TO MEET WITH SHARON AS SHE WAS GOING TO BE ON VACATION. I WAS ON VACATION AT THE TIME OF THIS. WHEN I CAME BACK, WE WENT IMMEDIATELY UP TO CONFERENCE AT THE AFL-CIO IN RENO. I THEN WAS APPROACHED ABOUT THE -- I'M NOT GOING TO GIVE TESTIMONY. I'M SORRY. I APOLOGIZE.

BY MS. MANCINI:

Q ARE YOU AWARE, WERE THERE ANY PRIVATE SECTOR PEOPLE THAT WENT WITH YOU INTO THE HOSPITAL? OR DID YOU KNOW THAT WERE WITH THEM TO GO IN TO THE HOSPITAL?

A I DO NOT KNOW OF ANY PRIVATE SECTOR PEOPLE WHO WENT INTO THAT HOSPITAL, NO.

Q OKAY. SO YOU WEREN'T AWARE OF ANYONE THAT KNEW WHAT THE POLICIES AND PROCEDURES WERE WHEN THEY CAME TO THE HOSPITAL, CORRECT?

A I HAD ACTUALLY ASKED SHARON IF SHE KNEW WHAT THE POLICY WAS. AND THAT WAS THE OTHER ISSUE SHE HAD WAS TRYING TO FIND A CONTRACT FOR RENOWN IN GETTING IN THERE. SO I KNOW THAT WHEN THEY WENT THERE, THEY DID ASK WHEN THEY GOT THERE WHAT WAS THE POLICY.

Q OKAY. SO YOU ARE NOT AWARE OF A LETTER FROM HR STATING THAT THE ACCESS WAS VIOLATED BY RENOWN HOSPITAL BY MS. KISLING AND EVERYONE THAT WAS THERE?

A I WAS AWARE OF THAT LATER. BUT THAT'S NOT WHAT I WAS -- THE EXPERIENCE THEY TOLD ME AT THE TIME.

Q SO THEN ALSO BASED UPON THAT, DO YOU KNOW IF THEY EVEN KNEW WHO WAS REPRESENTED IN THAT HOSPITAL, WHO

WAS REPRESENTED, WHETHER IT BE NURSES, WHETHER IT BE ANCILLARY, WHETHER IT BE CHARGE PEOPLE OR NOT? DO YOU KNOW IF THEY KNEW THAT?

A I'M NOT SURE IF THEY HAD A LIST.

Q OKAY. SO YOU WOULDN'T KNOW IF THEY WERE TALKING TO MEMBERS OR NONMEMBERS, RIGHT?

A I WOULD NOT KNOW.

MS. MANCINI: THANK YOU.

MS. PURDIE: SO WHAT DOCUMENTS ARE YOU REFERENCING?

MS. MANCINI: I'M REFERENCING C IN MY PACKET, SORRY.

MS. PURDIE: SO THE PACKET, I TOOK APART. BECAUSE EACH EXHIBIT NEEDS TO BE MARKED SEPARATELY AS YOU INTRODUCE THEM. SO IS THIS AN E-MAIL THAT YOU SENT TO THE WITNESS OR THAT SHE COPIED?

MS. MANCINI: NO.

MS. PURDIE: LET'S TAKE A LOOK AT IT.

MS. MANCINI: THAT'S WHY I SAID, I DIDN'T EXPECTED TO DO IT THIS WAY. I EXPECTED TO GO DOWN THE CHARGES.

MS. PURDIE: YOU ARE SAYING YOUR EXHIBIT C THAT WAS IN THAT PACKET?

MS. MANCINI: CORRECT.

BY MS. MANCINI:

Q AND ALSO, WHEN YOU WERE IN THE OFFICE, WERE YOU AWARE OF SHARON COLLECTING FILES OF RECEIPTS THAT WERE ACTUALLY TAKEN FROM THAT OFFICE, WHICH I BELIEVE ARE PART

OF THE BIG BOOK EXHIBIT?
A YES. SHE DID TAKE SOME OLD MAIL AND THINGS OUT OF THE OFFICE, YES.
Q OKAY. SO DID YOU SEE HER TAKE RECEIPTS OR ANYTHING IN A FILE FOLDER?
A SHE HAD A BIG ENVELOPE ACTUALLY. I BELIEVE IT WAS AN ENVELOPE OF ALL THE THINGS THAT WERE JUST LAYING AROUND ON A DESK THAT WERE REALLY OLD THAT SHE TOOK OUT OF THERE.
Q OKAY. SO SHE BASICALLY TOOK IT. BUT YOU DON'T KNOW IF SHE EVER CONTACTED NATALIE TO DISCUSS IT?
A I WOULD NOT KNOW THAT.
MS. MANCINI: OKAY. THANK YOU.
MR. SERRANO: I HAVE ONE POINT.
THE HEARING OFFICER: OKAY.

EXAMINATION

BY MR. SERRANO:
Q SO THE RENO OFFICE, WAS THAT NATALIE'S OFFICE?
A THAT IS THE OFFICE THAT NATALIE WORKED OUT OF. AND SHE ALSO SPENT A LOT OF TIME IN ELKO AS WELL.
Q DO YOU KNOW HOW THEY GOT INTO THAT OFFICE? DID NATALIE PROVIDE A KEY FOR THEM?
A THEY HAD IT REKEYED.
Q SO THEY WENT IN THERE WITHOUT NATALIE'S KNOWLEDGE, IN HER OFFICE?
A YES. BUT ACTUALLY PRESIDENT MANCINI WAS AWARE OF THAT. THIS WAS ALL GOING ON AT THE CONFERENCE, AND

EVERYBODY HAD SPOKEN TO EACH OTHER ABOUT HOW TO GET INTO THAT OFFICE. BECAUSE I DON'T THINK EVEN PROPERTY MANAGEMENT HAD A KEY TO IT. BECAUSE IT HAD BEEN REKEYED, AND THEY DIDN'T HAVE A KEY.

Q BUT AS FAR AS YOU KNOW, NATALIE WAS NOT AWARE? NOBODY HAD CONTACTED NATALIE?

A NO.

THE HEARING OFFICER: GO AHEAD.

MS. SPRINGER: HI VICTORIA. CORRECT ME IF I'M WRONG, BUT MAYBE ONE OR TWO E-BOARDS AGO, MARY GRILLO -- THERE WAS A BIG BROUHAHA ABOUT WHY RENOWN WAS SO LOW. AND MARY GRILLO EXPLAINED TO US WHY, COULD YOU EXPLAIN IN YOUR OWN WORDS WHAT MARY SAID?

THE WITNESS: THE BEST OF MY RECOLLECTION OF THAT WAS THAT THEY HAD A VERY HARD TIME ORGANIZING RENOWN, THAT IT WAS HARD TO GET IN. THEY DIDN'T HAVE ACCESS TO IT. AND THEY ACTUALLY SENT A LOT OF PEOPLE, I THINK, FROM INTERNATIONAL TO TRY AND ORGANIZE THAT. THEY SPENT A LOT OF TIME AND EFFORT ON THAT. AND THEY STILL WEREN'T ABLE TO GET THAT GOING PRETTY MUCH.

MS. SPRINGER: THANK YOU.

THE HEARING OFFICER: SO JUST A CLARIFICATION, THE CHARGES HAVE AN 11 PERCENT MEMBERSHIP RATE. AND THEN THIS DOCUMENT THAT'S PART OF EXHIBIT 2 HAS A 13 PERCENT, SECTION 5, RELATED TO NATALIE'S WORK. WHAT HISTORICALLY IS THE MEMBERSHIP RATE? DOES ANYONE KNOW?

MS. SPRINGER: ABOUT THAT.

THE HEARING OFFICER: ABOUT 11 TO 13?

MS. SPRINGER: YEAH.

THE WITNESS: ACTUALLY, THEY PUT IT UP TO ABOUT 20-SOMETHING WHEN THEY DID THE --

MS. MANCINI: I THINK THAT'S THE HIGHEST IT'S EVER BEEN.

THE WITNESS: AND THAT'S THE HIGHEST THEY COULD MAINTAIN IT.

THE HEARING OFFICER: SO THE QUESTION I ASKED WAS THAT WHEN THERE WAS A DRIVE AND THERE WAS OTHER STAFF HELPING TO GET IT UP TO 20 PERCENT --

THE WITNESS: YES, IT WAS.

MS. MANCINI: IT WAS -- INTERNATIONAL CAME TO HELP.

THE HEARING OFFICER: ALL RIGHT.

FURTHER EXAMINATION

BY MS. KISLING:

Q ARE YOU AWARE THERE ARE MEMBERS PAYING DUES AT RENOWN?

A THERE ARE MEMBERS PAYING DUES AT RENOWN, YES.

Q OKAY. SO AS AN EXECUTIVE BOARD MEMBER, DO YOU HAVE AN OBLIGATION TO PROVIDE THEM WITH SUPPORT?

A YES.

Q NOW, THERE HAS BEEN A LOT OF TALK ABOUT ACCESS ISSUES. WHEN I DID HAVE A CONVERSATION OR REPORT TO THE E-BOARD, DO YOU REMEMBER WHAT THEIR CONTRACT ACTUALLY SAID ABOUT ACCESS?

A IT WAS ACTUALLY VERY LIBERAL ACCESS POLICY. I

THINK YOU JUST HAD TO NOTIFY THEM THAT YOU WERE THERE.
Q OKAY. SO IF I SAID BASICALLY WITHIN TWO HOURS, YOU COULD BE BADGED AND HAVE ACCESS TO -- DOES THAT SOUND ABOUT --
A YES. IT WAS VERY LIBERAL, YES.
Q OKAY. SO ALSO IN TERMS OF THE CONCERNS ABOUT NOT PROVIDING THAT SUPPORT TO RENOWN AND HAVING ONE ORGANIZER ASSIGNED TO JUST RENOWN AND JUST ELKO, WOULD THE EXPECTATION OF THE EXECUTIVE BOARD BE THAT THEY RECEIVE MORE SUPPORT THAN THEY WERE RECEIVING?
A DO YOU THINK THEY SHOULD HAVE MORE SUPPORT?
Q YES. ABSOLUTELY. I DO THINK THEY SHOULD HAVE MORE SUPPORT.
Q HAVE YOU EVER -- WHICH JOB ARE YOU FROM?
A I'M FROM THE HEALTH DISTRICT.
Q HAVE YOU HAD CONCERNS ABOUT NOT HAVING SUPPORT IN YOUR SHOP?
A YES.
Q AND HOW DID YOU AND YOUR MEMBERS FEEL?
A THERE IS TIMES WE FEEL THE UNION JUST ISN'T THERE FOR US.
THE HEARING OFFICER: ARE YOU DONE?
MS. WALFOORT: NO? OH, OKAY.
THE HEARING OFFICER: SO THE COURT REPORTER IS ABLE TO BE HERE AT 8:30. IT SEEMS LIKE THIS IS TAKING AWHILE TO GO THROUGH.
MS. WALFOORT: WE'RE NOT MAKING YOU.
THE HEARING OFFICER: I'M ASKING, WOULD FOLKS

BE ABLE TO BE HERE AT 8:30?

MS. KISLING: I CANNOT. I HAVE A FIVE-YEAR-OLD GRANDSON.

THE HEARING OFFICER: YOU'LL NOT BE ABLE TO BE HERE AT 8:30?

MS. KISLING: CAN WE GO AFTER THE OTHER ONES?

THE HEARING OFFICER: WE SHOULD REALLY KEEP THIS MOVING AND GET IT FINISHED. AND WE CAN'T START THE OTHER CHARGES BECAUSE THE NOTIFICATION SAID 10:00 O'CLOCK. AND IF WE WANT TO FINISH THIS ANY TIME THAT'S NOT RIDICULOUSLY LATE TOMORROW, WE HAVE GOT TO GET GOING EARLIER.

MS. SPRINGER: WE'LL BE HERE EARLY, NO PROBLEM.

THE HEARING OFFICER: 9:00 O'CLOCK, SHARON SAID. SO LET'S DO 9:00 O'CLOCK, LIKE WE SAID EARLIER. EVERYBODY AT 9:00.

MS. SPRINGER: TOMORROW WE'RE GOING TO START WITH ANY WITNESSES THAT CHERIE HAS, AND THEN WE'LL GO INTO FINAL STATEMENTS, CLOSING STATEMENTS?

THE HEARING OFFICER: RIGHT. YOU WILL HAVE YOUR WITNESSES FIRST. AND THEN FINAL STATEMENTS AFTER THAT.

MS. MANCINI: FINE.

MS. WALFOORT: AND YOU THINK YOU HAD HOW MANY?

MS. MANCINI: WELL, NOW I HAVE MORE. DEPENDING ON -- DEPENDING ON WHAT'S BROUGHT UP.

MS. WALFOORT: WELL, YOU ARE GOING TO START TOMORROW.

MS. MANCINI: NO, THAT'S WHAT I'M SAYING, DEPENDING ON WHAT WAS BROUGHT UP TODAY.

MS. WALFOORT: YOU MEAN ON THE BASIS OF WHAT WAS BROUGHT UP TODAY, YOU HAVE MORE?

MS. MANCINI: YES. BUT I DOUBT I WILL HAVE MORE THAN FOUR. AND THEY'LL BE VERY QUICK.

MS. WALFOORT: THANK YOU.

(EXHIBITS ADMITTED.)

(HEARING ADJOURNED AT 9:00 P.M.)

SEIU LOCAL 1107

NEEDS AND INTERNAL CHARGES

HEARING - DAY 2

BEFORE HEARING OFFICER CAROL NIETERS

SUNDAY, OCTOBER 30, 2016

CIRCUS CIRCUS LAS VEGAS HOTEL AND CASINO

2880 LAS VEGAS BOULEVARD SOUTH

LAS VEGAS, NEVADA 89109

STEPHANIE COPP GUANKO
CSR NO. 13746

PAGES 1 - 309

LAS VEGAS, NEVADA, SUNDAY, OCTOBER 30, 2016
9:05 A.M.

THE HEARING OFFICER: SO I DON'T KNOW IF THERE'S ANY QUESTIONS. OR DO PEOPLE WANT ME TO GO THROUGH THE RULES AS I READ THEM?

MS. THOMAS: WHATEVER YOU THINK IS BEST. THAT'S HOW I FEEL ABOUT IT.

THE HEARING OFFICER: WELL, I WOULD SAY THAT I WOULD PREFER TO GO FORWARD. I DON'T THINK WE NEED TO TAKE MORE TIME ON THAT. BECAUSE WE NEED ALL THE TIME FOR THE REMAINING CHARGES.

SO CHERIE, YOU ARE UP.

MS. MANCINI: YES. I'M GOING TO BE CALLING NATALIE HERNANDEZ.

THE HEARING OFFICER: OKAY. AND WHAT IS YOUR -- HOW MANY WITNESSES DO YOU EXPECT TO HAVE TODAY? BECAUSE YOU HAD SAID TWO, AND THEN YOU SAID FOUR.

MS. MANCINI: ABOUT FOUR. THAT'S WHAT I SAID AT THE END.

THE HEARING OFFICER: OKAY. AND THEN NATALIE IS FIRST?

MS. MANCINI: YES.

THE HEARING OFFICER: ALL RIGHT. AND ARE THERE, KIND OF, SPECIFICS ON WHAT YOU ARE HOPING TO PULL OUT?

MS. MANCINI: YES. THIS IS IN REGARDS TO -- I'M GOING TO TELL YOU WHAT THE CHARGE IS.

THE HEARING OFFICER: OKAY. BECAUSE THAT WOULD BE HELPFUL. I WANT TO MOVE IT ALONG SO WE CAN FINISH THIS.

MS. MANCINI: SO THIS IS IN REGARDS TO -- IT'S IN SECTION 15. SO THE FIRST PAGE.

THE HEARING OFFICER: YEP, OKAY.

MS. MANCINI: SO IT WILL BE --

THE HEARING OFFICER: ARTICLE 15, ARE YOU SAYING?

MS. MANCINI: YEAH. IN REGARDS TO RENOWN HOSPITAL AND THE DISCUSSION WE HAD YESTERDAY ABOUT THE ORGANIZER AT RENOWN AND WHAT THE OFFICE LOOKED LIKE AND SO ON AND SO FORTH.

THE HEARING OFFICER: HERE'S WHAT I'M GOING TO ASK YOU THOUGH, CHERIE, WHAT I TOOK OR WHAT I HEARD YESTERDAY WAS AT LEAST THAT THERE WERE PROBLEMS WITH THE ORGANIZER THERE. BUT AT THE END OF THE DAY, I DON'T KNOW -- THE MEMBERSHIP NUMBERS ARE NOT SIGNIFICANTLY DIFFERENT NOW THAN IT WAS SIX MONTHS AGO OR A YEAR AGO.

OR AT LEAST THAT'S WHAT I HEARD FROM PEOPLE, THAT IT'S HAD CHALLENGING MEMBERSHIP LEVELS FOR A REALLY LONG TIME, THAT WITHOUT EXTRA INVESTMENT FROM THE INTERNATIONAL --

MS. MANCINI: SO YOU FEEL LIKE YOU DON'T NEED TO KNOW ANY MORE ABOUT THAT?

THE HEARING OFFICER: I DON'T FEEL LIKE I NEED TO KNOW ANYTHING MORE ABOUT THAT, TO BE HONEST WITH YOU.

MS. MANCINI: SO YOU DON'T NEED TO KNOW

ANYTHING IN REGARDS TO WHAT THE ISSUES WERE AT THE OFFICE? BECAUSE THAT'S WHAT'S COME UP. WHAT'S COME UP IS THAT THEY SAID THAT THAT OFFICE WAS A MESS, THERE WERE PAPERS, THERE WERE --

THE HEARING OFFICER: I DON'T KNOW THAT I NEED THAT. IF IT RELATES TO ANY OF THE MALFEASANCE OR FINANCIAL MALPRACTICE, IF IT RELATES TO THAT, THEN I NEED IT.

MS. MANCINI: YES, YES, EXACTLY.

MR. SERRANO: YES THIS IS A BIG PART OF IT.

(SIMULTANEOUS SPEAKERS.)

MS. MANCINI: IT'S PART OF -- IT'S RECEIPTS --

MS. WALFOORT: GUYS, REMEMBER, SHE'S TRYING TO GET THE TESTIMONY DOWN. SO YOU CAN'T BE TALKING AT THE SAME TIME.

THE HEARING OFFICER: OKAY. IF IT'S FINANCIAL, THEN IT SHOULD BE HEARD.

MS. KISLING: YESTERDAY, MY UNDERSTANDING WAS THERE WERE TWO WITNESSES. I UNDERSTAND THERE ARE MORE TODAY. I DON'T KNOW THE EXACT NUMBER. BUT I GUESS MY QUESTIONS ARE -- WHAT IS THE TIME FRAME? BECAUSE I WOULD REALLY APPRECIATE IF I'M NOT RUSHED IN TERMS OF THE INFORMATION THEY MAY OR MAY NOT BE PROVIDING TO DISPUTE WHAT I ACTUALLY PUT ON.

THE HEARING OFFICER: SO I DO NOT HAVE A DEFINED "WE'RE LIMITING IT TO ONLY THIS MUCH TIME." WHAT I AM TRYING TO DO IS GET THE RELEVANT INFORMATION I NEED. I HEARD A LOT OF DUPLICITY YESTERDAY. ACTUALLY EVEN MORE

THAN THAT ON SOME THINGS. I THINK THERE ARE AREAS THAT I FEEL LIKE I HAVE ENOUGH INFORMATION.

AND THERE ARE SOME THINGS FROM THE CHARGES REMAINING AND THE REST OF CHARGE 2 THAT I STILL WANT TO HEAR ABOUT. SO IF I DON'T HEAR ABOUT THEM THROUGH THE TESTIMONY COMING OUT, I'LL ASK THAT BEFORE WE GO TO CLOSING STATEMENTS. BECAUSE I THINK IT'S IMPORTANT TO GET ALL OF THAT ON THE RECORD. BUT I WANT MAKE SURE THAT WE TRY TO GET THROUGH THIS TODAY. BECAUSE THERE ARE STILL THREE CHARGES REMAINING, AND THEY ARE VERY SUBSTANTIVE CHARGES.

AND WE NEED TO DO THAT AND I THINK THE MEMBERS DESERVE US TO GET TO AN END OF THIS AND A RESOLUTION AND SOMETHING TO HELP THE LOCAL MOVE FORWARD. THAT'S MY GOAL. SO LET'S GET GOING.

MS. MANCINI: AGREED. AND I WOULD JUST LIKE TO SAY THAT THERE WERE FIVE HOURS TAKEN UP YESTERDAY.

MS. KISLING: IS THAT NECESSARY?

MS. THOMAS: IS THAT RELEVANT? WAS THAT RELEVANT?

MS. WALFOORT: LET'S MOVE ON. LET'S NOT TAKE TIME ON THAT KIND OF THING.

MS. KISLING: EXACTLY.

NATALIE HERNANDEZ,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: AND STATE YOUR NAME AND SPELL IT, PLEASE.

THE WITNESS: NATALIE HERNANDEZ, N-A-T-A-L-I-E, HERNANDEZ, H-E-R-N-A-N-D-E-Z.

EXAMINATION

BY MS. MANCINI:

Q GOOD MORNING, NATALIE.

A HI.

Q CAN YOU TELL ME HOW LONG HAVE YOU BEEN THE ORGANIZER UP IN RENO?

A OFFICIALLY, ABOUT -- IT'S GOING TO BE TWO YEARS IN FEBRUARY. BUT I OFFICIALLY MOVED UP THERE AND EVERYTHING A LITTLE UNDER A YEAR AND A HALF AGO.

Q OKAY. CAN YOU TELL ME ABOUT THE DISTURBING PHONE CALL THAT YOU HAD AROUND THE END OF AUGUST, LIKE AROUND THE 23RD OR 24TH?

A YEAH. SO I GOT A PHONE CALL FROM A PERSON THAT I KNEW WAS NOT ON STAFF ANYMORE ASKING ME TO SET UP MEETINGS WHILE I WAS OUT ON VACATION, FOR SHARON TO COME IN AND TALK TO MEMBERS. AND I LET HER KNOW THAT I WAS GOING TO BE OUT ON VACATION THAT WEEK.

AND SHE HAD STATED, OH -- SHE WAS LIKE, "OH, I THOUGHT YOU WERE GOING TO BE WORKING." AND I WAS LIKE, "NO, I'M GOING TO BE GONE. SO I CAN'T SET UP MEETINGS IF I'M NOT THERE." AND SHE WAS LIKE, "WELL, CAN YOU SEND OVER A LIST OF MEMBERS" AND STUFF LIKE THAT SO SHE COULD SET UP MEETINGS BY HERSELF.

I WAS LIKE, "WELL, IF SHE NEEDS LISTS, SHE CAN GET THEM FROM THE LOCAL DIRECTLY. I'M NOT ALLOWED TO GIVE THAT INFORMATION TO JUST ANYBODY." SHE WAS LIKE, "OKAY, WE'LL BE IN TOUCH." AND THAT WAS THE PHONE CALL.

Q OKAY. AND YOU WERE ON YOUR VACATION, CORRECT?

A CORRECT.

Q AND WHEN YOU CAME BACK FROM VACATION, CAN YOU TELL ME WHAT THE UNION HALL LOOKED LIKE OR YOUR OFFICE?

A I COULDN'T ACCESS IT, FIRST OF ALL. THE LOCKS WERE CHANGED, AND NOBODY WAS GIVEN ANY PRIOR NOTICE. I HAD TO CALL DOWN TO THE LAS VEGAS OFFICE TO SEE IF ANYBODY HAD ACCESSED THE OFFICE WHILE I WAS ON VACATION.

CHERIE DIDN'T KNOW ABOUT IT. MY SUPERVISOR DIDN'T KNOW ABOUT IT. NOBODY KNEW ABOUT IT. PHONE CALLS WERE MADE, AND IT WAS FOUND OUT THAT THE LOCKS HAD BEEN CHANGED. AND I HAD TO GO TO THE LEASING OFFICE. SO THAT STOPPED ME FROM DOING THAT DAY'S WORK WHEN I CAME BACK FROM VACATION UNTIL I COULD GET THE KEYS FROM THE LEASING OFFICE TO REENTER THE OFFICE.

Q AND WHEN YOU ENTERED, WHAT DID IT LOOK LIKE THERE?

A IT SEEMED LIKE I LEFT IT, BUT THEN I STARTED NOTICING WHEN I GOT INTO MY ACTUAL OFFICE THAT CERTAIN FILES WERE MISSING. SO LIKE REPORTS OF -- MY SPENDING REPORTS THAT I USE FOR CREDIT CARDS AND STUFF LIKE THAT, WHICH THE HALL ALREADY HAD, THAT FILE WAS MISSING. AND THEN FILES FROM PRIOR ORGANIZERS THAT WERE THERE, I NOTICED, WERE MISSING ALSO.

Q OKAY. DID YOU EVER GET THOSE FILES BACK?
A NO. THEY ARE STILL NOT BACK TO ME.
Q OKAY. AND THEN AFTER THAT, WERE YOU CONTACTED BY RENOWN HOSPITAL?
A I WAS. I WAS CONTACTED BY SUZANNE OETJEN AT HR. AND SHE'S THE PERSON I USUALLY DEAL WITH WHENEVER I DO GRIEVANCES OR REPRESENT A MEMBER UP THERE. AND SHE HAD ASKED ME IF THERE WAS A BETTER PHONE NUMBER TO REACH SHARON KISLING AT. BECAUSE THE PHONE NUMBER THEY WERE REACHING HER AT, THEIR PHONE CALLS WEREN'T BEING ANSWERED, OR IT WAS YET TO BE ANSWERED.
BECAUSE SHE HAD ACCESSED THE HOSPITAL WITHOUT GIVING PRIOR NOTICE. AND SHE BASICALLY ACCESSED ALL THE FLOORS WITHOUT GETTING -- WHAT'S THE WORD -- PERMISSION. AND THAT GOES AGAINST CONTRACT LANGUAGE. AND WE ACTUALLY ARBITRATED THAT WAY BACK WHEN. SO IT WAS GETTING TO THE POINT WHERE THEY WERE GETTING READY TO FILE FOR NO MORE ACCESS AT RENOWN HOSPITAL.
Q AND SO WHAT DID YOU DO TO TRY TO REMEDIATE THE SITUATION?
A I APOLOGIZED ON BEHALF OF WHATEVER HAPPENED. I WAS LETTING HER KNOW THAT WE WERE STILL GETTING ALL THE INFORMATION OURSELVES ON THE SITUATION THAT HAPPENED. BUT I TOLD HER THAT I UNDERSTOOD AS ORGANIZER OF THAT HOSPITAL ABOUT THE ACCESSIBILITY ISSUES AND STUFF LIKE THAT, AND I UNDERSTOOD THE CONTRACT LANGUAGE AND THAT IT SHOULDN'T BE HAPPENING AGAIN.
AND SHE WAS HAPPY ENOUGH TO WRITE LIKE A LETTER

TO US, BASICALLY STATING THE EVENTS THAT HAPPENED AND UNDERSTANDING THAT I APOLOGIZED. AND SHE THANKED ME FOR THE APOLOGY AND THAT SHE UNDERSTANDS THAT I DO UNDERSTAND THE CONTRACT LANGUAGE AND ACCESSIBILITY ISSUES AT RENOWN.

Q WERE YOU EVER ASKED ABOUT ANY OF THE RECEIPTS THAT WERE TAKEN? DID ANYBODY APPROACH YOU AND ASK YOU ANY QUESTIONS IN REGARDS TO THE RECEIPTS THAT WERE REMOVED FROM YOUR OFFICE?

A ANYBODY ELSE FROM THE HALL?

Q YEAH.

A NO.

Q OKAY. SO YOU WEREN'T ASKED ANY QUESTIONS ABOUT ANY OF THE RECEIPTS AND ANY PERTINENT INFORMATION IN ANY OF THOSE FILES?

A NOT ANYBODY OUT OF THE HALL, NO.

MS. MANCINI: OKAY. THANK YOU.

THE HEARING OFFICER: ALL RIGHT.

EXAMINATION

BY MS. KISLING:

Q DO YOU HAVE A COPY OF THAT LETTER?

A YES. CHERIE HAS IT.

MS. MANCINI: IT'S RIGHT HERE (INDICATING). I APOLOGIZE, I DIDN'T GIVE IT TO YOU. I GAVE IT TO HER.

MS. PURDIE: IS THAT THE ONE REGARDING THE PHONE CALLS?

MS. MANCINI: YES.

MS. PURDIE: HERE YOU GO.

MS. MANCINI: I'M OKAY.

BY MS. KISLING:

Q SO YOU SAID YOU ARE FAMILIAR WITH THE CONTRACT FOR RENOWN?

A YEAH.

Q OKAY. CAN YOU TELL ME, HOW DO YOU ACCESS RENOWN HOSPITAL?

A I HAVE TO GIVE PRIOR NOTICE TO THE HOSPITAL. I USUALLY GIVE THEM ABOUT FOUR HOURS PRIOR NOTICE OR A DAY BEFORE TO LET THEM KNOW I WILL BE ACCESSING THE HOSPITAL. AND THEN I'M ONLY ALLOWED IN THE CAFETERIA AND STARBUCKS.

Q SO WHAT DOES THE CONTRACT ACTUALLY SAY?

A WORD FOR WORD, OFF THE TOP OF MY HEAD, I CAN'T REMEMBER. BUT LIKE I SAID, GIVE PRIOR NOTICE, A DAY. BECAUSE I KNOW THAT WHEN I'M GOING, I HAVE SPECIFIC SCHEDULES. AND IF I'M GOING TO GO REPRESENT SOMEBODY, I USUALLY GIVE ABOUT FOUR HOURS PRIOR NOTICE.

Q SO IF I TOLD YOU THE CONTRACT SAID TWO HOURS NOTICE AND YOU COULD ACTUALLY RECEIVE A BADGE TO GO TO ALL OF THE FLOORS, IS THAT SOMETHING YOU'VE EVER DONE?

A NO. BECAUSE IT'S NOT ALLOWED.

Q IT'S IN THE CONTRACT THOUGH.

A IT'S NOT ALLOWED. WE ARBITRATED THAT, AND IT'S NOT ALLOWED. THE ARBITRATION COUNSEL STATED THAT WE'RE NOT ALLOWED TO WALK THE FLOORS WITH OR WITHOUT A BADGE. WE'RE ONLY ALLOWED IN THE CAFETERIA AND IN THE STARBUCKS.

Q ALTHOUGH THE CONTRACT SPECIFIES DIFFERENT, DO YOU HAVE A COPY OF THAT?

A THE ARBITRATION, IT WAS FROM MY PRIOR MANAGEMENT THAT HAS THAT INFORMATION. THEY NEVER GAVE ME THAT.

Q BUT HAVE YOU READ THE CONTRACT THAT GIVES YOU THE RIGHTS TO DO JUST AS I SAID, WITHIN TWO HOURS, GET A BADGE AND BE ABLE TO ACCESS THE FLOORS?

A RIGHT. I ASKED THAT OF MY PRIOR MANAGEMENT. BECAUSE LIKE I SAID, IT DOES SPECIFY IN THE CONTRACT. BUT THEY LET ME KNOW THAT IT WAS ARBITRATED A WHILE BACK. AND I DON'T KNOW WHERE THAT PAPERWORK IS, BUT IT WAS FROM PRIOR MANAGEMENT.

Q WHO'S PRIOR MANAGEMENT?

A THAT COMES FROM CHERYL NOLAN BUNCH AND THEN ALSO MARTIN, GRACE AND BRYAN.

THE HEARING OFFICER: JUST FOR THE RECORD, THIS IS FROM CHARGE NUMBER 2, CHARGED PARTY EXHIBIT 7.

(COURT REPORTER CLARIFICATION.)

BY MS. KISLING:

Q SO ARE YOU PAID A SALARY? AND WHAT HOSPITALS DO YOU REPRESENT?

A I AM PAID A SALARY. AND I REPRESENT RENOWN HOSPITAL IN RENO AND NORTHEASTERN NEVADA REGIONAL HOSPITAL IN ELKO.

Q OKAY. DO YOU KNOW WHAT THE HEALTHY CHAPTER REPORT OR WHAT THE PERCENTAGE OF MEMBERSHIP WAS WHEN YOU TOOK OFFICE?

A AT RENOWN, IT WAS ABOUT 13 PERCENT, 13 -- SOMETHING. I CAN'T REMEMBER SPECIFICALLY. AND THEN AT

RH, BOTH UNITS WERE UNDER 50 PERCENT.
Q IF I TOLD YOU -- DID YOU RECEIVE A COACH AND COUNSEL THE LATTER PART OF LAST YEAR BECAUSE YOU WERE UNDER 13 PERCENT?
A YES. BUT THAT WAS FOUGHT AGAINST BECAUSE THE ORGANIZER THAT WAS THERE BEFORE ME, MY ACTUAL -- WHO TURNED OUT TO BE SUPERVISOR, GRACE, SHE HAD BEEN UP THERE EIGHT MONTHS AND ONLY RECEIVED TWO CARDS. SO WE ARGUED AGAINST IT AND THAT COACHING IS NO LONGER ON MY FILE.
Q OKAY. IT ACTUALLY IS LOCATED IN YOUR FILE. DID YOU KNOW THAT?
A WELL, AS FAR AS LIKE TWO OR THREE DAYS BACK, I HAD A MEETING WITH ALL OF MY SUPERVISORS, AND THAT COACHING IS NO LONGER IN MY FILE.
Q WOULD IT SURPRISE YOU THAT NO ONE AT THE HOSPITAL KNEW HOW THEY WERE REPRESENTED OR HAD A CONTRACT -- A COPY OF THEIR CONTRACT?
A NO, IT WOULDN'T. BECAUSE I KNOW HOW ACCESSIBILITY IS. AND I HAVE TO GO OUT OF MY WAY SIGNIFICANTLY TO VISIT CERTAIN MEMBERS, LET ALONE PEOPLE THAT AREN'T MEMBERS OF THAT HOSPITAL. AND BECAUSE RENOWN HAS SUCH A HIGH TURNOVER RATE, BY THE TIME I GET TO SOME NAMES ON THE LIST -- AND I HAVE TO RENEW MY LIST EVERY SO OFTEN BECAUSE IT BECOMES USELESS AFTER A FEW MONTHS -- A LOT OF PEOPLE ARE ALREADY GONE.
Q SO WOULD IT SURPRISE YOU THAT WE MET A LOT OF PEOPLE DURING THE THREE-DAY CONTACT THAT HAD BEEN THERE FOR YEARS TO INCLUDE THE BARGAINING OF BOTH CONTRACTS

THAT HAVE BEEN NEGOTIATED WITH RENOWN?
A YES. BECAUSE I KNOW ABOUT A HANDFUL OF THEM.
Q OKAY. BUT ARE YOU AWARE THAT THEY DID NOT KNOW YOU?
A AGAIN, THAT DOESN'T SURPRISE ME BECAUSE OF THE ACCESSIBILITY ISSUES AND THE FACT THAT I HAVE TO GO -- I DON'T HAVE ACCESS TO THE HOSPITAL. SO MY DAYS CONSIST OF PHONE BANKING AND HOUSE-VISITING MEMBERS OR PEOPLE TO TRY TO LET THEM BECOME MEMBERS AND LET THEM KNOW THAT THERE IS A UNION AT THE HOSPITAL.
I HAVE RECEIVED THAT BEFORE IN MY VISITS TO THE HOSPITAL. BECAUSE I HAVE A SPECIFIC DAY OF THE MONTH -- OF THE WEEK, I'M SORRY, THAT I GO TO THE HOSPITAL TO MAKE MYSELF VISIBLE TO THE MEMBERSHIP.
THE HEARING OFFICER: NATALIE, YOU KNOW WHAT, I DON'T KNOW THAT WE NEED TO GO ON ANY FURTHER WITH THIS AT ALL.
MS. THOMAS: SHE WAS READY TO MOVE ON.
BY MS. KISLING:
Q NOW, YOU MENTIONED THAT NO ONE HAS SPOKEN TO YOU ABOUT MY VISIT TO RENOWN AND ANYTHING THAT WAS FOUND IN THE OFFICE?
A THAT WAS FOUND -- WHAT DO YOU MEAN?
Q DID ANYONE WITH SEIU HAVE A CONVERSATION WITH YOU IN TERMS OF THE VISIT THAT I MADE AND ANY OF THE CONCERNS THAT WERE REPORTED?
A YES. THEY MENTIONED THE FACT THAT YOU DID TAKE MY RECEIPTS AND STUFF LIKE THAT, WHICH THE HALL ALREADY

HAD COPIES OF THOSE RECEIPTS. BECAUSE THAT WAS THE FILE OF THE RECEIPTS THAT I HAD TURNED IN. AND THE FACT THAT YOU DID ACCESS THE HOSPITAL WITHOUT PERMISSION AND WALKED THE FLOORS WITHOUT PERMISSION.

Q SO I'M ASKING, DID THEY ASK YOU ABOUT THE CONCERNS IN TERMS OF SAYING THEY DID NOT KNOW WHO WAS IN THE SUITE?

A THEY JUST SAID THAT IT WAS SOME LADY FROM VEGAS.

Q NO. THAT YOU WERE NEVER AT THE SUITE.

A WHAT DO YOU MEAN? WHAT SUITE?

Q DID ANYONE TALK TO YOU ABOUT ANY TYPE OF CONCERNS?

MS. WALFOORT: SHARON, I THINK THE HEARING OFFICER HAS INDICATED THAT WE DON'T NEED TO GO MORE INTO THIS TERRITORY. SO WE CAN MOVE ON TO OTHER THINGS.

MS. KISLING: OKAY. CAN I JUST SPEAK TO ONE OF THE CONCERNS HAD TO DO WITH THE FACT THAT THERE WAS CONCERNS ABOUT RENOWN. AND IN THE CHARGES, THE FACT THAT PRESIDENT MANCINI DOESN'T DO ANY FOLLOW-UP TO E-BOARD DIRECTIVES.

ONE OF THE DIRECTIVES WAS THAT SHE WAS TO SPEAK TO NATALIE HERNANDEZ ABOUT THE CONCERNS AND THAT WE FOUND ORIGINAL RECEIPTS. AND ALL OF THAT WAS PROPERTY OF THE HALL AND WAS TURNED IN TO OUR ATTORNEY. AND THAT'S IN OUR PACKET. THAT'S WHAT I WANT TO MAKE SURE. SO SHE MAY NOT BE AWARE OF THAT.

(SIMULTANEOUS SPEAKERS.)

MS. MANCINI: SO SHE CAN GIVE TESTIMONY?

THE HEARING OFFICER: HANG ON.

MS. WALFOORT: SHE IS TELLING US WHAT THE IMPORTANCE OF THAT IS. I THINK WE'VE GOT THAT ALREADY, AND I DON'T THINK YOU NEED TO FOLLOW UP.

MS. MANCINI: THERE WAS NO DIRECTIVE FROM THE EXECUTIVE BOARD.

THE HEARING OFFICER: WE'RE GOING TO BE GETTING THE MINUTES. MY UNDERSTANDING IS YOU ARE GOING TO BE PROVIDING THEM. SO WE'LL SEE THAT IN TIME. AND OTHERWISE, I FEEL LIKE I'M HEARING A LOT OF THE SAME THINGS THAT I HEARD YESTERDAY. I DON'T WANT TO DO THAT. I WANT TO KEEP THINGS MOVING. SO EVERY TIME THIS HAPPENS --

MS. MANCINI: SO I'M DONE.

MS. KISLING: AND ALSO, OUR ATTORNEY DIRECTED HER, AND SHE SAID SHE WOULD FOLLOW UP.

THE HEARING OFFICER: OKAY. WE ARE READY TO MOVE ON.

MS. MANCINI: THANK YOU, NATALIE.

THE HEARING OFFICER: DO YOU WANT TO CALL YOUR NEXT WITNESS?

SO I GOT TWO COPIES OF TWO ITEMS THAT WERE PUT INTO EVIDENCE YESTERDAY. AND JUST TO GET THEM ON THE RECORD, I'M GOING TO NAME THOSE. SO THE FIRST IS CHARGE 2, CHARGED PARTY EXHIBIT 5. AND IT'S A CASH ON HAND ANALYSIS DATED OCTOBER 19TH, 2016. AND THEN THE SECOND IS CHARGE 2, CHARGED PARTY EXHIBIT 6, CHRISTINA BREEDEN'S

TIME CARD.

(EXHIBIT ADMITTED.)

MS. MANCINI: YOU NEED TO GIVE HER WHAT THE EXHIBIT IS.

MS. KISLING: SO I ONLY HAVE C AND F.

MS. MANCINI: SHE'S MARKING THEM DIFFERENT. THAT'S THE PROBLEM. SO THOSE ARE PER MY EXHIBITS.

MS. KISLING: I HAVE NOTHING.

MS. WALFOORT: OKAY. JUST WAIT A MINUTE. WE'RE MARKING THEM.

THE HEARING OFFICER: STEPHANIE WILL SWEAR YOU IN. AND THEN STATE AND SPELL YOUR NAME FOR THE RECORD.

SUSAN SMITH,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: MY NAME IS SUSAN SMITH, S-U-S-A-N S-M-I-T TH. I'VE GOT SOMETHING FOR YOU GUYS. SHOULD I GIVE IT TO THEM?

MS. MANCINI: SUSAN, PULL YOUR MICROPHONE DOWN A LITTLE BIT.

EXAMINATION

BY MS. MANCINI:

Q MORNING, SUSAN. CAN YOU TELL ME IN THE STAFF UNION WHAT YOUR POSITION IS?

A VICE PRESIDENT OF THE STAFF UNION.

Q OF THE STAFF UNION, THANK YOU. DO YOU RECALL THAT I CAME TO YOU IN REGARDS TO SETTING A SALARY FOR ANDREA BOND?

A YES.

Q OKAY. SO YOU WILL SEE IN EXHIBIT F -- OR THE EXHIBIT YOU JUST -- I DON'T THINK I HAVE A MARKED COPY, THE ONE I JUST GAVE YOU, WHICH IS THE JOB DESCRIPTION FOR COMPLIANCE COORDINATOR.

THE HEARING OFFICER: SO SHE'S REFERRING TO CHARGE 2, CHARGE PARTY EXHIBIT 8.

MS. THOMAS: WE WANT TO NOTE FOR THE RECORD THAT WE'RE MISSING 1 THROUGH 6 OF HER EXHIBITS.

MS. WALFOORT: OKAY.

(DISCUSSION HELD OFF THE RECORD.)

BY MS. MANCINI:

Q SO DO YOU RECALL THAT I CAME TO YOU TO DETERMINE WHAT THE WAGE SCALE WOULD BE FOR THE OFFER LETTER FOR ANDREA BOND?

A YES.

Q AND WHEN WE TALKED, WE LOOKED AT THE COMPLIANCE COORDINATOR'S JOB DESCRIPTION, AND WE NOTED THAT BASED UPON THE REQUIREMENTS OF THE JOB WHICH WERE: CASE MANAGER, COMPLIANCE OFFICER, PARALEGAL CERTIFICATION, AND I BELIEVE A DEGREE AS WELL --

MS. THOMAS: ARE WE TESTIFYING AGAIN?

MS. WALFOORT: I THINK IT'S A QUESTION.

MS. MANCINI: I'M JUST STATING WHAT'S ON THE PAPER, WHAT'S IN FRONT OF YOU.

BY MS. MANCINI:

Q AND THAT BASED -- AND HOW DID WE COME UP WITH HER SALARY?

A SHE HAD ONE YEAR OF CASE MANAGEMENT. SO THAT WAS A ONE FOR ONE. AND THEN PARALEGAL EXPERIENCE, WHICH WOULD GIVE HER FOUR YEARS FOR EIGHT YEARS. SO WE DETERMINED THAT BASED UPON --

Q HOW DID WE DETERMINE THE PARALEGAL EXPERIENCE BEING INVOLVED?

A I'M NOT SURE I UNDERSTAND THE QUESTION.

Q HOW DID WE COME UP WITH GIVING CREDIT FOR FOUR YEARS?

A PARALEGAL WAS --

Q WE HAD A DISCUSSION IN REGARDS TO HOW IT APPLIED TO THE POSITION.

A YES. SO THE PARALEGAL WAS NOT REQUIRED -- I'M SORRY. I'M SORRY.

Q ON THERE, WHAT DOES IT SAY THAT THE REQUIREMENTS ARE?

A OKAY. MINIMUM OF ONE YEAR UNION CASE MANAGEMENT EXPERIENCE, PARALEGAL CERTIFICATION, BA IN RELATED FIELDS, COMBINATION OF THE ABOVE.

Q AND WE DETERMINED THAT BASED UPON THE EIGHT YEARS THAT WE WILL GIVE HER FOUR YEARS? IS THAT WHAT WE DETERMINED?

A THAT IS WHAT WE DETERMINED.

Q OKAY. SO IN TURN, ON THE WAGE SCALE THAT'S ATTACHED TO WHAT YOU HAVE, WHERE WOULD SHE BE ON THE WAGE

SCALE?
A SHE WOULD BE AT THE FIVE-YEAR MARK WITH ONE YEAR CASE MANAGER, FOUR YEARS PARALEGAL, FIVE (INAUDIBLE).
Q AND IS THAT CONSISTENT WITH HER OFFER LETTER?
A YES.
Q AND THAT WAS APPROVED BY THE STAFF UNION FOR PLACEMENT ON THE SCALE?
A CORRECT.
Q THANK YOU.
THE HEARING OFFICER: CAN I ASK A COUPLE OF CLARIFYING QUESTIONS FOR MYSELF? CAN YOU TELL ME WHERE THE EIGHT YEARS -- OR BASED ON WHAT EIGHT YEARS? SO I SEE LESS THAN A YEAR OF UNION EXPERIENCE. AND I SEE LESS THAN TWO YEARS OF PARALEGAL EXPERIENCE. SO WHERE IS THE EIGHT YEARS? BECAUSE I'M JUST NOT SEEING IT.
MS. MANCINI: I DON'T HAVE A COPY IN FRONT OF ME.
THE HEARING OFFICER: OKAY. IF YOU COULD HELP CHERIE, THAT WOULD BE FINE.
MS. MANCINI: SURE.
MS. KISLING: I'M SORRY. FOR THE RECORD, WE STILL DON'T HAVE 1 THROUGH 6.
MS. PURDIE: WE'LL FIGURE IT OUT AFTER THIS WITNESS IS DONE.
MS. KISLING: OKAY.
THE HEARING OFFICER: SO IS IT CORRECT THAT THE UNION EXPERIENCE IS LESS THAN A YEAR AND THE PARALEGAL

EXPERIENCE --

MS. MANCINI: YES. THAT'S CORRECT. APPARENTLY, I MADE A MISTAKE.

THE HEARING OFFICER: OKAY. THEN ANOTHER QUESTION IS IS THERE LATITUDE IN THE STAFF CONTRACT TO HIRE BEYOND YEARS OF EXPERIENCE? SOMETIMES CONTRACTS ALLOW IT, AND SOMETIMES THEY DON'T. I'M JUST TRYING TO FIGURE OUT -- STAFF PLACEMENT IS NOT ALWAYS BASED ON YEARS OF EXPERIENCE. SOMETIMES SOMEONE IS ALLOWED TO GRANT YEARS. IS THAT POSSIBLE? OR DOES THE CONTRACT PROHIBIT?

THE WITNESS: MAY I ANSWER THAT?

THE HEARING OFFICER: YES, PLEASE.

THE WITNESS: ALSO, EXPERIENCE CAN BE FOR SCHOOLING, EDUCATION, ANY KIND OF RELEVANT EXPERIENCE. SO ALTHOUGH IT DOESN'T SAY IT IN ARTICLE 15, THE STAFF -- AND MOST HOSPITALS I REPRESENT IT'S LIKE THIS. THIS WOULD BE MINIMUM. YOU COULD ACTUALLY HIRE ABOVE THAT IF THERE IS A REASON TO HIRE ABOVE THAT. PEOPLE WITH A BACHELOR'S DEGREE, FOR INSTANCE, MIGHT GET CREDITED FOR A COUPLE OF YEARS.

THE HEARING OFFICER: SO WHAT YOU'RE ASSERTING IS THAT THE LOCAL IS ABLE TO HIRE SOMEBODY ABOVE YEARS OF EXPERIENCE. SO LET'S SAY, THEY MIGHT HAVE THREE YEARS, THAT COULD ACTUALLY PUT THEM AT STEP FIVE OR SIX?

THE WITNESS: THAT'S TRUE. IT COULD HAPPEN IF THERE'S EDUCATION OR A REASON TO DO THAT, IF THE PERSON HAS THE EDUCATION AND EXPERTISE.

THE HEARING OFFICER: OKAY. THAT'S FINE. THANK YOU.

MS. KISLING: I WOULD ASK THAT THAT IS NOT CONSISTENT WITH THE CONTRACT, ONE. AND TWO, THE REASON WHY THEY SAID SHE RECEIVED THE PAY WAS BECAUSE SHE WAS GRANTED EIGHT YEARS OF EMPLOYMENT HISTORY. AND THAT SPEAKS TO THE CHARGES IN TERMS OF NOT VARYING EMPLOYMENT. AND THE SECOND --

THE HEARING OFFICER: BEFORE YOU GO ON, SHARON, IF YOU COULD POINT ME TO EXACTLY WHERE IT PROHIBITS THE LOCAL LEADERSHIP FROM MOVING SOMEBODY OR GRANTING YEARS OF EXPERIENCE, TELL ME EXACTLY WHERE THAT IS. WE DON'T NEED TO GO INTO A LOT OF DIALOG ABOUT IT. I JUST WANT THE FACTS.

MS. KISLING: I PROVIDED THE STAFFING CONTRACT YESTERDAY THAT HASN'T BEEN APPROVED BY THE EXECUTIVE BOARD. SO I WOULD ASK FOR THE OLD LANGUAGE. SO ALTHOUGH I DON'T HAVE THE OLD LANGUAGE, I KNOW THAT IN THE BYLAWS, IT STATES THAT THAT SHOULD HAVE COME BEFORE THE BOARD.

THE HEARING OFFICER: I HEARD THAT YESTERDAY. THAT, I'M NOT DISPUTING. WHAT I WANT TO KNOW IS IS THERE LANGUAGE IN THE CONTRACT? YOU PUT THE CONTRACT INTO EVIDENCE?

MS. KISLING: YES.

THE HEARING OFFICER: IS THERE LANGUAGE IN THERE THAT SAYS THE LOCAL LEADERSHIP CANNOT HIRE -- OR THE BOARD -- ABOVE A SPECIFIC STEP?

DID YOU SAY "NO"?

MS. THOMAS: I SAID "NO" BUT SHE --

MS. KISLING: BECAUSE SHE'S TALKING ABOUT THE BYLAWS. SHE'S TALKING ABOUT THE CONTRACT. SO I HAVE TO GET BACK TO YOU ON THE CONTRACT. SO I COULD ADD THAT TO MY CLOSING ARGUMENT. THE CONTRACT IS IN EVIDENCE.

BUT WHAT I'M SPEAKING TO IS THIS POSITION SPECIFICALLY GENERATES FROM A MOTION I MOVED ON THE BOARD.

THE HEARING OFFICER: AND ARE YOU DONE WITH YOUR QUESTIONING?

MS. MANCINI: ONE QUESTION.

THE HEARING OFFICER: YEP. AND THEN WE WILL DO THE CROSS-EXAM.

BY MS. MANCINI:

Q SUSAN, HOW LONG HAVE YOU WORKED AT THE UNION HALL?

A EIGHT YEARS.

Q AND HOW LONG HAVE YOU BEEN AN OFFICER OF YOUR STAFF UNION?

A FOR THREE, ALMOST FOUR YEARS.

MS. KISLING: IS THIS REDIRECT?

MS. WALFOORT: NO. SHE'S FINISHING HER EXAMINATION. AND NOW YOU ARE GOING TO CROSS.

THE WITNESS: MAY I OFFER ONE TIDBIT? THIS IS RELEVANT. I AM A CASE IN POINT BECAUSE I HAVE A BACHELOR'S DEGREE. I HAVE EIGHT YEARS EXPERIENCE, BUT I'M AT TEN YEARS. SO THIS IS SOMETHING THAT DOES HAPPEN, ALTHOUGH IT MIGHT NOT BE IN THE CBA.

THE HEARING OFFICER: SO THAT'S HELPFUL. WHEN WERE YOU HIRED AT THE LOCAL?

THE WITNESS: SEPTEMBER 8, 2008.

THE HEARING OFFICER: OKAY. AND YOU WERE HIRED AT WHAT STEP?

MS. SMITH: GOOD QUESTION. JEEZ, THAT'S GOING BACK A WAY. I'M PRETTY SURE -- HARD TO REMEMBER, BUT I'M PRETTY SURE I WAS AT ZERO STEP. AND THEN AS I WAS WORKING, THEN I GOT A CREDIT FOR EDUCATION. SO I GOT A RAISE, AND THEN I GOT A STEP INCREASED.

MS. THOMAS: SO I JUST WANT TO CLARIFY. WE'RE BASING THIS CONVERSATION ABOUT ANDREA BOND ON SUSAN SMITH? WE'RE USING THAT AS A CONTRAST?

THE HEARING OFFICER: NO. I WANTED TO ALLOW SUSAN, IF SHE THOUGHT SOMETHING WAS RELEVANT, TO SAY WHAT THAT WAS. I DON'T KNOW THAT SUSAN HAS PARTICIPATED IN ONE OF THESE HEARINGS BEFORE. IT'S YOUR OPPORTUNITY NOW TO CROSS. GO AHEAD.

MS. WALFOORT: DO YOU HAVE ANYTHING, SHARON?

MS. KISLING: YEAH, I DO. FIRST, WE PROVIDED EXHIBITS TODAY, THE COPIES. CAN WE GET BACK OUR COPY?

BY MS. KISLING:

Q SO BASED ON YOUR TESTIMONY, YOU SAID THAT THERE WAS A CONVERSATION TO AGREE TO BRING ANDREA BOND IN ON A SCALE FOR THE -- GIVING HER, IF I'M CORRECT, TEN YEARS OF EXPERIENCE WHICH CUT IN FIVE BECAUSE IT WASN'T LABOR EXPERIENCE, CORRECT?

A I'M NOT SURE I CAN ANSWER THAT. BECAUSE I

DON'T REALLY UNDERSTAND.

Q I'M JUST TRYING TO FOLLOW UP WITH WHAT YOU INITIALLY SAID AS TO HOW IT CAME THAT ANDREA BOND WAS BROUGHT IN $10,000 HIGHER THAN SOMEONE WITH HER EXPERIENCE NORMALLY WOULD.

A PLEASE REPHRASE IT. I REALLY DON'T KNOW WHAT YOU'RE GETTING AT. SORRY.

Q OKAY. SO THE POSITION ANDREA BOND WAS HIRED INTO, BASED ON HER EXPERIENCE, SHE SHOULD HAVE STARTED AT 49,000 BASED ON YOUR WAGE SCALE. HOWEVER, EARLIER IN YOUR TESTIMONY, YOU SAID THERE WAS A CONVERSATION WITH PRESIDENT MANCINI REVIEWING HER WORK HISTORY. AND BECAUSE OF THAT, THERE WAS AN AGREEMENT THAT SHE WOULD ACTUALLY BE OFFERED 59,000? SHE WOULD BE BROUGHT IN ON A HIGHER PAY SCALE.

A WELL, SHE HAD PARALEGAL EXPERIENCE.

Q OKAY. CAN YOU SHOW ME ON HER RESUME WHERE SHE ACTUALLY HAS A PARALEGAL CERTIFICATION?

A I'M NOT SEEING WHERE SHE HAS A CERTIFICATION. BUT I AM SEEING WHERE SHE HAS A LOT OF EXPERIENCE AND EXPERTISE.

Q CAN YOU SHOW ME OR TELL ME WHERE THE EXPERIENCE IS?

A CORDELL AND CORDELL.

Q OKAY. DO YOU KNOW -- DID YOU YOURSELF DO AN EMPLOYMENT CHECK TO VERIFY THAT THAT INFORMATION IS CORRECT?

A I DON'T DO EMPLOYMENT CHECKS.

Q OKAY. SO I'M JUST ASKING, IN YOUR CONVERSATION, BECAUSE THAT'S WHAT THE WAGE SCALE WAS BASED ON, YOU TOOK THE RESUME AT FACE VALUE?

A YES. WE HAD A DISCUSSION ABOUT THIS. AND ALSO I WOULD LIKE TO NOTE THAT THE DESIRED QUALIFICATIONS ARE ANY COMBINATION OF THE ABOVE, AND SHE DOES HAVE QUALIFICATIONS.

Q BUT DO YOU REALIZE THOSE WERE DESIRED QUALIFICATIONS? SO THE APPLICANT DID NOT HAVE TO HAVE THOSE?

MS. WALFOORT: SHARON, WE'VE GOT THIS NOW. YOU CAN GO BACK AND FORTH FOREVER. WE'VE GOT THE ISSUE. WE'VE GOT DISPOSITION OF ACQUISITION. WE'RE GOOD.

THE HEARING OFFICER: SO I HAVE ONE QUESTION. AS THE VICE PRESIDENT, YOU ARE ON THE BOARD, CORRECT?

MS. MANCINI: NO. SHE'S VICE PRESIDENT OF STAFF UNION.

THE HEARING OFFICER: OH, OF THE VICE PRESIDENT OF STAFF UNION?

THE WITNESS: YES. IT'S A SMALL STAFF UNION, SO WE DON'T HAVE A BOARD. WE HAVE MEETINGS.

THE HEARING OFFICER: OKAY. DO YOU KNOW IF ANDREA BOND'S WORK AGREEMENT WENT THROUGH THE BOARD FOR APPROVAL?

THE WITNESS: I'M NOT SURE.

MS. MANCINI: THEY DON'T ATTEND BOARD MEETINGS.

MS. WALFOORT: WHAT DID YOU SAY?

MS. MANCINI: I SAID THE STAFF DO NOT ATTEND

BOARD MEETINGS.

THE HEARING OFFICER: DO YOU KNOW IF ANDREA BOND'S WORK AGREEMENT WENT THROUGH THE BOARD FOR APPROVAL?

MS. MANCINI: NO.

THE HEARING OFFICER: NO, IT DID NOT?

MS. MANCINI: NO, IT DID NOT. WELL, IT WAS APPROVED BY -- THE POSITION ITSELF WAS APPROVED BY THE BOARD ALREADY.

THE HEARING OFFICER: OKAY. DO YOU HAVE REDIRECT?

MS. MANCINI: NO.

THE HEARING OFFICER: THANK YOU, SUSAN.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO WE HAVE THEN CLOSING STATEMENTS WOULD BE NEXT; IS THAT CORRECT? BECAUSE I DO HAVE QUESTIONS ON SOME THINGS I FEEL LIKE I HAVE NOT HEARD.

MS. MANCINI: WELL, I HAVE A QUESTION IN REGARDS TO THE CHARGES THAT ARE AGAINST ME. DO I GET TO SPECIFICALLY ADDRESS THOSE?

THE HEARING OFFICER: WHAT SPECIFICALLY ARE YOU REFERRING TO, CHERIE?

MS. MANCINI: SPECIFICALLY EVERY SINGLE THING ON THAT CHARGE. AM I JUST SUPPOSED TO CALL WITNESSES THAT THERE'S NO WITNESSES TO WHAT TRANSPIRED?

MS. WALFOORT: DIDN'T YOU CROSS-EXAMINE THE WITNESSES THAT SUPPORTED THESE CHARGES?

MS. MANCINI: BUT THEY'RE NOT ADDRESSING EVERY SINGLE THING THAT'S ON THE LIST. THAT'S FINE. I'LL SUBMIT ALL OF THIS PAPERWORK. BECAUSE IT IS THE SUPPORTING DOCUMENTATION THAT WILL GO WITH ALL OF THAT.

MS. WALFOORT: AND YOU CAN REFER TO ANYTHING IN CLOSING ARGUMENTS.

MR. SERRANO: THAT'S WHAT I WAS GOING TO SAY, OUR STATEMENTS HAVE TO BE INCLUDED IN OUR CLOSING ARGUMENTS. BECAUSE WE COULDN'T GIVE STATEMENTS WITH THE WITNESSES.

MS. MANCINI: WE WEREN'T ALLOWED TO GIVE TESTIMONY.

MS. WALFOORT: RIGHT. THIS IS YOUR CHANCE TO SUM IT UP FROM YOUR POINT OF VIEW.

MS. MANCINI: OKAY.

MR. SERRANO: WE'RE NOT FAMILIAR WITH THE PROCESS.

MS. WALFOORT: THAT'S A GOOD QUESTION.

THE HEARING OFFICER: SO THERE ARE A NUMBER OF CONTRACTS THAT ARE IN THE CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 2. AND I WANTED TO GO THROUGH THEM ALL, CHERIE, WITH YOU JUST TO GET YOUR RESPONSE ON IF THEY'VE BEEN APPROVED BY THE BOARD.

AND THEN I HAVE -- SO I HAVE QUESTIONS FOR YOU, CHERIE, AND I WILL HAVE SOME FOR YOU AS WELL, SHARON. AND I WOULD PREFER THAT YOU WERE BOTH SWORN IN SO IT'S ON THE RECORD, SO DO YOU WANT TO DO THAT FROM THERE, AND I'LL HAVE THE COURT REPORTER SWEAR YOU IN? OR DO YOU

WANT TO COME UP HERE?

MS. MANCINI: I WOULD RATHER BE HERE.

THE HEARING OFFICER: OKAY. GO AHEAD.

CHERIE MANCINI,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: STATE YOUR NAME.

THE WITNESS: CHERIE MANCINI.

THE HEARING OFFICER: AND THEN I'M LOOKING AT I BELIEVE IT'S EXHIBIT 2.

MS. MANCINI: THE BIG FAT ONE? IS THAT WHAT I NEED?

THE HEARING OFFICER: YEAH. BUT I'M TRYING TO FIND THE PACKET THAT --

MS. PURDIE: SO FOR THE RECORD, WE'RE LOOKING AT CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 2, EXHIBIT 1 TO THAT EXHIBIT.

THE HEARING OFFICER: EXHIBIT 1 WITHIN THAT. SO THE VERY FIRST YELLOW DOCUMENT THAT'S EXHIBIT 1. SO THE FIRST IS THE KROME IT SOLUTIONS. HAS THAT BEEN APPROVED BY THE BOARD?

THE WITNESS: NO, IT HAS NOT.

THE HEARING OFFICER: MARLENE LOCKHARD?

THE WITNESS: I DIDN'T SIGN THAT AGREEMENT.

THE HEARING OFFICER: HAS THAT BEEN APPROVED BY THE BOARD THOUGH?

THE WITNESS: I DON'T KNOW. THIS IS FROM AUGUST OF '15. I DON'T RECALL.

THE HEARING OFFICER: THAT WAS PRE YOUR ELECTION?

THE WITNESS: CORRECT. I BECAME THE PRESIDENT OCTOBER 16TH OF 2015.

THE HEARING OFFICER: OKAY. SHARON NOLEN BUNCH?

THE WITNESS: DID IT COME BEFORE THE BOARD?

THE HEARING OFFICER: DID IT COME BEFORE THE BOARD, YES?

THE WITNESS: NO. IT DID NOT.

THE HEARING OFFICER: DOLORES BODIE? DID THAT COME BEFORE THE BOARD?

THE WITNESS: NO. THERE WAS DISCUSSION IN REGARDS TO DOLORES'S RETIREMENT. I HAVE THAT IN THE MINUTES OF THE MEETING AND THAT SHE HAD OFFERED TO DO AN HOURLY CONTRACTED AGREEMENT IF WE NEEDED HER TO AS WE WERE SHORT ON CONTRACT REPRESENTATIVES.

THE HEARING OFFICER: OKAY. AND --

THE WITNESS: THERE WAS NOT APPROVAL FROM THE BOARD.

THE HEARING OFFICER: OKAY.

THE WITNESS: THERE WAS DISCUSSION IN REGARDS TO IT, BUT NO APPROVAL.

THE HEARING OFFICER: OKAY, DOCUMENTS DATED DECEMBER 5TH, 2015?

THE WITNESS: NO. THAT DID NOT.

THE HEARING OFFICER: BRUCE BOYIN (PHONETIC)?
THE WITNESS: DID NOT COME BEFORE THE BOARD.
THE HEARING OFFICER: OKAY. PETER NGUYEN? IS THAT HOW YOU SAY HIS LAST NAME?
THE WITNESS: PETER NGUYEN.
THE HEARING OFFICER: PETER NGUYEN, OKAY. DID THAT CONTRACT COME BEFORE THE BOARD?
THE WITNESS: NO. IT DID NOT.
THE HEARING OFFICER: DANA GENTRY? DID THAT CONTRACT COME BEFORE THE BOARD?
THE WITNESS: NO. IT DID NOT.
THE HEARING OFFICER: AND THEN THERE ARE A COUPLE DATED THE SAME DATE. SO I'M NOT GOING TO GO --
THE WITNESS: OKAY.
THE HEARING OFFICER: JOHN ARCHER? DID THAT CONTRACT COME BEFORE THE BOARD?
THE WITNESS: NO.
THE HEARING OFFICER: AND ANDREA BOND, WE ALREADY COVERED, I BELIEVE.
THE WITNESS: THAT WOULD BE NO.
THE HEARING OFFICER: THAT WOULD BE NO?
THE WITNESS: UH-HUH.
THE HEARING OFFICER: ALL RIGHT. AND SO MY QUESTION TO YOU IS WHAT WAS THE REASON THAT THEY DID NOT COME BEFORE THE BOARD?
THE WITNESS: THEY WERE APPROVED POSITIONS. THE ONLY -- THE POSITION FOR COMPLIANCE COORDINATOR HAD NOT BEEN BUDGETED FOR, BUT IT HAD BEEN TALKED ABOUT AT

THE BOARD AS FAR AS IT WAS APPROVED THAT WE BRING SOMEONE ON TO DO THAT POSITION. AS WELL AS -- THE OTHER POSITIONS WERE REFILLS OF POSITIONS THAT PEOPLE HAD VACATED. AND THEY WERE BUDGETED FOR. AND SO PREVIOUSLY, IF YOU LOOK IN CONSTITUTION AND BYLAWS, I HAVE A COPY OF IT HERE, CONSTITUTION AND BYLAWS, ARTICLE 15, WHERE IT SAYS "LOCAL PRESIDENT AND UNION STAFF."

THE HEARING OFFICER: WHAT PAGE ARE YOU ON, CHERIE?

THE WITNESS: PAGE 43, NUMBER 4 STATES: UNDER "LOCAL PRESIDENT AND UNION STAFF, DUTIES OF THE PRESIDENT," NUMBER 4 STATES "HIRE AND FIRE WITH PRIOR CONSULTATION WITH EXECUTIVE VICE PRESIDENT, ASSIGN AND DIRECT THE LOCAL UNION STAFF IN ACCORDANCE WITH ANY APPLICABLE BARGAINING AGREEMENT," ET CETERA.

THIS WAS THE LANGUAGE THAT I USED FROM THE CONSTITUTION AND BYLAWS, AND I BELIEVE WAS CONSISTENT FOR PREVIOUS POSITIONS THAT WERE FILLED BASED UPON THE PRIOR PRESIDENTS. AND ALSO ANY OF THE POSITIONS THAT WERE APPROVED THAT WERE BROUGHT IN PRIOR JULY 1ST OF 2015, I HAD NO VICE PRESIDENT TO CONSULT WITH. AND I HAD TAKEN INTO ACCOUNT THE OFFICERS AT LARGE TO HELP ME WITH THE ACTUAL HIRING OF THOSE APPLICANTS, WHICH THERE WAS SOME INCLUSION ON A COUPLE OF OCCASIONS BY SHARON KISLING.

MS. WALFOORT: LET ME -- THE RECORD SHOULD REFLECT THAT SHE'S REFERRING TO HEARING OFFICER EXHIBIT 2.

THE HEARING OFFICER: AND THERE IS ANOTHER

PIECE OF LANGUAGE IN THE BYLAWS AROUND THE REQUIREMENT TO HAVE THE EXECUTIVE BOARD APPROVE ALL CONTRACTS, SERVICE VENDORS. SO ARTICLE 8, SECTION 2, ITEM 3, SO THE EXECUTIVE BOARD IN THEIR AUTHORITY, SECTION 2'S AUTHORITY, APPROVE THE COMPENSATION, TERMS AND CONDITIONS FOR THE EMPLOYMENT OF THE STAFF OF LOCAL UNION, APPROVE ALL THE CONTRACTS FOR SERVICE RENDERED SUCH AS LEGAL, AUDITING AND PAYROLL SERVICES, MEMBER BENEFIT PROGRAMS OR OFFICE LEASES.

THE WITNESS: OKAY.

THE HEARING OFFICER: SO WHY WAS THIS NOT FOLLOWED?

THE WITNESS: ARE YOU TALKING ABOUT IN RELATION TO KROME? OR ARE YOU TALKING IN RELATION TO EVERYTHING?

THE HEARING OFFICER: EVERYTHING.

THE WITNESS: OKAY. SO FOR THE STAFF PARTICULARLY, NUMBER ONE, THAT LANGUAGE, THE POSITIONS WERE ALREADY BUDGETED FOR. THE POSITIONS HAD ALREADY BEEN APPROVED AS THEY WERE VACATED AND NEEDED TO BE REFILLED, ASIDE FROM THE COMPLIANCE COORDINATOR WHICH WAS PUT THROUGH THE BOARD AS FAR AS THE JOB DESCRIPTION, WHETHER OR NOT THE POSITION WAS APPROVED OR NOT AND THEN IT WAS WITHIN THE SCALE OF THE STAFF UNION CONTRACT, THE WAGE SCALE.

THE HEARING OFFICER: AND THEN HOW ABOUT THE SERVICE CONTRACT?

THE WITNESS: ARE YOU TALKING FOR KROME?

THE HEARING OFFICER: YES.

THE WITNESS: FOR KROME, WE WERE HAVING PROBLEMS WITH OUR IT. OUR SERVERS WERE ABOUT TO GO DOWN. WE HAD DISCUSSED IT AT THE BOARD MEETING. I MEAN, I CAN'T -- I CAN'T GIVE AN EXPLANATION AS TO WHY IT DIDN'T COME BEFORE THE BOARD.

THE HEARING OFFICER: AND THEN FROM WHAT I'VE HEARD THROUGH QUESTIONS AND TESTIMONY, THE STAFF CONTRACT HAS NOT BEEN APPROVED TO DATE; IS THAT CORRECT?

THE WITNESS: CORRECT. IT WAS SUPPOSED TO BE ON THE JUNE --

THE HEARING OFFICER: AND HAS THE LANGUAGE OF THE CONTRACT BEEN APPLIED, THE LANGUAGE OF THE NEW UNAPPROVED BOARD CONTRACT?

THE WITNESS: I WAS TRYING TO THINK IF THERE'S ANY NEW LANGUAGE THAT'S BEEN APPLIED.

THE HEARING OFFICER: COMPENSATION? DID ANY --

THE WITNESS: COMPENSATION, YES.

THE HEARING OFFICER: SO THEN IT'S BEEN APPLIED?

THE WITNESS: YES.

THE HEARING OFFICER: OKAY. AND THEN RELATED TO YOUR COMPENSATION, CHERIE --

THE WITNESS: YES.

THE HEARING OFFICER: -- HAS THE BOARD APPROVED ANY COMPENSATION?

THE WITNESS: THE BOARD DOESN'T APPROVE MY COMPENSATION.

THE HEARING OFFICER: WHO DOES?

THE WITNESS: IT'S IN MY CONTRACT.

THE HEARING OFFICER: AND WHO APPROVES YOUR CONTRACT?

THE WITNESS: MY CONTRACT WAS RATIFIED BY MY MEMBERSHIP AT ST. ROSE HOSPITAL, AS I AM ON LEAVE WITHOUT PAY FROM MY FACILITY BASED ON MY CONTRACT.

THE HEARING OFFICER: SO WHO IS PAYING YOUR CONTRACT?

THE WITNESS: WHO'S PAYING MY WAGES?

THE HEARING OFFICER: YEAH?

THE WITNESS: THE UNION HALL.

THE HEARING OFFICER: SO IF IT'S THE MEMBERS' FUNDS, WHAT PART OF THE CONSTITUTION AND BYLAWS ALLOWS ANYBODY OTHER THAN THE BOARD TO APPROVE THAT CONTRACT? WHY WOULD A BARGAINING UNIT BE ALLOWED TO APPROVE YOUR CONTRACT WHEN THE LOCAL UNION HAS TO PAY IT?

THE WITNESS: I'LL TELL YOU THE LANGUAGE IN THE CONTRACT. THE LANGUAGE IN THE CONTRACT STATES THAT IF YOU ARE A PUBLIC SECTOR EMPLOYEE, IN THEIR CONTRACT IT STATES THAT YOU ARE PAID THROUGH THE COUNTY. BUT IT SAYS THAT ANY -- THERE'S NO MEMBER THAT'S PROHIBITED FROM BECOMING PRESIDENT.

MS. WALFOORT: WHAT ARE YOU REFERRING TO WHEN YOU SAY "THE CONTRACT"?

THE WITNESS: THE CONSTITUTION AND BYLAWS.

ON PAGE 11, YOU SEE THE FINAL PARAGRAPH UNDER NUMBER 13 IN THE MIDPART OF THE PAGE?

THE HEARING OFFICER: OH, YEP.

THE WITNESS: CAN I READ THAT?

MS. WALFOORT: WAIT. GIVE US A MINUTE. WE CAN READ IT. JUST HOLD ON ONE SECOND.

THE HEARING OFFICER: OKAY. SO THIS IS THE LANGUAGE YOU ARE RELYING ON FOR YOUR COMPENSATION?

THE WITNESS: CORRECT.

THE HEARING OFFICER: AND DOES YOUR COMPENSATION REFLECT 40 HOURS OF (INAUDIBLE) TIME?

THE WITNESS: YES. AND THE COMPENSATION IS BASED ON WHAT I WOULD BE MAKING IF I WAS WORKING MY NORMAL REGULAR JOB.

THE HEARING OFFICER: AND THEN, SHARON, I HAVE A FEW QUESTIONS FOR YOU. SO THE SAME. I DO WANT YOU TO BE SWORN IN SO IT'S ON THE RECORD. DO YOU WANT TO DO THAT THERE OR COME UP TO THE WITNESS STAND? OKAY.

SHARON KISLING,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: SO WHAT IS YOUR CHARGE, SHARON, AGAINST SPECIFICALLY ALFREDO AND DEB? THE CHARGE THAT YOU FILED, ALL OF THIS ENCOMPASSES CHERIE, ALFREDO AND DEB. BUT ALL THE TESTIMONY I'VE REALLY HEARD IS RELATED TO CHERIE. SO WHAT SPECIFICALLY IS THE ALLEGATION AGAINST ALFREDO?

MS. KISLING: SO THE ALLEGATIONS AGAINST ALFREDO, WHICH IS ACTUALLY CONSISTENT WITH THE ALLEGATION

AGAINST DEB SPRINGER IN THEIR POSITION AS TRUSTEES --

MS. WALFOORT: OH, HOLD ON ONE MINUTE BECAUSE HE'S NOT HERE. MAYBE YOU CAN START WITH DEB. BECAUSE I WOULD LIKE ALFREDO TO BE HERE.

THE WITNESS: SO IT'S THE SAME. BECAUSE THEY ARE TRUSTEES AND THEIR RESPONSIBILITY IS FOR THE GOOD AND WELFARE OF THE LOCAL. THEY WERE COPIED. CHERIE INITIATED A PRACTICE OF COPYING THEM ON ALL COMMUNICATION WHERE I WOULD ADVISE HER AS EXECUTIVE VICE PRESIDENT TO HAVE CONTRACTS GO BEFORE THE BOARD FOR APPROVAL AND DIFFERENT THINGS CONSISTENT WITH THE BYLAWS.

THEY NEVER SUPPORTED THE LANGUAGE OF THE BYLAWS TO HAVE THINGS GO BEFORE THE BOARD FOR APPROVAL. SO CLARA THOMAS, THE THIRD TRUSTEE, HAS BEEN THE ONLY TRUSTEE TO UPHOLD THE BYLAWS.

SO THAT'S WHY THEY ARE INCLUDED IN THE CHARGES. BECAUSE THEY ARE AWARE OF EVERYTHING THAT HAS BEEN CHARGED AND TOOK NO ACTION OR DIFFERENTIATION. SO AN EXAMPLE IS WITH THE HIRING, THERE WAS A COMMITTEE THAT WAS TO PROVIDE RECOMMENDATION TO THE BOARD. PRESIDENT MANCINI WOULD GO AGAINST THE RECOMMENDATION OF THE COMMITTEE AND NOT TAKE IT TO THE BOARD AND MAKE A DECISION TO HIRE.

WHEN IT WAS BROUGHT TO THE TRUSTEES, ALFREDO SERRANO SAID IT'S UP TO HER TO, YOU KNOW, HIRE WHO SHE WANTS TO, WHICH IS NOT CONSISTENT WITH THE LANGUAGE IN THE BYLAWS.

THE HEARING OFFICER: SO YOUR SPECIFIC

ALLEGATION AND THE WAY YOU ARE STATING THIS --

ALFREDO, WHAT I'M TRYING TO GET AT IS WHAT IS THE SPECIFIC ALLEGATION CHARGED AGAINST YOU. BECAUSE IT'S ENCOMPASSING FOR BOTH YOU AND DEB ON CHARGE THAT WHAT WAS FILED. SO WHAT SHE'S RESPONDING TO.

THE WITNESS: CAN I JUST REFER YOU? SO IN THE BYLAWS, WHERE I PULLED THAT FROM IS UNDER SECTION 10, PAGE 13, TRUSTEES, IT SPEAKS TO THEIR DUTIES. I WON'T READ IT. BUT IT SPEAKS TO THEIR DUTIES, ONE, AS GUARDIANS AND, TWO, TO SEE THAT OFFICERS FULFILL THEIR DUTIES.

MS. WALFOORT: AND IS IT FAIR TO SAY THAT WHAT YOU'RE SAYING IS THEY DIDN'T FULFIL THEIR DUTY BECAUSE THEY DIDN'T UPHOLD PRACTICES THAT PER SE ABIDE WITH THE CONSTITUTION AND BYLAWS?

THE WITNESS: YES. OR INVESTIGATE.

MS. WALFOORT: OKAY.

THE HEARING OFFICER: OKAY. SO WE'RE GOING TO DO CLOSING STATEMENTS. DO YOU WANT -- THE CHARGING PARTY WILL GO FIRST. CAN YOU KEEP YOUR CLOSING STATEMENT TO THREE MINUTES? AND THEN THE CHARGED PARTY WILL DO THE SAME?

MS. KISLING: CAN WE TAKE A QUICK BREAK?

THE HEARING OFFICER: OKAY. FIVE MINUTES. AND BE PREPARED TO START RIGHT AWAY.

(BREAK TAKEN.)

THE HEARING OFFICER: SO WE'RE BACK TOGETHER AND GOING TO GET STARTED. SO BEFORE WE GET TO THE

CLOSING ARGUMENTS, I WANT TO KEEP EVERYTHING FOR CHARGE 2 TOGETHER. SO YOU HAD MENTIONED SOME THINGS YOU HAD NOT BEEN ABLE TO GET OUT, CHERIE, EVIDENCE YOU HAD BROUGHT IN OR SOMETHING YOU WANTED TO RESPOND TO.

DO YOU HAVE EVERYTHING ON THE RECORD FOR CHARGE 2 THAT YOU WANT ON THE RECORD? OTHERWISE I WANT TO ALLOW --

MS. MANCINI: NO, I DON'T.

THE HEARING OFFICER: OKAY. SINCE YOU WERE SWORN IN, WHAT I'M OFFERING IS THE OPPORTUNITY TO DO THAT NOW. AND THEN SHARON, YOU WILL BE ABLE TO REBUT OR REDIRECT TO THAT, JUST SPECIFIC TO WHAT CHERIE SAYS. AND THEN WE'LL GO TO CLOSING ARGUMENTS, SO EVERYTHING IS TOGETHER ON CHARGE 2.

MS. MANCINI: OKAY. WELL, IT'S A BIG LONG DRAWN-OUT THING. SO I'M JUST -- IF YOU GUYS BOTH WANT A COPY, OTHERWISE WE'RE GOING TO SIT HERE, AND I'M GOING TO GO THROUGH EVERY SINGLE THING.

THE HEARING OFFICER: CAN YOU TELL ME SPECIFICALLY WHAT YOU HAVE? THAT MIGHT BE HELPFUL.

MS. MANCINI: SPECIFICALLY WHAT I HAVE IS I HAVE IN REGARDS TO THE STAFF UNION, THAT SHARON WAS ON COMMUNICATION FOR THE STAFF UNION CONTRACTS. SO SHE WAS WELL AWARE OF WHAT WAS HAPPENING WITHIN THE STAFF CONTRACTS AND WHEN IT WAS GOING TO BE PRESENTED AND THAT.

ALSO THERE WERE ALLEGATIONS THAT I HAVEN'T RESPONDED TO E-MAILS, WHICH I HAVE EVIDENCE OF THAT. THERE IS ABOUT 10 EXHIBITS. THERE IS ABOUT 10 DIFFERENT

THINGS.

MS. WALFOORT: OKAY. BUT WHAT YOU'RE DOING IS HELPFUL. YOU ARE SAYING -- YOU WANTED TO SHOW WHILE WE'RE HERE ABOUT WHAT AFFECTS YOU. SO ONE THING YOU SAID IS YOU HAVE EVIDENCE THAT YOU DID RESPOND TO E-MAILS.

MS. MANCINI: CORRECT.

MS. WALFOORT: WHAT ELSE?

MS. MANCINI: I HAVE COMMUNICATIONS WITH STEVE YURI (PHONETIC) IN REGARDS TO MIKE URBAN'S RENEWAL OF HIS AGREEMENT WITH US AS OUR ATTORNEY AND HIS RECOMMENDATIONS ON THAT.

MS. WALFOORT: AND THAT SHOWS WHAT?

MS. MANCINI: THAT SHOWS THAT BASICALLY IT WAS NOT A GOOD CONTRACT. THAT BASICALLY, WE WERE GOING TO BE PAYING MORE MONEY FOR LESS SERVICES.

SO THE PROBLEM WAS THAT I WAS ACCUSED OF NOT NEGOTIATING A CONTRACT WITH MIKE URBAN BASED ON THE BOARD'S RECOMMENDATION, RIGHT? THAT IS TRUE. THE BOARD RECOMMENDED THAT I GO BACK AND NEGOTIATE WITH MIKE URBAN. MIKE URBAN BASICALLY SAID THAT WAS HIS FEE AGREEMENT.

I FORWARDED IT TO STEVE YURI, OUR ATTORNEY AT INTERNATIONAL, TO REVIEW THE AGREEMENT, AS WELL AS MARY GRILLO WHO IS ON THE COMMUNICATION AS WELL TO REVIEW THE -- I MEAN, I'M NOT AN EXPERT -- TO GIVE ME THEIR INTERPRETATION OF THE NEW FEE AGREEMENT AND WHAT THEY THOUGHT ABOUT THAT.

AND BASED UPON THAT RECOMMENDATION AND BASED UPON THE FACT THAT WE HAD BEEN IN TALKS ABOUT THE

COMPLIANCE COORDINATOR, AS FAR AS TAKING SOME OF THE WORK, BUSY WORK, AWAY FROM MIKE URBAN'S FIRM, AS FAR AS PUTTING THE CASES TOGETHER, HAVING EVERYTHING READY FOR ARBITRATION SO THAT THE LAW FIRM WOULDN'T HAVE TO CHARGE US TO DO THAT.

SO I HAD SAID BASICALLY I'M GOING TO HAVE AN E-MAIL TO THAT EFFECT, THAT WE TALKED ABOUT REVIEWING THE BILL ON A MONTHLY BASIS TO DETERMINE IF THE BILL WAS GOING DOWN BASED ON THE COMPLIANCE OFFICER'S EMPLOYMENT.

MS. WALFOORT: SO WHAT YOU ARE SAYING IS THAT YOU DID NOT FOLLOW THE DIRECTION OF THE BOARD TO NEGOTIATE A FEE AGREEMENT FOR MICHAEL URBAN BECAUSE OF THE REASONS YOU JUST SAID? THOSE WERE YOUR REASONS FOR NOT COMPLYING WITH THE BOARD IN THOSE TWO MEETINGS THAT WERE REFERRED TO?

MS. MANCINI: I DID COMPLY WITH THE BOARD. I DID NOT SIGN AN AGREEMENT WITH MICHAEL URBAN. I TALKED TO MIKE URBAN ABOUT THAT FEE AGREEMENT. I RECEIVED A NEW FEE AGREEMENT. WE HAD DISCUSSION ON IT, AND I FORWARDED IT TO THE APPROPRIATE CHANNEL TO TRY TO GET RECOMMENDATION ON THAT AS TO WHETHER IT WAS EVEN A GOOD FEE AGREEMENT OR NOT.

NOW, MICHAEL URBAN WAS NOT GOING TO COME DOWN ON HIS FEE AGREEMENT. AND BASED UPON THAT, AS WELL AS AT ONE OF THE E-BOARD MEETINGS -- I'LL PROVIDE YOU THE MINUTES -- THAT THERE WAS DISCUSSION IN REGARDS TO BECAUSE OF THE FACT THAT WE HAD DFRS AND THAT THERE WAS NO DOCUMENTATION AT THE HALL, THERE WAS NO ONE WHO

MANAGED THE DOCUMENTATION -- AND THIS DOCUMENTS FROM THIS CASE WAS FROM TWO PRESIDENTS PRIOR -- THAT WE NEED SOMEBODY TO BE THE GATEKEEPER OF THE INFORMATION WHEN IT CAME TO GRIEVANCES AND ALL OF OUR DOCUMENTATION FOR WHAT WE DID ON THOSE CASES.

SO THEN THE DISCUSSION AFTER THAT, AFTER WE DECIDED WE WERE GOING TO HIRE THIS PERSON, I HAD A DISCUSSION WITH MIKE URBAN AND STATED TO HIM, I DON'T FEEL LIKE A $35,000 RETAINER PER MONTH IS -- WE HAVE HIRED THIS NEW PERSON. SO NOW WE SHOULD BE SEEING OUR BILL GO DOWN. SO IF WE SEE OUR BILL GO DOWN, THEN WE SHOULDN'T BE PAYING $35,000 IN A RETAINER.

WE NEED TO EVALUATE ON A MONTHLY BASIS TO SEE IF THE BILL IS COMING DOWN BASED UPON HER WORK AT THE UNION HALL.

MS. WALFOORT: OKAY.

MS. MANCINI: SO THERE WAS DISCUSSIONS. DID I NEGOTIATE A NEW FEE AGREEMENT? NO, I DID NOT. BUT THERE WERE DISCUSSIONS ABOUT THE FEE.

THE HEARING OFFICER: AND DO YOU HAVE ANY OTHER ITEMS?

MS. MANCINI: OBVIOUSLY, IT WAS ESTABLISHED THAT WE HAD NO POLICY AND PROCEDURES ON ANYTHING IN THE UNION HALL. BUT THERE IS CHARGES HERE THAT "PRESIDENT'S DUTY TO ADMINISTER THE AFFAIRS OF THE LOCAL UNION AND IMPLEMENT THE POLICIES ESTABLISHED BY THE EXECUTIVE BOARD ON A DAY-TO-DAY BASIS." THERE IS NO POLICIES. IT WAS ESTABLISHED THAT THERE HASN'T BEEN POLICY FOR QUITE

SOMETIME.

I "ACCEPT NO GOVERNMENT AND PRESENT BARRIERS": AS FAR AS THE HIRING INTERVIEW COMMITTEE, THE AD HOC COMMITTEE, THERE WAS NO CHAIR. THE MEMBERS WERE ROTATING. THERE WAS NOT A CHARTER FOR THIS COMMITTEE. IT WAS AN INTERVIEW COMMITTEE WHICH IN TURN TURNED INTO "WE'RE GOING TO TELL YOU WHAT YOU'RE GOING TO DO AND WHAT YOU'RE NOT GOING TO DO COMMITTEE."

BECAUSE WE COULDN'T EVEN HAVE AN OPEN DIALOG ABOUT CANDIDATES BECAUSE IT ALL TURNED INTO THE PEOPLE ON THE COMMITTEE BASICALLY SAYING, "NO. YOU'RE NOT HAVING THAT PERSON," OR "YOU'RE NOT HIRING THAT PERSON BECAUSE THEY'RE A FRIEND OF SOMEBODY ELSE." I DON'T KNOW ABOUT YOU, BUT IF SOMEONE THAT WORKED FOR ME WAS A GOOD PERSON AND I KNEW THEIR WORK ETHIC, I WOULD BY HAPPY TO HAVE THEM COME WORK FOR ME.

THE HEARING OFFICER: CAN YOU JUST STICK WITH HIRING COMMITTEE AND --

MS. MANCINI: SURE. SO THE COMMITTEE HAD NO -- THERE WAS -- SOMETIMES DEB SPRINGER WAS ON IT, SOMETIMES CLARA WAS ON IT. SOMETIMES SHEILA GRAIN WAS ON IT. IT WAS NOT A CONSISTENT COMMITTEE. IT DEPENDED ON WHO WE WERE -- LIKE DEB IS A PAC PERSON, SO WE USE HER FOR INTERVIEWING THE POLITICAL ORGANIZER.

THE HEARING OFFICER: WAS THERE OFFICIAL MINUTES THAT WOULD GO TO THE BOARD FOR APPROVAL?

MS. MANCINI: NO.

THE HEARING OFFICER: ANYTHING ELSE?

MS. MANCINI: YOU SEE THAT THERE IS NOTED THAT ON JULY 14TH THAT I PROVIDED AN INTEROFFICE MEMO IN REGARDS TO DIRECTION GIVEN BY STAFF. AND THAT'S BASED UPON THE FACT THAT SHARON KISLING WAS CALLING IN EVERY DAY TO THE PART-TIME PEOPLE AND BASICALLY GIVING THEM INSTRUCTION ON WHAT SHE WANTED THEM TO DO.

MS. WALFOORT: CAN YOU REMIND US WHAT THAT 7/14 MEMO WAS?

MS. MANCINI: 7/14 MEMO WAS "EFFECTIVE IMMEDIATELY, ANY DIRECTION GIVEN BY AN OFFICER OF THE UNION MUST BE APPROVED BY THE PRESIDENT BEFORE THE ASSIGNMENT IS COMPLETED." I HAVE DOCUMENTATION TO SHOW YOU THAT THERE WERE REQUESTS FOR MEMBERSHIP LISTS THAT MY STAFF FORWARDED TO ME THAT WERE APPROVED BY ME. AND ALSO THERE WERE REQUESTS BY SHARON KISLING THAT WERE APPROVED BY ME.

SO THIS WAS JUST BASED UPON THE FACT THAT THERE WAS EXTRA DUTIES BEING DONE THAT WERE TAKEN AWAY FROM WHAT THE DUTIES WERE OF THE HALL. WE TALKED ABOUT UCMC BARGAINING TEAM.

IN REGARDS TO THE RESUMES, THE RESUMES WERE REVIEWED. IF THE PERSON DID NOT HAVE RELEVANT EXPERIENCE OR DIDN'T -- YOU CAN'T GO THROUGH EVERY SINGLE -- YOU CAN'T INTERVIEW EVERY SINGLE CANDIDATE THAT APPLIES FOR A POSITION. BECAUSE IT'S NOT PRUDENT SO, RIGHT? SO I WENT THROUGH AND PICKED OUT THE THREE THAT I LIKED THE BEST, AND APPARENTLY THE HIRING COMMITTEE DIDN'T LIKE WHAT I DID.

(DISCUSSION HELD OFF THE RECORD.)

MS. WALFOORT: GO AHEAD.

MS. MANCINI: IN REGARDS TO THE NRLB COMPLAINTS, THERE WERE THOSE TWO THAT WE HEARD FROM CHRISTINA AND MALESIA, BUT THERE WERE COMPLAINTS FROM NUMEROUS PREVIOUS EMPLOYEES WHO WERE PRIOR TO MY TIME COMING IN. I HAD FOUR WRONGFUL TERMINATIONS THAT I HAD TO DEAL WITH.

THE HEARING OFFICER: THAT'S REALLY A DIFFERENT FORUM THAT WE'RE GOING TO HANDLE THAT IN.

MS. MANCINI: OKAY. I'M NOTING THAT THERE WERE SEVERAL NRLB COMPLAINTS. SO THERE WERE QUITE A FEW, BUT A LOT OF THEM HAD TO DO WITH PEOPLE PRIOR TO MY PRESIDENCY.

THE HEARING OFFICER: SO A NUMBER OF THESE ITEMS DID COME UP IN THE TESTIMONY OF THE WITNESSES YESTERDAY.

ALFREDO, VERY SHORT, DO YOU HAVE SOMETHING TO ADD?

MR. SERRANO: WELL, I WAS JUST WONDERING -- WHEN I WALKED IN, THERE WAS A DISCUSSION ABOUT WHY I WAS INCLUDED IN THE CHARGES. NOW, IF I WAS INCLUDED IN EVERY CHARGE ON THERE, IS IT NECESSARY FOR ME TO GO THROUGH EVERY SINGLE CHARGE AS CHERIE JUST DID AND SAY "I WASN'T AWARE; I WASN'T THERE"?

THE HEARING OFFICER: NO. WE HAVE TAKEN THE TESTIMONY. WE WILL TAKE THAT INTO ACCOUNT AS WELL AS THE EVIDENCE THAT SUPPORTS. SO, CHERIE, FOR WHAT YOU JUST

LAID OUT, IF YOU HAVE ANY EVIDENCE OF THAT THAT YOU WANT TO ENTER IN AS EXHIBITS, WE'LL TAKE THEM. YOU SHOULD GIVE A COPY TO SHARON AS WELL.

MS. MANCINI: OKAY.

THE HEARING OFFICER: AND WE WILL LOOK AT THEM FOR HOW THEY APPLY TO THE CHARGES AND WHAT WE'VE HEARD, AS WE GO FORWARD. OKAY?

SO DOES THAT ANSWER WHAT YOUR --

MR. SERRANO: YEAH. AND I THINK I'LL COVER IT GENERALLY IN MY CLOSING STATEMENTS.

THE HEARING OFFICER: OKAY.

MS. WALFOORT: AND YOU DON'T HAVE ANY EXHIBITS THAT YOU WANT TO BRING ME?

MR. SERRANO: NO, NOT UNLESS I HAVE TO DEFEND MYSELF ABOUT EVERY ALLEGATION FILED MENTIONING CHERIE.

MS. MANCINI: MAYBE YOU NEED TO REITERATE WHAT HE'S INCLUDED ON. I DON'T THINK HE HEARD HOW WE CLARIFIED HOW DEB AND ALFREDO WERE INCLUDED.

MR. ALFREDO: I HEARD THE ONE EXAMPLE THAT I DIDN'T DO ANYTHING ABOUT IT WHEN THEY SAID THAT SOMEBODY WAS HIRED WITHOUT APPROVAL OF THE BOARD. AND IN THAT SITUATION, I GAVE MY INTERPRETATION. I ACTUALLY EXPLAINED THAT IN MY OPENING STATEMENTS.

THE HEARING OFFICER: AND WE HEARD THAT.

MS. WALFOORT: I THINK WE'RE OKAY.

THE HEARING OFFICER: SO IF YOU WOULD PROVIDE THE EXHIBITS, WE WILL DO THAT. SO HERE'S THE THING I WANT YOU TO THINK ABOUT IS WHEN YOU CLOSE, YOU'VE GOT

THREE MINUTES. SO THAT'S AN OPPORTUNITY FOR YOU TO TELL US WHAT YOU'VE DEMONSTRATED BASED ON THE CHARGES. AND FOR THE CHARGED PARTIES, YOU CAN TELL US WHAT THE EVIDENCE EITHER SHOWED OR DIDN'T SHOW AS IT RELATES TO YOU. KEEP IT SPECIFIC TO YOU, OKAY, IN YOUR RESPONSE, IF THAT'S HELPFUL.

MS. KISLING: WHEN YOU FIRST GAVE HER THE OPPORTUNITY TO SPEAK, YOU SAID THAT I WOULD BE ABLE TO CROSS-EXAMINE OR REBUT.

THE HEARING OFFICER: YEP.

MS. KISLING: OKAY. SO I'M UNABLE TO DO THAT NOW?

THE HEARING OFFICER: YES.

MS. KISLING: SO BASED ON SOME OF WHAT SHE DISCUSSED, SHE PUT ON THE RECORD THAT I SERVED ON THE COMMITTEE FOR THE STAFF UNION CONTRACT. WHICH, YES, I DID. AND AT THE TIME OF THE ELECTION AND THE TIME IT WAS SIGNED, WE HAD NOT COMPLETED THE NEGOTIATION OF THAT STAFF CONTRACT. THAT'S WHY I WAS CONCERNED WHEN IT WAS SIGNED AND RETRO PAY WAS BEING PROVIDED. AND I ASKED AT THAT TIME WHEN WAS IT GOING BEFORE THE EXECUTIVE BOARD. TO DATE, IT HAS STILL NOT WENT BEFORE THE EXECUTIVE BOARD.

THE HEARING OFFICER: AND I PULLED THAT OUT IN MY QUESTIONING. SO WE'RE GOOD.

MS. KISLING: OKAY. BECAUSE SHE MADE A STATEMENT THAT I WAS ON IT, SO I APPROVED IT, AND I DID NOT.

SHE MENTIONED IN TERMS OF FEE AGREEMENT FOR URBAN WHICH IS ONLY ONE EXAMPLE OF HER NOT FOLLOWING UP WITH THE EXECUTIVE BOARD. AND I UNDERSTANDING SHE'S SAYING SHE GOT A RECOMMENDATION FROM INTERNATIONAL. AND MY CONCERN WOULD BE CURRENTLY WE'RE STILL FUNCTIONING UNDER THIS UNSIGNED UNAUTHORIZED AGREEMENT. SO WHETHER OR NOT IT WAS A COSTLY AGREEMENT, FROM JANUARY, WE HAVE BEEN MAKING THIS PAYMENT. SO IT SHOULD HAVE COME BACK TO THE BOARD FOR SOME TYPE OF REMEDY.

THE HEARING OFFICER: YEP.

MS. KISLING: AND WE TALKED ABOUT THE COMPLIANCE COORDINATOR POSITION, AND THAT ACTUALLY CAME WHEN URBAN'S LAW FIRM PROVIDED CONCERNS TO ALL THE EXECUTIVE BOARD MEMBERS ABOUT OUR EXPOSURE TO LIABILITY. AND THAT CAME FROM THE LOCAL UNDER THE ADMINISTRATION OF PAST PRESIDENTS AND THE CURRENT PRESIDENT, WHICH IS WHAT WAS REPORTED, THAT THEY WERE NOT RESPONDING TO E-MAILS WHICH LED TO DFRS, EMRB COMPLAINT AND DFR COMPLAINTS.

AND THEN, THOSE WERE NOT COMING BEFORE THE EXECUTIVE BOARD. SO THAT WAS THE CONCERN. AND THAT LED TO THE MOTION TO IDENTIFY COMPLIANCE COORDINATOR WHO ACTUALLY HAS NOT BEEN FUNCTIONING THE WAY THE BOARD DESCRIBED.

THE HEARING OFFICER: AND I THINK WE HAVE HEARD THAT TOO.

MS. KISLING: OKAY. ALSO, SHE MENTIONED URBAN WAS NOT OPEN TO NEGOTIATING THE 35,000. HOWEVER, I KNOW THAT THERE WERE A FEW BOARD MEMBERS SPECIFICALLY BRENDA

MARZAN, SHEILA GRAIN AND MYSELF WHO HAVE SPOKEN TO URBAN, AND HE SAID HE WAS WILLING TO NEGOTIATE, HOWEVER HE HAS NEVER BEEN APPROACHED TO NEGOTIATE OR DISCUSS THIS AGREEMENT AS DIRECTED BY THE BOARD.

THE OTHER PART HAD TO DO WITH THE INTERVIEW. SHE CALLED IT AN AD HOC COMMITTEE. THE CONCERN -- AND JUST FOR CLARIFICATION, SHE MENTIONED DIFFERENT PEOPLE ON THE COMMITTEE. IT CONSISTENTLY AFTER JULY 1 WAS MADE UP OF AT-LARGE OFFICERS. PRIOR TO THAT, IT WAS AT-LARGE OFFICERS AND THEN MYSELF.

SHE SAID SHE WOULD PICK OUT THREE OF THE RESUMES WHO SHE LIKED BEST. AND THE CONCERN WAS THAT THE RESUMES THAT WERE PICKED OUT, ONE, WOULD BE SOMEONE WHO PETER NGUYEN, WHO AS SHE STATED IT WAS OKAY IF THEY WORKED AND WORKED WELL. THE CONCERN HAD TO DO WITH THE PRIOR LAWSUITS OF LABOR UNIONS AND THE CONCERNS THAT THEY HAD WITH PETER NGUYEN AND WHY WOULD WE EXPOSE OURSELVES TO LIABILITY. AND THE BEST CANDIDATE IS WHOSE MEMBER'S DUES SHOULD PROVIDE WAGES TO.

THE HEARING OFFICER: AND WE HAVE HEARD TESTIMONY AROUND THIS.

MS. KISLING: OKAY. SO THAT WAS REALLY JUST TO CLARIFY SOME OF THE THINGS SHE SPOKE TO.

THE HEARING OFFICER: OKAY. ANYTHING ELSE THAT IS ENTERED IN, YOU WILL RECEIVE A COPY OF AS WELL.

CLARA, DID YOU HAVE ANYTHING TO ADD?

MS. THOMAS: NO.

THE HEARING OFFICER: OKAY. SO THEN WE'RE

GOING TO GO INTO THE CLOSING STATEMENTS. ARE YOU PREPARED TO START?

MS. WALFOORT: WE'RE GOING TO GIVE THREE MINUTES TO EVERYBODY. AND WE ARE KEEPING TRACK OF THE TIME. SO WHEN YOU HEAR SOMEONE SAY THREE MINUTES, THAT REALLY MEANS YOU HAVE TO CONCLUDE, AND WE'LL GIVE THE NEXT PERSON THE SAME AMOUNT OF TIME.

MS. THOMAS: IS THERE A PROBLEM WITH ME GOING FIRST, AND I JUST WANT TO DO A QUICK MINUTE AND THEN DEFER MY OTHER TWO MINUTES TO SHARON, GIVING HER FIVE MINUTES?

THE HEARING OFFICER: OKAY.

MS. THOMAS: YOU HAD INDICATED WE WOULD GO FIRST.

THE HEARING OFFICER: YOU WILL.

MS. WALFOORT: SO THAT'S WHAT YOU WANT TO DO? YOU WANT TO DO ONE MINUTE AND --

MS. THOMAS: DEFER THE FIVE, WHATEVER'S LEFT.

AGAIN, GOOD MORNING. I JUST WANT TO SAY UPFRONT THAT I REALLY DO APPRECIATE YOU GIVING US A VOICE, THAT YOU ARE LISTING TO OUR CONCERNS. AND IT HAS BEEN A PLEASURE SPEAKING OUT AGAINST SOME THINGS THAT WE WOULD NORMALLY NOT HAVE A VOICE IN DOING. THIS PANEL HAS ALLOWED US TO DO THAT, AND I REALLY DO APPRECIATE THAT. I APPRECIATE YOU.

MY AREA OF CONCERN STILL REMAINS WITH PETER NGUYEN. THIS CONCERN IS MADE BECAUSE OF THE WAY WE DO BACKGROUND INVESTIGATIONS OR THE LACK THEREOF. AND IT

HAS EXPOSED US TO LITIGATION. AND I DID HAND IN THOSE E-MAILS THAT MR. NGUYEN SENT TO OUR ATTORNEY. AND THIS -- AND I'M HOPING THAT INTERNATIONAL TAKES IT VERY, VERY SERIOUSLY.

BECAUSE, TO ME, THIS IS MONEYS THAT BELONG TO OUR MEMBERSHIP. AND ME, AS A TRUSTEE, WHEN I TOOK MY OATH AND WHEN I RAN FOR OFFICE, I SAID THAT I WOULD DO THE BEST JOB THAT I COULD. I WOULD DO THE BEST JOB AS FAR AS PROTECTING THOSE ASSETS OF THE MEMBERSHIP. AND I MEANT THAT.

AFTER 20 YEARS OF MILITARY SERVICE, I FEEL THAT IT IS IMPERATIVE THAT WE OWN UP TO WHAT IS IMPORTANT TO US. AND THOSE THINGS ARE: OWN UP TO YOUR RESPONSIBILITIES. AND THE PRESIDENCY IS VERY RESPONSIBLE. THANK YOU.

MS. WALFOORT: CAN I JUST REPEAT WHAT THE HEARING OFFICER SAID WHICH IS THE QUESTION WE'RE HOPING YOU WILL ANSWER HERE IS WHAT DO YOU THINK THAT ALL THE EVIDENCE THAT'S COME IN YESTERDAY AND TODAY, WHAT DO YOU THINK IT HAS DEMONSTRATED? WHAT DO YOU THINK YOU WERE ABLE TO SHOW?

MS. THOMAS: AND I WOULD PLEASE DEFER THAT ONE TIMEKEEPER, PLEASE. I'M SORRY, THAT WAS A LITTLE ANNOYING TO HAVE ANOTHER TIMEKEEPER.

MS. PURDIE: I'M KEEPING TIME.

MS. THOMAS: THANK YOU.

MS. KISLING: OKAY. FIRST I WANT TO SAY THIS IS MY FIRST TIME, AND I BELIEVE CLARA'S FIRST TIME AS

WELL. IT HAS NOT COME TO THE POINT WHERE I FELT THE NEED TO RISE TO ACTUALLY PUTTING IN VARIOUS CHARGES AGAINST ANOTHER MEMBER OF THE UNION.

SO THE CHARGES WE DID, THEY REALLY ATTEMPTED TO ADDRESS AND WHAT I FEEL LIKE WE HAVE PROVEN IS PRESIDENT MANCINI'S EGREGIOUS BEHAVIOR THAT ACTUALLY HAS CONTINUED IN SPITE OF LEGAL ADVICE. AND, MY UNDERSTANDING, IT'S ALSO THE DIRECTION THAT HAS BEEN PROVIDED AND GUIDANCE FROM REPRESENTATIVES OF THE INTERNATIONAL.

I FEEL WE HAVE DEMONSTRATED THAT EMPLOYERS, LEGAL CHIEF STEWARDS, VICE PRESIDENTS AND OTHERS ON THE EXECUTIVE BOARD PROVIDE DAILY CONCERN REGARDING THE FAILURE OF PRESIDENT MANCINI AND HER STAFF TO RESPOND TO THEIR REQUESTS FOR INFORMATION, ACTION OR SUPPORT.

WE DISCUSSED THE FINANCIAL AFFAIRS. AND THE LM-2 CAME UP IN CONCERNS REGARDING DOUBLE-DIPPING. I, AS EXECUTIVE VICE PRESIDENT, HAVE CONSISTENTLY ASKED FOR REPORTS. BECAUSE I HAVE USED THE REPORTS AND WANTED COPIES FOR THE PURPOSES OF PROVIDING FOR TODAY'S CHARGES AND HAVE NOT RECEIVED THEM. SO HOPEFULLY THAT'S SOMETHING YOU CAN GUYS CAN GET WITHIN YOUR INVESTIGATION.

ON SEPTEMBER 8TH, I FEEL I HAVE PROVEN THROUGH THE TESTIMONY OF TREASURER SHEILA GRAIN THAT SHE HAS HAD CONCERNS OF THE MISMANAGEMENT OF FUNDS. THEY WERE REPORTED ACTUALLY PRIOR TO THE ELECTION AS THE LAST FINANCIAL DIRECTOR LEFT. AND THERE WERE CONCERNS ABOUT HOW HE HANDLED THE AFFAIRS. THERE WERE RECEIPTS FOUND IN TRASH CANS, THERE WERE CREDIT CARDS NUMBERS ON THE BACKS

OF PAPERS.

AFTER THAT, WITH THE TRUSTEES, THERE WAS A CONVERSATION THAT STILL HAS NOT LED TO ANY TYPE OF INVESTIGATION ABOUT WHAT ACTUALLY OCCURRED DURING HIS TENURE AS THE FINANCIAL DIRECTOR. AT THIS TIME, OUR TREASURER SHEILA GRAIN SAYS SHE CONTINUES TO FEEL THAT PRESIDENT MANCINI IS FAILING TO EXERCISE A LEVEL OF CARE THAT A REASONABLE AND PRUDENT PERSON SERVING AS PRESIDENT OF THE UNION WOULD USE TO CARRY OUT THEIR DUTIES AND FAILING TO PROTECT UNION ASSETS.

THROUGH HER OWN TESTIMONY AND THROUGH THE TESTIMONY OF OTHERS, IT IS CLEAR THAT SHE HAS BEEN PRESIDENT FOR APPROXIMATELY ONE YEAR, AND THERE ARE NO POLICIES AND PROCEDURES THAT HAVE BEEN DEVELOPED. SHE IS FULLY RELEASED FROM WORK, ONE JOB, WHICH IS TO GOVERN THE LOCAL. SHE HAS A STAFF THAT SHE UTILIZES FOR DIFFERENT TASKS. AND SO, AGAIN, WITH DIRECTORS, I WOULD HAVE HOPED TO SEE SOME TYPE OF POLICIES AND PROCEDURES COME BEFORE THE BOARD.

I FEEL THAT WE HAVE PROVEN THAT THERE ARE MANY UNAUTHORIZED AND UNAPPROVED INDIVIDUALS CURRENTLY ON OUR PAYROLL. MY UNDERSTANDING AFTER LEGAL ADVICE IS THAT THEY MAY NOT WORK FOR SEIU NEVADA LOCAL 1107 AS PRESIDENT MANCINI DID NOT HAVE A RIGHT TO HIRE, ACCORDING TO OUR BYLAWS, WITHOUT ESTABLISHED PROVISIONS IN THE BYLAWS BEING MET FOR PROPER AUTHORIZATION AND APPROVAL.

PART OF THAT SAYS THAT THESE OFFERS TO HIRE AND FIRE, ONE, WOULD BE IN CONSULTATION WITH MYSELF,

EXECUTIVE VICE PRESIDENT. AND I BELIEVE I PROVIDED EVIDENCE TO SHOW THAT IN WRITING I SAID I DID NOT SUPPORT, BASED ON -- SPECIFICALLY, ONE EXAMPLE IS THE FINANCIAL DIRECTOR, HR FINANCIAL DIRECTOR. AND THAT WAS BASED ON THE RECOMMENDATION OF BOTH THE TRUSTEE AND THE TREASURER.

I BELIEVE THE MERE PRESENCE OF THESE UNAUTHORIZED AND UNAPPROVED INDIVIDUALS DURING THE BUSINESS OF THE LOCAL AND ON ACTIONS ON BEHALF OF MEMBERSHIP CREATES A LEGAL LIABILITY FOR ALL MEMBERS OF ALL MEMBERS OF THE EXECUTIVE BOARD AND THE LOCAL. BACKGROUND CHECKS, EMPLOYMENT VERIFICATION AND REFERENCE CHECKS ARE NOT BEING COMPLETE ON NEW HIRES ALTHOUGH AN ESTABLISHED PAST PRACTICE UNDER PRIOR PRESIDENTS HAS BEEN COMMUNICATED.

I BELIEVE WE HAVE PROVIDED DOCUMENTATION. THERE WAS A LOT MORE WE'RE TRYING TO REIN IN TO SUPPORT THESE CHARGES. I JUST WANT TO SAY I RAN -- WE ACTUALLY CAMPAIGNED TOGETHER AND RAN ON THE SAME SLATE. SO I KNOW EARLIER IN THE NEEDS ASSESSMENT, THERE WAS A CONVERSATION ABOUT PEOPLE FEELING THAT PEOPLE TARGETED OR "DISGRUNTLED."

AFTER THE CAMPAIGN, I MADE A POINT TO SAY, "WE'RE ALL MEMBERS; WE'RE GOING TO WORK ACROSS THE TABLE WITH WHOEVER WORKS AGAINST OUR SLATE." I'VE DONE THAT. I DO NOT FEEL LIKE PRESIDENT MANCINI HAS DONE THAT. WE SPLIT WAYS WHEN IT CAME DOWN TO INTEGRITY AND HOLDING OURSELVES ACCOUNTABLE TO THE MEMBERSHIP. AND I'M JUST

ASKING THAT ANOTHER GOVERNING BODY HELP US TO GET ON TRACK. AND I FEEL I HAVE PROVEN THAT THROUGH THE TESTIMONY.

THE HEARING OFFICER: SO REMEMBER, EVIDENCE DOES NOT COME IN THROUGH THIS. THIS IS REALLY YOUR CLOSING STATEMENT. SO IF YOU COULD KEEP IT TO WHAT YOU BELIEVE THE EVIDENCE EITHER DID OR DID NOT PROVE WOULD BE REALLY HELPFUL.

MS. WALFOORT: AND CHERIE, WE'RE GOING TO GIVE YOU 20 SECONDS EXTRA.

MS. MANCINI: THAT'S FINE.

THE HEARING OFFICER: HANG ON, DEB, DO YOU HAVE A QUESTION?

MS. SPRINGER: YEAH. I TURNED THIS PACKAGE IN YESTERDAY. AND I WAS WONDERING WHEN I GET TO SPEAK TO IT?

THE HEARING OFFICER: SO I ASKED YOU EARLIER, ALFREDO AND DEB, IF YOU HAD ANYTHING TO ELSE TO ADD, AND YOU SAID NO. SO IT'S IN AS EVIDENCE ALREADY.

MS. SPRINGER: IT'S THE FIRST THING YOU GOT YESTERDAY. SO I WANT TO SPEAK TO THAT.

THE HEARING OFFICER: YOU MIGHT WANT TO ADD THAT IN YOUR --

MS. MANCINI: WELL, THAT WILL BE TESTIMONY, RIGHT?

MS. WALFOORT: I THINK IF SHE WANTS TO SPEAK TO THAT AS PART OF HER CLOSING, WE COULD DO THAT.

THE HEARING OFFICER: GO AHEAD, CHERIE.

MS. MANCINI: OKAY. I BELIEVE THAT, NUMBER ONE, JUST BY THE SHEER VOLUME OF THE NUMBER OF CHARGES, THAT THIS HAS TURNED INTO A COMPLETE WITCH HUNT. I CAN TELL YOU, AM I PERFECT, NO. CAN I TELL YOU THAT WE RAN TOGETHER ON A SLATE? WE ABSOLUTELY DID. AND WITHIN THE FIRST WEEK, THINGS LIKE "I NEED AN EXECUTIVE ASSISTANT" CAME UP, WHICH I GAVE YOU EVIDENCE OF THAT. THE ISSUES WITH THE STAFF MEMBERS THAT WERE HIRED ON AS PART TIME THAT WERE BEING CONTACTED DAILY TO KNOW WHAT WAS HAPPENING IN THE LOCAL, THAT THEY SAID THEY WERE RECEIVING CALLS DAILY FROM SHARON TO FIND OUT WHAT WAS GOING ON.

SHARON WAS PART OF PETER'S INTERVIEW PROCESS, WHICH IT WAS BROUGHT TO LIGHT IN REGARDS TO THE ISSUES THAT HE HAD AT THE PREVIOUS LOCAL. AND I'M SURE THERE IS EVIDENCE TO SHOW YOU OF WHAT IT IS, AND I'M SURE YOU WILL TAKE THAT INTO ACCOUNT AS FAR AS WHAT THE CONCERNS WERE THAT HE ADDRESSED WITH HIS LOCAL.

I CAN TELL YOU THAT WHAT I DO KNOW IS THAT THERE HAVE BEEN NUMEROUS THINGS THAT HAVE BEEN BROUGHT TO ME IN LIGHT OF -- ANYTHING THAT I HAVE TO DO WITH SHARON, AND I'LL GIVE YOU E-MAILS, AND CLARA AS WELL, WERE MET WITH PUSH BACK, WERE MET WITH DIVISIVENESS, ATTACKING. SO THERE WAS NO COOPERATION. I CAN AGREE WITH THAT.

I SHOWED YOU THAT -- I GAVE YOU A FINANCIAL STATEMENT TODAY THAT SHOWS THE FINANCIAL HEALTH OF OUR LOCAL UNION IS FINE ASIDE FROM THE FACT THAT WE PAY OVER HALF A MILLION DOLLARS A YEAR TO AN ATTORNEY TO DO

ARBITRATIONS FOR US. WHICH IT'S MY RESPONSIBILITY AS THE PRESIDENT, TO LOOK INTO THOSE THINGS AND TO NOT SIGN AN AGREEMENT IF I DON'T BELIEVE IT'S BENEFICIAL TO OUR LOCAL AND TO OUR MEMBERSHIP.

WHEN I CAME INTO OFFICE, I HAD NO LEADERSHIP. I HAD NO DIRECTORS. I HAD BARELY ANY STAFF. I HAD CONTRACTS ON THE TABLE. I DID WHAT I THOUGHT WAS BEST TO HIRE PEOPLE WHO HAD PREVIOUSLY WORKED AT OUR LOCAL, TO NEGOTIATE THE CONTRACTS IN ELKO, WHICH WOULD HAVE BEEN CHERYL BUNCH. SHE WAS CHEAPER THAN THE ATTORNEY'S FEE THAT WAS COSTING US FOR THE CONTRACT THAT THEY PREVIOUSLY COULDN'T GET NEGOTIATED AFTER SIX MONTHS, WHICH I ENDED UP GETTING DONE IN TWO DAYS.

BRUCE BOYIN, WE HAD A VERY DIFFICULT EMPLOYER, UHS. I HAD HIM NEGOTIATE THAT CONTRACT. HE HAD NEGOTIATED THE PREVIOUS ONE, SO THAT'S WHY I HAD BROUGHT HIM IN UNDER THAT. AND HIS FEE WAS LESS THAN THE ATTORNEY'S AS WELL. AND HE WAS WELL VERSED ON WHAT THE ISSUES WERE AT UHS. SO THAT WAS THE REASONING BEING THAT.

I HAVE NOT SEEN -- AS A BOARD MEMBER, I HAVE NOT SEEN INDIVIDUAL OFFER LETTERS BROUGHT TO THE BOARD UNDER ANY PRESIDENT BECAUSE THEY HAVE BEEN BUDGETED. THAT'S WHAT A BUDGET IS FOR. YOU BUDGET IN. AND THAT'S THE THING: SO IF I HAD TO GO TO EVERY SINGLE BOARD MEETING TO HIRE SOMEONE, IT WOULD TAKE ME A MONTH TO HIRE SOMEONE.

MS. PURDIE: TIME.

MS. MANCINI: OKAY, THANK YOU.
MS. WALFOORT: YOU'RE GOING TO GET THE EXECUTIVE BOARD MEETING --
MS. MANCINI: YES. AND I DID REQUEST -- AND I CAN GIVE YOU THE E-MAIL THAT I REQUESTED THE RECORDINGS OF THE EXECUTIVE BOARD MINUTES. AND I WAS NOT GIVEN THOSE. BECAUSE WHEN YOU LOOK AT THE PACKET, IT WILL SAY "REFER TO RECORDING," "REFER TO RECORDING."
MS. THOMAS: WHEN WAS SHE ASKED? AND I'M ASSUMING THAT'S TO THE SECRETARY.
MS. MANCINI: I'M SORRY?
MS. WALFOORT: WHEN DID SHE ASK SOMEBODY?
MS. THOMAS: WHEN DID SHE ASK FOR THOSE RECORDINGS, FOR THE RECORD?
MS. WALFOORT: WELL, I THINK THAT WHAT SHE'S TRYING TO SAY IS THAT SHE HASN'T GOTTEN THE MINUTES YET.
MS. MANCINI: I HAVE THE -- I HAVE ONE COPY OF THE MINUTES. AND IN THE MINUTES, YOU WILL SEE "REFER TO RECORDING," "REFER TO RECORDING."
THE HEARING OFFICER: SO WE MIGHT NOT FIND IN THE MINUTES WHAT WE THINK WE'LL FIND?
MS. MANCINI: CORRECT.
THE HEARING OFFICER: OKAY. SO WE DO NEED THE RECORDING?
MS. THOMAS AND I WANT TO NOTE FOR THE RECORD, WHEN DID SHE ASK THE SECRETARY FOR THOSE?
MS. MANCINI: DOES IT MATTER?
MS. THOMAS: YES.

MS. WALFOORT: CHERIE, CAN WE GET THOSE?

MS. KISLING: THERE ARE COPIES OF THE MINUTES. WE GET THOSE AT EVERY MEETING.

MS. MANCINI: THAT'S NOT WHAT I'M SAYING.

MS. WALFOORT: SHE'S SAYING THEY'RE INCOMPLETE.

MS. MANCINI: THAT'S CORRECT.

MS. WALFOORT: CHERIE, ARE THERE TIMES IN THERE WHERE IT SAYS "REFER TO RECORDING," MEANING THERE'S NO TRANSCRIPT, IT REFERS YOU TO A RECORDING INSTEAD?

MS. KISLING: SO I REMEMBER ONE, UNFORTUNATELY, THAT BROKE OUT INTO A FIGHT BECAUSE OF STUFF THAT WAS INSTIGATED. BUT IF YOU LOOK, IT ACTUALLY HAS MINUTES IN HERE.

MS. MANCINI: WHEN YOU ARE PROVIDED THE MINUTES, YOU WILL SEE.

THE HEARING OFFICER: OKAY. WE WILL LOOK AT IT WHEN WE GET THERE. WE DO NEED COMPLETE MINUTES. BECAUSE THERE ARE A NUMBER OF ALLEGATIONS THAT REFER TO MINUTES. SO WE WILL HAVE TO TRY TO GET THEM.

MS. THOMAS: THE ONLY REASON WHY I'M SAYING THIS IS BECAUSE I JUST CANNOT BELIEVE THAT OUR SECRETARY WOULD IGNORE THE PRESIDENT.

THE HEARING OFFICER: WE DON'T NEED TO GO INTO THAT NOW.

(SIMULTANEOUS SPEAKERS.)

MS. MANCINI: I REQUESTED THEM, BUT THEY WERE NOT PROVIDED AT THE TIME.

THE HEARING OFFICER: THERE'S TWO PEOPLE

TALKING SIMULTANEOUSLY. THAT'S A PROBLEM. WE DID MUCH BETTER YESTERDAY. THESE ARE TOUGH ISSUES, SO I GET THAT TENSIONS AND EMOTION KIND OF RISE. BUT LET'S TRY NOT TO DO THAT.

WE'RE GOING TO GET THE MINUTES. IF THEY POINT TO SOMETHING ELSE, WE'LL FIND OUT AND REQUEST THOSE.

MS. MANCINI: MY POINT WAS THAT I DID NOT RECEIVE THE RECORDINGS PRIOR TO TODAY. I DID NOT SAY I WAS DENIED THEM.

THE HEARING OFFICER: THIS IS YOUR CLOSING STATEMENT. SO IF YOU WISH TO SAY THAT DURING THAT, THAT'S FINE.

MS. MANCINI: I'M DONE.

THE HEARING OFFICER: EVIDENCE DOESN'T COME IN NOW.

ALFREDO?

MR. SERRANO: I WILL START MY CLOSING STATEMENT THAT THE MINUTES ARE JUST AN OUTLINE OF MINUTES. THEY'RE NOT DETAILED MINUTES UNLESS YOU LISTEN TO THE RECORDING.

SO MY CLOSING STATEMENT:

MANY OF THE CONCERNS BROUGHT UP IN THE TESTIMONY YOU'VE HEARD ARE LONGSTANDING CONCERNS OF THIS LOCAL. CHERIE TOOK OFFICE FOR A PRESIDENT WHO LEFT OUR LOCAL WITHOUT STRUCTURE OR RESOURCES. OUR ORGANIZERS HAVE BEEN REMOVED FROM SPECIFIC JOB SITES, AND THE NEW MODEL LEFT THEM GOING TO UNFAMILIAR JOB SITES TRYING TO PUT OUT FIRES. KEY STAFF AND ORGANIZERS HAVE LEFT, LEAVING LITTLE SUPPORT STAFF WHATSOEVER.

CHERIE STEPPED UP AND WORKED WITH THE ORGANIZERS TO GO BACK TO A MODEL THAT HAD WORKED IN OUR LOCAL AND WAS FAMILIAR TO THE MEMBERS AND ORGANIZATION. SHE THEN HIRED STAFF SUCH AS PETER WHO HAD BEEN SUCCESSFUL AS RECHARGING THE ORGANIZERS TO GO OUT TO THE FIELD AND WORK TO INCREASE MEMBERSHIP AND MOTIVATE OUR MEMBERSHIP TO GET INVOLVED.

I'M SURE CHERIE WOULD BE THE FIRST TO TELL YOU THAT THIS HAS NOT BEEN AN EASY TASK. HAVE THERE BEEN E-MAILS THAT WERE NOT RESPONDED TO IN A TIMELY MATTER, HAS SHE HAD A LOT ON HER PLATE, YES. THIS IS WHY SHE'S WORKED HARD TO FIND SOME OF THE MOST QUALIFIED STAFF I'VE SEEN TO ASSIST HER.

I'VE BEEN A MEMBER OF THE E-BOARD FOR OVER 8 YEARS. AND JUST IN REFERENCE TO THE HIRING AND THE CONTRACTS COMING TO THE E-BOARD, I DON'T RECALL ANYBODY, ANY JOB, ANY JOB POSITION THAT WAS FILLED, COMING BEFORE THE EXECUTIVE BOARD UNLESS IT WAS A NEW JOB POSITION, NOR ANY CONTRACTS THAT WERE SIGNED. I REMEMBER DISCUSSIONS ABOUT, "WELL, WE'RE GOING TO CHANGE PHONE SERVICES." BUT NEVER DID THE CONTRACTS COME TO THE EXECUTIVE BOARD FOR APPROVAL.

UNFORTUNATELY, WE HAD THESE CHARGES BROUGHT FORWARD WHICH HAMPERED THE PROGRESS WE HAVE SET IN MOTION. YOU TALK ABOUT INEFFICIENCY AND UNNECESSARY EXPENDITURES. HOW MUCH OF OUR MONEY HAS BEEN SPENT ON THESE CHARGES?

AN UNPRECEDENTED E-MAIL VOTE WAS TAKEN TO

HANDLE THE ALLEGATION AND EVIDENCE BROUGHT FORWARD FROM SHARON TO MIKE URBAN TO ASSIST THE E-BOARD IN DIRECTING CONCERNS THROUGH THE CORRECT CHANNELS. HAD THE MEMBERS OF THE BOARD KNOWN THAT THIS MATERIAL WAS GOING TO BE USED SOLELY FOR SHARON'S PRESENTATION OF CHARGES TO INTERNATIONAL, I BELIEVE THAT PERHAPS THAT VOTE WOULD HAVE COME OUT DIFFERENTLY.

THE CHARGING PARTY HAS USED HER LEGAL KNOWLEDGE TO DO A IMPRESSIVE JOB IN COMPILING INFORMATION IN A LEGAL FORMAT FOR PRESENTATION. I'M AN OR NURSE. I CAN IMPRESS YOU BY TELLING YOU HOW TO DO OPEN-HEART SURGERY.

BUT HAVE THEY SHOWN ANY INTENT OF MALICE OR INTENTIONAL MISAPPROPRIATION OF FUNDS OR HARM TO A MEMBER? THEY HAVE NOT.

MS. WALFOORT: SPEAK AS TO YOU.

MR. SERRANO: CORRECT.

I SPEAK MORE IN DEFENSE OF CHERIE BECAUSE THE CHARGES AGAINST ME HAVE NOT BEEN ADDRESSED ONCE IN ANY PRESENTATION OF EVIDENCE PROVIDED. THESE CHARGES ARE ERRONEOUS, AND THE FILING OF THESE CHARGES THEMSELVES ARE A VIOLATION OF OUR CONSTITUTION. WILL I FILE CHARGES ON THESE FALSE CHARGES? NO. BECAUSE I BELIEVE OUR TIME IS BETTER SPENT DOING THE WORK WE ALL SIGNED UP FOR AND BUILDING A BETTER LOCAL FOR OUR MEMBERS. THANK YOU.

MS. SPRINGER: OH, MY GOD, EVERYONE IS LOOKING AT ME.

THANK YOU FOR HOLDING THIS HEARING. FIRST OF ALL, I GAVE YOU A PACKET YESTERDAY OF MY TESTIMONY. I

LISTED CHAPTER AND VERSE FROM THE CONSTITUTION AND BYLAWS. AND I WOULD JUST LIKE TO SAY RIGHT NOW THAT THE REQUIREMENTS OF THE CONSTITUTION AND BYLAWS ABOUT THE BASIS OF THESE CHARGES HAVE NOT BEEN MET BECAUSE THERE'S NO DATE AND TIME AND PLACE OF OCCURRENCE. AND YOU CAN READ ON.

AND I WILL JUST MENTION THIS. YOU HAVE MY TESTIMONY. THESE CHARGES ARE TAINTED AND SHOULD BE DISMISSED. THEY'RE IN THE PUBLIC DOMAIN ON A WEBSITE. THESE CHARGES THAT I AM IN RECEIPT OF HAVE BEEN ALTERED ON THAT WEBSITE. SOMEONE HAD TO PROVIDE WHOEVER CREATED AND MAINTAINED THIS WEBSITE A COPY OF THESE CHARGES, POSSIBLY VIOLATING MY PRIVACY RIGHTS. I BELIEVE PUTTING THESE CHARGES ON THE WEBSITE WAS DONE MALICIOUSLY AND WITH AFORETHOUGHT.

YOU'VE HEARD MANY HOURS OF TESTIMONY BY THE CHARGING PARTY ACCUSING THE CHARGED PARTY. IN ALL OF THESE HOURS, THE CHARGING PARTY FAILED TO ASK THE TRUSTEE, ASK ME, ANY QUESTIONS. THAT MIGHT LEAD ONE TO CONCLUDE THAT THE CHARGING PARTY REALLY DIDN'T NEED TO CHARGE ME ON FACE VALUE. RATHER, THERE WERE OTHER REASONS FOR THEM TO ENJOIN ME IN THESE CHARGES.

WE HAVE HEARD THAT THERE ARE FEW OR NO WRITTEN POLICIES AND PROCEDURES ON HOW THE LOCAL BUSINESS SHOULD BE CONDUCTED. EVEN YOU, MADAM HEARING MASTER, MADE A COMMENT ON HOW OUR CBL IS CONTRADICTORY. I APPLAUD BRENDA MARZAN FOR STARTING TO WRITE PROCEDURES. I HOPE THAT A COMMITTEE FROM BOTH PUBLIC AND PRIVATE SECTORS

COULD JOIN IN THE WRITING OF THOSE POLICIES AND PROCEDURES SO WE COULD COVER THE WHOLE OF THE UNION BUSINESS.

I AM SADDENED THAT A PERSON OR PERSONS CONNECTED WITH OUR LOCAL UNION HAVE CHOSEN TO BUILD A WEBSITE THAT ADVOCATES DECERTIFICATION, SECESSION AND THE FORMATION OF A NEW ASSOCIATION. NOT A UNION, BUT AN ASSOCIATION.

WE HAVE HEARD IN TESTIMONY THAT EXECUTIVE VICE PRESIDENT KISLING HAS ALTERED TIME CARDS AND SIGNED SUCH CARDS, CLEARLY NOT IN HER DUTIES LISTED IN THE CONSTITUTION AND BYLAWS. WE HAVE ALSO HEARD TESTIMONY FROM MALESIA THAT SHE CAN BUILD AND UPDATE A WEBSITE. IT WOULD MAKE ONE WONDER IF MALESIA WAS ASKED TO BUILD A WEBSITE, UMC-CCPEA, AND IS BEING FED INFORMATION FROM EXECUTIVE VICE PRESIDENT KISLING ALONG WITH OTHER CURRENT OR FORMER MEMBERS OF SEIU.

I WOULD LIKE TO ASK THE INTERNATIONAL TO INVESTIGATE THIS WEBSITE AND ISSUE A REPORT TO THE LOCAL ON THAT INVESTIGATION. I WOULD ALSO ASK IF THE INTERNATIONAL FOUND ANY EVIDENCE THAT CURRENT MEMBERS ARE FURNISHING MATERIAL TO THIS WEBSITE, THAT THEY BE DEALT WITH APPROPRIATELY. I WOULD LIKE TO FIND OUT WHY CHARGES AGAINST ME WERE PUT ON THIS WEBSITE, CHARGES THAT WERE ALTERED FROM WHAT WE RECEIVED. I FEEL THE AIRING OF THOSE CHARGES IN A PUBLIC DOMAIN VIOLATES MY RIGHT OF PRIVACY. THANK YOU.

MS. THOMAS: POINT OF ORDER, WAS THAT AN

ACCUSATION DURING A CLOSING? I JUST WANT TO KNOW.

THE HEARING OFFICER: WHAT I SAID EARLIER IS THE CLOSING STATEMENT IS NOT A PLACE WHERE YOU ENTER EVIDENCE. PEOPLE CHOSE WHAT THEY WANTED TO SAY FOR THAT THREE MINUTES. AND I GAVE DIRECTION ON WHAT I WAS LOOKING FOR. BUT EVERYBODY HAD AN OPPORTUNITY TO CLOSE AS THEY CHOSE. SO THERE IS NO NEED TO RESPOND TO ANYTHING.

WE'RE GOING TO MOVE ON TO BRENDA MARZAN'S CHARGE.

MS. MANCINI: CAN I MAKE A REQUEST?

THE HEARING OFFICER: WHAT'S YOUR REQUEST?

MS. MANCINI: MY WITNESS CANNOT BE HERE FOR THE WHOLE ENTIRE DAY.

THE HEARING OFFICER: OKAY.

MS. MANCINI: SO CAN WE GO --

MS. WALFOORT: WITNESS ON WHICH?

MS. MANCINI: ON MY CHARGING ON SHARON FOR SECESSION.

THE HEARING OFFICER: CAN WE DO THAT RIGHT AFTER BRENDA? THAT'S THE ORDER WE WERE LOOKING AT. WE'RE GOING TO TAKE A BREAK. WHAT TIME IS IT RIGHT NOW?

MS. MANCINI: SHE HAS A DISABLED MOTHER AT HOME.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: WE'RE GOING TO TAKE A 15-MINUTE BREAK.

(BREAK TAKEN.)

THE HEARING OFFICER: BRENDA, THOUGHTS ON NUMBER OF WITNESSES?

MS. MARZAN: TWO.

THE HEARING OFFICER: AND DO YOU HAVE ANY IDEA?

MS. MANCINI: NO.

THE HEARING OFFICER: ALL RIGHT. SO LET'S GET STARTED.

MS. MANCINI: ACTUALLY, I TAKE IT BACK. I'LL HAVE ONE.

THE HEARING OFFICER: ALL RIGHT.

MS. MANCINI: MAY AS WELL RESERVE THE RIGHT, RIGHT?

THE HEARING OFFICER: OKAY. WE'RE GOING TO GO THROUGH THE SAME PROCESS WE DID YESTERDAY WITH CHARGING PARTY IDENTIFYING THEMSELVES AND SPELLING THEIR NAME AND THEN THE PARTY CHARGED AND THEN OPENING STATEMENTS AND SO FORTH. OKAY. SO BRENDA FIRST.

MS. MARZAN: CHARGING PARTY NUMBER 4, BRENDA MARZAN, B-R-E-N-D-A, MARZAN, M-A-R-Z-A-N.

THE HEARING OFFICER: ALL RIGHT. AND CHARGED PARTY?

MS. MANCINI: CHERIE MANCINI, C-H-E-R-I-E M-A-N-C-I-N-I.

THE HEARING OFFICER: AND DO YOU WISH TO MAKE AN OPENING STATEMENT?

MS. MARZAN: NO.

THE HEARING OFFICER: CHERIE, OPEN STATEMENT?

MS. MANCINI: NO. I'M OKAY.

THE HEARING OFFICER: OKAY. ALL RIGHT. THEN YOU CAN CALL YOUR FIRST WITNESS, BRENDA.

MS. MARZAN: I'M GOING TO CALL PAT GREAUX.

PAT GREAUX,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: PAT, YOU NEED TO STATE YOUR NAME.

AND DO YOU NEED HER TO SPELL HER NAME AS WELL? NO?

THE WITNESS: PATRICIA GREAUX.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. MARZAN:

Q MORNING, PAT.

A MORNING.

Q THIS PAST YEAR YOU DID BARGAINING WITH UMC; IS THAT CORRECT?

A CORRECT.

Q THERE WERE HOW MANY OF YOU THAT WERE THE -- I'M GOING TO CALL THEM -- CHAIRS OF THAT COMMITTEE?

A THREE.

Q AND THOSE WERE?

A MYSELF, GWEN STEVENS AND DEETRA REVELS.

Q IF YOU GO TO EXHIBIT --

THE HEARING OFFICER: SO THIS IS GOING TO BE ENTERED AS CHARGE 4, CHARGING PARTY EXHIBIT -- SO WE'RE GOING TO CALL THIS EXHIBIT 2. AND YOU'LL GO TO THE SECTION AND POINT THAT WAY.

BY MS. MARZAN:

Q OKAY. WHAT TYPE OF BARGAINING DID YOU DO?

A INTEREST-BASED BARGAINING.

Q WAS THERE TRAINING THAT YOU HAD TO DO IN REGARDS TO INTEREST-BASED BARGAINING?

A YES.

Q SO IF YOU GO TO EXHIBIT -- NO --

MS. WALFOORT: YOU CAN SAY "TAB."

BY MS. MARZAN:

Q TAB NUMBER 11 -- YES, 11 -- ARE THESE E-MAILS THAT YOU SENT TO THE TEAM REGARDING THOSE TRAININGS?

A YES, CORRECT.

Q AND WAS CHERIE MANCINI INCLUDED IN THOSE TRAININGS?

A YES. SHE WAS.

Q AND DID SHE ATTEND THOSE TRAININGS?

A NO. SHE DID NOT.

Q HOW MANY OF THE SESSIONS DID CHERIE ATTEND FOR YOUR INTEREST-BASED BARGAINING?

A NONE.

Q SO IF YOU'LL REFER TO EXHIBIT 10 -- TAB 10, SORRY. THIS IS AN E-MAIL THAT WAS SENT OUT TO WHOM?

A IT WAS SENT OUT TO THE WHOLE SEIU MEMBERSHIP.

Q DO YOU KNOW IF THIS WAS POSTED ANY PLACE?

A YES. IT WAS ALSO POSTED ON THE WEBSITE, AND IT WAS ALSO E-MAILED TO UMC'S MANAGEMENT, WHICH INCLUDES HR, THE COO, THE CEO AND ALSO EVERY BARGAINING MEMBER.

THE HEARING OFFICER: ARE YOU REFERRING TO A DOCUMENT DATED JUNE 26TH, 2016?

MS. MARZAN: YES. THAT'S A WRONG DATE. THAT SHOULD BE JULY 26TH INSTEAD OF JUNE 26TH. SO IT WAS SENT OUT WITH AN INCORRECT DATE.

THE HEARING OFFICER: OKAY.

BY MS. MARZAN:

Q IN REGARDS TO THIS LETTER RIGHT BEHIND THAT, YOU CAN SEE THE PETITION AND LETTER THAT YOU SENT TO MARY KAY.

A CORRECT.

Q WHAT PROMPTED THIS LETTER TO BE SENT?

A THE E-MAIL BLAST THAT SHE SENT OUT TO ALL THE MEMBERS AND ALSO THIS LETTER THAT'S IN FRONT OF ME.

Q HOW DID THE BARGAINING TEAM FEEL WHEN THEY SAW THIS LETTER?

A APPALLED. BECAUSE I WORK FROM 7:00 A TO 7:00 P. I STARTED RECEIVING TEXT MESSAGES AS SOON AS IT WENT ON. I DIDN'T NOTICE UNTIL SOMEBODY TEXTED ME. AND I HAD TO WAIT UNTIL I GOT HOME TO VIEW IT. THEY SENT IT VIA TEXT, AND I DIDN'T GET TO LOOK AT IT. BUT MY PHONE WAS BLOWING UP WHILE I WAS AT WORK.

Q AS A PART OF THAT LETTER, IT TALKS ABOUT AN INVESTIGATION THAT WAS HAPPENING. WAS THERE EVER AN INVESTIGATION DONE THAT YOU'RE AWARE OF?

A NOT THAT I'M AWARE OF.
Q IN HERE, IT TALKS ABOUT BEING DERELICT IN THEIR DUTY TO PROPERLY COMMUNICATE WITH MEMBERS AND THE UNION. I WANT TO TALK ABOUT THE TABS 7, 8 AND 9. CAN YOU TELL US WHAT THESE ARE?
A THESE ARE WHAT -- WE CALL THEM "THE PULSE." AND IT'S A MAGAZINE THAT UMC PUTS OUT FOR THE EMPLOYEES.
Q IN NUMBER 7, IF YOU GO TO THE EXTRA LITTLE TAB THAT'S PAGE 11 ON THERE, HAS "NEGOTIATIONS UPDATES" OR NEGOTIATIONS CONTINUE ON THIS ONE, WAS THIS IN EVERY PULSE THAT YOU GUYS PUT OUT?
A NOT EVERY PULSE. BECAUSE THE PULSE GETS OUT, I THINK, TWICE A MONTH. AND WE HAVE TO GET TOGETHER DEPENDING ON WHAT WE DISCUSS IN NEGOTIATIONS, IF THERE'S ANY UPDATES, THEN WE PUT UPDATES IN THE PULSE, IF IT'S TIMELY.
Q OKAY. SO THERE IS ONE THEN FROM THE APRIL 29TH SESSION, THE PULSE. THERE IS ALSO UPDATES THAT I FOUND IN THE JULY 22ND, WHICH IS IN SECTION 11, LITTLE TAB, "NEGOTIATIONS UPDATE," AND ALSO ON THE JUNE 24TH, WHICH IS NUMBER 16.
A CORRECT.
Q OKAY. IF YOU GO BACK TO THE -- WAY BACK, THERE WERE COMMUNICATIONS -- I'M SORRY -- THERE WAS COMMUNICATIONS IN THE TAB NUMBER EXHIBIT 6?
A CORRECT.
Q THE FIRST PART OF THIS IS TALKING ABOUT THE NRS PROBLEMS THAT WE WERE GOING TO HAVE IN REGARDS TO THE SB

241 CHANGES THAT TOOK PLACE. WHAT ARE THESE FIRST COUPLE OF E-MAILS TALKING ABOUT?

A WELL, WE'RE ALSO PART OF THE COUNTY. WE'RE CONSIDERED TO BE COUNTY. AND WE'RE ALSO GOVERNED UNDER NRS 288. AND WHAT AFFECTS -- I CALL IT -- THE BIG HOUSE ALSO AFFECTS UMC. AND SENATE BILL 241 ALSO AFFECTED US DURING OUR NEGOTIATIONS. AND THAT'S WHAT THIS LETTERS ARE ABOUT.

Q WAS CHERIE MANCINI CC'D ON THESE E-MAILS AS WELL?

A YES. IT WAS CC'D WHEN -- BECAUSE GWEN WAS OUR VP. AND ON THE BOTTOM, YOU CAN SEE MASON, WHICH IS OUR CEO; KURT, OUR COO; OUR PRESIDENT, CHERIE MANCINI AND MYSELF AND DEETRA. AND THEY DIDN'T RECEIVE A RESPONSE FROM KIRK. SO DOUG, WHO IS OUR DIRECTOR OF HUMAN RESOURCES ALSO SENT E-MAILS TO CHERIE AND HE CC'D MYSELF. I SEE HE CC'D THE WRONG GWEN ON IT AND DEETRA AND HIS BOSS, JOHN.

Q OKAY.

A AND THEN THE NEXT LETTER IS JOHN REPLYING TO A LETTER THAT GWEN HAD WROTE BECAUSE -- WELL, WE WENT TO MIKE URBAN TO HAVE THE LETTER WRITTEN. BECAUSE -- WELL, CHERIE DIDN'T RESPOND TO THEM. SO WE TOOK IT UPON OURSELVES TO GO TO THE BARGAINING TEAM AND GO TO MIKE URBAN AND HAVE HIM DRAW UP THE LETTER ON OUR BEHALF. AND THEN THE NEXT PAGE IS JOHN REPLYING TO THE LETTER THAT WE SENT TO HIM.

Q OKAY. SO THEN ON JULY 1ST WHEN YOU ACTUALLY

LOSE THE ABILITY TO USE BANKED HOURS, WHAT HAPPENS?
A JOHN WAS E-MAILED, JOHN ESPINOZA. HE PUTS A MASS E-MAIL ON OUR INTRANET, WHICH IS WHERE THE EMPLOYEES GO AND READ; IT'S NOT THE INTERNET, JUST OUR PRIVATE INTRANET. HE SENT OUT TO ALL THE EMPLOYEES ABOUT WHAT SB 241, HOW THAT WOULD AFFECT THEM, THAT THEIR LONGEVITY IS FROZEN, THEIR MERIT INCREASES FROZEN, THAT THE CAL TIME THAT THEY'RE SUPPOSED TO RECEIVE IS ALSO FROZEN DUE TO SB 241, AND HOW IT ALL AFFECTS THEM AND THE BARGAINING TEAM.
Q OKAY. SO AFTER THAT, YOU GUYS SETTLED FAIRLY QUICKLY?
A CORRECT. WE CAME IN ON SATURDAYS TO DO THAT. AND I ALSO FAILED TO MENTION THAT AT THE BEGINNING OF THE BARGAINING, WE DID HAVE AN ORGANIZER, ANGEL RANGEL (PHONETIC). SHE ATTENDED OUR CLASSES FROM THE HALL. SHE WAS OUR ORGANIZER.
Q OKAY. SO SHE TOOK MINUTES AND STUFF IN THOSE MEETINGS?
A NO. BECAUSE OUR MINUTES WERE GIVEN TO US THE VERY NEXT DAY -- I MEAN THE NEXT WEEK. SO SHE PUT THEM IN A PURPLE BINDER.
Q OKAY. DO YOU KNOW WHERE THAT BINDER WAS KEPT?
A WITH HER.
Q SO IN THE NEXT LETTER AFTER YOU GUYS GOT DONE, YOU SENT OUT SOMETHING IN THE PULSE ACTUALLY, IN THE NUMBER 12, I BELIEVE IT IS -- NO, NUMBER 11. IN THAT UPDATE, YOU ACTUALLY HAVE THE TIMES AND DATES OF WHEN YOU

PLANNED ON RUNNING THE VOTE, THE RATIFICATION VOTE?
NUMBER 11 -- OH, I'M SORRY I KEEP DOING THAT -- NUMBER 9-11.
A CORRECT. THAT WENT OUT IN OUR PULSE.
Q WHAT HAPPENED TO THOSE DATES?
A THAT WAS CANCELED BY CHERIE MANCINI.
Q AND THAT'S WITH THE LETTER THAT WAS STATED PRIOR?
A CORRECT.
Q SO WAS THERE EVER A CONVERSATION HAD WITH ANY OF YOU OR THE BARGAINING TEAM IN REGARDS TO WHAT TOOK PLACE AS FAR AS THE CANCELLATION, WHY IT WAS BEING CANCELED OR ANYTHING? OR WERE YOU NOTIFIED JUST LIKE EVERYBODY ELSE?
A NOTIFIED LIKE EVERYBODY ELSE VIA E-MAIL.
Q SO NOT EVEN A SEPARATE E-MAIL TO YOU AS PART OF THE BARGAINING TEAM OR AS AN OFFICER OF UMC?
A NO, HUH-UH. NO CALL, NOTHING, JUST FOUND OUT VIA TEXT AND TOLD TO GO READ MY E-MAIL BY A MEMBER.
Q SO THERE IS SOME ADDITIONAL CONVERSATIONS YOU ARE HAVING TOWARDS THE BACK -- NO, IT'S TEXT MESSAGES IN REGARDS TO THE RATIFICATION VOTES, WHICH IS NUMBER 5.
A YES.
Q SO IN HERE, THIS IS -- YOU ARE TRYING TO -- THIS IS AFTER EVERYTHING'S GOING TO MOVE FORWARD, CORRECT?
A CORRECT.
Q SO ORIGINALLY, YOU HAD ASKED FOR THREE DAYS.

CAN YOU TELL ME WHAT HAPPENED DURING THIS CONVERSATION?

A WELL, AS YOU CAN TELL, IT SAYS "MORNING CHERIE, AS YOU ARE AWARE, WE HAVE SETTLED OUR CONTRACT. BUT WE NEED TO DO A RATIFICATION VOTE FOR THE MEMBERS. I WOULD LIKE TO KNOW IF I CAN MEET WITH YOU AND THE COMMUNICATION DIRECTOR THIS AFTERNOON SO WE CAN MAKE SOME FLYERS. GIVE ME A CALL AND LET ME KNOW. THANKS." AND THIS WAS SENT THURSDAY, JULY THE 21ST AT 10:31 A.M.

AND THEN AT 10:31 --

Q OKAY. IT'S JUST THE LITTLE PIECE ON THE BOTTOM, ON THE NEXT PAGE?

A I THINK I PUT -- I DON'T KNOW IF THESE ARE IN ORDER. OH, IT'S THE SAME. "BOTH NEXT WEDNESDAY, THURSDAY AND FRIDAY."

THEN SHE SAYS "I WILL HAVE TO GET WITH PETER IN REGARDS TO STAFFING FOR THE VOTE AND GET BACK TO YOU. HE'S IN ELKO AND WON'T BE BACK UNTIL MONDAY. WE CAN STILL WORK ON THE FLYERS THOUGH. I'LL BE AT THE HALL WITHIN THE NEXT HOUR."

I SAID "OKAY. CALL ME AND I CAN COME TO THE HALL TO DO THE FLYERS. I HAVE VOLUNTEERS FOR ALL THREE DAYS AND DEETRA WOULD NEED SOMEONE FOR THE QUICK CARES WITH HER."

SHE SAYS, "OKAY, I WILL TALK TO PETER ABOUT SCHEDULING." THEN I TEXTED BACK "THANKS." AND THEN AT 12:45, "ALL RIGHT. CAN I COME BY THE HALL AT 1:30 TO DO THE FLYERS?" SHE TEXT BACK "I'M IN A MEETING. WILL CALL YOU BACK." I TEXT "OKAY."

THE HEARING OFFICER: INSTEAD OF READING THROUGH ALL OF THEM, COULD YOU JUST SPEAK TO THE SUBSTANCE, LIKE WHAT'S THE CORE THAT YOU ARE TRYING TO GET AT.

THE WITNESS: THAT I NEVER -- SHE NEVER GOT BACK TO ME THAT DAY ABOUT SCHEDULING. AND AS YOU CAN CLEARLY SEE, SHE SAYS "I WILL TALK TO PETER TODAY." THERE WAS A SENSE OF URGENCY WHEN WE FINISHED THE CONTRACT. BECAUSE WE HAD TWO OTHER BOARDS THAT NEEDED TO GET THIS APPROVED.

WE HAVE A HOSPITAL BOARD THAT GOVERNS UMC ALSO. AND JOHN, WHEN WE TALKED ABOUT SCHEDULING THESE THINGS, HE ASKED WOULD IT BE OKAY. I STATED TO HIM, "YES. I WILL GET WITH CHERIE" LIKE I DID THAT MORNING.

AND JOHN HAD THE HOSPITAL BOARD -- AN EMERGENCY MEETING WITH THE HOSPITAL BOARD IN ORDER SO THEY COULD MEET AND READ THROUGH OUR CONTRACT SO THEY COULD RATIFY THE CONTRACT. AND AFTER THEY RATIFY IT, THEN IT HAS TO GO THROUGH OUR COUNTY COMMISSIONERS FOR RATIFICATION. THAT WAS OUR URGENCY ON GETTING IT DONE.

AND NOT ONLY THAT WAS THE REASON, IT WAS DUE TO THE FACT THAT WE WERE TOLD THAT IF WE CAN DO THIS CONTRACT -- AND THIS WAS BY DON BURNETTE, THE COUNTY MANAGER AT THAT TIME -- THAT THEY WOULD MAKE SURE THAT THEY WOULD RETRO THE MEMBERS. THEIR CHECK WOULD BE RETRO IF WE GOT IT DONE TIMELY. THAT WAS THE REASON WHY AFTER THE RATIFICATION I CALLED CHERIE THE NEXT DAY TO HAVE IT DONE.

BY MS. MARZAN:

Q SO WHAT HAPPENED ONCE IT WAS CANCELED BY CHERIE? DID YOU MAKE THOSE SAME DATES?

A NO. WE DIDN'T. IT WAS -- WE DIDN'T GET OUR CONTRACT RATIFICATION UNTIL SEPTEMBER THE 6TH. IT PUSHED EVERYTHING BACK. BECAUSE LIKE I SAID, OUR HOSPITAL BOARD WAS ON VACATION. SO THEY WEREN'T GOING TO MEET. BUT THROUGH OUR CONTRACT AND THROUGH JOHN, CHRO, CHIEF HUMAN RESOURCE OFFICER, MADE A CALL TO EVERY BOARD MEMBER OF THE HOSPITAL BOARD, AND THEY AGREED TO MEET WITH US TO GO OVER THE CONTRACT TO MAKE THE RECOMMENDATIONS TO THE COUNTY COMMISSIONERS.

THE HEARING OFFICER: AND THEN I'M NOT SURE IF YOU'RE ASKING THIS, BUT SINCE YOU MENTIONED IT, I WANT TO KNOW, WAS THE CONTRACT RETRO'D WHEN IT WAS APPROVED IN SEPTEMBER?

THE WITNESS: CORRECT.

THE HEARING OFFICER: OKAY.

THE WITNESS: THERE WAS A REASON WHY. BECAUSE THEY TOLD WHAT HAPPENED, AND THAT'S WHY.

THE HEARING OFFICER: IT WAS PAID THOUGH?

THE WITNESS: YEAH.

THE HEARING OFFICER: GO AHEAD.

MS. MARZAN: OKAY. I THINK THAT'S IT. THANK YOU, PAT.

THE WITNESS: THANK YOU.

THE HEARING OFFICER: DO YOU WANT TO CROSS? GO AHEAD.

EXAMINATION

BY MS. MANCINI:

Q PAT, DID YOU KNOW THAT'S I'VE BEEN PREVIOUSLY TRAINED IN INTEREST-BASED BARGAINING BY LAURON RITTER (PHONETIC)?

A I THINK YOU SAID THAT, I THINK.

Q PRIOR TO THE BARGAINING STARTING, CORRECT?

A THAT, I DON'T REMEMBER. BUT I DO REMEMBER WE HAD THAT CONVERSATION AT AN E-BOARD.

Q YOUR NEGOTIATIONS -- BECAUSE OF THE FACT THAT NRS 288 HAD BEEN CHANGED THE YEAR BEFORE, RIGHT -- YEAH, THE YEAR BEFORE, 2015, IT WAS CHANGED IN LEGISLATION SESSION. AND THE CHANGE WENT INTO PLACE JUNE 1ST, RIGHT? OR JULY -- JUNE 1ST? AT ANY RATE, YOU WERE AWARE THAT WHEN YOU WENT IN TO NEGOTIATE, THE NEW PROVISIONS OF NRS 288 APPLIED?

A CORRECT. WHICH IS WHY WE HAD A CONVERSATION TELLING YOU WE WANTED TO START EARLY.

Q AND DID I ALLOW YOU TO START IT EARLY?

A YES.

Q SO BASED UPON THAT LANGUAGE, YOU KNEW THAT IF THE CONTRACT EXPIRED, THAT THERE WAS A CHANCE THAT EMPLOYEES COULD BE DENIED THEIR LONGEVITY AND THEIR MERIT, CORRECT?

A CORRECT.

Q HOW OFTEN DID YOU MEET?

A ONCE A WEEK.

Q AND HOW LONG WERE THOSE SESSIONS?

A ALL DAY, FROM 8:00 A.M. TO 5:00.
Q OKAY. WELL APPARENTLY, THAT'S NOT WHAT WAS COMMUNICATED TO ME. I WAS TOLD THEY WERE HALF-DAY SESSIONS UNTIL THE END. SO I'LL HAVE TO PULL INFORMATION ON THAT.
A YEAH. THEY WERE 8:00 A.M. TO 5:00 P.M.
Q OKAY.
A I HAVE OUR SIGN-IN SHEETS IF YOU NEED THAT THAT SHOW THAT THEY WERE ALL DAY.
Q OKAY. AND ANGEL WAS YOUR ORGANIZER THAT WAS BARGAINING WITH YOU?
A CORRECT. SHE WENT TO CLASS WITH US ALSO.
Q AND SHE MAINTAINED A BOOK, A BARGAINING BOOK?
A CORRECT.
Q AND DO YOU KNOW WHY SHE IS NO LONGER EMPLOYED AT SEIU LOCAL 1107?
A NO. WE WERE NEVER TOLD WHY. SHE JUST STOPPED SHOWING UP ONE DAY.
Q BECAUSE SHE HAD NO BARGAINING BOOK. SHE HAD NO MINUTES. AT ANY RATE --
A WELL LA NITA CAME IN WITH ONE THAT DAY, THE 5TH OR WHATEVER DAY SHE SHOWED UP.
Q WHEN WE TALKED ABOUT THE RATIFICATION IN THE E-MAILS THAT WERE SENT -- OR I'M SORRY, THE TEXT MESSAGES THAT WE JUST SPOKE ABOUT, ON THOSE TEXT MESSAGES, I STATED THAT PETER WAS IN ELKO, AND I WOULD HAVE TO CONFER WITH HIM IN REGARDS TO STAFFING THE VOTE.
A CORRECT.

Q AND DID I EVER GET BACK TO YOU TO TELL YOU THAT WE HAD STAFF TO COVER ALL THREE OF THOSE 14.5-HOUR DAYS THAT YOU HAD SCHEDULED IN THE PULSE MAGAZINE?

A NO. BECAUSE YOU SAID "OKAY, I'LL TALK TO PETER TODAY ABOUT SCHEDULING." SO I ASSUMED YOU WERE GOING TO GET WITH HIM.

Q DID YOU EVER HAVE ANY CONFIRMATION FROM ME THAT I EVER SAID THAT THOSE WERE GOING TO BE STAFFED?

A WHY ELSE WOULD YOU CALL HIM TODAY WHEN YOU TOLD ME IN THE EARLIER TEXT THAT HE WAS IN ELKO?

Q I NEVER GAVE YOU CONFIRMATION OF THAT; IS THAT TRUE?

A THAT'S WHAT IT SAID IN HERE, "I'LL TALK TO PETER TODAY."

Q DID I CONFIRM --

A TO ME, THAT'S A CONFIRMATION THAT THAT'S WHAT YOU WERE GOING TO DO.

Q I NEVER GAVE YOU CONFIRMATION FOR WEDNESDAY, THURSDAY OR FRIDAY SPECIFICALLY, DID I?

A NO. BUT WHEN YOU PUT THAT IN THERE, I ASSUMED THAT'S WHAT YOU WERE GOING TO DO.

Q THANK YOU. SO DID YOU GIVE THIS INFORMATION TO THE PULSE MAGAZINE TO BE PUT OUT?

A CORRECT. NO, NOT TO THE PULSE. I GAVE IT TO JOHN ESPINOZA WHEN WE WERE IN BARGAINING OUR LAST DAY. HE ASKED WHEN DID WE THINK WE CAN GET IT DONE . I SAID WE'RE GOING TO GO FOR WEDNESDAY, THURSDAY, FRIDAY NEXT WEEK. "I WILL GET WITH CHERIE FIRST THING IN THE

MORNING," AS YOU CAN SEE ON THE TEXT THAT I DID THAT. AND YOU NEVER TEXTED ME OR CALLED ME BACK.
Q AND WE HAD A CONVERSATION IN REGARDS TO THIS. DO YOU RECALL WHEN I HAD FOUND OUT THAT YOU HAD SCHEDULED ALREADY?
A YEAH. YOU SENT AN E-MAIL THAT I SCHEDULED IT PRIOR TO GETTING AUTHORIZATION OR SOMETHING LIKE THAT. AND THEN SENT YOU AN E-MAIL TELLING YOU THAT WE HAVE ALWAYS SET UP THE DATES AND TOLD THE HALL WHAT WE NEEDED SINCE WE HAVE OUR OWN VOLUNTEERS.
Q RIGHT. BUT ISN'T IT KNOWN THAT YOU HAVE TO HAVE A STAFF MEMBER AT THE VOTING?
A NO.
Q YOU DON'T HAVE TO HAVE ANYONE FROM THE UNION HALL? SO IT CAN ALL BE DONE BY MEMBERSHIP? THERE DOESN'T HAVE TO BE ANY OTHER WITNESSES?
A THAT, I DON'T KNOW. WE HAVE ALWAYS DONE -- AND I SAID IT IN THE E-MAIL. THAT'S HOW WE HAVE ALWAYS DONE IT. ANGEL HAS ALWAYS BEEN OUR ORGANIZER. SHE'S ALWAYS BEEN THERE. AND SUSAN WAS ONCE TOO.
Q SO HOW MANY TIMES HAVE YOU HAD A RATIFICATION VOTE WHERE IT WAS ONLY MEMBERS THAT WERE MANNING THE BOOTH?
A NONE, THAT I REMEMBER.
Q NONE? OKAY, THANK YOU. YOU DON'T RECALL THAT I HAD TOLD YOU THAT WE DID NOT HAVE STAFF TO BE AVAILABLE FOR 14.5 HOURS PER DAY FOR THREE DAYS IN A ROW?
A I THINK YOU PUT THAT IN E-MAIL.

MS. MARZAN: THAT'S ACTUALLY AN E-MAIL, NUMBER 12, I BELIEVE.
BY MS. MANCINI:
Q CAN YOU TELL ME, PAT, ON THE VERY FIRST DAY OF BARGAINING, THE UNION ACCESS PROVISION WAS CHANGED. CAN YOU TELL ME ABOUT THAT?
A WHEN?
Q ON I BELIEVE IT WAS MARCH 9TH. OR CAN YOU TELL ME ABOUT THE BARGAINING IN RELATION TO THE ARTICLE WHICH RELATES TO UNION ACCESS IN UMC?
A I DON'T HAVE IT IN FRONT OF ME. SO YOU HAVE THE NOTES.
Q YOU DON'T RECALL ANYTHING OF THE --
A I REMEMBER THE ARTICLE COMING UP DEFINITELY --
(SIMULTANEOUS SPEAKERS.)
MS. WALFOORT: ONE AT A TIME. SHE CAN'T GET TWO PEOPLE SPEAKING.
MS. MANCINI: I'VE ALREADY SUBMITTED TO YOU COPIES OF THE UMC CONTRACT.
THE WITNESS: DID YOU ASK ME FOR NOTES? YOU WANT THE CONTRACT LANGUAGE? OR DO YOU WANT THE MINUTES? AM I CONFUSED ON THAT?
THE HEARING OFFICER: WE'RE MARKING THE CONTRACT RIGHT NOW. SO JUST HANG ON.
MS. PURDIE: SO WE'RE GOING TO MARK THIS CONTRACT.
THE HEARING OFFICER: CHARGE 4, CHARGED PARTY EXHIBIT 1.

(EXHIBIT ADMITTED.)

BY MS. MANCINI:

Q SO THIS IS IN RELATION TO PAGE 8 OF THE UMC CONTRACT WHICH IS PART OF ARTICLE 7, UNION RIGHTS, AND IT'S NUMBER 2 OF UNION RIGHTS. CAN YOU READ THAT FOR ME, PLEASE?

A NUMBER 2?

Q NUMBER 2.

A THE WHOLE THING? OR JUST WHAT'S ON THE LINE?

Q THE WHOLE THING.

A "NON-EMPLOYEE REPRESENTATIVES OF THE UNION SHALL BE ADMITTED TO THE PREMISES OF UMC AT REASONABLE TIMES. REPRESENTATIVES SHALL PROVIDE 24 HOURS NOTICE TO A CHIEF STEWARD OR A REPRESENTATIVE DESIGNATED BY THE CHIEF STEWARD AND THE CHIEF HUMAN RESOURCES OFFICER TO BE APPROVED PRIOR TO SUCH VISITATION. ALL NON-EMPLOYEE REPRESENTATIVES APPROVED MUST BE ESCORTED BY AN SEIU UMC APPOINTED STEWARD OR ELECTED OFFICER WHILE ON THE PREMISES. THE SELECTED STEWARD OR ELECTED OFFICER MUST BE RELEASED BY HIS OR HER SUPERVISOR IN ACCORDANCE WITH SECTION 5 BELOW. SUCH VISITATION SHALL BE FOR THE REASONS OF THE ADMINISTRATION OF THIS AGREEMENT AND UPON THE REQUEST OF CHIEF HUMAN RESOURCES OFFICER; THE UNION WILL PROVIDE CLARIFICATION FOR THIS VISIT." OH, "FOR THE VISIT," I'M SORRY.

Q THANK YOU. SO DO YOU RECALL BARGAINING THIS?

A CORRECT.

Q DO YOU RECALL THE DISCUSSION IN REGARDS TO

THIS?

A NOT WITHOUT LOOKING AT THE MINUTES THAT WE POSED. BUT DO I REMEMBER DOING IT, YES. DO I REMEMBER EVERY DETAIL, NO.

Q I BELIEVE YOU STATED YESTERDAY THAT IT WAS REGARDING LUNCHES?

A CORRECT. BUT THAT'S NOT WHAT YOU ASKED ME.

Q DO YOU RECALL THAT THIS LANGUAGE CAME UP BASED UPON EMPLOYEES STATING THEY HAD PROBLEMS WITH HAVING THEIR LUNCHES FREE?

A CORRECT. HAVING TO CLOCK IN AND OUT FOR LUNCH BECAUSE OF DLR CHARGE, YES.

Q SO TELL ME HOW THIS LANGUAGE RELATES TO THE LUNCHES.

A WE HAD EMPLOYEES COMPLAINING ABOUT PEOPLE COMING UP THERE DURING THEIR LUNCH TIME. THAT'S WHAT IT STATES. THE ONLY TIME WE CAN DO UNION BUSINESS IS ON A BREAK OR LUNCH. SO EMPLOYEES COMPLAINED TO US AND ALSO TO HUMAN RESOURCES ABOUT BEING BOTHERED ON THEIR LUNCHES AND DUE TO THE FACT THAT WE HAVE TO CLOCK IN AND OUT FOR LUNCH, AND WE ONLY GET 30 MINUTES FOR LUNCH.

EMPLOYEES STATED THEY WOULD LIKE TO HAVE THEIR LUNCH UNINTERRUPTED, JUST PLAIN BY THEMSELVES WITHOUT BEING BOTHERED BY ANYBODY, MEANING: NOT ME, NOT MANAGEMENT, NO ONE.

Q SO YOU BELIEVE THAT IT WAS PRUDENT BASED UPON THE OUTLINE THAT UNION BUSINESS COULD ONLY BE -- OR UNION BUSINESS OR CONVERSATIONS WITH THE UNION COULD ONLY BE

DONE ON BREAKS AND LUNCHES, YOU FOUND IT PRUDENT TO TAKE INTO ACCOUNT THAT YOU WERE ELIMINATING THE UNION'S ACCESS TO 30 MINUTES OF UNINTERRUPTED TIME WITH MEMBERSHIP?

A THAT'S MEMBERSHIP'S REQUEST. IT WASN'T MINE. SO WHEN WE DID THE SURVEYS, THAT'S WHAT WAS ON THERE, THAT THEY WANTED TO BE HAVING THEIR LUNCH BECAUSE OF THE CHARGES THAT WERE FILED.

Q HOW LONG HAVE YOU BEEN AN OFFICER OF THE UNION?

A THIS IS MY THIRD TERM.

Q SO THAT'S NINE YEARS?

A THIS IS THE SEVENTH. NO, NOT NINE.

Q SEVEN, OKAY. SO AS A CHIEF NEGOTIATOR AND AS A SEVEN-YEAR OFFICER OF THE EXECUTIVE BOARD, I'M SURE THAT YOU SHOULD -- OR I'M SURE THAT YOU WOULD UNDERSTAND THAT ACCESS TO MEMBERSHIP OR RESTRICTION TO MEMBERSHIP IS -- ACCESS TO MEMBERSHIP IS THE VITAL BLOOD LINE TO THE UNION. AND SOMETIMES THAT'S THE ONLY TIME YOU CAN GET PEOPLE IS ON THEIR LUNCH, DUE TO THE CONTRACT STATING IT HAS TO BE ON NONWORKING TIME.

A NO. WE CAN MEET PRIOR TO THEM COMING TO WORK OR RIGHT AFTER WORK. SO WE HAVE OTHER TIMES. OR TELL THEM, "WE'RE GOING TO BE IN HERE THIS TIME 1:00 TO 3:00. COME IN IF YOU'RE AVAILABLE." AND A LOT OF THEM DO COME IN. SO IT'S NOT JUST ALWAYS ON THEIR LUNCH.

Q OKAY. SO AS A CHIEF NEGOTIATOR AND A SEVEN-YEAR OFFICER, YOU FOUND IF PRUDENT TO PUT IN LANGUAGE THAT WOULD RESTRICT ACCESS?

MS. MARZAN: CAN I ASK WHY WE'RE HAVING THESE

SAME CONVERSATIONS? BECAUSE PAT'S NOT ON TRIAL HERE. IT'S CHERIE'S CHARGES, NOT PAT'S CHARGES. IF SHE WANTED THOSE QUESTIONS ANSWERED, SHE SHOULD HAVE ASKED THEM YESTERDAY.

BY MS. MANCINI:

Q QUESTION, WERE YOU REQUESTED BY ME TO PROVIDE A COPY OF THE ACTUALLY FINAL TAS OF THE CONTRACT?

A YES.

Q AND WHEN DID YOU GIVE THOSE TO ME?

A I DON'T THINK I EVER DID. I THINK YOU CAME AND GOT THEM FROM GWEN. BECAUSE I'M NOT SURE IF YOU HAVE THE E-MAIL OR NOT, BUT I WORK 12 HOURS. AND YOU WERE ASKING ME ON A MONDAY, AND I TOLD YOU THAT I HAVEN'T HAD TIME. BECAUSE MONDAYS AND TUESDAY I WORK 7:00 A TO 7:00 P. BUT I WOULD BE MORE THAN HAPPY TO DO IT WEDNESDAY.

BUT I GUESS YOU WERE IN A RUSH. SO THAT WEDNESDAY, YOU SHOWED UP IN BARGAINING AND WANTED COPIES, AND YOU RECEIVED COPIES FROM GWEN. YOU COPIED HER BOOK. SO I ASSUMED YOU HAD THEM AT THAT TIME YOU CAME IN.

Q OKAY. SO THAT WAS -- I CAME IN TO GET A COPY OF THE BARGAINING BOOK, IS THAT CORRECT, WHICH IS INTEREST-BASED BARGAINING, WHICH ARE PICTURES?

A ALL THE TAS WERE IN THAT BOOK THAT YOU COPIED, CORRECT.

THE HEARING OFFICER: SO WE HAD A LOT OF TESTIMONY YESTERDAY AROUND UMC. IS THERE ANYTHING -- SOMETHING PARTICULAR NEW THAT YOU NEED TO GET IN?

BY MS. MANCINI:

Q WHEN YOU WERE REQUESTED OF ME TO PROVIDE A COPY OF -- A CONSOLIDATED COPY OF TAS SO THAT WE COULD AT LEAST SEE -- BECAUSE WE HAD MEMBERSHIP THAT WAS ASKING ABOUT WHAT THE TAS WERE --

A YOU MEAN AFTER YOU CANCELED OUR RATIFICATION VOTE? I ASSUMED THAT SINCE YOU CANCELED IT, YOU WERE TAKING CARE OF EVERYTHING.

MS. WALFOORT: LET'S NOT KEEP GOING OVER THAT SAME --

MS. MANCINI: THAT'S FINE. I THINK I MADE IT CLEAR ON WHAT THE BARGAINING LOOKED LIKE.

THE HEARING OFFICER: DO YOU NEED TO REDIRECT OR REBUT?

MS. MARZAN: I HAVE TWO QUESTIONS.

HOW MANY DAYS WERE BARGAINING NORMALLY -- I MEAN RATIFICATION NORMALLY DONE FOR YOUR UNITS?

THE WITNESS: THREE DAYS. THAT'S WHY WE ASKED FOR THREE DAYS. THIS IS SOMETHING I'VE NORMALLY ALWAYS ASKED FOR. BUT THAT WEDNESDAY THAT WE ASKED FOR IT TO BE BARGAINED, WE COULDN'T DO RATIFICATION. BUT EVERYBODY SHOWED UP AT OUR HOSPITAL TO PUT UP FLYERS THAT IT WAS CANCELED. SO HOW CAN YOU TELL ME ONE DAY, "NO, YOU DON'T HAVE THE MEMBERS." BUT THEN YOU HAVE EVERY MEMBER OF THE UNION HALL AT UMC?

MS. MARZAN: THAT'S IT.

THE HEARING OFFICER: ALL RIGHT. THANK YOU. YOU HAVE ONE MORE WITNESS?

MS. MARZAN: YES. SHARON KISLING.

THE HEARING OFFICER: SHARON, STATE YOUR NAME.
THE WITNESS: SHARON KISLING.
THE HEARING OFFICER: GO AHEAD.

SHARON KISLING,
THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

EXAMINATION

BY MS. MARZAN:
Q HI, SHARON.
A HI.
Q BACK MANY MONTHS AGO, I BELIEVE IT WAS AROUND FEBRUARY/MARCH, TIME FRAME, THERE WAS AN EXECUTIVE BOARD MEETING WHERE MICHAEL URBAN CAME TO THE BOARD IN REGARDS TO THE TERMINATED EMPLOYEES. I BELIEVE THERE WAS FOUR OF THEM AT THE TIME. AND DO YOU REMEMBER US TALKING ABOUT THAT AND HAVING A VOTE TO EITHER MOVE FORWARD WITH ARBITRATION OR WHAT WE WOULD DO?
A YES.
Q AND WHAT WAS THAT RESOLUTION?
A I KNOW HE PROVIDED A HANDOUT BECAUSE I REVIEWED SOME OF MY STUFF RECENTLY. HE PROVIDED A HANDOUT ON EACH INDIVIDUAL CASE AS REQUESTED BY THE BOARD ON THE MERIT. AND AT THE TIME, HE ADVISED US THAT ALL OF THEM HAD ENOUGH MERIT TO MOVE FORWARD TO ARBITRATION.
AND SO THERE WAS A MOTION AND IT CARRIED THAT THEY WOULD ALL BE MOVED FORWARD TO ARBITRATION.

Q THAT VERY NEXT MEETING, THAT SAME -- THAT SAME AGENDA ITEM SHOWED UP. AND THERE WAS ANOTHER VOTE TO DO WHAT?

A I BELIEVE IT WAS MEDIATION.

Q WAS THERE A REASON BEHIND THE CHANGE?

A I DON'T KNOW. I'VE SEEN THAT A LOT, WHERE WE DO A REVOTE.

MS. MARZAN: THANK YOU.

THE HEARING OFFICER: FOR CLARIFICATION, WAS THE MOTION TO GO TO MEDIATION APPROVED? DID THE BOARD TAKE A FORMAL VOTE? AND WAS THAT TO GO TO MEDIATION?

THE WITNESS: HONESTLY, I CAN'T REMEMBER. BECAUSE THERE ARE TIMES WHERE, LIKE, THERE IS A VOTE. AND THEN THE NEXT MEETING, WE'RE ADVISED OF SOMETHING. SO WE MAY HAVE BEEN ADVISED AT THE FOLLOWING MEETING THAT WE WERE GOING TO GO TO MEDIATION BY PRESIDENT MANCINI. OR IT MAY HAVE BEEN A VOTE. I CAN'T RECALL.

THE HEARING OFFICER: SO A CLARIFICATION, DID THE BOARD OBJECT TO MEDIATION?

MS. MARZAN: NO. THERE WAS ACTUALLY A PANEL PUT IN PLACE TO DO THE MEDIATION.

THE HEARING OFFICER: SO THEY TOOK ACTION TO PURSUE MEDIATION? OKAY. THAT'S HELPFUL.

BY MS. MARZAN:

Q IN MY EXHIBIT NUMBER 2, UNDER NUMBER 3 --

A NUMBER 3?

Q YES. THIS IS AN E-MAIL BETWEEN THE BARGAINING TEAM BASICALLY THAT HAD BEEN IN PLACE FOR TWO YEARS. AND

WE FOUND OUT THAT JUDGE BARE'S DECISION CAME DOWN. CAN YOU TELL US KIND OF WHAT HAPPENED AFTER WE FOUND THAT NOTICE OUT?

A WELL, IT LOOKS LIKE THERE WAS COMMUNICATION. I'M TRYING TO REFRESH MY MEMORY -- WELL, I KNOW ONE OF THE INITIAL CONCERNS THAT CAME TO OUR ATTENTION WAS THAT COMMUNICATION WENT DIRECTLY TO MEMBERSHIP SAYING WHAT THE DECISION WAS. AND IF I'M CORRECT, LIKE THE DECISION WAS ATTACHED. SO A LOT OF THE MEMBER OF THE BARGAINING TEAM WERE CONCERNED THAT THAT INFORMATION WAS NOT SHARED WITH THEM PRIOR TO ACTUALLY BEING COMMUNICATED TO MEMBERSHIP AT LARGE.

SO WHAT OCCURRED IS PHONE CALLS WERE BEING RECEIVED BY STEWARDS AND CHIEF STEWARDS AND VPS. AND THEY DIDN'T KNOW EXACTLY WHAT MEMBERSHIP WAS TALKING ABOUT. AND I KNOW IT LOOKS LIKE THIS E-MAIL THAT WE'RE REFERENCING THAT WAS EXACTLY WAS THE CONVERSATION. AND I SEE WHERE I CHIMED IN THAT WE KIND OF RESPECT THE WISHES AND THAT WE COULD BE BRIEFED AND REVIEW SETTLEMENT AGREEMENTS THAT WE'RE CONSIDERING.

Q SO AT THAT POINT, I ACTUALLY THINK, IF YOU LOOK AT THE VERY FIRST PAGE, IT'S THE FRIDAY, AUGUST 12TH --

A NUMBER 3?

Q IT'S NUMBER 3 ON THE CORNER, YES. IT'S AN E-MAIL SENT BY MYSELF TO CHERIE BASICALLY SAYING IT HAD COME TO MY ATTENTION THAT THERE WAS BARGAINING GOING ON THAT WE WERE UNAWARE OF.

A YES.

Q AND HER RESPONSE WAS THAT THERE WAS ABSOLUTELY NO BARGAINING GOING ON. BUT THEN A FEW -- I DON'T KNOW WHY THIS DIDN'T PRINT RIGHT. BUT THERE IS AN E-MAIL LATER THAT SHE TALKS ABOUT THAT THERE WAS NO SETTLEMENT -- THERE WAS NO BARGAINING GOING ON BUT MIKE URBAN WAS WRITING UP A SETTLEMENT AGREEMENT.

SO IS A SETTLEMENT AGREEMENT, AS FAR AS YOU ARE CONCERNED, PART OF NEGOTIATIONS?

A YES.

Q SO ALSO IN THIS E-MAIL CHAIN, PRESIDENT MANCINI STATES THAT SHE WILL LET ALL THE ENTIRE BARGAINING TEAM KNOW WHAT THAT SETTLEMENT AGREEMENT LOOKS LIKE BEFORE IT GOES OUT. WERE YOU INCLUDED ON THAT LAST E-MAIL OR ON THAT LAST DECISION -- OR THAT LAST SETTLEMENT AGREEMENT BEFORE IT ACTUALLY WAS POSTED ON THE WEBSITE SIGNED BY CHERIE MANCINI PRIOR TO THE DATE THAT WE ACTUALLY APPROVED IT?

A I'M SORRY ARE YOU ASKING --

Q WERE YOU NOTIFIED BEFORE IT WENT OUT TO MEMBERSHIP?

A NO, NO.

MS. MARZAN: I DON'T HAVE THIS. I'M ACTUALLY GOING TO GET A COPY OF IT FOR YOU GUYS.

BY MS. MARZAN:

Q BACK IN AROUND THE APRIL TIME FRAME, PART OF OUR CONTRACT STATES THAT WE HAVE THE ABILITY TO ENGAGE OUR HEALTH INSURANCE COMMITTEE, WHICH IS EQUALLY SEATED BY MANAGEMENT AND THE UNION. BACK IN APRIL, WAS THERE AN

E-MAIL SENT TO CHERIE TO ASK TO SEND MEMBERS TO THAT?
A YES. THERE WAS AN E-MAIL FROM THE ADMINISTRATOR, I BELIEVE, LESLIE SHELL (PHONETIC). AND ACTUALLY IT WAS IN ANOTHER CASE, IT WAS IN CHARGING PARTY 2, THE BIG REVIEW FROM LEGAL, THE LETTER IS INCLUDED IN THERE THAT WENT TO THE HALL REQUESTING REPRESENTATIVES.
Q TO YOUR KNOWLEDGE, WAS THAT COMMITTEE EVER PUT INTO PLACE?
A NO. THERE WAS NO RESPONSE FROM PRESIDENT MANCINI.
Q SO AFTER THEY DETERMINED WHAT WAS GOING TO BE IN THERE, THEY CALLED AND ASKED TO THEN TALK ABOUT THE CHANGES WITH US. THOSE CHANGES REALLY HURT THE MEMBERSHIP; IS THAT CORRECT?
A YES.
Q SO DO YOU BELIEVE THAT PRESIDENT MANCINI PREVENTED US THE ABILITY TO BARGAINING, NOT COMMUNICATING WELL, NOT TALKING BACK TO THAT E-MAIL OR THAT LETTER?
A YES. BECAUSE THEN WE WOULD HAVE HAD A VOICE. THERE WERE THREE SEATS FOR LABOR.
THE HEARING OFFICER: BRENDA, CAN I ASK YOU A QUESTION? ON THE PREVIOUS QUESTION RELATED TO TAB 2, NUMBERED AS ITEM 3, CAN YOU GIVE ME THE BARE BONES OF WHAT THIS IS ? BECAUSE I'M LOOKING AT IT. IT LOOKS LIKE A JUDGE'S DECISION. AND THEN URBAN, THE ATTORNEY FOR THE LOCAL-RIGHT, IT LOOKS LIKE HE WORKED OUT WHAT THAT DECISION MEANT OR HOW IT APPLIED. SO WHAT IS THIS?
MS. MARZAN: SO BASICALLY, WHAT'S BEEN

HAPPENING IS WE HAVE ASKED, AS THE VPS, MARK MATHEWS AND MYSELF, OVER AND OVER THAT WE NEED TO BE INCLUDED IN ALL COMMUNICATION IN REGARDS TO THE MEMBERSHIP PER THE CONSTITUTION AND BYLAWS ARTICLE 7 SECTION -- WHATEVER IT IS -- SECTION 11, LETTER 4.

SO THIS CONTINUES TO HAPPEN ALL THE TIME. AND THIS IS ONE CASE WHERE THERE IS STUFF BEING SENT OUT TO THE MEMBERSHIP AGAIN WHERE NONE OF US WERE AWARE OF IT. SO YOU START GETTING PHONE CALLS, E-MAILS, TEXTS. AND YOU HAVE NO CLUE WHAT'S HAPPENING. SO IT'S IMPOSSIBLE TO TRY TO COMMUNICATE WITH THE MEMBERS WHEN YOU DON'T KNOW HOW TO COMMUNICATE WITH THEM.

PART -- YOU KNOW, THE NUMBER ONE PIECE OF COLLECTIVE BARGAINING AND ORGANIZING IS TO HAVE A MESSAGE. SO IF THERE IS A MESSAGE GOING OUT WITHOUT THE ENTIRE BARGAINING TEAM OR COUNTY OFFICERS UNDERSTANDING WHAT THAT MESSAGE IS SUPPOSED TO BE, IT'S VERY DIFFICULT TO BE UNITED.

THE HEARING OFFICER: SO THIS SPEAKS TO THE LACK OF COMMUNICATION? IS WHAT YOU ARE SAYING?

MS. MARZAN: YES.

THE HEARING OFFICER: OKAY.

MS. MARZAN: AND IN THIS CASE SPECIFICALLY, THAT THERE WAS COMMUNICATIONS GOING ON AS URBAN, OUR ATTORNEY, WAS TALKING TO THEIR ATTORNEY TO COME UP WITH A SETTLEMENT AGREEMENT, WHICH IS PART OF NEGOTIATIONS.

THE HEARING OFFICER: OKAY.

BY MS. MARZAN:

Q THE VERY LAST ITEM, NUMBER 14, FIRST OF ALL, I'M GOING TO ASK YOU HOW LONG WAS THE LAST NEGOTIATIONS GOING ON WITH THE CLARK COUNTY BARGAINING TEAM?

A IF I'M CORRECT THE CONTRACT EXPIRED JUNE 30TH, 2012 OR '13. SO BASICALLY, WE WERE IN NEGOTIATIONS AND SUITS FOR ABOUT THREE YEARS.

Q SO IN THE MIDDLE OF THAT NEGOTIATION IS WHEN THE SB 241 ISSUES BECAME ISSUES, CORRECT?

A YES.

Q SO AS PART OF THE BARGAINING TEAM THAT SAT DURING THAT FIASCO, DID YOU HAVE A LOT OF OWNERSHIP IN REGARDS TO WHAT WAS TAKING PLACE, WHAT WAS HAPPENING, THE JUDGE'S DECISION, SINCE WE HAD ALL THESE LAWSUITS GOING AND EVERYTHING?

A ABSOLUTELY. I WAS A MEMBER OF THE BARGAINING TEAM.

Q SO WHEN CHERIE IS SAYING NOW THAT THE BARGAINING TEAM WAS NO LONGER BARGAINING, EVEN THOUGH THESE THINGS WERE OUTSTANDING, DO YOU TAKE OFFENCE TO THE FACT THAT YOU WERE NO LONGER PART OF THAT BARGAINING TEAM?

A YES.

Q THIS E-MAIL IS A CHAIN TALKING ABOUT ONE OF THE DECISIONS THAT CAME OUT, AND WE WERE TALKING ABOUT HOW TO GET THAT E-MAIL OUT. AND IN HERE, MULTIPLE PEOPLE SAY THAT THE E-MAIL NEEDS TO GO OUT TO THE BARGAINING TEAM BECAUSE -- I BELIEVE BECAUSE THIS BARGAINING WAS GOING ON FOR SO LONG, PEOPLE WERE STARTING TO QUESTION THINGS. SO

IT WAS IMPORTANT TO US AS A TEAM, CORRECT, TO MAKE SURE THAT OUR COWORKERS KNEW THAT WE WERE STILL FIGHTING FOR THEM?

A YES.

MS. MARZAN: THAT'S IT.

THE HEARING OFFICER: HOW MANY MORE QUESTIONS DO YOU HAVE?

MS. MARZAN: JUST A COUPLE.

BY MS. MARZAN:

Q ARE YOU AWARE THAT MARK MATHEWS AND I HAVE ASKED MULTIPLE TIMES TO BE INCLUDED IN MANAGEMENT MEETINGS?

A YES.

Q ON HOW MANY MEETINGS HAVE YOU ATTENDED PERSONALLY WITH PRESIDENT MANCINI WHERE MARK OR I OR BOTH OF US HAVE NOT BEEN THERE?

A I PROBABLY COULD ACTUALLY ANSWER THAT ON THE FLIP, IF THAT'S OKAY. MEANING THAT THERE HAVE BEEN NO MEETINGS WE HAVE HAD WITH MANAGEMENT WHERE YOU GUYS WERE PRESENT.

Q THANK YOU. ONE MORE QUESTION. DO YOU RECALL A CASE FOR O'BANNON EVER COMING TO THE BOARD THAT WE APPROVED A SETTLEMENT AGREEMENT FOR?

A NO.

Q OKAY, THANK YOU.

THE HEARING OFFICER: YOU CAN CROSS, CHERIE.

EXAMINATION

BY MS. MANCINI:

Q IS IT TRUE, SHARON, THAT THERE WAS NO ACTIVE BARGAINING GOING ON AT THE TIME THAT THIS AGREEMENT CAME OUT, THIS SETTLEMENT AGREEMENT?

A I GUESS IT WOULD DEPEND ON ONE'S INTERPRETATION OF "ACTIVE BARGAINING." AT THE TIME, THERE WAS NOT REMEDY TO THE LAST CONTRACT. SO THERE WAS NO BUBBLE PEOPLE. THERE WERE STILL PEOPLE WHO HADN'T RECEIVED MERIT OR LONGEVITY BASED ON THE CONTINUED LITIGATION OF BARGAINING.

MS. WALFOORT: CAN I ASK IF THIS IS THE SETTLEMENT AGREEMENT WITH THE TWO JUDGE'S ORDERS?

MS. MANCINI: THIS IS IN REGARDS TO STATING ABOUT WHETHER THE BARGAINING TEAM WAS ACTIVE OR NOT ACTIVE.

MS. WALFOORT: ALL I WANT TO KNOW IS IS THIS THAT CLARK COUNTY SETTLEMENT AGREEMENT? OR IS IT O'BANNON?

MS. MANCINI: I'M SORRY. CLARK COUNTY SETTLEMENT AGREEMENT, SORRY.

BY MS. MANCINI:

Q WERE YOU ACTIVELY DISCUSSING THE BUBBLE PEOPLE, NEGOTIATING ABOUT THE BUBBLE PEOPLE? OR WAS THAT IN A LAWSUIT IN THE COURTS?

A IT WAS LAWSUIT. BUT WE WERE ACTIVELY HAVING CONVERSATION, WHETHER OR NOT TO CONTINUE THE LAWSUIT, WHETHER OR NOT TO HAVE AGREEMENTS. AT THE SAME TIME, I BELIEVE WE WERE TRYING TO REACH WHETHER OR NOT -- WE WERE

IN NEGOTIATION FOR OUR COLA. SO IT SEEMS LIKE WE HAD BEEN IN NEGOTIATION.

ACTUALLY, I JUST REMEMBERED THAT CAME UP. WE WERE IN NEGOTIATION FOR OUR COLA, AND THAT BEGAN LAST YEAR. SO, YES, WE WERE ACTIVELY IN NEGOTIATIONS.

Q WERE YOU ACTIVELY DISCUSSING A SETTLEMENT FOR THE 1700 PEOPLE WHO DID NOT RECEIVE THEIR MERIT AND LONGEVITY? WERE YOU NEGOTIATING WITH MANAGEMENT ABOUT THAT AS A BARGAINING TEAM?

A NO. BUT I THINK WE SHOULD HAVE BEEN. THAT'S WHAT SHE'S SAYING.

Q OKAY. AND DID I HAVE ANYTHING TO DO WITH WHY YOU WEREN'T TALKING ABOUT THAT IN BARGAINING?

A I BELIEVE SO.

Q CAN YOU PLEASE TELL ME HOW I AFFECTED YOU NOT BEING ABLE TO NEGOTIATE FOR THE 1700 PEOPLE WHO WERE NOT RECEIVING THEIR MERITS OR LONGEVITY PER THE LAW?

A YEAH. BECAUSE A LOT OF CONCERNS THAT WE HAD WAS YOU WOULD HAVE COMMUNICATIONS WITH URBAN LAW FIRM AND PROVIDE THEM WITHOUT DIRECTION WITHOUT CONSULTING THE BARGAINING TEAM.

Q AND THAT WAS IN REGARDS TO HOW THE LAWSUIT WAS GOING IN FEDERAL COURT?

A IT WAS IN REGARDS TO EVERYTHING.

Q SO THE SETTLEMENT AGREEMENT -- I'M SORRY, LET ME GO BACK TO -- ACTUALLY, THERE WERE QUITE A FEW THINGS BROUGHT UP. I'LL STICK WITH THE SETTLEMENT AGREEMENT. YOU HAD SAID THERE WAS AN E-MAIL WHICH IS PART OF TAB 2.

MS. MARZAN: NUMBER 3.
MS. MANCINI: NO IT'S 2.
MS. MARZAN: IT'S TAB 2, NUMBER 3.
MS. MANCINI: THIS IS IN REGARDS TO JUDGE BARE'S DECISION. IF YOU LOOK AT THE VERY LAST PAGE, IT STATES ON FRIDAY AUGUST 12, 2:39 P.M. -- AND BRENDA IS ON THIS AS WELL, BRENDA, BRENT MILLER. IT STATES -- CAN I READ IT? OR IS IT FINE? DO YOU NEED ME TO READ IT?
IT STATES I HAD SAID TO MIKE URBAN, "PLEASE SEND THE COMPLETE SETTLEMENT TO THIS GROUP. ALSO, I WILL REITERATE TO YOU AGAIN THAT I HAVE NOT NEGOTIATED ANYTHING, SO BEING ALLUDED TO BEING A LIAR IS COMPLETELY OFFENSIVE TO ME."
BY MS. MANCINI:
Q SO BASICALLY, WHAT HAD HAPPENED WAS -- DO YOU KNOW HOW THAT SETTLEMENT AGREEMENT CAME ABOUT, SHARON?
A NO.
Q OKAY. SO YOU DON'T KNOW WHO PROPOSED THE SETTLEMENT AGREEMENT OR HOW IT CAME TO ME?
A HOW IT CAME TO YOU, NO.
Q OKAY.
A I SHOULD.
Q SO YOU ARE NOT AWARE THAT YOLANDA KING GAVE ME SOMETHING AS FAR AS THE SETTLEMENT WAS CONCERNED, AND THAT I FORWARDED IT ON TO MIKE URBAN FOR REVIEW?
A NO, CHERIE. THAT WAS A CONCERN. I WASN'T BEING COPIED AS EXECUTIVE VICE PRESIDENT.
Q BUT ARE YOU AWARE OF THAT OR NOT AWARE OF THAT,

THAT YOLANDA PROPOSED A SETTLEMENT TO ME THAT WAS GIVEN TO MIKE URBAN FOR REVIEW?

A NO. IT CLEARLY SOUNDS LIKE I WOULD NOT HAVE BEEN AWARE OF IT.

Q OKAY. SO WERE YOU EVER -- DID YOU EVER HAVE PEOPLE COME UP TO YOU AND ASK YOU ABOUT THEIR MERITS AND LONGEVITY AND WHEN THEY WERE GOING TO GET IT?

A YES.

Q WAS IT FREQUENT?

A YES.

Q OKAY. SO IT WAS PRETTY FREQUENT, OKAY. TO GO BACK TO THE FOUR STAFF MEMBERS WHO WERE TERMINATED THAT WE HAD SPOKE ABOUT THAT WE HAD APPROVED THEM TO GO TO ARBITRATION --

A YES.

Q -- AND THEN, IN TURN, WE HAD COME BACK TO THE E-BOARD MEETING?

A YES.

Q DO YOU RECALL WHAT THE DISCUSSION WAS?

A I'M SORRY, I DON'T.

Q SO YOU DON'T RECALL THE DISCUSSION WAS THAT IT WOULD BE MORE PRUDENT UPON OUR PART TO GO TO MEDIATION, AS IT WOULD NOT BE AS FISCALLY DAMAGING TO THE LOCAL TO DO MEDIATION VERSUS PAYING ARBITER'S FEES?

A I DON'T REMEMBER THAT BEING THE CONVERSATION WHEN WE VOTED TO MOVE IT. WHAT I DO RECALL WAS I WASN'T IN AGREEMENT WITH IT GOING TO ARBITRATION BECAUSE OF THE COST, AND I CONSISTENTLY HAD CONCERNS ABOUT THE LEGAL

FEES WITH A LOT OF WHAT'S GONE ON.
Q DO YOU RECALL WHO WAS PUT ON THAT PANEL?
MS. WALFOORT: THE MEDIATION PANEL?
MS. MANCINI: UH-HUH.
MS. WALFOORT: I THINK WE HAVE GOT THE GIST.
MS. MANCINI: IT WAS BRENDA MARZAN, BRENT MILLER AND PAT GREAUX, JUST TO BE CLEAR.
MS. WALFOORT: ALL RIGHT.
BY MS. MANCINI:
Q SHARON, ARE YOU AWARE OF A HEALTH CARE CALL THAT MYSELF, MARK MATHEWS AND JIM COWAN PARTICIPATED IN?
A YES.
Q OKAY. AND AT THAT TIME, DO YOU KNOW WHAT WAS DISCUSSED ON THAT CALL?
A NO.
Q WHAT WAS DISCUSSED ON THAT CALL WAS THE CHANGES TO THE BENEFITS. AND THAT'S WHY I HAD INCLUDED JIM AND MARK ON THE CALL. BECAUSE THEY WERE THE ONES THAT HAD SAID THAT THEY COULD PARTICIPATE.
A WHAT I DO REMEMBER IS, LIKE I SAID, THERE WAS A LETTER THAT WAS SENT TO THE HALL LATER DISCOVERED FROM SEVERAL MONTHS AGO THAT HAD RECEIVED NO RESPONSE. THEN I SAW AN E-MAIL FROM MARK MATHEWS WHERE ADMINISTRATION WAS NOW CALLING BECAUSE THEY NOW HAD THESE POLICIES OR CHANGES THAT THEY WANTED TO DISCUSS.
I REMEMBER IT WASN'T EVEN A 24-HOUR NOTICE THAT THERE WAS GOING TO BE A CONFERENCE CALL. SO I KNOW MARK MATHEWS WAS ON A CONFERENCE CALL, AND IT SOUNDS LIKE

MAYBE WHO ENDED UP ON THE CALL WERE YOU, JIM AND MARK.
Q SO YOU ARE NOT AWARE THAT I (INAUDIBLE) THE CONFERENCE CALL?
A THAT'S NOT WHAT THE E-MAIL SHOWS. SO WHAT I'M SAYING IS IT WAS JUST THE OUTCOME OF THE CHANGES.
Q ONE LAST QUICK QUESTION. IN REGARDS TO THE BARGAINING TEAM, GETTING OUT COMMUNICATIONS TO MEMBERSHIP, HOW QUICK OF A TURNAROUND -- OR I'LL REPHRASE IT.
DID YOU ALWAYS HAVE TO SCHEDULE A MEETING WITH THE BARGAINING TEAM BEFORE YOU PUT OUT A COMMUNICATION TO MEMBERSHIP? OR WAS IT A COMMON PRACTICE?
A IT WAS A COMMON PRACTICE THAT THE BARGAINING TEAM WOULD DISCUSS WHAT THE MESSAGING WOULD BE, AND THEN IT WOULD GET SENT OUT, YES.
Q AND HOW QUICK WERE YOU USUALLY ABLE TO GET A BARGAINING TEAM TOGETHER AS IN DAYS?
A I DON'T KNOW. BECAUSE WE NORMALLY PLANNED. WE PLANNED. TYPICALLY, IF WE HAD A SESSION, WE WOULD PLAN IT THEN OR GET ON A QUICK CONFERENCE CALL. BUT WE HAVE MET WITHIN DAYS' OF NOTICE.
Q I KNOW THAT THERE HAVE BEEN TIMES WHERE -- I'LL -- STRIKE THAT.
THAT'S FINE. THANK YOU.
THE HEARING OFFICER: OKAY. VERY GOOD, THANK YOU. DID YOU HAVE ANY FOLLOW-UP THAT YOU NEEDED TO DO BRENDA, REBUTTAL?
MS. MARZAN: I JUST HAVE ONE FOLLOW-UP --

QUESTION.

ITEM NUMBER 5 -- TAB 6, NUMBER 5 -- NO, TAB 4, NUMBER 5.

THE WITNESS: OKAY.

MS. MARZAN: THE SEIU NEVADA -- THIS IS AN E-MAIL THAT WAS SENT OUT IN REGARDS TO THE EMRB STUFF AGAIN. CAN YOU JUST READ THE SECOND PARAGRAPH?

THE HEARING OFFICER: YOU DON'T NEED TO READ IT. I CAN READ IT. WHAT'S THE POINT? JUST LIFT THAT OUT.

MS. MARZAN: SO IN HERE, AS YOU HAD BEEN ON THE BARGAINING TEAM FOR YEARS AND YEARS, THERE WAS ONE THING THEY PUT IN HERE THAT THEY HAD PUT IN THIS FLYER STATING THAT LONGEVITY WAS A BONUS, WHICH NEVER CAME BEFORE THE BOARD. WAS THERE A LOT OF DISCUSSION AMONGST THIS AND US ASKING TO PLEASE BE INCLUDED BEFORE ANY OF THESE MESSAGES WENT OUT AGAIN?

THE WITNESS: YES.

MS. MARZAN: WERE THERE ADDITIONAL MESSAGES AFTER THIS THAT WENT OUT? NOT NECESSARILY IN REGARDS TO THE SAME ITEMS, BUT ANYTHING IN REGARDS TO THE BARGAINING TEAM THAT THE BARGAINING TEAM OR CLARK COUNTY SHOULD HAVE REVIEWED BEFORE BEING SENT?

THE WITNESS: THAT'S BEEN A CONTINUOUS CONCERN ACROSS ALL SHOPS.

MS. MARZAN: THANK YOU.

MS. MANCINI: JUST A QUICK.

DID YOU HAVE ANY PERSON COME TO YOU AND SAY,

"WHY WAS LONGEVITY CALLED A 'BONUS'?" DID YOU HAVE ANY MEMBER COME AND ASK YOU, "WHY WAS LONGEVITY TERMED AS A 'BONUS'?"

MS. MARZAN: I'VE HAD MEMBERS COME TO ME AND ASK WHY WE WOULD SAY THAT WHEN IT'S PART OF OUR SALARY.

MS. MANCINI: I'M NOT ASKING YOU.

THE HEARING OFFICER: WE'RE GOING TO TAKE THIS INTO EVIDENCE FOR WHAT IT'S WORTH AND MOVE FORWARD. SO CHERIE, WHO DO YOU HAVE FOR YOUR FIRST WITNESS?

MS. MANCINI: PATTI CURRY, PLEASE.

THE HEARING OFFICER: HOW MANY DO YOU HAVE?

MS. MANCINI: I HAVE TWO.

THE HEARING OFFICER: THEY WILL BE QUICK?

MS. MANCINI: THEY'LL BE QUICK.

THE HEARING OFFICER: OKAY. VERY GOOD.

PATTI CURRY,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: MY NAME IS PATTI CURRY. MY WHOLE NAME OR JUST LAST NAME?

THE HEARING OFFICER: SPELL BOTH.

THE WITNESS: C-U-R-R-Y.

THE HEARING OFFICER: AND PATTI?

THE WITNESS: P-A-T-T-I.

THE HEARING OFFICER: VERY GOOD. GO AHEAD.

EXAMINATION

BY MS. MANCINI:

Q PATTI, CAN YOU TELL ME HOW LONG YOU'VE WORKED 1107?

A 5TH OF DECEMBER WILL BE 11 YEARS.

Q AND SO DURING THE TIME THAT THE 1700 PEOPLE WERE NOT RECEIVING THEIR MERITS AND LONGEVITY, CAN YOU TELL ME HOW OFTEN YOU HAD MEMBERS CALLING OR REQUESTING INFORMATION ABOUT WHAT WAS GOING ON?

A IT WOULD HAVE TO BE BETWEEN 10 TO 15 CALLS A DAY.

Q AND CAN YOU TELL ME WHAT WERE SOME OF THE QUESTIONS THAT WERE ASKED OF YOU?

A WHEN THEY WERE GOING TO GET THE RAISE, ANY INFORMATION, BECAUSE THEY WEREN'T HEARING ANYTHING IN THE SHOPS.

MS. MANCINI: NOTHING FURTHER.

THE HEARING OFFICER: OKAY. DID YOU WANT TO CROSS?

MS. MARZAN: NOPE.

MS. MANCINI: THANK YOU, PATTI.

THE HEARING OFFICER: THANKS, PATTI.

YOUR NEXT WITNESS?

MS. MANCINI: ROMINA LORETO. AND THIS IS IN REGARDS TO UMC.

THE HEARING OFFICER: ROMINA, YOU'RE GOING TO BE SWORN. THEN STATE AND SPELL YOUR NAME FOR THE RECORD.

MS. LORETO: ROMINA LORETO, R-O-M-I-N-A

L-O-R-E-T-O.

ROMINA LORETO,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

EXAMINATION

BY MS. MANCINI:

Q ROMINA, CAN YOU TELL ME WHAT YOU DO AT 1107?

A I AM THE NEW UNION ORGANIZER FOR UMC HOSPITAL.

Q CAN YOU TELL ME, SINCE YOU TOOK OVER UMC HOSPITAL, HAVE YOU HAD ANY DIFFICULTY WITH ACCESS TO THE FACILITY?

A YES. I'M REQUIRED TO GIVE A 24-HOUR NOTICE BEFORE I CAN ACTUALLY STEP IN THE HOSPITAL. AND ALSO, A CHIEF STEWARD OR A DESIGNEE IS REQUIRED TO ACCOMPANY ME AT ALL TIMES, THE WHOLE TIME THAT I'M GOING TO BE AT UMC HOSPITAL.

Q HAVE YOU BEEN AWARE OF ANYONE THAT'S BEEN ASSIGNED AS A DESIGNEE?

A THERE IS ONE. LIZ BOLHOUSE SENT OUT AN E-MAIL TO JOHN ESPINOZA ASSIGNING THE VP THERESA DIAZ AS DESIGNEE.

Q BUT THERE ARE NO OTHERS?

A NO.

Q HAVE YOU HAVE YOU BEEN ABLE TO ACCESS ORIENTATION?

A NO. BUT AFTER A CONVERSATION WITH PAT, SHE

TEXTED ME LAST WEEK SAYING THAT THEY MIGHT HAVE ME ON THE NOVEMBER 7TH NEW HIRE ORIENTATION.

Q HAVE YOU GIVEN NOTICE AND THEN HAD DIFFICULTY GETTING RESPONSE TO GO INTO THE HOSPITAL?

A SINCE MY FIRST WEEK AT WORK, YES. I ALWAYS SEND OUT A NOTICE TO THE HOSPITAL ON THURSDAY AFTERNOON, A SCHEDULE, UNION ACCESS NOTIFICATION FOR THE FOLLOWING WEEK FOR MONDAY THROUGH FRIDAY, THE HOURS I'LL BE THERE AND THE DAYS AND TIMES I'LL BE THERE.

THE ONLY RESPONSE I GET IS FROM LIZ BOLHOUSE WHO IS ONE OF THE CHIEF STEWARDS. SHE GIVES ME TUESDAY FROM AROUND 10:00 TO LIKE 2:00 IN THE AFTERNOON. AND THERESA DIAZ, THE DESIGNEE, GOES WITH ME ON MONDAYS ON HER DAY OFF. SHE GIVES HER DAY OFF TO GO WITH ME TO THE HOSPITAL FROM 9:00 A.M. TO 3:00 IN THE AFTERNOON.

THE HEARING OFFICER: CHERIE?

MS. MANCINI: WE'LL BE DONE. I'M DONE.

THE HEARING OFFICER: FROM THE LANGUAGE OF WHAT SHE'S TESTIFYING, THAT ACCESS IS DIFFICULT, I DO WANT TO FOLLOW UP ON -- I'M NOT SURE IF IT'S POSSIBLE, BUT I BELIEVE IT WAS NATALIE WHO TESTIFIED EARLIER ABOUT AN ARBITRATION AWARD THAT SET THE LANGUAGE IN PLACE OR THE REQUIREMENT FOR ACCESS.

MS. MANCINI: FOR RENOWN.

THE HEARING OFFICER: YEAH. OH, THAT'S SEPARATE? OKAY.

MS. MANCINI: YEAH. THAT'S NOT UMC.

THE HEARING OFFICER: I APOLOGIZE.

MS. MANCINI: THAT'S OKAY.

THAT'S ALL FROM ME.

THE HEARING OFFICER: THANK YOU. ANY FOLLOW-UP OR REBUTTAL? NO? OKAY, THANK YOU.

MS. MANCINI: THANK YOU, ROMINA.

THE HEARING OFFICER: SO TO WRAP THIS UP, WE WILL HAVE CLOSING STATEMENTS. I WANT TO KEEP THOSE SHORT. SO IF YOU COULD, BRENDA, PROVIDE WHAT IS THE INFORMATION YOU PUT FORWARD THAT SUPPORTS THE CHARGES THAT YOU HAVE, WOULD BE REALLY GOOD. AND IF YOU COULD KEEP THAT TO THREE MINUTES, THAT'S WHAT I WANT TO SET. SO WE CAN BREAK FOR LUNCH AND MOVE ON.

AND THE SAME, WHAT EITHER WAS NOT PROVEN OR EVIDENCE YOU PROVIDED THAT -- FOR THE CHARGES. OKAY? THANK YOU. KEEP IT TO THREE MINUTES.

VERY GOOD, BRENDA.

MS. MARZAN: IT SADDENS ME TO BE HERE TODAY. BECAUSE I DON'T LIKE TO DO THIS STUFF. I THINK THE MOST IMPORTANT THING IS OUR MEMBERSHIP, AND WE SHOULD KEEP THE MEMBERSHIP AT THE FOREFRONT EVERY DAY OF OUR LIVES AT LOCAL 1107. UNFORTUNATELY, I BELIEVE THAT'S NOT THE CASE TODAY. AND I FEEL THAT THE MEMBERSHIP ISN'T GETTING WHAT THEY NEED AND WHAT THEY DESERVE BECAUSE OF ITEMS THAT I HAVE PRESENTED.

WHEN YOU ARE CONSTANTLY PUT IN A POSITION WHERE YOU ARE HAVING TO FIGHT WITH THE REST OF THE LOCAL TO BE ABLE TO PROVIDE FOR YOUR MEMBERSHIP, IT BECOMES VERY, VERY DISINGENUOUS. SO BASICALLY, I HAVE BEEN ASKING OVER

A YEAR FOR CERTAIN THINGS FROM PRESIDENT MANCINI, AND HAVE YET TO GET THOSE THINGS.

MOST IMPORTANTLY, THE RESPECT THAT'S DESERVED OF THE CLARK COUNTY OFFICERS, SPECIFICALLY MARK AND I BEING INCLUDED AS PER THE CONSTITUTION AND BYLAWS ON MEETINGS THAT ARE HELD WITH THE MANAGEMENT. THERE IS SOME THINGS THAT ARE IN HERE THAT YOU GUYS WILL RECEIVE THAT I DIDN'T GO OVER.

BUT SPECIFICALLY BRINGING UP VIOLATIONS AMONGST ALL THE CLARK COUNTY ENTITIES IN REGARDS TO BANK TIME, WHICH WILL END UP CAUSING A LOT OF PROBLEMS EVENTUALLY IN LEGISLATION BECAUSE WE DO NOT HAVE FRIENDS UP THERE THAT ARE FINDING EVERY PLACE THEY CAN TO FIND THINGS TO FIGHT US WITH.

AND WHEN OUR OWN PRESIDENT PUBLICLY PUTS ITEMS OUT BADMOUTHING OR SLANDERING MEMBERS AND OFFICERS OF THIS LOCAL, IT'S NOT ACCEPTABLE. AND I'VE REACHED OUT MULTIPLE TIMES TO TRY TO HELP. AND THERE IS SOME OF THESE E-MAILS RIGHT IN HERE THAT YOU CAN READ AGAIN. SO I DIDN'T HAVE ANY OTHER CHOICE. WE'VE GOT TO MOVE THIS LOCAL FORWARD. AND IF IT MEANS PUTTING THINGS OUT ON THE TABLE AND GETTING HELP, THAT'S WHAT WE NEED TO DO.

THE HEARING OFFICER: THANK YOU.

CHERIE?

MS. MANCINI: SO YOU'VE SEEN TODAY THAT BASICALLY THERE WAS LACK OF COMMUNICATION -- OR I'M SORRY, LACK OF ADHERING TO A CONVERSATION AT UMC IN REGARDS TO THE RATIFICATION VOTE THAT THE CHIEF ANCILLARY

STEWART, PAT GREAUX, TOOK IT UPON HERSELF TO PUBLISH THREE DAYS WORTH OF -- FOR ONE FACILITY, ONE LOCATION, THREE DAYS OF 14.5 HOURS OF VOTING, THAT WOULD HAVE REQUIRED -- IT WOULD HAVE BEEN A COMPLETE STRAIN ON THE HALL TO BE THERE. THAT WOULD HAVE TAKEN EVERY STAFF MEMBER OF THE ENTIRE HALL.

YOU SAW THAT THE LANGUAGE IN THE CONTRACT WAS COMPLETELY DETRIMENTAL TO THE ORGANIZATION, COMPLETELY DETRIMENTAL TO THE MEMBERSHIP. AND AS AN OFFICER OF THE LOCAL AND AN OFFICER OF THE BARGAINING TEAM, PAT HAD AN OBLIGATION TO MAKE SURE THAT MEMBERSHIP WAS PROTECTED. AND AS YOU CAN TELL BY THE LANGUAGE, THAT WAS NOT COMPLETED.

YOU HEARD FROM THE TESTIMONY OF PATTI CURRY THAT THERE WERE PEOPLE CALLING THE HALL EVERY SINGLE DAY ASKING, "WHERE IS MY MONEY?" "WHERE IS MY MONEY?" "WHERE IS MY MONEY?" SO WHEN SOMETHING COMES FORWARD THAT HASN'T BEEN ABLE TO BE RECTIFIED IN THREE YEARS, WHEN A SETTLEMENT COMES FORWARDS AND IS PROPOSED TO OUR LEGAL, WHO WAS THE CHIEF NEGOTIATOR OF THAT CONTRACT, AND HE RECOMMENDS THAT WE SETTLE TO GET THESE PEOPLE PAID, THAT'S NOT NEGOTIATING. THAT MIGHT HAVE BEEN YOLANDA KING NEGOTIATING WITH THE CHIEF NEGOTIATOR OF THE CLARK COUNTY BARGAINING TEAM. BUT IT WAS NOT NEGOTIATION WITH ME.

MY OBLIGATION WAS TO MAKE SURE THAT THESE MEMBERS GOT WHAT WAS RIGHTLY DESERVED TO THEM AND IN AS TIMELY A FASHION AS I COULD GET IT DONE. THAT'S WHAT I'M

OBLIGATED AS A PRESIDENT TO DO.

THE ISSUE OF COMMUNICATION, THAT HAS BEEN AN ISSUE SINCE DAY ONE. MEMBERSHIP HAS SAID, "WE DO NOT GET TIMELY COMMUNICATION, IF WE GET ANY." I FELT IT WAS MY OBLIGATION TO GIVE THEM THAT INFORMATION AS SOON AS POSSIBLE. BECAUSE IT AFFECTED THEM AND THEIR WAGES. WHEN, IN TURN, THE BARGAINING TEAM WOULD TAKE DAYS UPON END TO FIGURE OUT WHEN THEY WERE GOING TO MEET, SIT DOWN AND TRY TO PUT TOGETHER SOME SORT OF MESSAGE THAT CAME FROM A BARGAINING TEAM THAT WAS NOT EVEN EXISTENT AT THAT TIME.

I'VE TRIED TO BE IN CONTACT AND TRIED TO BE OPEN WITH THEM IN TERMS OF THE BARGAINING TEAM -- I'LL CONCLUDE -- AM I PERFECT WITH KNOWING EVERYTHING GOING ON WITH THE COUNTY, NO I'M NOT. IF I MISS SOME THINGS, I APOLOGIZE. I DID THE BEST I COULD TO MAKE SURE THAT WHEN I GOT THE MESSAGE IN REGARDS TO THE HEALTH CARE BENEFITS, I MADE SURE SOMEONE WAS ON THAT CALL WITH ME. THANK YOU.

THE HEARING OFFICER: ALL RIGHT, THANKS.

WE'RE GOING TO TAKE A BREAK NOW UNTIL 1:30, WE'LL GO. SO IT GIVES EVERYBODY ABOUT 45 MINUTES. AND WE ARE GOING TO RECONVENE ACROSS THE HALL, MEETING ROOM -- MEETING ROOM E, WHICH IS MUCH COOLER.

MS. WALFOORT: SO BRING YOUR STUFF.

THE HEARING OFFICER: YOU COULD PUT IT IN THE ROOM NOW IF YOU CHOOSE.

MS. MANCINI: SO MY NEXT WITNESS IS GOING TO HAVE TO LEAVE.

THE HEARING OFFICER: OKAY. SO IS IT GOING TO BE TOO LATE? COULD WE INSTEAD OF EVEN DOING THE OPENING STATEMENTS, CHERIE, WOULD YOU BE COMFORTABLE JUST TO COME IN AND HAVE YOUR WITNESS TESTIFY ON THE RECORD, AND THEN WE'LL BREAK?

MS. MANCINI: NO, NOT NOW. SHE CAN STAY UNTIL 3:30.

THE HEARING OFFICER: OH, SO WE'LL BE FINE.

MS. PURDIE: SO WE'RE GOING TO READ A COUPLE OF EXHIBITS INTO THE RECORD FOR CHARGE NUMBER 2.

CHARGE NUMBER 2, CHARGED PARTY EXHIBIT NUMBER 2 WAS WITHDRAWN. AND WE'RE MARKING CHARGE NUMBER 2, CHARGED PARTY EXHIBIT 9, WE'RE GOING TO MARK THAT INTO THE RECORD, AND IT LOOKS LIKE A STACK OF E-MAILS STARTING WITH THE E-MAIL DATED FEBRUARY 26TH, 2016, WITH THE SUBJECT "FORWARD: NSEUSU /STAFF UNION." AND THE CHARGED PARTY IS PROVIDING CHARGING PARTY A COPY OF THESE EXHIBITS.

(LUNCH BREAK TAKEN.)

THE HEARING OFFICER: WE NOTE THAT WE'RE IN THE PROCESS OF MARKING EXHIBITS AND THAT THE CHARGED PARTY, SHARON KISLING, IS NOT HERE.

(PAUSE IN PROCEEDINGS.)

THE HEARING OFFICER: SO IT'S 2:00 O'CLOCK, AND I SAID I WOULD FOLLOW UP AT THAT TIME. SO THE CHARGED PARTY IS STILL NOT HERE. WE HAVE BEEN WAITING A HALF HOUR. MY UNDERSTANDING IS ABOUT TEN MINUTES AGO, SHE WAS FIVE MINUTES AWAY. SO IF SOMEONE COULD CHECK HER

EXPECTED TIME OF ARRIVAL NOW, THAT WOULD BE GREAT.

WE DO HAVE A WITNESS THAT HAS TO BE DONE WITH HER TESTIMONY BY 3:30, WHICH MEANS TO ENSURE WE'RE GIVEN ENOUGH TIME, I'M GOING TO GET STARTED BY 2:30 AT THE LATEST SO THAT WITNESS CAN HAVE HER TESTIMONY TAKEN ON THE RECORD.

THANK YOU.

(PAUSE IN PROCEEDINGS.)

THE HEARING OFFICER:  ALL RIGHT.  WE'RE GOING TO GO BACK ON THE RECORD AND OPEN THE MEETING FOR THE AFTERNOON PORTION.  TO SET CONTEXT ON WHERE WE ARE RIGHT NOW, WE HAD SET THE OPENING FOR THE SESSION TO START AT 1:30.  WE'RE ABOUT 45 MINUTES BEHIND DUE TO THE ABSENCE OF THE CHARGED PARTY.

AND SO WE'RE GOING TO START WITH -- INSTEAD OF OPENING STATEMENTS AND THAT PROCESS, WE'RE GOING TO START WITH GETTING ONE WITNESS ON THE STAND FROM CHARGE 5, MANCINI VERSUS KISLING.  AND THEN WE'RE GOING TO CLOSE THAT FOR A BIT TO BRING UP AMELIA GAYTON'S CHARGE VERSUS KISLING.  AND WE'LL GO THROUGH THAT AND COME BACK AFTER THAT.

MS. MANCINI:  OKAY.  SO MINE WILL BE LAST?

THE HEARING OFFICER:  YEAH.

MS. MANCINI:  OKAY.

MS. WALFOORT:  NO.  YOUR CHARGE WILL BE LAST.

MS. MANCINI:  YEAH.

THE HEARING OFFICER:  YOUR OPENING STATEMENT WILL BE DONE LATER.  THIS IS JUST TO GET YOUR WITNESS ON

THE STAND SO YOU'VE GOT THE TIME YOU NEED TO HAVE EVERYTHING BROUGHT IN, THE EVIDENCE THAT YOU NEED. SO GO AHEAD.

MS. MANCINI: I CALL FABIOLA PAVEL.

THE HEARING OFFICER: WE'LL HAVE HER SWORN IN FIRST.

AND THEN IF YOU COULD STATE YOUR NAME AND SPELL IT AFTER YOU'RE SWORN IN.

FABIOLA PAVEL,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: MY NAME IS FABIOLA PAVEL, F-A-B-I-O-L-A, PAVEL, P-A-V-E-L.

I'M VERY, VERY TIRED.

THE HEARING OFFICER: JUST BEFORE YOU STARTED, I HEARD SOMEBODY'S PHONE BEEP. SO REMEMBER THE RULES OF THE HEARING STILL APPLY, WHICH IS ALL DEVICES NEED TO BE SHUT OFF. THANK YOU.

EXAMINATION

BY MS. MANCINI:

Q FABIOLA, DID YOU WRITE ME A STATEMENT IN REGARDS TO THE INCIDENT THAT HAPPENED AT THE GOVERNMENT CENTER ON 10/12?

A YES, I DID.

Q CAN YOU DESCRIBE THAT FOR ME?

A THE STATEMENT IS PERTAINING TO A MANILLA FOLDER THAT SHARON GAVE TO ME AT THE CAFETERIA AT THE GOVERNMENT CENTER.

MS. MANCINI: CAN I GIVE HER THIS?

THE HEARING OFFICER: SO WHAT SHARON MANCINI IS REFERRING TO IS CHARGE NUMBER 5, CHARGING PARTY EXHIBIT 1.

(EXHIBIT ADMITTED.)

BY MS. MANCINI:

Q OKAY. SO CAN YOU TELL ME WHAT WAS IN THAT MANILLA ENVELOPE?

A IT WAS -- THEY WERE PETITIONS. THERE WAS -- I DON'T KNOW -- 6, 7, 8 OF THEM. AND IT WAS A RECALL PETITION ON YOU.

Q AND WAS THERE ANOTHER -- IF YOU LOOK IN THAT PACKET, WAS THERE ANOTHER STATEMENT IN THERE AS WELL? I BELIEVE THE BACK PAGE.

A OKAY.

Q THAT WAS WHAT YOU PROVIDED TO ME ALONG WITH THE PETITION?

A IT STATES: "CHARGES ADDRESSED, PRESIDENT MANCINI."

Q YOU DON'T HAVE TO READ IT.

MS. WALFOORT: CHERIE, ONE OF OUR EXHIBITS IS TWO PAGES SHORT.

MS. MANCINI: YOU CAN HAVE THIS ONE.

BY MS. MANCINI:

Q AND PER YOUR STATEMENT, THAT WAS ABOUT -- WHAT

TIME WAS THAT? WAS IT ABOUT 4:20? 4:30?

A I WAS GOING TO SAY BETWEEN 4:00, 4:30. 4:15, 4:30, SOMEWHERE AROUND THERE, APPROXIMATE TIME.

MS. MANCINI: OKAY. THAT'S ALL I HAVE.

THE HEARING OFFICER: OKAY. DO YOU WISH TO CROSS?

MS. KISLING: DOES SHE HAVE A COPY OF THE CHARGES?

MS. MANCINI: NO. I TOOK IT AWAY FROM HER. THE EXHIBIT?

MS. KISLING: NO, THE CHARGES THAT SHE'S TESTIFYING TO.

MS. WALFOORT: YOU WANT HER TO HAVE THAT?

THE HEARING OFFICER: WHICH IS CHARGE 5 OF THE CHARGING PARTY EXHIBIT 1.

MS. WALFOORT: THIS IS ACTUALLY SUPPOSED TO BE 2.

THE HEARING OFFICER: THIS ONE SHOULD BE 2? OKAY.

SO, SHARON, ON YOUR COPY OF THIS DOCUMENT, IT'S EXHIBIT 2, NOT 1. EXHIBIT 1 IS THE ACTUAL CHARGE.

MS. WALFOORT: SHARON, YOU'RE GOING TO CONFINE THIS TO CROSS-EXAMINATION OF WHAT'S ALREADY BEEN --

MS. KISLING: DID I MISS SOMETHING? THE CHARGE?

MS. MANCINI: YOU ASKED IF SHE HAD A COPY --

MS. KISLING: NO.

MS. MANCINI: YOU NEED A COPY OF THIS?

(DISCUSSION HELD OFF THE RECORD.)

EXAMINATION

BY MS. KISLING:

Q HI, FAB, SO DID YOU SEE THE ACTUAL CHARGES THAT YOU ARE TESTIFYING TO?

A NOW I DO, YES.

Q OKAY. SO I JUST WANT TO POINT YOU TO -- WELL, FIRST LET ME ASK YOU THIS. IS YOUR STATEMENT HERE IN WHOLE AND COMPLETE OF WHAT OCCURRED, THE STATEMENT YOU PROVIDED TO PRESIDENT MANCINI?

A IT JUST STATES WHAT HAPPENED. GIVE ME A MOMENT.

Q NO. THAT'S FINE.

A YES.

Q OKAY. SO NOW THE OTHER QUESTION WAS HAVE YOU SEEN THE CHARGES PRESIDENT MANCINI IS USING YOU AS A WITNESS FOR?

A YES.

Q OKAY. SO HER CHARGES SPEAK TO ADVOCATING OR ENGAGING IN DUAL UNIONISM OR SECESSION IN VIOLATION OF ARTICLE 21.

A YES.

Q OKAY.

MS. KISLING: DO I JUST REFER HER TO -- DOES SHE HAVE -- HOW DO I REFER HER TO THIS DOCUMENT? HOW DO I REFER HER TO THIS DOCUMENT? BECAUSE THAT'S WHAT I WAS GIVING AS A --

MS. WALFOORT: IS THIS THE CONSTITUTION AND BYLAWS?

THE HEARING OFFICER: WHAT WAS THE EXHIBIT NUMBER? IT WAS A HEARING OFFICER ON AN EARLIER ONE.

MS. WALFOORT: IT WAS HEARING OFFICER 2, I BELIEVE.

THE HEARING OFFICER: THAT'S RIGHT.

MS. WALFOORT: YOU CAN SHOW HER THAT PAGE.

BY MS. KISLING:

Q SO I'M JUST REFERRING YOU TO SEIU LOCAL 1107 BYLAWS. AND ARTICLE 19, RECALL, SO ON THE NEXT PAGE, CAN YOU JUST READ THAT FIRST SENTENCE?

A OKAY. PAGE 53 ON THE BOTTOM?

Q YES.

A OKAY. "ALL ELECTED OFFICERS AND STEWARDS MAY BE RECALLED BY A VOTE OF THE CONSTITUENCY" -- I'M NOT SAYING IT CORRECTLY, THE WORDS, PARDON ME -- "THAT ELECTED THEM TO OFFICE."

Q SO ARE YOU ON EXECUTIVE BOARD?

A NO, I'M NOT.

Q ARE YOU A STEWARD?

A I'M A SHOP STEWARD.

Q AND MEMBER?

A YES.

Q SO SEEING THAT RECALL IS ACTUALLY AN OPTION IN OUR BYLAWS, IS THAT CONSISTENT WITH THIS CHARGE?

A IS THIS A COPY OF OUR CONSTITUTION AND BYLAWS?

Q THAT IS AN EXCERPT THAT SPEAKS TO RECALL.

A YEAH. YOU UNDERSTAND WHAT I'M SAYING? YEAH. BECAUSE I DON'T HAVE IT HERE BEFORE ME. I TAKE IT, IT IS. IF THAT'S THE CASE, I WAS NOT AWARE THAT THIS IS IN OUR CONSTITUTION AND BYLAWS, IF THIS IS, LIKE YOU SAID, AN EXCERPT.

Q THERE IS A FULL COPY OF OUR BYLAWS IN THE RECORD. I'M SURE THE HEARING OFFICERS WOULD HOPEFULLY STOP US IF THAT WASN'T A TRUE EXCERPT FROM OUT OF HERE.

A OKAY.

Q SO WITH THAT, AT THAT TIME, DID I OBTAIN A SIGNATURE FROM YOU?

A NO. YOU DID NOT.

Q DID YOU OBSERVE ANY FORMS IN MY POSSESSION WITH SIGNATURES?

A IN THAT MANILLA ENVELOPE THAT YOU HANDED TO ME, THERE WERE NO SIGNATURES ON ANY OF THOSE PETITIONS.

MS. KISLING: OKAY. THANK YOU.

MS. MANCINI: CAN I REDIRECT?

THE HEARING OFFICER: YES, YOU CAN.

FURTHER EXAMINATION

BY MS. KISLING:

Q SO JUST TO BE CLEAR, THE CHARGE IS FINANCIAL MALPRACTICE AND GROSS DISLOYALTY. I WILL CONCUR WITH MS. KISLING THAT SHE HAD EVERY RIGHT TO RUN A RECALL PETITION. BUT THE PROBLEM IS THAT SHE WAS RUNNING IT WHILE SHE WAS ON BANK TIME.

MS. MANCINI: AND IF YOU WILL REFER TO -- WHICH

IS WHAT WE WERE TALKING ABOUT AS FAR AS FAB'S STATEMENT, WHICH STATED THAT SHE HAD SEEN HER ABOUT 4:30 ALONG WITH BRENDA AND -- ALONG WITH BRENDA IN THE GOVERNMENT CENTER. AND ON PAGE 2, YOU WILL SEE THAT I OBTAINED FROM LENA STELK FROM THE GOVERNMENT CENTER WHO WAS ON BANK TIME ON THIS DAY. AND SHARON KISLING WAS ON BANK TIME THIS DAY FROM 4:00 TO 7:00 P.M. THAT'S HOW THIS IS IN RELATION TO THE CHARGES.

MS. KISLING: SO NOW MAY I ASK BASED ON THAT?

MS. WALFOORT: IF YOU NEED TO ASK THIS WITNESS QUESTIONS BASED ON THAT.

MS. KISLING: YES.

MS. WALFOORT: OKAY.

FURTHER EXAMINATION

BY MS. KISLING:

Q SO HOW DID YOU COME TO SEE ME AT THE CAFETERIA AT THE GOVERNMENT CENTER?

A I GOT OUT OF A MEETING FROM A MEETING UP THERE. THIS IS WHAT HAPPENED. MY TRUCK WAS IN THE SHOP. I WENT DOWNSTAIRS. I KNEW I COULD GET A RIDE BACK TO THE HALL THROUGH THE STEWARDS MEETING. SO WHEN I WENT DOWN THERE TO HOOK UP FOR A RIDE BACK TO THE OFFICE, THAT'S WHEN I SAW YOU AND BRENDA SITTING THERE.

Q DID WE SAY WHY WE WERE SITTING THERE?

A YOU DID STATE FOR A STEWARDS MEETING.

Q OKAY. SO AT THAT TIME, DID WE SAY OR DID I SAY THAT I WAS RUNNING A PETITION?

A NO. YOU DID NOT.
Q DID I, AGAIN, OBTAIN YOUR SIGNATURE?
A NO. YOU DID NOT.
Q DID YOU SEE ME WITH FORMS AS IF I WAS OBTAINING SIGNATURES AT THAT TIME?
A NO.
Q THANK YOU.

MS. MANCINI: ONE LAST QUESTION.

WHAT WAS THE PRETENSE THAT SHE WAS GIVING YOU THE FORMS? DID SHE ASK YOU TO OBTAIN SIGNATURES ON THESE FORMS?

THE WITNESS: NO. SHE DID NOT. SHE JUST MENTIONED TO ME -- I THINK THE EXACT WORDS WERE "I HAVE SOMETHING FOR YOU" OR "WAIT, I HAVE SOMETHING TO GIVE YOU," "I HAVE SOMETHING FOR YOU." THAT WAS THE ONLY CONVERSATION THAT WAS BETWEEN US TWO.

MS. MANCINI: THAT'S FINE. THANK YOU.

THE HEARING OFFICER: OKAY. THANK YOU. ALL RIGHT. SO WE'RE GOING TO KIND OF SUSPEND THIS CHARGE UNTIL --

MS. MANCINI: CAN I REFER THIS OR -- THAT'S OKAY. GO AHEAD.

THE HEARING OFFICER: OKAY. AND THEN WE'RE GOING TO START WITH THE CHARGE -- I THINK IT'S 3, AMELIA VERSUS SHARON KISLING. SO FOR THE RECORD, WE'RE GOING TO ENTER FOR CHARGE 3, CHARGING PARTY EXHIBIT 1, WHICH ARE THE CHARGES AGAINST SHARON KISLING.

(EXHIBIT ADMITTED.)

THE HEARING OFFICER: AND THEN AMELIA CAN YOU COME UP TO PRESENT THE CHARGES AND EVIDENCE?

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO WE'RE GOING TO GET STARTED WITH FIRST THE CHARGING PARTY IDENTIFYING YOURSELF, SPELLING YOUR NAME. AND THEN THE CHARGED PARTY IDENTIFYING YOURSELF AND SPELLING YOUR NAME.

MS. GAYTON: AMELIA GAYTON, A-M-E-L-I-A G-A-Y-T-O-N.

THE HEARING OFFICER: THANK YOU.

MS. KISLING: SHARON KISLING, S-H-A-R-O-N K-I-S-L-I-N-G.

THE HEARING OFFICER: ALL RIGHT. AND AMELIA, DO YOU WISH TO MAKE AN OPENING STATEMENT?

MS. GAYTON: NO.

THE HEARING OFFICER: OKAY. SHARON, DO YOU WISH TO MAKE AN OPENING STATEMENT?

MS. KISLING: YES.

THE HEARING OFFICER: GO AHEAD.

MS. KISLING: DO YOU HAVE A COPY OF THE CHARGES?

MS. WALFOORT: DO YOU NOT HAVE ONE?

MS. KISLING: YEAH. I DON'T HAVE ONE. SHE DID NOT GIVE ME ONE.

THE HEARING OFFICER: SO FOR THE RECORD, IT'S GOING TO BE CHARGE 3, CHARGING PARTY EXHIBIT 1, CHARGES AGAINST SHARON KISLING.

(EXHIBIT ADMITTED.)

MS. KISLING: SO I BELIEVE THESE CHARGES ARE DONE IN CONSULTATION WITH EMPLOYEES AT SEIU. AND I OBJECT TO A LOT OF INFORMATION PROVIDED IN HERE. BECAUSE I FEEL LIKE THEY HAVE TO DO WITH PERSONNEL MATTERS AND NOT NECESSARILY SOMETHING THAT'S IN ADHERENCE OR NONADHERENCE OF THE BYLAWS OF SEIU LOCAL 1107.

THE HEARING OFFICER: WE'RE GOING TO START WITH WITNESSES. AMELIA, DO YOU KNOW HOW MANY YOU ARE GOING TO HAVE?

MS. GAYTON: 11.

THE HEARING OFFICER: SO I'LL JUST SAY IF IT ENDS UP BEING WHERE THE TESTIMONY STARTS REPEATING ITSELF, I'LL RAISE THAT AS AN ISSUE, SO WE CAN KEEP MOVING THINGS ALONG. BUT I WANT TO MAKE SURE YOU HAVE AN OPPORTUNITY TO HAVE YOUR CASE HEARD AS WELL.

MS. GAYTON: THANK YOU.

THE HEARING OFFICER: AND SHARON, DO YOU HAVE AN IDEA ABOUT THE NUMBER OF WITNESSES YOU HAVE?

MS. KISLING: DEPENDING ON WHAT'S SAID, RIGHT NOW, 2.

THE HEARING OFFICER: GO AHEAD AND CALL YOUR FIRST WITNESS.

MS. GAYTON: I WOULD LIKE TO CALL MY FIRST WITNESS, DANA GENTRY.

THE HEARING OFFICER: SO YOU'LL BE SWORN IN. AND THEN AFTER YOU'RE SWORN IN, STATE YOUR NAME AND SPELL IT FOR THE RECORD.

DANA GENTRY,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: DANA GENTRY.

THE HEARING OFFICER: AND SPELL YOUR NAME AS WELL.

THE WITNESS: D-A-N-A G-E-N-T-R-Y.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. GAYTON:

Q DANA, WHAT IS YOUR TITLE, PLEASE?

A I'M THE COMMUNICATIONS DIRECTOR FOR SEIU NEVADA.

Q ARE YOU AWARE OF THE SITUATION IN WHICH SHARON KISLING USURPED CHERIE MANCINI'S AUTHORITY AS PRESIDENT?

A I'M AWARE OF SEVERAL INSTANCES.

Q OKAY. AND IF YOU COULD PLEASE SHARE THAT WITH US?

A PROBABLY THE MOST SERIOUS WAS HER EFFORT TO STOP THE PUBLICATION OF A MAGAZINE THAT WAS GOING OUT TO 18,000 BARGAINING UNIT MEMBERS ON THE DAY BEFORE AND ON THE DAY THAT IT WAS GOING TO PRINT. THE DAY BEFORE, ON AUGUST 18TH, SHE CALLED A SPECIAL STAFF MEETING AT THE HALL. AFTER THE STAFF MEETING, SHE CAME IN MY OFFICE ALONG WITH CLARA THOMAS AND ALFREDO SERRANO AND SHEILA GRAIN AND TOLD ME THAT THERE WAS NO BUDGET FOR THE LABOR

MATTERS MAGAZINE ALTHOUGH SHE HAD KNOWN ABOUT IT SINCE AUGUST 2ND. AND I HAVE THE E-MAILS WHICH WILL DEMONSTRATE HER KNOWLEDGE.

I WENT TO LUNCH WHEN THEY WENT TO DISCUSS THE MATTER. I TOLD THEM WE COULD GO AHEAD AND STOP THE PUBLICATION BUT WE WOULD HAVE TO REFUND AD MONEY THAT HAD BEEN PURCHASED BY PUBLIC OFFICIALS. AND I WAS CONCERNED ABOUT THE PERCEPTION OF CANCELING THE PUBLICATION SINCE WE HAD ALREADY SOLD ADS TO SEVERAL PUBIC OFFICIALS, CANDIDATES CURRENTLY RUNNING FOR OFFICE. IT WAS SUPPOSED TO BE A LABOR DAY EDITION. AND THEY WERE PURCHASING MESSAGES TO OUR MEMBERS IN THE PUBLICATION.

I WENT TO LUNCH, AND WHILE I WAS AT LUNCH, OUR ACTING FINANCIAL DIRECTOR KEN UBANI CALLED ME AND TOLD ME SHARON AND SHEILA WANTED ME TO RETURN TO THE HALL TO COMPLETE THE MAGAZINE. I TOLD HIM I WAS AT LUNCH, AND I WOULD BE RIGHT BACK. WHEN I CAME BACK, SHARON WAS GONE, BUT SHEILA TOLD ME THEY HAD FOUND MONEY IN THE BUDGET AND THEY HAD DECIDED TO GO AHEAD WITH THE PUBLICATION. AND SHE TOLD ME THAT SHARON APOLOGIZED FOR HER BEHAVIOR AND ASKED THAT I GIVE HER ANOTHER CHANCE.

I SHOULD SAY THAT IN THE PREVIOUS MEETING I HAD SAID THAT I WAS THINKING ABOUT LEAVING BECAUSE OF THE DYSFUNCTION ONCE CHERIE WENT ON VACATION.

Q HAS KISLING EVER IMPROPERLY DIRECTED YOU AS A STAFF?

A YES. I WAS -- I WASN'T FINISHED WITH THE TIMES THAT SHE HAD USURPED CHERIE'S AUTHORITY. THERE WAS AN

OCCASION WHERE TWO OF HER INTERNS THAT SHE HAD PLACED IN THE UNIT, CHRISTINE BREEDEN AND NATALIE -- I FORGOT --

UNIDENTIFIED SPEAKER: CHANG.

THE HEARING OFFICER: PLEASE DON'T.

THE WITNESS: SORRY.

THE HEARING OFFICER: NO. I'M NOT REFERRING TO YOU. GO AHEAD.

THE WITNESS: THEY CAME INTO MY OFFICE AND OFFERED TO DO SOMETHING WITH MY COMPUTER. AND I SAID "SURE." AND THEN LATER THAT DAY, WHEN I ASKED THEM A QUESTION, THEY TOLD ME THAT CHERIE HAD TOLD THEM NOT TO HELP ME ANYMORE. THEY HAD OFFERED THE HELP, SO I DIDN'T SAY ANYTHING. I DIDN'T -- I WASN'T REALLY CONCERNED ABOUT IT. AND THEN LA NITA TROYANO, ANOTHER STAFF MEMBER, SAID TO ME, "DANA, YOU ARE A DIRECTOR. THEY CAN'T TELL YOU WHAT TO DO."

AND I THINK LA NITA KNEW IT WASN'T COMING FROM CHERIE. IT DIDN'T SOUND LIKE SOMETHING CHERIE WOULD HAVE SAID. I BELIEVE LA NITA WENT TO CHERIE, AND THERE WAS AN INVESTIGATION, AND IT WAS DISCOVERED THAT IT WAS SHARON KISLING, NOT CHERIE, WHO TOLD THEM TO COME TO ME AND TELL ME THIS ON BEHALF OF CHERIE, EVEN THOUGH CHERIE HAD NOTHING TO DO WITH IT.

THERE WAS ALSO A CANDIDATE FORM THAT WAS BEING PLANNED DURING THE INTERNAL OFFICER ELECTIONS. AND I HAD READ THE BYLAWS AND THE CONSTITUTION. AND IT SAID THAT MEMBERS OF THE CANDIDATE -- OF THE ELECTION COMMITTEE, EXCUSE ME, WERE NOT ALLOWED TO BE CANDIDATES. AND I KNEW

MS. KISLING WAS A CANDIDATE. ALTHOUGH SHE WAS DIRECTING ME TO SEND OUT INFORMATION TO MEMBERS AS WELL AS MEMBERS OF THE EXECUTIVE BOARD ON BEHALF OF THE ELECTION COMMITTEE, WHICH I WAS CONCERNED ABOUT AS WELL.

SHE ALSO UNILATERALLY CHOSE THE MODERATOR FOR THAT EVENT. AND THEN ON JUNE -- MAY 28, I BELIEVE IT WAS, SHE E-MAILED ME. IT WAS MEMORIAL DAY SATURDAY, MEMORIAL DAY WEEKEND. AND SHE E-MAILED ME IN THE MIDDLE OF THE NIGHT AND TOLD ME TO SEND OUT A COMMUNICATION REGARDING THE CANDIDATE FROM. I DIDN'T SEE THE E-MAIL UNTIL THAT MORNING.

I WAS IN BOULDER CITY. I HAD AN EVENT PLANNED FOR MY DAUGHTER, AN ENGAGEMENT PARTY ON A HOUSE BOAT. I WAS TAKING FOOD OUT TO THE HOUSE BOAT. THEY'D BEEN OUT THE NIGHT BEFORE, AND I WAS GOING TO MEET THEM AND ACCOMPANY THEM FOR THE EVENING. AND I TOLD MS. KISLING I WAS NOT AT HOME AND COULD I SEND IT OUT ON TUESDAY. AND SHE E-MAILED ME BACK AND SAID "IT HAS TO GO OUT TODAY," IN ALL CAPS. I HAD ONLY BEEN AT THE UNION FOR A MONTH. SO I WAS CONCERNED ABOUT UPSETTING HER.

AND SHE WAS NOT IN ANY ELECTED POSITION -- OR SHE WAS NOT THE ELECTED VICE PRESIDENT AT THE TIME, I SHOULD SAY. THIS WAS IN MAY . SO I WENT HOME AND I DID THAT. THEN IN JUNE, SHE SENT ME ANOTHER -- SHE CALLED ME, TOLD ME TO SEND OUT AN E-MAIL TO THE MEMBERSHIP REGARDING THE CANDIDATE FORM. AND I ASKED HER IF SHE COULD PUT IT IN E-MAIL.

AND SHE TOLD ME SHE WOULD HAVE THE CANDIDATE OR

THE ELECTION COMMITTEE SEND ME AN E-MAIL. AND THAT NEVER HAPPENED. AND THE NEXT DAY, SHE CALLED CHERIE AND SAID THAT I DIDN'T DO WHAT I WAS TOLD TO DO AND SENT ME ANOTHER E-MAIL THAT DAY TELLING ME TO GO AHEAD AND DO IT. THAT WAS JUNE 3RD AND I HAVE ALL OF THE E-MAILS TO BACK THIS UP.

MS. GAYTON: THAT'S ALSO GOING TO BE EXHIBIT 2 THAT SHE'S REFERRING TO, THE E-MAILS.

THE WITNESS: ON JULY 1ST, WHICH WAS THE SATURDAY OF THE 4TH OF JULY WEEKEND, I HAD GONE TO THE MOUNTAINS, AND I DROVE DOWN THE MOUNTAIN TO PICK UP A FRIEND'S CHILD WHO WAS BEING DROPPED OFF AT THE BASE. AND I LOOKED AT MY PHONE AND SAW AN E-MAIL THAT WAS SENT FROM MS. KISLING THE NIGHT BEFORE TELLING ME TO SEND OUT A LIST OF UNCONTESTED RAISES IN THE ELECTION.

THE ELECTION HAD BEEN ON THE PREVIOUS THURSDAY. I SENT OUT THE RESULTS OF THE ELECTION ON FRIDAY. BUT ON SATURDAY, IT WAS VERY IMPORTANT TO MS. KISLING THAT THIS LIST OF UNCONTESTED CANDIDATES GO OUT, WHICH I REALLY DIDN'T UNDERSTAND. BECAUSE IF THEY WERE UNCONTESTED, IT SEEMS I COULD HAVE BEEN PROVIDED WITH THE INFORMATION WEEKS EARLIER.

AND I TOLD HER I WAS IN THE MOUNTAINS. AND SHE TOLD ME IT HAD TO BE DONE IMMEDIATELY. SHE SAID SHE DIDN'T KNOW I WAS ON LEAVE. I WAS NOT ON LEAVE; IT WAS A THREE-DAY WEEKEND. AND SHE TOLD ME SHE WAS GOING TO CALL IN ANOTHER STAFF MEMBER. SO I SAID I DON'T WANT SOMEBODY ELSE TO BE CALLED IN TO DO IT. SO I LEFT MY FAMILY IN

THE MOUNTAINS AND DROVE BACK TO LAS VEGAS AND SENT OUT THE E-MAIL THAT SHE DEMANDED BE SENT OUT THAT DAY.

THE HEARING OFFICER: SO JUST FOR THE RECORD, WHAT DANA IS REFERENCING IS CHARGE 3, CHARGING PARTY EXHIBIT 2, A PACKET OF E-MAILS.

BY MS. GAYTON:

Q DID (INAUDIBLE) BRING ATTENTION TO CANCEL -- PUBLISH OF THE LABOR MATTERS NEWS MAGAZINE?

A YES. I THINK I'VE COVERED THAT.

Q ARE YOU AWARE OF EMPLOYEES' COMPLAINTS WHICH HAVE BEEN FILED AGAINST SISTER KISLING?

A I'M AWARE THROUGH JUST SECONDHAND KNOWLEDGE FROM PETER NGUYEN THAT HE HAS FILED A COMPLAINT. I ALSO FILED A COMPLAINT ON AUGUST 18TH, AND NOTHING HAS BEEN DONE. I'M ALSO IN THE PROCESS OF FILING A DEFAMATION LAWSUIT AGAINST HER FOR HER COMMENTS WHICH I BELIEVE WERE RETALIATORY ON AUGUST 31ST IN WHICH SHE STATED THAT I WAS STEALING FROM THE UNION BY BASICALLY DOUBLE-DIPPING WITH MY CREDIT CARD.

SHE SAID IN WRITING AND I'M TOLD VERBALLY THAT I USED MY CREDIT CARD IN TOWN TO BUY LUNCH EVEN THOUGH I RECEIVE A STIPEND. SHE SAID WHEN I WAS OUT OF TOWN EVEN THOUGH I RECEIVED A STIPEND. I HAVE NEVER USED MY CREDIT CARD TO BUY LUNCH IN TOWN. I HAVE NEVER USED MY CREDIT CARD TO BUY LUNCH OUT OF TOWN NOR HAVE I EVER RECEIVED A STIPEND.

SHE ALSO SAID THAT DESPITE THE FACT I RECEIVE A CAR ALLOWANCE, I USED MY CREDIT CARD TO BUY GAS IN TOWN,

THAT HAS NEVER HAPPENED EITHER. THE ONLY TIME I HAVE USED THE CREDIT CARD FOR GAS WAS WHEN I WENT TO ELKO IN A RENTAL CAR AND RETURNED THE CAR TO THE AIRPORT HERE. I DID PUT GAS BEFORE I RETURNED IT TO THE AIRPORT, WHICH WAS A REQUIREMENT.

BUT PART OF THE REASON -- OH, I SHOULD FINISH UP MY COMPLAINTS. THE OTHER THING SHE SAID WAS THAT I DRINK AT WORK, WHICH I FOUND EXTREMELY AMUSING, NOT ONLY DISTURBING, BUT AMUSING. I HAD ONLY BEEN THERE FOUR MONTHS, AND SHE MADE THIS ALLEGATION. PEOPLE WHO HAVE KNOWN ME FOR A LONG TIME KNOW THAT I'VE NEVER HAD A BEER, A GLASS OF WINE NOR A GLASS OF CHAMPAGNE IN MY LIFE. I BELIEVE I'VE HAD A STRAWBERRY DAIQUIRI.

BUT I DON'T DRINK. I HAVE NO TOLERANCE FOR ALCOHOL. SO THAT WAS EXTREMELY DISTURBING TO KNOW SHE TOLD THIS TO THE EXECUTIVE BOARD IN BOTH WRITING AND VERBALLY.

ANOTHER THING SHE HAS SAID TO THE EXECUTIVE BOARD THAT PARTICULARLY DISTURBED ME WAS ABOUT A STAFF MEMBER WAS THAT NATALIE HERNANDEZ, OUR ORGANIZER IN RENO WAS SHACKING UP IN A MOTEL IN RENO WITH HER BOYFRIEND. AND ALL YOU HAD TO DO WAS LOOK AT THE CREDIT CARDS RECEIPTS AND SHE WOULD HAVE SEEN IT WAS A HOTEL IN ELKO THAT MS. HERNANDEZ ALONE STAYED AT WHEN SHE WAS IN ELKO ON BUSINESS, NOT RENO. AND I FELT THAT ABUSE OF STAFF MEMBERS WAS INAPPROPRIATE, AND THAT WAS PART OF THE REASON I FILED A REQUEST FOR INVESTIGATION.

AND I SHOULD SAY MS. THOMAS THAT DAY ASKED THAT

I SUBMIT MY INVESTIGATION TO HER, AND NOTHING HAS BEEN DONE. IT'S BEEN TWO MONTHS NOW. WHEN I ASKED MS. THOMAS ABOUT IT, SHE TOLD ME NOT TO COMMUNICATE WITH HER.

Q HAVE THERE BEEN ANY INSTANCES OF SISTER KISLING FAILING HER DUTY OR NOT FOLLOWING THROUGH ON HER TASK AS SHE HAS PROMISED TO COMPLETE?

A YES. WELL, AND I SHOULD ADD, ON THE LABOR MATTERS MAGAZINE, THE DAY AFTER THEY TOLD ME TO GO AHEAD WITH IT, THE NEXT DAY WHEN I WAS ON MY WAY TO THE PRINTER, SHE STARTED E-MAILING ME -- ACTUALLY, I WAS AT THE PRINTER. I WAS TURNING OVER COPIES OF ARTICLES, PICTURES AND THINGS FOR THE PRINTER TO ASSEMBLE INTO THIS NEWS MAGAZINE. AND I GOT IN MY CAR AND SAW MY E-MAIL.

SHE WAS E-MAILING ME AS WELL AS ALL OF THE EXECUTIVE BOARD MEMBERS, COMPLAINING THAT I DID NOT SUBMIT IT TO HER FOR APPROVAL OF THE CONTENT. AND THEN WHEN I SAID I WAS UNAWARE OF ANY REQUIREMENT THAT I SUBMIT IT FOR APPROVAL OF CONTENT, SHE THEN SAID THAT THERE WAS NO BUDGET FOR IT, EVEN THOUGH I HAD BEEN TOLD THE DAY BEFORE TO GO AHEAD WITH IT BECAUSE THERE WAS A BUDGET FOR IT.

THE HEARING OFFICER: AMELIA, I'M GOING TO ASK IF THERE ARE E-MAILS RELATED TO THE TESTIMONY, THEY BE REFERRED TO SO THERE IS CLARITY EXACTLY WHAT IS COMING IN.

THE WITNESS: THERE IS.

THE HEARING OFFICER: IT WOULD BE BETTER IF YOU CONNECT IT TO THE EVIDENCE THAT YOU PROVIDE.

MS. GAYTON: OKAY.
THE HEARING OFFICER: SO THIS PARTICULAR EXHIBIT AND WHAT PAGE IT'S ON.
THE WITNESS: THE E-MAILS BEGIN ON AUGUST 2ND FOR THAT PARTICULAR INCIDENT AND GO THROUGH AUGUST 19TH.
THE HEARING OFFICER: SO ARE YOU REFERRING TO CHARGE 3, CHARGING PARTY EXHIBIT 2?
THE WITNESS: I DON'T KNOW WHAT THAT ONE IS, I'M SORRY. IS IT ABOUT HER SABOTAGING MY ABILITY TO DO MY JOB?
THE HEARING OFFICER: IT'S A SERIES OF E-MAILS.
THE WITNESS: YEAH. I HAVE ALL OF THE E-MAILS HERE. YOU CAN HAVE THAT ONE.
MS. WALFOORT: AMELIA, ONE SECOND, OKAY?
THE WITNESS: WOULD YOU LIKE ME TO READ THE SPECIFIC E-MAILS I'M REFERENCING?
THE HEARING OFFICER: NO. I WANT AMELIA TO ASK A QUESTION AND THEN YOU CAN RESPOND.
BY MS. GAYTON:
Q HAS SISTER KISLING EVER VIOLATED THE CONSTITUTION AND BYLAWS?
A I WAS STILL ANSWERING THE OTHER QUESTION. I'M SORRY. DO YOU WANT ME TO FINISH THE OTHER QUESTION?
Q YES.
A SO THE FIRST TIME --
THE HEARING OFFICER: CAN I JUST ASK WHAT THE QUESTION WAS AGAIN?
THE WITNESS: I WAS ANSWERING THE QUESTION

REGARDING HER FAILURE TO COMPLETE ASSIGNMENTS OR TASKS THAT SHE HAD PROMISED.

THE HEARING OFFICER: AND THEN YOU WERE GOING TO REFER TO SOMETHING IN THE E-MAIL PACKET.

THE WITNESS: RIGHT. SO THE E-MAILS THAT I WAS TALKING ABOUT ON THE LABOR MATTERS MAGAZINE ARE DATED AUGUST 2ND THROUGH AUGUST 19TH.

MS. WALFOORT: SO AMELIA, YOU CAN PURSUE THIS LINE IF YOU WANT, BUT YOU ARE GOING TO HAVE LIMITED TIME. AND THERE MAY BE CHARGES AND CLAIMS YOU REALLY WANT TO GET TO. SO I JUST WANT TO SAY YOU'VE BEEN GOING A LONG TIME ABOUT THESE GENERAL COMPLAINTS.

MS. KISLING: I DON'T HAVE THE E-MAIL SHE'S REFERRING TO.

THE HEARING OFFICER: THIS IS CHARGE 3, EXHIBIT 2, CHARGING PARTY EXHIBIT 2.

MS. KISLING: SO I SEE MAY. ARE WE --

THE HEARING OFFICER: IF YOU GO, YEAH, FURTHER BACK -- IT'S IN CHRONOLOGICAL ORDER -- YOU WILL GET TO THE E-MAILS.

THE WITNESS: IN THE AUGUST 2ND E-MAIL, I WAS ASKING HER IF SHE WOULD ARRANGE A SITE VISIT, OR IF SHE WOULD GIVE ME INFORMATION REGARDING THE NEW BUILDING THAT WE WERE MOVING INTO SO I COULD WRITE AN ARTICLE FOR THE LABOR MATTERS MAGAZINE. THAT'S WHEN SHE STARTED ASKING ABOUT THE COST OF THE MAGAZINE. AND I TOLD HER WHAT I KNEW. AND THEN SHE AGREED TO ARRANGE A SITE VISIT FOR ME. THAT WAS AUGUST 2ND.

ON AUGUST 15TH, I BELIEVE, I E-MAILED HER AGAIN AND TOLD HER I NEVER HEARD BACK REGARDING THE SITE VISIT, AND SHE TOLD ME AT THAT POINT THAT PRESIDENT MANCINI WAS SUPPOSED TO RELAY THE INFORMATION TO ME. THEN SHE TOLD ME SHE WOULD GO AHEAD AND WRITE THE STORY FOR ME, AND SHE ASKED ME THE DEADLINE. I TOLD HER I NEEDED IT ON FRIDAY. ON FRIDAY MORNING, WHEN I ASKED HER FOR IT, SHE NEVER SENT ME ANYTHING.

THEN THAT AFTERNOON, SHE SENT SOME E-MAILS THAT WERE NOT A STORY, HAD SOME INFORMATION ABOUT THE BUILDING. BUT BY THAT TIME, THE MAGAZINE HAD ALREADY GONE TO PRINT. THE FIRST NEWS LETTER WE PUT OUT THE NIGHT BEFORE. AND I HAVE THE E-MAILS. IT'S DATED JULY 14TH. SHE OFFERED -- WE WERE TALKING ABOUT THE NEWS LETTER COMING OUT THE NEXT DAY. SHE TOLD ME SHE NEEDED IT EARLY IN THE MORNING TO BE ABLE TO DISSEMINATE IT TO THE COUNTY.

I SENT IT EARLY THE NEXT MORNING. SHE ALSO OFFERED THE EVENING BEFORE TO PROVIDE ME WITH CONTACTS FOR THE REST OF THE COUNTY DEPARTMENTS TO DISSEMINATE THE E-MAIL. THE NEXT MORNING WHEN I ASKED HER FOR THAT INFORMATION, SHE TOLD ME SHE WAS TOO BUSY TO PROVIDE IT AND I SHOULD GET IT FROM PRESIDENT MANCINI WHO SHE KNEW WAS DRIVING TO CALIFORNIA AND UNAVAILABLE.

AND THEN THE FIRST TIME THAT SHE LET ME DOWN WAS WHEN WE HAD HIRED A PHOTOGRAPHER TO PRODUCE A VIDEO OF OUR MEMBERS. SHE AGREED TO BE IN THE VIDEO. WE WERE PAYING THE PHOTOGRAPHER, I BELIEVE, $100 AN HOUR. AND

SHE WAS SUPPOSED TO MEET ME AT CHILD PROTECTIVE SERVICES AT 9:00 O'CLOCK. I BELIEVE IT WAS THE END OF APRIL, AND SHE WAS NOT THERE.

THE HEARING OFFICER: I'M GOING TO STOP YOU FOR A MINUTE, DANA.

AMELIA, CAN YOU TELL ME WHAT PARTICULAR PART OF YOUR CHARGES DANA IS RESPONDING TO?

MS. GAYTON: SHE IS RESPONDING TO THE CHARGES OF "DID SISTER KISLING ATTEMPT TO CANCEL PUBLISH OF THE LABOR MAGAZINE?"

THE HEARING OFFICER: AND WE HEARD THAT.

MS. GAYTON: AND LET'S SEE, OH, AND "HAVE THERE BEEN ANY INSTANCE OF SISTER KISLING FAILING HER DUTY OR NOT FOLLOWING THROUGH ON TASKS THAT SHE HAS PROMISED?"

MS. WALFOORT: AND WHERE IS THAT IN YOUR CHARGE? WHAT IS SHE VIOLATING BY THAT?

MS. GAYTON: IT'S IN THE BYLAWS, CHARGE 2, VIOLATION OF ARTICLE 21, SECTION 3 PARAGRAPH 2, VIOLATED THE FOLLOWING PROVISION OF THE OATH OF OFFICE --

THE HEARING OFFICER: WELL, WE HAVE HEARD THE TESTIMONY RELATED TO YOUR CHARGE AND YOU REFERENCED THAT IT'S RELATED TO THE MAGAZINE. DO YOU HAVE OTHER QUESTIONS IN RELATION TO YOUR CHARGES FOR THIS PARTICULAR WITNESS?

MS. GAYTON: NO.

THE HEARING OFFICER: OKAY. SHARON DO YOU HAVE A CROSS?

MS. KISLING: YES.

EXAMINATION

BY MS. KISLING:

Q OKAY. DANA, ONE OF THE THINGS YOU STATED WAS THE MOST SERIOUS CONCERN YOU HAD WAS THAT I ATTEMPTED TO STOP PUBLICATION OF A MAGAZINE THAT WAS GOING OUT TO 18,000 MEMBERS.

A NO. THAT'S NOT WHAT I SAID.

Q OKAY. TELL ME WHAT YOU SAID.

A I SAID TO 18,000 BARGAINING UNIT MEMBERS.

Q OKAY. TO 18,000 BARGAINING UNIT MEMBERS. SO CAN YOU TELL ME, DO YOU KNOW WHAT THE DISCUSSION WAS AROUND THAT PUBLICATION?

A YOUR QUESTION IS VAGUE. I'M NOT SURE WHAT YOU MEAN.

Q OKAY. WAS THERE IN FACT COMMUNICATION TO YOU BY I AND THE TRUSTEES THAT THERE WAS A CONCERN THAT YOU TOLD US THAT IT WOULD BE A BUDGET OF $15,000?

A RIGHT. WHICH IT CAME IN AT 10-.

Q OKAY. BUT IS THAT CORRECT?

A YES.

Q AND DID WE NOT SAY THAT WAS THE FIRST TIME WE HAD HEARD OF THE BUDGET?

A I DON'T REMEMBER THAT. I DON'T REMEMBER WHAT YOU SAID ABOUT THAT. YOU JUST TOLD ME THERE WAS NO MONEY IN THE BUDGET FOR IT ALTHOUGH I HAD BEEN TOLD DIFFERENTLY BY CHERIE.

Q WEREN'T YOU PART OF AN E-MAIL DISCUSSION BETWEEN THE TREASURER AND PRESIDENT MANCINI WHERE THE

TREASURER WAS SAYING, ONE, THAT IT WAS NOT IN THE BUDGET BECAUSE THERE WAS NO COMMUNICATION BUDGET?
A NO, MA'AM. I WAS NOT.
Q OKAY.
A I WAS COPIED ON E-MAILS THAT YOU GUYS SENT OUT ON THE 19TH AFTER YOU TOLD ME TO PROCEED WITH THE MAGAZINE, WHICH YOU WERE SAYING AGAIN THAT THERE WAS NO MONEY FOR IT.
Q TWO, DO YOU KNOW IF THIS SHOULD OR SHOULD NOT HAVE WENT BEFORE THE EXECUTIVE BOARD FOR APPROVAL?
A FROM WHAT I UNDERSTAND, IF SOMETHING IS BUDGETED, IT DOES NOT REQUIRE EXECUTIVE BOARD APPROVAL, NO.
Q OKAY. DO YOU REMEMBER A DONATION ON BEHALF OF SEIU IN REGARDS TO MARTHA FLOYD, A MOTION SHE BROUGHT BEFORE US?
A YES.
Q OKAY. AND THE BUDGET FOR THAT WAS $150, CORRECT?
A I HAVE NO IDEA. I DON'T KNOW. I DON'T BELIEVE THAT WAS IN THE BUDGET.
Q IT WAS IN THE SAME BUDGET AS YOU WOULD DO THE PUBLICATION.
A MA'AM, IT'S NOT MY JOB. I HAVE NO IDEA.
Q SO I GUESS MY POINT IS THAT HAD TO BE MOVED TO A VOTE. ARE YOU AWARE OF THAT?
A YES.
Q AND IT WAS FOR $150?

A YES.
Q SO CAN YOU UNDERSTAND WHY THERE MAY HAVE BEEN CONCERN THAT A $15,000 WOULD NOT GO BEFORE THE EXECUTIVE BOARD?
A AGAIN, I WAS UNDER THE IMPRESSION THAT IF SOMETHING IS IN THE BUDGET, WHICH I WAS TOLD THE MAGAZINE WAS IN THE BUDGET, AND I WAS TOLD THAT THE MARTHA FLOYD DONATION WAS NOT IN THE BUDGET.
Q BUT, AGAIN, YOU ALSO SAID THE TRUSTEE AND THE TREASURER SAID THE MAGAZINE WAS NOT IN THE BUDGET BECAUSE THERE WAS NO COMMUNICATION BUDGET?
A THAT'S WHAT THEY TOLD ME AFTER I WAS TOLD IT WAS IN THE BUDGET. AND THEN I WAS TOLD THAT SAME DAY THAT THEY FOUND MONEY IN THE BUDGET FOR IT. AND THE NEXT DAY, YOU TOLD ME THERE WAS NO MONEY IN THE BUDGET FOR IT.
Q OKAY. SO, AGAIN, DO YOU UNDERSTAND -- OR DID THE TRUSTEES AND THE TREASURER TRY TO EXPLAIN TO YOU WHY THERE WAS CONCERN?
A YES. AND I WENT TO LUNCH WHEN YOU LEFT MY OFFICE AND WENT TO MEET.
Q OKAY. SO --
THE HEARING OFFICER: SHARON, ARE YOU GOING TO PURSUE THE SAME LINE OF QUESTION OF THE MAGAZINE AND WHETHER IT'S IN THE BUDGET OR NOT?
MS. KISLING: YEAH. SO I CAN'T ASK OTHER QUESTIONS ABOUT THE MAGAZINE? BECAUSE THAT WAS SUPPOSEDLY WAS THE MOST SERIOUS, AND I KNOW THAT IT'S ACTUALLY IN THE CHARGES.

THE WITNESS: NO, MA'AM. THAT'S NOT WHAT I SAID.

THE HEARING OFFICER: SO WE HAVE HEARD EVIDENCE REGARDING THE MAGAZINE AND WHETHER IT WAS IN THE BUDGET OR NOT IN THE BUDGET. SO I'M INTERESTED IN NEW INFORMATION AND THEN EVIDENCE THAT SUPPORTS THAT. OTHERWISE, WE WILL LOOK AT THE EVIDENCE AND WE HAVE THE TRANSCRIPTS FROM ALL THE CONVERSATIONS THAT HAVE HAPPENED AS WE MOVE FORWARD.

THE WITNESS: YOU MISSTATED MY TESTIMONY.

THE HEARING OFFICER: COULD YOU JUST HOLD ON?

THE WITNESS: YES.

BY MS. KISLING:

Q YOU SPOKE OF THE CANDIDATE FORM, AND THE FIRST THING YOU SAID WAS THAT THE MODERATOR WAS SELECTED BY ME. I'M NOT REALLY CLEAR HOW THAT TIES INTO THE CHARGES.

A I WOULD LIKE TO CLARIFY WHAT YOU SAID. I DID NOT SAY THAT THAT WAS MY MOST SIGNIFICANT CONCERN. I SAID THAT WAS MY MOST SIGNIFICANT CONCERN REGARDING THAT ONE QUESTION.

BY MS. KISLING:

Q NOW I'M ASKING THE QUESTION --

MS. WALFOORT: JUST A MINUTE. DANA, WE'LL HAVE A TRANSCRIPT OF WHAT YOU SAID. IT WILL BE THERE RIGHT IN FRONT OF OUR EYES. SO WE DON'T NEED TO GO THROUGH THIS. LET'S GET ON TO THE NEXT QUESTION.

THE WITNESS: I JUST WANTED TO CLARIFY HER SAYING THAT I'M A THIEF WITH --

MS. WALFOORT: I UNDERSTAND THAT. BUT DID YOU HEAR WHAT I SAID? WE'LL HAVE A TRANSCRIPT, AND WE'LL BE ABLE TO SEE WHAT YOU SAID, AND WE'LL KNOW WHAT SHE ASKED.

THE WITNESS: THANK YOU.

BY MS. KISLING:

Q SO NOW, IF WE GO TO CHARGE 3, EXHIBIT 2, THE FIRST E-MAIL THERE, SATURDAY MAY 28TH, 2016, STATES: "ALSO IF YOU GUYS HAVE ANY IDEA FOR A MODERATOR."

A RIGHT.

Q ARE YOU NOT INCLUDED ON THAT E-MAIL?

A YES. AND THEN WE HAD A MEETING ABOUT IT, AND WE ADVISED AGAINST HAVING AN ELECTED OFFICIAL AS A MODERATOR. BUT YOU PROCEEDED WITH YOUR SELECTION OF CALVIN ATKINSON (PHONETIC).

Q SO NEXT, CAN WE GO TO MAY 28TH. YOU TALK ABOUT MEMORIAL DAY WEEKEND.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: FOR THE RECORD THEY'RE JUST DISCUSSING THE EXHIBITS AND MAKING SURE THAT WE'VE GOT ALL THE EXHIBITS THAT ARE GOING TO GET PRESENTED MARKED.

MS. WALFOORT: SHARON, ARE YOU GOING TO USE 1 THROUGH 4 WITH THIS WITNESS?

MS. KISLING: NO. I BELIEVE IT'S 4 THAT I'M LOOKING AT.

MS. WALFOORT: JUST GIVE IT TO THE HEARING OFFICER TO READ IT INTO THE RECORD.

THE HEARING OFFICER: I'LL ENTER IT.

MS. KISLING: OH, OKAY.
THE HEARING OFFICER: CAN I GO AHEAD AND ENTER IT?
MS. KISLING: YES.
THE HEARING OFFICER: OKAY. SO THIS EXHIBIT IS CHARGE 3, CHARGED PARTY EXHIBIT 4, AND IT'S "FORWARD: OFFICERS LIST" IS THE TITLE.
(EXHIBIT ADMITTED.)
BY MS. KISLING:
Q SO IN THIS, YOU MENTIONED BEING CONTACTED TO SEND OUT THE RESULTS OF THE ELECTION?
A THE UNCONTESTED RAISES.
Q YES. WAS IT COMMUNICATED TO YOU OR DO YOU RECALL IT BEING COMMUNICATED TO YOU THAT THE BYLAWS INDICATE THAT THE ELECTIONS NEED TO BE SENT OUT IMMEDIATELY AFTER THE ELECTION INCLUDING THE UNCONTESTED?
A YES. YOU AND I PREPARED THE INFORMATION THAT WENT OUT ON FRIDAY AT WHICH TIME YOU COULD HAVE TOLD ME TO SEND OUT THE UNCONTESTED RAISES. BUT YOU CHOSE TO WAIT UNTIL SATURDAY, JULY 4TH WEEKEND, TO DO, AND THEN DEMANDED THEY GO OUT THAT DAY.
Q CAN YOU TELL ME, ON THE SECOND PAGE OF WHAT I GAVE YOU, WHAT'S THE DATE ON THERE?
A JULY 2ND, SATURDAY.
Q NO. ON THE FIRST PART OF THE COMMUNICATION, JULY 1ST?
A RIGHT, AT 9 O'CLOCK. 8:44 AT NIGHT YOU WROTE IT.

Q RIGHT. AND DO YOU SEE WHAT THE COMMUNICATION INDICATES? "SORRY SO LATE. HOWEVER, UPON RECEIPT FROM ALISA (PHONETIC) I JUST HAD OPPORTUNITY TO REVIEW ATTACHED LIST," BASICALLY, TAKING INITIATIVE TO GET THE LIST TOGETHER TO FORWARD TO YOU. SO YOU WERE JUST BEING ASKED TO PUSH IT THROUGH TO ALL THE MEMBERS.

A WHEN I TOLD YOU I WOULD DO IT TUESDAY, YOU TOLD ME IT HAD TO GO OUT THAT DAY.

Q BUT, AGAIN, IF YOU THEN LOOK TO THE CONVERSATION THAT WAS OCCURRING ON THIS IS NOW SUNDAY, IN RESPONSE TO PETER, IT HAD TO DO -- "NO ONE ON THE ELECTION COMMITTEE GATHERED THE INFORMATION. I DID SO AS I KNOW THE MEMBERS AND THIS IS MORE THAN JUST INFORMATION TO THEM. YOU WERE ABLE TO SEND OUT FULL RESULTS YESTERDAY. IT WOULD HAVE BEEN UNREASONABLE TO ASK THE MEMBERSHIP TO WAIT FIVE DAYS."

MS. WALFOORT: SHARON, WE CAN READ THE BACK AND FORTH IN THE E-MAILS. AND I THINK YOU MIGHT WANT TO MOVE ON NOW.

BY MS. KISLING:

Q OKAY. I MEAN, ALL OF THIS IS BACK TO ALL YOUR DIRECTION, WAS IT RELATED TO SOMETHING TO SEIU AND THE MEMBERSHIP?

A ON SUNDAY WHEN YOU WERE WRITING BACK, I HAD ALREADY RETURNED HOME FROM MY TRIP OUT OF TOWN TO SEND OUT AN E-MAIL.

Q I DON'T THINK THAT ANSWERS THE QUESTION.

A WHAT YOU WERE RESPONDING TO THEN WAS PETER

SAYING "I DON'T UNDERSTAND WHY THIS HAS TO GO OUT THIS WEEKEND. IT'S A HOLIDAY WEEKEND. OUR MEMBERS ARE ENJOYING THE WEEKEND."

(SIMULTANEOUS SPEAKERS.)

MS. WALFOORT: YOU CAN'T BOTH SPEAK AT THE SAME TIME.

THE WITNESS: AND YOU SAID OUR TREASURER IS ONE OF THE PEOPLE WHO WILL DEMAND THAT IT GO OUT TODAY.

BY MS. KISLING:

Q I'M WAITING FOR THE ANSWER TO THE QUESTION I ASKED.

MS. WALFOORT: WHAT I REALLY WANT YOU TO DO IS MOVE ON TO SOMETHING ELSE. BUT IF YOU WANT TO ASK THE QUESTION AGAIN, THEN ASK IT. BUT I REALLY THINK YOU'D BE WISE TO MOVE THIS ALONG.

MS. KISLING: THAT'S WHAT I'M TRYING TO DO.

BY MS. KISLING:

Q I ASKED THE DIRECTION YOU GAVE OR ALL OF THESE CONVERSATIONS, DID IT HAVE TO DO WITH SOMETHING FOR THE MEMBERSHIP IN SEIU?

THE WITNESS: ABSOLUTELY.

MS. KISLING: OKAY. THANK YOU.

THE HEARING OFFICER: DID YOU WANT TO REBUTTAL? GO AHEAD.

MS. GAYTON: AS FAR AS THE E-MAIL THAT WE HAVE ON THE EXHIBITS, IT WILL SHOW YOU HOW IT WAS VERY DIFFICULT FOR DANA TO DO HER JOB IN SENDING OUT THIS MAGAZINE IN A TIMELY MANNER, WHICH DID HURT OUR

MEMBERSHIP. AND THE E-MAILS ARE JUST GOING BACK AND FORTH.

THE HEARING OFFICER: AND IT'S ENTERED INTO EVIDENCE. WE CAN LOOK AT IT.

THANKS, DANA.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: DO YOU WANT TO CALL YOUR NEXT WITNESS?

MS. GAYTON: PETER NGUYEN.

MS. KISLING: I NEED TO OBJECT.

THE HEARING OFFICER: AND WHAT'S THE BASIS OF YOUR OBJECTION?

MS. KISLING: THAT THERE IS A LEGAL PROCEEDING RIGHT NOW, AND THE ORDER FROM THE JUDGE WAS THAT WE WERE SUPPOSED TO NOT HAVE ANY CONTACT.

THE HEARING OFFICER: OKAY.

MS. KISLING: SO I DON'T WANT TO VIOLATE THE ORDER. WE GO BACK TO COURT ON MONDAY. SO I CANNOT --

THE HEARING OFFICER: OKAY. HANG ON ONE SECOND. LET ME CHECK INTO THIS. MARY, CAN YOU JUST MAKE SURE THAT PETER DOESN'T COME INTO THE ROOM.

WE'RE GOING TO CHECK ON THE LEGAL POSSIBILITY TO MAKE THE TESTIMONY POSSIBLE. WHILE WE'RE FIGURING THIS OUT, I'M GOING TO TAKE A FIVE-MINUTE BREAK. SO WE'LL RECONVENE AT 3:25. PLEASE BE HERE ON TIME.

(BREAK TAKEN.)

THE HEARING OFFICER: SO WHILE WE HAD THE BREAK, THERE WERE SOME MORE DOCUMENTS BROUGHT IN TO GET

MARKED. AND THEY WILL BE BROUGHT INTO EVIDENCE AS EITHER PARTY IS DELIVERING THEIR CASE.

BUT A LEGAL MATTER WAS RAISED, AND I ALSO CONFERRED WITH MY COUNSEL. SO I'M ACTUALLY GOING TO ASK YOU, MARNIE, TO RESPOND.

MS. WALFOORT: ALL RIGHT. SO WE HEARD AMELIA SAY SHE WANTED TO CALL PETER NGUYEN AS A WITNESS. AND WE UNDERSTAND -- IT'S BEEN BROUGHT TO OUR ATTENTION THAT THERE HAS BEEN A TEMPORARY PROTECTIVE ORDER ISSUED ON BEHALF OF PETER AND AGAINST SHARON KISLING AT PETER'S BEHEST. AND THE ORDER HAS BEEN STAYED, MEANING IT'S NOT IN EFFECT. BUT PETER FEELS HE'S BEEN ADVISED BY THE JUDGE NOT TO BE IN THE SAME ROOM WITH SHARON WITHOUT A PARTICULAR INDIVIDUAL TO BE A WITNESS FOR HIM, IF NECESSARY.

SO GIVEN THAT, SHARON, YOU ARE A PERSON NAMED IN THAT ORDER, I WOULD LIKE TO ASK YOU IF PETER IS WILLING TO WAIVE THE PROTECTIVE ORDER TEMPORARILY SO THAT HE COULD PARTICIPATE IN THIS PROCEEDING IN THE SAME ROOM AS YOU, WOULD YOU ALSO FEEL COMFORTABLE WAIVING THAT SO THAT WE CAN PROCEED WITH THIS?

MS. KISLING: NO. THE PROTECTIVE ORDER IS STAYED. HOWEVER, THERE IS A HEARING ON MONDAY, AND WE WERE BOTH ADVISED NOT TO HAVE CONTACT WITH ONE ANOTHER OR TO INSTIGATE COMMUNICATION BETWEEN MEMBERS AND OURSELVES. SO I CANNOT. IT'S TOO MUCH.

MS. WALFOORT: WE'RE NOT TAKING ANY QUESTIONS ON THIS. IT IS A SERIOUS MATTER. AND I THINK, AMELIA,

I'M GOING TO ASK YOU TO PROCEED WITH A DIFFERENT WITNESS AND TO NOT CALL PETER. AND HE WON'T BE COMING IN, AND NEITHER WILL HIS DESIGNATED INDIVIDUAL.

SO WE'LL JUST CONTINUE WITH YOUR CHARGE 3 WITH YOUR NEXT WITNESS.

MS. GAYTON: I WOULD LIKE TO CALL CHERIE MANCINI.

THE HEARING OFFICER: ALL RIGHT, CHERIE.

NOW, JUST FOR MY OWN PURPOSE DOES SHE NEED TO BE SWORN AGAIN?

THE COURT REPORTER: YOU STILL REMAIN UNDER OATH.

MS. MANCINI: THANK YOU.

THE HEARING OFFICER: VERY GOOD.

DO YOU WANT TO STATE YOUR NAME FOR THE RECORD? YOU DON'T NEED TO SPELL IT.

THE WITNESS: CHERIE MANCINI.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. GAYTON:

Q DOES THE EXECUTIVE VICE PRESIDENT REPORT TO THE PRESIDENT ACCORDING TO THE LOCAL 1107 CONSTITUTIONS AND BYLAWS?

A YES. ARTICLE 7, SECTION 7, SUBSECTION A OF THE CONSTITUTION AND BYLAWS.

Q ARE YOU AWARE OF THE SITUATION IN WHICH SISTER SHARON KISLING FAILED TO REPORT TO YOU?

MS. WALFOORT: CAN YOU FOCUS HER A LITTLE MORE SPECIFICALLY ON THINGS YOU WANT HER TO TALK ABOUT?
BY MS. GAYTON:
Q OKAY. USURP OF YOUR AUTHORITY AS PRESIDENT?
A THE ATTEMPTED FIRING OF PETER NGUYEN AND THE IMPROPER SIGNING OF CHRISTINA BREEDEN'S TIME CARD WHEN SHE HAD -- DURING THE TIME I WAS ON VACATION, I ALLOWED THAT TO BE PAID. BUT AS I HAD COME BACK FROM VACATION THE SECOND WEEK, I SHOULD HAVE BEEN THE ONE TO SIGN HER TIME CARD WHEN IN FACT IT WAS SIGNED BY SHARON.
Q HAVE THERE BEEN OTHER CASES IN WHICH SISTER KISLING VIOLATED ARTICLE 7, SECTION 7, ACTED BEYOND THE SCOPE OF HER AUTHORITY?
A THERE WERE MANY. THERE WAS CALLING OF AN EXECUTIVE BOARD MEETING WHILE I WAS AWAY ON VACATION, WHEN IN FACT I WAS DUE TO COME BACK THE NEXT DAY. THERE WERE NOT -- THERE WAS NOT PROPER NOTIFICATION BASED UPON THE CONSTITUTION AND BYLAWS IN REGARDS TO THE PROCEDURES OF HOW TO CALL AN EMERGENCY BOARD MEETING.
Q DID SISTER KISLING ATTEMPT TO CANCEL PUBLICATION OF THE LABOR MATTERS NEWS MAGAZINE?
A YES.
Q ARE YOU AWARE OF EMPLOYEES' GRIEVANCES WHICH HAVE BEEN FILED AGAINST SISTER KISLING?
A YES. I'M AWARE OF AT LEAST FOUR GRIEVANCES THAT HAVE BEEN FILED AGAINST HER FROM THE STAFF, REPRESENTED BY THE STAFF UNION.
Q DO YOU KNOW OF ANY FINANCIAL MALPRACTICE BY

SISTER KISLING?

A DURING THE TIME THAT I WAS AWAY ON VACATION, I HAD ALREADY BOOKED ALL OF ARRANGEMENTS FOR THE AFL-CIO CONVENTION THAT WAS IN RENO. WE HAD BOOKED FLIGHTS, THE ROOMS AND ALL OF THAT. AND UPON MY RETURN, AFTER THE ATTEMPTED FIRING OF PETER NGUYEN, THE HOTEL ROOM WAS -- WELL, THE HOTEL ROOM WAS CANCELED FOR HIM, AND THE FLIGHT RESERVATION WAS CANCELED FOR HIM, AND I HAD TO REBOOK THOSE AT A SIGNIFICANTLY HIGHER COST.

Q HAS SISTER KISLING EVER IMPROPERLY TAKEN OR REMOVED PROPERTY OF THE UNION?

A WE HAD EVIDENCE EARLIER IN TESTIMONY IN REGARDS TO THE RENO OFFICE WHERE THERE WAS PAPERWORK, THERE WERE RECEIPTS AND SUCH THAT WERE TAKEN AND NOT RETURNED. AS WELL AS WHEN PETER WAS QUOTE, UNQUOTE SUSPENDED OR ATTEMPTED TO BE TERMINATED, HIS KEYS, HIS PHONE, THE OTHER PROPERTY THAT HAD BEEN GIVEN TO HIM AS AN EMPLOYEE OF THE UNION WERE TAKEN FROM HIM.

AND I HAD ATTEMPTED TO GET THOSE RETURNED. AND IT WAS QUITE DIFFICULT TO GET IT RETURNED AS I WAS TOLD THAT SHARON HAD THEM, AND SHE WAS SUPPOSED TO COME IN AND GIVE THOSE TO ME. BUT THEN I FOUND OUT THAT, IN TURN, TRUSTEE THOMAS HAD THEM. SO IT WAS VERY DIFFICULT TO GET THE PROPERTY RETURNED.

Q WERE YOU EVER AWARE OF THE EMERGENCY EXECUTIVE BOARD MEETING ON AUGUST THE 20TH, 2016?

A I WAS AWARE OF IT AFTER EVERYBODY STARTED BLOWING UP MY PHONE WHEN I WAS IN HAWAII.

MS. GAYTON: I DON'T HAVE ANY FURTHER QUESTIONS.

THE HEARING OFFICER: ALL RIGHT. SHARON, DO YOU HAVE CROSS-EXAMINE?

MS. KISLING: YES, I DO.

EXAMINATION

BY MS. KISLING:

Q I'M GOING TO START GOING BACKWARD. I BELIEVE IT'S EXHIBIT 2 DATED AUGUST 20TH, 2016.

MS. PURDIE: FOR THE RECORD, ARE YOU REFERRING TO CHARGED PARTY EXHIBIT 2?

MS. KISLING: YES.

THE HEARING OFFICER: ALL RIGHT. SO CHARGE 3, CHARGED PARTY EXHIBIT 2, IT LOOKS LIKE A SERIES OF E-MAILS THAT ARE FORWARDED, "REQUEST FOR OPINION ON SEIU LOCAL 1107 CONSTITUTION."

GO AHEAD.

THE WITNESS: I DON'T HAVE THAT.

MS. KISLING: THERE IS ONE MORE. I DON'T THINK I TOOK A COPY, WHERE YOU PUT "CHARGED PARTY."

THE HEARING OFFICER: I'VE GOT THAT.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO THE OTHER ITEM IS CHARGE 3, CHARGED PARTY EXHIBIT 3. AGAIN, IT LOOKS LIKE A SERIES OF E-MAILS ON THE TOP, "FORWARD: EMERGENCY MEETING."

(EXHIBITS ADMITTED.)

MS. WALFOORT: SHARON, YOU ARE TALKING ABOUT EXHIBIT 2 AT THIS TIME, RIGHT? CHARGE PARTY 2?

MS. KISLING: YES.

EXAMINATION

BY MS. KISLING:

Q SO YOU SAID YOU DIDN'T KNOW ANYTHING ABOUT THE EMERGENCY E-BOARD MEETING UNTIL YOUR PHONE STARTED GETTING BLOWN UP. IN FACT, WEREN'T YOU ON A COMMUNICATION THAT WAS ON THE EVE OF THE INCIDENT WITH PETER NGUYEN, AUGUST 17TH, WEDNESDAY?

A APPARENTLY I WAS ON THAT. I WAS ON VACATION. SO I WAS NOT ROUTINELY CHECKING MY E-MAIL.

Q I UNDERSTAND THAT. BECAUSE THERE WERE OTHER E-MAILS AND MESSAGES THAT YOU DIDN'T RESPOND TO. HOWEVER, WASN'T THAT PART OF -- WHAT YOU PROVIDED IS THAT YOU WERE ACTUALLY NOT ABSENT. SO IF YOU ARE NOT AVAILABLE, WHO IS THEN AVAILABLE?

A I'M AVAILABLE TO BE CONSULTED WITH. I'M NOT GOING TO DO ROUTINE BUSINESS WHILE I'M ON VACATION.

Q WELL, WOULDN'T THIS BE A CONSULTATION IN TERMS THIS IS COMING FROM THE LAW FIRM IN REGARDS TO PETER NGUYEN?

A I DON'T KNOW. I DIDN'T READ IT AT THAT TIME.

Q OKAY. BUT YOU ARE -- I GUESS WHAT I'M SAYING IS YOU'RE ON HERE AND THEN YOU FORWARDED TO THE TRUSTEE SAYING "FYI." SO ALTHOUGH YOU ARE SAYING YOU DID NOT READ IT, IT CLEARLY SHOWS YOU FORWARDING THE E-MAIL.

A OH, OKAY. I GUESS I DID FORWARD IT. AND I FORWARDED IT TO THE OFFICERS AT LARGE TO LET THEM KNOW THAT THIS WAS GOING ON AND THAT YOU WERE -- BECAUSE THERE ARE NO OTHER --

I'M THE ONLY ONE ON THIS MESSAGE THAT IS DATED AUGUST 17TH AT 2:32 THAT IS SENT FROM SEAN MC DONALD -- SEAN MC DONALD TO YOU IN REGARDS TO "OPINION OF CONSTITUTION AND BYLAWS REGARDING EXECUTIVE VICE PRESIDENT AUTHORITY IN THE ABSENCE OF THE PRESIDENT." SO IT LOOKS LIKE YOU INITIATED THIS E-MAIL TO THE ATTORNEY.

Q EXACTLY. SO WHAT I'M SAYING IS YOU AND I WERE COPIED ON THE E-MAIL TO THE ATTORNEY, GETTING LEGAL ADVICE ON A SITUATION THAT WAS OCCURRING. SO THEREFORE, YOU WERE AWARE THAT A SITUATION WAS OCCURRING?

A ON THIS E-MAIL RIGHT NOW, THE ONE I'M LOOKING AT, IT SAYS "REQUEST FOR OPINION OF THE CONSTITUTION AND BYLAWS." IT DOES NOT ADDRESS -- WHERE DOES IT ADDRESS THE SPECIFIC SITUATION? DOES IT ADDRESS THE SPECIFIC SITUATION?

MS. KISLING: I ALREADY ENTERED IT. SO IF YOU GUYS REVIEW IT --

THE WITNESS: OKAY, THAT'S FINE.

BY MS. KISLING:

Q AND THE NEXT PIECE, SATURDAY FROM FREDO, WHO IS ONE OF THE TRUSTEES. HE SPEAKS TO URBAN BEING PRESENT. DO YOU RECALL THAT?

A YOU HAVE TO POINT IT OUT TO ME.

Q IT'S ON THE FIRST PAGE.

A "FOR CLARITY, I CALLED THIS MEETING TO PROVIDE A REPORT TO THE E-BOARD." IS THAT WHAT YOU'RE TALKING ABOUT?

(SIMULTANEOUS SPEAKERS.)

THE WITNESS: "REQUEST THAT MR. URBAN OR SOMEONE FROM HIS OFFICE BE PRESENT AT THE EMERGENCY BOARD MEETING THIS AFTERNOON TO CLARIFY THE AMBIGUITY OR ANSWER QUESTIONS REGARDING THE OPINION."

BY MS. KISLING:

Q SO ISN'T THIS EVIDENCE THAT YOU WERE AWARE THAT THERE WAS GOING TO BE AN E-BOARD MEETING?

A I GUESS.

Q OKAY.

A I GUESS.

Q THIS IS ALL I WANT TO SAY, PRESIDENT MANCINI --

A THAT'S FINE.

Q -- I GET THE POSITION. BUT WHAT I'M SAYING IS YOU WERE COPIED AND YOU WERE ROUTINELY COPIED BY ME ON E-MAILS. SO DO YOU FEEL THAT IT IS -- HOW SHOULD -- IF I SEND YOU COMMUNICATION, AND YOU SEEM TO TAKE ACTION ON IT, HOW WOULD I THEN PERCEIVE THAT YOU ARE NOT AWARE OF SOMETHING?

A DOES IT SAY ANYWHERE IN THIS E-MAIL WHAT THIS E-BOARD MEETING IS ABOUT? DOES IT STATE IN HERE?

Q YES. "I HAVE CALLED TO PROVIDE A REPORT TO THE E-BOARD. THEY IN TURN, MAY TAKE ALL NECESSARY ACTIONS UNDER ARTICLE 8 -- HAVE THE AUTHORITY TO INTERPRET THE BYLAWS."

MS. WALFOORT: SO WE WILL READ THE E-MAIL.

(SIMULTANEOUS SPEAKERS.)

THE WITNESS: WHAT WAS THE CONCERNS? I WAS NOT AWARE OF CONCERNS, OF WHAT THE CONCERNS WERE OF THE EMERGENCY E-BOARD.

BY MS. KISLING:

Q THE OTHER ONE IS DATED JULY 2016. AND I DON'T THINK I NEED TO PUT THIS IN. DID WE NOT GET A LEGAL OPINION ON THE ORGANIZATIONAL CHART?

A THERE WAS AN OPINION FROM MIKE URBAN THAT, IN TURN, WAS SENT OUT AS A -- THERE WAS A CORRECTION SENT OUT AT A LATER TIME IN REGARDS TO THE BYLAWS STATING THAT -- I BELIEVE IT SAYS IN ARTICLE 7, SECTION 7 SUBSECTION A, WHICH STATES THAT THE VICE PRESIDENT REPORTS TO THE PRESIDENT. WHICH, IN TURN, MIKE URBAN STATED THAT THERE WAS A DOTTED LINE TO THE PRESIDENT. AND THAT YOU REPORTED TO THE EXECUTIVE BOARD.

WHICH, IN TURN, THERE WAS A PROBLEM WITH THAT. WE HAD A MEETING. AND IF I NEED TO PUT IT INTO EVIDENCE THAT THERE WAS A CORRECTION TO WHAT HE STATED --

MS. WALFOORT: BOTH OF YOU ARE WILLING TO CONCEDE THAT THE CONSTITUTION AND BYLAWS DO TELL YOU?

THE WITNESS: SUPERCEDES.

MS. KISLING: EXACTLY. THAT'S MY POINT, THAT IN TURN, WE REPORT TO THE EXECUTIVE BOARD. CORRECT?

THE WITNESS: IN TURN, THE VICE PRESIDENT REPORTS TO THE PRESIDENT. WE ALL, IN TURN, REPORT TO THE EXECUTIVE BOARD; THAT IS CORRECT.

BY MS. KISLING:

Q OKAY. SO ALSO IN THIS E-MAIL, OR IS THERE ANY DOCUMENTATION, WHERE YOU OBJECTED TO THE SESSION AND WERE YOU NOT AVAILABLE BY PHONE?

A WHAT SESSION WAS THAT?

Q THE EMERGENCY SESSION?

A I DID NOT KNOW WHAT THE MEETING WAS ABOUT. IT WAS ABOUT QUOTE, UNQUOTE, "CONCERNS." I, IN TURN, WAS ON THE TELEPHONE DURING THIS MEETING.

Q YES. BUT EARLIER I SHOWED YOU A DOCUMENT IN WHICH YOU WERE INCLUDED THAT SHOULD HAVE TOLD YOU WHAT THE BOARD MEETING WAS ABOUT.

A WHAT DID IT SAY? CAN YOU TELL ME? I DON'T RECALL.

MS. WALFOORT: WE HAVE THE E-MAIL.

THE WITNESS: IT SAID "CONCERNS." I WAS ON THE TELEPHONE. AND NO ONE BUT THE SECRETARY COULD HEAR ANYTHING THAT I WAS SAYING DURING THE MEETING BECAUSE EVERYONE WAS YELLING AND SCREAMING IN THE MEETING.

BY MS. KISLING:

Q SO I JUST ASKED, WITH THE KNOWLEDGE YOU SHOULD HAVE HAD FROM THE 17TH, DID YOU OBJECT?

A I DIDN'T KNOW WHAT THE MEETING WAS FOR.

MS. WALFOORT: WE GOT IT.

THE WITNESS: CAN I STATE SOMETHING? I DID OBJECT.

THE HEARING OFFICER: HANG ON. JUST ONE SECOND SO THAT WE DON'T HAVE TWO PEOPLE TALKING AT ONCE. SO I'M

GOING TO LET YOU FINISH YOUR STATEMENT.

THE WITNESS: I DID OBJECT AS I CONSULTED WITH THE ATTORNEY AND HAD THE ATTORNEY SEND A LETTER TO SHARON TO LET HER KNOW THAT I WAS AVAILABLE AND THAT SHE COULD NOT TAKE OVER AS IF I HAD LEFT THE COUNTRY AND WAS UNOBTAINABLE OR DEAD OR ON MY DEATH BED OR ANYTHING TO THAT EFFECT.

THE HEARING OFFICER: OKAY.

THE WITNESS: AND THAT WAS SENT TO YOU.

BY MS. KISLING:

Q DID YOU NOT EARLIER SAY THOUGH THAT YOU WERE NOT DOING ROUTINE BUSINESS, SO YOU DIDN'T READ THE E-MAIL?

A I SAID AFTER I FOUND OUT WHAT WAS HAPPENING, I CONTACTED THE ATTORNEY TO SEND YOU A LETTER.

THE HEARING OFFICER: I THINK WE'RE JUST GOING TO GO BACK AND FORTH. I WOULD ASK YOU TO MOVE ON.

BY MS. KISLING:

Q BACK TO THE MAGAZINE BECAUSE THE CHARGE --

A OKAY.

Q AT THE GENERAL MEETING, DID YOU NOT IN FACT ADVISE E-BOARD MEMBERS THAT THAT MAGAZINE WAS GOING TO PAY FOR ITSELF, AND THERE WOULD BE NO FUNDS FROM MEMBERSHIP DUES USED?

A I ABSOLUTELY DID NOT.

Q SO IF I BRING THREE WITNESSES IN WHICH YOU SAID THIS TO, WHAT IS YOUR THOUGHT?

A MY THOUGHT IS THERE'S NO WAY WE COULD PUT OUT A

MAGAZINE THAT WAS COMPLETELY PAID FOR BY CONTRIBUTIONS FROM ELECTED OFFICIALS. BECAUSE THAT'S ALL THAT WOULD BE IN THE MAGAZINE. BECAUSE THEY WOULD HAVE TO TAKE UP EVERY SINGLE PAGE OF THE MAGAZINE. SO THERE IS NO WAY THAT I COULD LOGICALLY EVEN SAY THAT. NOW, WE DID TALK ABOUT SELLING ADVERTISEMENTS IN THE MAGAZINE TO HELP PAY FOR IT.

Q SO DO YOU NOT RECALL HAVING A CONVERSATION WITH THE TREASURER AND TWO OF THE BOARD MEMBERS?

A IN REGARDS TO?

Q IN REGARDS TO THE MAGAZINE AND THE BUDGET.

A WHAT WAS THE CONVERSATION? WAS IT IN PAYING FOR ITSELF? WAS IT IF IT WAS BUDGETED OR NOT BUDGETED?

THE HEARING OFFICER: LET ME STEP IN FOR A SECOND. SO I WANT TO MAKE SURE THAT WE GET AS MUCH ON THE RECORD AND EVIDENCE IN AS IT RELATES TO THE CHARGES THAT YOU BROUGHT FORWARD. BUT DON'T WANT TO REHASH WHAT WE HAVE IN. SO AS IT RELATES TO THE MAGAZINE, THERE HAS BEEN A NUMBER OF FOLKS THAT HAVE TESTIFIED ON THAT AND INFORMATION IN THE RECORD FOR BOTH THE MAGAZINE, FOR SOME OTHER RECEIPTS AND WHETHER THINGS WENT TO THE BOARD OR NOT FOR APPROVAL.

SO WE CAN TAKE FROM THE RECORDS AND THE TRANSCRIPT AS WELL AS THE EVIDENCE THAT'S PROVIDED ON WHAT DECISIONS WERE MADE OR NOT MADE AND WHAT ACTION WAS TAKEN OR NOT TAKEN. SO I'M NOT SURE WE'RE HEARING ANYTHING NEW RIGHT NOW.

THE WITNESS: I HAVE SOMETHING NEW.

THE HEARING OFFICER: HANG ON A SEC. SO I WOULD PREFER WE MOVE FORWARD SO WE CAN HEAR EVERYTHING AS IT RELATES TO THE CHARGE AND ANY EVIDENCE YOU HAVE. BUT I DON'T WANT TO REHASH IT. BECAUSE I'M WORRIED ABOUT GETTING THROUGH NOT ONLY THIS CHARGE, BUT THE OTHER CHARGE REMAINING. AND IT'S IMPORTANT THAT WE TRY TO MOVE IT ALONG SO WE CAN COMPLETE AT SOME POINT LATER THIS EVENING.

THE WITNESS: CAN I MAKE A FINAL COMMENT ABOUT THAT MAGAZINE?

THE HEARING OFFICER: I'M NOT SURE ANYTHING IS NEW AT THIS POINT.

THE WITNESS: IT IS NEW. THE MAGAZINE WAS BUDGETED UNDER EXTERNAL ORGANIZING BECAUSE IT WAS SENT TO THE ENTIRE BARGAINING UNIT, 18,000. AND IT WAS EXTERNAL ORGANIZING BASED UPON THE FACT THAT I HAD NOT BEEN IN OFFICE VERY LONG AS THE NEW PRESIDENT. WE WANTED TO SHOW A CHANGE. AND IT WAS BUDGETED FOR. BECAUSE THERE WAS $88,000 -- I'M DONE.

THE HEARING OFFICER: DO YOU HAVE EVIDENCE WHERE WITHIN THE BUDGET OR DOCUMENTATION THAT SUPPORTS THAT? BECAUSE I FEEL LIKE WE'RE GOING TO GET IN A BACK AND FORTH.

THE WITNESS: I CAN GET THAT.

THE HEARING OFFICER: THAT WOULD BE HELPFUL.

GO AHEAD.

BY MS. KISLING:

Q SO MY FINAL QUESTION ON THAT, WAS THAT APPROVED

BY THE EXECUTIVE BOARD?

A NO. IT WAS NOT.

THE HEARING OFFICER: OKAY. DO YOU HAVE REBUTTAL?

MS. GAYTON: I HAVE EXHIBITS FROM WHAT MANCINI IS TALKING ABOUT, EXHIBIT 10, EXHIBIT 3 AND EXHIBIT 9.

MS. WALFOORT: DO YOU JUST WANT THOSE ADMITTED?

MS. GAYTON: ADMITTED, YES.

MS. WALFOORT: WE CAN DO THAT, 3.

MS. GAYTON: 3, 9 AND 10.

MS. KISLING: CAN I REFERENCE ANOTHER DOCUMENT NOW?

THE HEARING OFFICER: LET ME ENTER THESE FIRST. SO BASED ON THE TESTIMONY, THESE ARE THE EXHIBITS THAT WILL BE ENTERED. CHARGE 3, CHARGING PARTY EXHIBIT 10, AND THAT IS SEIU MAIL, REQUEST FOR OPINION ON SEIU LOCAL 1107 CONSTITUTION AND BYLAWS; CHARGE 3, CHARGING PARTY EXHIBIT 3, SEIU LOCAL 1107 MAIL SEIU -- OR SERVICE EMPLOYEE INTERNATIONAL UNION, LOCAL 1107, AND THAT'S "DEBORAH SPRINGER" IS ON THE TOP OF THAT ONE; THEN CHARGE 3, CHARGING PARTY EXHIBIT 9, THE URBAN LAW FIRM DOCUMENT.

(EXHIBITS ADMITTED.)

THE HEARING OFFICER: ALL RIGHT. AND SHARON, DID YOU SAY YOU NEED SOMETHING ENTERED AS WELL?

MS. KISLING: YES. IT'S ALREADY BEEN ENTERED. I JUST HAVE A QUESTION ON IT.

THE HEARING OFFICER: FOR ME?

MS. KISLING: NO. FOR THE WITNESS.

THE HEARING OFFICER: BUT YOU ALREADY ENDED YOUR CROSS. AND, AMELIA, WE WERE ON REBUTTAL.

MS. KISLING: I THOUGHT SHE FINISHED.

THE HEARING OFFICER: OKAY. THEN WE'RE DONE WITH THIS WITNESS, IF THAT'S THE CASE.

MS. GAYTON: IF I COULD HAVE ONE MORE QUESTION FOR THIS WITNESS.

THE HEARING OFFICER: OKAY.

MS. GAYTON: HOW HAVE THE LOCAL OPERATIONS CHANGED AND CULTURE CHANGED SINCE NGUYEN ARRIVED AT THE UNION?

THE WITNESS: WHEN WHO ARRIVED?

MS. GAYTON: PETER NGUYEN.

THE WITNESS: WE HAVE DEFINITELY SEEN A SHIFT IN MEMBERSHIP, THAT'S FOR SURE. WE HAVE NUMBERS WE CAN PROVIDE. WE'RE UP -- OVER THE LAST YEAR, WE'VE BROUGHT IN OVER 560 NEW MEMBERS. I COULD PROVIDE OFFICIAL DOCUMENTATION ON THAT. OUR COPE (PHONETIC) NUMBERS ARE UP.

WE HAVE HAD THE HIGHEST MEMBERSHIP MONTH THAT WE'VE EVER HAD IN ANY RECENT HISTORY, WHICH IS BRINGING IN 170 MEMBERS. WE STARTED A MEMBERSHIP RETENTION PROGRAM. WE STARTED A BIRTHDAY CARD, WELCOME LETTERS FROM THE PRESIDENT. AND WE HAVE GOTTEN A LOT OF REALLY POSITIVE FEEDBACK.

THE HEARING OFFICER: OKAY.

MS. GAYTON: THANK YOU.

THE HEARING OFFICER: ALL RIGHT. THANK YOU,

CHERIE.

CAN YOU CALL YOUR NEXT WITNESS?

MS. GAYTON: PATTI CURRY.

THE HEARING OFFICER: PATTI CURRY.

PATTI, YOU'LL BE SWORN IN. THEN IF YOU COULD STATE AND SPELL YOUR NAME FOR THE RECORD.

PATTI CURRY,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: MY NAME IS PATTI CURRY, P-A-T-T-I C-U-R-R-Y.

MS. KISLING: I HAVE A QUESTION BEFORE WE MOVE FORWARD WITH THIS WITNESS. BECAUSE THERE WERE A FEW -- AND IT WAS MENTIONED EARLIER THAT THERE WERE A FEW WITNESSES WITH THE STAFF UNION WHO FILED GRIEVANCES. AND THOSE GRIEVANCES, TO MY UNDERSTANDING, HAVE NOT BEEN RESOLVED YET. SO I'M NOT SURE HOW THIS WOULD BE APPROPRIATE. BECAUSE THEY MAY HAVE AN EFFECT.

THE HEARING OFFICER: BUT THEY CAN TESTIFY TO WHATEVER THEY EXPERIENCED ON THE DAY OF AUGUST 17TH, I BELIEVE IT IS. SO THAT WOULD BE WHAT THEY HAVE TO TESTIFY TO.

MS. KISLING: AND THE GRIEVANCES ARE RELATED TO THAT DAY AS WELL.

THE HEARING OFFICER: SO THAT'S A SEPARATE AVENUE FROM THIS HEARING. WE HAVE -- THIS HEARING, WHAT

WE'RE DEALING WITH HERE, ARE THE CHARGES THAT WERE FILED BY AMELIA AGAINST YOU. SO THAT'S WHERE WE NEED TO HAVE TESTIMONY. THE GRIEVANCE WILL FOLLOW ANOTHER AVENUE OR VENUE FOR RESOLUTION.

SO IF THE QUESTION IS ARE WE GOING TO DEAL WITH THEM? NO.

MS. KISLING: OKAY. SO WHAT PART OF THE CHARGES IS THIS FALLING UNDER? I'M JUST ASKING.

MS. WALFOORT: AMELIA, HOW DOES THIS RELATE TO YOUR CHARGES?

MS. GAYTON: CHARGE 4, VIOLATION OF ARTICLE 21, SECTION 3, PARAGRAPH 4 AND CHARGE 2, VIOLATION OF ARTICLE 21, SECTION 3; CHARGE 6, VIOLATION OF ARTICLE 21, SECTION 3 PARAGRAPH 5.

MS. KISLING: THAT DOESN'T SPEAK TO AUGUST 17TH. I'M SORRY.

THE HEARING OFFICER: I THINK YOU POINTED OUT SEVERAL AREAS THAT IT DOES APPLY.

MS. GAYTON: YES.

THE HEARING OFFICER: SO GO AHEAD.

MS. GAYTON: THANK YOU. JUST FOR THE RECORD TO BE KNOWN, PATTI CURRY DOES HAVE A SPEECH PROBLEM. SO I WANT THAT TO BE KNOWN, THAT SHE'S NOT NERVOUS, THAT SHE DOES HAVE A SPEECH PROBLEM.

EXAMINATION

BY MS. GAYTON:

Q PATTI, HOW LONG HAVE YOU BEEN AT THE LOCAL?

A ALMOST 11 YEARS.
Q AND IF YOU CAN TELL US WHAT HAPPENED ON AUGUST 17TH, PLEASE?
A I WAS IN MY OFFICE, DOING MY WORK. AND I WOULD GUESS THAT IT WAS PROBABLY BETWEEN 2:00 AND 3:00 O'CLOCK IN THE AFTERNOON, SOMEWHERE AROUND THERE. AND THERE WAS A BIG COMMOTION OUT IN THE HALLWAY -- OR IN THE HALL, SORRY. AND I SAW SHARON COME OUT OF THE MEETING ROOM BEHIND PETER, YELLING AND SCREAMING AT HIM.
AND WHEN THEY GOT TO -- AND WHEN THEY GOT IN FRONT OF PETER'S OFFICE, SHE HAD HER FINGER IN PETER'S FACE AND THAT'S WHEN YOU GOT BETWEEN THEM TO SEPARATE THEM.
Q HAS SISTER KISLING DIRECTED YOU OR ANY OTHER STAFF IN AN APPROPRIATE MANNER?
MS. WALFOORT: SAY THAT AGAIN. I'M SORRY?
BY MS. GAYTON:
Q HAS SISTER KISLING DIRECTED YOU OR ANY OTHER STAFF IN AN APPROPRIATE MANNER -- INAPPROPRIATE?
MS. WALFOORT: CAN WE JUST STICK TO THIS WITNESS? IF SHE'S DIRECTED THIS WITNESS IN AN INAPPROPRIATE MANNER?
THE WITNESS: I FEEL THAT SHE HAS IN THE PAST. IN THE PAST ELECTIONS, STAFF HAS BEEN DIRECTED THAT WE'RE NOT TO HAVE ANYTHING TO DO WITH THE ELECTIONS, I MEAN, BECAUSE THAT'S A VIOLATION. AND WE CAN'T BE SEEN AS HELPING IN ANY WAY. AND THE ONLY RESPONSIBILITY THAT I HAVE AS FAR AS THE ELECTIONS IS HELPING TO VERIFY THE

MEMBER ELIGIBILITY.

AND THERE WERE MULTIPLE TIMES THAT I WAS ASKED TO HELP OUT THE ELECTION COMMITTEE. AND I DID STATE MULTIPLE TIMES THAT I WAS NOT REALLY SUPPOSED TO BE DOING ANYTHING WITH THE ELECTION COMMITTEE OTHER THAN VERIFYING THE ELIGIBILITY OF THE PEOPLE THAT WERE NOMINATED.

BY MS. GAYTON:

Q DO YOU RECALL WHAT HAPPENED ON AUGUST 18TH?

A I DO. WE WERE -- I CAME INTO WORK, AND WE WERE TOLD THAT THERE WAS GOING TO BE AN ALL STAFF MEETING WITH ALFREDO SERRANO AND CLARA THOMAS BECAUSE THEY WERE THE TRUSTEES CALLED ON THE DAY OF THE 17TH TO KIND OF TALK ABOUT THE EVENT OF THAT DAY.

AND IT WAS MADE FOR US TO BELIEVE THAT THE MEETING WAS SUPPOSED TO ALLEVIATE OUR CONCERNS AND, YOU KNOW, JUST TO GET OUR FEELINGS ABOUT THAT DAY. SO ALL OF US WERE IN THE BACK MEETING ROOM, AND ALFREDO AND CLARA BOTH CAME IN. CLARA CAME IN FIRST. AND THE FIRST WORDS THAT WE HEARD WAS, "OH, YOU ARE ALL FIRED, HA-HA, I'M JUST JOKING."

AND THAT KIND OF MADE US ALL FEEL LIKE, WOW, YOU KNOW. I MEAN, IT JUST PUT THE MEETING IN A DIFFERENT LIGHT. BECAUSE, YOU KNOW, IT AUTOMATICALLY PUT ALL OF US ON GUARD.

Q WHAT IMPACT DID THAT HAVE ON STAFF?

MS. WALFOORT: AMELIA, YOU'VE GOT A LOT OF STATEMENTS IN THE RECORD THAT HAVE MANY PEOPLE SPEAKING ON THE IMPACT IT'S HAD ON THEMSELVES. AND WE CAN READ

THAT. IF YOU CAN FOCUS YOUR WITNESS ON ANYTHING THAT'S NOT IN THOSE STATEMENTS, THAT WOULD BE MORE HELPFUL TO US.

MS. GAYTON: I'M DONE WITH PATTI.

THANK YOU, PATTI.

THE HEARING OFFICER: DO YOU HAVE ANY CROSS, SHARON?

MS. KISLING: YES.

EXAMINATION

BY MS. KISLING:

Q THE FIRST THING, IN REGARDS TO THE SITUATION WHICH OCCURRED ON AUGUST 7TH, HOW LONG WOULD YOU SAY YOU WERE AT THE HALL AFTER THE INCIDENT OCCURRED?

MS. WALFOORT: DID YOU SAY AUGUST 7TH?

BY MS. KISLING:

Q 17TH, I'M SORRY.

A I LEFT A LITTLE AFTER 5:00.

Q OKAY. WERE YOU ADVISED AT ANY TIME THAT IF YOU WERE UNCOMFORTABLE WITH THE SITUATION THAT YOU COULD LEAVE EARLY?

A I WAS. AND I DID STAY. BECAUSE I HAD SOME WORK TO TIE UP. I WAS RIGHT IN THE MIDDLE OF SOME THINGS.

Q SO DID CLARA THOMAS SPEAK WITH YOU, THE TRUSTEE, WHEN SHE CAME IN THE OFFICE?

A SHE SPOKE TO ME BRIEFLY AND ASKED IF I WAS OKAY. AND I SAID "YES." BUT I FELT THAT THINGS WERE OUT

OF CONTROL.
Q OKAY. BUT YOU TOLD HER YOU WERE OKAY. THAT'S WHY YOU WERE STILL THERE?
A YEAH.
Q OKAY. AFTERWARDS, DID YOU ATTEND THE BIRTHDAY PARTY FOR PETER NGUYEN?
A YES.
Q OKAY. NEXT, YOU TALKED ABOUT ADMIN SUPPORT TO THE ELECTION COMMITTEE. DO YOU KNOW IF THOSE THINGS -- WAS CHERIE AWARE THAT YOU WERE BEING TASKED WITH ADMINISTRATIVE SUPPORT TO THE ELECTION COMMITTEE?
A IT WAS BROUGHT -- WELL, IN MY REQUEST FROM YOU, YOU HAD MENTIONED A COUPLE OF TIMES THAT CHERIE KNEW ABOUT IT.
Q OKAY. SO PRIOR TO PETER NGUYEN ARRIVING, DID YOU SPECIFICALLY BRING CONCERNS TO ME ABOUT NOT FEELING YOU WERE ABLE TO GET YOUR JOB DONE BECAUSE OF OTHER TASKS BEING ASSIGNED BY DIFFERENT PEOPLE TO YOU?
A YES.
Q AND DID I SUPPORT YOU IN GETTING ASSISTANCE IN THOSE SITUATIONS?
A I'M NOT SURE I UNDERSTAND THE QUESTION EXACTLY.
Q SO DID YOU BRING CONCERNS TO ME IN REGARDS TO BEING PROVIDED WITH TASKS BY, LET'S SAY, AN EMPLOYEE MIKE PFARR?
A YES. MIKE PFARR DID ASK ME TO DO THINGS.
Q OKAY. NOW, DID YOU SEE -- I GUESS WHAT I'M TRYING TO GET TO IS WAS IT UNCOMMON WITH CHERIE'S

KNOWLEDGE FOR ME TO PROVIDE SUPPORT AND SUPERVISION WHEN IT CAME TO GETTING SOME THINGS DONE AS RELATED TO MEMBERSHIP NEEDS?

A I'M STILL NOT SURE WHAT SPECIFIC THING THAT YOU'RE ASKING.

Q WAS IT UNCOMMON FOR ME TO PROVIDE YOU OR OTHER STAFF SUPERVISION DIRECTION AROUND GETTING TASKS DONE TO MEET MEMBERSHIP NEEDS WITH CHERIE'S KNOWLEDGE?

A I'M NOT SURE IF CHERIE KNEW WHAT -- I MEAN, I'M NOT SURE WHAT YOU'RE TRYING TO ASK.

MS. WALFOORT: ARE YOU ASKING HER, DID YOU -- WAS IT A PRACTICE OF YOURS TO DIRECT STAFF AND CHERIE KNEW ABOUT THAT?

MS. KISLING: YES.

MS. WALFOORT: DID IT HAPPEN THAT SHE WOULD DIRECT STAFF AND CHERIE KNEW THAT SHE WAS DOING THAT?

THE WITNESS: I KNEW SHARON WAS DIRECTING STAFF, BUT I HAVE NO IDEA IF CHERIE KNEW.

MS. WALFOORT: THERE YOU GO.

BY MS. KISLING:

Q WAS SHE PRESENT IN THE HALL WHEN THESE THINGS HAPPENED?

A I DON'T RECALL EVERY INSTANCE THAT YOU ASKED US TO DO SOMETHING IF CHERIE WAS THERE. I DON'T KNOW.

THE HEARING OFFICER: ARE YOU THROUGH WITH YOUR QUESTIONS?

MS. KISLING: LET ME CHECK. BECAUSE I WANT TO MAKE SURE I COVER EVERYTHING THIS TIME.

BY MS. KISLING:

Q ONE MORE THING, WAS EVERYTHING THAT WAS ASKED OF YOU -- DID IT HAVE TO DO WITH SUPPORTING MEMBERSHIP NEEDS?

A YES, YEAH.

MS. KISLING: OKAY. THAT'S IT.

THE HEARING OFFICER: OKAY. DO YOU HAVE ANY REBUTTAL?

MS. GAYTON: NO.

THE HEARING OFFICER: ALL RIGHT. THANK YOU, PATTI.

WHO'S YOUR NEXT WITNESS, AND HAVE YOU LOOKED AT PRIORITIZING TO LOOK AT THOSE THAT YOU WANT TO PULL THINGS OUT?

MS. GAYTON: DEBBIE MILLER.

THE HEARING OFFICER: DEBBIE MILLER, OKAY.

ALL RIGHT. YOU WILL BE SWORN IN. AND AFTER THAT, PLEASE STATE YOUR NAME FOR THE RECORD AND SPELL BOTH YOUR FIRST AND LAST NAME.

DEBBIE MILLER,

THE DEPONENT HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, WAS DEPOSED AND TESTIFIED AS FOLLOWS:

MS. WALFOORT: AMELIA, LET ME REMIND YOU WE HAVE GOT HER STATEMENT. AND IF THERE IS SOMETHING YOU WANT TO EMPHASIZE, THAT WOULD BE GREAT.

THE HEARING OFFICER: CAN YOU STATE AND SPELL

YOUR NAME FOR THE RECORD?

THE WITNESS: MY NAME IS DEBBIE MILLER, D-E-B-B-I-E M-I-L-L-E-R.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. GAYTON:

Q DEBBIE MILLER, WHAT IS YOUR TITLE AT SEIU?

A I'M LEAD ORGANIZER AT LOCAL 1107.

Q THANK YOU. HOW DID SHARON'S ACTION ON AUGUST 17TH HURT THE STAFF?

A ON AUGUST 17TH, BETWEEN THE HOURS OF 3:00 AND 4:00 O'CLOCK, I HEARD A LOT OF YELLING. I WAS IN MY OFFICE. AND I STEPPED OUT BY MY DOOR. AND I SAW SHARON YELLING AT PETER NGUYEN. SHARON WAS STANDING IN PETER NGUYEN'S DOORWAY. AMELIA GAYTON WAS IN FRONT OF HER. AND PETER NGUYEN WAS IN FRONT OF AMELIA.

AND THERE WAS YELLING. SHARON TOLD HIM, "THIS IS MY UNION. YOU NEED TO LEAVE NOW. THE AUTHORITIES HAVE BEEN CALLED."

AND AT THAT TIME, A LOT OF STAFF MEMBERS HAD COME OUT OF THEIR OFFICE AND WERE PRETTY SHAKEN, INCLUDING MYSELF.

Q DO YOU REMEMBER REACHING OUT TO AN EXECUTIVE BOARD MEMBER TO HELP THE SITUATION THAT OCCURRED ON AUGUST 17TH?

A YES, I DO.

Q CAN YOU PLEASE TALK ABOUT THAT INCIDENT,

PLEASE?

A THE STAFF WERE VISIBLY SHAKEN. AND THERE WERE SOME THAT WERE CRYING. I PICKED UP MY CELL PHONE, AND CALLED CLARA THOMAS AND TOLD HER THAT THERE IS A SITUATION AT THE HALL AND EMPLOYEES HAD COME OUT OF THEIR OFFICES AND WERE STANDING IN THE DOOR. AND I WAS VERY SHAKEN.

MS. GAYTON: OKAY. I WAS THERE AS A WITNESS AS WELL ON THAT WHOLE INCIDENT. I'M TRYING TO GATHER MY THOUGHTS IN HOW TO APPROACH MS. MILLER, IF SHE HEARD THE CONVERSATION THAT WAS TAKING PLACE ON THE CELL PHONE, WHAT CLARA THOMAS WAS SAYING TO SISTER KISLING.

THE HEARING OFFICER: SO I'M JUST NOT -- SO WHAT I'M HEARING IS CLARA THOMAS AND SISTER KISLING WERE ON THE PHONE TOGETHER. AND I'M NOT SURE HOW DEBBIE MILLER COULD TESTIFY TO WHAT WAS BEING SAID UNLESS IT WAS ON A SPEAKER PHONE. I'M NOT SURE IF THAT'S POSSIBLE.

MS. GAYTON: WELL, IT WAS A VERY LOUD CONVERSATION THAT I HEARD. AND I GUESS I CAN ASK MY OTHER WITNESSES.

THE HEARING OFFICER: IF THERE IS SOMEBODY ELSE THAT WOULD HAVE HEARD IT, THAT WOULD BE GOOD.

MS. GAYTON: I'LL ASK DEBBIE IF SHE HEARD IT.

THE HEARING OFFICER: OKAY.

BY MS. GAYTON:

Q DID YOU HEAR THE CONVERSATION WHEN YOU HANDED OVER THE PHONE TO SISTER KISLING, WHAT WAS GOING ON?

A YES, I DID. THE CONVERSATION ACTUALLY HAPPENED

ON MY PHONE. BECAUSE I WALKED TOWARDS PETER NGUYEN'S OFFICE WITH MY PHONE AND HANDED THE PHONE -- IT WAS ON SPEAKER PHONE. AND THEN HANDED THE PHONE TO MS. KISLING AND HEARD PART OF THE CONVERSATION, TELLING MS. KISLING TO CALM DOWN, TO PLEASE CALM DOWN.

THE HEARING OFFICER: SO WHAT YOU HEARD IS WHAT YOU JUST SAID?

THE WITNESS: YES.

THE HEARING OFFICER: OKAY.

BY MS. GAYTON:

Q ARE YOU AWARE OF EMPLOYEES GRIEVANCES OR COMPLAINTS WHICH HAVE BEEN FILED AGAINST SISTER KISLING?

A YES. OUR STAFF UNION HAD FILED FOUR TO FIVE GRIEVANCES.

THE HEARING OFFICER: SO I'M GOING TO ASK YOU THOUGH, SO WE HAVE THAT IN YOUR CHARGES AND COPIES OF THE GRIEVANCES. SO WE DON'T NEED TO REHASH ALL OF THAT. THE TESTIMONY THAT I WANT YOU TO PULL OUT IS SPECIFIC TO YOUR CHARGES AND THE KNOWLEDGE THAT THIS PARTICULAR WITNESS HAS THAT MIGHT BE IN ADDITION TO WHAT WE ALREADY HAVE. OKAY.

BY MS. GAYTON:

Q HOW HAVE THE OPERATION AND CULTURE OF THE LOCAL CHANGED SINCE THE ARRIVAL OF PETER NGUYEN?

A WELL, I CAN TELL YOU, SINCE THE ARRIVAL OF PETER NGUYEN, THE LOCAL HAS MOVED IN A VERY POSITIVE WAY. SINCE MR. NGUYEN CAME ONBOARD, HE HAS BROUGHT ON SOME PROGRAMS, ONE BEING THE RETENTION CALLS THAT WE NOW DO TO

WELCOME NEW MEMBERS, WHICH IS VERY APPRECIATED BY OUR NEW MEMBERS.

WHEN YOU MAKE THESE CALLS, THE MEMBERS ARE SURPRISED AND HAPPY THAT SOMEBODY CALLED THEM TO SAY "WELCOME TO SEIU. AND IF THERE'S ANYTHING WE CAN DO, FEEL FREE TO CALL US." THAT'S ONE PROGRAM, A RETENTION PROGRAM.

THE SECOND PROGRAM MR. NGUYEN HAS BROUGHT ON IS A CONTINUOUS MONTHLY TRAINING THAT TAKES PLACE THE SECOND SATURDAY OF EVERY MONTH. AND IT'S "KNOW YOUR RIGHTS." WHAT MR. NGUYEN DOES IS WE AS FIELD ORGANIZERS COME BACK AND TELL HIM THE NEEDS OF DIFFERENT AREAS OF OUR LOCAL SUCH AS, FOR EXAMPLE, A LOT OF MEMBERS WANTING TO KNOW ABOUT JUST CAUSE. HOW DO YOU APPLY JUST CAUSE WHEN YOU ARE REPPING PEOPLE.

MR. NGUYEN TAKES THESE IDEAS AND THIS NEW TRAINING PROGRAM THAT HE HAS HAS BEEN A WIN-WIN FOR OUR MEMBERSHIP.

MS. GAYTON: OKAY.

THE HEARING OFFICER: DO YOU HAVE CROSS, SHARON?

MS. KISLING: YES.

EXAMINATION

BY MS. KISLING:

Q OKAY. YOU MENTIONED, KIND OF, THE DAY OF AUGUST 17TH. AND YOU TALKED ABOUT A STATEMENT ABOUT "THIS IS MY UNION." DO YOU KNOW WHAT THAT WAS IN

RESPONSE TO?

A I DON'T KNOW. I HEARD THOSE WORDS BEING SAID TO MR. NGUYEN WHEN I STEPPED OUT OF MY OFFICE.

Q AND YOU TALK ABOUT PETER NGUYEN AND THE EFFECT HE'S HAD ON THE LOCAL. SO WAS PRESIDENT MANCINI NOT TAKING US IN A POSITIVE DIRECTION PRIOR TO HIM COMING ON?

A PRESIDENT MANCINI AND MR. NGUYEN, TOGETHER WITH OUR TEAM, WE MEET TWO TO THREE TIMES A WEEK. AND MR. NGUYEN PRESENTS THE PROGRAMS THAT THE STAFF HAS GIVEN TO HIM AND GOES TO THE PRESIDENT FOR HER APPROVAL.

Q SO WERE YOU DOING THAT PRIOR TO HIM ARRIVING, IS WHAT I'M ASKING?

A NO. WE DID NOT DO IT UNDER THE PRIOR ADMINISTRATION.

MS. WALFOORT: SHARON, LET ME JUST REMIND YOU, PETER IS NOT BEING CHARGED WITH ANYTHING. SO WE UNDERSTAND YOU HAVE A DIFFERENCE OF OPINION --

MS. KISLING: NO. IT WAS BROUGHT UP.

MS. WALFOORT: I UNDERSTAND THAT. BUT WHAT I'M SAYING IS I DON'T THINK YOU REALLY NEED TO PURSUE IT. BECAUSE IT'S REALLY NOT PART OF OUR PROCEEDING HERE.

MS. KISLING: OKAY. IT TIES INTO THIS. AND YOU CAN TELL ME IF THIS IS NOT. BUT I FEEL LIKE IT --

BY MS. KISLING:

Q THE QUESTION IS, WAS IT UNCOMMON PRIOR TO PETER NGUYEN, FOR MYSELF -- FOR STAFF TO REACH OUT TO ME TO PROVIDE SUPERVISION AND DIRECTION AND TASK ASSIGNMENT?

A WAS IT UNCOMMON?

Q YES.
A I'M NOT SURE WHAT CONTEXT YOU ARE TALKING. I MEAN, ARE YOU TALKING ABOUT YOU COMING AND TELLING US OR ASKING US? IS THAT WHAT YOU ARE ASKING?
Q I'M ASKING, WAS IT UNCOMMON PRIOR TO PETER NGUYEN ARRIVING -- HAVE YOU EVER CALLED AND ASKED ABOUT, LET'S SAY, THE INCIDENT WITH CHRIS MUELLER? WERE YOU AWARE THAT STAFF REACHED OUT FOR ME TO COME AND ASSIST IN THAT SITUATION?
A NO.
Q OKAY. YOU WEREN'T AWARE THEY DID?
A NO.
Q OKAY. WERE YOU AWARE OF ANY TIME WHERE I PROVIDED -- DID I EVER PROVIDE DIRECTION TO YOU?
A NO.
MS. KISLING: OKAY. THEN WE'LL LEAVE IT THAT.
THE HEARING OFFICER: ANY REBUTTAL?
MS. GAYTON: NO.
THE HEARING OFFICER: THANK YOU, DEBBIE.
CHERIE MANCINI: I DON'T KNOW IF YOU WANT TO SEE THE ALLUDED MAGAZINE OR NOT.
THE HEARING OFFICER: WELL, DO YOU WANT TO PUT IT INTO EVIDENCE, CHERIE? I DON'T KNOW THAT IT'S NECESSARY.
CHERIE MANCINI: SURE. THAT'S FINE.
(DISCUSSION HELD OFF THE RECORD.)
THE HEARING OFFICER: WE'RE GOING BACK ON THE RECORD. SO WHAT I WANT TO ASK YOU, AMELIA, IS YOU'VE GOT

A NUMBER OF WITNESSES. YOU ALSO HAVE ONE YOU ARE NOT ABLE TO BRING IN TO HAVE YOUR CASE HEARD. SO I JUST WANT TO CHECK IN WITH YOU TO SEE WHAT IS -- TO MAKE SURE YOU GET EVERYTHING ON THE RECORD. I'M WORRIED ABOUT TIME A LITTLE BIT.

ARE YOU INTERESTED AT ALL IN YOU TESTIFYING TO WHAT YOU HEARD, EXPERIENCED AND SAW? BECAUSE YOU ALSO PRESENTED CHARGES. IT WOULD OPEN YOU UP TO CROSS-EXAMINATION. BUT IT'S ONE WAY TO ENSURE THAT IT GETS ON THE RECORD.

MS. GAYTON: YES, I DO.

THE HEARING OFFICER: SO YOU WOULD BE WILLING TO DO THAT?

MS. GAYTON: YES.

THE HEARING OFFICER: DO YOU FEEL LIKE THAT THEN WOULD REDUCE THE LIST OR MIGHT REMOVE A LOT OF THE FOLKS ALTOGETHER? WHAT DO YOU THINK? AND I WANT YOU TO DO WHAT YOU FEEL IS BEST TO PRESENT YOUR CASE.

I JUST WANT TO MAKE SURE YOU GET IT, KNOWING YOU ARE NOT ABLE TO GET THROUGH ONE WITNESS. I WANT TO MAKE SURE I'M FORMULATING A WAY TO DO IT. AND I THINK THAT MIGHT HELP.

MS. GAYTON: YES. BECAUSE I WAS THERE FROM THE BEGINNING ALL THE WAY TO THE END.

THE HEARING OFFICER: OKAY.

MS. GAYTON: AND I CAN CALL MY WITNESSES. BUT IT WILL BE SHORT. BECAUSE I CAN JUST -- I JUST HAVE -- I HAVE MY WITNESSES THAT I DO WANT THEM TO ANSWER -- THAT

ARE DIFFERENT STATEMENTS FROM WHAT I'M -- THAT HAS BEEN HEARD.

MS. WALFOORT: SO WHY DON'T WE START WITH TESTIMONY FROM YOU. AND THEN BETWEEN WHAT YOU HAVE BEEN ABLE TO PUT ON THE RECORD AND THE STATEMENTS WE HAVE GOT, YOU CAN THINK ABOUT WHAT ELSE NEEDS TO BE ADDED?

MS. GAYTON: YES.

THE HEARING OFFICER: AND YOU'VE BEEN SWORN IN ALREADY, AMELIA, IS THAT RIGHT?

MS. GAYTON: NO.

THE HEARING OFFICER: SO DO YOU WANT TO BE SWORN AND DO YOUR TESTIMONY THERE OR COME OVER HERE?

MS. GAYTON: I CAN DO IT HERE.

THE HEARING OFFICER: OKAY. GO AHEAD.

AMELIA GAYTON,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

MS. WALFOORT: SO YOU DON'T NEED TO ASK YOURSELF QUESTIONS. SO JUST --

THE HEARING OFFICER: SO JUST PRESENT AND SHARON WILL HAVE AN OPPORTUNITY TO CROSS.

(SIMULTANEOUS SPEAKERS.)

THE WITNESS: I DO HAVE MY STATEMENT.

MS. WALFOORT: YES, YOU DO, IN THE RECORD.

THE WITNESS: DID YOU WANT ME TO READ MY WHOLE STATEMENT?

THE HEARING OFFICER: NO.

THE WITNESS: NO? OKAY.

SO THE MORNING OF AUGUST 17TH, ACTUALLY IT WAS IN THE AFTERNOON, I WAS DOING SOME PHONE BANKING THERE AT THE LOCAL 1107 UNION HALL. I'M A CHIEF STEWARD FOR ST. ROSE SIENA HOSPITAL. I'VE BEEN A CHIEF STEWARD SINCE 2004. I'VE BEEN ELECTED AS AN OFFICER AS WELL. ON MY CONTRACT, I'M ABLE TO GO ON LOST TIME TO HELP THE HALL FOR ANY TYPE OF ASSISTANCE THAT'S NEEDED BECAUSE THEY HAVE A SKELETON CREW WORKING AT THE UNION HALL.

SO I GAVE UP MY TIME, NOT GOING TO WORK, BUT TO HELP OUT WITH THE UNION HALL. I WAS DOING SOME PHONE BANKING FOR UHS HOSPITAL FOR THEIR BARGAINING. I WAS ADDRESSED BY PETER NGUYEN, CAME UP TO ME AND SAID, "AMELIA, CAN I HAVE YOU AS A WITNESS?" AND I WAS LIKE, "SURE," YOU KNOW. I STOPPED WHAT I WAS DOING.

THERE WAS -- IN THE CONFERENCE ROOM, I BELIEVE IT'S B, THERE WAS SHARON KISLING ALONG WITH TWO OTHER STAFF PEOPLE, I BELIEVE. I DIDN'T REALLY GET TO KNOW THEM. I KNEW OF THEM, BUT DIDN'T KNOW WHAT THEIR ROLE WAS. SHARON WANTED TO HAVE A MEETING WITH PETER BECAUSE THERE WAS A WHOLE BUNCH OF ISSUES SHE WANTED TO ADDRESS TO PETER IN FRONT OF -- I BELIEVE HER NAME WAS MALESIA, AND I BELIEVE IT WAS JENNIFER.

BUT FROM WHAT MY UNDERSTANDING WAS, ONE OF THEM WAS INFORMED BY OUR PRESIDENT BY A LETTER SAYING THAT "YOU ARE NO LONGER NEEDED UNTIL FURTHER NOTICE." SO I COULDN'T UNDERSTAND WHY THESE TWO WERE THERE. I DON'T

KNOW REALLY WHO THEY WERE OR ANYTHING. SO WHEN I WENT INSIDE THE ROOM WITH PETER, SHARON WAS TALKING TO PETER ABOUT ALL THE CONCERNS OF THE COMPLAINTS SHE HAD, AND SHE WANTED THEM TO BE ADDRESSED IN FRONT OF THESE TWO INDIVIDUALS, WHICH I FELT THAT THAT WASN'T FAIR FOR PETER TO HAVE THESE TWO INDIVIDUALS IN HERE.

AND SHARON HAD STATED, "I NEED THEM TO WRITE OUT THE STATEMENT" OR WRITE OUT THE -- I GUESS THEY WERE HER PERSONAL ASSISTANTS. AND I SAID TO SISTER KISLING, "IS THIS APPROPRIATE? CAN THIS WAIT UNTIL OUR PRESIDENT GETS BACK FROM HER VACATION?" SHE SAID, "NO, THIS HAS TO BE ADDRESSED RIGHT NOW."

PETER DID NOT FEEL COMFORTABLE. HE HAD INSTRUCTED ONE OF THE EMPLOYEES THERE TO PLEASE GO MANDATE THE FRONT DESK. THIS EMPLOYEE, I BELIEVE HER NAME IS MALESIA, LOOKED AT SHARON. AND SHARON SAID, "NO, I WANT YOU TO STAY HERE. YOU ARE GOING TO TAKE NOTES."

AND I COULDN'T UNDERSTAND WHY. BECAUSE THERE WAS ANOTHER PERSON IN THE ROOM THAT COULD HAVE TAKEN NOTES. I DIDN'T EVEN KNOW WHO SHE WAS. SO AT THAT POINT, I COULD FEEL THE TENSION IN THAT ROOM. PETER WAS A LITTLE NERVOUS . I COULD FEEL SHARON'S WANTING TO HAVE THAT MEETING RIGHT THEN AND THERE. PETER FELT UNCOMFORTABLE.

AND I SAID, "YOU KNOW WHAT, THIS IS NOT APPROPRIATE, SHARON. THIS CAN WAIT. THIS CAN WAIT UNTIL OUR PRESIDENT GETS BACK FROM HER VACATION." SHE WAS SO UPSET BECAUSE SHE WANTED THE MEETING RIGHT NOW. PETER

GOT UP, WENT OUT THROUGH THE DOOR TO EXCUSE HIMSELF. BECAUSE HE WAS NOT GOING TO HAVE THIS MEETING WITH THESE INDIVIDUALS IN THE ROOM. SHARON GETS UP, FOLLOWS RIGHT BEHIND PETER. I GET UP, FOLLOW RIGHT BEHIND SHARON.

PETER WENT TO HIS OFFICE TO STAY AWAY FROM SHARON. SHARON WAS FOLLOWING RIGHT BEHIND HIM. PETER DIDN'T KNOW THAT SHARON WAS FOLLOWING RIGHT BEHIND HIM. PETER HAD CLOSED THE DOOR. SHARON WAS UPSET, WAS RIGHT BEHIND HIM, PUT HER BODY AGAINST THE DOOR, SCREAMING, "YOU'RE NOT GOING TO SLAM THE DOOR IN MY FACE."

AT THAT POINT, I SAID, "SHARON, YOU NEED TO STEP AWAY. GIVE PETER HIS OWN SPACE." AND I EVEN HAD TO GO IN BETWEEN PETER BEHIND ME AND SHARON AND WENT LIKE THIS TO SHARON TO STOP (INDICATING). SHE WAS SO IRATE, SHE HAD ONE OF THE -- MALESIA OR ONE OF HER ASSISTANCE CALL METRO.

MS. WALFOORT: AND WHAT IS METRO?

MS. GAYTON: THE POLICE OFFICERS.

I SAID, "WHY ARE YOU CALLING THE OFFICERS? WHY ARE YOU CALLING THE POLICE?" BECAUSE SHE WANTED HIM ESCORTED OUT OF THE BUILDING. SHE DIDN'T WANT HIM THERE, PERIOD. AND I SAID, "WE CAN WAIT UNTIL OUR PRESIDENT GETS BACK."

SHE SAID, "IT'S ALREADY BEEN DONE. THE POLICE ARE ON THEIR WAY. I WANT HIM OUT." SHE THEN PROCEEDS TO GO INSIDE PETER'S OFFICE, WANTS TO GRAB A CELL PHONE, A LAPTOP, AND I SAID, "NO, DO NOT TOUCH HIS PERSONAL BELONGINGS." SHE THEN INDICATED, "THIS IS SEIU'S

PROPERTY." I SAID, "NO, WE DON'T KNOW THAT. YOU CALLED THE POLICE. THEY'RE ON THEIR WAY. LET THEM HANDLE THIS MATTER."

AT THAT POINT, SHE WAS SO IRATE. SHE WAS LIKE, "NO, WE DIDN'T CALL THE POLICE. YOU GUYS DID." I SAID, "NO."

THE HEARING OFFICER: AMELIA, A LOT OF THAT, YOU HAVE IN YOUR CHARGES WITH YOUR STATEMENT. AND I HEAR THE EMOTION IN WHAT HAPPENED. SO THE QUESTION I HAVE, DO YOU KNOW, WAS THERE A TRIGGERING EVENT THAT CAUSED THINGS TO HAPPEN IN THAT WAY? I WOULD BE INTERESTED IN WHAT WAS IT THAT STARTED THIS?

THE WITNESS: BECAUSE PETER WOULD NOT MEET WITH HER REGARDING THE ACCUSATIONS SHE RECEIVED, COMPLAINTS THAT SHE WANTED TO LAY DOWN WITH PETER WITH EVERY ACCUSATION. AND BECAUSE PETER DIDN'T WANT TO MEET WITH HER, SHE GOT IRATE AND CALLED THE POLICE. YOU DON'T CALL THE POLICE BECAUSE YOU WON'T MEET WITH SOMEBODY.

THE HEARING OFFICER: SO I HEAR THAT. BUT I THINK THAT'S ALSO IN YOUR STATEMENT.

THE WITNESS: YES.

THE HEARING OFFICER: MY QUESTION IS, WHAT DO YOU KNOW OF A NEW EVENT? LIKE, SO THERE WAS COMPLAINTS. WERE THOSE COMPLAINTS BROUGHT ON EVENTS THAT HAPPENED THAT PARTICULAR DAY? DO YOU KNOW?

MS. GAYTON: YES.

THE HEARING OFFICER: AND THAT SHE WAS RESPONDING TO THOSE? AND IF SO, WHAT WERE THE COMPLAINTS

THAT CAME THAT DAY?

THE WITNESS: THAT DAY? THE STAFF MEMBERS CAME OUT. BECAUSE IT WAS LOUD. IT'S A BIG OPEN UNION HALL. THE STAFF HEARD THE COMMOTION.

THE HEARING OFFICER: I ASKED A DIFFERENT QUESTION. SO BEFORE THE EVENTS TRANSPIRED, DO YOU KNOW WHAT HAPPENED THAT SHARON WANTED TO MEET WITH PETER? WHAT WAS THE EVENT THAT HAPPENED THAT DAY? OR WAS THERE SOMETHING THAT HAPPENED THAT YOU KNEW OF THAT WOULD RESULT IN NEEDING AN IMMEDIATE MEETING?

THE WITNESS: NO. BECAUSE I WAS BUSY DOING MY PHONE BUSINESS.

THE HEARING OFFICER: SO YOU DON'T KNOW THAT?

THE WITNESS: NO. WHEN PETER ASKED ME TO COME IN AS A WITNESS, I WITNESSED A WHOLE BUNCH OF STUFF THAT WAS GOING ON FROM SHARON KISLING, HOW SHE WAS SO -- SHE WAS OUT OF CONTROL.

THE HEARING OFFICER: OKAY. AND I THINK I'VE GOT THAT. YOU PUT THAT IN YOUR STATEMENT. SO I HAVE THAT TO LOOK AT. JUST HANG ON ONE SECOND.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO THE ONLY FOLLOW-UP QUESTION IS HAVE YOU EVER BEEN WITNESS TO THAT TYPE OF BEHAVIOR BY SHARON KISLING TO ANYONE ELSE PRIOR TO THAT DAY OR SINCE THAT DAY?

THE WITNESS: NO.

THE HEARING OFFICER: OKAY. ALL RIGHT. AND DO YOU HAVE ANYTHING NEW IN ADDITION TO YOUR STATEMENT AND

THE DOCUMENTATION YOU HAVE THAT YOU WANT TO ENTER INTO THE RECORD?

THE WITNESS: ANYTHING NEW AS FAR AS THE E-BOARD, THE EMERGENCY E-BOARD MEETING?

THE HEARING OFFICER: WE HAVE HEARD ABOUT THAT THROUGH TESTIMONY YESTERDAY AND EARLIER TODAY. SO DO YOU HAVE SOMETHING NEW THAT WE HAVEN'T HEARD YET?

THE WITNESS: LET ME CHECK AND SEE.

I DO HAVE A WITNESS THAT DOES STATE THAT SHE FELT LIKE SHARON WAS GOING TO PHYSICALLY HARM PETER, IF I CAN HAVE THAT WITNESS SPEAK THAT MATTER.

THE HEARING OFFICER: WE NEED TO WRAP THIS UP FIRST. SO IF YOU DON'T HAVE ANYTHING NEW TO ENTER FOR YOURSELF, I'LL ALLOW SHARON AN OPPORTUNITY TO CROSS.

THE WITNESS: I DO HAVE SOMETHING NEW TO ENTER. IT'S MY STATEMENT. OKAY. I DON'T KNOW -- I'VE NEVER WORKED WITH SHARON KISLING. I DON'T KNOW ANYTHING ABOUT HER. I TOOK A BUSINESS CARD OF WHO TO VOTE FOR FOR VICE PRESIDENT, FOR PRESIDENT, FOR TRUSTEE. AND I TOOK THAT FROM MY PRESIDENT, CHERIE MANCINI, WHO I'VE BEEN KNOWING SINCE 2003, WHO TO RUN AGAINST, YOU KNOW, WHO TO HAVE AS HER VICE PRESIDENT.

AND I TOOK THIS AND TOOK IT TO ALL OF MY SHOPS AT ALL THREE CAMPUSES AT ST. ROSE TO HAVE MEMBERS VOTE FOR SHARON KISLING. AND I JUST TOOK THE WORD OF THE PRESIDENT BECAUSE SHE MAKES GOOD DECISIONS. AND I REGRET IT. I REGRET IT. BECAUSE I WISH I HAD NEVER.

THE HEARING OFFICER: I HEAR WHAT YOU'RE

SAYING. DO YOU HAVE ANYTHING ELSE TO ENTER?

THE WITNESS: AND MY MEMBERS REGRET IT TOO.

THE HEARING OFFICER: OKAY. SO I'M GOING TO ALLOW SHARON TO RECROSS -- OR CROSS, SORRY.

MS. KISLING: OKAY. WITH THAT SAID, CHARGING PARTY EXHIBIT 2, AM I ABLE TO USE THAT IN THIS ONE?

MS. WALFOORT: CHARGING PARTY 2 IN THIS CHARGE?

MS. KISLING: NO. FROM ANOTHER ONE. BECAUSE IT SPEAKS TO -- BECAUSE I DIDN'T KNOW SHE WAS GOING TO BE ABLE TO PROVIDE TESTIMONY. BUT THERE ARE MINUTES AS SHE SPOKE TO OF TWO DIFFERENT INDIVIDUALS THAT TOOK MINUTES DURING THAT MEETING.

MS. WALFOORT: WELL, IF THEY'RE IN THE RECORD, DO YOU HAVE TO ASK HER ABOUT THEM? CAN YOU JUST TELL US WHERE IT IS, AND WE CAN READ THEM? BECAUSE YOU ARE SAYING TWO OTHER PEOPLE, RIGHT?

MS. KISLING: YES. AND THERE IS AN AUDIO RECORDING. BUT I WAS NOT PREPARED, SO I DON'T HAVE COPIES.

THE HEARING OFFICER: SO SHARON IS REFERRING TO CHARGE 2, CHARGING PARTY EXHIBIT NUMBER 2; IS THAT CORRECT?

MS. KISLING: YES. IT'S JUST -- LET ME SEE. MAYBE I CAN DO IT BETTER. IT'S 10 PAGES IN, BASICALLY, "MEETING WITH PETER 3:30, 8/17."

THE HEARING OFFICER: IS IT WITHIN EXHIBIT 2? SO THE SECOND YELLOW? OKAY. AND THE 10TH PAGE IN FROM THERE?

MS. KISLING: OR FROM THE BACK REALLY. BUT IT'S NOTED "8/17 MEETING WITH PETER."

MS. GAYTON: DOES PETER KNOW HE WAS BEING RECORDED IN THOSE MINUTES?

MS. WALFOORT: I DON'T THINK THAT WE'RE GOING TO GO INTO THAT. LET'S SEE WHERE THIS IS GOING.

THE WITNESS: AND ALSO, CAN WE GET PETER ON FACETIME IN THIS HEARING? HIS TESTIMONY IS IMPORTANT.

THE HEARING OFFICER: BECAUSE OF OTHER DYNAMICS THAT ARE HAPPENING THOUGH, WE'VE GOT LEGAL ADVICE ON HOW TO PROCEED. THAT'S WHY I WANTED TO GIVE YOU AN OPPORTUNITY TO MAKE SURE THAT YOU WERE ABLE TO GET EVERYTHING IN FROM CHARGES YOU HAD.

CHERIE MANCINI: THAT'S ON THE RECORD, THAT HE CAN'T PARTICIPATE VIA FACE TIME, CORRECT?

THE HEARING OFFICER: YES, IT IS. I OPENED UP THE HEARING WITH THAT.

CHERIE MANCINI: WELL, WE TALKED ABOUT HIM COMING INTO THE ROOM. WE DIDN'T ASK ABOUT FACETIME.

(SIMULTANEOUS SPEAKER.)

THE HEARING OFFICER: SO YOU ARE ON -- WHAT PAGE ARE YOU ON, SHARON?

MS. KISLING: I'M JUST CONFUSED. BECAUSE THERE IS A QUESTION ABOUT THE RECORDING. SO MY QUESTION IS IF THE RECORD SUPPORTS WHAT IS BEING STATED, WHAT WOULD BE THE PROBLEM?

MS. WALFOORT: YOU DON'T HAVE THE RECORDING.

MS. KISLING: I DO.

MS. WALFOORT: HERE?

MS. KISLING: YES.

THE WITNESS: ALSO, I HAVE A RECORDING OF HER BEING IRATE. CAN I BRING THAT INTO EVIDENCE AS WELL?

THE HEARING OFFICER: SO I FEEL LIKE WE HAVE GOT THAT IN DOCUMENTED STATEMENTS ALREADY. I'M NOT SURE THAT THAT GIVES US ANYTHING NEW FROM ANYONE. SO IF THERE IS STATEMENTS IN HERE, WE'LL TAKE IT INTO ACCOUNT BASED ON EVIDENCE THAT'S SUBMITTED FOR THE VALUE IT BRINGS TO THE CASE AS WE LOOK THROUGH THIS.

THE WITNESS: I WOULD ALSO LIKE TO PUT -- SOMETHING JUST POPPED IN MY HEAD. WHEN DEBBIE MILLER GAVE HER PHONE TO SHARON KISLING, I DID HEAR THE CONVERSATION THAT WAS TAKING PLACE BETWEEN CLARA THOMAS AND CHERIE KISLING BECAUSE IT WAS LOUD, AND I WAS STANDING RIGHT THERE. CLARA THOMAS HAD TO TELL SHARON KISLING, "REMEMBER, YOU NEED TO CALM DOWN. THE POLICE ARE ON THE WAY." SHE WAS COACHING HER HOW TO BEHAVE WHEN THE OFFICER ARRIVES.

THE HEARING OFFICER: AMELIA, I HEAR WHAT YOU ARE SAYING. BUT FEEL LIKE I'VE HEARD THAT AND READ ABOUT THAT ALREADY. SO I'M NOT SURE THAT WE NEED IT TO COME IN AGAIN. THIS WILL ALL BE INFORMATION AND EVIDENCE THAT I LOOK INTO AS I'M MAKING A RECOMMENDATION TO MARY KAY, PRESIDENT HENRY.

MS. KISLING: THIS IS THE LAST ONE. I WANT TO MAKE NOTE. I'M NOT SURE HOW THIS WORKS IN TERMS OF OVERLAPPING EVIDENCE IN ONE CHARGE. YOU UNDERSTAND WHAT

I'M SAYING? HOW IT WOULD BE ENTERED IN. BUT THESE ARE THE NOTES TAKEN.

THE HEARING OFFICER: AND THESE ARE THE HANDWRITTEN DOCUMENTS?

MS. KISLING: YES. SO THEY WERE TURNED IN RIGHT AFTER THE INCIDENT. THEY WERE GATHERED AND TURNED IN.

THE HEARING OFFICER: I'LL TAKE A LOOK AT THOSE.

THE WITNESS: AND ARE THESE NOTES OR A TRANSCRIPT?

THE HEARING OFFICER: THEY'RE NOTES, HANDWRITTEN NOTES. AND YOU HAVE THAT IN YOUR DOCUMENT.

THE WITNESS: IS THERE AN EXHIBIT NUMBER?

THE HEARING OFFICER: IT'S THE END OF -- SO GO TO THE YELLOW PAGE MARKED EXHIBIT 2, AND IT'S PROBABLY ABOUT THE LAST 10 PAGES OF IT. IT'S A PRETTY DECENT CHUNK.

DO YOU HAVE ANY QUESTIONS TO CROSS BASED ON WHAT YOU HEARD IN AMELIA'S TESTIMONY?

THE WITNESS: I DO.

MS. WALFOORT: WAIT. SHE GETS A CHANCE.

THE HEARING OFFICER: SHE GETS A CHANCE TO DO A REBUTTAL NOW. WE'RE JUST STARTING THIS.

MS. KISLING: I THINK I'LL LET THE RECORD, WHATEVER I'VE ENTERED AND WITH EVERYTHING ELSE, SPEAK FOR ITSELF.

THE HEARING OFFICER: OKAY. AND DO YOU HAVE

REBUTTAL?

THE WITNESS: YES.

MS. WALFOORT: WAIT A MINUTE. WHAT IS SHE REBUTTING? SHE'S NOT ASKING ABOUT -- YOU WOULD HAVE TO ASK ABOUT WHAT SHE ASKED ABOUT, AND SHE'S NOT ASKING ANYTHING.

THE WITNESS: CAN I MAKE A STATEMENT?

MS. WALFOORT: YOU WILL GET A CHANCE TO CLOSE WHERE YOU GET TO MAKE A STATEMENT. CAN YOU HOLD IT?

CHERIE MANCINI: WRITE IT DOWN, AMELIA.

THE WITNESS: OKAY, THANK YOU.

THE HEARING OFFICER: AND YOU SAID YOU HAVE ANOTHER WITNESS THAT YOU NEED TO PULL, YOU WANT TO GET TESTIMONY FROM?

MS. GAYTON: YES, ANDREA BOND.

THE HEARING OFFICER: DO YOU KNOW HOW MANY QUESTIONS YOU WILL HAVE FOR ANDREA? I'M JUST TRYING TO FIGURE OUT WHAT --

MS. GAYTON: YOU WANT A QUESTION THAT I HAVEN'T ASKED THE OTHERS, RIGHT?

THE HEARING OFFICER: YES. THAT'S WHAT I WANT YOU TO DO, YES. MY QUESTION IS, DO YOU KNOW HOW MANY QUESTIONS YOU HAVE OR HOW LONG IT WILL TAKE? I'M TRYING TO FIGURE OUT WHERE WE ARE ON THIS PARTICULAR CHARGE AND THEN HOW MANY MORE WITNESSES YOU HAVE, IF YOU HAVE AN IDEA. BECAUSE WE'RE AT 20 TO 5:00 RIGHT NOW.

MS. GAYTON: I'LL JUST ASK HER TWO QUESTIONS.

MS. WALFOORT: AND I THINK YOU SAID YOU WANT

THIS ONE MORE WITNESS, IS WHAT YOU NEED?

THE HEARING OFFICER: ALL RIGHT. IS THIS IT? OR DO YOU HAVE MORE WITNESS YOU WANT TO CALL?

MS. GAYTON: I HAVE ANOTHER ONE. I ALSO WANTED TO MAKE SURE WE GET INTO THE EXECUTIVE EMERGENCY E-BOARD MEETING. BECAUSE I HAVE THREE WITNESSES ON THAT ONE AS WELL.

THE HEARING OFFICER: SO WE HAVE HEARD A LOT ABOUT THAT ALREADY FROM A NUMBER OF PEOPLE IS IT SOMETHING NEW? BECAUSE WE HAVE INFORMATION WITHIN YOUR CHARGE AND EVIDENCE AND TESTIMONY THAT'S ALREADY COME IN. SO IS IT SOMETHING NEW?

MS. GAYTON: WELL, THESE ARE DIRECT MEMBERS OF THE E-BOARD.

THE HEARING OFFICER: MEMBERS THAT WERE ATTENDING THE BOARD MEETING?

MS. GAYTON: YES.

MS. WALFOORT: AND MAKE SURE THEY HAVE SOMETHING THAT WE CAN'T ALREADY GET FROM WITHIN THE EVIDENCE.

THE HEARING OFFICER: HI, ANDREA. YOU ARE GOING TO BE SWORN IN. AND THEN STATE YOUR NAME FOR THE RECORD. AND THEN AFTER YOU'RE SWORN IN, STATE AND SPELL YOUR FIRST AND LAST NAME.

ANDREA BOND,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: ANDREA BOND, A-N-D-R-E-A B-O-N-D.

THE HEARING OFFICER: GO AHEAD.

MS. GAYTON: OKAY. SO MY WITNESS HERE, SHE WAS AT THE HALL.

THE HEARING OFFICER: YOU HAVE TO ASK HER QUESTIONS.

EXAMINATION

BY MS. GAYTON:

Q DID YOU WORK IN THE HALL ON AUGUST THE 17TH, 2016?

A I DID. IT WAS MY SECOND DAY OF EMPLOYMENT.

Q SO WERE YOU THERE WHEN THE INCIDENT WITH SHARON AND PETER TOOK PLACE?

A YES, I WAS.

Q AND DID YOU SUBMIT A STATEMENT CONCERNING WHAT YOU WITNESSED ON THE 17TH?

A I DID. BUT THE PACKET THAT I RECEIVED THAT HAS EVERYONE'S STATEMENTS ONLY HAS ONE PAGE OF MINE, SO I BROUGHT EXTRA COPIES IN CASE YOU DON'T HAVE MY ENTIRE STATEMENT.

MS. GAYTON: IS SHE ALLOWED TO READ HER STATEMENT?

MS. WALFOORT: NO. BECAUSE WE CAN READ IT.

THE HEARING OFFICER: BUT WE'RE GOING TO CHECK TO BE SURE IT'S COMPLETE.

MS. GAYTON: THANK YOU.

THE WITNESS: I'M PRETTY SURE YOU ONLY HAVE ONE PAGE OF MY STATEMENT.

THE HEARING OFFICER: I'M NOT FINDING IT AT ALL.

THE WITNESS: CAN I SUBMIT IT TO YOU NOW, IF THAT'S EASIER?

THE HEARING OFFICER: HOLD ON.

MS. WALFOORT: OKAY. I'VE GOT YOUR STATEMENT. I'VE GOT TWO PAGES. IT STARTS WITH "STATEMENT REGARDING 8/17/2016 SEIU INCIDENT."

THE HEARING OFFICER: OH, YEAH.

MS. WALFOORT: AND IT ENDS WITH -- IS IT SUPPOSED TO BE THREE PAGES?

THE WITNESS: YES, MA'AM. THE PACKET I HAD ONLY HAD ONE PAGE IN IT.

MS. WALFOORT: IS THE THIRD PAGE A FORWARDED E-MAIL FROM MALESIA BRITT-WILLIAMS?

THE WITNESS: IT IS.

THE HEARING OFFICER: IT'S CHARGE 3, CHARGING PARTY EXHIBIT 1.

MS. WALFOORT: I THINK WE HAVE GOT THREE PAGES, INCLUDING THAT SNIPPET ON THE THIRD PAGE.

THE WITNESS: OKAY.

MS. WALFOORT: SO WE HAVE GOT HER STATEMENT. AND YOU SHOULD PULL OUT ANYTHING YOU THINK IS ADDITIONAL OR NEW.

BY MS. GAYTON:

Q DID YOU THINK THAT SHARON KISLING WAS GOING TO

PHYSICALLY HARM PETER?

A NOT ONLY DID I THINK SHE WAS GOING TO HARM PETER, BUT I THOUGHT SHE WAS GOING TO HARM YOU. BECAUSE YOU WERE TRYING TO STOP HER. AND YOU WERE STANDING IN BETWEEN SHE AND PETER. SHE WAS OUT OF CONTROL. AND IT WENT ON FOR HOURS.

Q DID IT SEEM THAT SHARON KISLING HAD PREMEDITATED THIS DRAMATIC EVENT?

A YES. BECAUSE AS SOON AS SHE CAME OUT OF CONFERENCE ROOM WHERE SHE AND PETER -- I DON'T KNOW WHO WAS IN THE ORIGINAL MEETING. BUT THAT WAS THE FIRST TIME I HEARD THE NOISE IN THE MIDDLE OF THE HALL.

WHEN SHE CAME OUT, ONE OF THE FIRST THINGS I HEARD HER SAY WAS, "I'VE ALREADY CONTACTED THE E-BOARD. I'VE ALREADY CONTACTED THE URBAN LAW FIRM. I KNOW WHAT I CAN DO, AND I'M DOING IT." AND SHE LOOKED AT PETER AND SAID, "YOUR PHONE, YOUR LAPTOP, WE'RE DONE, THIS IS OVER." AND CONSISTENTLY REPEATED IT.

AND THEN SHE PROCEEDED TO PARADE AROUND THE MIDDLE OF THE HALL. PETER WENT INTO ANOTHER ROOM AND TRIED TO SHUT THE DOOR. WHEN SHARON REALIZED THAT PETER WAS NOT FOLLOWING HER, SHE TURNED AROUND AND WENT BACK AND LODGED HERSELF IN THE DOOR, BANGING ON THE DOOR. AND AMELIA STEPPED IN AND SAID, "STOP, THIS LOOKS BAD. YOU'RE BEING UNPROFESSIONAL. THIS LOOKS REALLY BAD. YOU NEED TO STOP."

AND SHE KEPT PUSHING. FINALLY, PETER RELEASED THE DOOR. WHEN PETER RELEASED THE DOOR, HE STARTED

VIDEOING HER. AND SHE SAID, "I DON'T GIVE YOU PERMISSION TO VIDEO ME," AND SHE TONED HER VOICE DOWN DRAMATICALLY.

THE HEARING OFFICER: AND WE ALREADY HAVE THAT PART OF IT IN THE STATEMENT.

BY MS. GAYTON:

Q DID THE TRUSTEES OF THE BOARD ADDRESS THE STAFF AFTER THIS INCIDENT?

A THEY DID. CLARA THOMAS AND ALFREDO CAME IN THE NEXT DAY AND CALLED A MEETING. CLARA WALKED INTO THE MEETING AND THE FIRST THING SHE SAID WAS, "YOU ARE ALL FIRED," AND THEN PROCEEDED -- BASICALLY, THE MEETING WAS HELD TO TELL US TO STAY OUT OF OUT OF IT, LET MANAGEMENT HANDLE IT.

AND THERE WAS ADDITIONAL COMMENTS MADE LIKE, "BUT IF THERE IS ANYTHING ELSE GOING ON THAT WE DON'T KNOW ABOUT, COME TALK TO US." NOT LONG AFTER THAT, THERE HAS BEEN SLANDEROUS E-MAILS, PUBLICLY, INCLUDING MULTIPLE PEOPLE ON EACH E-MAIL, INCLUDING AN E-MAIL FROM CLARA STATING THAT STAFF WAS INCOMPETENT.

Q AND WERE YOU PRESENT ON SEPTEMBER 28, 2016, WHEN SHARON WAS SERVED?

A I WAS.

Q CAN YOU DESCRIBE WHAT HAPPENED THAT DAY, PLEASE?

A YEAH. THEY WERE IN A MEETING. IT WAS SHARON AND SOME OTHER PEOPLE IN OUR CONFERENCE ROOM. THE PROCESS SERVER WALKED INTO THE MEETING AND SERVED HER. IT TOOK ALMOST AN HOUR FOR HER TO LEAVE. AS SOON AS SHE

WAS SERVED, MARY GRILLO STEPPED OUT OF THE ROOM. SHE WENT TOWARD PETER'S OFFICE AND STARTED YELLING THAT PETER NEEDED TO LEAVE.

CHERIE PULLED MARY ASIDE AND KIND OF CALMED HER DOWN. AND GOING FROM THERE, THERE WAS SOME OTHER CONVERSATIONS THAT WERE HEATED IN THE MIDDLE OF THE HALL. I WAS CALLED OUT OF MY OFFICE ON BUSINESS. AND THEN I WAS TOLD TO GO BACK INTO MY OFFICE AND BASICALLY STAY OUT OF IT.

SO, YEAH, IT WAS ANOTHER DRAMATIC EVENT. IT TOOK SHARON AN HOUR TO LEAVE AFTER SHE WAS SERVED.

Q AND ARE YOU AWARE OF SHARON'S DISCIPLINE DOCUMENT THAT SHARON RECEIVED FROM THE COUNTY?

MS. KISLING: EXCUSE ME?

MS. GAYTON: THIS IS SOMETHING DIFFERENT.

MS. KISLING: OKAY, NO.

MS. WALFOORT: I DIDN'T HEAR THE QUESTION. I'M SORRY.

MS. KISLING: SHE'S ASKING ABOUT DISCIPLINE DOCUMENTS.

THE HEARING OFFICER: LET HER ASK. AND YOU'LL HAVE AN OPPORTUNITY TO RECROSS. LET ME CLARIFY MAYBE IF POSSIBLE.

MS. GAYTON: I'LL STRIKE THAT ONE.

I DON'T HAVE ANY FURTHER QUESTIONS.

THE HEARING OFFICER: OKAY. DO YOU WANT TO -- DO YOU HAVE CROSS?

EXAMINATION

BY MS. KISLING:

Q OKAY. SO YOU'VE DESCRIBED -- I'M GOING TO GO BACKWARDS FORWARD. SO YOU DESCRIBED THE EVENT -- I BELIEVE IT WAS JUST A RECENT EVENT A FEW WEEKS AGO WHERE THE PROCESS SERVER CAME IN. AND YOU SAID "IT TOOK AN HOUR FOR SHARON TO LEAVE, AND IT WAS ANOTHER DRAMATIC EVENT." WOULD YOU SAY THAT WAS KIND OF EQUIVALENT TO THE EVENT THAT OCCURRED ON AUGUST 17TH?

A NO. BECAUSE ONCE YOU WERE SERVED, THE PEOPLE YOU WERE HAVING THE MEETING WITH CAME OUT AND STARTED SCREAMING AT CHERIE TO THE EXTENT I HAD TO CALL THE POLICE. AND IT WAS A THREAT OF CALLING THE POLICE ON PETER BECAUSE HE WOULDN'T LEAVE, EVEN THE THOUGH THE TPO WAS AGAINST YOU, HE WAS BEING ASKED TO LEAVE.

AND AT THAT POINT, I TOLD CHERIE, OUR PRESENT, "DON'T WORRY, THE POLICE ARE ALREADY ON THEIR WAY. I ALREADY FELT THE NEED TO CALL." SHE ASKED ME -- YOU HAD LEFT AT THAT POINT. SO THEN SHE ASKED ME TO RESCIND THAT CALL, WHICH I DID.

Q BUT DID YOU FEEL IN FEAR THE SAME WAY YOU DID ON AUGUST 17TH?

A YES, I DID.

Q OKAY.

MS. KISLING: THAT'S IT.

THE HEARING OFFICER: OKAY. DO YOU HAVE ANY REBUTTAL?

MS. GAYTON: NO. SUSAN SMITH.

MS. WALFOORT: DOES THIS REALLY ADD SOMETHING? BECAUSE I'VE GOT A VERY GOOD SENSE OF WHAT HAPPENED THAT DAY.

MS. GAYTON: IT'S SOMETHING NEW. I MEAN, IT'S NOTHING THAT WAS DISCUSSED. IT'S JUST -- DO YOU WANT ME TO READ THE STATEMENT?

MS. WALFOORT: NO. BUT CAN YOU SAY IN ONE SENTENCE WHAT IS IT THIS WITNESS IS GOING TO DO?

MS. GAYTON: FALSE STATEMENTS THAT SHE HEARD FROM SHARON -- MAKING ABOUT PETER NGUYEN ON THAT DAY ON AUGUST THE 17TH.

THE HEARING OFFICER: WAS IT WHILE THE EVENT WAS TRANSPIRING?

MS. GAYTON: YES.

THE HEARING OFFICER: AND DOES SHE ALREADY HAVE A STATEMENT FOR THE RECORD WITHIN YOUR COMPLAINTS?

MS. GAYTON: YES.

THE HEARING OFFICER: IS IT WITHIN THAT STATEMENT? LET'S LOOK AND SEE. IN LOOKING AT THAT, I THINK THE STATEMENT YOU HAVE COVERS IT. SO WE WILL TAKE THAT INTO CONSIDERATION AS PART OF THE EVIDENCE WITHIN THIS.

MS. GAYTON: OKAY.

THE HEARING OFFICER: I'M NOT SURE IT ADDS ANYTHING THAT WE NEED. BECAUSE WE HAVE HEARD SO MUCH ALREADY. AND WE HAVE GOT THE DOCUMENTS YOU INCLUDED IN YOUR CHARGES.

MS. WALFOORT: AND, AGAIN, COULD YOU TELL US

WHAT IT IS YOUR WANT YOUR WITNESSES TO DO WITHIN THAT EXECUTIVE BOARD MEETING? WHAT IS IT YOU WANT THEM TO TELL US?

MS. GAYTON: SHE BROKE -- THE CHARGES, ARTICLE 8, SECTION 1, KISLING CALLED AN EMERGENCY EXECUTIVE BOARD MEETING ON AUGUST 20TH, 2016, WITH ONLY TWO DAYS' NOTICE. AND THIS IS A VIOLATION, WHICH STATES "THE EXECUTIVE BOARD SHALL MEET MONTHLY UNLESS IT DECIDES BY MAJORITY VOTE FOR THOSE MEMBERS PRESENT TO MEET MORE OR LESS FREQUENTLY." IT'S THE -- IT'S ON MY CHARGES, WHICH SHE DID.

THE HEARING OFFICER: SO WE HAVE THAT WITHIN YOUR CHARGES. THE CONSTITUTION AND BYLAWS HAVE BEEN SUBMITTED. AND THERE'S BEEN A WHOLE TON OF TESTIMONY AROUND THIS PARTICULAR MEETING. SO WE WILL TAKE THAT AS A WHOLE, AS A COLLECTIVE, ALL OF THAT INFORMATION TOGETHER. SO I DON'T THINK THIS IS ANYTHING WE NEED. WE HAVE GOT EVERYTHING EITHER ENTERED AS EXHIBITS AND TESTIMONY ENTERED BY A NUMBER OF PEOPLE ALONG WITH YOUR CHARGES.

MS. GAYTON: WELL, THERE WAS ONLY ONE EXHIBIT THERE THAT WAS A STATEMENT FROM AN E-BOARD MEMBER FROM THIS INCIDENT. BUT I HAVE THREE MORE WITNESSES THAT CAN TESTIFY TO THAT EXECUTIVE BOARD EMERGENCY E-BOARD MEETING.

THE HEARING OFFICER: COULD YOU BRING IN ONE WITNESS, THE STRONGEST ONE YOU HAVE, TO GET THAT ON THE RECORD? I FEEL LIKE WE HAVE GOT SO MUCH AROUND THIS

AUGUST MEETING ALREADY THAT, LIKE, I'M FINE IF YOU COULD BRING IN ONE. BUT I WOULD LIKE YOU TO JUST BRING IN ONE. FIND OUT WHO THAT WOULD BE.

MS. GAYTON: I WOULD LIKE TO CALL ALFREDO.

MS. KISLING: NOW, I DON'T DISAGREE THAT THERE WAS A MEETING. IT WAS ENTERED ALREADY ENTERED INTO EVIDENCE THAT MANCINI SHOULD HAVE BEEN AWARE OF. SHE WAS ON THE COMMUNICATION. SO I'M NOT SURE WHY -- BECAUSE STILL I HAVE TO BRING WITNESSES AND -- THE WHOLE RUSHING. AND WE STILL HAVE THE OTHER CHARGES THAT CHERIE DID, WE STILL HAVE TO DO. SO I'M ASKING THE QUESTION --

THE HEARING OFFICER: WE HAVE -- THIS IS A REALLY LENGTHY HEARING. WE'RE HEARING A LOT OF TESTIMONY. BUT IT IS OVERLAPPING IN MANY WAYS. AND A LOT OF THE CHARGES ACTUALLY OVERLAP AS WELL, WHICH IS WHY WE TRIED TO KIND OF -- AND I THINK MARY KAY TRIED TO CHUNK THEM A LITTLE BIT. AND I DID WHEN WE PRESENTING THE HEARING SO WE'RE NOT GETTING THIS OVER AND OVER AND OVER. BUT WE ARE GETTING SOME OF THIS REPETITIVELY.

SO I WANT TO POINT TO AND CLARIFY WHERE I ALREADY HAVE HEARD TESTIMONY AND WHERE WE HAVE BOTH EVIDENCE THAT'S ALREADY BEEN BROUGHT IN THAT WE DON'T NEED IT AGAIN. BECAUSE I CAN LOOK AT THIS. I'LL GET THE TRANSCRIPT.

ANYONE ELSE THAT WANTS THAT CAN CONTACT STEPHANIE TO GET THAT. BUT WE HAVE A LOT OF EVIDENCE AND A LOT OF TESTIMONY. AND I DON'T THINK ANYTHING WILL BE ADDED BY HEARING IT YET AGAIN. SO I'M TRYING TO PUSH

PEOPLE HARDER TODAY TO GET NEW STUFF IN THE RECORD.
ALFREDO, YOU'VE BEEN SWORN IN?
MS. GAYTON: CAN WE TAKE A BREAK?
MS. WALFOORT: TWO OR THREE MINUTES.
THE HEARING OFFICER: SO IT'S THREE MINUTES TO 5:00. LET'S SEE IF WE CAN GET BACK IN BY 5:00.
(BREAK TAKEN.)
THE HEARING OFFICER: ALL RIGHT. THANK YOU FOR ALL BEING BACK IN A VERY TIMELY WAY. THAT IS WONDERFUL.
SO ALFREDO, HAVE YOU BEEN SWORN IN? YOU HAVEN'T? ALL RIGHT.

ALFREDO SERRANO,
THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: AND STATE YOUR NAME FOR THE RECORD.
THE WITNESS: ALFREDO SERRANO.

EXAMINATION
BY MS. GAYTON:
Q ALFREDO, DID YOU ATTEND THE SO-CALLED EMERGENCY EXECUTIVE BOARD MEETING AUGUST THE 20TH?
A I DID.
Q WHO CONTACTED YOU ABOUT THE MEETING?
A ACTUALLY, I RECEIVED AN E-MAIL. I WAS FORWARDED AN E-MAIL REGARDING DISCUSSING THE EXECUTIVE

BOARD HAVING A FINAL SAY ON THE SITUATION -- ON THE SITUATION. I COULDN'T EVEN SEE THE ATTACHMENT.

BUT THERE WAS SOMETHING THAT SAID THERE WAS AN EXECUTIVE BOARD EMERGENCY MEETING. THEY WERE GOING TO CALL AN EMERGENCY MEETING. AND THEN I RESPONDED TO THAT E-MAIL SAYING I HAVEN'T HEARD ABOUT AN EMERGENCY MEETING. AND THEN SHARON E-MAILED BACK THAT SHE WAS GOING TO DIRECT SOMEBODY TO SEND OUT ON INVITATION. SO THEN E-MAILS CAME OUT SAYING THERE WAS GOING TO BE AN EMERGENCY MEETING.

Q DO YOU REMEMBER WHAT HAPPENED AT THE MEETING?

A NOT IN REAL DETAIL. BUT I REMEMBER THAT THERE WAS DISCUSSION THAT SHARON WAS PRESENTING THE SITUATION THAT OCCURRED WITH PETER.

Q WAS THERE AN AGENDA AT THIS MEETING?

A THERE WAS NO AGENDA SENT OUT PRIOR TO THIS MEETING.

Q DO YOU KNOW IF ANY OF THE MEMBERS RECEIVED ANY NOTICE REGARDING THIS MEETING, ANY TYPE OF NOTICE?

A I BELIEVE AN E-MAIL WENT OUT TO -- I DON'T KNOW IF IT WAS THE ENTIRE EXECUTIVE BOARD. BUT IT WENT OUT TO A LIST OF EXECUTIVE BOARD MEMBERS.

Q DO YOU BELIEVE THIS MEETING WAS IN VIOLATION OF THE LOCAL CONSTITUTION AND BYLAWS?

A PRIOR TO THE MEETING, I WAS NOT CLEAR ON WHETHER OR NOT THE MEETING COULD BE CALLED BY A VICE PRESIDENT. BUT AFTERWARDS AND LOOKING AT THE CONSTITUTION AND BYLAWS, I SAW THAT AN EMERGENCY MEETING

WOULD BE CALLED BY THE PRESIDENT OR THE EXECUTIVE BOARD COULD ALSO SCHEDULE A MEETING.

Q AND I DO --

MS. GAYTON: AND I DO HAVE MY EXHIBIT THERE.

MS. WALFOORT: DO YOU WANT THE WITNESS TO HAVE A COPY IN FRONT OF HIM? OR IS THAT NOT NECESSARY?

MS. GAYTON: NO. ALSO WITH MY WITNESS AND ALSO THE CHARGING PARTY 3 -- EXHIBIT 3, "TO WHOM IT MAY CONCERN," FROM AN E-BOARD MEMBER THAT IS IN YOUR GUYS' DOCUMENTS, WHO ALSO WAS THERE AT THE MEETING AS WELL.

THE HEARING OFFICER: IS THAT IN EXHIBIT 1, YOUR --

MS. GAYTON: EXHIBIT 4.

THE HEARING OFFICER: WHAT DOES IT HAVE ON THE FRONT? WHAT DOES IT LOOK LIKE?

MS. GAYTON: "TO WHOM IT MAY CONCERN."

THE HEARING OFFICER: I DON'T HAVE THAT.

(DISCUSSION HELD OFF THE RECORD.)

MS. KISLING: SO THIS A STATEMENT FROM ANOTHER MEMBER. I'M NOT SURE WHY HE WOULD TESTIFY TO THIS.

THE HEARING OFFICER: WE HAVE GOT TO SEE IT FIRST.

(DISCUSSION HELD OFF THE RECORD.)

MS. GAYTON: YOU HAD MENTIONED THAT IF YOU HAVE IT AS AN EXHIBIT, THAT'S AN EXHIBIT THERE, TO WHOM ALFREDO IS SPEAKING ABOUT. BECAUSE HE WAS ALSO AT THE E-BOARD MEETING. BECAUSE YOU GUYS DON'T WANT ME TO BRING IN MORE PARTIES ABOUT THIS ACCUSATION.

MS. WALFOORT: HE CAN TESTIFY AS TO --

THE HEARING OFFICER: OKAY.

MS. GAYTON: YES. SO THERE'S THAT ONE PARTY'S STATEMENTS, AND I HAVE ALFREDO'S, AND I HAVE TWO MORE. BUT YOU GUYS ARE NOT ALLOWING ME TO BRING THOSE WITNESSES FORWARD. BECAUSE YOU SAY IT'S REDUNDANT, IT'S THE SAME.

MS. WALFOORT: REPETITIVE. IF YOU FEEL IT'S NOT REPETITIVE, WE'RE NOT TELLING YOU NOT TO DO IT. WE'RE JUST SAYING IF IT COVERS THE SAME GROUND, IT'S NOT NECESSARY TO DO IT. AND WE'RE UNDER SOME TIME PRESSURE.

MS. GAYTON: THAT'S WHY I WANTED TO BRING THAT TO YOUR ATTENTION.

MS. WALFOORT: THAT'S IN THE RECORD.

MS. GAYTON: I WANT THAT NOTED IN THE RECORD.

THE HEARING OFFICER: SO WE ARE TAKING IN CHARGE 3, CHARGING PARTY EXHIBIT 4, LETTER DATED OCTOBER 28, 2016, FROM SEAN TAGER (PHONETIC).

MS. GAYTON: YES.

(EXHIBIT ADMITTED.)

MS. GAYTON: AND I HAVE NOTHING FURTHER.

THE HEARING OFFICER: OKAY. AND DO YOU HAVE ANY CROSS?

EXAMINATION

BY MS. KISLING:

Q I WANT TO CONFIRM YOU WERE AT THE BOARD MEETING, THE SPECIAL BOARD MEETING. SO EVERYONE WAS AT THE SPECIAL BOARD MEETING, RIGHT?

A I DON'T --
Q SO MY QUESTION IS SIMPLE. DID YOU ATTEND THE BOARD MEETING, THE SPECIAL --
A THE EMERGENCY --
Q I'M SORRY, THE EMERGENCY BOARD MEETING?
A I DID ATTEND THE EMERGENCY BOARD MEETING. I WANTED TO BE THERE TO FIND OUT WHAT WAS GOING ON. THAT DOESN'T MEAN THAT I AGREED WITH THE FACT THAT WE SHOULD BE HAVING AN EMERGENCY MEETING. BUT, YES, I DID ATTEND.
Q IS THERE AN ACTION THAT YOU COULD HAVE DONE WITHIN THE DISCUSSION ABOUT THE BOARD MEETING? DO YOU REMEMBER A DISCUSSION HAD WITH YOURSELF AND THE OTHER TRUSTEE, CLARA THOMAS, ON THE DAY OF AUGUST 18TH IN REGARDS TO SCHEDULING A BOARD MEETING TO DISCUSS THE ACTIONS THAT HAD THEY TAKEN PLACE?
A I REMEMBER DISCUSSING THE FACT THAT I THOUGHT THAT WE COULD WAIT UNTIL PRESIDENT MANCINI CAME BACK TO DEAL WITH ANY ISSUES RELATED TO PETER NGUYEN AND YOU TRYING TO FIRE HIM.
Q RIGHT. BUT I'M REFERRING TO THE BOARD MEETING.
A I REMEMBER SAYING THAT I DIDN'T THINK WE NEED AN EMERGENCY MEETING, THAT WE SHOULDN'T BE CALLING AN EMERGENCY BOARD MEETING; THAT WE SHOULD WAIT FOR CHERIE MANCINI TO COME BACK. SHE WAS SUPPOSED TO RETURN WITHIN A COUPLE OF DAYS.
Q IF I'M CORRECT, WASN'T IT INITIALLY SAID THAT SHE WOULD RETURN BY WHEN IT WAS SCHEDULED, WHICH WAS LATE SATURDAY?

A NO. I DIDN'T KNOW AT THE TIME. I KNEW SHE WAS TO BE BACK WITHIN THE WEEKEND. OR I THINK SUNDAY WE WERE EXPECTING HER BACK.

Q OKAY. SO YOU DON'T RECALL BEING THE ONE TO SAY SATURDAY?

A NO.

MS. KISLING: OKAY. THANK YOU.

THE WITNESS: BECAUSE I DIDN'T KNOW WHEN SHE WAS COMING BACK.

THE HEARING OFFICER: AND DO YOU HAVE ANY REBUTTAL, AMELIA?

MS. GAYTON: NO.

THE HEARING OFFICER: I DO HAVE A QUESTION. WHAT WAS DIFFERENT FROM THIS MEETING THAN ANOTHER BOARD MEETING YOU ATTENDED?

THE WITNESS: THERE WAS NO AGENDA. IT WAS CALLED AT THE LAST MINUTE. IT WASN'T CALLED BY THE PRESIDENT. IT WASN'T ACTUALLY A BOARD MEETING. I DIDN'T KNOW THAT IT WAS AN ACTUAL SPECIFIC BOARD MEETING AT ALL. IT DIDN'T HAVE THE FORMAT OF A BOARD MEETING. IT WAS JUST A MEETING.

THE HEARING OFFICER: OKAY. AND ONCE THE MEETING STARTED, WHAT WAS YOUR EXPERIENCE?

THE WITNESS: I FELT THAT SHARON WAS HAVING A MEETING SIMPLY TO TRY TO GET THE EXECUTIVE BOARD TO BACK HER UP ON THE DECISION TO FIRE PETER AFTER I HAD -- THE PRIOR -- WHEN I SHOWED UP AT THE HALL BECAUSE ONE OF THE ORGANIZERS CALLED MY THAT SHARON WAS AT THE HALL AND OUT

OF CONTROL, SHE HAD SAID THAT SHE WAS GOING TO FIRE HIM.

AND I SAID, "I DON'T THINK YOU HAVE THAT AUTHORITY." AND I ACTUALLY WAS THE ONE THAT SUGGESTED THAT WE CALL IT A SUSPENSION UNTIL CHERIE COULD GET BACK AND DISCUSS IT. BECAUSE I WASN'T SURE THAT SHARON HAD THE AUTHORITY TO DO THAT. SO I SAID, "WELL" -- I WAS TRYING TO CALM THINGS DOWN. AND I SAID "LET'S JUST" -- I DISCUSSED IT WITH PETER AND SAID, "LOOK, WE'RE GOING TO JUST CALL THIS A SUSPENSION. I WANT YOU TO LEAVE THE PROPERTY SO WE CAN CALM THINGS DOWN."

SO AFTER THAT, THEN THE EMERGENCY -- THE EMERGENCY MEETING CAME UP, AND I WAS LIKE, HERE WE GO AGAIN. SHE IS TRYING TO CALL AN EMERGENCY MEETING TO GET WHAT SHE WANTED ACCOMPLISHED ACCOMPLISHED BY CALLING EMERGENCY MEETING BEFORE CHERIE GOT BACK IN TOWN AND TRY TO GET THE E-BOARD TO BACK HER UP ON THE DECISION TO TERMINATE HIM.

AND LATER FINDING OUT THAT HIS CONTRACT SAYS THAT HE CAN APPEAL TO THE -- THAT CHERIE MANCINI CAN TERMINATE HIM, THE PRESIDENT CAN TERMINATE HIM, AND HE COULD APPEAL TO THE EXECUTIVE BOARD. BUT I THINK THERE WAS SOME MISUNDERSTANDING THAT THE EXECUTIVE BOARD COULD ALSO -- WOULD HAVE THE SAME POWER. AND THAT'S WHY THE EMERGENCY MEETING WAS BEING CALLED. SO THAT WAS THE ONLY AGENDA FOR THE MEETING THAT I KNOW OF.

THE HEARING OFFICER: HOW LONG WAS THE MEETING?

THE WITNESS: IT MUST HAVE RAN LIKE -- I CAN'T SAY, HONESTLY.

MS. GAYTON: I CAN.
THE HEARING OFFICER: DID YOU ATTEND THE MEETING?
MS. GAYTON: YES.
THE HEARING OFFICER: COULD YOU SPEAK TO THE LENGTH OF THE MEETING?
THE WITNESS: WAS THERE ANY OTHER QUESTIONS FOR ME?
THE HEARING OFFICER: NO. YOU CAN GO.
MS. GAYTON: I REMEMBER BECAUSE I WAS GOING TO -- MY DAUGHTER WAS THROWING A SCENTSY PARTY THAT SHE WANTED ME TO HELP HER WITH, AND THIS TOOK TWO HOURS.
MS. WALFOORT: THE MEETING WAS TWO HOURS LONG?
MS. GAYTON: YES. THE EMERGENCY BOARD MEETING WAS TWO HOURS LONG.
MS. KISLING: CAN I HAVE IT PUT ON THE RECORD WHO CHAIRED THE MEETING?
MS. GAYTON: WHAT?
MS. KISLING: WHO CHAIRED THE MEETING?
MS. GAYTON: WHO SHARED?
MS. KISLING: CHAIRED.
MS. GAYTON: WHO CONDUCTED THE MEETING?
MS. KISLING: YES.
MS. GAYTON: YOU DID.
MS. KISLING: OKAY. YOU DID NOT BRING PRESIDENT MANCINI VIA PHONE, AND SHE ACTUALLY CHAIRED THE MEETING?
MS. GAYTON: I DID CALL CHERIE MANCINI ON MY

CELL PHONE. AND SHE WAS ON MY CELL PHONE. BECAUSE SHE IS OUR PRESIDENT. SHE NEEDED TO BE AWARE WHAT WAS GOING ON AT THIS EMERGENCY E-BOARD MEETING.

MS. KISLING: THAT'S FINE. I JUST ASKED.

MS. GAYTON: YES, YES, YES.

MS. KISLING: OKAY.

THE HEARING OFFICER: OKAY. JUST SO I'M CLEAR, CHERIE, DID YOU RUN THE AGENDA -- WELL, THERE WASN'T AN AGENDA BUT DID YOU RUN THE MEETING TOPICS AND ANY VOTES TAKEN?

CHERIE MANCINI: I ABSOLUTELY DID NOT. NO ONE COULD HEAR ME ON THE TELEPHONE.

THE HEARING OFFICER: WERE THERE ANY VOTES TAKEN IN THIS MEETING?

MS. GAYTON: NO.

CHERIE MANCINI: AND THERE'S NO MINUTES, NO AGENDA, NOTHING.

THE HEARING OFFICER: AND NO MINUTES DRAFTED OR APPROVED SINCE?

MS. KISLING: NO. IT WASN'T A REGULAR BOARD MEETING. IT WAS LITERALLY TO BRIEF THE BOARD ON WHAT HAD OCCURRED THE 17TH AND 18TH. AND THAT'S WHAT IT SAID IN THE COMMUNICATION WITH THE ATTORNEY. BECAUSE THERE WAS AN ISSUE ABOUT CONTRACT INTERPRETATION -- OR NOT CONTRACT, SORRY, INTERPRETATION OF THE C&BS.

THE HEARING OFFICER: WAS THERE QUORUM FOR THE MEETING?

MS. KISLING: YES, THERE WAS QUORUM.

CHERIE MANCINI: AS I WAS ON THE TELEPHONE, CAN I GIVE ANY TESTIMONY?

CLARA THOMAS: WELL, THEN CAN I SINCE MY NAME WAS CALLED HOW MANY TIMES?

CHERIE MANCINI: MINE WILL BE VERY SHORT. IF YOURS CAN BE SHORT.

MS. KISLING: WHAT HAPPENED TO US PUTTING WITNESSES ON?

THE HEARING OFFICER: WE'LL KEEP IT -- I HAD SOME FOLLOWUP QUESTIONS. BOTH PARTIES ASKED AND ANSWERED. SO WE'RE GOING TO MOVE FORWARD. DO YOU HAVE ANYONE ELSE YOU NEED TO BRING IN AS A WITNESS?

MS. WALFOORT: THAT WOULD ADD SOMETHING WE HAVEN'T COVERED?

MS. GAYTON: SINCE SISTER KISLING BROUGHT UP IF I CONTACTED CHERIE MANCINI, WHICH I DID, I PUT HER ON SPEAKER PHONE, AND SHE WAS IN HAWAII. SO SHE WAS KIND OF GETTING BITS AND PIECES OF WHAT WAS GOING ON. AND SHE COULDN'T EVEN CALL ORDER OVER THE PHONE BECAUSE IT WAS JUST CHAOS. I DON'T KNOW IF YOU WANT HER TO TESTIFY TO THAT?

THE HEARING OFFICER: NO. YOU WERE IN THE ROOM. SO YOU WOULD BE THE ONE THAT WOULD HAVE TO TESTIFY. SO I'M GOING TO TAKE THAT NOTE OF WHAT YOU BELIEVE YOUR EXPERIENCE WAS THAT DAY.

MS. GAYTON: YES.

THE HEARING OFFICER: ARE WE ABLE TO MOVE FORWARD THEN?

MS. GAYTON: YES.
THE HEARING OFFICER: SHARON, DO YOU HAVE WITNESSES YOU WANT TO BRING FORWARD?
MS. KISLING: OH, YES.
THE HEARING OFFICER: AND IS THAT TWO PEOPLE? AND ARE THEY GOING TO BE TESTIFYING TO SOMETHING NEW?
MS. KISLING: OKAY. WELL, I GUESS I NEED CLARIFICATION WHEN YOU SAY "NEW." BECAUSE MY UNDERSTANDING IS I HAVE THESE CHARGES HERE BEFORE ME, AND THIS IS MY FIRST TIME -- I JUST WANT TO MAKE SURE THERE IS TESTIMONY TO REBUT ANY OF THIS.
THE HEARING OFFICER: AND YOU HAVE AN ABILITY TO DO THAT.
MS. KISLING: RIGHT. SO THAT'S WHY I'M CALLING, RIGHT? YES? SO IF I CAN GET BRENDA MARZAN.
(SIMULTANEOUS SPEAKERS.)
MS. KISLING: OKAY. THEN LET ME GO AHEAD AND CALL CLARA THOMAS.
THE HEARING OFFICER: CLARA, YOU'VE BEEN SWORN IN; IS THAT CORRECT?
THE WITNESS: NO.
MS. KISLING: IT'S HER FIRST FIRST TIME.
THE HEARING OFFICER: ALL RIGHT. SO YOU WILL BE SWORN AND STATE YOUR NAME.
THE WITNESS: AND I USE AFFIRM.

CLARA THOMAS,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY

AFFIRMED, TESTIFIED AS FOLLOWS:

EXAMINATION

BY MS. KISLING:

Q SO ONE OF THE CHARGES AGAINST ME IS ARTICLE 7, SECTION 7, AND IT DISCUSSES NOT CONSULTING WITH PRESIDENT MANCINI PRIOR TO ATTEMPTING TO TERMINATE PETER NGUYEN. NOW, THIS EVENT -- I KNOW THERE WAS AN EARLIER QUESTION IN TERMS OF WHAT PRECEDED THE EVENT OF AUGUST 18TH. ON AUGUST 17TH, WERE YOU PRIVY TO A CONVERSATION WITH PETER NGUYEN?

A YES.

Q OKAY. AND CAN YOU JUST BRIEFLY TELL US WHAT THAT CONVERSATION WAS?

A WHEN DEBBIE MILLER CALLED ME AND WAS TELLING ME HOW THE STAFF WAS REALLY UPSET --

Q NO. I'M SORRY, THE DAY BEFORE. IN TERMS OF -- IT WAS A CONVERSATION HE HAD WITH CHRISTINA JOHNSON, AND YOU WERE CALLED IN BY HIM.

A OH, OKAY. WHEN YOU WERE ON YOUR FLIGHT BACK?

Q YES.

A YES. OKAY. ON AUGUST 17TH -- I'M SORRY, I BELIEVE IT WAS THE 16TH, AUGUST 16TH. I WAS THERE AT THE UNION HALL FOR A PAC MEETING. AND IN BETWEEN THAT MEETING, DEBBIE MILLER ALONG WITH PETER NGUYEN CAME OUT OF DEBBIE MILLER'S OFFICE. AND SHE STATED IN THE HALLWAY IN MY PRESENCE, "I HAVE BOTH TRUSTEES HERE." AND SHE SAYS, "WE NEED TO SPEAK WITH YOU RIGHT NOW."

SO WE WENT INTO CONFERENCE ROOM B. AND PETER BEGAN TO TELL ME WHAT HIS CONCERN WAS THAT -- HE STATED SHARON HAD ASKED ONE OF -- AND HE STATED HER NAME -- NATALIE HERNANDEZ UP IN RENO, TO GET HER A LIST OF MEMBERS UP IN RENO. AND CHRISTINA BREEDEN WAS CALLING TO GET THAT LIST.

HE SAID THAT CHRISTINA NO LONGER WORKS FOR SEIU, AND THAT WAS ILLEGAL. AND WE DON'T KNOW IF WE GAVE HER PERMISSION -- IF SHE WAS IN FACT DOING THE BUSINESS FOR SHARON. SO I ASKED PETER, I SAID "PETER, DID YOU CALL SHARON AND ASK SHARON, DID SHE ASK FOR A MEMBERSHIP LIST FOR RENOWN?" AND HE IGNORED ME FIRST. AND THEN HE GOES, "NO. LET ME EXPLAIN TO YOU WHAT'S GOING ON." AND THEN WE HAD THE CONVERSATION OF THIS NOT BEING AN EMPLOYEE.

AND I SAID, "PETER, DID YOU DO YOUR DUE DILIGENCE? DID YOU GIVE SHARON A CALL TO FIND OUT IF SHE IN FACT DID REQUEST THIS MEMBERSHIP LIST?" HE SAID TO ME, "NO."

BY THAT TIME, I HAD CALLED SHARON, AND LUCKILY SHE PICKED UP. AND I PUT SHARON ON SPEAKER. I SAID THERE IS A QUESTION HERE ABOUT MEMBERSHIP. AND I EXPLAINED TO HER, AND SHE INTERRUPTED ME, AND SHE SAID, "I HAVE FIVE MINUTES BEFORE I BOARD MY FLIGHT." I SAID, "GIVE ME THREE OF THOSE."

AND I TOLD HER WHAT WAS GOING ON, AND I ASKED HER POINT BLANK, "DID YOU HAVE CHRISTINA CALL NATALIE AND REQUEST A MEMBERSHIP LIST?" AND SHE SAID, "YES, I DID."

SHE SAID, "WE'RE GOING UP TO RENO FOR THE AFL-CIO CONVENTION, AND I WANTED THE LIST SO I COULD MAKE A VISIT UP THERE WITH OUR MEMBERSHIP."

AND THEN IT WAS ASKED OF HER, BY ME, "WELL, DIDN'T YOU GET A LIST? BECAUSE THAT'S WHAT PETER SAID, 'SHE GOT A LIST ALREADY'." AND SHE GOES, "NO, I DON'T HAVE A MEMBERSHIP LIST. I HAVE A LIST OF EMPLOYEES."

SO PETER, AFTER WE HUNG UP WITH SHARON, PETER LOOKED OVER AT ME. AND I SAID, "PETER, THAT'S ALL YOU HAD TO DO WAS CALL IN THE FIRST PLACE. I DON'T THINK THAT THIS IS A CONCERN OR EMERGENCY." AND HE GOES, "WELL, YOU DON'T UNDERSTAND." I GO "I THINK I DO UNDERSTAND."

HE SAID, "WELL, I THINK THAT IF YOU WOULD HAVE UNDERSTOOD THAT CHRISTINA IS NO LONGER AN EMPLOYEE, THAT'S WHAT I'M CONCERNED WITH, THAT SHE ASKED FOR THE LIST. AND SHE HAD NOT A RIGHT TO ASK FOR THE LIST." SO HE THEN TOLD ME THAT -- I SAID, "IF YOU'D JUST DO YOUR DUE DILIGENCE, YOU WOULD HAVE KNOWN THIS WASN'T A BIG DEAL." HE SAYS, "RIGHT NOW, I FIND THIS TO BE A HOSTILE ENVIRONMENT."

SO I CALLED JAVIER INTO THE OFFICE. AND HE SAID TO ME, "YOU CAN'T CALL MY EMPLOYEE INTO THE OFFICE." I SAID, "I'M CALLING FOR A WITNESS BECAUSE YOU SAID I WAS CREATING A HOSTILE ENVIRONMENT, AND I DON'T WANT TO BE A HOSTILE ENVIRONMENT." AND THEN I SAID, "OKAY, WE'RE DONE HERE." BECAUSE I WAS DONE.

AND I WAS WALKING OUT. AND HE WAS BEHIND ME,

TELLING ME HOW CORPORATE AMERICA WORKS, THAT I DON'T UNDERSTAND HOW AN EMPLOYER SHOULD REACT TO AN EMPLOYEE, THAT IF WE WERE -- IF OUR COUNTY COMMISSIONERS WANTED TO REFER TO ME, I WOULD HAVE TO GO THROUGH THE MANAGERS. I WOULD HAVE TO GO THROUGH THE STAFF.

THE HEARING OFFICER: CAN I JUST ASK YOU A SECOND, PETER IS NOT THE ONE WHERE THE CHARGES ARE FILED. SO I WOULD LIKE YOU TO KEEP THE QUESTIONS RELATED TO THE CHARGE BECAUSE I FEEL LIKE WE'RE GOING OFF THAT. AND I'D RATHER FOCUS ON THE SPECIFIC CHARGE. I'M NOT SURE HOW THIS APPLIES, IF YOU COULD TELL ME? PETER IS NOT THE ONE WITH THE CHARGE FILED.

MS. KISLING: NO, I UNDERSTAND THAT. BUT IT'S THE VIOLATION OF THIS ARTICLE AND ALL THAT'S BEING USED TO SUPPORT THE VIOLATION, SAYING THE ATTEMPT TO TERMINATE AND NOT MAKE CONTACT WITH THE PRESIDENT. SO THE PURPOSE OF THAT WAS TO SET UP WHY THE EVENTS OCCURRED THE FOLLOWING DAY IN TERMS OF PETER AND HIS INTERACTION WITH EXECUTIVE BOARD MEMBERS WHICH THEN LED TO THE SAME TYPE OF INTERACTION WITH ME WHICH LED TO HIM INSTIGATING A SITUATION WHERE ALL THE STAFF CAME OUT AS OPPOSED TO LEAVING THE PREMISES.

TRUSTEE ALFREDO SERRANO, TRUSTEE CLARA ASKED HIM TO LEAVE. HE WOULD NOT LEAVE TO DEFUSE THE SITUATION. SO PART OF THIS IS AFTER THAT INCIDENT, SHE REACHED OUT TO CONTACT PRESIDENT MANCINI. IF PRESIDENT MANCINI HAD RESPONDED -- THAT WAS TRYING TO HAVE THE DISCUSSION THAT NEEDED TO BE HAD THAT FOLLOWING DAY WITH

PETER NGUYEN, WHICH LED TO THE 18TH. SO A LOT OF THE ALLEGATION IN HERE HAS TO DO WITH THE 18TH AND INTERACTIONS AND MY ACTIONS --

THE WITNESS: THE 16TH.

MS. KISLING: I'M SORRY, THE 16TH. THAT'S WHY I'M GETTING THIS IN.

THE WITNESS: YOU ASKED EARLIER. YOU ASKED AMELIA HOW DID THIS ALL OCCUR? AND IT REALLY STARTED ON THE 16TH OF AUGUST.

THE HEARING OFFICER: OKAY.

MS. KISLING: SO THAT WAS THE DISCUSSION THAT WAS ON CALENDAR TO HAVE THE FOLLOWING DAY. AND, AGAIN, THIS IS TESTIMONY JUST TO SAY THAT ATTEMPTS WERE MADE TO REACH OUT TO PRESIDENT MANCINI, EVEN BY OFFICERS, THE DAY OF THE INCIDENT, AND SHE DID NOT RESPOND.

THE HEARING OFFICER: OKAY.

BY MS. KISLING:

Q OKAY. SO LET'S SEE, OKAY. SO ONE OF MY QUESTIONS WAS DID YOU TEXT PRESIDENT MANCINI?

A YES, I DID.

Q DID YOU GET ANY RESPONSE?

A NO, I DIDN'T.

Q ALSO, THERE ARE JUST THINGS -- AND I'LL TRY TO MAKE IT A BLANKET -- IN THE CHARGES THAT TALK ABOUT THE OUTCOME WHICH ARE ATTEMPTING TO SUPPORT CHARGE NUMBER 2, THE VIOLATION, DESCRIBING THE BEHAVIORS, UNETHICAL, IRRESPONSIBLE, THERE BEING A PLANNED TRAINING OF ATUS (PHONETIC).

LET ME JUST SAY "YES" OR "NO" QUESTIONS.
SO DO YOU REMEMBER CONVERSATION WITH JAVIER CABRERA, WHO IS A SENIOR ORGANIZER, IN REGARDS TO MAKING PLANS FOR LET'S SAY, THE ATUS TRAINING?
A NO.
Q DO YOU REMEMBER THAT IN FACT JAVIER LED THE TRAINING, AND ABOUT FOUR MEMBERS SHOWED UP WHEN WE CHECKED BACK WITH HIM?
A NO.
Q YOU DON'T REMEMBER THAT?
A I DO NOT REMEMBER THAT.
Q OKAY. THAT'S FINE. BUT IS IT FEASIBLE THAT BOTH THE TRUSTEES AND I WORKED ON DIFFERENT THINGS TO MAKE SURE THE BUSINESS OF THE LOCAL CONTINUED AFTER THAT INCIDENT WITH PETER NGUYEN?
A YES, YES.
Q OKAY. A LOT OF THE CHARGES -- I GUESS A LOT OF THE CHARGE FOR ME ARE STEMMING OUT OF MY UNDERSTANDING AND WANTING TO PROVIDE REPORT TO THE EXECUTIVE BOARD AND TRYING TO DO RIGHT BY THE MEMBERS. DO YOU, KNOWING WHAT YOU KNOW, DISAGREE WITH ANY OF THE ACTIONS?
A NO.
Q OKAY. WOULD YOU DESCRIBE ME WHEN YOU SAW ME ON THE DAY OF THE 18TH OR THEREAFTER AS OUT OF CONTROL AND THERE WAS ANOTHER WORD THEY USED?
MS. WALFOORT: ARE YOU TALKING ABOUT THE 18TH NOW, THE DAY OF THE MEETING?
MS. KISLING: YES.

THE HEARING OFFICER: THE STAFF MEETING?

MS. KISLING: NO. I MEAN THE 17TH, SORRY, THE 17TH.

BY MS. KISLING:

Q WOULD YOU DESCRIBE ME AS OUT OF CONTROL?

A NO.

Q OKAY. DO YOU REMEMBER HOW LONG IT TOOK THE OFFICER TO ACTUALLY GET PETER TO COMPLY WITH THE REQUEST?

A AFTER I GOT TO THE UNION HALL, I GOT THERE ABOUT 4:00-ISH. PRIOR TO ME GETTING THERE, I WAS THE ONE, NOT A STAFF MEMBER, BUT I WAS THE ONE THAT CALLED TRUSTEE ALFREDO.

AND I ASKED HIM, I SAID, "WHERE ARE YOU?" I SAID, "THERE IS AN INCIDENT AT THE UNION HALL." AND HE SAID I'M ABOUT 15 TO 20 MINUTES AWAY." I SAID "YOU'RE CLOSER THAN I AM." BECAUSE I WAS SICK THAT DAY, AND I HAD TO GET DRESSED TO GO DOWN TO THE UNION HALL. AND I SAID, "IT'S GOING TO TAKE ME ANYWHERE BETWEEN 30 AND 45 MINUTES." HE SAID, "OKAY, I'M ON MY WAY." I SAID, "THANK YOU."

Q OKAY. I THINK THAT'S IT. AGAIN, DO YOU AGREE WITH THOSE CHARGES? LET ME ASK YOU REAL QUICK.

A NO, I DON'T.

MS. KISLING: THANK YOU.

THE HEARING OFFICER: AND DO YOU HAVE CROSS?

MS. GAYTON: YES.

/////

/////

EXAMINATION

BY MS. GAYTON:

Q CLARA, ON THAT INCIDENT WHERE THE POLICE CAME, YOU CAME TOWARDS THE END OF THAT WHEN EVERYTHING WAS PRETTY MUCH SETTLED DOWN BECAUSE THE POLICE WAS THERE. I DO HAVE A QUESTION. WHY WOULD SHARON NOT COORDINATE WITH PETER AS THE DIRECTOR OF ORGANIZING TO ARRANGE BEFOREHAND OF ANY OF THE FOLLOWING TESTIMONY THAT YOU JUST SAID, WHAT SHARON JUST SAID ABOUT PETER?

A AS SOMEONE THAT WORKS IN THE DISTRICT ATTORNEY'S OFFICE, I HONESTLY CANNOT ANSWER THAT QUESTION. BECAUSE I CANNOT TELL YOU WHAT EITHER PARTY WAS THINKING.

Q AND YOU HAD MENTIONED THAT YOU HAD TEXTED MANCINI WHEN SHE WAS ON HER HAWAII VACATION AND THAT YOU DIDN'T GET A RESPONSE. DO YOU REMEMBER WHAT YOU TEXTED HER?

A NO, I DON'T.

MS. GAYTON: I HAVE THE TEXT MESSAGES HERE FROM CLARA, WHAT SHE TEXTED TO MANCINI. IS IT OKAY TO READ THEM OUT?

MS. WALFOORT: WHY DON'T YOU SHOW THEM TO THE WITNESS AND ASK HER IF THAT'S HER TEXT MESSAGE.

THE WITNESS: OKAY. I'M SEEING THAT I TEXT CHERIE ON AUGUST 16TH AT 4:49 P.M., WHEN SHE RECEIVED IT. THERE IS A TEXT MESSAGE. THERE IS NO ANSWER. YOU ARE ASKING ME. THEN ON THE 18TH, I ALSO TEXT CHERIE BECAUSE I WAS ADVISING HER OF EVERY INCIDENT THAT WAS HAPPENING.

MS. WALFOORT: I THINK IN ALL FAIRNESS THE QUESTION WAS, DID YOU TEXT HER ON THE 17TH?

THE WITNESS: NO. THE 16TH.

THE HEARING OFFICER: AND WHAT WAS THE MESSAGE YOU SENT HER?

THE WITNESS: "CHERIE, I CAN'T TAKE PETER TALKING DOWN TO ME. I AM TO RESPECT HIM BUT HE'S NOT TO RESPECT ME? THERE IS MUCH MORE TO THIS." AND THAT WAS THE DAY I ALREADY EXPLAINED TO YOU WHAT HAD OCCURRED.

MS. WALFOORT: THANK YOU.

BY MS. GAYTON:

Q AND HOW WOULD CHERIE MANCINI KNOW WHAT WAS HAPPENING FROM THAT TEXT MESSAGE THAT YOU SENT HER?

MS. WALFOORT: YOU KNOW, I DON'T THINK SHE CAN TELL YOU WHAT CHERIE WOULD KNOW. SO WHAT IS IT YOU WANT HER TO EXPLAIN ABOUT THAT TEXT?

MS. GAYTON: I KIND OF WANTED HER TO READ OFF THE TEXT THAT SHE SENT TO CHERIE MANCINI.

THE HEARING OFFICER: SHE DID THAT.

CHERIE MANCINI: THE TESTIMONY WAS SHE NOTIFIED ME OF WHAT WAS HAPPENING.

MS. WALFOORT: YOU CAN'T TESTIFY FROM THERE, CHERIE. I'M SORRY. IT DOESN'T WORK THAT WAY.

MS. GAYTON: BECAUSE IT SAYS IN THE TEXT MESSAGE A BUDGET REFERENCE FROM THAT MAGAZINE THAT CLARA TEXTED TO MANCINI.

THE WITNESS: ON WHAT DAY? WAS THAT THE 16TH?

MS. GAYTON: NO.

THE WITNESS: OH, OKAY.

MS. GAYTON: THAT WAS AUGUST THE 18TH. DO YOU RECALL THAT TEXT?

THE WITNESS: IF YOU CAN BRING IT BACK TO ME, I CAN READ IT AGAIN.

MS. WALFOORT: THAT'S AFTER THE 17TH. SO IS THERE RELEVANCE?

MS. GAYTON: THAT'S OKAY. THANK YOU.

BY MS. GAYTON:

Q DID YOU WITNESS THE ALTERCATION ON THE 17TH?

A NO, I DID NOT.

Q REGARDING THE EMERGENCY E-BOARD MEETING, WAS IT RECORDED FOR OFFICIAL MINUTES TO BE TRANSCRIBED? THE NOTES AND THE RECORDING, ARE THEY IN YOUR POSSESSION?

THE WITNESS: COULD SHE CONFER WITH CHERIE AGAIN AND GET THE RIGHT QUESTION?

CHERIE MANCINI: STRIKE IT.

MS. GAYTON: OKAY.

THE HEARING OFFICER: DO YOU HAVE ANY CROSS?

MS. GAYTON: I JUST WANT THE RECORD TO BE KNOWN THAT SHE DID NOT WITNESS THE ALTERCATION ON THE 17TH.

THE HEARING OFFICER: SHE ALREADY SAID THAT SHE WASN'T THERE.

MS. GAYTON: THANK YOU.

THE HEARING OFFICER: SO DO YOU HAVE REBUTTAL?

MS. KISLING: YES, I DO.

THE HEARING OFFICER: GO AHEAD.

FURTHER EXAMINATION

BY MS. KISLING:

Q SPECIFICALLY TO THAT, "DID YOU WITNESS THE ALTERCATION ON THE 17TH," SINCE THE 17TH, HAVE YOU HEARD AN AUDIO RECORDING OF THE MEETING AND ALLEGED INCIDENT?

A I HAVE.

Q IS IT CONSISTENT WITH THE TESTIMONY BY STAFF OR AMELIA GAYTON AND THE WRITTEN STATEMENTS THEY PROVIDED?

A NO. IT'S NOT.

Q THE NEXT QUESTION, THEY TALKED ABOUT A TEXT. COULD IT BE THAT THERE WAS A TEXT THAT WENT TO PRESIDENT MANCINI TO RESPOND IN WHICH IT WAS IN A GROUP TEXT? SO MAYBE THAT'S NOT WHAT WAS ACTUALLY SHOWN TO YOU?

MS. WALFOORT: I DON'T THINK YOU CAN ASK ABOUT WHAT COULD HAVE BEEN. IT'S GETTING WAY FAR FIELD, ANYTHING COULD HAVE BEEN.

THE WITNESS: I WOULD HAVE ANSWERED THE SAME WAY. I DON'T KNOW.

MS. KISLING: OKAY. I DON'T KNOW THAT THAT'S RELEVANT. OKAY.

THE HEARING OFFICER: JUST TO BE CLEAR -- YOU CAN BE EXCUSED THEN, SHARON.

MS. GAYTON: I HAVE TWO MORE QUESTIONS.

CHERIE MANCINI: IT'S OKAY. STRIKE IT.

THE HEARING OFFICER: YOU HAVE ONE MORE WITNESS, IS THAT RIGHT?

CHERIE MANCINI: CAN WE TAKE A BREAK? IT'S BEEN LIKE THREE HOURS.

THE HEARING OFFICER: I WANT TO TRY TO WRAP THIS ONE UP. BECAUSE I WOULD LIKE TO THEN FINISH THIS UP AND START RIGHT AFTER DINNER, VERY SHORT DINNER, WITH THE LAST CHARGE. BECAUSE WE'RE RUNNING OUT OF TIME HERE.

MS. KISLING: OKAY. BRENDA MARZAN, SORRY.

THE HEARING OFFICER: OKAY. AND IS THAT YOUR LAST WITNESS?

AND BRENDA, YOU WERE SWORN IN EARLIER.

THE WITNESS: YES.

THE HEARING OFFICER: SO FOR THE RECORD, BRENDA MARZAN.

GO AHEAD.

MS. KISLING: I'M GOING TO TRY TO LIMIT, SO GIVE ME ONE QUICK SECOND. SORRY.

THE HEARING OFFICER: YEP.

EXAMINATION

BY MS. KISLING:

Q HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THE CHARGES THAT WERE ENTERED AGAINST ME?

A YES.

Q IS THERE ANY PART OF THE CHARGE -- SO I'M GOING TO BE GENERAL TO HELP THIS MOVE ALONG. AS AN EXECUTIVE BOARD MEMBER, IS THERE ANY PART OF THIS CHARGE THAT YOU SEE THAT SUPPORTS A VIOLATION OF AN ARTICLE OF OUR BYLAWS?

A NO.

Q AS AN EXECUTIVE BOARD MEMBER, DO YOU HAVE A

DUTY AND OBLIGATION TO ADHERE TO THE BYLAWS?
A YES.
Q DO YOU HAVE AN OBLIGATION TO HOLD ME ACCOUNTABLE TO THE BYLAWS?
A ABSOLUTELY.
Q FROM YOUR EXPERIENCE WITH ME OVER THE LAST FEW YEARS, BUT SPECIFICALLY I'LL SAY SINCE JULY 1ST, MY ROLE AS EXECUTIVE VICE PRESIDENT, DO YOU FEEL THAT IT IS MY INTENT TO VIOLATE ANY OF THE BYLAWS?
A NO.
Q ARE THERE ACTIONS -- ARE THERE ANY ACTIONS AND, I GUESS, BRIEFLY, THAT YOU CAN SHOW THAT ACTUALLY WOULD REBUT ME NOT ATTEMPTING OR ATTEMPTING TO VIOLATE BYLAWS? SO I GUESS WHAT I'M ASKING IS, DO I ROUTINELY BRING THINGS BEFORE THE EXECUTIVE BOARD FOR APPROVAL?
A ABSOLUTELY.
Q DO I ROUTINELY ADVISE THE PRESIDENT FOR US TO ADHERE TO THE CONSTITUTION AND BYLAWS?
THE WITNESS: CAN I SAY THAT IT'S VERY FRUSTRATING WHEN YOU CAN SEE ALL OF THIS STUFF GOING ON BEHIND, AND YOU CAN'T FOCUS ON THE QUESTION?
THE HEARING OFFICER: LET'S RESPECT THE WITNESS AND THE CHARGED PARTIES.
THE WITNESS: SORRY.
BY MS. KISLING:
Q OKAY. DO I ROUTINELY TRY AND HOLD THE PRESIDENT ACCOUNTABLE TO THE BYLAWS?
A YOU HOLD THE ENTIRE BOARD ACCOUNTABLE TO THE

BYLAWS.

Q OKAY. AM I ROUTINELY SEEN WITH A COPY OF THE BYLAWS AT THE BOARD MEETINGS?

A YOU HAVE LIKE 14 COPIES OF THE BYLAWS. THAT MIGHT BE A LITTLE -- BUT, YES, YOU HAVE THE MOST ORGANIZED BYLAWS THAT I HAVE EVER SEEN.

MS. KISLING: OKAY. THAT'S IT.

THE HEARING OFFICER: ALL RIGHT. DO YOU HAVE CROSS?

MS. GAYTON: YES.

THE HEARING OFFICER: GO AHEAD.

EXAMINATION

BY MS. GAYTON:

Q HAVE YOU READ THE CONSTITUTION AND BYLAWS?

A EVERY PAGE.

Q AND SO YOU HAD JUST STATED EARLIER THAT SISTER KISLING DID NOT VIOLATE ANY OF THESE BYLAWS, CONSTITUTION AND BYLAWS?

A IN MY OPINION, WHAT TOOK PLACE BASED UPON THOSE CHARGES, I DO NOT AGREE THAT SHE -- THAT -- NO.

MS. GAYTON: I FIND THAT VERY DISTURBING.

THE HEARING OFFICER: BUT YOU HAVE TO ASK HER A QUESTION THOUGH. YOU HAVE TO ASK QUESTIONS OF THE WITNESS BASED --

MS. GAYTON: SHOULD I READ EVERY ONE THAT SHE VIOLATED AND REFERENCE IT TO THE BYLAWS?

THE HEARING OFFICER: WE HAVE GOT YOUR CHARGE.

WE HAVE GOT EVERYTHING IN EVIDENCE.

MS. GAYTON: OKAY.

THE HEARING OFFICER: DO YOU HAVE ANY REBUTTAL AT ALL?

MS. KISLING: NO.

THE HEARING OFFICER: SO THANK YOU, BRENDA. SO WE'RE GOING TO -- I'M GOING TO ALLOW YOU BOTH A COUPLE OF MINUTES. AND I BELIEVE DONE WITH WITNESSES; IS THAT CORRECT?

MS. GAYTON: I DID WANT TO CALL ANOTHER WITNESS. BUT IT'S PERTAINING TO WHAT YOU GUYS ALREADY HEARD.

THE HEARING OFFICER: OKAY. SO THEN WHAT WE'LL DO IS YOU A COUPLE OF MINUTES TO PUT YOUR CLOSING STATEMENTS TOGETHER, JUST TWO. THEN YOU'RE GOING TO HAVE THREE MINUTES TO PRESENT YOUR CLOSING STATEMENT. WHEN WE FINISH THAT, WE'LL TAKE A VERY SHORT BREAK AND RECONVENE TO START ON THE LAST CHARGE. OKAY? SO AT 5:44, 5:45, WE WILL RECONVENE.

(BREAK TAKEN.)

THE HEARING OFFICER: SO, AMELIA, DO YOU WANT TO START WITH YOUR CLOSING STATEMENT, PLEASE?

MS. GAYTON: YES. I FIRST WANT TO MAKE SURE THAT THE HEARING OFFICERS RULE ON THE FACT THAT PETER NGUYEN SUBMITTED A WRITTEN STATEMENT ON THE CHARGES. I JUST WANT THAT TO BE READ.

THE HEARING OFFICER: THAT WE HAVE WITHIN YOUR CHARGES?

MS. GAYTON: YES.

THE HEARING OFFICER: YES, WE DO. SO THREE MINUTES. AND LA RELL IS TIMING THAT.

MS. GAYTON: THE EVIDENCE PRESENTED CLEARLY PROVES THAT SHARON KISLING HAS ENGAGED IN MANY ACTS WHICH VIOLATE THE CONSTITUTION AND BYLAWS AND HER OATH OF OFFICE. SHE HAS EXCEEDED HER AUTHORITY AND USURPED THE PRESIDENT'S AUTHORITY BY DIRECTING AND FIRING STAFF AND ATTEMPTING TO TAKE OVER DAY-TO-DAY OPERATIONS OF THE UNION. SPECIFICALLY, SHE THREATENED, ASSAULTED, BATTERED, HARASSED, STOLE FROM AND FALSELY IMPRISONED PETER NGUYEN, THE DIRECTOR OF THE ORGANIZATION AND REPRESENTATION WHO IS AN EXCELLENT EMPLOYEE DOING GREAT WORK FOR OUR LOCAL.

IN ADDITION, KISLING HURT THE LOCAL, ITS MEMBERS, AND EXPOSED US TO LIABILITY BY VIOLATING THE EMPLOYMENT RIGHTS OF OUR STAFF, INTERFERING WITH THE WORK OF THE UNION WHICH CAUSED HARM TO MEMBERS AND COST THE UNION MONEY THROUGH HER MISDEEDS. HER ACTIONS WERE PREMEDITATED AND DESIGNED TO CAUSE HARM TO THIS ORGANIZATION.

IN ADDITION, SHE HAS CLEARLY VIOLATED SOME OF THE MOST IMPORTANT PRINCIPLES OF THE LABOR MOVEMENT AND SEIU INCLUDING RESPECT FOR CIVIL RIGHTS AND EMPLOYEE RIGHTS.

KISLING'S VIOLATIONS HAVE ALSO OPENED LOCAL 1107 TO PUBLIC CRITICISM IN AN ELECTION YEAR IN A STATE WHERE LABOR RIGHTS ARE UNDER ATTACK. SHE HAS BEHAVED

IRRESPONSIBLY AND HAS RISKED THE WELL-BEING OF OUR MEMBERS AND ALL UNIONIZED WORKERS IN THE STATE BY JEOPARDIZING SEIU'S REPUTATION IN THE STATE OF NEVADA GOING INTO THE 2017.

THE ONLY WAY FOR SEIU TO DISTANCE OURSELVES FROM HER BAD ACTS AND THE TERRIBLE TYPE OF UNIONISM FOR WHICH SHE HAS REPRESENTED IS THE HIGHEST FORM OF PUNISHMENT TO BE APPLIED BY THIS HEARING PANEL WHICH IS EXPULSION FROM THE UNION.

THE HEARING OFFICER: SHARON, ARE YOU READY FOR CLOSING STATEMENT? PLEASE START, AND YOU'LL HAVE THREE MINUTES AS WELL.

MS. KISLING: BASED ON THE EVIDENCE AND TESTIMONY AMELIA HAS PROVIDED TODAY, I SEE THAT THERE WAS NO --

MS. WALFOORT: PLEASE USE THE MICROPHONE.

MS. KISLING: BASED ON THE EVIDENCE AND TESTIMONY AMELIA GAYTON PROVIDED, THERE HAS BEEN NO SUPPORT OF THE CHARGES MADE AGAINST ME. SHE'S ONLY PROVIDED TESTIMONY BASED ON EMOTION, NOT BASED ON FACT. IT IS EVEN CLEARER BASED ON THE TESTIMONY OF, ONE, ANDREA BOND THAT APPEARS THE EVENT OF AUGUST 17TH TO BE CONSISTENT WITH AN EVENT THAT OCCURRED JUST IN THE LAST FEW WEEKS AT LOCAL 1107. THEY USED TERMS LOOSELY "OUT OF CONTROL," "YELLING," TO ALLUDE THAT MARY GRILLO WAS OUT OF CONTROL OR YELLING OR PEOPLE WERE YELLING AT PETER IS JUST NOT CORRECT. PEOPLE WERE NOT YELLING AT PRESIDENT MANCINI.

PRESIDENT MANCINI HAS ACTUALLY BEEN AWARE AND IS COPIED ON ALL ACTIONS. SHE CHOOSES NOT TO READ CORRESPONDENCE SENT TO HER, THEN DENIES KNOWLEDGE OF RECEIPT. WHEN YOU PROVIDE THE PROOF THAT SHE WAS COPIED OR COMMUNICATION WAS SENT TO HER, THEN SHE WILL COMMUNICATE THAT THERE WAS A LACK OF UNDERSTANDING. AS TO ALL ARTICLES, THERE JUST IS NO EVIDENCE IN TERMS OF MY INTENT OR ANY DIRECT OR INDIRECT ACTIONS THAT WOULD SUPPORT ANY OF THESE CHARGES.

TO ASK FOR EXPULSION, THAT CLOSING STATEMENT ALONE, I CAN ASSURE YOU WAS NOT WRITTEN BY MY SISTER, AMELIA GAYTON. AND THAT'S BEEN MY CONCERN THROUGHOUT THESE PROCEEDINGS, THAT CHARGES HAVE BEEN FILED AND THINGS ARE BEING INSTIGATED BY INDIVIDUALS WHO HAVE INSTIGATED THE SAME TYPE OF CHAOS IN OTHER LABOR UNIONS.

SO I REALLY HOPE THAT NOT ONLY DOES INTERNATIONAL, BUT I HOPE MOVING FORWARD, OUR EXECUTIVE BOARD JUST DOES NOT PARTAKE IN THESE INTERACTIONS. THIS IS EXACTLY WHAT EXPOSES US TO LIABILITY, IS ALLOWING THE UNAUTHORIZED PRESENCE OF, ONE, PETER NGUYEN.

THE HEARING OFFICER: ALL RIGHT. SO WE'RE GOING TO TAKE A DINNER BREAK. IT IS 7 MINUTES TO 6:00. WE HAVE THIS ROOM UNTIL 9:00 O'CLOCK. AND SO MY HOPE IS THAT WE CAN GET THROUGH THE CHARGE. IF WE CAN'T, WE'RE GOING TO HAVE TO FIGURE OUT HOW WE GO FROM HERE. BUT THAT'S HOW LONG WE HAVE THE ROOM. SO I JUST WANT TO BE CLEAR ABOUT THAT. SO I DON'T KNOW IF --

MS. MANCINI: I HAVE TWO WITNESSES.

THE HEARING OFFICER: YOU HAVE TWO?

MS. MANCINI: YEP.

THE HEARING OFFICER: OKAY. THAT'S HELPFUL. SO YOU ARE NOT ENTERING ANYTHING NEW IN?

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO THERE IS A COUPLE OF EXHIBITS THAT BOTH AMELIA, YOU, AND SHARON HAVE, THAT YOU ACTUALLY DIDN'T ENTER IN THROUGH TESTIMONY. SO MY QUESTION IS, DO YOU WANT THEM ENTERED INTO THE RECORD? AND I'LL TAKE THEM BASED ON WHAT THEY SAY IN THE CONTEXT OF WHAT I'VE HEARD THROUGHOUT THE TWO DAYS OF THE HEARING.

MS. GAYTON: YES, PLEASE.

THE HEARING OFFICER: OKAY.

MS. KISLING: YES, PLEASE.

THE HEARING OFFICER: YES.

MS. WALFOORT: THAT'S A YES, SHARON?

MS. KISLING: THAT'S A YES.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: OKAY. THEN WE'RE GOING TO DO THAT. 6:30 SHARP AND EVERYBODY BE IN YOUR SEATS. AND BEFORE WE CLOSE THE RECORD, LA RELL IS GOING TO ENTER THE EXHIBITS INTO THE RECORD.

MS. PURDIE: SO THERE IS CHARGE 3, CHARGING PARTY EXHIBIT 1, WHICH IS THE CHARGE; CHARGE 3, CHARGING PARTY EXHIBIT 2, WHICH IS A MAY 28TH E-MAIL REGARDING THE CANDIDATE FORM; CHARGE 3, CHARGING PARTY EXHIBIT 3, AUGUST 18TH E-MAIL FROM ANGELA GARDUNO (PHONETIC), CHARGE

3, CHARGING PARTY EXHIBIT 4, SEAN TAGER, OCTOBER 28TH STATEMENT; CHARGE 3, CHARGING PARTY EXHIBIT 5 IS THE PETITION; CHARGE 3, CHARGING PARTY EXHIBIT 6 IS A SEPTEMBER 9TH E-MAIL REGARDING OATH OF OFFICE; CHARGE 3, CHARGING PARTY EXHIBIT 7 IS THE AUGUST 16TH E-MAIL REGARDING PHONE CALLS; CHARGE 3, CHARGING PARTY EXHIBIT 8 IS A TEMPORARY ORDER FOR PROTECTION; CHARGE 3, CHARGING PARTY EXHIBIT 9 IS A LETTER, AUGUST 18TH LETTER FROM SEAN MC DONALD; CHARGE 3, CHARGING PARTY EXHIBIT 10 IS AN AUGUST 17TH E-MAIL REGARDING REQUEST FOR OPINION ON SEIU LOCAL 1107 CONSTITUTION AND BYLAWS; CHARGE 3, CHARGING PARTY EXHIBIT 11 IS DATED AUGUST 31ST, 2016, LOOKS LIKE A MEMO REGARDING MULTITUDE OF CONCERNS REGARDING THE BUSINESS OF THE LOCAL.  CHARGE 3, CHARGED PARTY EXHIBIT --

(DISCUSSION HELD OFF THE RECORD.)

MS. PURDIE:  CHARGE 3, CHARGED PARTY EXHIBIT 1 IS AN OCTOBER 30TH E-MAIL REGARDING FINANCIALS; CHARGE 3, CHARGED PARTY EXHIBIT 2 IS OCTOBER 30TH E-MAIL REGARDING REQUEST FOR OPINION ON CONSTITUTION AND BYLAWS; CHARGE 3, CHARGED PARTY EXHIBIT 3 IS OCTOBER 30TH E-MAIL REGARDING EMERGENCY MEETING; CHARGE 3, CHARGED PARTY EXHIBIT 4 IS A SEPTEMBER 2ND --

(INTERRUPTION IN PROCEEDINGS.)

MS. PURDIE:  CHARGE 3, CHARGED PARTY EXHIBIT 4, SEPTEMBER 2ND E-MAIL REGARDING OFFICERS LIST.

(DINNER BREAK TAKEN.)

THE HEARING OFFICER:  SO WE'LL START THE LAST

CHARGE, WHICH IS CHERIE MANCINI VERSUS SHARON KISLING. AND DO YOU WANT TO MAKE OPENING STATEMENTS? FIRST, I'M GOING TO RECONNECT ON THE NUMBER OF WITNESSES. CHERIE, HOW MANY ARE YOU GOING TO HAVE?

MS. MANCINI: WE ALREADY HAD ONE WITNESS.

THE HEARING OFFICER: YEP.

MS. MANCINI: SO I'LL BE HAVING FOUR MORE WITNESSES.

THE HEARING OFFICER: AND DO YOU EXPECT THAT TO BE A SHORTER LENGTH OF --

MS. MANCINI: I ANTICIPATE -- ON MY SIDE, I ANTICIPATE IT TO BE FAIRLY SHORT.

THE HEARING OFFICER: OKAY. WE HAVE THE ROOM, LIKE I SAID, I JUST WANT TO BE MINDFUL UNTIL 9:00 O'CLOCK. SO I WOULD REALLY LIKE TO BE ABLE TO WRAP THIS UP.

AND SHARON, DO YOU HAVE ANY IDEA HOW MANY WITNESSES YOU ARE GOING TO HAVE FOR THIS PORTION?

MS. KISLING: AT LEAST THREE. AND DEPENDING ON WHAT HER WITNESSES SAY, IN CASE I NEED TO REBUT.

THE HEARING OFFICER: OKAY. AND IT LOOKS LIKE YOU HAVE GOT A BUNCH OF EVIDENCE YOU'RE GOING TO ENTER IN? OR IS THAT ITEMS THAT HAVE ALREADY BEEN ENTERED?

MS. KISLING: I BELIEVE I STILL HAVE DOCUMENTS OUTSTANDING THAT HAVE BEEN ENTERED FOR THIS ONE, RIGHT? I TRIED TO KEEP THOSE SEPARATE. I PUT IN -- LET ME SEE. YEP, EXHIBIT 1 -- THIS IS HER EXHIBIT. I THINK I HAVE PUT IN LIKE THREE ON THIS ONE.

THE HEARING OFFICER: OKAY. SO FOR CHARGE 5, CHARGED PARTY 1, 2, 3; IS THAT RIGHT?

MS. KISLING: YES.

THE HEARING OFFICER: CHERIE, DO YOU WISH TO MAKE OPEN STATEMENT?

MS. MANCINI: YES. IN REGARDS TO THE CHARGES THAT WERE FILED AGAINST VICE PRESIDENT KISLING, WHICH INCLUDE ADVOCATING OR ENGAGING IN DUAL UNIONISM OR SECESSION, ARTICLE 21, SECTION 3 OF CONSTITUTION AND BYLAWS. I WILL ALSO PROVE FINANCIAL MALPRACTICE AS WELL AS GROSS DISLOYALTY AND CONDUCT UNBECOMING A MEMBER.

I WILL SHOW YOU THAT THERE IS A LACK OF REGARD IN TERMS OF USING THE UNION FOR WHAT YOU WANT TO DO, BASICALLY LEAVING THE UNION OPEN UP TO LITIGATION FROM THE COUNTY POTENTIALLY AND JEOPARDIZING BANK TIME FOR FUTURE MEMBERS OF CLARK COUNTY.

THE HEARING OFFICER: ALL RIGHT. SHARON, DO YOU WISH TO MAKE AN OPENING STATEMENT?

MS. KISLING: YES.

I BELIEVE THESE ARE FRIVOLOUS CHARGES. I DON'T SEE ANY OF THESE CHARGES BEING PRUDENT. AND JUST AS IN THE ONE TESTIMONY THAT WAS ALREADY HEARD, THERE WAS MINIMAL INFORMATION GATHERED TO MOVE CHARGES FORWARD, REALLY IN RETALIATION FOR CHARGES THAT WERE MADE AND THE CONCERNS THAT HAD BEEN COMMUNICATED IN REGARDS TO PRESIDENT MANCINI.

THE HEARING OFFICER: ALL RIGHT. SO CHARGING PARTY, YOU CAN CALL YOUR FIRST WITNESS, CHERIE.

MS. MANCINI: CAN I CALL DEB SPRINGER, PLEASE? I'M GOING TO BE REFERENCING CHARGED PARTY EXHIBIT 5. IF YOU WILL TURN TO PAGE 3, PLEASE.

THE HEARING OFFICER: HOLD ON ONE SECOND.

MS. WALFOORT: LET US MAKE SURE WE HAVE GOT IT.

THE HEARING OFFICER: SHE'S GOT THEM ALL.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: GO AHEAD. SO WE'RE LOOKING AT CHARGE 5, CHARGING EXHIBIT 6.

BY MS. MANCINI:

Q DO YOU HAVE THIS DEBBIE (INDICATING)?

A YEAH, GOT IT.

Q CAN YOU TELL ME WHAT THIS PICTURE OF THIS WEBSITE -- WHAT KIND OF WEBSITE IS THIS?

A WELL, TO THE BEST OF MY KNOWLEDGE --

THE HEARING OFFICER: HANG ON A SECOND, DEBBIE. YOU NEED TO BE SWORN IN AND THEN STATE YOUR NAME.

DEBORAH SPRINGER,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE HEARING OFFICER: STATE YOUR NAME.

THE WITNESS: DEBBIE, D-E-B-B-I-E, SPRINGER, S-P-R-I-N-G-E-R.

EXAMINATION

BY MS. MANCINI:

Q CAN YOU TELL ME WHAT THIS WEBSITE IS RELATED

TO?

A WELL, IT LOOKS LIKE A WEBSITE CREATED TO DECERT THE UNION AND TO -- NOT DECERT THE MEMBERS, BUT, YOU KNOW, HAVE THE MEMBERS DROP OUT SO IT CAN BE DECERTIFIED.

Q CAN YOU LOOK AT PAGE 3 OF THAT DOCUMENT?

A PAGE 3?

Q 3 OF 8.

A OKAY, YES.

Q CAN YOU TELL ME WHAT THAT IS?

A THAT LOOKS LIKE, TO ME, LIKE AN ALTERED VERSION OF THE CHARGES THAT WERE FILED AGAINST YOU AND ME AND ALFREDO.

MS. WALFOORT: PAGE 3?

MS. MANCINI: PAGE 3 OF 8.

THE HEARING OFFICER: OKAY. SO FURTHER IN HERE?

MS. MANCINI: AT THE TOP OF THE RIGHT-HAND CORNER --

THE HEARING OFFICER: I SEE THAT NOW.

MS. WALFOORT: CAN I MENTION, IF MS. SPRINGER DOESN'T HAVE PERSONAL KNOWLEDGE OF IT AND IT'S GOING TO BE JUST WHAT IT IS, I DON'T KNOW THAT YOU HAVE TO ASK HER ABOUT THAT. SHE'S SAYING "IT APPEARS TO BE," "IT LOOKS LIKE."

MS. MANCINI: OKAY, OKAY. I'LL ASK HER ONE LAST QUESTION.

BY MS. MANCINI:

Q DEBBIE, ARE THESE CHARGES ALTERED IN ANY WAY

FROM THE ORIGINAL CHARGES?
A YES, THEY ARE.
Q HOW ARE THEY ALTERED?
A IN THE ORIGINAL CHARGES, CLARA THOMAS'S NAME IS AFFIXED AS A CHARGING PARTY.
Q AND THIS ONE JUST STATES?
A AND THIS ONE JUST STATES SHARON KISLING.
MS. MANCINI: NOTHING FURTHER.
THE HEARING OFFICER: OKAY. DO YOU WANT TO CROSS?
MS. MANCINI: YES.

EXAMINATION

BY MS. KISLING:
Q SO I GUESS I'M TRYING TO UNDERSTAND HOW THIS DOCUMENT -- AND IT SOUNDS LIKE YOU SPOKE TO IT -- HOW DOES THIS SUPPORT OR WHAT DOES THIS HAVE TO DO WITH THE CHARGES FILED BY PRESIDENT MANCINI?
A WELL, IT GOES TO ALTERATION. SOMEHOW, SOMEBODY THAT MAINTAINS, KEEPS, THIS WEBSITE PUT THESE CHARGES ON THERE. AND I'M SURE THAT CHERIE AND I AND ALFREDO NEVER GAVE THEM TO ANYBODY. SO WHAT DO YOU WANT ME TO DRAW FROM THAT? I MEAN, THEY HAVE BEEN ALTERED. DO YOU AGREE THEY HAVE BEEN ALTERED, SHARON?
Q EXCUSE ME --
A DO YOU AGREE THEY HAVE BEEN ALTERED?
Q I DON'T KNOW. THIS IS THE FIRST TIME I'VE SEEN THIS INFORMATION. I'M ASKING A QUESTION.

MS. KISLING: OKAY. AM I ASKING THE QUESTIONS OR --

THE HEARING OFFICER: YOU ARE ASKING THE QUESTIONS, AND THEN, YEP, DEB YOU NEED TO RESPOND TO THE QUESTIONS ASKED.

THE WITNESS: FIRE AWAY.

BY MS. MANCINI:

Q OKAY. THE CHARGES WENT OUT TO THE MAJORITY OF THE E-BOARD. OKAY. SO MY QUESTION IS, YOU ARE SHOWING ME A WEBSITE THAT SAYS "UMC CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION."

A DID THESE CHARGES GO OUT -- I DON'T KNOW IF THESE CHARGES WENT OUT TO THE ENTIRE E-BOARD. IS THAT WHAT YOU JUST SAID?

Q YES. I MADE A STATEMENT.

A OKAY. AND I SAID I DON'T KNOW IF THEY WENT OUT TO THE ENTIRE E-BOARD.

MS. KISLING: I'M GETTING CONFUSED. THAT WAS NOT MY QUESTION.

THE WITNESS: THAT WAS YOUR QUESTION.

MS. WALFOORT: THERE MAY BE SOME CONFUSION. YOU KNOW, THE WITNESS IS TALKING ABOUT --

THE HEARING OFFICER: PAGE 3 OF 8. AND I THINK YOU ARE ON THE FRONT PAGE. AND I DON'T THINK YOU PREFACED IT, OR AT LEAST I DIDN'T CATCH IT EITHER.

BY MS. KISLING.

Q I'M GOING BACK TO THIS WAS PREFACED AS THIS BEING A WEBSITE FOR UMC.

A RIGHT.
Q SO WHERE ON THIS WEBSITE -- EXCEPT FOR IT LOOKS LIKE WHERE THERE IS A COPY OF CHARGES -- DOES IT SHOW MY NAME?
A WEBSITES CAN BE USED TO DISGUISE ANYTHING. SO NOWHERE AT THIS TIME DOES IT SHOW YOUR NAME.
Q OKAY. SO HOW DOES THIS SUPPORT THE CHARGES AGAINST ME IS WHAT I'M ASKING?
A HOW DOES IT SUPPORT THE CHARGES? WELL, I TRIED TO TELL YOU THAT EARLIER.
THE HEARING OFFICER: CAN YOU JUST ANSWER THE QUESTION, DEBBIE?
THE WITNESS: I BELIEVE THAT ONLY ONE, TWO, THREE, FOUR, FIVE -- NO MORE THAN SIX PEOPLE HAD A COPY OF THESE CHARGES. SO HOW DID THEY END UP ON THIS WEBSITE UNLESS ONE OF THOSE SIX PEOPLE PROVIDED THE MAKER AND THE UPDATER OF THIS WEBSITE WITH THESE ALTERED CHARGES?
MS. WALFOORT: OKAY. YOUR ASSUMPTION IS THAT ONE OF THE PEOPLE NAMED IN THE CHARGES MUST HAVE PROVIDED THIS?
THE WITNESS: CORRECT.
MS. WALFOORT: BUT YOU DON'T KNOW WHO?
THE WITNESS: CORRECT. I DON'T KNOW.
BY MS. KISLING:
Q LET'S GO BACK TO 3 OF 8.
A OKAY.
Q WHAT DOES THE FIRST SENTENCE SAY?
A "I, SHARON KISLING, ON THE BEHALF OF THE

MAJORITY OF MEMBERS OF SEIU NEVADA LOCAL 1107 EXECUTIVE BOARD ARE CHARGING."

Q OKAY. WOULD IT BE REASONABLE THAT THOSE MEMBERS THAT I INCLUDE ON HERE WOULD NOT HAVE BEEN COPIED WHEN THIS WAS INITIALLY E-MAILED TO INTERNATIONAL?

A WELL, IT WOULD BE REASONABLE FOR ME AND HELPFUL TO ME TO UNDERSTAND WHO THE MAJORITY OF MEMBERS THAT SO SAID THIS WERE.

Q WAS THAT AN ANSWER?

A YES. YOU WANTED AN ANSWER.

THE HEARING OFFICER: CAN YOU ASK IT AGAIN, SHARON? I WAS LOOKING AT THE DOCUMENT.

MS. KISLING: I ASKED ON PAGE 3 OF 8 FOR HER TO READ THE FIRST SENTENCE. SHE READ THE FIRST SENTENCE. AND IT CLEARLY STATES "ON BEHALF OF MAJORITY OF MEMBERS OF SEIU NOVEMBER LOCAL 1107 EXECUTIVE BOARD." I STATED THIS WAS INITIALLY E-MAILED TO INTERNATIONAL.

BY MS. KISLING:

Q WOULD IT BE REASONABLE THAT THESE MAJORITY OF MEMBERS WOULD HAVE BEEN COPIED ON THIS E-MAIL?

A IT COULD BE REASONABLE.

Q OKAY. HAVE YOU RECEIVED ANY E-MAIL FROM ME WHERE OTHER EXECUTIVE BOARD MEMBERS WERE COPIED?

A QUITE A FEW.

Q BEFORE I REFER TO THIS NEXT -- ARE YOU INFERRING THAT I HAVE SOMETHING TO DO WITH THIS WEBSITE?

A INDIRECTLY.

Q CAN YOU PLEASE EXPLAIN THAT?

A THERE WAS ONLY SIX PEOPLE WHO KNEW ABOUT THESE CHARGES. WELL, OKAY, LET'S SAY A DOZEN. SO CAN YOU TELL ME THAT YOU HAD NOTHING TO DO WITH THIS?
Q I COULD PROVIDE THE TESTIMONY. I DON'T THINK THIS IS THE APPROPRIATE TIME. SO I'M GOING BACK TO MY QUESTION. WHAT IN THIS PACKET SUPPORTS THAT I HAVE ANYTHING TO DO WITH THIS WEBSITE?
A NOTHING AT THIS TIME.
Q WELL, WHAT -- OKAY.
(DISCUSSION HELD OFF THE RECORD.)
THE HEARING OFFICER: LET THE RECORD SHOW THAT THEY'RE WORKING ON EXHIBITS.
BY MS. KISLING:
Q OKAY. FOR THE RECORD, THIS IS -- THIS SAYS CHARGE 5, CHARGE PARTY EXHIBIT 2. OKAY. CAN YOU READ THE STATEMENT BEING PROVIDED?
A WHAT? THIS ONE YOU JUST GAVE ME?
Q YES.
A OKAY. "MY NAME IS MALESIA BRITT-WILLIAMS AND I HAVE NEVER SEEN, DEVELOPED OR ACCESSED ANY WEBSITE AGAINST SEIU ON BEHALF OF SHARON KISLING OR ANY OTHER EXECUTIVE BOARD MEMBER" DATED YESTERDAY, 10/29/2016.
Q OKAY. DOES THIS ANSWER YOUR QUESTION? BECAUSE I THINK YOU ALLUDED TO THE FACT THAT THIS PERSON HAS THE ABILITY TO BUILD A WEBSITE?
A SHE TESTIFIED ON THAT YESTERDAY.
Q OKAY. SO THIS IS A STATEMENT THAT SHE'S NOT AWARE -- NOR AM I -- AS OF TODAY. SO IT GOES BACK TO

DOES ANYTHING IN THIS PACKET SUPPORT THE CHARGES?

A YES.

Q WHAT IN THIS PACKET SUPPORTS THE CHARGES?

MS. WALFOORT: SHARON, I THINK WE HAVE GOT THE WITNESS THINKS THAT THERE IS A DIFFERENCE OR AN ASSUMPTION SHE CAN DRAW FROM THIS.

MS. KISLING: OKAY.

MS. WALFOORT: AND THAT'S HER ANSWER. IT'S NOT GOING TO CHANGE IF YOU ASK HER MORE AND MORE.

MS. KISLING: I'M DONE WITH THE WITNESS THEN IF THERE'S NOTHING --

THE HEARING OFFICER: REBUTTAL?

FURTHER EXAMINATION

BY MS. MANCINI:

Q IF YOU CAN REFERENCE PAGE 56 OF THAT, I'LL JUST READ IT REAL QUICK. IT SAYS "THE FILING OF CHARGES. FILING AND SERVICE OF CHARGES AGAINST ANY MEMBER OR OFFICER OF THIS LOCAL UNION SHALL BE WITH IN DUPLICATE WITH THE SECRETARY OF THIS LOCAL UNION, WHO SHALL SERVE A COPY THEREFOR ON THE ACCUSED, EITHER PERSONALLY OR BY REGISTERED CERTIFIED MAIL DIRECT TO THE LAST KNOWN ADDRESS OF THE ACCUSED AT LEAST 10 CALENDAR DAYS BEFORE THE HEARING UPON CHARGES."

SO DEBBIE YOU'VE BEEN ON THE BOARD FOR QUITE SOME TIME AND SEEN CHARGES FILED AGAINST OTHER OFFICERS IN THE UNION; IS THAT CORRECT?

A CORRECT.

Q HAVE YOU EVER SEEN WHERE THE WHOLE ENTIRE EXECUTIVE BOARD HAS BEEN E-MAILED COPIES OF CHARGES ON ANY OFFICER?

A NOT TO MY KNOWLEDGE, NO.

Q DO YOU FEEL THAT THAT WOULD BE A DIRECT VIOLATION OF WHAT I JUST READ AS FAR AS FILING CHARGES?

A I BELIEVE SO.

Q SO, IN TURN, ONE OF TWO THINGS -- WELL, I DON'T WANT TO GIVE MY TESTIMONY. SO, IN TURN, EITHER THERE WAS A MISHANDLING OF THE FILING OF CHARGES, OR SOMEHOW THE PERSON WHO INITIATED THESE CHARGES, SOMEHOW IT LEAKED OUT TO SOMEONE WHO PUT IT ON THIS ANTI-UNION, ANTI-SEIU WEBSITE. DO YOU BELIEVE THAT?

A I BELIEVE SOMEBODY PUT THESE CHARGES ON, AND THESE CHARGES HAVE BEEN ALTERED FROM WHAT WE RECEIVED.

MS. MANCINI: OKAY, THANK YOU.

THE HEARING OFFICER: ALL RIGHT. THANK YOU, DEBBIE.

DO YOU WANT TO CALL YOUR NEXT WITNESS?

MS. KISLING: I HAVE A QUESTION FOR HER BASED ON WHAT SHE ASKED.

THE HEARING OFFICER: CAN YOU KEEP IT SHORT?

MS. MANCINI: YES, I CAN.

THE HEARING OFFICER: HOLD ON, DEBBIE.

MS. KISLING: TWO QUESTIONS, ACTUALLY.

FURTHER EXAMINATION

BY MS. KISLING:

Q WERE YOU AWARE THAT AMELIA GAYTON HANDED OUT

HER CHARGES AT AN EXECUTIVE BOARD MEETING?
A YES.
Q OKAY. TWO, WERE YOU AWARE THAT --
A WAIT A MINUTE, THAT AMELIA HANDED THEM OUT OR SHE GAVE THEM TO PAT TO HAND OUT?
Q WERE CHARGES DISTRIBUTED AT AN EXECUTIVE BOARD MEETING?
A IT'S UNCLEAR IN MY MIND WHO DISTRIBUTED THOSE CHARGES.
Q WERE YOU AWARE THAT MY CHARGES WERE ACTUALLY FILED AT AND WITH THE INTERNATIONAL?
A I BELIEVE SO ARE THESE.
Q NO, THEY WERE NOT. BUT I'M REFERRING TO MY CHARGES. BECAUSE THAT'S WHAT WE WERE DISCUSSING.
A I WAS NOT AWARE OF THAT, NO.
THE HEARING OFFICER: THE CHARGING PARTY GETS THAT LAST OPPORTUNITY.

FURTHER EXAMINATION

BY MS. MANCINI:
Q SO AT THAT MEETING WHERE CHARGES WERE DISTRIBUTED, WERE THEY DISTRIBUTED TO EVERY SINGLE PERSON AT THE EXECUTIVE BOARD OR JUST TO THE SECRETARY?
A WHAT CHARGES ARE YOU TALKING ABOUT?
Q I'M SORRY. THE CHARGES THAT SHARON IS ALLUDING TO THAT AMELIA FILED ON HER, WERE THEY GIVEN OUT TO -- DID YOU RECEIVE A COPY OF THOSE CHARGES?
A I WOULD HAVE TO LOOK AT THOSE CHARGES, BUT I

DON'T BELIEVE EVERY SINGLE MEMBER OF THE E-BOARD GOT ONE.

MS. MANCINI: THAT'S FINE. THANK YOU.

THE HEARING OFFICER: ALL RIGHT. THANK YOU, DEB.

NEXT WITNESS?

MS. MANCINI: I'M GOING TO REFERENCE NUMBER 5, CHARGING PARTY EXHIBIT 2. I WOULD LIKE TO CALL IN JAVIER CABRERA, PLEASE.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO WE'RE ENTERING IN CHARGE NUMBER 5, CHARGING PARTY EXHIBIT 3, WHICH IS JUSTICE COURT OF LAS VEGAS TOWNSHIP AND CHARGE 5, CHARGING PARTY EXHIBIT -- DID I SAY -- EXHIBIT 4, THIS ONE IS. AND IT'S UNION RELEASE FROM DUTY.

MS. KISLING: DO I GET A COPY?

MS. MANCINI: I GAVE YOU EVERYTHING.

THE HEARING OFFICER: HAVE YOU BEEN SWORN IN YET?

THE WITNESS: YES.

THE HEARING OFFICER: AND THAT STILL STANDS. CAN YOU STATE YOUR NAME FOR THE RECORD?

MR. CABRERA: JAVIER CABRERA. DO YOU WANT ME TO SPELL THAT?

THE HEARING OFFICER: NO. WE'RE GOOD.

EXAMINATION

BY MS. MANCINI:

Q JAVIER, WERE YOU IN ATTENDANCE AT A HEARING ON

OCTOBER 24TH, 2016, AT 10:30 A.M.?
A YES, I WAS.
Q CAN YOU TELL ME IF ANY -- WERE THERE ANY OFFICERS THAT WERE THERE AT THAT?
A YES. IT WAS SHARON KISLING AND CLARA THOMAS.
Q AND THAT STARTED AT 10:30 A.M.; IS THAT CORRECT?
A THAT'S CORRECT.
Q AND HOW LONG DID THAT RUN FOR?
A IT ENDED A LITTLE AFTER 12:00, SO ABOUT A COUPLE OF HOURS.
Q OKAY.
A APPROXIMATELY.
Q AND YOU WILL SEE IN EXHIBIT 2 THAT THERE IS A COPY OF A BANK TIME SLIP FROM SHARON KISLING THAT'S DATED 10/24, 10:30 A.M. TO 7:00 P.M. AND IT STATES THE REASON IS FOR SAHARA AND RANCHO RELOCATION COMMITTEE.
A I SEE THAT, YES.
MS. PURDIE: I THINK YOU ARE REFERRING TO EXHIBIT 4.
MS. MANCINI: OH, EXHIBIT 4, I'M SORRY. I MARKED IT. I JUST DIDN'T SAY THE RIGHT THING, EXHIBIT 4.
MR. CABRERA: YES.
MS. MANCINI: NO FURTHER QUESTIONS, JAVIER.
MR. CABRERA: OKAY.
THE HEARING OFFICER: DO YOU WANT TO CROSS, SHARON?
MS. KISLING: WHAT DID HE TESTIFY TO, THE

UNION?

THE HEARING OFFICER: THE UNION BUSINESS AND THE -- SO BOTH EXHIBIT 3 AND EXHIBIT 4.

MS. KISLING: OKAY.

EXAMINATION

BY MS. KISLING:

Q SO AT 10:30 -- SO THIS SLIP IS SHOWING THAT I TOOK DESIGNATED CONTRACT HOURS, RIGHT?

A WHICH ONE ARE YOU TALKING ABOUT?

Q I'M TALKING ABOUT EXHIBIT 4.

A DESIGNATED CONTRACT HOURS?

Q YES, CORRECT?

A I SEE THAT MARKED THERE.

Q DO YOU KNOW IF I HAVE A ROLE ON THE RELOCATION COMMITTEE?

A I KNOW YOU HAVE A ROLE ON THE RELOCATION COMMITTEE, BUT THIS HAS NOTHING TO DO WITH THAT.

Q NO. THAT'S ON HERE, RIGHT, AS TO WHY I'M OFF ON THE MONDAY, 10/24?

A WHAT I SEE HERE --

Q IT'S ON THE SECOND PAGE.

A IT SAYS SAHARA RANCHO RELOCATION COMMITTEE. BUT I DIDN'T SEE YOU THERE. I SAW YOU IN COURT.

Q WHAT I'M ASKING YOU IS ARE YOU AWARE OF A ROLE I HAVE ON THE COMMITTEE?

A I AM AWARE THAT YOU HAVE A ROLE ON THE COMMITTEE.

Q OKAY. SO DO YOU KNOW WHETHER OR NOT I WAS ACTUALLY DOING ANYTHING AT SAHARA AT RANCHO ANY TIME THAT DAY OR ALL THAT DAY OUTSIDE OF WORKING HOURS?
A ALL I KNOW IS THAT I SAW YOU IN COURT BETWEEN 10:30 AND ABOUT 12:30.
Q AND WHAT WAS I IN COURT IN REGARDS TO?
A IT WAS IN REGARDS TO A TPO AGAINST YOU FROM PETER NGUYEN.
Q AND DO YOU KNOW WHAT HAPPENED WITH THAT PROTECTIVE ORDER? WAS IT OUT OF MY PERSONAL BUSINESS?
A CAN YOU REPEAT THE QUESTION? BECAUSE I DIDN'T GET YOU.
Q IS THAT A PERSONAL MATTER?
A AS FAR AS I AM CONCERNED, IT IS.
Q AS FAR AS YOU ARE CONCERNED?
A UH-HUH.
Q I'M ASKING YOU, IS IT IN REGARDS TO MY DUTIES AS AN OFFICER AT SEIU? HOW ABOUT THIS: WAS IT IN REGARDS TO AN INCIDENT AT SEIU?
A THE TPO, YES.
MS. KISLING: OKAY, THANK YOU.
THE HEARING OFFICER: REBUTTAL.
MS. MANCINI: YES. I WOULD ASSUME THIS IS EXHIBIT 7, NOW?
MS. PURDIE: THIS ONE (INDICATING)?
MS. MANCINI: YES.
/////
/////

FURTHER EXAMINATION

BY MS. MANCINI:

Q THIS PAGE 10 OF THE CLARK COUNTY CONTRACT THAT STATES WHAT UNION BUSINESS REPRESENTS AS FAR AS UNION BANK TIME. "UNION BUSINESS SHALL INCLUDE THE REPRESENTATION OF EMPLOYEES AT MEETINGS SCHEDULED AND HELD WITH DIRECTOR OR DESIGNEE. GRIEVANCE REVIEW HEARINGS, TERMINATION HEARINGS, ATTENDANCE AT LABOR MANAGEMENT, SAFETY COMMITTEE MEETINGS, AND MONTHLY UNION STEWARD MEETINGS. ANY OTHER UNION-RELATED ACTIVITIES SHALL BE DEDUCTED FROM THE HOURS FOUND IN SECTION 7"?

MS. MANCINI: I HAVE NO FURTHER QUESTIONS.

THE HEARING OFFICER: OKAY. JUST FOR CLARIFICATION, I'M NOT SURE IF WE'VE GOT THIS ONE ENTERED. SO IF NOT, IT'S CHARGE 5, CHARGING PARTY EXHIBIT 7. AND IT'S A PAGE 10 OF THE CONSTITUTION AND BYLAWS; IS THAT CORRECT?

MS. MANCINI: NO. IT'S THE CLARK COUNTY CONTRACT.

THE HEARING OFFICER: OH, CLARK COUNTY CONTRACT. I'M SORRY, OKAY.

(EXHIBIT ADMITTED.)

MS. MANCINI: NOTHING FURTHER.

THE HEARING OFFICER: SHARON, DO YOU HAVE?

MS. KISLING: YES. THIS CLEARLY IS SPEAKING TO STEWARDS. I'M NOT A UNION STEWARD. AND THERE WAS NO QUESTION ASKED. SO SHE JUST READ THAT. WHAT WAS THE QUESTION?

MS. MANCINI: I JUST WAS MAKING SURE WE ENTERED THE EXHIBIT.

MS. WALFOORT: OKAY. WE HAVE GOT IT IN THE RECORD.

THE HEARING OFFICER: VERY GOOD. THANK YOU, JAVIER.

YOU'RE CALLING YOUR NEXT WITNESS.

MS. MANCINI: I WOULD -- CAN I PLEASE HAVE ANDREA BOND, PLEASE?

THE HEARING OFFICER: AND YOU ARE STILL SWORN IN.

THE WITNESS: YES, MA'AM.

THE HEARING OFFICER: AND YOU CAN BEGIN QUESTIONING ANDREA BOND.

EXAMINATION

BY MS. MANCINI:

Q ANDREA, CAN YOU TELL ME IF YOU ARE AWARE OF A DISCIPLINE DOCUMENT THAT WAS RECEIVED BY THE HALL FOR CHERIE KISLING?

A YES. SHE DID RECEIVE A DISCIPLINE DOCUMENT.

MS. WALFOORT: I'M SORRY. CAN YOU SLOW DOWN A LITTLE? I COULDN'T UNDERSTAND WHAT YOU SAID.

THE WITNESS: I SAID SHE DID RECEIVE A DISCIPLINE DOCUMENT. I'M AWARE OF THAT.

BY MS. MANCINI:

Q WHAT REPRESENTATIVE ATTENDED THIS MEETING WITH SHARON FOR HER STEP 1?

A WELL, THE ORIGINAL DISCIPLINE DOCUMENTS --

MS. KISLING: I DON'T UNDERSTAND WHAT THIS HAS TO DO WITH THIS CHARGE.

MS. WALFOORT: WE DON'T KNOW YET. LET'S LISTEN FOR A MINUTE.

THE WITNESS: I BELIEVE THAT SHARON REPRESENTED HERSELF AT THE INVESTIGATORY MEETING. BUT SHE CIRCUMVENTED GOING THROUGH THE HALL, USING A STEWARD OR A UNION REPRESENTATIVE. AT THE TIME THE DISCIPLINE WAS ISSUED, SHE WENT STRAIGHT TO OUR LAW FIRM AND HAD AN ASSOCIATE ATTORNEY ATTEND THE DISCIPLINE ISSUANCE WITH HER. AND THAT WAS BASICALLY USING OUR COUNSEL OF RECORD FOR HER OWN PERSONAL DISCIPLINE.

BY MS. MANCINI:

Q CAN YOU TELL ME WHAT THE NATURE OF THE DISCIPLINE WAS?

A YES, I CAN. IT WAS SHE HAD APPROVED SUBORDINATES FOR THE USE OF COUNTY VEHICLES FOR UNION BUSINESS. AND ALSO, SHE HAD AUTHORIZED OVERTIME FOR SOME OTHER PEOPLE. AND THEN ONCE THEY WORKED IT, SHE REFUSED TO SIGN OFF AND HAVE THEM PAID FOR IT.

Q DO YOU BELIEVE THAT THIS DISCIPLINE LEFT 1107 TO LEGAL LIABILITY?

A ABSOLUTELY. SHE BASICALLY SET US UP FOR PREFERENTIAL TREATMENT. NOW IF ANOTHER MEMBER FINDS OUT THAT THEY'RE NOT ENTITLED TO HAVE AN ATTORNEY APPEAR AT THEIR DISCIPLINE MEETING OR INVESTIGATORY MEETING AT THAT STEP, IT'S GOING TO OPEN US UP TO PREFERENTIAL TREATMENT.

Q DO YOU KNOW -- NOTHING FURTHER.
THE HEARING OFFICER: OKAY. SHARON, DO YOU WANT TO CROSS?

EXAMINATION

BY MS. KISLING:
Q ONE, HOW DO YOU SEE PERSONNEL MATTERS COMING THROUGH THE HALL AND BEING USED FOR THESE CHARGES?
A PERSONAL MATTERS SUCH AS?
Q PERSONNEL MATTERS.
A PERSONNEL MATTERS SUCH AS?
Q YOU WERE JUST ASKED QUESTIONS ABOUT DISCIPLINE BEING ISSUED.
A THE DISCIPLINE DOCUMENTS COME THROUGH THE COUNTY COMMUNICATIONS E-MAIL, WHICH I DO HAVE ACCESS TO. AS COMPLIANCE COORDINATOR, THAT'S PART OF MY JOB DUTIES.
Q OKAY. IS IT PUBLIC RECORD?
A NO. IT COMES THROUGH THE HALL. IT'S THE HALL'S RECORDS, WHICH I HAVE ACCESS TO.
Q RIGHT. IS IT PUBLIC RECORD?
A NO. IT'S HALL RECORDS.
Q SO ARE YOU ABLE TO GO COMMUNICATE ANYONE'S DISCIPLINE OUTSIDE OF SEIU?
A NO.
Q FOR PURPOSES --
(SIMULTANEOUS SPEAKERS.)
MS. WALFOORT: ONE AT A TIME, PLEASE.
THE WITNESS: I WOULD HAVE NO REASON TO DO

THAT.
BY MS. KISLING:
Q IS THAT NOT WHAT YOU ARE DOING RIGHT NOW?
A THIS IS RELEVANT TO THIS HEARING, THESE PROCEEDINGS.
Q IS THIS OUTSIDE OF SEIU'S USE OF REPRESENTATION?
A THIS IS SEIU, THE INTERNATIONAL. IS IT NOT?
Q NO, IT'S NOT. NOT FOR PERSONNEL MATTERS. HOWEVER, MY QUESTION IS, WHAT EVIDENCE DO YOU HAVE THAT YOU SAY SOME TYPE OF ASSOCIATE ATTORNEY ATTENDED WITH ME?
A YES. HE SIGNED THE DOCUMENT THAT HE WAS THERE.
Q CAN YOU PRODUCE THE DOCUMENT?
A I DO NOT HAVE IT. I BELIEVE CHERIE HAS IT. I ALSO QUESTIONED PAUL MYSELF, AND PAUL DID TELL ME THAT HE WAS THERE. PAUL AND I HAD A DISCUSSION ABOUT THAT.
MS. MANCINI: THIS IS EXHIBIT 5.
THE HEARING OFFICER: HANG ON A SECOND. LET SHARON FINISH THE CROSS, AND YOU HAVE AN OPPORTUNITY FOR REBUTTAL.
MS. MANCINI: SURE.
MS. KISLING: WELL, I CAN'T FINISH THE CROSS BECAUSE I DON'T HAVE WHAT THEY'RE REFERRING TO.
THE HEARING OFFICER: YOU SHOULD ENTER THIS FIRST.
MS. MANCINI: IT'S ALREADY ENTERED.
MS. PURDIE: THEY'RE MARKED. THEY'RE NOT ENTERED.

MS. WALFOORT: YOU KNOW, IT'S NOT ENTERED YET. IT'S MARKED; THEY'RE NOT ENTERED.

MS. MANCINI: OKAY. CAN WE HAVE IT ENTERED THEN?

THE HEARING OFFICER: SO WE'RE ENTERING CHARGE NUMBER 5, CHARGING PARTY EXHIBIT 5. AND IT'S CLARK COUNTY DEPARTMENT OF FAMILY SERVICES.

(EXHIBIT ADMITTED.)

THE WITNESS: IT'S ACTUALLY THE LAST PAGE, PAGE 3, WHERE PAUL SIGNED THAT HE ATTENDED THE MEETING ON 9/19/16.

BY MS. KISLING:

Q IS THAT SIGNATURE NOT CONSISTENT WITH THE SIGNATURE ABOVE?

A I'M SORRY? I DON'T UNDERSTAND WHAT YOU'RE SAYING, THE LAST SIGNATURE --

Q IS THE WRITING -- WHERE DO YOU SEE -- CAN YOU SHOW ME PAUL COTSONIS' SIGNATURE ON THE FORM?

A THE VERY LAST SIGNATURE WHERE IT SAYS "PRINT NAME," IT SAYS PAUL COTSONIS. THAT'S THE ATTORNEY FOR THE URBAN LAW FIRM.

Q I'M ASKING YOU IS THAT THE SAME PRINT AS ABOVE WHERE IT SAYS "SHARON KISLING"?

A I DON'T KNOW. ARE YOU SAYING THAT YOU SIGNED PAUL'S NAME ON THIS FORM?

Q IT CLEARLY SAYS -- THERE IS NO SIGNATURE ON HERE FROM PAUL. THAT'S WHAT I'M SHOWING YOU.

MS. WALFOORT: WE DON'T NEED TO ARGUE. YOU'RE

SAYING IT'S NOT HIS SIGNATURE, AND SHE'S SAYING IT IS HIS SIGNATURE.

THE WITNESS: FURTHERMORE, FOR THE RECORD, I PERSONALLY HAD A DISCUSSION WITH PAUL COTSONIS, THE ASSOCIATE ATTORNEY WITH THE URBAN LAW FIRM, AND HE TOLD ME THAT HE -- HE TOLD ME HE WAS CALLED INTO THIS MEETING. AND HE WENT WITHOUT THE PERMISSION AND AUTHORITY OF CHERIE. HE DID NOT CONSULT WITH CHERIE OR THE HALL.

FURTHERMORE, SHARON DID CIRCUMVENT THE HALL AND HURT UNION RIGHTS AND WENT AND HAD THE LAW FIRM REPRESENT HER ON A PERSONAL MATTER.

BY MS. KISLING:

Q OKAY. THE QUESTION IS, I REPRESENTED MYSELF, AND IT'S CLARA THAT WAS AT THE STEP 1. DO YOU KNOW WHAT THE OUTCOME WAS?

A I DO ACTUALLY. THERE WERE WITNESSES THAT WERE INVESTIGATED --

Q I'M ASKING YOU WHAT THAT OUTCOME WAS.

A I'M ANSWERING YOUR QUESTION. WOULD YOU LIKE ME TO ANSWER?

Q HOW ABOUT THIS: WAS THE OUTCOME THAT THE DISCIPLINE WAS REMOVED FROM --

(SIMULTANEOUS SPEAKERS.)

MS. KISLING: EXCUSE ME. THIS IS A "YES" OR "NO" QUESTION.

MS. WALFOORT: WAIT. WAIT. ASK YOUR QUESTION AGAIN.

BY MS. KISLING:

Q WAS THE DISCIPLINE REMOVED FROM MY FILE?
A IT WAS REMOVED FROM YOUR FILE.
MS. KISLING: THAT'S IT. I'M DONE.
MS. WALFOORT: LET HER FINISH.
THE WITNESS: THANK YOU.
WITNESSES WERE QUESTIONED, INVESTIGATED. IT WAS IN FACT PROVEN THAT THESE ACCUSATIONS DID HAPPEN. HOWEVER, SHARON SUBSEQUENTLY TRANSFERRED INTO A DIFFERENT DEPARTMENT. SO THE DISCIPLINE WAS REMOVED FROM HER FILE, BUT THAT WAS BECAUSE SHE WAS ABLE TO TRANSFER INTO A DIFFERENT DEPARTMENT.
CLARA THOMAS: THAT IS A LIE.
MS. WALFOORT: I THINK THAT REALLY IT IS NOT VERY DIRECTLY RELATED.
(SIMULTANEOUS SPEAKERS.)
MS. MANCINI: IT IS COMPLETELY RELATED OF CONDUCT UNBECOMING A MEMBER BY ADVOCATING MEMBERS OF THE ELECTION COMMITTEE TO UTILIZE COUNTY VEHICLE ON THE ELECTION DAY.
MS. WALFOORT: CAN I ASK YOU, IS YOUR CHARGE ABOUT DUAL UNIONISM AND SECESSION?
MS. MANCINI: IT ALSO SAYS "CONDUCT UNBECOMING A MEMBER." HERE, MY CHARGE IS "DUAL UNIONISM, SECESSION, FINANCIAL MALPRACTICE, GROSS DISLOYALTY OR CONDUCT UNBECOMING A MEMBER."
THE HEARING OFFICER: SO MY QUESTION OR MY RESPONSE WOULD BE THOUGH THAT ANDREA CAN RESPOND TO WHAT SHE KNOWS OR WHAT SHE PARTICIPATED IN. WHAT SHE IS

RESPONDING TO NOW SEEMS TO BE WHAT SHE'S HEARD FROM SOMEBODY ELSE. AND WITHOUT THAT OTHER PERSON HERE, THAT WOULD BE DIFFICULT. SO WE HAVE TAKEN THE TESTIMONY --

MS. MANCINI: CAN I REDIRECT TO HER?

THE HEARING OFFICER: IF SHARON'S DONE, YOU WILL GET A REBUTTAL.

MS. MANCINI: REBUTTAL, SORRY.

THE HEARING OFFICER: WE'LL -- I'LL TAKE THAT INTO EVIDENCE WHERE WE HAVE SOMETHING TO BACK UP WHAT HER STATEMENT IS OR THAT APPLIES. DOES THAT MAKE SENSE? BECAUSE I'VE BEEN PRETTY LENIENT ON ALLOWING TESTIMONY THROUGHOUT THIS PROCESS TO MAKE SURE PEOPLE WERE HEARD AND THEN TAKING -- SO WE'RE TAKING IN A LOT OF EVIDENCE. AND WE'RE GOING TO BRING THAT UP OR REVIEW IT AS PART OF THE PROCESS.

BUT IT ALSO WILL BE HOW MUCH DO WE HAVE IN TESTIMONY AND THEN FACTUAL THAT THE PERSON THAT PROVIDED THE TESTIMONY CAN SPEAK TO. SO IF IT'S WHAT SOMEBODY TOLD SOMEBODY, THAT --

MS. MANCINI: I WILL ASK A QUESTION TO CLEAR THAT UP.

MS. KISLING: I OBJECT TO THIS BEING ENTERED. AND I HAVE NO FURTHER QUESTIONS. BUT I OBJECT TO HER TESTIFYING TO SOMETHING THAT CAME THROUGH THE HALL THAT IS NOT THE BUSINESS OF ANDREA BOND OR CHERIE MANCINI.

THE HEARING OFFICER: SO I'M GOING TO NOTE YOUR OBJECTION TO THAT. DO YOU HAVE ANY FURTHER QUESTIONS?

MS. KISLING: NO, I DO NOT.

THE HEARING OFFICER: OKAY.

FURTHER EXAMINATION

BY MS. MANCINI:

Q ANDREA, DO YOU MAINTAIN THE COMPLETE RECORDS OF ALL DISCIPLINES THAT ARE --

A YES, I DO.

Q -- PUT THROUGH THE UNION HALL?

A YES, I DO.

Q FROM THE INITIAL DISCIPLINE ALL THE WAY THROUGH WHATEVER IT IS THAT THE OUTCOME IS?

A YES, I DO. FROM THE INVESTIGATORY THROUGH ARBITRATION COUNSEL, I FORWARD ON THE FILES ONWARD TO --

Q SO YOU ACTUALLY RECEIVE SOMETHING BACK FROM THE COUNTY THAT TELLS YOU WHAT THE END RESULT OF THE CASE IS?

A THAT'S CORRECT.

MS. MANCINI: THANK YOU.

THE HEARING OFFICER: ALL RIGHT.

MS. KISLING: BUT THAT'S NOT WHAT WAS PROVIDED. THE OUTCOME ISN'T HERE. IT WAS REMOVED. I STILL OBJECT.

THE HEARING OFFICER: I HAVE NOTED THAT.

MS. KISLING: OKAY.

THE HEARING OFFICER: DO YOU WANT TO CALL YOUR -- THANK YOU, ANDREA.

DO YOU WANT TO CALL YOUR NEXT WITNESS?

MS. MANCINI: I HAVE ONE LAST WITNESS. CAN WE CALL BRUCE YARWOOD, PLEASE?

MS. KISLING: I'M GOING TO OBJECT AGAIN.

BECAUSE IF HE'S COMING IN TO TESTIFY AS TO MY EMPLOYEES AND HIS REPRESENTATION, THIS IS ALL OUT OF ORDER. THAT HAS TO DO WITH PERSONNEL ISSUES IN THE WORKPLACE. SO I DON'T EVEN KNOW THAT THEY WOULD BE COMFORTABLE WITH HIM TESTIFYING AS TO HIS KNOWLEDGE OF THE CIRCUMSTANCES.

MS. WALFOORT: WELL LET'S SEE WHAT HE SAYS.

DEBBIE SPRINGER: YOU DON'T EVEN KNOW WHAT HE'S GOING TO SAY.

MS. WALFOORT: HEY, DEBBIE, YOU NEED TO NOT SPEAK UP.

(SIMULTANEOUS SPEAKERS.)

THE HEARING OFFICER: OKAY. IF THIS IS GOING TO CONTINUE, I'M GOING TO REMOVE EVERYBODY.

MS. MANCINI: THIS IS GOING TO BE QUICK AND I'LL BE DONE. SO ANYONE THAT HAS TO DO WITH ME, PLEASE RESPECT.

THE HEARING OFFICER: BRUCE, STEPHANIE IS GOING TO SWEAR YOU IN. AND AFTER, PLEASE STATE YOUR NAME AND SPELL IT FOR THE RECORD.

BRUCE YARWOOD,

THE WITNESS HEREIN, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE WITNESS: BRUCE YARWOOD, Y-A-R-W-O-O-D.

EXAMINATION

BY MS. MANCINI:

Q BRUCE, CAN YOU TELL ME WHAT YOUR OCCUPATION IS AT THE HALL?

A I'M A CONTRACT REPRESENTATIVE.

Q WERE YOU INVOLVED IN THE INVESTIGATION REGARDING RION BELL (PHONETIC) AND MARKITA JEFFERSON (PHONETIC) IN RELATION TO THEIR DISCIPLINE FOR SHARON KISLING?

A YES, I WAS.

Q CAN YOU TELL ME HOW THE EMPLOYEES FELT DURING THE TIME THAT THEY WERE BEING QUESTIONED ABOUT THE INCIDENT?

A BOTH OF THEM WERE NERVOUS. WHAT BOTHERED ME THE MOST WAS RION BELL -- I THINK IS THE NAME -- WAS AFTER THE MEETING WITH HER, WE WERE OUTSIDE IN THE HALLWAY AND JUST STARTED TALKING A LITTLE BIT. AND I'M A BIG PERSON, SO I'M AWARE OF THINGS. AND I NOTICED SHE WAS STANDING IN THE CORNER. AND AT FIRST, I FELT LIKE I WAS BACKING HER INTO A CORNER.

AND I SAID, "OH, I DON'T MEAN TO DO THAT." AND SHE SAID, "OH, NO, PLEASE SHIELD ME. I'M AFRAID OF HER." I DIDN'T KNOW WHAT SHE MEANT AT THE TIME. AND I HAD SEEN SHARON WALKING AROUND. AND THAT WAS BEFORE MARKITA WENT IN, THE SECOND ONE.

AND MARKITA WAS VERY NERVOUS DURING THAT INTERVIEW. SHE WASN'T EVEN CLOSE TO THE MONTHS. I MEAN, WE'RE TALKING ABOUT -- SHE WAS OFF BY MONTHS ON THE EVENT. BUT SHE DIDN'T REMEMBER THE STATEMENT. BUT YOU COULD TELL SHE WAS JUST NERVOUS. SO THAT WAS MY

IMPRESSION.
Q AND SO DO YOU KNOW WHERE MS. KISLING'S WHEREABOUTS WHILE THIS INVESTIGATION WAS GOING ON?
A SHE WALKED BY THE DOOR AT LEAST TWICE WHILE THE INTERVIEW WAS GOING ON.
Q OKAY.
A AND ONE OF THE TIMES I WAS TALKING WITH MARKITA WHEN SHE WALKED BY. WE WERE WAITING TO GO IN.
Q ONE LAST THING, DID YOU -- DURING THE INVESTIGATION, DID YOU MAKE ANY -- DID YOU TELL THE HEARING OR THE INVESTIGATORY PERSON IN REGARDS TO DID YOU TALK ABOUT RETALIATION?
A YES. I WAS CONCERNED. I TOLD HIM AFTERWARDS THAT I WAS A LITTLE CONCERNED. BOTH WITNESSES SEEMED NERVOUS, AND I WAS CONCERNED ABOUT RETALIATION. AND THAT WAS TO ERIC BELL -- NO, I'M SORRY, ERIC SOLE (PHONETIC) AND DAWN SANCHEZ. THOSE WERE THE TWO PEOPLE IN THE HEARING. SO I TOLD THEM, AND THEY SAID DULY NOTED.
MS. MANCINI: NOTHING FURTHER.
THE HEARING OFFICER: SHARON, DO YOU WANT TO CROSS?
MS. KISLING: NO. I HAVE NO QUESTIONS.
THE HEARING OFFICER: ALL RIGHT, THANK YOU. IS THAT YOUR LAST?
MS. MANCINI: IT IS.
THE HEARING OFFICER: ALL RIGHT. SHARON, DO YOU -- ARE YOU GOING TO HAVE THREE WITNESSES? IS THAT WHAT YOU BELIEVE?

MS. KISLING: WELL, I HAVE AN ISSUE NOW. BECAUSE I WOULD HAVE WANTED THE OPPORTUNITY TO PROVIDE WITNESSES IF THEY WERE GOING TO TESTIFY FOR PEOPLE TO SUPPORT THEIR CHARGES. SO I GUESS I NEED A RULING ON WHETHER OR NOT THAT SOMETHING THEY'RE ONLY PRIVY TO BECAUSE THEY ARE SEIU, FROM AN EMPLOYEE'S FILE, WHICH WAS REMOVED -- I WOULD LIKE TO KNOW WHAT I CAN DO. BECAUSE I NEED TO HAVE WITNESSES THEN. IF THEY'RE GOING TO TESTIFY TO CERTAIN THINGS, I DON'T HAVE AN OPPORTUNITY TO BRING WITNESSES TO REBUT.

MS. MANCINI: I BELIEVE I HAD THE SAME ISSUE ON THE PREVIOUS CHARGES.

MS. KISLING: NO, YOU DON'T.

MS. WALFOORT: YOU DON'T TALK TO EACH OTHER DIRECTLY. TALK THROUGH US.

MS. KISLING: OKAY.

MS. WALFOORT: DO YOU HAVE HERE ANYTHING YOU WANT TO PRODUCE AS A DOCUMENT TO SUPPORT YOUR POSITION THAT THIS WAS REMOVED FROM YOUR RECORD? I'M JUST ASKING IN GENERAL. IS THERE A DOCUMENT YOU WOULD LIKE TO PRODUCE FOR THAT?

MS. KISLING: IF THEY WERE ABLE TO PROVIDE YOU WITH THIS, THEN THEY HAVE THE OUTCOME OF THE STEP 1. AND I REPRESENTED MYSELF IN THE STEP 1 WITH THE WITNESS AND CLARA THOMAS. SO, YES, I CAN GO PRINT IT OUT, IF YOU ALLOW ME THE TIME. AND I FEEL I DESERVE THE TIME IF YOU ARE GOING TO PERMIT SOMETHING IN AN EMPLOYEE FILE AND WITH A STIPULATION TO SAY -- ANDREA SAYING THAT EVEN

THOUGH IT WAS REMOVED, IT STILL HAS MERIT. THAT'S NOT HOW IT WORKS.

THE HEARING OFFICER: HERE IS WHAT WE'LL DO. WE'LL ACCEPT IT AFTER THE HEARING. SO AS LONG AS YOU GET THAT DOCUMENT TO US BY OR BEFORE NOVEMBER 4TH, WE'LL TAKE THAT IN WITH THE REST OF THE EVIDENCE.

MS. KISLING: OKAY. I APPRECIATE THAT.

MS. WALFOORT: AND DO YOU HAVE ANY TESTIMONY TO INTRODUCE?

MS. KISLING: YES, I DO HAVE WITNESSES. I NEED A FIVE-MINUTE BREAK THOUGH.

THE HEARING OFFICER: OKAY. SO AT 7:27.

(BREAK TAKEN.)

THE HEARING OFFICER: SO CHERIE HAD MENTIONED SHE'S GOT ONE MORE PIECE OF EVIDENCE ENTERED. SO I DIDN'T WANT TO HAVE THAT CONVERSATION UNTIL YOU WERE IN THE ROOM.

MY QUESTION IS DO YOU NEED TO BRING IN A WITNESS TO GET THAT IN?

MS. MANCINI: NO.

THE HEARING OFFICER: SO YOU HAVE BEEN SWORN IN. SO I'M OPEN TO YOU, IF YOU WANT TO ENTER IT THAT WAY. AND DESCRIBE WHAT IT'S ABOUT.

MS. MANCINI: IT'LL BE QUICK. THIS IS A COPY OF A BILL FROM OUR ATTORNEY, THE URBAN LAW FIRM.

MS. PURDIE: COULD WE GET A COPY?

MS. WALFOORT: AND MAYBE WE SHOULD JUST MARK IT NOW.

MS. MANCINI: YES. THAT WOULD BE GOOD.

(DISCUSSION HELD OFF THE RECORD.)

THE HEARING OFFICER: SO CHARGE 5, CHARGING PARTY EXHIBIT NUMBER 8, THE URBAN LAW FIRM.

(EXHIBIT ADMITTED.)

MS. MANCINI: SO AS YOU CAN SEE, THIS IS THE BILL FOR SERVICES RENDERED BY URBAN LAW FIRM. AND AS YOU CAN SEE, I PUT A START NEXT TO THE DATE, 8/17. IT STATES THAT BASICALLY THAT THE URBAN LAW FIRM HAD A 3.7-HOUR CONSULTATION WITH SHARON IN REGARDS TO REQUEST FOR OPINION ON EXECUTIVE VICE PRESIDENT AUTHORITY IN ABSENCE OF THE PRESIDENT. IT'S RIGHT HERE TOWARDS THE BOTTOM OF THE PAGE.

THE HEARING OFFICER: OKAY.

MS. MANCINI: AND SUBSEQUENTLY I PUT STARS NEXT TO ALL OF THE OTHER -- I GUESS ANY OTHER FEES THAT WERE INCURRED IN RELATION TO -- YOU'LL SEE SPECIAL E-BOARD MEETING CONFERENCE, TELEPHONE CALL WITH ME, BASICALLY 200 -- 800 -- 1,000 -- 1200 -- ALMOST OVER $2,000 WORTH OF CONSULTATIONS WITH THE ATTORNEY IN RELATION TO WHETHER OR NOT SHE HAD AUTHORITY IN THE ABSENCE OF THE PRESIDENT. SO I JUST WANTED TO ENTER THAT IN.

MS. KISLING: OKAY. I HAVE SOME CROSS. BECAUSE I DON'T SEE WHERE SHE'S COMING UP WITH THAT NUMBER. AND I DON'T SEE 3.7 HOURS. IT CLEARLY SAYS IN HERE -- IT DISCUSSES DIFFERENT THINGS THAT WERE BEING DONE. AND RIGHT HERE, "TELEPHONE CALL TO SHARON KISLING, 0.1," WHICH I DON'T KNOW IF THAT'S A MINUTE OR A SECOND.

AND THEN AT THE BOTTOM, "TELEPHONE CALL FROM SHARON KISLING, LEFT MESSAGE REGARDING UNION MATTER." I'M NOT CLEAR WHERE SHE SEES A "3," AND I DON'T HAVE 3.70 HOURS TO BE ON A PHONE WITH AN ATTORNEY.

MS. MANCINI: RIGHT HERE AT THE TOP WHERE IT SAYS "HOURS."

MS. KISLING: I KNOW EXACTLY WHAT I'M LOOKING AT.

MS. MANCINI: I'M CLARIFYING TO YOU.

MS. WALFOORT: HOLD ON, IF YOU WILL, PLEASE.

MS. MANCINI: THAT'S FINE.

MS. WALFOORT: SHARON -- YES, SHARON, DO YOU DISPUTE THIS WAS A BILL THAT WAS RECEIVED FROM THE LOCAL FROM THE URBAN LAW FIRM?

MS. KISLING: I DISPUTE WHAT SHE JUST SAID.

MS. WALFOORT: JUST TELL ME THIS. DO YOU THINK THIS IS A BILL RECEIVED FROM --

MS. KISLING: THAT'S FINE IF IT IS.

MS. WALFOORT: IN OTHER WORDS, YOU DON'T DISPUTE THAT?

MS. KISLING: NO.

MS. WALFOORT: OKAY. THEN EVERYTHING HERE IS SOMETHING WE CAN LOOK AT AND READ. SHE WILL NOW TELL YOU WHERE THAT NUMBER CAME FROM. BUT THERE'S REALLY NO NEED TO COMMENT ON WHAT IS IN THE BILL. WE CAN LOOK AT THAT.

MS. KISLING: OKAY. BUT I WAS COMMENTING ON HER STATEMENT.

MS. WALFOORT: LET ME JUST HEAR HER CLARIFY.

MS. MANCINI: AT THE TOP OF THE PAGE RIGHT HERE ON THE RIGHT-HAND SIDE, THERE'S THREE COLUMNS. IT SAYS "HOURS," "RATE" AND "TOTAL AMOUNT." AND THE SECOND TO THE LAST ON THE FIRST PAGE, IT SAYS AUGUST 17TH AND STATES 3.17 HOURS.

THE HEARING OFFICER: 3.7.

MS. MANCINI: OR I'M SORRY, 3.7 HOURS.

MS. WALFOORT: THAT'S ALL SHE'S SAYING. AND SHARON, WE CAN SEE HOW THAT 3.7 IS DIVIDED UP.

MS. KISLING: THAT'S ALL I WAS SAYING. BECAUSE SHE EARLIER SAID IT WAS ON A PHONE CALL.

MS. WALFOORT: WE CAN SEE.

THE HEARING OFFICER: IT'S SPLIT UP.

MS. KISLING: THANK YOU. THAT'S ALL I WAS CLARIFYING.

THE HEARING OFFICER: THE ONE FOLLOW-UP QUESTION I HAVE IS, SHARON, DID YOU OR DID YOU NOT UTILIZE LOCAL UNION COUNSEL PRIOR TO YOUR DISCIPLINARY MEETING?

MS. KISLING: DID I -- NO, I DID NOT. I STAFFED THE CIRCUMSTANCES WITH HIM VIA PHONE, WHICH WE DO ALL THE TIME. BECAUSE I WAS REPRESENTING MYSELF. HE DID NOT COME WITH ME. HE WAS NOT PRESENT IN PERSON. I REPRESENTED MYSELF, AND THAT'S WHAT THAT RECORDS WILL SHOW.

THE HEARING OFFICER: SO THEN MY QUESTION IS YOU DID UTILIZE THE LOCAL UNION COUNSEL FOR YOUR DISCIPLINE MEETING. IT MIGHT HAVE BEEN BY PHONE, BUT YOU

DID UTILIZE LOCAL UNION COUNSEL TO PREPARE FOR THAT MEETING?

MS. KISLING: NO. YOU DON'T PREPARE FOR INVESTIGATORY.

MS. WALFOORT: SHARON, LET ME JUST ASK, DID YOU CONSULT THE ATTORNEY --

MS. KISLING: YES.

MS. WALFOORT: OKAY. LET ME FINISH. DID YOU CONSULT THE ATTORNEY BEFORE YOUR DISCIPLINARY MEETING?

MS. KISLING: YES.

THE HEARING OFFICER: OKAY.

MS. MANCINI: CAN I ASK A QUESTION?

THE HEARING OFFICER: GO AHEAD.

MS. MANCINI: SO IF YOU CONSULTED WITH HIM BEFORE, WHY WOULD IT BE OFFICIALLY ON THE RECORD THAT HE ATTENDED VIA PHONE AT THE ACTUAL DISCIPLINARY -- OR AT THE INVESTIGATORY? BECAUSE IT SAYS "SEPTEMBER 19TH, I ACCEPT" --

THE HEARING OFFICER: CHERIE, CAN I ASK A QUESTION THAT I THINK WOULD HELP GET TO THIS?

MS. MANCINI: YEAH.

THE HEARING OFFICER: WE ARE ALLOWING PEOPLE TO SUBMIT DOCUMENTATION AFTER THE HEARING. I WOULD SUGGEST YOU SUBMIT THAT ATTORNEY BILL FOR THE MONTH OF SEPTEMBER. AND YOU CAN NOTE IF THAT SHOWS IN THERE THAT THERE IS A CONSULTATION CALL. AND WE COULD UTILIZE IT AT THAT POINT. THAT WOULD BE THE EVIDENCE TO BACK UP IF THERE WAS LOCAL UNION COUNSEL HELP.

MS. MANCINI: WELL, IT SAYS IT HERE. BUT THAT'S FINE. I'LL SUBMIT THE BILL AS WELL.

THE HEARING OFFICER: ALL RIGHT. GO AHEAD, SHARON, WITH YOUR FIRST WITNESS.

MS. KISLING: I GUESS QUICKLY LET ME JUST CALL VICTORIA HARDING.

MS. MANCINI: I'M SORRY. I THOUGHT WE SAID WE WERE GOING TO DO CLOSING?

THE HEARING OFFICER: NO. SHE DID SAY SHE HAD A FEW WITNESSES.

MS. MANCINI: SORRY, I APOLOGIZE.

MS. KISLING: OKAY. ONE OF THE THINGS I'M BRINGING YOU UP FOR VICTORIA IS THERE WAS A STATEMENT REGARDING --

THE HEARING OFFICER: LET ME START THIS.

HAVE YOU BEEN SWORN?

THE WITNESS: I WAS SWORN IN.

THE HEARING OFFICER: AND YOU STILL ARE. AND VICTORIA, I FORGOT YOUR LAST NAME. I APOLOGIZE.

THE WITNESS: HARDING.

THE HEARING OFFICER: HARDING.

GO AHEAD.

EXAMINATION

BY MS. KISLING:

Q VICTORIA, THERE WAS A STATEMENT EARLIER AS TO HOW CHARGES MAY OR MAY NOT BE HANDED OUT OR PROVIDED OUTSIDE OF WHAT THE TYPICAL DISTRIBUTION IS. ARE YOU AWARE OF ANY TIME WHERE THAT MAY HAVE OCCURRED RECENTLY

AT AN E-BOARD MEETING?

A YES. AMELIA GAYTON GAVE HER CHARGES OUT TO EVERYONE AT THE E-BOARD MEETING. I DON'T REMEMBER WHICH MONTH, WHETHER IT WAS LAST MONTH OR THE MONTH BEFORE. BUT SHE HANDED THAT OUT TO EVERYONE. WE SAID -- I DIDN'T WANT IT. I LEFT IT THERE. I DON'T KNOW WHAT HAPPENED TO IT. IT WAS KIND OF OUT OF ORDER. AND AMELIA KEPT SAYING THAT SHE WANTED EVERYBODY TO KNOW ABOUT THE CHARGES THAT SHE WAS PUTTING OUT. WE ALL SAID, "STOP. IT'S OUT OF ORDER. IT'S OUT OF ORDER." AND SHE KEPT GOING UNTIL FINALLY SHE WAS QUIET.

Q WERE YOU AWARE OF HER DOING THE SAME CONDUCT WITH THE STAFF GRIEVANCES?

A WITH THE STAFF GRIEVANCES? THAT, I AM NOT AWARE OF.

MS. KISLING: THAT'S FINE. DOES SHE HAVE A COPY OF THIS IN FRONT OF HER?

THE WITNESS: WHAT IS THAT?

BY MS. KISLING:

Q THIS IS --

A THE WEBSITE. I'VE SEEN THE WEBSITE THOUGH.

Q OKAY. YOU'VE SEEN THE WEBSITE?

A I'VE SEEN THE WEBSITE.

Q IS THERE ANYTHING -- BECAUSE I HAVEN'T SEEN THE WEBSITE. IS THERE ANYTHING ON THE WEBSITE THAT WOULD REFER YOU BACK TO ME?

A NO.

Q OKAY. AM I A CONTACT LISTED ON THE WEBSITE?

A NO.
Q HAVE I EVER REFERRED YOU TO THE WEBSITE?
A NO.
Q HAVE I EVER APPROACHED YOU AND HAD A CONVERSATION ABOUT DECERTIFYING OR SECESSION?
A NO.
MS. KISLING: OKAY. THAT'S IT.
THE HEARING OFFICER: ALL RIGHT. DO YOU HAVE CROSS?
MS. MANCINI: YES.

EXAMINATION

BY MS. MANCINI:
Q IN REGARDS TO THE AMELIA GAYTON CHARGES, AT THAT MEETING, WERE THOSE CHARGES GIVEN OUT TO EVERY SINGLE BOARD MEMBER?
A YES. THEY WERE. SHE CAME IN WITH AN ARMFUL LIKE, THIS AND HANDED OUT A PACKET TO EVERYONE (INDICATING).
Q AND WERE THEY -- IN TURN, WHEN SHE WAS TOLD SHE WAS OUT OF ORDER, WERE THEY, IN TURN, PICKED UP?
A NO. THEY WERE NOT ALL PICKED UP. BECAUSE MINE SAT THERE AT THE END OF THE EVENING, AND I LEFT IT THERE.
Q OKAY. IN REGARDS TO THE WEBSITE -- SO I'M GOING BACK TO -- WHICH YOU WILL PROBABLY NEED TO HAVE A COPY SO YOU CAN SEE IT.
MS. WALFOORT: WHICH ONE?
MS. MANCINI: I THINK IT MIGHT BE EXHIBIT 6.

MS. WALFOORT: IS THAT THAT ONE YOU'VE GOT?
THE WITNESS: UH-HUH.
MS. WALFOORT: I GAVE THAT TO HER.
MS. MANCINI: OKAY.
BY MS. MANCINI:
Q SO AS A MEMBER OF THE EXECUTIVE BOARD, WERE YOU CONSULTED BEFORE THESE CHARGES WERE PRESENTED AS A MAJORITY MEMBER THAT WAS FILING THESE CHARGES?
A I WAS AWARE CHARGES CAN BE FILED. YES, I WAS.
Q THAT THEY WERE FILED OR THAT THEY CAN BE FILED?
A THEY WERE GOING TO BE FILED.
Q THAT THEY WERE GOING TO BE FILED?
A YES.
Q WERE YOU PART OF THE CHARGING PARTY?
A I'M NOT LISTED AS PART OF THE CHARGING PARTY.
Q WERE YOU ONE OF THE MAJORITY OF MEMBERS OF THE EXECUTIVE BOARD THAT WAS CHARGING, THAT WAS REFERENCED ON THIS AS CHARGING ME?
A WOULD I CONSIDER MYSELF AS SUCH, POSSIBLY. IT WAS NOT ASKED OF ME WHETHER OR NOT I WANTED TO BE ON AS A CHARGING MEMBER. IT WAS NEVER ASKED OF ME.
Q OKAY. SO YOU DIDN'T GIVE CONSENT TO BE A MEMBER OF THIS CHARGING PARTY?
A NO.
Q THANK YOU. ALSO HAVE YOU EVER HAD CHARGES E-MAILED TO YOU EVER?
A YES.
Q AND CAN YOU TELL ME WHEN THAT WAS?

A NOT OFF THE TOP OF MY HEAD.
Q COULD YOU TELL ME WHAT THEY WERE IN RELATION TO?
A THEY WERE SHARON'S CHARGES AGAINST YOU.
Q OKAY. SO SHE -- JUST SO THAT I'M CLEAR, SO SHE E-MAILED OUT A COPY OF THESE CHARGES TO YOU?
THE HEARING OFFICER: "SHE" REFERENCING?
BY MS. MANCINI:
Q I'M SORRY. SHARON E-MAILED YOU A COPY OF THESE CHARGES?
A SHE DID. IT WAS A MULTIPLE E-MAIL THAT WENT OUT TO MORE THAN ONE PERSON. I WAS ON THAT E-MAIL, YES.
Q OKAY. SO IF YOU'RE STATING THAT CHARGES WERE GIVEN OUT AT A BOARD MEETING, AND IT WAS INAPPROPRIATE, WHY WOULD YOU THINK IT WAS APPROPRIATE FOR THEM TO BE E-MAILED OUT TO EVERY BOARD MEMBER?
A I DIDN'T SAY THAT IT WAS.
Q OKAY. SO YOU AS AN OFFICER DON'T FEEL THAT THAT WAS AN APPROPRIATE ACTION?
A I THINK IT'S APPROPRIATE TO DO IT THE WAY THE CBA SAYS OR THE BYLAWS SAYS TO DO IT. THAT DOESN'T MEAN THAT SOMEBODY ELSE WHO COULD PASS THAT ON TO SOMEBODY WHO WOULD LIKE TO KNOW. BUT AS AN E-MAIL, I HAVE MY CHOICE TO OPEN IT OR NOT OPEN IT. I DON'T HAVE TO LOOK AT THOSE CHARGES. WHEN SOMEBODY SHOVES IT IN MY FACE, WAS A VERY DIFFERENT THING.
Q I GET THAT.
A THAT WAS THE DIFFERENCE.

Q IF YOU CAN JUST GIVE ME ONE SECOND. HANG ON ONE SECOND. I'M ACTUALLY GOING BACK TO THE CONSTITUTION AND BYLAWS TO PAGE 56, SECTION 4. SO BASED UPON EARLIER TESTIMONY FROM BRENDA MARZAN IN RELATION TO THE CONSTITUTION AND BYLAWS AND HOW WELL SHARON KNEW THE CONSTITUTION AND BYLAWS, SHOULD SHE HAVE KNOWN THAT -- AND AS WELL AS YOURSELF AS AN OFFICER OF THE EXECUTIVE BOARD, WOULD YOU HAVE KNOWN THAT IT STATES THAT THE ONLY WAY THAT CHARGES CAN BE FILED IS A COPY NEEDS TO EITHER GO REGISTERED OR CERTIFIED MAIL TO THE PEOPLE WHO ARE BEING CHARGED?
A YES. I'M AWARE. I BELIEVE SHARON IS AWARE. I DON'T BELIEVE THAT HER SENDING IT TO ME HAD ANYTHING TO DO WITH FILING OF CHARGES. I THINK IT WAS JUST PROVIDING INFORMATION THAT CHARGES WERE FILED.
Q OKAY. SO SHE THEN, IN TURN, SENT OUT PUBLICLY CHARGES THAT WERE FILED AGAINST OFFICERS OF THE UNION TO WE DON'T KNOW WHO OR TO A LARGE GROUP OF PEOPLE, YOU WOULD SAY?
A IT WASN'T A LARGE GROUP OF PEOPLE. IT WAS -- I BELIEVE CLARK COUNTY.
Q THE WHOLE CLARK COUNTY?
A NO, NOT ALL OF CLARK COUNTY.
Q OH.
(SIMULTANEOUS SPEAKERS.)
THE WITNESS: BUT I THINK ALL OF THE EXECUTIVE BOARD OF CLARK COUNTY, THE ENTIRE CLARK COUNTY, NO.
BY MS. MANCINI:

Q SO SHE SENT OUT THE CHARGES VIA E-MAIL TO ALL OF THE BOARD MEMBERS OF CLARK COUNTY?
A I BELIEVE ALL OF THEM WERE ON THERE.
Q AND YOU DIDN'T THINK THAT THAT WAS A VIOLATION OR THAT YOU NEEDED TO LET SOMEONE KNOW?
A NO. I DID NOT.
Q THAT THAT WAS A VIOLATION OF OUR CONSTITUTION AND BYLAWS?
A NO. I DID NOT.
MS. WALFOORT: COULD I GET CLARIFICATION? BY "BOARD MEMBERS OF CLARK COUNTY," DO YOU MEAN MEMBERS OF THE EXECUTIVE BOARD OF 1107?
THE WITNESS: YES. THE EXECUTIVE BOARD, YES.
MS. KISLING: I MIGHT BE ABLE TO ADD SOMETHING. I HAVE THE E-MAIL HERE.
THE HEARING OFFICER: YOU WILL BE ABLE TO REBUT.
MS. KISLING: OKAY.
MS. MANCINI: NOTHING FURTHER.
THE HEARING OFFICER: OKAY. SHARON?
MS. KISLING: CAN I APPROACH THE WITNESS?
MS. WALFOORT: YES.

EXAMINATION

BY MS. KISLING:
Q CAN YOU SPEAK TO WHO THIS E-MAIL IS TO?
A THERE IS SOMEBODY FROM SEIU THAT I DON'T EVEN KNOW AND THEN OUR SECRETARY.

Q CAN YOU SAY THEIR NAME?
A GARY OR GERRY HUDSON.
Q OKAY.
MS. WALFOORT: ARE YOU GOING TO ASK MORE QUESTIONS ABOUT THAT?
MS. KISLING: I AM.
MS. WALFOORT: CAN WE SEE IT?
MS. KISLING: OF COURSE.
THE HEARING OFFICER: AND CAN THAT BE FORWARDED TO LA RELL AND PUT INTO EVIDENCE?
(DISCUSSION HELD OFF THE RECORD.)
MS. KISLING: SO THE INITIAL E-MAIL ACTUALLY WENT OUT TO GERRY HUDSON, WHO SHE'S NOT FAMILIAR WITH. BUT THAT'S THE INTERNATIONAL SECRETARY AT THAT TIME. THAT'S WHO I UNDERSTOOD TO BE THE INTERNATIONAL SECRETARY. AND THAT'S WHO I FILED THE CHARGES WITH. AND THEN THE PEOPLE COPIED WERE SECRETARY OF OUR LOCAL AND THE SIX EXECUTIVE VICE PRESIDENTS OF INTERNATIONAL AND THEN OUR ATTORNEY, MICHAEL URBAN.
SO THAT'S WHO THE INITIAL E-MAIL WENT OUT TO. AND THEN IT WAS FORWARDED. AND THAT'S THE ONE THAT WENT OUT TO THE COUNTY. AND THAT INCLUDED VICTORIA, BASED ON CONCERNS THEY HAD PROVIDED THAT I HAD INCLUDED IN THE CHARGES.
THE HEARING OFFICER: CAN YOU FORWARD THAT TO LA RELL SO THAT WE CAN ENTER IT INTO EVIDENCE THROUGH THAT PROCESS? AND CAN YOU NOTE WHAT THAT'S GOING TO BE NAMED?

MS. PURDIE: WE CAN DO IT HERE AFTER WE FINISH.
MS. MANCINI: A QUICK QUESTION ON THE E-MAIL. CAN YOU TELL ME WHEN YOU SENT IT TO THE INTERNATIONAL AND WHEN DID YOU SEND IT TO THE BOARD MEMBERS, SHARON?
THE HEARING OFFICER: WE DON'T HAVE IT.
MS. KISLING: OH, OKAY. SEPTEMBER 9TH.
MS. MANCINI: SEPTEMBER 9TH YOU SENT IT OUT TO EVERYBODY?
MS. KISLING: YES, GERRY HUDSON, SEPTEMBER 9TH.
MS. MANCINI: AND WHEN WAS IT SENT TO THE COUNTY E-BOARD MEMBERS?
MS. KISLING: IT WAS SEPTEMBER 9TH AS WELL.
MS. MANCINI: OKAY. SO MY CHARGES WERE RECEIVED AT THE UNION HALL FROM GERRY HUDSON ON SEPTEMBER 20TH. SO ALL OF THESE CHARGES WERE BASICALLY OUT TO THE CLARK COUNTY EXECUTIVE BOARD MEMBERS BEFORE THE CHARGED PARTY WAS EVEN PRIVY TO CHARGES EVEN BEING FILED AGAINST THEM.
NOW MY SECOND QUESTION IS THAT IS AN ENCRYPTED E-MAIL. WAS THAT A CLARK COUNTY E-MAIL?
MS. KISLING: NO. IT WAS THE ATTORNEYS FROM HERE. YOU CAN MAKE YOUR E-MAILS ENCRYPTED.
MS. MANCINI: OKAY. BUT I THOUGHT I HAD SEEN "CLARKCOUNTY.GOV" ON THAT E-MAIL.
MS. KISLING: NO. LOCAL 1107 AND SEIU --
MS. MANCINI: CAN I SEE IT?
MS. KISLING: I'M GOING TO FORWARD --
(SIMULTANEOUS SPEAKERS.)

MS. WALFOORT: LET ME, ONE SECOND. BECAUSE THE WITNESS CAN'T ANSWER BECAUSE YOU'RE THE ONLY ONE THAT HAS ACCESS TO THAT, WHY DON'T YOU FORWARD THAT TO LA RELL PURDIE AND TO CHERIE SO SHE CAN LOOK AT IT.

AND YOU DO REALLY NEED TO CONCLUDE THIS.

MS. MANCINI: THE POINT I WAS MAKING IS I WANTED TO KNOW IF IT WAS ACTUALLY SENT OUT ON CLARK COUNTY E-MAIL, WHICH IS HER EMPLOYER.

MS. WALFOORT: AND SHE'S SAYING NO.

MS. MANCINI: SHE'S SAYING NO. BUT I WOULD LIKE TO VERIFY THAT.

MS. WALFOORT: I UNDERSTAND THAT.

MS. KISLING: AND THAT'S FINE. BUT HOW DOES THAT SUPPORT THE CHARGES? WHAT DOES THAT HAVE TO DO WITH THIS WITNESS'S TESTIMONY?

MS. MANCINI: YOU BROUGHT UP THE E-MAIL.

MS. WALFOORT: WELL, WE HAVE GOT THE CONTEXT, AND WE WILL MOVE ON NOW.

MS. KISLING: OKAY. THANK YOU.

ALL RIGHT. SO I'M DONE. IF SHE'S DONE, I'M DONE. I CAN CALL MY NEXT WITNESS.

THE HEARING OFFICER: YES.

MS. KISLING: BRENDA MARZAN.

THE HEARING OFFICER: BRENDA MARZAN, YOU STILL ARE SWORN IN.

YOU CAN GO AHEAD AND START QUESTIONING, SHARON.

/////

/////

EXAMINATION

BY MS. KISLING:

Q OKAY. SO A FEW THINGS I WANT TO FOLLOW UP WITH AS REBUTTAL TESTIMONY. ONE OF THEM HAS TO DO WITH -- I DON'T HAVE THE DATE. BUT FAB PAVEL PROVIDED TESTIMONY ABOUT -- IS THIS IT? YES.

SO ON 10/18, CAN YOU TELL US WHY YOU AND I WERE ACTUALLY AT THE CAFETERIA AT THE GOVERNMENT CENTER?

A SURE. THAT DAY, WE HAD SCHEDULED A STEWARDS MEETING TO BE HELD AT THE GOVERNMENT CENTER CAFETERIA, WHICH HAD BEEN CHANGED A COUPLE OF WEEKS PRIOR. AND IT WAS CHANGED BECAUSE THE TRO WAS PUT AGAINST YOU. SO YOU COULDN'T BE AT THE UNION HALL. SO WE SENT OUT AN APPOINTMENT THAT CHANGED IT TO THE GOVERNMENT CENTER.

EARLIER THAT WEEK, CHERIE SENT A REVISED VERSION OF THAT AND DID NOT INCLUDE US. SO WE ENDED UP AT THE CAFETERIA ALONE -- WELL, EXCEPT FOR JAVIER CABRERA SHOWING UP WITH RANDY PETERS TO DETERMINE WHO ELSE WAS GOING TO SHOW UP.

Q SO WE ACTUALLY WERE RELEASED FROM WORK BECAUSE WE UNDERSTOOD US TO BE GOING TO A STEWARD MEETING?

A CORRECT.

Q AND ONCE WE GOT THERE, FOUND OUT THAT THAT MEETING HAD BASICALLY BEEN -- THE LOCATION HAD CHANGED WITHOUT US BEING NOTIFIED?

A CORRECT.

Q NOW, WHILE WE WERE THERE WAITING TO SEE SINCE THAT WAS THE INITIAL PLACE WHERE THE STEWARD MEETING WAS

TO BE HELD, WERE WE OBTAINING SIGNATURES OR RUN A RECALL PETITION?

A NO. WE ACTUALLY WERE WAITING FOR A MEETING. SO WHEN WE GOT THERE AND REALIZED -- I ACTUALLY THINK ONE OF THE STEWARDS WAS HEADING TO THE HALL, THAT YOU RAN INTO. AND WE STARTED TRYING TO FIGURE OUT WHAT WAS GOING ON. SO WE WENT TO THE CAFETERIA TO MAKE SURE THAT NOBODY ELSE WAS GOING TO SHOW UP THERE EITHER. AND AT THAT POINT, WE ACTUALLY HAD SOME CONVERSATION ABOUT THE MOVE.

Q HAVE I EVER DISCUSSED SECESSION WITH YOU?

A ABSOLUTELY NOT.

Q HAVE I EVER REFERRED YOU TO THE WEBSITE APPARENTLY THAT IS UP THERE?

A NO.

Q DO YOU KNOW IF I WAS INVOLVED IN THIS WEBSITE?

A NO. NO, I KNOW YOU WEREN'T.

Q OKAY. SO YOU ACTUALLY KNOW THAT I WAS NOT INVOLVED?

A I KNOW YOU WERE NOT INVOLVED IN THIS WEBSITE.

Q IS THERE ANYTHING ON THIS WEBSITE TO MAKE ANOTHER PARTY SEE THAT I'M A POINT OF CONTACT?

A I THINK EVERYBODY'S ASSUMING BECAUSE THE CHARGES WERE THERE THAT THIS WAS YOU. BUT THERE IS A LOT OF PEOPLE THAT HAD THOSE CHARGES.

Q OKAY. DO YOU KNOW IF I -- OR DID I HAVE SOMEONE DEVELOP THE WEBSITE?

A NO.

Q DID YOU DEVELOP THE WEBSITE?

A NO.
Q DO YOU KNOW WHO DEVELOPED THE WEBSITE?
A YES, I DO.
Q OKAY. NOW, GOING TO SOMETHING ELSE THAT CAME UP, DISCIPLINE. WHEN DISCIPLINE IS ISSUED, IS THERE A PROCESS TO SEE WHETHER OR NOT IT HAS MERIT?
A YES.
Q SO CAN ANYONE RECEIVE DISCIPLINE?
A UPFRONT, YES I GUESS THEY CAN. BUT ONCE IT GOES THROUGH THE PROCESS, IF THERE IS NO FINDINGS, IT'S REMOVED FROM THE FILE. ACTUALLY IT REALLY NEVER GETS TO THE FILE.
Q OKAY. WHICH IS TRUE. SO IF IT NEVER GETS TO THE FILE, CAN IT BE REFERENCED WITHIN YOUR EMPLOYMENT?
A NO. AND ACTUALLY, IF YOU GO THROUGH THE PROCESS AND IT GETS REMOVED DURING THE PROCESS -- SO IF YOU FILE A STEP 1 OR FILE A STEP 2 IN THE GRIEVANCE PROCESS, IF IT'S DETERMINED THAT IT'S NOT VALID, IT GETS REMOVED. AND IT CAN NO LONGER BE CONSIDERED. AND THAT IS IN OUR CONTRACT, OUR CBA.
Q CAN IT BE REFERENCED IN A PERFORMANCE EVALUATION?
A NOT IN A PERFORMANCE EVALUATION. IT CAN'T BE CONSIDERED FOR PROMOTION. IT CAN'T BE CONSIDERED FOR ANYTHING.
Q DO YOU THINK THAT EMPLOYEE MEMBERS KNOW THAT THEIR DISCIPLINE CAN BE USED BY SEIU FOR OTHER PURPOSES?
A NO.

Q DO YOU AGREE WITH IT BEING USED FOR OTHER PURPOSES?

A NO.

Q DOES DISCIPLINE -- WE HEARD TESTIMONY THAT DISCIPLINE GETS REMOVED FROM THE FILE WHEN SOMEONE IS TRANSFERRED. DO YOU KNOW THAT TO BE TRUE?

A ABSOLUTELY NOT. THE DISCIPLINE REMAINS IN THE FILE UNTIL -- THROUGH THE COLLECTIVE BARGAINING AGREEMENT, THERE IS TIME FRAMES BASED ON THE TYPE OF GRIEVANCE OR BASED ON THE TYPE OF DISCIPLINE.

SO I BELIEVE LIKE A DOCUMENTED ORAL WARNING IS SIX MONTHS, A WRITTEN IS 12, ET CETERA, ET CETERA. SO UNTIL THAT TIME FRAME IS MET, NOTHING CAN BE PULLED OUT, EVEN IF YOU GET TRANSFERRED TO ANOTHER DEPARTMENT, ANOTHER DIVISION, IT DOESN'T MATTER. IT STAYS IN YOUR FILE.

Q WITH THAT, CAN THE STATEMENTS WITH ANDREA BOND BE TRUTHFUL?

A NO.

Q NEXT, HAS HR ACTUALLY REACHED OUT TO YOU BECAUSE THEY HAVEN'T BEEN PROVIDED WITH INFORMATION TIMELY AND PROFESSIONALLY BY ANDREA BOND AT SEIU?

A YES. THEY HAVE.

Q IS THERE ANYTHING ELSE?

A NO.

MS. KISLING: OKAY. THAT'S IT.

THE HEARING OFFICER: ALL RIGHT. CHERIE, DO YOU WANT TO CROSS?

MS. MANCINI: YES.

EXAMINATION

BY MS. MANCINI:

Q SO BRENDA, WERE YOU ONE OF THE OFFICERS WHO RECEIVED THOSE SETS OF CHARGES ON THE 9TH OF SEPTEMBER?

A ABSOLUTELY.

Q AND SO YOU TESTIFIED EARLY THAT YOU KNEW -- THAT YOU ARE VERY, VERY WELL VERSED IN THE CONSTITUTION AND BYLAWS; IS THAT CORRECT?

A I SAID I HAVE READ THEM THOROUGHLY.

Q I BELIEVE YOU SAID THAT YOU WERE VERY WELL VERSED. SO HAD YOU EVER SEEN THIS STATEMENT ON FILING CHARGES IN THE CONSTITUTION AND BYLAWS?

A YES.

Q SO AS AN OFFICER OF THE LOCAL, DID YOU THINK THAT IT WAS UNUSUAL TO GET AN E-MAIL OF SOMEONE'S CHARGES?

A NO.

Q HAVE YOU EVER RECEIVED CHARGES VIA E-MAIL BEFORE?

A I DON'T RECALL.

Q HAVE YOU EVER BEEN GIVEN -- HAVE YOU EVER BEEN GIVEN SOMEONE'S CHARGES -- STRIKE THAT. HAVE YOU EVER BEEN AWARE OF CHARGES BEING FILED ON ANOTHER OFFICER OF THE UNION?

A ABSOLUTELY.

Q OKAY. HOW WOULD THE BOARD FIND OUT ABOUT

CHARGES, IF IT WASN'T VIA E-MAIL?
A WHEN WE DO A HEARING.
Q SO THAT WOULD BE --
A WHEN IT'S PUT ON THE AGENDA.
Q SO THEN IT WOULD BE PUT ON THE AGENDA OF THE EXECUTIVE BOARD, AND IT WOULD GO THROUGH A HEARING PROCESS, CORRECT?
A NOT NECESSARILY. HALF THE TIME, THEY NEVER GET HEARD.
Q BUT IF WE LOOKED AT CONSTITUTION AND BYLAWS, THAT WOULD BE A RULE WE WOULD FOLLOW, CORRECT?
A WELL, BASED ON THE CONSTITUTION AND BYLAWS, IT'S VERY CONFUSING. BUT THAT'S THAT A DIFFERENT STORY. BUT, YES, THEORETICALLY, IT WOULD BE HEARD.
Q SO YOU FIND THE CONSTITUTION AND BYLAWS CONFUSING?
A ON THE PROCESS FOR CHARGES, ABSOLUTELY.
Q OKAY. WELL, I KNOW THAT WE SPOKE OF THE CONFLICTING LANGUAGE WITHIN THE CONSTITUTION AND BYLAWS.
A YES. AND THE CHARGES IS ONE AREA THAT'S VERY CONFUSING.
Q OKAY. YOU JUST STATED THAT YOU KNEW WHO DEVELOPED THAT WEBSITE. CAN YOU PLEASE TELL ME?
A MARTIN BASSICK.
Q NOT THAT ANY OF US ARE SURPRISED (INAUDIBLE).
MS. KISLING: OKAY. WAS THAT A STATEMENT? MY QUESTION IS THEN --
MS. WALFOORT: WAIT, LET HER FINISH HER

QUESTIONING.
BY MS. MANCINI:
Q DO YOU HAVE REGULAR COMMUNICATIONS WITH MARTIN BASSICK?
A I DON'T THINK THAT'S RELEVANT.
Q EXCUSE ME?
A THAT'S PERSONAL.
MS. KISLING: THAT'S YOUR ANSWER.
MS. MANCINI: DOES SHE NOT HAVE TO ANSWER MY QUESTION?
MS. KISLING: SHE DID.
MS. MANCINI: I ASKED HER DOES SHE HAVE REGULAR COMMUNICATIONS WITH MARTIN BASSICK?
MS. KISLING: SHE SAID IT'S PERSONAL.
MS. WALFOORT: WHY DON'T YOU ASK HER HOW SHE KNOWS.
BY MS. MANCINI:
Q HOW DO YOU KNOW MARTIN BASSICK?
MS. WALFOORT: NO. HOW DOES SHE KNOW WHO SET UP THE WEBSITE.
BY MS. MANCINI:
Q HOW DO YOU KNOW WHO SET UP THE WEBSITE?
A BECAUSE HE TOLD ME.
Q SO THEN YOU HAVE COMMUNICATIONS WITH MARTIN BASSICK?
A MARTIN BASSICK TOLD ME HE DID THE WEBSITE, YES.
Q SO CAN YOU TELL ME WHEN HE TOLD YOU THIS?
A COULDN'T TELL YOU.

MS. WALFOORT: APPROXIMATELY?

THE WITNESS: PROBABLY A MONTH AGO.

BY MS. MANCINI:

Q SO AS AN OFFICER OF THE UNION, YOU WOULD NOT FEEL THAT YOU WOULD NEED TO REPORT THAT TO THE PRESIDENT?

A NO.

Q A WEBSITE THAT YOU KNEW WAS ACTIVELY TRYING TO TAKE PEOPLE TO AN ORGANIZATION CALLED CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION?

A THIS IS ABOUT UMC. AND THIS IS SOMETHING THAT PERSONALLY I DON'T BELIEVE IS ACTUALLY BEING PUSHED FOR THE REASON THAT PEOPLE THINK IT'S BEING PUSHED.

Q OKAY. SO DO YOU HAVE A REASON WHY IT'S BEING PUSHED?

MS. KISLING: I'M NOT UNDERSTANDING HOW THIS SUPPORTS CHARGES AGAINST ME? BECAUSE IT SEEMS LIKE IT DOES THE OPPOSITE.

MS. WALFOORT: IT SEEM RELEVANT TO THE QUESTION OF THE WEBSITE AND WHETHER YOU ARE RESPONSIBLE FOR IT OR NOT.

MS. KISLING: RIGHT. BUT THAT'S BEEN ANSWERED. IT SOUNDS LIKE SHE'S TRYING TO GET MORE INFORMATION ABOUT THE WEBSITE, WHICH IS FINE. BUT WOULD WE DO IT NOW? BECAUSE I KNOW TIME --

MS. MANCINI: I'M TRYING TO FIND OUT FROM THE WITNESS WHAT SHE KNEW ABOUT THE WEBSITE.

THE HEARING OFFICER: LET'S LET THE QUESTIONS CARRY THROUGH. I EVEN HAVE ONE MORE QUESTION.

BY MS. MANCINI:
Q SO HOW LONG HAVE YOU BEEN A MEMBER OF THE UNION?
A SINCE 1988.
Q SINCE 1988. SO WHEN YOU FIRST CAME INTO THE UNION, WERE YOU PART OF CLARK COUNTY PUBLIC EMPLOYEE ASSOCIATION?
A ABSOLUTELY.
Q AND SO AS A LONGSTANDING MEMBER, YOU WOULD NOT THINK THAT SOMETHING AS EGREGIOUS AS A WEBSITE PROMOTING PEOPLE TO DECERTIFY FROM SEIU WOULD BE WORTH REPORTING TO THE PRESIDENT OF THE UNION?
A FIRST OF ALL, I BELIEVE THAT THIS IS FOR ATTENTION FROM THE INTERNATIONAL. SO DO I BELIEVE THAT THIS IS ACTUALLY GOING TO MOVE FORWARD, ABSOLUTELY NOT.
Q THAT'S NOT WHAT I ASKED. I ASKED, DID YOU NOT THINK THAT IT WAS IMPORTANT ENOUGH AS AN OFFICER OF CLARK COUNTY AND AN OFFICER OF SEIU 1107, THAT IT WAS IMPORTANT ENOUGH TO BRING TO THE ATTENTION OF THE PRESIDENT?
A I BELIEVE AT THAT POINT THAT I RECEIVED THE INFORMATION THAT IT WAS THROUGHOUT THE ENTIRE LOCAL ALREADY.
Q DID YOU BELIEVE THAT YOU -- I'M STILL NOT GETTING AN ANSWER. IT'S EITHER "YES" OR "NO." DID YOU THINK IT WAS IMPORTANT TO BRING TO ME OR NOT?
A NO. BECAUSE IT WAS ALREADY KNOWN.
Q DID WE HAVE A CONVERSATION THAT I KNEW IT?
A THERE WAS ALREADY THE COMMUNICATIONS THAT WERE

GOING ON THROUGHOUT UMC THAT THIS WEBSITE EXISTED. SO, YES, I WAS AWARE THAT YOU WERE ALREADY AWARE OF IT.
Q BUT YOU DIDN'T THINK IT WAS IMPORTANT ENOUGH? TOOK BEING TODAY, BEING UNDER OATH, TO TELL ME THAT MARTIN BASSICK IS THE ONE THAT CREATED THIS WEBSITE?
A IT DOESN'T MATTER.
Q IT DOESN'T MATTER? OKAY. THANK YOU.
MS. KISLING: I HAVE A CROSS.
MS. WALFOORT: JUST ONE SECOND.
THE HEARING OFFICER: SO I JUST HAVE ONE, POSSIBLY A COUPLE, FOLLOWUP QUESTIONS. YOU SAID IT WAS KNOWN THROUGHOUT UMC. HOW DO YOU KNOW IT WAS KNOWN THROUGHOUT? WHO DID YOU TALK TO ABOUT IT?
THE WITNESS: BECAUSE THERE WERE ALL KINDS OF COMMUNICATIONS GOING ON. THERE WAS E-MAILS THAT CHERIE HAD PUT OUT AGAIN ABOUT THE BARGAINING TEAM DOING THINGS THAT THEY SHOULDN'T BE DOING. AND IT WAS ALL ABOUT THIS WEBSITE AND THE DECERT.
THE HEARING OFFICER: OKAY. AND DO YOU HAVE THE E-MAIL OR E-MAILS THAT YOU ARE REFERRING TO?
THE WITNESS: I CAN GET AHOLD OF THOSE, YES.
THE HEARING OFFICER: ALL RIGHT. AND DID YOU TALK TO SHARON AT ALL ABOUT THE WEBSITE?
THE WITNESS: NO.
THE HEARING OFFICER: DID YOU TALK TO ANY OTHER EXECUTIVE BOARD MEMBERS?
THE WITNESS: PAT GREAUX.
THE HEARING OFFICER: PAT GREAUX?

ALL RIGHT, SHARON.

FURTHER EXAMINATION

BY MS. KISLING:

Q OKAY. SO PRESIDENT MANCINI SEEMED TO STRUGGLE WITH IF YOU DID OR DID NOT COMMUNICATE WITH HER. DO YOU HAVE A HEALTHY RELATIONSHIP WITH PRESIDENT MANCINI?

A ABSOLUTELY NOT.

Q DOES SHE NORMALLY RESPOND TO COMMUNICATION FROM YOU?

A NO.

MS. KISLING: THANK YOU.

MS. MANCINI: MAY I OR NOT?

MS. WALFOORT: I DON'T THINK THERE'S ANY NEED TO. IS IT GOING TO BE RIGHT DIRECTLY ON THIS POINT ON WHETHER SHE HAD A HEALTHY RELATIONSHIP WITH YOU?

MS. MANCINI: I CAN SHOW YOU E-MAILS THAT SHE DEFINITELY HAS NOT A PROBLEM TO COMMUNICATE WITH ME. IF SHE HAS AN OPINION, SHE WILL COMMUNICATE IT TO ME. AND SOMETHING AS IMPORTANT AS KNOWING ABOUT A DECERTIFICATION WITHIN THIS UNION, IF IT WAS SOMETHING TO DO WITH HER SHOP OR ANYONE ELSE'S SHOP, I HAVE NO PROBLEM AS MY OBLIGATION AND MY OATH OF OFFICE TO BRING THAT FORWARD. THAT IS THE PIECE HERE. WE HAVE ALL TAKEN AN OATH OF OFFICE TO PROTECT OUR MEMBERS.

THE HEARING OFFICER: CAN I SAY SOMETHING? I WILL TAKE EVERYTHING EITHER OFFERED AS EVIDENCE OR TESTIMONY WITH WHAT I BELIEVE IS THE APPROPRIATE WEIGHT

FOR THAT PARTICULAR EVIDENCE OR TESTIMONY. AND THAT I'M NOT -- I DON'T THINK THAT WE NEED TO GO ON. SHE TESTIFIED TO HOW SHE FELT THE RELATIONSHIP WAS. I DON'T KNOW THAT THAT'S DISPUTABLE REALLY.

MS. MANCINI: OKAY.

THE HEARING OFFICER: SO THANKS, BRENDA.

MS. KISLING: CLARA THOMAS NEXT.

THANK YOU, BRENDA.

MS. WALFOORT: IS THIS THE LAST WITNESS?

THE HEARING OFFICER: CLARA, YOU WERE SWORN IN EARLIER, CORRECT?

THE WITNESS: YES, MA'AM.

THE HEARING OFFICER: YOU'RE STILL SWORN IN.

CLARA THOMAS IS THE WITNESS.

GO AHEAD, SHARON.

MS. KISLING: I'M GOING TO GIVE YOU A COPY OF THIS.

MS. WALFOORT: CAN YOU SHOW US?

(DISCUSSION HELD OFF THE RECORD.)

MS. PURDIE: SO THIS WAS FROM CHARGE 3 AN E-MAIL FROM OCTOBER 30TH WITH THE SUBJECT "FORWARD: FINANCIALS," CHARGE NUMBER 3.

MS. MANCINI: THAT WAS FROM TODAY?

MS. PURDIE: YES, EARLIER TODAY.

MS. MANCINI: OH, EARLIER TODAY? OKAY. I DON'T HAVE IT.

MS. WALFOORT: YOU HAVE IT SOMEWHERE. BUT USE IT FOR NOW.

MS. WALFOORT: SHARON?
MS. KISLING: YES.

EXAMINATION

BY MS. KISLING:
Q SO DID YOU HAVE A COPY?
A NO, MA'AM.
Q SO WE TALKED ABOUT THIS ACTUALLY THROUGHOUT CHARGES. BUT SPECIFIC TO THIS ONE, THERE IS CONCERN ABOUT EGREGIOUS USE OF FINANCIAL RESOURCE AS WELL AS CONDUCT UNBECOMING A MEMBER. LOOKING AT THAT E-MAIL, THERE WERE REQUESTS. IT'S DOUBLE-SIDED. GO TO THE OTHER PAGE. THERE WERE REQUESTS FOR REPORTS. BECAUSE PREVIOUS EMPLOYEE CHRIS MUELLER HAD LEFT. AND THERE WERE CONCERNS ABOUT THE WAY MONEYS WERE HANDLED. WOULD YOU SAY THAT THAT SHOULD HAVE BEEN INVESTIGATED?
A EXACTLY, YES.
Q OKAY.
MS. MANCINI: I DO NOT KNOW WHAT SHE'S ALLUDING TO ON THE E-MAIL.
THE WITNESS: ARE YOU ALLUDING TO SEPTEMBER 12TH?
MS. KISLING: YES.
MS. WALFOORT: COULD YOU CLARIFY? YOU ARE SAYING SOMETHING SHOULD HAVE BEEN INVESTIGATED? WHAT IS IT THAT --
MS. KISLING: I'M SORRY.
BY MS. KISLING:

Q THE CONCERNS THAT ARE PROVIDED WITHIN THAT E-MAIL. IT WAS REQUESTING AN INVESTIGATION BASED ON IF -- SHE'S REFERENCING CONDUCT UNBECOMING A MEMBER, AND SHE'S REFERENCING FINANCIAL MALFEASANCE OR ANYTHING LIKE THAT. IS THAT AN EXAMPLE OF SOMETHING THAT SHOULD BE INVESTIGATED?
A YES.
THE HEARING OFFICER: COULD YOU JUST TELL ME EXACTLY WHAT IT SAYS? BECAUSE I DON'T HAVE A COPY IN FRONT OF ME.
MS. MANCINI: HERE. I'LL GIVE IT TO YOU.
MS. WALFOORT: WE GAVE OURS AWAY.
BY MS. KISLING:
Q SO I'M REFERRING YOU TO THIS. AND I KNOW THEY WILL BE ABLE TO READ THAT. BECAUSE IT'S IN EVIDENCE.
A WANT ME TO GO TO THE FIRST PAGE?
Q NO I'M JUST TYING IT INTO THE CONCERNS THERE AND NOT GETTING A RESPONSE TO DATE. WOULD YOU AGREE THAT THIS WOULD BE AN APPROPRIATE CHARGE, RUNNING A RECALL PETITION? IS THAT A VIOLATION OF -- IS THAT A VIOLATION OF THE BYLAWS?
A I DON'T THINK IT'S A VIOLATION.
Q OKAY. THAT'S IT ON THAT ONE.
HAVE I EVER APPROACHED YOU WITH A DISCUSSION ABOUT DECERTIFICATION?
A NO.
Q HAVE I EVER REFERRED YOU TO THAT WEBSITE RIGHT THERE?

A NO. THAT'S WHY I WAS NOSY AND WAS READING IT.
Q OKAY. ARE YOU AWARE OF WHEN I'VE DONE UNION BUSINESS OUTSIDE OF WORK HOURS?
A I WOULD SAY YES. I THINK THAT WE ALL HAVE, LIKE NOW.
Q ARE YOU AN EMPLOYEE OF CLARK COUNTY?
A YES, MA'AM.
Q SO DO YOU KNOW HOW YOU SUBMIT THE UNION BANK FORM IN ADVANCE?
A YES. WE HAVE A NEW SYSTEM. WE CALL IT ESS SYSTEM. YOU GO ONLINE. AND JUST LIKE YOU WOULD PUT IN FOR VACATION TIME OR SICK TIME, THEY HAVE A NEW SYSTEM THAT WE PUT UNION BANK TIME IN. AND IT GIVES YOU AREAS WHETHER OR NOT THE TIME IS FOR UNION BUSINESS OR GRIEVANCES, ET CETERA, ET CETERA.
THE HEARING OFFICER: AND ARE YOU REFERRING TO THIS? CHARGE 5, CHARGING PARTY EXHIBIT 4?
BY MS. KISLING:
Q CAN YOU LOOK ON THIS FORM AND LET ME KNOW IF THE DATE IT WAS SUBMITTED IS ACTUALLY MISSING? YOU CAN GO TO THE SECOND PAGE WHERE THE SIGNATURES WOULD BE.
A YES.
Q DOES IT APPEAR THAT IT WAS WHITED-OUT OR SOME KIND OF --
A YEAH. I COULD SEE THAT.
MS. WALFOORT: EXCUSE ME? WHAT WAS WHITED-OUT?
THE WITNESS: THE SIGNATURE DOWN AT THE BOTTOM.
MS. KISLING: THE DATE.

THE WITNESS: THE DATE, I'M SORRY.
MS. KISLING: SO THE FORM HAS A SIGNATURE AND DATE LINE, AND THERE IS NO DATE ON THAT.
THE HEARING OFFICER: SO YOU ARE SUGGESTING THERE SHOULD BE ANOTHER LINE BELOW THIS (INDICATING)?
MS. KISLING: YES.
BY MS. KISLING:
Q SO MY QUESTION IS, CAN THESE FORMS BE SUBMITTED FAR IN ADVANCE?
A I CAN ONLY REFER TO MY SHOP.
Q OKAY.
A OKAY. AND MY SHOP, IT -- ACTUALLY, YOU CAN. YOU CAN PROJECT. AND THEY ASK YOU TO GIVE ADVANCE NOTICE. AND I'LL REFER TO THE MONTH OF MAY. IN MAY OF THIS YEAR, IT WAS ASKED OF ALL UNION EMPLOYEES -- I MEAN UNION MEMBERS TO DO A -- OH, WHAT WAS IT? IT WAS A PROGRAM THAT, I GUESS, INTERNATIONAL WAS RUNNING FOR ALL OF US TO PUT IN TIME FOR UNION TELEPHONE BANKING, KNOCKING ON DOORS, TO BUILD UP OUR MEMBERSHIP.
BECAUSE APPARENTLY, THE MEMBERSHIP WAS FAR BELOW THE STANDARDS ESPECIALLY IN CLARK COUNTY. BECAUSE WE WERE JUST ABOUT AT 50 PERCENT. SO THEY WERE RUNNING A CAMPAIGN ON THAT. SO WE DID PUT IN ADVANCED TIME.
BUT GENERALLY, IF A MEMBER CALLS ME UP AS A STEWARD, I AM STILL A STEWARD AS FAR AS STEWARD/TRUSTEE. AND IF THEY NEED REPRESENTATION, I CAN PUT IN A UNION BANK TIME AT THAT TIME.
Q DO YOU REMEMBER US HAVING CONVERSATIONS ON THE

RELOCATION COMMITTEE ABOUT TRYING TO TAKE REGULAR TIME OFF AT LEAST ONCE A WEEK BECAUSE THERE WAS SO MANY THINGS TO TIGHTEN UP PRIOR TO THE MOVE?
A YES.
Q AND IT WAS HARD TO DO WITH OUR WORK SCHEDULE?
A YES.
Q ARE YOU ALSO AWARE THAT THE FRIDAY PRIOR TO THAT MONDAY THAT I WAS ACTUALLY IN MEDIATION WITH PETER NGUYEN?
A YES.
Q AND WHEN THAT MEDIATION WAS NOT SUCCESSFUL, I WAS THEN PROVIDED THAT MONDAY'S DATE?
A YES.
Q SO WOULD IT SURPRISE YOU IF THERE WAS NOT TIME TO ACTUALLY CHANGE THAT REQUEST, IF I NEED TO DO SO?
A NO.
Q OKAY. IS THERE ANYTHING THAT PROHIBITS US FROM WORKING OUR EIGHT AND A HALF HOURS OUTSIDE OF OUR REGULAR WORK SCHEDULE FOR UNION BUSINESS?
A NO.
Q THANK YOU.
THE HEARING OFFICER: ALL RIGHT. CROSS, CHERIE?
MS. KISLING: NO, NO.
THE HEARING OFFICER: OH, YOU ARE NOT DONE?
MS. KISLING: I WANT TO MAKE SURE I COVER ALL THE CHARGES.
MS. MANCINI: SURE.

MS. KISLING: I WANT TO REFER HER TO THIS, CHARGE 5 EXHIBIT 7. OKAY?

BY MS. KISLING:

Q SO I WAS TOLD THIS IS AN EXCERPT FROM THE CLARK COUNTY CONTRACT. HOWEVER, IT DOESN'T SHOW AN ARTICLE OR ANYTHING ELSE. IF YOU LOOK AT THE PARAGRAPH BEFORE OR AFTER THE HIGHLIGHTED AREA, THIS IS SOMETHING CHERIE REFERENCED, IS THAT NOT REFERENCING STEWARDS?

A WELL, IT ADDRESSES IT CLEARLY, "ALL STEWARDS," ONLY ONE "STEWARD," SO YES.

Q AND ISN'T IT SPEAKING TO NON-DEDUCTIBLE HOURS?

A AND THIS IS A -- YES, IT WOULD BE.

Q OKAY. ARE YOU AWARE THAT THERE ARE BOTH NON-DEDUCTIBLE UNION HOURS AND DEDUCTIBLE UNION HOURS?

A YES AND NO.

Q OKAY, OKAY.

A AND CAN I JUST SAY, THE REASON WHY I WENT "YES AND NO" IS BECAUSE CLEARLY ON THE FORM, IT TELLS YOU WHAT IS NON-DEDUCTIBLE AND WHAT'S DEDUCTIBLE.

Q OKAY. PERFECT.

MS. KISLING: I'M GOING TO REFER HER TO THAT (INDICATING).

THE HEARING OFFICER: CHARGE NUMBER 5, CHARGING PARTY EXHIBIT 5 IS WHAT SHARON'S GOING TO REVIEW WITH YOU.

BY MS. KISLING:

Q WERE YOU AWARE OF THIS DISCIPLINE THAT WAS BEING ISSUED?

A I BELIEVE THIS WAS THE STEP 1 THAT I WAS --
Q YES.
A -- YES.
Q OKAY. WAS THERE AN ATTORNEY THERE?
A NO.
Q OKAY. WHO DID -- WHO REALLY DID THE REPRESENTATION ON THAT CASE?
A YOU DID.
Q OKAY. DO YOU REMEMBER THE OUTCOME?
A YES.
Q OKAY. CAN YOU SHARE IT WITH US, PLEASE? BECAUSE THEY DIDN'T PROVIDE IT.
A YES. AN E-MAIL CAME TO ME ALONG WITH.
MS. WALFOORT: CLARA, THE QUESTION IS JUST DO YOU KNOW WHAT THE OUTCOME WAS.
THE WITNESS: YES.
THE HEARING OFFICER: WHAT WAS IT?
THE WITNESS: OKAY. IT WAS DETERMINED THAT THERE WAS NO DISCIPLINE.
BY MS. KISLING:
Q OKAY. SO ALTHOUGH DISCIPLINE IS ISSUED, ONCE IT'S GRIEVED, IF IT'S DETERMINED TO HAVE NO MERIT, IS THAT BASICALLY WHAT THE DECISION WAS, THAT IT HAD NO MERIT? SO THEN IT WOULD NOT BE PLACED IN THE FILE? IT WAS REMOVED?
A EXACTLY.
Q OKAY. DO YOU THINK MEMBERS ARE AWARE THAT DISCIPLINE CAN BE USED OUTSIDE OF THE INTENDED PURPOSE BY

SEIU?

A NO.

Q DO YOU THINK THEY WOULD AGREE WITH THIS?

A NO.

Q DO YOU THINK THAT ANY OF THE EVIDENCE HERE TODAY ACTUALLY SUPPORTS THE CHARGES WRITTEN BY PRESIDENT MANCINI?

A NO.

MS. WALFOORT: CLARA, I THINK THAT'S REALLY FOR THE HEARING OFFICER TO DETERMINE.

MS. KISLING: I CAN'T GET WHAT THE EXECUTIVE BOARD --

MS. WALFOORT: WHAT HER OPINION IS ON THE EVIDENCE?

MS. KISLING: YEAH.

MS. WALFOORT: NO. THE HEARING OFFICER WILL MAKE THAT DETERMINATION.

MS. KISLING: OKAY. I'M GOING TO REST.

THE HEARING OFFICER: MOVE ON WITH CROSS, CHERIE.

EXAMINATION

BY MS. MANCINI:

Q YOU SAID YOU ATTENDED THE STEP 1 WITH SHARON; IS THAT CORRECT?

A CORRECT.

Q SO THERE WAS NOT -- SO PAUL COTSONIS WAS NOT ON THE TELEPHONE?

A NO.
Q SO IN THE INVESTIGATORY, IT STATES -- HIS NAME IS WRITTEN THERE. AND I'LL REFERENCE THAT. I'M SORRY, I APOLOGIZE. I'M TRYING TO FIND THE ONE THAT HAS THE NUMBER ON IT, SO THAT --
THE HEARING OFFICER: NUMBER 8 -- NO, THAT'S NOT IT.
MS. MANCINI: NO. NUMBER 5, I THINK.
THE HEARING OFFICER: YES, YEP.
MS. MANCINI: NUMBER 5.
BY MS. MANCINI:
Q SO WERE YOU THE STEWARD FOR SHARON?
A YES.
Q OKAY. SO I JUST WANT TO POINT OUT THEN THAT IT STATES THAT UNION REPRESENTATION WAS ACCEPTED. AND WHY IS IT THAT YOUR NAME IS NOT ON THIS DOCUMENT?
A PERHAPS BECAUSE NO ONE PUT THAT DOCUMENT IN FRONT OF ME TO SIGN. THERE WAS NO SIGNING SHEET. I CAN ONLY TELL YOU THAT I WAS THERE. PAUL WAS NOT.
Q IS IT GENERALLY CUSTOMARY FOR THE STEWARD TO DOCUMENT -- OBVIOUSLY IT IS ON THIS FORM, THAT THE UNION REP THAT IS IN ATTENDANCE DOCUMENTS THEIR NAME FOR THE RECORD?
A IT JUST DEPENDS ON WHAT THE ISSUE IS AND DEPENDS ON -- I DON'T KNOW WHAT THAT DOCUMENT IS, TO TELL YOU THE TRUTH.
Q DO I NEED TO SHOW IT TO YOU?
A YOU CAN SHOW IT TO ME. I STILL WOULDN'T KNOW

WHAT IT IS.

Q IT'S DEPARTMENT OF FAMILY SERVICES, AND IT HAS THE -- THIS CAME DIRECTLY FROM HR. AND I WOULD THINK THAT OBVIOUSLY IF IT STATES THAT A UNION REPRESENTATION WAS STATED, THEN YOU WOULD BE ON HERE.

EARLIER MS. KISLING STATED THAT THE WRITING HERE LOOKED TO BE THE SAME AS HERS. JUST FOR THE RECORD, SHE STATED THAT PAUL DID NOT SIGN THAT.

IS IT TRUE THAT IN ORDER FOR THE DISCIPLINE TO BE REMOVED, SHARON WAS MOVED TO A DIFFERENT DEPARTMENT SO THAT SHE DID NOT SUPERVISE THE SAME EMPLOYEES THAT WERE ALSO INVOLVED IN THIS INVESTIGATION?

A I CAN'T ANSWER THAT. I'M NOT IN HER CHAIN OF COMMAND. SO I DON'T KNOW WHY SHE WAS MOVED, IF SHE REQUESTED TO MOVE, IF THEY IN FACT DECIDED TO MOVE HER BECAUSE, YOU KNOW, SHE SUPERVISED TWO PEOPLE. THAT WAS NEVER DISCUSSED IN THE STEP 1, NEVER.

Q SO I THOUGHT YOU SAID YOU KNEW WHAT THE RESULTS OF THE INVESTIGATION WAS?

A EXACTLY. AND THE RESULT DID NOT INDICATE THAT SHARON WOULD BE REMOVED FROM HER JOB. IT DID NOT STATE ANY OF THAT. AND WHEN YOU SEE THE E-MAIL THAT WAS MAILED TO ME, YOU WILL SEE THAT IT JUST GAVE THE FACTS AND THE RESULTS.

Q OKAY. SO YOU WERE ONLY INVOLVED IN THE INVESTIGATORY?

A THE STEP 1.

Q OKAY. IF, IN TURN, THE ALLEGATIONS ON THIS

DISCIPLINE WERE TRUE, IF THEY WERE TRUE, WOULD YOU CONDONE THIS ACTION AS AN OFFICER OF THE BOARD?

A FOR THE RECORD, STATE IT SO THAT I CAN GIVE A TRUE ANSWER.

Q SURE. I THINK I HAVE ONE THAT'S NOT MARKED, THIS SAME EXHIBIT.

MS. WALFOORT: OKAY. YOU ARE GOING TO GIVE IT TO HER AND ASK HER?

MS. MANCINI: UH-HUH.

BY MS. MANCINI:

Q IF YOU COULD SEE, IT SAYS "DESCRIPTION OF EVENTS." AND THEN THE THIRD LITTLE PARAGRAPH DOWN SAYS "BASED ON THE INCIDENT, AN INVESTIGATION FILING OUTLINES TWO EMPLOYEES ASSIGNED TO YOU, SHARON KISLING, RION BELL AND MARKITA JEFFERSON UTILIZED COUNTY VEHICLE, WAS CHECKED OUT FROM THE DFS PICKUP LOCATION FROM 8:44 A.M. UNTIL 2:48 P.M. ON JUNE 30TH. DURING THE INVESTIGATION, BOTH MS. BELL AND JEFFERSON ADMITTED TO UTILIZING THE VEHICLE TO CONDUCT UNION BUSINESS ON THIS DATE."

AND ALSO, IT STATES DOWN BELOW THAT THERE WAS DIRECTION GIVEN BY THEIR SUPERVISOR. "BOTH CONFIRM THEY WERE SPECIFICALLY GIVEN PERMISSION BY SHARON KISLING TO USE THE COUNTY VEHICLES OF TRANSPORTATION FOR UNION BUSINESS ON THIS DATE AND TIME."

IF THIS WAS ALLEGEDLY TRUE, WOULD YOU CONDONE THIS ACTION?

A IF IT WAS ALLEGEDLY TRUE AND IT WAS PROVEN TO BE TRUE, NO, I WOULD NOT CONDONE IT.

Q DO YOU BELIEVE THAT THIS ACTION WOULD SET THE UNION, THE 1107, UP TO LIABILITY WHEN IT COMES TO BASICALLY DAMAGING THE REPUTATION OF THE UNION IN THE EYES OF THE COUNTY?

A NO.

Q YOU DON'T BELIEVE THAT THIS INSTANCE WOULD --

A NO.

Q THANK YOU. HOLD ON. I HAVE ANOTHER ONE.

CAN YOU TELL ME -- SO ON THIS -- THIS IS NUMBER 5 -- I'M SORRY NUMBER 3 -- NO, NUMBER 4.

THE HEARING OFFICER: NUMBER 5, CHARGING PARTY EXHIBIT 4.

MS. MANCINI: DO YOU HAVE THAT UP THERE, CLARA?

THE WITNESS: NO, MA'AM.

MS. MANCINI: OKAY, I APOLOGIZE. I CAN SEND THIS ELECTRONICALLY AS WELL. THE PRINTER DIDN'T WANT TO PRINT THIS OUT. IT'S SUPPOSED TO BE ONE FORM. I JUST WANT TO MAKE SURE THAT THERE'S NO CONFUSION IF SOMETHING WOULD HAVE BEEN WHITED-OUT OR ANYTHING TO THAT EFFECT. SO I MIGHT SEND IT TO YOU ELECTRONICALLY.

BY MS. MANCINI:

Q CAN YOU TELL ME, "NON-DEDUCTIBLE HOURS" OR "DESIGNATED CONTRACT HOURS," WHAT THAT MEANS?

A THE NON-DEDUCTIBLE ARE WHAT THE COUNTY WILL PAY, THOSE HOURS. AND THE DEDUCTIBLE IS WHAT THE UNION PAYS THE EMPLOYEE. YES.

Q THE DEDUCTIBLE IS FOR UNION BUSINESS? AND THAT'S -- THE UNION HALL PAYS FOR THAT?

A YES. AS FAR AS IT WAS EXPLAINED TO ME. IF I'M INCORRECT, THEN I'M INCORRECT. BUT IT WAS EXPLAINED TO ME BY MY HR PERSON THAT WHEN I TAKE DEDUCTIBLE FOR UNION BUSINESS THAT THE UNION PAYS FOR IT. AND THE NON-DEDUCTIBLE IS WHAT CLARK COUNTY PAYS FOR.
Q WHAT DOES "DESIGNATED CONTRACT HOURS" MEAN?
A SINCE I'M NOT A CHIEF STEWARD, I DON'T KNOW.
Q BUT HAVE YOU EVER USED DESIGNATED CONTRACT HOURS? HAVE YOU EVER USED THAT AS A STEWARD?
A NO. BECAUSE -- I WOULDN'T BECAUSE I'M NOT ON A BARGAINING TEAM.
Q YOU CAN SEE ON HERE THAT IT SAYS "DESIGNATED CONTRACT HOURS." IT SAYS "CHIEF STEWARD" ON THERE.
A "EXAMPLE, CHIEF STEWARD."
Q OKAY. SO I KNOW THAT THERE IS CHIEF STEWARDS AND THAT THERE IS VICE PRESIDENTS OF CLARK COUNTY, CORRECT?
A CORRECT.
Q IN THE CONTRACT, DO YOU KNOW -- OR DO YOU KNOW WHAT -- I'M NOT GOING TO ASK -- DO YOU KNOW SPECIFICALLY IF THE VICE PRESIDENT GETS A DESIGNATED AMOUNT OF HOURS PER MONTH?
MS. KISLING: WHICH ONE?
BY MS. MANCINI:
Q I'M SORRY, THE EXECUTIVE VICE PRESIDENT. IF A CLARK COUNTY EMPLOYEE IS AN EXECUTIVE VICE PRESIDENT, DO THEY GET A SPECIFIC AMOUNT OF THE HOURS PER MONTH?
A I KNOW THAT SHARON KISLING HAS GOTTEN LIKE FOUR

HOURS PER MONTH.
Q IS THAT CORRECT THAT -- IS THAT YOUR RECOLLECTION OF WHAT THE CONTRACT STATES?
A WELL, YEAH.
Q AND I'M NOT SAYING YOU KNOW IT VERBATIM.
A NO, I DON'T KNOW THE CONTRACT FRONT AND BACK.
THE HEARING OFFICER: CHERIE, WHAT ARE YOU TRYING TO PULL OUT? WE HAVE 25 MINUTES, AND I'M CONCERNED ABOUT THAT. AND I FEEL LIKE WE'RE PRETTY FAR THROUGH THIS WITH THE ABILITY TO FINISH BEFORE THE ROOM GETS SHUT DOWN. SO POSSIBLY --
MS. MANCINI: THIS WILL BE QUICK.
BY MS. MANCINI:
Q SO YOU ARE PART OF THE RELOCATION COMMITTEE, CORRECT?
A CORRECT.
Q AM I A PARTY OF THE RELOCATION COMMITTEE?
A AS FAR AS I KNOW, YOU ARE.
Q WAS I PRESENT AT SAHARA AT RANCHO AT A RELOCATION COMMITTEE MEETING?
A YES.
Q ON THIS SPECIFIC DAY?
A ON THE 24TH OF OCTOBER?
Q OF SEPTEMBER -- OR I'M SORRY, SORRY, OCTOBER. YOU ARE CORRECT.
A I DON'T KNOW.
Q DO YOU RECALL SEEING ME?
A IF YOU GIVE ME MY -- WHAT WAS THE 24TH? WHAT

DAY WAS IT?

Q I BELIEVE IT WAS A MONDAY.

A IT WAS A MONDAY? NO, I DIDN'T SEE YOU.

Q IT WAS EITHER A MONDAY OR TUESDAY.

THE HEARING OFFICER: IT WAS LAST MONDAY.

THE WITNESS: I DIDN'T SEE HER.

THE HEARING OFFICER: OKAY.

BY MS. MANCINI:

Q SO AT THE RELOCATION COMMITTEE, HOW MANY MEMBERS ATTENDED ON THAT DAY?

A I DON'T KNOW.

Q WERE YOU THERE?

A NO.

Q OKAY. SO YOU -- OKAY. SO AS FAR AS WE KNOW THEN, THE ONLY PERSON THAT WAS THERE WAS SHARON, CORRECT? AS FAR AS WE KNOW?

A I DON'T KNOW. I DON'T KNOW. I WAS AT WORK.

Q OKAY. THAT'S FINE.

MS. WALFOORT: TWO QUESTIONS.

THE HEARING OFFICER: AND THEN REBUTTAL? JUST A COUPLE? IS THAT RIGHT?

MS. KISLING: THAT'S WHAT -- THEN CLOSING STATEMENTS?

MS. WALFOORT: YOU CAN ASK A COUPLE OF FOLLOW-UP QUESTIONS. AND THEN WE'RE GOING TO HAVE ONE MINUTE TO GET CLOSING STATEMENTS TOGETHER.

MS. KISLING: OKAY.

FURTHER EXAMINATION

BY MS. KISLING:

Q OKAY. SO THERE WAS A LOT OF DISCUSSION ABOUT THIS TRANSFER AND DIFFERENT THINGS. WAS A TRANSFER -- ACTUALLY, IN OUR CONTRACT, ARE YOU AWARE THAT MANAGEMENT ACTUALLY CANNOT TRANSFER AN EMPLOYEE AS A FORM OF DISCIPLINE?

A THAT'S A FACT.

Q OKAY. ALSO, WITHOUT HAVING THE OUTCOME HERE, DO YOU RECALL THAT I WAS ABLE TO PROVE AND SHOW THAT NOT ONLY MARKITA JEFFERSON WAS NOT AT WORK ON THE DAY OF THE REPORTED INCIDENT, BUT I, MYSELF, WAS NOT AT WORK?

A YOU DID.

Q YOU AWARE THAT MANY STEWARDS, CHIEF STEWARDS, VPS AND ELECTED UNION OFFICIALS ACTUALLY ARE SUBJECT TO DISCIPLINE?

A YES.

Q SO WHEN THEY TRY TO SAY IS IT A LIABILITY THAT DISCIPLINE WAS ACTUALLY ISSUED, WOULDN'T THAT PREVENT PEOPLE FROM ACTUALLY -- EVERYONE AT THE LOCAL LEVEL FROM, YOU KNOW, SITTING ON THE BOARD?

A I THINK SO.

Q OKAY. DOESN'T COMMISSIONER CALVIN -- OR SENATOR CALVIN ATKINSON SAY THAT HE WAS TERMINATED?

A EXACTLY.

Q AND HE'S NOW A SENATOR?

A EXACTLY.

Q AND A MEMBER?

A EXACTLY.

MS. KISLING: THANK YOU.

THE HEARING OFFICER: VERY GOOD. SO WE'RE GOING TO TAKE JUST A COUPLE-MINUTE BREAK. AND THEN BOTH PARTIES ARE GOING TO GIVE THEIR CLOSING STATEMENTS. AND IF YOU CAN KEEP THEM TO THREE MINUTES, WE HAVE KIND OF CONSISTENTLY BEEN MOVING ON THAT PATH. WE SHOULD BE GOOD.

(BREAK TAKEN.)

THE HEARING OFFICER: SO BEFORE YOU START YOUR CLOSING STATEMENT, I JUST HAVE ONE QUESTION, BASED ON THE NOTE WITH MARTIN BASSICK THAT CAME UP.

WHEN DID HE STEP DOWN OR RESIGN, YOU TOOK THE POSITION --

MS. MANCINI: HE STEPPED DOWN OCTOBER 16TH.

THE HEARING OFFICER: WHEN WAS THAT?

MS. MANCINI: OCTOBER 16TH, 2015.

THE HEARING OFFICER: OKAY. AND YOU'VE BEEN IN THE POSITION OF PRESIDENT EVER SINCE, CORRECT?

MS. MANCINI: THAT'S CORRECT.

THE HEARING OFFICER: SO CHERIE, DO YOU WANT TO BEGIN WITH CLOSING STATEMENTS?

MS. MANCINI: SURE.

THE HEARING OFFICER: AND THEN I'M GOING TO GIVE THE SAME DIRECTION AS LAST TIME. WHAT PART AS THE CHARGING PARTY DID YOU PROVIDE EVIDENCE FOR TO SUPPORT YOUR CHARGES? AND THEN FOR THE CHARGED PARTY, WHAT PART DO YOU BELIEVE THAT EITHER NO EVIDENCE WAS PROVIDED OR

YOUR POSITION ON THAT AS WELL? IF YOU CAN KEEP IT TO THAT, IT'S HELPFUL.

MS. MANCINI: SURE.

AS YOU CAN SEE BY THE EVIDENCE PRESENTED TODAY, SHARON KISLING HAS NO REGARD FOR FOLLOWING THE RULES WHETHER IT BE FROM E-MAILING OUT CHARGES THAT VIOLATE THE CONSTITUTION AND BYLAWS, WHETHER IT BE FOLLOWING THE USE OF BANK TIME, WHICH WE'VE HEARD TODAY HAS BEEN A HOT TOPIC WHEN IT COMES TO THE LEGISLATION.

LAST CONTRACT, THE MEMBERS HAD TO GIVE UP SOMETHING IN ORDER TO KEEP THEIR BANK TIME. AND I FEEL THAT THAT IS A SERIOUS VIOLATION AND A DETRIMENT TO MEMBERS WHO ACTUALLY GAVE UP SOMETHING TO MAINTAIN BANK TIME. AND FOR IT TO BE USED FOR NOT THE PURPOSE, I FIND IT TO BE EGREGIOUS.

ALSO YOU CAN SEE BY THE TESTIMONY THAT WAS PROVIDED TODAY VIA BRENDA MARZAN THAT THERE IS KNOWLEDGE OF WHO HAS BUILT THIS WEBSITE THAT NOTHING WAS BROUGHT TO THE UNION TO NOTIFY US OF SOMETHING AS SERIOUS AS A SECESSION; WHICH, IN TURN, THE CHARGES BEING POSTED ON THAT WEBSITE HAVE A DIFFERENT CHARGING PARTY. IT ONLY STATES SHARON KISLING. IT DOES NOT STATE CLARA THOMAS.

WHETHER OR NOT THESE CHARGES WERE MALICIOUSLY INTENTLY SENT OUT TO BE PUT ON THIS WEBSITE, BY THEM BEING COMMUNICATED TO COUNTY OFFICERS WHO ARE IN CONTACT WITH MARTIN BASSICK IS THE SAME AS POSTING THEM YOURSELF.

YOU CAN ALSO SEE THAT OBVIOUSLY THERE IS NOT ANY REGARD FOR THE RULES, WHETHER IT BE THE RULES OF THE

CONSTITUTION AND BYLAWS, WHETHER IT'S THE RULES OF ENGAGING IN THIS HEARING. OBVIOUSLY, THERE IS NO REGARD FOR WHETHER IT BE THE LOCAL'S RULES OR THE INTERNATIONAL'S RULES. OBVIOUSLY, IT'S NOT TAKEN INTO CONSIDERATION.

I DON'T BELIEVE THAT FUNDAMENTALLY, THAT SHARON BELIEVES THAT SHE NEEDS TO FOLLOW ANY RULES, ESPECIALLY WHEN IT COMES TO INSTRUCTING EMPLOYEES TO GO AND TAKE A COUNTY VEHICLE, AND THEY WERE ON THE BARGAINING TEAM, AND ON JUNE 30TH, WHICH WAS ACTUALLY ELECTION DAY OF THE LOCAL. TO JEOPARDIZE AND PUT THE LOCAL IN LIABILITY AT THE COUNTY LEVEL IS SERIOUS. I THINK I'VE PROVEN TODAY THAT THE PARTIES THAT WERE CALLED UP --

MS. PURDIE: THAT'S YOUR TIME.

MS. MANCINI: THAT'S MY TIME? OKAY. THAT'S FINE.

THE HEARING OFFICER: ARE YOU OKAY WITH THAT?

MS. MANCINI: YEP, I'M GOOD.

THE HEARING OFFICER: OKAY. SHARON, YOUR CLOSING.

MS. KISLING: WITH EVERY WITNESS PRESIDENT MANCINI BROUGHT UP HERE, SHE HAS NOT BEEN ABLE TO PROVE ANYTHING EXCEPT FOR SHE DID NOT INVESTIGATE ANY OF HER ACTUAL CONCERNS PRIOR TO PLACING THE CHARGES ON ME.

AND I BELIEVE BASED ON INTERNATIONAL BYLAWS, SHE HAS ACTUALLY VIOLATED ANOTHER ARTICLE. BECAUSE ALL OF THIS IS IN RETALIATION AND TRYING TO CAUSE HARM BECAUSE OF THE CONCERNS THAT I, THROUGH DUE PROCESS AND

TRIED TO EXHAUST ALL REMEDIES, BROUGHT FORTH TO THE EXECUTIVE BOARD. AND IT ENDED UP IN THE FILING OF CHARGES.

THE CHARGES WERE E-MAILED. AND, YES, THEY WERE E-MAILED TO COUNTY OFFICERS. ALL OF THOSE OFFICERS PROVIDING CONCERNS WHICH ABSOLUTELY WERE INCLUDED IN THE CHARGES. SO THEY WERE A PARTY TO THE CHARGES. WHETHER OR NOT THAT WENT TO A WEBSITE THAT I HAVE NOT BEEN ON, THAT I WAS NOT AWARE OF UNTIL THESE CHARGES AND THEN PROVIDED THE E-MAIL, I MEAN, WE CLEARLY HEARD I DO NOT TALK TO MARTIN BASSICK. I CAN'T REMEMBER THE LAST TIME I HAD A CONVERSATION WITH HIM. IT WAS PROBABLY WHEN HE WAS THE PRESIDENT.

SO SHE CLEARLY HAS NOT PROVEN ANY TYPE OF GROSS DISLOYALTY, CONDUCT UNBECOMING A MEMBER, FINANCIAL MALPRACTICE. ALSO, LIKE I SAID, UNFORTUNATELY, MANY STEWARDS AND CHIEF STEWARDS AND ANY LEADER IS THE SUBJECT OF DISCIPLINE. THAT'S WHY THERE IS A DUE PROCESS. THERE IS A GRIEVANCE PROCESS.

FOR THEM TO BRING THAT INFORMATION OUT OF THE HALL AND TRY TO USE IT TO SUPPORT THESE FRIVOLOUS CHARGES IS OF HUGE CONCERN. MY CONCERN IN TERMS OF NOT FOLLOWING THE RULES OR HAVING INTEGRITY IS ALL COMMUNICATION THAT COMES THROUGH THE HALL IS SUBJECT TO OTHER USE.

I CLEARLY PROVED WITH THEIR WITNESS, WHO WAS FAB PAVEL, THAT SHE DID NOT OBSERVE ME DOING ANYTHING ON BANK TIME. I THINK SHE SAID THAT I MAY HAVE SAID ONE SENTENCE IN TERMS OF "TAKE A LOOK THIS." SO IF THAT'S

WAS I SAID TO HER THAT DAY, THAT ABSOLUTELY DOES NOT SUPPORT ANYTHING IN REGARDS TO USING BANK TIME TO RUN A RECALL PETITION.

I HAVE SHOWN WHERE IN OUR BYLAWS -- FAB PAVEL WAS NOT AWARE -- THERE IS A RECALL SECTION AND ARTICLE. AND I'M SURE PRESIDENT MANCINI, WHEN SHE SAW THE PETITION, REALIZED THAT THERE WAS NO VIOLATION OF OUR BYLAWS OR ANY INTERNATIONAL BYLAWS.

ALSO THE DATE THAT SHE'S REFERRING TO IN TERMS OF UNION BANK TIME, I PUT SO MUCH TIME AND ENERGY INTO THIS UNION HALL, TO SIT HERE AND SAY THAT BECAUSE I AM SUBJECT TO COURT APPEARANCE BECAUSE I'M TRYING TO FULFILL MY DUTIES AND JUST THE CHAOS AND INSTIGATION OF CONFLICT WITHIN THIS IS JUST -- I'M JUST REALLY INSULTED BY THIS WHOLE WEEKEND AND THE TIME THAT HAS BEEN SPENT TO GO THROUGH THESE CHARGES.

AND WHETHER OR NOT SHE FEELS THE SAME, I FEEL THAT THE CHARGES I MADE ABSOLUTELY HAVE SUPPORT AND COULD HAVE BEEN RESOLVED AT AN EARLIER TIME. JUST LIKE IF THESE WERE BROUGHT TO ME, AN APPARENTLY SIMPLE QUESTION TO BRENDA MARZAN OR OTHERS, THEY COULD HAVE SAID WHO ACTUALLY WAS THE MAKER OF THIS WEBSITE.

MS. PURDIE: THAT'S YOUR TIME.

MS. KISLING: THAT'S IT. SO, AGAIN, I DON'T SEE HOW SHE COULD HAVE PROVEN ANY CASE.

THE HEARING OFFICER: OKAY. THANK YOU EVERYBODY FOR PARTICIPATING OVER TWO VERY LONG DAYS. I'M GOING TO GIVE SOME DIRECTION TO KIND OF WRAP THIS UP.

SO I BELIEVE THAT WE'VE INCLUDED THE EVIDENCE TO BE CONSIDERED IN THIS MATTER. AND IF ANY OF THE CHARGING PARTIES OR CHARGED PARTIES WISHES TO SUBMIT A BRIEF OR STATEMENT FOR THE RECORD, YOU MAY DO SO. SEND IT TO MY COUNSEL, LA RELL PURDIE. AND THERE ARE SOME SMALL SHEETS THAT MIGHT HAVE BEEN OUT, THAT LORNA HAD AT THE TABLE. SO GET ONE OF THOSE. YES, DEB HAS ONE. SO AND SO NO LATER THAN DECEMBER 4TH --

MS. WALFOORT: NOVEMBER.

THE HEARING OFFICER: OH, NOVEMBER 4TH. AND THEN REMEMBER THOUGH, THIS IS NOT A PLACE WHERE YOU ENTER NEW EVIDENCE IN. OKAY? BECAUSE THAT WILL NOT BE CONSIDERED IF YOU DO SO.

SO, AGAIN, THANK YOU FOR THE TIME AND ATTENTION IN ALL OF THIS, BOTH THE HEARING YESTERDAY AND TODAY. AND PRESIDENT HENRY WILL GET A RESPONSE TO THE CHARGING AND CHARGED PARTIES AS WELL AS THE LOCAL ON THE INTERNAL NEEDS ISSUES AS SOON AS POSSIBLE. ANY QUESTIONS?

MS. MANCINI: YES, QUICK QUESTION: SO I KNOW THAT THE FIRST PART OF YESTERDAY WAS IN REGARDS TO WHAT'S GOING ON IN THE LOCAL. SO I CAN SUBMIT DOCUMENTATION FOR THAT?

THE HEARING OFFICER: CORRECT.

MS. MANCINI: OKAY.

THE HEARING OFFICER: AND JUST MAKE SURE WHEN YOU SUBMIT IT FOR THE INTERNAL NEEDS, YOU SPECIFICALLY NOTE IT THAT THAT'S WHAT THAT'S FOR.

MS. MANCINI: OKAY. INTERNAL NEEDS.

THE HEARING OFFICER: AND THEN LA RELL IS GOING TO ENTER SOME MORE EXHIBITS IN. IS THAT RIGHT?

MS. PURDIE: YES. SO FOR CHARGE NUMBER 5, BOTH THE CHARGING AND CHARGE PARTY GAVE ME EXHIBITS THAT THEY DIDN'T RELY ON DURING THEIR WITNESS'S TESTIMONY. SO ARE THOSE TO BE ENTERED INTO THE RECORD?

MS. KISLING: PLEASE.

MS. MANCINI: YEAH, MAY AS WELL.

MS. PURDIE: OKAY. AND THEN SOMEBODY LEFT SOME LM-2S UP HERE?

MS. KISLING: THOSE ARE FROM EARLIER. IT'S THE HEALTHY CHAPTER REPORT AND THE LM-2 THAT WAS BEING REFERENCED.

MS. PURDIE: SO YOU LEFT THESE?

MS. KISLING: CORRECT.

MS. PURDIE: SO WHAT CHARGE?

MS. KISLING: OH, JEEZ, WAS IT CHARGING PARTY 2?

MS. WALFOORT: THE BIG ONE?

MS. KISLING: YES, EXACTLY, YES.

MS. PURDIE: SO BOTH OF YOU SHOULD MAKE SURE THAT YOU HAVE THESE MARKED CORRECTLY AND THAT YOU EACH HAVE COPIES OF THE OTHER EXHIBITS. SO I'M GOING TO RUN THROUGH THEM QUICKLY.

SO CHARGE 5, CHARGING PARTY EXHIBIT 1 IS THE CHARGE; CHARGING PARTY EXHIBIT 2 IS FABIOLA'S STATEMENT; CHARGING PARTY EXHIBIT 3 IS THE PROTECTIVE ORDER STATUS CHECK; CHARGING PARTY EXHIBIT 4 IS THE RELEASE FROM DUTY

FORM; CHARGING PARTY'S EXHIBIT 5 IS A COUNSELING FORM, SHARON KISLING'S COUNSELING FORM; CHARGING PARTY EXHIBIT 6 IS THE WEBSITE; CHARGING PARTY EXHIBIT 7 IS THE EXCERPT FROM THE CLARK COUNTY CONTRACT.

MS. KISLING: I DON'T THINK I HAVE 5.

MS. PURDIE: SO CHARGING PARTY EXHIBIT 7 IS THE EXCERPT FROM THE CLARK COUNTY CONTRACT; CHARGING PARTY EXHIBIT 8 IS A STATEMENT FROM THE URBAN LAW FIRM. AND THEN THAT'S IT FOR YOUR EXHIBITS.

MS. MANCINI: I WANTED TO ASK A QUESTION IN REGARDS TO BASED ON THE FACT THAT PETER NGUYEN WAS SO INVOLVED IN ALL OF THE TESTIMONY, BASED UPON THE FACTS HE WAS NOT ALLOWED TO COME IN AND TESTIFY, IS HE ALLOWED TO HAVE AN ALTERNATE METHOD TO TESTIFY? I WOULD LIKE TO KNOW ON RECORD TO SAY THAT IS HE ALLOWED TO PROVIDE A WRITTEN STATEMENT?

MS. WALFOORT: WE HAVE THAT IN THE RECORD. WE HAVE A LOT ACTUALLY FROM HIM IN THE RECORD.

MS. MANCINI: NO. BUT IS HE ALLOWED TO PROVIDE TESTIMONY?

MS. WALFOORT: NO. THE STATEMENT IS ALREADY IN FROM HIM. AND THE SUPPORTING DOCUMENTATION, WHICH WAS CONSIDERABLE, THAT IS IN THE RECORD. IF YOU LOOK, THERE IS QUITE A BIT FROM PETER IN THERE.

MS. MANCINI: OKAY. SO HE CANNOT -- SO BASICALLY, HE'S NOT ALLOWED TO DO ANYTHING AS FAR AS -- OKAY.

MS. WALFOORT: I THINK THAT'S PART OF WHY YOU

WERE OFFERED THE OPPORTUNITY -- I'M SORRY, THAT AMELIA WAS OFFERED THE OPPORTUNITY TO EXPLAIN WHAT THE CHARGES WERE ABOUT AND TESTIFY. BECAUSE HE COULDN'T.

MS. MANCINI: WELL, THAT'S WHY I WANTED TO VERIFY WHETHER HE WAS ALLOWED OR NOT ALLOWED TO PROVIDE A WRITTEN STATEMENT. HE'S NOT ALLOWED?

THE HEARING OFFICER: NO. WE HAVE DOCUMENTATION WITHIN AMELIA'S CHARGE THAT IS INCLUDED HERE AS WELL AS A NUMBER OF OTHER STAFF, I THINK, THAT WERE IN THAT CHARGE THAT TESTIFIED.

MS. WALFOORT: HOLD ON A SECOND. LET'S FINISH WHAT WE HAVE TO DO ON THE RECORD. I DID WANT TO REMIND SHARON AND CHERIE THAT THERE ARE SOME DOCUMENTS THAT YOU SAID YOU WOULD SUBMIT. FOR INSTANCE, THE COLLECTIVE MINUTES OF THE EXECUTIVE BOARD MEETING AND THE BILLING FROM THE LAW FIRM, THOSE THINGS SHOULD STILL COME IN. THOSE THINGS WE WANT YOU TO SUBMIT.

MS. MANCINI: CORRECT. NO, I WANTED TO VERIFY WHETHER OR NOT THERE WAS EVER -- OKAY, THAT PETER WOULD EVER BE ABLE TO PUT IN A WRITTEN STATEMENT BASED ON THE FACT THAT HE WAS NOT ABLE TO TESTIFY.

THE HEARING OFFICER: AND THAT WAS LEGAL CHARGES THAT WERE PENDING OUTSIDE OF HERE.

MS. MANCINI: RIGHT. BUT THOSE CHARGES ARE BASED UPON HIM NOT BEING ABLE TO HAVE A LIVE INTERACTION WITH SHARON, CORRECT?

MS. WALFOORT: RIGHT.

MS. MANCINI: SO THERE IS NOTHING THAT

PROHIBITS HIM FROM PROVIDING WRITTEN STATEMENT.

MS. WALFOORT: YES. THERE IS SOMETHING THAT PROHIBITS HIM. AND SO, NO, HE CAN'T DO THAT.

MS. MANCINI: OKAY.

MS. WALFOORT: ALFREDO, DID YOU HAVE A QUESTION?

MR. SERRANO: I WAS ASKING OR THINKING IF THERE WAS TESTIMONY THAT SHE WOULD HAVE ASKED HIM BECAUSE OF STATEMENTS THAT WERE MADE OR WHATEVER THAT WERE DIFFERENT FROM HIS STATEMENT THAT HE'S ALREADY SUBMITTED THAT -- WOULD THAT MAKE A DIFFERENCE TO HER? I JUST ASKED HER THAT. AND SHE SAID THAT ANYTHING THAT IS IN HIS STATEMENTS WOULD HAVE COVERED ANYTHING THAT SHE MIGHT HAVE HIM STATE. SO WE'RE COMFORTABLE WITH THAT.

MS. WALFOORT: GOOD.

MS. PURDIE: CAN I FINISH? SO SHARON, FOR YOUR EXHIBITS, I HAVE FOR CHARGE NUMBER 5, CHARGED PARTY EXHIBIT 1 IS THE 10/30 E-MAIL, SEIU LOCAL UNION TRANSITION USE OF BANK TIME; AND THEN WE HAVE CHARGED PARTY -- AND THEN WE HAVE CHARGED PARTY EXHIBIT 2 WHICH IS MALESIA BRITT-WILLIAMS' STATEMENTS.

IS THAT IT, SHARON?

MS. KISLING: YES.

MS. PURDIE: THEN WE'RE GOING TO MARK THE LM-2 PERIOD COVERING -- AT LEAST THE COVER SHEET IS THE PERIOD COVERING JANUARY 1, 2005 TO DECEMBER 31ST -- SORRY, JANUARY 1, 2015 TO DECEMBER 31, 2015. WE'LL MARK THAT CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 16.

AND THEN FOR SEIU LOCAL 1107 HEALTHY CHAPTER BY SECTOR DATED JANUARY 23, 2015 TO JANUARY 30, 2015, AT LEAST ON THE COVER SHEET, WE'RE GOING TO MARK THAT CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 17.

AND THEN ON THE RECORD YESTERDAY IN CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 2 -- AND I BELIEVE IT WAS EXHIBIT 2 OF THAT, OF THE LARGE MEMO, THERE WAS A SERVICE AGREEMENT FOR KROME IT SOLUTIONS THAT WAS MISSING A PAGE. AND THE CHARGING PARTY PROVIDED THE ENTIRE CONTRACT. SO I'M GOING TO MARK THAT CHARGE NUMBER 2, CHARGING PARTY EXHIBIT 2A.

THE HEARING OFFICER: SO I'M GOING TO CLOSE THE RECORD THEN.

(PROCEEDINGS CONCLUDED AT 9:00 P.M.)

CALIFORNIA DEPOSITION REPORTERS

When Every Word Counts

SEIU LOCAL 1107

NEEDS AND INTERNAL CHARGES

HEARING - DAY 1

BEFORE HEARING OFFICER CAROL NIETERS

SATURDAY, OCTOBER 29, 2016

CIRCUS CIRCUS LAS VEGAS HOTEL AND CASINO

2880 LAS VEGAS BOULEVARD SOUTH

LAS VEGAS, NEVADA 89109

STEPHANIE COPP GUANKO
CSR NO. 13746

PAGES 1 – 270

JOB NO. 146932

CERTIFIED COPY

# CHARGES EXHIBIT

PART 1

P.O. Box 108 • Covina, CA 91723 • phone 800.242.1996 • fax 800.960.1811
Bakersfield • Carlsbad • Corona • Covina • Fresno • Irvine • Los Angeles • Ontario • Palm Springs • Riverside
Sacramento • San Bernardino • San Diego • Temecula • Victorville

6

Phone 6:50 PM

Cheri Mancini Union

We don't need lunch today we just finished our contract so I will give you a call on dates

Sounds good thank you

Thu, Jul 21, 10:31 AM

Morning Cheri as your aware we have settled our contract but we need to do a ratification vote for the members. I'd like to know if I can meet with you and the communication director this afternoon so we can make some flyers give me a call and let me know thanks

1-21

10/27/2016 IMG_1322.PNG

Phone ●●●○○ 6:50 PM

Cheri Mancini Union

Thu, Jul 21, 10:31 AM

Morning Cheri as your aware we have settled our contract but we need to do a ratification vote for the members. I'd like to know if I can meet with you and the communication director this afternoon so we can make some flyers give me a call and let me know thanks

We would like to do the vote next week Wednesday Thursday and Friday

I will have to get with Peter in regards to

https://mail.google.com/mail/u/0/#inbox/1580483b10d268c5?projector=1

1-22

1/1

Phone ●●●○○ 6:51 PM

C

Cheri Mancini Union

Wednesday Thursday and Friday

I will have to get with Peter in regards to staffing for the vote and get back to you. He is in ELKO and won't be back till Monday. We can still work on the flyer though. I will be at the hall with the next hour..

Ok call me and I can come to the hall to do the flyers. I have volunteers for all three days and Deetra would need someone for quick cares with her

Ok I will talk to Peter

1-23

Phone ●●●●○ 6:51 PM

C

Cheri Mancini Union

come to the hall to do the flyers. I have volunteers for all three days and Deetra would need someone for quick cares with her

Ok I will talk to Peter today about scheduling.

Ty

Thu, Jul 21, 12:45 PM

Can I come by the hall at 130 to do the flyers

I am in a meeting will call you back

Ok

1-24

Phone 3G 8:58 PM

Cheri Mancini Union

work on the flyer though. I will be at the hall with the next hour..

Ok call me and I can come to the hall to do the flyers. I have volunteers for all three days and Deetra would need someone for quick cares with her

Ok I will talk to Peter today about scheduling.

Ty

Thu, Jul 21, 12:45 PM

Can I come by the hall at 130 to do the flyers

10/27/2016 IMG_1325.PNG

Phone ●●●●○ 6:51 PM

C

Cheri Mancini Union

Thu, Jul 21, 12:45 PM

Can I come by the hall at 130 to do the flyers

I am in a meeting will call you back

Ok

Thu, Jul 21, 4:44 PM

Call me when you can I'll give you an update on what's going out in our UMC. Paper tomorrow about are voting next week

I can send you a copy tomorrow once it's printed if you'd like

1-20

10/27/2016 IMG_1337.PNG

Phone ●●●●○ 12:37 PM

C

Cheri Mancini Union

You to do the flyers

I am in a meeting will call you back

Ok

Thu, Jul 21, 4:44 PM

Call me when you can I'll give you an update on what's going out in our UMC. Paper tomorrow about are voting next week

I can send you a copy tomorrow once it's printed if you'd like

Thu, Jul 28, 8:19 PM

Pat I have membership

https://mail.google.com/mail/u/0/#inbox/15807fe566fc19f3?projector=1

1-27

1/1

7

1800 W. Charleston Blvd.
Las Vegas, NV 89102
Phone: (702) 383-2000

UMC
UNIVERSITY MEDICAL CENTER

Mason VanHouweling
Chief Executive Officer

7

June 28, 2016

Gwen Stevens
Vice President, SEIU, Local 1107 - UMC
3785 E. Sunset Road
Las Vegas, NV 89120

Dear Gwen;

As we discussed in our negotiation session last week, the provisions of NRS 288 were changed by the Nevada legislature (Senate Bill 241) in an effort to increase accountability to the public sector bargaining processes. The law was revised in two areas that impact our current negotiations.

First, the new law eliminates the automatic rollover of evergreen provisions of expired collective bargaining agreements. The law mandates that employers "shall not" provide interim pay increases or benefits after an agreement expires until a new agreement becomes effective. This change impacts UMC by freezing any salary increases (merit increases), accrual of additional longevity benefits or compensation, increases to CAL and EIB accruals due based on years of service.

Second, the new law prohibits UMC from allowing its employees to work on behalf of an employee organization at taxpayer expense unless the union reimburses the employer the full cost of the time spent conducting union business or negotiates for the value of that time. As a solution, I recommend that UMC continue to track hours employees spend conducting union business and invoice SEIU, Local 1107 for reimbursement. Another solution is for such employees to use CAL or leave without pay to conduct union business. If you have another solution, please let me know.

If you have questions, please feel free to contact me at 702-383-2232.

Sincerely,

John Espinoza
Chief Human Resources Officer

cc: Mason VanHouweling, CEO
Kurt Houser, COO
Cherie Mancini, President, SEIU, Local 1107
Pat Greaux, Chief Steward
Deetra Revels, Chief Steward

Board of Trustees:
Lawrence Weekly, *Chair* • Chris Giunchigliani, *Vice Chair* • Susan Brager • Larry Brown • Marilyn Kirkpatrick • Mary Beth Scow • Steve Sisolak
Donald G. Burnette, *Clark County Manager*

1-28

**Patricia Greaux**

**From:** Doug Spring
**'ent:** Wednesday, June 29, 2016 4:59 PM
**o:** Cherie Mancini
**Cc:** Patricia Greaux; Gwenda Broeren; Deetra Revels; John Espinoza
**Subject:** SB241 Mandates - Union release time

Cherie,
I am following up on the letter John sent to you regarding the recent changes to NRS 288 due to Senate Bill 241 which eliminates the evergreen provisions of the collective bargaining agreement. Our specific concern is the need for union release time as identified in the CBA to be either reimbursed by the union or the union representatives use paid leave time or leave without pay.

The most simple solution would be for the UMC to notice you of union hours and have SEIU reimburse the hospital. I would appreciate your response to this issue and how it should be handled.

Thank you.

**Doug Spring**
Director of Human Resource Operations
Human Resources

University Medical Center of Southern Nevada
1800 W Charleston Blvd
Las Vegas, NV 89102
: (702) 383-2557

Compassion • Accountability • Integrity • Respect

**ELECTRONIC MAIL**

Mr. John Espinoza
Chief Human Resources Officer
University Medical Center
1800 West Charleston Blvd.
Las Vegas, NV 89102
*John.espinoza@umcsn.com*

June 30, 2016

Re: **UMC letter of June 28, 2016**
**Contract Negotiations with SEIU Local 1107**
**Senate Bill 241**

Dear Mr. Espinoza:

I am in receipt of your letter dated June 28, 2016, and the effect of Senate Bill 241 on the present negotiations.

The SEIU Local 1107 bargaining team believes that UMC and SEIU Local 1107 are close to finishing their negotiations for a new collective bargaining agreement with only a few non-economic Articles and contract economics to be completed. We believe that these final negotiations can be completed in the next 2-3 bargaining sessions.

In response to your letter, the SEIU Local 1107 bargaining team proposes the following:

1. Complete the final bargaining sessions on the present schedule of every Wednesday.

2. Track the hours of employee time spent on finalizing the new collective bargaining agreement.

3. Discuss the value and reimbursement of costs for the time spent in completing negotiations as part of the required contract negotiations to comply with Senate Bill 241 in the parties' new collective bargaining agreement.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,
Gwen Stevens

cc:
Patricia Greaux
Deetra Revels

1-30

1800 W. Charleston Blvd.
Las Vegas, NV 89102
Phone: (702) 383-2000

UMC
UNIVERSITY MEDICAL CENTER

Mason VanHouweling
Chief Executive Officer

July 1, 2016

Gwen Stevens
SEIU, Local 1107 – UMC
3785 E. Sunset Road
Las Vegas, NV 89120

Dear Gwen:

I received your letter dated June 30, 2016, regarding the application of Senate Bill 241 and its effect on our current negotiations. While I can appreciate your interest in negotiating terms during our current discussions to compensate for the time spent in negotiation, SB241 is clear that any concessions must be made from the provisions of the existing contract.

We have communicated with Cherie Mancini regarding our initial letter to you on this topic and have not received any response. Unless an arrangement is finalized regarding reimbursement by SEIU, the law would require employees who attend negotiations to use CAL or leave without pay.

We look forward to continuing full day negotiations each Wednesday and also believe we can complete the process fairly quickly. Thank you for your continued patience as we work through these mandatory requirements.

Sincerely,

John Espinoza
Chief Human Resources Officer

cc: Mason VanHouweling, CEO
Kurt Houser, COO
Cherie Mancini, President, SEIU, Local 1107
Pat Greaux, Chief Steward
Deetra Revels, Chief Steward

Board of Trustees:
Lawrence Weekly, *Chair* • Chris Giunchigliani, *Vice Chair* • Susan Brager • Larry Brown • Marilyn Kirkpatrick • Mary Beth Scow • Steve Sisolak
Donald G. Burnette, *Clark County Manager*

1-31

**Patricia Greaux**

| | |
|---|---|
| **From:** | John Espinoza |
| **Sent:** | Friday, July 01, 2016 10:44 AM |
| **To:** | UMCPost |
| **Subject:** | Collective bargaing (negotiations) |

Effective 2015 and recently affirmed by District Court, the Nevada Legislature made changes to the Nevada law that governs public sector collective bargaining (NRS 288). Senate Bill 241 was approved in an effort to increase accountability of the public sector bargaining process. The law was revised in two areas that impact our current negotiations with SEIU and discussions with the Operating Engineers. It also affects time spent by union stewards in conducting union business.

First, the new law eliminates the automatic rollover of evergreen provisions of collective bargaining agreements once they expire. Both the SEIU and Operating Engineer agreements expire on June 30, 2016. The law mandates that employers "shall not" provide interim pay increases or benefits after an agreement expires to bargaining unit covered employees until a new agreement becomes effective. This change impacts UMC by freezing any salary increases (merit increases), accrual of additional longevity benefits or compensation, increases to CAL accruals due based on years of service. Performance evaluations will continue to be administered, but the law restricts UMC from providing any increase in pay to bargaining unit eligible employees. Longevity will be paid to those who have received it in the past, but the amount received will mirror what was received the previous year. Everyone will continue to accrue hours into their CAL bank; however, any increase in the amount of hours accrued each pay period due to years of service is frozen.

Second, the new law prohibits UMC from allowing its employees to work on behalf of an employee organization at taxpayer expense unless the union reimburses the employer the full cost of the time spent conducting union business or negotiates for the value of that time.

These revisions were mandated by the law and the unions and management are obligated to comply.

Negotiations for both SEIU and the Operating Engineers is progressing positively and the parties are interested in settling the agreements as soon as practical to limit the amount of disruption these mandates may create. Please continue to read the PULSE for updates on how negotiations are progressing.

John A. Espinoza
Chief Human Resources Officer
Human Resources

University Medical Center of Southern Nevada
1800 W Charleston Blvd
Las Vegas, NV 89102
O: (702) 383-2232

Compassion • Accountability • Integrity • Respect

1

1-32

**Patricia Greaux**

**From:** Peter Nguyen [pnguyen@seiunv.org]
**`ent:** Tuesday, July 26, 2016 7:32 PM
**o:** John Espinoza
**Cc:** Cherie Mancini
**Subject:** Cancellation of ratification vote
**Attachments:** Ratification cancellation.pdf

Dear John,

Please be advised that the contract ratification scheduled for this Thursday is hereby cancelled.

Would you please distribute the attached letter from President Cherie Mancini via your internal email system?

Please let me know if you have any questions or are unable to fulfill our request.

Thank you,

**Peter Q. Nguyen, J.D.**
Director of Organizing & Representation
SEIU Nevada, Local 1107

702-386-8849 phone
702-386-4883 fax

SEIU NEVADA

June 26, 2016

In the best interest of our UMC members, SEIU Nevada is forced to cancel the Tentative Agreement ratification vote scheduled for Thursday, July 28, 2016.

SEIU Nevada is investigating allegations against members of the bargaining team including, but not limited to:

-Violation of fiduciary duty

-Acting against the best interest of members

-Behavior inconsistent with the mutually agreed upon Interest Based Bargaining process

-Failing to conduct bargaining in a prudent manner

-Being derelict in their duty to properly communicate with members and the Union

The union is taking this critical action, in order to prevent potential irreparable harm to the bargaining unit.

In the interest of transparency, accountability, to share the most recent information and gather member input, the Union will be holding meetings on Thursday, July 28 at 8 a.m. to 10 a.m., 4 p.m. to 6 p.m. and 7 p.m. to 9 p.m. at the Union Hall, 3785 Sunset Rd. #1.

In Solidarity,

Cherie Mancini, President
SEIU Nevada 1107

SERVICE EMPLOYEES
INTERNATIONAL UNION
LOCAL 1107, CTW, CLC

3785 E. Sunset Drive
Las Vegas, NV 89120

PHONE 702-386-8849
FAX 702-386-4883

www.seiunv.org

1-34

**Patricia Greaux**

**From:** Patricia Greaux
**Sent:** Monday, July 11, 2016 9:26 AM
**To:** ltroyano@seiunv.org
**Cc:** John Espinoza; Doug Spring; Deetra Revels; Gwendolyn Stevens; Mancini SEIU; Patricia Greaux; pnguyen@seiunv.org
**Subject:** RE: UMC-SEIU negotiations

Lanita

Morning thank you for your interest in coming to UMC bargaining. I guess there is a misunderstanding its more to it then you just notifying us. I should be brought up to both sides and they would have to mutually agree on it. Due to us being near ending our negotiations secessions there is no need for you to join us at this time but we will need your assists in getting things together to ratify our vote.

Thank you
Patricia Greaux
Chief Steward Ancillary

---

**From:** Patricia Greaux [mailto:luvvliness@cox.net]
**Sent:** Friday, July 08, 2016 10:46 PM
**To:** Patricia Greaux
**Subject:** Fwd: UMC-SEIU negotiations

Begin forwarded message:

**From:** Lanita Troyano <ltroyano@seiunv.org>
**Subject: UMC-SEIU negotiations**
**Date:** July 8, 2016 at 8:21:46 PM PDT
**To:** James Mumford UMC <James.Mumford@umcsn.com>, John Espinoza <John.Espinoza@umcsn.com>, "luvvliness@cox.net" <luvvliness@cox.net>
**Cc:** Peter Nguyen < >, Cherie Mancini < >

Good Evening,

Per my conversation with Patricia Greaux on Tuesday July 5,2016. I was informed that in order for us to attend UMC interest based bargaining I needed to give advanced notification. Please except this as SEIU Local 1107's notification to attend further negotiations.

Thank you,
LaNita Troyano
SEIU Union Representative
702-860-4484

Sent from my iPhone



1-35

**John Espinoza**

**From:** John Espinoza
**Sent:** Thursday, July 28, 2016 8:57 AM
**To:** Cherie Mancini (cmancini@seiunv.org)
**Cc:** Mason VanHouweling; Susan Pitz
**Subject:** Cancelation of Ratification Vote
**Attachments:** 2016-07-27-SEIU Correspondance.pdf

Cherie,

I shared with Mason VanHouweling, UMC CEO, the email from Mr. Peter Nguyen of your office with your attached letter regarding cancelling the UMC SEIU employee ratification vote for the tentative agreement recently bargained.

Mason attempted to call you several time yesterday without success. Due to our concern for the impact this would have on UMC employees and the operation of the hospital he has asked that I send you the attached letter.

Please feel free to call me if you wish to discuss this further.

Thank you,

John Espinoza
Chief Human Resource Officer, UMC



1-3U

1800 W. Charleston Blvd.
Las Vegas, NV 89102
Phone: (702) 383-2000

UMC
UNIVERSITY MEDICAL CENTER

Mason VanHouweling
Chief Executive Officer

July 27, 2016

VIA EMAIL

Ms. Mancini:

We are in receipt of the notice to cancel the ratification vote of the SEIU agreement. We will not be distributing the letter to your membership on SEIU's behalf. Additionally, it is our belief that UMC has negotiated in good faith with the chief spokespersons tasked with bargaining this agreement on behalf of SEIU. You have not indicated the reason for SEIU's refusal to move the contract forward for a ratification vote but if we do not hear from you by close of business (5:00pm) on Monday, August 1, 2016 our intent is to take this matter to the Employee-Management Relations Board (EMRB). We look forward to further communications from SEIU and expeditious resolution of this matter without involvement of the EMRB.

Sincerely,

Mason VanHouweling

Mason VanHouweling, CEO
University Medical Center of Southern Nevada

Board of Trustees
Lawrence Weekly, *Chair* · Chris Giunchigliani, *Vice Chair* · Susan Brager · Larry Brown · Marilyn Kirkpatrick · Mary Beth Scow · Steve Sisolak
Donald G. Burnette, *Clark County Manager*

L37

8

# THE PULSE

UMC EMPLOYEE MAGAZINE
April 29, 2016

8



## Departments

MASON'S PAGE ........................ 1
PATIENT EXPERIENCE ............ 2
HUMAN RESOURCES ................ 5
TEAMUMC ................................ 6
AWARDS ................................... 8
INFORMATION TECHNOLOGY . 10
WELLNESS CENTER ................ 11
TRAUMA .................................. 13
PHARMACY ............................ 19
BIRTHDAYS ............................ 20



*These Happy Days Car Show trophies created by CHNV's pediatric patients, ready for tomorrow's event.*




Story on Page 8

## IN THIS ISSUE

Message from Mason .............. 1
Thank You Notes ............................1
ICARE4U ..........................................2
New Hire Orientation ..................5
Trainer of the Year...................... 5
TeamUMC ..................................... 6
Employee of the Month........... 8
Negotiations Continue .......... 11
AFAN Walk ................................ 11
Blue and Green Day ............... 12
Saluting Our Veterans ............ 12
A Growing Tradition .............. 14
Nurses Week.............................. 17
IV-to-PO Conversions ............... 19

# UMC SALUTES OUR VETERANS!

More on Page 12

Send newsletter articles and information to Danny Romero by email at Danny.Romero@umcsn.com or interoffice mail to *Human Resources, Delta Point* by 4:30 p.m. the Friday before payday. Late submissions may be delayed until the next issue.

## Message from Mason

'e have a fun day planned tomorrow with "Those Happy Days" Car Show, happening in the Hope Place parking lot in front of the Trauma Center and Children's Hospital of Nevada at UMC. Please join us and bring your family to check out some cool classic cars, music, classic snacks and 50s fun!

Proceeds from the event are donated to Children's Hospital of Nevada at UMC. If you are working tomorrow, please come out and enjoy some fun during your lunch break. My appreciation to TeamUMC for hosting the event! More details are included in this edition of The Pulse.

Mason VanHouweling
UMC CEO



## ROUNDING CORNER

Administrators frequently round to find out how they can help improve your day, your shift and your work area. The rounding notes are then compiled into actionable items so they can make quick improvements and keep track of how they can make your day flow easier.

Here's a look at some of the items they have recently addressed:

OR: Morale is good overall; they need positions filled, and they were informed that the HR team is doing their best and is focused on this need. They were pleased to be recognized.

L/D: Additional lactation support is needed; CNO Deb Fox is working on a proposal to address this going forward.

Lab: This Medical Laboratory Professionals Week so please be sure to say "thank you" to a lab professional this week.

NSCU: We spoke with an Air Force Resident (5th year ENT), who is very pleased with her training. She loves UMC, and has 58 days until she completes her residency and heads to Alaska.

5 North and 5 South: These teams are excited about the trial of the Triad Model. They are confident that it will be successful. Look for more information about this trial in upcoming issues of The Pulse.

## For outstanding service to patients and colleagues, we recognize our recent ICARE4U recipients!

Caught U ICARE-ing nominations are accessible via the intranet in the Communication Portal or by following this link:
*http://umcintranet/CommunicationPortal/*

Denyse Byrne
Angela Trail
Joseph Bruno
Stacey Whipple
Nina Castaneda
Hilary Rubin
Faustin Rusine
Joann Perilla
Jamie Hinzman
Cynthia Jones
Yolanda Cullison
Carmen Libutti

To: Mason VanHouweling,
UMC Chief Executive Officer

I just wanted you to know I received the best care and service I have ever seen in a medical office. The Summerlin Quick Care from reception to the doctor, to the nurses and x-ray personnel were AWESOME!

I am in the medical field, and I appreciate you all.

Thank You,
Lorraine R.

---

To: Mason VanHouweling,
UMC Chief Executive Officer

I was seen at your Peccole Ranch office and wanted to thank Dr. Hansen for the care provided. I don't know what the future holds, but he has made the present much more comfortable.

Thank You,
Lorraine R.





## Get Caught ICARE-ing

If you've received a "Caught U ICARE-ing" card for exemplifying the ICARE4U principles, be sure and follow the lead of your colleagues in these photos and head up to Administration to receive one of five exclusive ICARE4U pins.

Managers, administrators and ICARE4U champions have been making the rounds and recognizing all of our great staff living the ICARE4U way.

Your colleagues pictured here have gone above and beyond in ICARE-ing for our patients, from helping them get something to eat to providing some new clothes. Asking and responding seem to be the theme for these recipients.

Remember, it's up to us to keep ICARE4U successful.






Care4u

## Responding

- Respond promptly to patients. Remember they spend their time with us waiting and wondering. Being responsive helps ease the anxiety by showing them you care and that they are your priority

- Respond to colleagues promptly. Your response is directly connected to how they perceive your professionalism

UMC
UNIVERSITY MEDICAL CENTER




UMC's Human Resources and Organizational Development departments welcome our newest employees and additions to TeamUMC for the week of April 25, 2016.

## Welcome to TEAMUMC!

Enereyda Arellano de Bojorquez - SURGICAL SVCS
Russell Arendt - TICU
Gabrielle Baria - PICU
Robert Blaiklock - TRANSPORT-CENTRAL
Nancy Browne - PATIENT ACCESS SVCS
John Mark Buen - PEDS
Abigail Jayne Canda - PEDS
James Carr - ASU
Debra Chapa - SUNSET QUICK CARE
Marty Comer - 5 SOUTH
Anlenie Franks - SUNSET PRIMARY CARE
Quarnetta Grubbs - 2 SOUTH
Kristie Anne Hanson - NICU
Diane Hughes - ONCOLOGY
Amanda Lovecchio - TICU
Khelsey Macaspac - NURSING-FLOAT
Irene Brooke Malvar - NICU
Vernon Manlago - AMB FLOAT POOL
Edgar Morales - PLANT OPS
Adalynn Nesjan - SURGICAL SVCS
Nkemdilim Nwofor - NICU
Jennifer Oneal - PHARMACY
Melissa Ortega - IT
Anna Porto - SUNSET PRIMARY CARE
Loure Mae Rivera - EMERGENCY DEPT
Deanna Russell - PEDS
Cheryl Smith - SURGICAL SVCS
Marbella Solano - QC ADMIN
Jack Thames - STERILE PROCESSING
Graciela Whitlow - PATIENT ACCESS SVCS
Myesha Wilson - AMB FLOAT POOL
Johnna Young - PATIENT ACCESS SVCS



LAS VEGAS
CORPORATE CHALLENGE

UMC
UNIVERSITY MEDICAL CENTER




*Left - TeamUMC badminton team members Hollie Thornton and Anna Caputo sharing a smile.*

*Left Center - TeamUMC's Kristin Ann Quiamzon and Scott Keigley.*

*Right Center - Walk racers included Estefani Elias, Craig Sampal, Maricela Kassman, Kore Oglesbee, Evelyn Sanchez and Liz Costen.*

*Bottom - James Hull, Brian Hollingsworth, Cherel McCracken, William Pirtle and Steve Kirsch.*








LAS VEGAS CORPORATE CHALLENGE

UMC UNIVERSITY MEDICAL CENTER



*Top Left - Bill Robey, Chris Jones, Aaron Stagg and Richard Aquilino bonding over bocce.*

*Left Center - Elizabeth Walsh, Ernest Todd, Brandon Line, La Shawn Kilgore, Myra Perez and Nina Castaneda were on target for the laser tag event.*

*Below and Right Center - Michael Jaleco and Mario Casas along with Debbie Rotundo and Rose Coker enjoying a day on the course.*

*Bottom - TeamUMC softball team members included: Top row: Bill Robey, Brandon Line, Chris Jones, Heather Hartzell, Christina Hernandez, Aaron Stagg and Eugene Samson.*

*Bottom row: Courtney Cordova, Kelly Swanson, Eve Olivera and Erica Nansen.*







Table of Contents




## KATHY SAMPSON
### APRIL 2016 EMPLOYEE OF THE MONTH

The surprise on Kathy Sampson's face said it all, as her family and colleagues were gathered to celebrate her Employee of the Month honor. Kathy had tears in her eyes, long with most people in the room, as she was congratulated for being a "superwoman" to her patients.

Kathy's nomination for Employee of the Month described how she can do "32 things at once" and is always making sure everyone is taken care of. Kathy is a tenured employee here at UMC who is known for doing "amazing work on a daily basis."

Kathy recently took the time to communicate with a patient who was extremely upset. She spent time with the patient to understand the frustration and managed to calm the patient down and help improve the situation.

For that patient, and all the others Kathy has helped along the way — for making every life that she touches brighter — Kathy is celebrated as the UMC April Employee of the Month.

Kathy received a $100 gift card, Employee of the Month name badge, an Employee of the Month cake, a special VIP parking spot and a proclamation read by CEO Mason VanHouweling.






Those Happy Days
CAR SHOW
Children's Hospital
OF NEVADA UMC
TOMORROW
10AM-2PM
PROCEEDS BENEFIT
CHILDREN'S HOSPITAL OF NEVADA AT UMC
REGISTRATION FORM AND INFO AT:
WWW.UMCSN.COM/CARSHOW
NOTICE
The Trauma / CHNV parking lot will
be closed TODAY at 4pm.
The lot will reopen tomorrow
at approx. 4pm

TEAMUMC
UNIVERSITY MEDICAL CENTER

# YOU'RE INVITED TO THE TEAMUMC PICNIC

## SATURDAY, MAY 21, 11AM - 3PM
## LORENZI PARK

## TICKETS ON SALE:
## MAY 13
## 11AM-1PM IN CAFE@UMC

TICKETS ARE $5 PER PERSON AND ARE AVAILABLE FOR ALL UMC EMPLOYEES AND THEIR IMMEDIATE FAMILY.

CASH OR CREDIT ONLY



GAMES, BOUNCE HOUSE, FOOD, POPCORN, COTTON CANDY AND LOTS OF FAMILY FUN.



## How to Know If You've Been Hacked!

*Or at least how to spot the obvious things*

So you have anti-virus on your laptop, but no protection on your smartphone or tablet — or you don't know for sure what kind of protection you have, if any. What can you do to make yourself less of a target for data and identity thieves?

Here are some good points for people who are not so it-savvy. The more you educate yourself on the basics, the better. You can start with simple things like adding the free Sophos apps to your smartphone and paying more attention to the terms and conditions you're asked to "click through" when downloading a new app or software program. The link below provides some basic things that will help you to know if you've been hacked, and what you can do if you notice these symptoms.
https://securingthehuman.sans.org/newsletters/ouch/issues/OUCH-201604_en.pdf