**ROTHNER, SEGALL & GREENSTONE**
GLENN ROTHNER (*pro hac vice*)
JONATHAN COHEN (NSB 10551)
ELI NADURIS-WEISSMAN (*pro hac vice*)
510 South Marengo Avenue
Pasadena, California 91101-3115
Telephone: (626) 796-7555
Facsimile: (626) 577-0124
Email: grothner@rsglabor.com; jcohen@rsglabor.com;
enaduris-weissman@rsglabor.com

**CHRISTENSEN JAMES & MARTIN**
EVAN L. JAMES, ESQ. (7760)
KEVIN B. ARCHIBALD, ESQ. (13817)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Facsimile: (702) 255-0871
Email: elj@cjmlv.com; kba@cjmlv.com

*Attorneys for Defendants Service Employees International Union; Luisa Blue; Mary Kay Henry; and Nevada Service Employees Union*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RAYMOND GARCIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, *et al.*,<br><br>Defendants. | CASE NO.: 2:17-cv-01340-APG-NJK<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF CLAIMS; SUPPORTING POINTS AND AUTHORITIES**<br><br>***(GARCIA, et al. v. SERV. EMPLOYEES INT'L UNION, et al.)***<br><br>**ORAL ARGUMENT REQUESTED** |
| CHERIE MANCINI, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SERVICE EMPLOYEES INTERNATIONAL UNION, *et al.*,<br><br>Defendants. | CASE NO.: 2:17-cv-02137-APG-NJK |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

NOTICE OF MOTION AND MOTION ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 2

I. INTRODUCTION ..... 2

II. FACTUAL BACKGROUND ..... 3

A. Background and Relevant Provisions of (1) the SEIU Constitution; (2) the Local 1107 Constitution; and (3) the Affiliation Agreement ..... 3

1. The SEIU Constitution Authorizes the Trusteeship of Local Unions ..... 3

2. The Local 1107 Constitution Authorizes the Local Union's Executive Board to Take Actions on Behalf of Local 1107 ..... 3

3. The Affiliation Agreement Permits SEIU to Impose, With the Executive Board's Approval, an Emergency Trusteeship Over Local 1107 ..... 4

B. Events Leading Up to the April 26, 2017 Board Meeting ..... 5

C. The Executive Board Voted to Accept a Voluntary Trusteeship During the April 26, 2017 Executive Board Meeting ..... 6

III. LEGAL STANDARD ..... 10

IV. ARGUMENT ..... 11

A. Garcia Lacks Article III Standing to Bring Claims Against Defendants ..... 11

1. Garcia Cannot Establish Standing For His Federal Section 301 Claims (Claims 2, 3, 5, 6, and 7) ..... 11

a. Garcia Lacks Third-Party Standing to Assert His Section 301 Claims ..... 11

b. Garcia's Alleged Personal Injury Cannot Be Fairly Traced to SEIU's Alleged Unlawful Conduct ..... 14

c. Garcia Has Failed to Establish an Injury-in-Fact that Resulted from SEIU's Alleged Omissions and Misrepresentations ..... 16

B. Garcia's Tort Claims Must Be Dismissed Because Section 301 Does Not Grant Federal Courts Jurisdiction Over Common-law Torts (Claims 3, 5, 6, and 7) ..... 17

## TABLE OF CONTENTS
(continued)

Page

C. Garcia's Claims Fail on the Merits .......... 19

1. Garcia Has Not Raised a Genuine Issue of Material Fact as to his Federal Claims (Claims 2, 3, 5, 6, and 7) .......... 19

a. Breach of Contract (the Affiliation Agreement) .......... 19

b. Breach of the Implied Covenant of Good Faith and Fair Dealing .......... 22

c. Negligent Misrepresentation .......... 24

d. Legal Malpractice. .......... 26

e. Breach of Fiduciary Duty .......... 26

2. Garcia Has Not Raised a Genuine Issue of Material Fact as to His State Law Claim for Breach of Contract (Claim 1) .......... 27

V. CONCLUSION .......... 30

# TABLE OF AUTHORITIES

Page

**Cases**

*A.C. Shaw Const., Inc. v. Washoe Cty.*,
784 P.2d 9 (Nev. 1989) .......... 22

*Ackley v. Western Conference of Teamsters*,
958 F.2d 1463 (9th Cir. 1992) .......... 21, 27

*Acton Ltd. v. Harsh*,
No. 95-cv-472 HDM (RAM), 1996 WL 576995 (D. Nev. Sept. 25, 1996),
*aff'd*, 4 F. App'x 529 (9th Cir. 2001) .......... 20

*Adkins v. Mireles*,
526 F.3d 531 (9th Cir. 2008) .......... 19

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 14

*Allis-Chalmers Corp. v. Lueck*,
471 U.S. 2020 (1985) .......... 18, 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 10

*Audette v. Int'l Longshoremen's and Warehousemen's Union*,
195 F.3d 1107 (9th Cir. 1999) .......... 19

*Avco Corp. v. Aero Lodge 735*,
390 U.S. 557 (1968) .......... 19

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*,
115 F.3d 1372 (8th Cir. 1997) .......... 11

*Bender v. Williamsport Area School Dist.*, 475 U.S. 534 (1986) .......... 11, 13

*Bernard v. Rockhill Dev. Co.*,
734 P.2d 1238 (Nev. 1987) .......... 20

*Bill Stremmel Motors, Inc. v. First Nat'l Bank of Nev.*,
575 P.2d 938 (Nev. 1978) .......... 24

*Brazinski v. Amoco Petroleum Additives Co.*,
6 F.3d 1176 (7th Cir. 1993) .......... 18, 19

*Brown v. Kinross Gold U.S.A., Inc.*,
531 F. Supp. 2d 1234 (D. Nev. 2008) .......... 26

*Carter v. Smith Food King*,
765 F.2d 916 (9th Cir. 1985) .......... 19

**TABLE OF AUTHORITIES**
(continued)

Page


*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ... 10

*Couturier v. Am. Invsco Corp.*,
2013 WL 2285050 (D. Nev. May 22, 2013) ... 22

*Dunn v. Christensen*,
No. 15-cv-01812 JCM (PAL), 2018 WL 615671 (D. Nev. Jan. 29, 2018) ... 26

*Glickert v. Loop Trolley Transp. Dev. Dist.*,
792 F.3d 876 (8th Cir. 2015) ... 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) ... 18, 19

*Gunter v. United Fed. Credit Union*,
No. 15-cv-00483 MMD (WGC), 2016 WL 3457009 (D. Nev. June 22, 2016) ... 20, 22

*Gutierrez v. United Foods, Inc.*,
11 F.3d 556 (6th Cir. 1994) ... 17

*Guz v. Bechtel Nat. Inc.*,
24 Cal.4th 317 (2010) ... 24

*Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*,
808 P.2d 919 (Nev. 1991) ... 22

*Hines v. Anchor Motor Freight, Inc.*,
424 U.S. 554 (1976) ... 17

*Howard Johnson Co. v. Hotel Employees*,
417 U.S. 249 (1974) ... 18

*Kimbro v. Pepsico, Inc.*,
215 F.3d 723 (7th Cir. 2000) ... 18

*Kucinich v. Bush*,
236 F. Supp. 2d 1 (D.D.C. 2002) ... 17

*Lewis v. Benedict Coal Corp.*,
361 U.S. 459 (1960) ... 18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 11

*Mainor v. Nault*,
101 P.3d 308 (Nev. 2004) ... 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ... 11

**TABLE OF AUTHORITIES**
(continued)

Page

*McCollum v. California Department of Corrections & Rehabilitation*, 647 F.3d 870 (9th Cir. 2011) ........ 11

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........ 11

*Nevada W. Petroleum, LLC v. BP W. Coast Prod., LLC*, No. 15-cv-01684 APG (PAL), 2017 WL 4172269 (D. Nev. Sept. 20, 2017) ........ 22

*Newberry v. Pac. Racing Ass'n*, 854 F.2d 1142 (9th Cir. 1988) ........ 19

*Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) (en banc) ........ 10

*Operating Eng'rs Pension Trust v. Cecil Backhoe Serv., Inc.*, 795 F.2d 1501 (9th Cir. 1986) ........ 21

*Pape v. Local 390 of Int'l Bhd .of Teamsters*, 315 F. Supp. 2d 1297 (S.D. Fla. 2004) ........ 19

*Perry v. Jordan*, 900 P.2d 335 (Nev. 1995) ........ 22

*Phillips v. Nat'l City Bank of Indiana First Franklin Div.*, 2010 WL 11537506 (D. Ariz. Sept. 22, 2010), *aff'd*, 462 F. App'x 666 (9th Cir. 2011) ........ 21

*Raines v. Byrd*, 521 U.S. 811 (1997) ........ 17

*Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041 (9th Cir. 1999) ........ 13

*Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105 (9th Cir. 1979) ........ 20

*Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222 (D. Nev. 2016) ........ 24

*Sou v. Bash*, No. 15-cv-00698 APG (VCF), 2017 WL 5615210 (D. Nev. Nov. 21, 2017) ........ 24

*Teamsters Local Union No. 406 v. Crane*, 848 F.2d 709 (6th Cir. 1988) ........ 19

*Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957) ........ 18, 20

*Tisza v. Commc'ns Workers of Am.*, 953 F.2d 298 (7th Cir. 1992) ........ 13, 14, 15

**TABLE OF AUTHORITIES**
(continued)

Page

*Trustees of the Operating Engineers Pension Tr. v. O'Dell*,
682 F. Supp. 1506 (D. Nev. 1988) .......... 20

*United States v. 100,348.00 in United States Currency*,
354 F.3d 1110 (9th Cir. 2004) .......... 12

*Voigt v. Savell*,
70 F.3d 1552 (9th Cir. 1995) .......... 12

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 2, 11

*Wash. Mut. Inc. v. United States*,
636 F.3d 1207 (9th Cir. 2011) .......... 10

*Wauchope v. United States Department of State*,
985 F.2d 1407 (9th Cir. 1993) .......... 13

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 17

*Wilson v. Nevada Affordable Hous. Assistance Corp.*,
No. 15-cv-01387 APG (CWH), 2017 WL 1276055 (D. Nev. Mar. 30, 2017) .......... 26

*Wooddell v. Int'l Bhd. of Elec. Workers Local Union 71*,
762 F. Supp. 747 (S.D. Ohio 1988) .......... 16

*Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*,
502 U.S. 93 (1991) .......... 15, 16

*Young v. Anthony's Fish Grottos, Inc.*,
830 F.2d 993 (9th Cir. 1987) .......... 19

**Statutes**

Labor Management Relations Act, Section 301,
29 U.S.C. § 185 .......... *passim*

**Rules**

Federal Rules of Civil Procedure
Rule 56 .......... 10
Rule 56(a) .......... 10
Rule 56(c) .......... 10
Rule 56(e) .......... 10

/ / /

/ / /

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

Restatement (Second) of Torts
§ 552 .......... 24

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**YOU ARE HEREBY NOTIFIED** that Defendants Service Employees International Union ("SEIU") and Nevada Service Employees Union ("Local 1107") (collectively, "Defendants"), hereby move for summary judgment on all claims, or in the alternative, summary adjudication of claims, in *Garcia, et al. v. Service Employees Int'l Union, et al.*, Case No. 2:17-cv-01340 APG (NJK).

Summary judgment is proper because (1) Plaintiff lacks standing to pursue any of the claims in the complaint; (2) Plaintiff's tort claims (Claims 3, 5, 6 and 7) are fully preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and must be dismissed as a result; and (3) Plaintiff has failed to raise a genuine issue of material fact concerning the remaining claims in the first amended complaint, namely, for breach of contract (Claims 1 and 2), breach of the implied covenant of good faith and fair dealing (Claim 3), negligent misrepresentation (Claim 5), legal malpractice (Claim 6), and breach of fiduciary duty (Claim 7).

This motion is based on the following memorandum of points and authorities; the Declarations of Neil Bisno, Brenda Marzan, Patricia Armstrong, and Eli Naduris-Weissman filed herewith; the Declaration of Mary Kay Henry (filed contemporaneously in support of summary judgment motion in *Mancini* action); the pleadings and papers filed in this action; and upon such other matters that may be presented to the Court in connection with this motion.

DATED: January 30, 2019

ROTHNER, SEGALL & GREENSTONE
GLENN ROTHNER (*pro hac vice*)
JONATHAN COHEN
ELI NADURIS-WEISSMAN (*pro hac vice*)

CHRISTENSEN JAMES & MARTIN
EVAN L. JAMES

By /s/ Eli Naduris-Weissman
Eli Naduris-Weissman
510 South Marengo Avenue
Pasadena, CA 91101
Tel.: (626) 796-7555; Fax: (626) 577-0124
*Attorneys for Defendants*
*Service Employees International Union; Luisa Blue; Mary Kay Henry; and Nevada Service Employees Union*

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff Raymond Garcia, a union member of Nevada-based Local 1107, a local affiliate of the Service Employees International Union ("SEIU" or "International Union"), brings this lawsuit against Defendants SEIU and the Executive Board of the Nevada Service Employees Union ("Local 1107 executive board"). Garcia, however, lacks Article III standing to bring these claims, all of which, based on the evidence, cannot survive summary judgment.

Garcia's contract and tort claims against SEIU rest mostly on his unfounded assertion that SEIU misrepresented *to the Local 1107 executive board* during its April 26, 2017 board meeting that it had no other choice but to request trusteeship. Garcia effectively seeks to assert the rights of the executive board, of which he was never a part, for SEIU's alleged wrongful acts against it. The third-party standing rule, however, bars him from asserting the executive board's legal interests in order to obtain relief for himself. *See Warth v. Seldin*, 422 U.S. 490, 498–99 (1975).

Even if he could establish third-party standing, his claims fail because there is no genuine dispute of material fact over whether SEIU made these misrepresentations. It did not. Defendants offer testimony from the high-ranking SEIU representative at the meeting and multiple executive board members who, unlike Garcia, were in attendance: all agree that SEIU made clear that the choice over whether to be placed under trusteeship belonged to the executive board alone. As one former plaintiff and executive board member aptly put it, "If there was no choice, why would there be a vote? . . . No one said that there was no choice."[1]

Garcia's single contract claim against the Local 1107 executive board must also fail. To begin with, Garcia has not established a "distinct and palpable" personalized injury—as opposed to an abstract injury applicable to all 17,000 represented workers—that stems from the executive board's trusteeship vote. Assuming he gets past his standing problem, Garcia's claim nevertheless fails on the merits. He alleges the executive board violated the Local 1107 constitution and bylaws by voting for the trusteeship when it had no authority to do so. The 1107 constitution and

---

[1] The court recently dismissed three of the four plaintiffs in this case: Raitis J. Liepins, Miles Rodela, and Karla Nolan. ECF No. 261.

bylaws, however, plainly shows that the executive board had express authority to take certain actions that the board determines are required for the direction and operation of the local union. Voting in favor of trusteeship amidst myriad internal and external challenges facing Local 1107 was one such action. Moreover, Local 1107's affiliation agreement with SEIU expressly allowed the executive board to approve SEIU's implementation of a trusteeship.

Accordingly, for the reasons above and those set forth in greater detail below, Defendants request that the court grant their motion for summary judgment in its entirety.

## II. FACTUAL BACKGROUND

### A. Background and Relevant Provisions of (1) the SEIU Constitution; (2) the Local 1107 Constitution; and (3) the Affiliation Agreement.

SEIU is an international labor union representing more than 2 million public and private sector employees in various industries. Declaration of Neal Bisno ("Bisno Decl.") ¶ 3. Mary Kay Henry has been president of SEIU since 2010. Declaration of Mary Kay Henry ("Henry Decl.") ¶ 2 (filed contemporaneously in support of summary judgment motion in *Mancini* action). Neal Bisno has been one of its executive vice presidents since 2016. Bisno Decl. ¶ 3. SEIU and its affiliates are governed by SEIU's Constitution and Bylaws ("the SEIU Constitution"). Henry Decl. ¶ 3. Local 1107 represents over 17,000 public and private sector employees. *Id.* ¶ 4.

#### 1. The SEIU Constitution Authorizes the Trusteeship of Local Unions.

Articles VIII, §§ 7(a) through (f) authorize SEIU's president to appoint a trustee over an affiliated union "for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of this International Union . . . ." Henry Decl. ¶ 3, Ex. A ("SEIU Constitution"). The trustee's appointment "shall have the effect of removing the officers of the [affiliated] Local Union." *Id.*

#### 2. The Local 1107 Constitution Authorizes the Local Union's Executive Board to Take Actions on Behalf of Local 1107.

Local 1107 itself has its own constitution and bylaws ("the 1107 Constitution"), which defines the union's jurisdiction as, in part, all "public and private sector and healthcare employees

in Nevada." Declaration of Brenda Marzan ("Marzan Decl.") ¶ 3, Ex. A ("1107 Constitution"), Art. 4.[2] It is governed by an executive board, which is "authorized and empowered to take all lawful actions consistent with the [1107 Constitution]." *Id.*, Art. 8 § 1. The executive board's actions "become effective immediately and shall be considered the action of the Local Union." *Id.* Such actions, however, must be voted upon by a majority of executive board members present at the monthly meeting where the proposed actions are raised. *Id.* The "[a]uthority of the Executive Board includes, but is not limited to . . . [t]he establishment of plans, policies and procedures that are required for the direction and operation of the Local Union." *Id.*, Art. 8 § 2.A. Notably, the 1107 Constitution "shall at all times be subordinate to the International Constitution and Bylaws." *Id.*, Art. 27. Under Article 27, should a conflict arise between the SEIU and 1107 constitutions, the "provisions of the International Constitution and Bylaws shall control, except in the case of specific exemptions provided in the affiliation agreement between the parties." *Id.*

**3. The Affiliation Agreement Permits SEIU to Impose, With the Executive Board's Approval, an Emergency Trusteeship Over Local 1107.**

In 1987, Local 1107 entered into an Affiliation Agreement with SEIU. Henry Decl. ¶ 4, Ex. B ("Affiliation Agreement"). The Affiliation Agreement identifies the unions' common objectives and purposes—e.g., to "advance the social, economic, and educational welfare of their members through organization"—and addresses various terms and conditions of the affiliation. In particular, paragraph 18 of the agreement expressly waives the provisions of Article VIII, §§ 7(a) through (f) involving trusteeship (hereinafter, "the trusteeship provisions") of the SEIU Constitution except, as relevant here, <u>with the approval of the Local 1107 executive board</u>:

> 18. The provisions of Article VIII, Section 7 (a–f) and Article XII, Section 3 of the SEIU Constitution regarding trusteeship are hereby waived except for the purpose of enforcing this agreement pursuant to Paragraph 21 below or with the approval of the PEA Board of Representatives.

*Id.* ¶ 18.[3] Thus, if the Local 1107 executive board approves, SEIU can impose a trusteeship over

---

[2] The 1107 Constitution has since been amended following the events in this case. *See* ECF No. 220-7 ¶ 13.

[3] The parties do not dispute that "PEA" (the Clark County Public Employees Association) refers to Local 1107 of SEIU. *See* Affiliation Agreement ¶ 3.

Local 1107 pursuant to the trusteeship provisions of the SEIU Constitution. *See* Bisno Decl. ¶ 15.

As a key governance document between Local 1107 and SEIU, the Affiliation Agreement was available to all 1107 officers. In fact, executive board members and other 1107 officers and staff had access to it well before April 26, 2017. Former 1107 President Vicki Hedderman stated that “[d]uring my tenure as Local 1107 President [beginning in 2007], the local had a copy of the Affiliation Agreement . . . on file at the local.” ECF No. 223-13 (“Hedderman Decl.”) ¶ 7. A few years before 2017, then-president Martin Bassick shared the Affiliation Agreement with executive board member Brenda Marzan when she asked for it. Marzan Decl. ¶ 4.

In early April 2017, then-1107 president Cherie Mancini received a copy of the Affiliation Agreement from SEIU after directing finance manager Robert Clarke to request it. Declaration of Eli Naduris-Weissman (“Naduris-Weissman Decl.”) ¶ 2, Ex. A (Deposition of Cherie Mancini (“Mancini Depo.”)) at 36–38; Naduris-Weissman Decl. ¶ 3, Ex. B (email from SEIU to Mancini and Clarke with the Affiliation Agreement attached). Clarke then sent an email to SEIU’s attorney thanking her for the Affiliation Agreement and said “I will make sure to file it so it can be found in the future.” Naduris-Weissman Decl. ¶ 4, Ex. C. Mancini later circulated the Affiliation Agreement to various individuals within Local 1107. Naduris-Weissman Decl. ¶¶ 5, 6, Exs. D, E.

**B. Events Leading Up to the April 26, 2017 Board Meeting.**

Between April and October 2016, various Local 1107 members and officers filed internal disciplinary charges against Local 1107 President Mancini, former Local 1107 Executive Vice President Sharon Kisling, and others. Henry Decl. ¶ 5. In October 2016, President Henry assumed jurisdiction over the disciplinary charges and appointed Carol Nieters as a hearing officer to hold a hearing on these charges. Bisno Decl. ¶ 6. President Henry also noticed a hearing on the internal needs of Local 1107, to be held in a consolidated hearing with the internal charges. *Id.* Multiple witnesses testified, including board member Marzan, who attested to the chaotic board meetings that prevented the executive board from carrying out its responsibilities. Marzan Decl. ¶ 6.

On April 26, 2017, Nieters issued a report on the internal charges recommending that SEIU remove Mancini and Kisling from their positions. Bisno Decl. ¶ 7. President Henry

subsequently removed Mancini and Kisling from their respective offices that same day. *Id.* Nieters also issued a report on the internal needs of Local 1107, in which she recommended, among other things, that Local 1107 be placed under trusteeship. *Id.* ¶ 8. President Henry adopted this report. *Id.* The Affiliation Agreement between SEIU and Local 1107, however, barred SEIU from placing Local 1107 under *involuntary* trusteeship. *Id.* ¶ 8; Affiliation Agreement ¶ 18.

On April 26, 2017, the Local 1107 executive board was scheduled to have its monthly meeting. Bisno Decl. ¶ 9. President Henry sent Bisno along with Deputy Chief of Staff Deirdre Fitzpatrick to discuss with the board how to move the union forward in light of its governance challenges.[4] *Id.* ¶¶ 5, 9. Aside from the leadership vacuum and internal strife, Local 1107 faced serious external challenges, including threats of decertifications, threats of employers withdrawing union recognition, and legislative efforts to weaken collective bargaining rights. *Id.* ¶ 5.

At 2:10 p.m., Mancini emailed various executive board members, urging them to "[p]lease attend tonight's board meeting as it is very important to voice your thoughts on the direction of your local to the International, who will be in attendance, as they have removed myself and Sharon as of today." Naduris-Weissman Decl. ¶ 7, Ex. F ("April 26, 2017 Mancini Email"); *see also* Marzan Decl. ¶ 10. Nearly all of the executive board members who attended the April 26, 2017 meeting received Mancini's email. *Compare* April 26, 2017 Mancini Email *with* Declaration of Patricia Armstrong ("Armstrong Decl.") ¶ 3, Ex. A ("April 26, 2017 Board Minutes").

### C. The Executive Board Voted to Accept a Voluntary Trusteeship During the April 26, 2017 Executive Board Meeting.

The executive board meeting began shortly after 5:30 p.m. Bisno Decl. ¶ 11; *see* April 26, 2017 Board Minutes. Twenty-nine executive board members showed up. *See* April 26, 2017 Board Minutes. In addition to Bisno, the SEIU officials and staff included Fitzpatrick, Kathy Eddy, and then-Associate General Counsel Steve Ury. Bisno Decl. ¶ 11. Secretary Patricia Armstrong convened the meeting. Armstrong Decl. ¶ 4. The executive board then voted to

---

[4] In or around Fall 2016, President Henry asked Bisno to work with International Union staff assigned to assist Local 1107 in resolving leadership conflicts that had impeded its ability to govern itself and to address external threats to its membership. Bisno Decl. ¶ 4. During this time, Bisno began having regular conversations with SEIU staff members about Local 1107. *Id.* ¶¶ 4–5.

conduct the meeting in executive session (i.e., closed session), and non-board members were asked to leave. *Id.*; Bisno Decl. ¶ 12. Ury, who had attended previous executive board meetings, started off by introducing Bisno. Bisno Decl. ¶ 12. Eddy and Fitzpatrick sat to the side as observers and did not participate in the meeting. *Id.* The union hall was filled with long tables arranged in an "open square" formation, with a podium set up in front. *Id.* ¶ 13. Bisno moved the podium out of the way, pulled up a chair, and sat at the table with the board. *Id.*

Bisno began with about 15-20 minutes of remarks. *Id.* ¶ 14. He laid out internecine disputes that occurred during the last several years, and which culminated in the removal of the president and executive vice president. *Id.* He talked about the external challenges that threatened the union's strength and ability to represent its members. *Id.* He also reminded the board about the significant support that SEIU had provided Local 1107 over the years. *Id.* He clarified that whatever the meeting's outcome, SEIU was not just going to walk away. *Id.* It was SEIU's position, however, that there was not much more it could do to fix Local 1107's problems and that doing more of the same would not lead to different results. *Id.* Bisno explained the board therefore had an important decision to make regarding how to deal with the vacancy in the top two leadership positions, a scenario the 1107 Constitution did not address. *Id.*; Marzan Decl. ¶ 11.

Bisno informed the executive board of SEIU's recommendation that Local 1107 be placed under trusteeship. Bisno Decl. ¶ 15. He emphasized, however, that under the Affiliation Agreement, the only way to have Local 1107 placed under trusteeship was if the executive board voted to do so. *Id.* He described a trusteeship, among other things, as involving: the SEIU president's appointing an experienced trustee or team of trustees to oversee the day-to-day management of the local; the dissolution of the executive board; and the suspension of the 1107 Constitution. *Id.*; Armstrong Decl. ¶ 6. All of these changes would take place immediately if the board voted to request a trusteeship. Bisno Decl. ¶ 15; Marzan Decl. ¶ 15.

After these remarks, Bisno opened up the floor for questions, reactions, and comments. Bisno Decl. ¶ 16. In order to maximize participation, he went around the room, person-by-person, and asked each individual if they had anything they wanted to say. *Id.*; Marzan Decl. ¶ 14. Bisno made sure to answer every person's question truthfully and accurately. Bisno Decl. ¶ 17. One of

the issues that came up was whether there was another option to trusteeship. *Id.* Bisno responded with his opinion that the alternative to trusteeship was maintaining the status quo. *Id.*

Throughout the discussion, he stressed that the choice over whether to be placed under trusteeship was the board's, not his or SEIU's. *Id.* ¶ 18; Armstrong Decl. ¶ 5 ("[Bisno] was very clear that this was our decision."). He made sure everyone understood that there would be no trusteeship absent a vote of the executive board. Bisno Decl. ¶ 18. Moreover, no SEIU representative stated that there were no alternatives to trusteeship or that the board had to vote for trusteeship. Marzan Decl. ¶ 13 ("[Bisno] made clear to us that the decision over whether to place Local 1107 under trusteeship was ours to make. It was our choice."); Bisno Decl. ¶ 18.

This account is reinforced by deposition testimony from former plaintiff and then-board member in attendance at the April 26, 2017 meeting, Raitis J. Liepins. According to Liepins, as evidenced by the following exchange with Defense counsel, the decision whether to vote for or against trusteeship was a choice that belonged to the executive board without coercion from SEIU:

> Q. Okay. Did anyone – Steve Ury or anyone else from SEIU – tell the executive board that they had no choice, that they had to vote for trusteeship?
> A. I believe we were given a choice. If there was no choice, why would there be a vote?
> Q. Okay. So the answer's no one said to you something to indicate that there was no choice?
> A. No one said that there was no choice.
> Q. And you described pressure earlier, which, from your comments I understand, but pressure can sometimes be taken as coercion. Was there any coercion you observed at the meeting on the part of the SEIU representatives?
> A. That would not be the word that I would use, no.
> Q. Okay. Is it fair to say that the – that the position expressed by the SEIU representatives was that this question was urgent?
> A. Yes.
> Q. Okay. So they were conveying an impression of urgency?
> A. Yes, they were.
> Q. Okay.
> A. Yes they were.

Naduris-Weissman Decl. ¶ 8, Ex. G (Deposition of Raitis J. Liepins ("Liepins Depo.")) at 41–42; *see also* Armstrong Decl. ¶ 9 ("[W]e were not pressured into voting yes, and those who did not favor trusteeship either voted no, abstained, or could have."). Indeed, in his deposition, Defense counsel asked, "[Y]ou were told by [in-house counsel] Steve Ury that you could vote the

trusteeship idea down; is that right?" Liepins Depo. at 35. Liepins responded, "We were told that we could vote it down, yes." *Id.* Some executive board members did express sentiments against trusteeship. Liepins himself acknowledged that he was not the only one to speak against trusteeship: "There were others, I believe, that also spoke up." *Id.* at 36.

The question-and-comment period between Bisno and the executive board lasted over two hours, with virtually every board member having participated. Bisno ¶ 19; Armstrong Decl. ¶ 7. Despite the sense of urgency SEIU imparted to the executive board, *see* Liepins Depo. at 41–42, at no point during the meeting did anyone move to postpone the vote. Bisno Decl. ¶ 19; Marzan Decl. ¶ 17 ("At no point in the meeting did anyone move to postpone the conversation about trusteeship."). Liepins did testify that a debate took place regarding postponement:

> [Q.] You didn't vote for trusteeship, and you expressed yourself that you think that this should be done at another time?
> A. Oh, absolutely, yeah.
> Q. Did anyone else express similar sentiments to those that I just described that you had expressed?
> A. One other person I [sic] did express and then he abstained at the vote.

Liepins Depo. at 38–39. Thus, although some executive board members thought the vote should take place later, the executive board decided to move forward regardless. *See* Armstrong Decl. ¶ 9 ("I also felt that we should vote on trusteeship that night of the executive board meeting."). The decision to go forward disappointed some board members like Liepins:

> A. I must say that I was concerned that there were so few people that were opposed [to the trusteeship].
> Q. Why did that concern you?
> A. Because it caught me by surprise as far as knowing these people. Knowing that they held, you know, a position of power as an E-board member, it concerned me that so many seemed to be willing to give it up.

Liepins Depo. at 40. Ultimately, however, as board member Marzan observed, "[n]either Bisno nor any SEIU representative said that we had to vote in favor of trusteeship or that we had to make a decision that very night." Marzan Decl. ¶ 13.

Eventually, executive board member Clara Thomas moved for a vote on whether to request that SEIU implement an emergency trusteeship. *See* April 26, 2017 Board Minutes; Bisno Decl. ¶ 20. After another board member seconded the motion, the executive board voted 17-7, with 5

abstentions, in favor of a voluntary trusteeship by SEIU. *See* April 26, 2017 Board Minutes; Bisno Decl. ¶ 20. After the trusteeship vote, the executive board continued to carry on normal business, discussing political endorsements before adjourning the meeting. Bisno Decl. ¶ 21.

On April 28, 2017, pursuant to her authority under Article VIII, §§ 7(a) and (f) of the SEIU constitution, President Henry issued an order imposing an emergency trusteeship over Local 1107. Henry Decl. ¶ 12.[5] Additionally, she appointed a Trustee and Deputy Trustee, suspended Local 1107's Constitution, and removed the union's officers and executive board members. *Id.*

## III. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of*

---

[5] In her order, President Henry cited the following: an "on-going and serious breakdown in internal union governance and democratic procedures at Local 1107, stemming from warring factions on the Local Executive Board"; "[l]eadership conflicts and in-fighting in Local 1107 [which] have caused great instability in the Local and interfered with its carrying out its collective bargaining responsibilities properly and effectively"; the union's "failure to communicate adequately with the Local membership interferes with its collective bargaining responsibilities"; "the communication breakdown in the Local impeded staff oversight, leaving Local staff without clear direction on the work they are required to perform . . . ."; "Local 1107's former Executive Vice President usurped the former President's constitutional authority to hire and fire Local staff by attempting to terminate a staff member while the former President was on vacation . . . ."; and "several conflicting provisions in Local 1107's Constitution and Bylaws pertaining to the authority of the Local's officers and Executive Board members contribute to the conflict and confusion in the Local." Henry Decl. ¶ 10, Ex. H.

*Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. ARGUMENT

### A. Garcia Lacks Article III Standing to Bring Claims Against Defendants.

Article III standing requires a plaintiff show an injury-in-fact that is (1) concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) fairly traceable to the challenged action; and (3) likely to be redressed by a favorable ruling. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Particularized harm means that "the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 n.1 (1992); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 543–544 (1986) (school board member who "has no personal stake in the outcome of the litigation" has no standing).

#### 1. Garcia Cannot Establish Standing For His Federal Section 301 Claims (Claims 2, 3, 5, 6, and 7).

##### a. Garcia Lacks Third-Party Standing to Assert His Section 301 Claims.

Garcia cannot establish third-party standing because he cannot "step into the shoes" of the executive board and invoke its right to sue.

"Even if a plaintiff meets the minimal constitutional requirements for standing, there are prudential limits on a court's exercise of jurisdiction." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1378 (8th Cir. 1997). One such limit is the "third-party standing" rule, which, in the absence of exceptional circumstances, "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury themselves." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975). "To demonstrate third party standing, a plaintiff must show his own injury, a close relationship between himself and the parties whose rights he asserts, and the inability of the parties to assert their own rights." *McCollum v. California Department of Corrections & Rehabilitation*, 647 F.3d 870, 879 (9th Cir. 2011). The close-relationship requirement can be satisfied in cases where the litigant "is fully, or very nearly, as effective a

proponent of the right as the [third party].” *Voigt v. Savell*, 70 F.3d 1552, 1564–65 (9th Cir. 1995); *see also United States v. 100,348.00 in United States Currency*, 354 F.3d 1110, 1127 (9th Cir. 2004) (a third party may litigate another person’s rights only if he can “reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal”).

Here, in bringing federal claims that all hinge on proving SEIU’s omission of material facts or material misrepresentations *to the executive board* during the April 26, 2017 meeting, <u>Garcia effectively seeks to assert the rights of the executive board</u>. *See* FAC ¶¶ 40–41 (claim 2: breach-of-contract claim alleging failure to advise the executive board of its rights and “mak[ing] misrepresentations to the Board”)[6]; *id.* ¶¶ 46–48 (claim 3: breach-of-the-implied-covenant claim alleging SEIU’s failure to “apprise Local 1107 of its rights under [the Affiliation Agreement]” and “misrepresenting to the Board of Local 1107 that they had no choice”); *id.* ¶¶ 62–64 (claim 5: negligent misrepresentation claim alleging SEIU failed to “communicat[e] to the Board their rights” and making “misrepresentations [that] induced the Board to grant the International Union trusteeship”); *id.* ¶ 74 (claim 6: legal malpractice claim alleging attorney “made misrepresentations of material fact regarding the rights of the Board”); *id.* ¶ 80 (claim 7: breach-of-fiduciary-duty claim alleging SEIU “ma[de] misrepresentations of fact regarding the rights of the Board”). Garcia, however, cannot establish third-party standing.

Even if Garcia can show injury, he has failed to establish a close relationship between himself—a single union member out of thousands—and the executive board. Garcia has never been an executive board member, and was not even present during SEIU’s presentation at the

---

[6] That Garcia’s section 301 breach-of-contract claim against SEIU is based only on alleged <u>omissions and misrepresentations to the executive board</u> is buttressed by Garcia’s own response to Defendants’ first set of interrogatories to Garcia. Defendants’ Interrogatory No. 2 asked Garcia to “identify each act or omission by the Defendants which you believe breached [the Affiliation Agreement, the 1107 Constitution, or the SEIU Constitution].” *See* Naduris-Weissman Decl. ¶ 9, Ex. H. In response, Garcia identified only two acts that breached the Affiliation Agreement: (1) the SEIU president’s “decision . . . to send various international Executive Board members to attend 1107’s Executive Board Meeting to convince the members that a *trusteeship was required* and that Local 1107 could not move forward without the board voting for trusteeship”; and (2) the “subsequent acts of Bisno, Fitzpatrick, and Steve Ury during the Executive Board Meeting on April 26, 2017 wherein they informed the Local 1107 membership that they had *no choice but to vote in favor of an emergency trusteeship*.” Naduris-Weissman Decl. ¶ 10, Ex. I (emphasis added).

April 26, 2017 meeting. This makes him a significantly less effective proponent of the executive board's rights. For one, he lacks personal knowledge regarding what SEIU said during the meeting, and any assertions he has regarding what other executive board members told him SEIU representatives said is inadmissible hearsay. *Cf. Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1045 (9th Cir. 1999). Moreover, he has not shown evidence of the executive board's inability to assert its own rights. *Cf. Wauchope v. United States Department of State*, 985 F.2d 1407, 1411 (9th Cir. 1993) (the deceased are incapable of asserting their own rights).

Furthermore, as this court already recognized, Garcia "ha[s] not presented argument or legal authority as to why [he] should be able to bring claims . . . on behalf of [the] executive board when [he] do[es] not represent a majority of the executive board." ECF No. 78 at 10 (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986)). In *Bender*, the Supreme Court examined "[w]hether one member of a School Board has standing to appeal from a declaratory judgment against the Board," and held that "although the School Board itself had a sufficient stake in the outcome of the litigation to appeal, an individual Board member cannot invoke the Board's interest in the case to confer standing upon himself." *Bender*, 475 U.S. at 536.

This *Bender* principle applies with even greater force here. Indeed, Garcia has never been a member of the executive board and did not have a vote on the trusteeship issue. *See* Marzan Decl. ¶ 20; *e.g.*, *Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 880–82 (8th Cir. 2015) (finding plaintiffs who were ineligible to vote on the creation of a transportation development district lacked standing to assert the rights of those who were eligible to vote). Critically, SEIU's alleged omissions and misrepresentations—the sole basis for all of Garcia's claims against SEIU—were made to the executive board, not to Garcia personally. *See* ECF No. 78 at 7 (dismissing fraudulent misrepresentation claim for lack of standing "because the misrepresentation was made to the Local 1107 executive board, not to the individual plaintiffs"); *id.* at 9 (dismissing legal malpractice claim in part for lack of standing because the SEIU attorney made the alleged misrepresentations "to the Local's board, not its individual numbers").

At the end of the day, the executive board can protect its own interests. It does not need Garcia to champion its interests in federal court. *See Tisza v. Commc'ns Workers of Am.*, 953 F.2d

298, 300 (7th Cir. 1992) (Easterbrook, J.) (finding no basis for third-party standing because union members of locals who did not have their votes counted by the international union in an election concerning an amendment to the union's pension plan with a nationwide employer "can protect their own interests" and "do not need [plaintiff] members of Local 4250 as their champions").

Accordingly, for the reasons set forth above, Defendants request that the court dismiss Garcia's section 301 claims for lack of standing.

**b. Garcia's Alleged Personal Injury Cannot Be Fairly Traced to SEIU's Alleged Unlawful Conduct.**

In order to establish Article III standing, "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 738 (1984). There is no evidence that any injury Garcia suffered can be fairly traced back to SEIU's alleged omissions and misrepresentations to the executive board on April 26, 2017.

One case that illustrates this principle in the union democracy context is *Tisza v. Communications Workers of America*, 953 F.2d 298, 300 (7th Cir. 1992). There, the Communications Workers of America ("CWA") reached agreement with AT&T on an early-retirement amendment to their pension plan. *Id.* at 299. CWA subsequently conducted a referendum on the charges. *Id.* Not all of the local unions with AT&T workers, however, reported votes from the membership: only 287 locals out of 425 did so. *Id.* The final count was 16,184 votes in favor of the changes and 13,382 against. *Id.* A group of members from one local (Local 4250) who voted against the retirement amendment filed suit, arguing that the election failed to comply with the Labor-Management Reporting and Disclosure Act (LMRDA) by denying "equal rights and privileges" to the members of the 138 locals who did not report votes. *Id.* The plaintiffs' theory was that "the union either failed to notify these locals and their members properly or neglected to count the votes they returned." *Id.*

Although the district court granted summary judgment to the CWA, the Seventh Circuit vacated the judgment and dismissed the lawsuit on jurisdictional grounds based on plaintiffs' inability to establish Article III standing on two related grounds. *Id.* at 301. First, *Tisza* concluded that there was "no foundation for third-party standing" because plaintiffs failed to "identify harm

personal to themselves"; if anything, plaintiffs' votes would have been actually "over-weighted if, as they sa[id], other members were cut out of the election." *Id* at 300 (citing *Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93, 99 n.4 (1991)). What is more, *Tisza* emphasized that "none of the plaintiffs contend[ed] that he lost any advantage available under the pension plan as it stood before its amendment." *Id.* at 301.

Second, *Tisza* addressed part two of the Article III injury analysis: traceability. *Id.* at 300–01. According to *Tisza*, "it [wa]s not enough [for plaintiffs] to point to a substantive rule"; they were also required to "identify a personal loss traceable to a violation of the rule." *Id.* at 300. Because there was "no reason to believe that members of the non-reporting locals were less favorably disposed toward the proposal [the retirement amendment] than were members of the 287 reporting locals," any "problems in voting d[id] not affect the outcome of the election." *Id.* at 301. In other words, any harm plaintiffs suffered could not be fairly traced back to purported issues with the way CWA ran the election; even if the non-reporting locals had their votes counted, there was no basis to believe the end result would be different (i.e., a vote against the amendment).

Here, not only is there no evidence of personal harm, there is no evidence about how any harm Garcia theoretically suffered would have been fairly traceable to SEIU's alleged omissions and misrepresentations. As in *Tisza*, there is no evidence that but for SEIU's alleged wrongdoing (e.g., allegedly informing the executive board that they had to vote for a trusteeship), the result (i.e., a vote in favor of trusteeship) would have been different. For instance, nothing indicates that any of the 17 executive board members who voted in favor of trusteeship—out of a quorum of 29 board members—would have changed their vote had they not relied upon the alleged misrepresentation by SEIU that they had no choice but to vote in favor of the trusteeship.

Accordingly, because any harm Garcia suffered cannot be fairly traced back to SEIU's alleged omissions and misrepresentations, he cannot establish standing. Put another way, "[w]hen problems in voting do not affect the outcome of the election, and the outcome of the election does not affect the welfare of the voters, there is no case or controversy." *Tisza*, 953 F.2d at 301.

/ / /

/ / /

**c. Garcia Has Failed to Establish an Injury-in-Fact that Resulted from SEIU's Alleged Omissions and Misrepresentations.**

The record lacks sufficient evidence establishing that Garcia suffered an injury-in-fact because of SEIU's alleged omissions and misrepresentations.

To be sure, as this court previously recognized, *Wooddell v. International Brotherhood of Electrical Workers, Local 71* established that federal courts have subject matter jurisdiction over section 301 suits by individual union members against a labor organization for breach of a contract between labor organizations. 502 U.S. 93, 101 (1991); ECF No. 78 at 10. At the same time, *Wooddell* acknowledged that "[o]f course for a petitioner to bring suit, he must have personal standing." *Id.* at 99 n.4. No party in *Wooddell*, however, disputed the petitioner individual union member's standing. *Id.* This is unsurprising. In that case, the union member sufficiently alleged an injury-in-fact; namely, that the local union discriminated against him in hiring-hall job referrals, in violation of the local union's contract with the parent union, which adversely affected his ability to obtain work. *See Wooddell v. Int'l Bhd. of Elec. Workers Local Union 71*, 762 F. Supp. 747, 748 (S.D. Ohio 1988) ("Plaintiff further claims . . . he was subjected to retaliation in the form of manipulation of the union's job referral system, resulting in loss of employment.").

Here, unlike in *Wooddell*, there is no evidence of how SEIU's alleged omissions and misrepresentations to the executive board (e.g., that they had no choice but to vote for a trusteeship) led Garcia to suffer particularized harm sufficient to establish "personal standing." All of Garcia's federal claims allege SEIU's wrongful actions at the April 26, 2017 board meeting paved the way for SEIU's trustee to "engage[] in actions that have directly and proximately harmed Local 1107 and its members" including:

> refusing to obey the laws of Local 1107 requiring that elections be held, arbitrarily expelling staff members, breaching Local 1107 contracts, entering into contracts, violating Local 1107 law, and dissipating Local 1107 funds without accounting in excess of $10,000 for International Union officials and employees' travel and lodging expenses to facilitate the transition of control and management of Local 1107, usurping Local 1107's right of independent democratic governance, and disrupting the bargaining process for pending employment contract negotiations that will irreparably harm the members of Local 1107.

FAC ¶ 42; *see id.* ¶¶ 50, 65, 76, 82. There is no evidence, however, regarding how SEIU's alleged

omissions and misrepresentations injured Garcia in a personal and individual way that is "distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

For instance, although Garcia testified in his deposition that 1107 members generally are "not getting the represent [sic] we're supposed to get" after the trusteeship, *see* Garcia Depo. at 29, he has not demonstrated an injury to himself personally that is "concrete in both a qualitative and temporal sense" and traceable to the SEIU's failure to explain fully to the executive board members its rights or SEIU's alleged statement that the executive board had no choice but vote for trusteeship. *Id.*; *cf. Kucinich v. Bush*, 236 F. Supp. 2d 1, 7 (D.D.C. 2002) ("generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal' or 'particularized,' but rather are institutional, and too widely dispersed to confer standing") (citing *Raines v. Byrd*, 521 U.S. 811 (1997)).

Garcia therefore lacks Article III standing to bring his federal claims because he has not suffered an injury-in-fact. *Cf. Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976) (finding that individual workers have standing under section 301 when they assert "'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge").[7]

**B. Garcia's Tort Claims Must Be Dismissed Because Section 301 Does Not Grant Federal Courts Jurisdiction Over Common-law Torts (Claims 3, 5, 6, and 7).**

This court ruled in its order dismissing part of the FAC that it would treat Garcia's tort claims—breach of the implied covenant of good faith and fair dealing (claim 3); negligent

---

[7] Garcia also cannot establish Article III standing for his state law claim against the Local 1107 executive board. Garcia alleges the local's executive board violated the local's own constitution by voting for the trusteeship, something it purportedly had no authority to do. *See* FAC ¶ 35. Additionally, Garcia alleges the Local 1107 executive board breached its duty under the 1107 Constitution to initiate a special election process to fill the vacancy of the executive vice president position. *Id.* ¶ 34. The harms Garcia alleges resulted from the executive board's breach of the 1107 Constitution, however, mirror the alleged harms resulting from SEIU's breach of the Affiliation Agreement. *Compare* FAC ¶ 36 *with id.* ¶¶ 42–43. Thus, as explained in section IV.A.1.c., although Garcia has alleged harms that affect the larger collective of union members, he has not established a "distinct and palpable" personalized injury that stems from the executive board's trusteeship vote. *Cf. Gutierrez v. United Foods, Inc.*, 11 F.3d 556, 560 (6th Cir. 1994) (distinguishing between rights under collective bargaining agreements that are "uniquely personal" and "amenable to individual enforcement," and rights considered to be "collective" of all union members and "reserved to the union to enforce").

representation (claim 5); legal malpractice (claim 6); and breach of fiduciary duty (claim 7)—as section 301 claims. The court should, however, dismiss these tort-based section 301 claims for lack of subject matter jurisdiction.

Courts have construed "[s]ection 301 [to] authoriz[e] federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements." *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470 (1960) (citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 451 (1957)). At the same time, in developing this common law, the Supreme Court "did not envision any freewheeling inquiry into what the federal courts might find to be the most desirable rule." *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 255 (1974). In *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 311 (2010), the Court stated that "[t]he balance federal statutes strike between employer and union relations in the collective-bargaining arena is carefully calibrated" and that "creating a federal common-law tort cause of action would require a host of policy choices that could easily upset this balance." *Id.* (citations omitted). The Court cited with approval *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1180 (7th Cir. 1993) (Posner, J.), where the Seventh Circuit held that courts' authority to "'create a federal common law of collective bargaining agreements under section 301 should be confined to 'a common law of contracts, not a source of independent rights, let alone tort rights; for section 301 is . . . a grant of jurisdiction only to enforce contracts.'" *Granite Rock*, 561 U.S. at 311 (quoting *Brazinski*, *supra*).

In this case, because no federal tort causes of action under section 301 are available to Garcia, Defendants request that the court dismiss his four tort claims for breach of the implied covenant of good faith and fair dealing, negligent representation, legal malpractice, and breach of fiduciary duty.[8] *See id.*; *Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000) ("[S]ection

---

[8] In its order partially granting Defendants' motion to dismiss, the Court agreed that Plaintiffs' state law tort claims were preempted by section 301, but permitted the claims to proceed as section 301 claims. *See* ECF No. 78 at 7–9. However, having correctly concluded that these tort claims were preempted by section 301, the court should have dismissed them, not permitted them to proceed as section 301 claims. Where a state law *breach of contract* claim is preempted by section 301, it may proceed as a claim under section 301. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985) ("[A] suit in state court alleging a violation of a provision of a labor contract

301 creates a right of action only for breach of a collective bargaining agreement; it is not a tort statute."). Section 301 is "'a grant of jurisdiction only to enforce contracts,'" not rights under tort. *See Granite Rock*, 561 U.S. at 311 (quoting *Brazinski*, *supra*).

### C. Garcia's Claims Fail on the Merits.[9]

#### 1. Garcia Has Not Raised a Genuine Issue of Material Fact as to his Federal Claims (Claims 2, 3, 5, 6, and 7).

##### a. Breach of Contract (the Affiliation Agreement).

Garcia alleges SEIU breached paragraph 18 of the Affiliation Agreement when it moved to place Local 1107 in trusteeship "without first consulting and advising the board regarding their rights and the existence of the waiver clause contained in the [Affiliation Agreement]." FAC ¶ 40 (describing paragraph 18 as a "waiver clause" that effectively waived the trusteeship provisions of the SEIU Constitution). Garcia also alleges that SEIU "breached its fiduciary duty owed to Local

---

must be brought under § 301 and be resolved by reference to federal law."); *see, e.g.*, *Avco Corp. v. Aero Lodge 735*, 390 U.S. 557 (1968) (affirming removal under section 301 of state law claim for breach of collective bargaining agreement). By contrast, where a state law *tort* claim is preempted by section 301, it must be dismissed. *See, e.g.*, *Adkins v. Mireles*, 526 F.3d 531, 541 (9th Cir. 2008) (affirming summary judgment on basis of section 301 preemption over state claim for fraud); *Audette v. Int'l Longshoremen's and Warehousemen's Union*, 195 F.3d 1107, 1112 (9th Cir. 1999) (affirming summary judgment on basis of section 301 preemption over state claims for breach of covenant of good faith and fair dealing and breach of fiduciary duty); *Newberry v. Pac. Racing Ass'n*, 854 F.2d 1142, 1147 (9th Cir. 1988) (affirming summary judgment on basis of section 301 preemption over state claim for breach of covenant of good faith and fair dealing); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 999–1001 (9th Cir. 1987) (affirming summary judgment on basis of section 301 preemption over state claims for breach of covenant of good faith and fair dealing, fraud, and negligent misrepresentation); *Carter v. Smith Food King*, 765 F.2d 916, 921 (9th Cir. 1985) (affirming summary judgment on basis of section 301 preemption over state claim for breach of covenant of good faith and fair dealing).

[9] In evaluating trusteeship challenges brought under section 301, courts should apply the same well-settled principles of deference that would otherwise apply to cases brought under Title III of the LMRDA. *See Allis-Chalmers*, 471 U.S. at 209 (holding that "substantive law to apply in § 301 cases is federal law, which the courts must fashion from the policy of our national labor laws") (internal quotation marks and citations omitted); *e.g.*, *Teamsters Local Union No. 406 v. Crane*, 848 F.2d 709, 714 (6th Cir. 1988) (holding that "courts must give deference to the decision of international unions to impose trusteeships upon their locals, absent a showing of dishonesty or bad faith" in analyzing LMRDA Title III claim challenging trusteeship); *Pape v. Local 390 of Int'l Bhd .of Teamsters*, 315 F. Supp. 2d 1297 (S.D. Fla. 2004) (applying LMRDA framework to various claims challenging imposition of trusteeship, including claim under LMRA Section 301 for breach of international union constitution).

1107 when it sent its counsel, Mr. Ury, to make misrepresentations to the Board" regarding a potential trusteeship. FAC ¶ 41.

"In keeping with the doctrine of *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), in *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1109 (9th Cir. 1979), the Ninth Circuit held that in considering actions to enforce obligations arising under labor contracts [under section 301], the court must apply federal substantive law, though the court may look to state law for guidance." *Trustees of the Operating Engineers Pension Tr. v. O'Dell*, 682 F. Supp. 1506, 1514 (D. Nev. 1988). "A plaintiff asserting a breach of contract claim under Nevada law must allege the following elements: (1) the formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Gunter v. United Fed. Credit Union*, No. 15-cv-00483 MMD (WGC), 2016 WL 3457009, at *2 (D. Nev. June 22, 2016) (citing *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987)).

Here, Garcia has not raised a genuine dispute of material fact over whether SEIU breached paragraph 18. To the contrary, the undisputed evidence shows that it did not. In relevant part, paragraph 18 of the Affiliation Agreement expressly waives "[t]he provisions of Article VIII, section 7 (a–f) and Article XII, Section 3 of the SEIU Constitution regarding trusteeship . . . except for the purpose of enforcing this agreement pursuant to Paragraph 21 below or with the approval of the [Local 1107] Board of Representatives." Affiliation Agreement ¶ 18. <u>Put differently, if the 1107 executive board so approves, the provisions of the SEIU Constitution that give the International Union the authority to place locals under trusteeship apply</u>. Because paragraph 18 is not ambiguous, the court need not look to other extrinsic evidence to discern the parties' intent. *See, e.g.*, *Acton Ltd. v. Harsh*, No. 95-cv-472 HDM (RAM), 1996 WL 576995, at *3 (D. Nev. Sept. 25, 1996), *aff'd*, 4 F. App'x 529 (9th Cir. 2001) ("a contract is ambiguous if it is susceptible to more than one interpretation").

Accordingly, to the extent Garcia's breach-of-contract claim is based on the argument that paragraph 18 precluded SEIU from imposing a trusteeship over Local 1107, it fails: the express terms of paragraph 18 unambiguously state that Local 1107's executive board may approve application of the SEIU Constitution's trusteeship provisions. *See id.* ("The Court is bound by the

language contained in the four corners of the agreement, and if the language itself is clear, no judicial interpretation is necessary.”).

To the extent Garcia’s breach-of-contract claim is based on SEIU’s failure to “consult[] and advis[e] the [executive] board regarding their rights and the existence” of paragraph 18 or its alleged misrepresentations to the executive board regarding trusteeship, it too must fail for three reasons. First, the undisputed evidence shows that Bisno fully informed the executive board of their right to request or refuse to request trusteeship. *See* Bisno ¶ 18, Armstrong Decl. ¶ 5; Marzan ¶ 13; Liepins Depo. at 41. As former plaintiff Liepins explained, “We were told [by SEIU representatives] that we could vote [the trusteeship] down.” Liepins Depo. at 35.

Second, nothing in paragraph 18 requires SEIU to in any way inform, consult, or advise Local 1107 of the trusteeship provisions in the SEIU Constitution and its relationship to the Affiliation Agreement. *Cf. Operating Eng’rs Pension Trust v. Cecil Backhoe Serv., Inc.*, 795 F.2d 1501, 1504–05 (9th Cir. 1986) (“Parties to collective bargaining agreements are conclusively presumed to have equal bargaining strength. . . . It is not a defense to claim that a union representative misrepresented the effect of signing an agreement.”); *Ackley v. Western Conference of Teamsters*, 958 F.2d 1463, 1473 (9th Cir. 1992) (the LMRDA does not require that union members be provided with “meaningful” information prior to voting on contract ratification). In any event, Local 1107 officers and executive board members either reviewed or had access to the Affiliation Agreement before the April 26, 2017 meeting. *See* Hedderman Decl.¶ 7; Marzan ¶ 4; Mancini Depo. at 33–37; Naduris-Weissman Decl. ¶¶ 3–6, Exs. B–E.

Finally, aside from paragraph 18, Garcia has not otherwise identified any term within the Affiliation Agreement that SEIU failed to comply with in allegedly failing to advise the executive board about their rights or misrepresenting to board members that they had to vote for trusteeship. *See, e.g., Phillips v. Nat’l City Bank of Indiana First Franklin Div.*, 2010 WL 11537506, at *2 (D. Ariz. Sept. 22, 2010), *aff’d*, 462 F. App’x 666 (9th Cir. 2011) (dismissing breach-of-contract claim because it “fail[ed] to specify the contractual term Defendants allegedly breached”).[10]

---

[10] Garcia has also not provided evidence of damages that he himself incurred as a result of SEIU’s alleged breach of the affiliation agreement. Thus, even if Garcia proves breach, his claim fails

In short, because Garcia has not raised a genuine dispute of material fact over whether Defendants breached any provision of the Affiliation Agreement, Defendants request that the court grant their summary judgment motion as to Garcia's federal breach-of-contract claim.

**b. Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Garcia alleges that SEIU "breach[ed] [its] duty of good faith when [it] engaged in misconduct by misrepresenting to the Board of Local 1107 that they had no choice . . . but to place Local 1107 in trusteeship . . . in contravention of the [Affiliation Agreement] and Local 1107's Constitution."[11] FAC ¶ 48.

"Under Nevada law, 'an implied covenant of good faith and fair dealing exists in all contracts.'" *Nevada W. Petroleum, LLC v. BP W. Coast Prod., LLC*, No. 15-cv-01684 APG (PAL), 2017 WL 4172269, at *3 (D. Nev. Sept. 20, 2017) (quoting *A.C. Shaw Const., Inc. v. Washoe Cty.*, 784 P.2d 9, 10 (Nev. 1989) (emphasis omitted)). A breach of the implied covenant of good faith and fair dealing requires establishing: (1) plaintiff and defendants were parties to an agreement; (2) defendants owed a duty of good faith to the plaintiff; (3) defendants breached that duty by performing in a manner that was unfaithful to the purpose of the agreement; and (4) the plaintiff's justified expectations were thus denied. *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995). Put another way, "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Nevada W. Petroleum*, 2017 WL 4172269, at *3 (quoting *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991)). "Whether a party acted in good faith is a question of fact." *Id.* at

---

because he cannot satisfy the fourth element for breach of contract under Nevada law. *See Gunter*, 2016 WL 3457009, at *2.

[11] Defendants will treat Garcia's breach-of-the-implied-covenant claim as a contract claim, and not a tort because Garcia alleges that SEIU's violation stems from a violation of the Affiliation Agreement. *See* FAC ¶ 48; *Couturier v. Am. Invsco Corp.*, 2013 WL 2285050, at *3 (D. Nev. May 22, 2013) (Gordon, J.) ("[T]here are two bases for claims of the breach of the implied covenant of good faith and fair dealing—contract-based and tort-based. . . . An action in tort for breach of the covenant arises only in rare and exceptional cases when there is a special relationship between the victim and tortfeasor." (internal quotation marks, brackets and citations omitted)). Should the court treat Garcia's third claim as a tort, however, it still fails for reasons discussed in section IV.B. analyzing whether section 301 creates jurisdiction over tort claims.

*3 (internal quotation marks and citation omitted).

Here, there is no genuine dispute of material fact as to whether SEIU deliberately contravened the intention and spirit of the Affiliation Agreement. Garcia's claim is based on (1) an omission (i.e., SEIU's failure to "fairly and adequately apprise Local 1107 of its rights under the [Affiliation Agreement] and to deal fairly with Local 1107") and (2) a misrepresentation (i.e., SEIU's statement to board members "that they had no choice after the removal of Local 1107's President and Vice President but to place Local 1107 in trusteeship"). FAC ¶¶ 46, 48. Both fail to serve as an adequate basis for his breach-of-the-implied-covenant claim. First, the undisputed evidence shows SEIU not only complied with paragraph 18, but fairly and adequately informed the executive board of its right to vote against a trusteeship, and thus acted consistently with paragraph 18's purpose of allowing the Local 1107 executive board to approve SEIU's invocation of a trusteeship. As Bisno explained, Local 1107 cannot be put under trusteeship without the executive board's approval. *See* Bisno ¶ 18, Armstrong Decl. ¶ 5; Marzan ¶ 13; Liepins Depo. at 41.

Second, there is no evidence that SEIU misrepresented to the executive board that it had no choice but to vote in favor of trusteeship. Bisno repeatedly emphasized to the executive board members during the April 26, 2017 meeting that "the choice over whether to be placed under trusteeship was theirs, not mine or SEIU's." Bisno Decl. ¶ 18. Executive board members also understood, based on Bisno's statements, that they had a choice to vote in favor of or against trusteeship. *See* Armstrong Decl. ¶ 5; Marzan ¶ 13. In the words of former plaintiff Liepins: "I believe we were given a choice. If there was no choice, why would there be a vote?" Liepins at 41. Contrary to some conclusory allegations in the FAC, "[n]o one [from SEIU] said that there was no choice." *Id.* That SEIU representatives expressed a sense of urgency does not create a genuine dispute of material fact over whether they misrepresented the executive board's ability to decide the trusteeship issue. *See id.* at 42 (agreeing that SEIU was "conveying an impression of urgency"). There is simply no evidence supporting the bald assertion that SEIU representatives told the executive board that "they had no choice after the removal of Local 1107's President and Vice President but to place Local 1107 in trusteeship." FAC ¶ 48.

In short, there is no evidence raising a genuine dispute that Bisno or any other SEIU representative deliberately contravened the intention and spirit of the Affiliation Agreement.[12] As such, Defendants are entitled to summary judgment on Garcia's claim for breach of the implied covenant of good faith and fair dealing.[13]

**c. Negligent Misrepresentation.**

Nevada has adopted the Restatement (Second) of Torts § 552's definition of negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Bill Stremmel Motors, Inc. v. First Nat'l Bank of Nev.*, 575 P.2d 938, 940 (Nev. 1978); *Sou v.*

*///*

---

[12] Even assuming Garcia presents evidence that some executive board members felt "rushed" to vote in favor of or against trusteeship, it is a red herring. *Cf.* Marzan Decl. ¶ 13 ("Bisno did not say we had to vote . . . that very night."); Liepins Depo at 38–39 (agreeing with statement that he did not vote for trusteeship and expressed himself at the meeting that the vote should take place at another time) . Drawing all factual inferences in the light most favorable to Garcia, even if SEIU said that board members needed to make a decision the night of the April 26, 2017 board meeting, it represents an understandable statement of urgency, and not enough to raise a genuine dispute that SEIU acted in a manner unfaithful to the Affiliation Agreement's purposes. *See* Bisno Decl. ¶ 14 (outlining serious internal and external challenges faced by Local 1107); *see also* Liepins Depo. at 38–39 (any "pressure" on board member Liepins to vote in favor of trusteeship did not work). Moreover, there is no allegation regarding statements about the *timing* of the vote in the FAC that could serve as a predicate for any of Garcia's claims.

[13] Garcia's breach-of-covenant claim should also be dismissed because it and the breach-of-contract claim are both premised on the same conduct: SEIU's breach of the Affiliation Agreement through its alleged misrepresentation and omission of facts. *Compare* FAC ¶¶ 40–41 *with id.* ¶¶ 46–47. "It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016) (Hicks, J.). Here, because Garcia's claim for breach of the implied covenant of good faith and fair dealing is superfluous, it should be dismissed. *See id.* ("when both a breach of contract and breach of implied covenants claim are based on the same conduct, the implied covenants claim is superfluous" (describing *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317 (2010)). That Garcia's claims are now construed as section 301 claims makes no difference. Garcia has thus far failed to cite any authority establishing that he may bring breach-of-contract and breach-of-covenant claims under section 301 claim based on the same alleged breaching conduct.

*Bash*, No. 15-cv-00698 APG (VCF), 2017 WL 5615210, at *2–3 (D. Nev. Nov. 21, 2017).[14]

Here, Garcia alleges SEIU "failed to exercise reasonable care or confidence in obtaining or communicating to the [executive board] their rights under the [Affiliation Agreement] and Local 1107 Constitution." FAC ¶ 62. Much like the breach-of-contract and breach-of-the-implied-covenant-of-good-faith claims, Garcia alleges SEIU made certain misrepresentations regarding the "necessity and obligation of the [executive board] to place Local 1107 in trusteeship," upon which he (or the executive board) relied. *Id.* ¶ 63. There is no evidence, however, that any of SEIU's representatives told Garcia or executive board members that they had to vote in favor of requesting trusteeship. *See* Liepins Depo. at 41; Bisno ¶ 18, Armstrong Decl. ¶ 5; Marzan ¶ 13. The undisputed evidence is that there was nothing false about the information Bisno conveyed to the executive board on April 26, 2017.

Furthermore, there is no evidence showing that Bisno or any other representative failed to exercise reasonable care or competence in representing to the executive board that it had a choice over the trusteeship issue. To the contrary, to ensure that executive board members had all the facts, Bisno turned to each and every executive board member and asked them if they had any questions or comments regarding trusteeship. *See* Bisno Decl. ¶¶ 16–19; Marzan Dec. ¶¶ 14–17; Armstrong Decl. ¶ 7. He took as much time as the members wanted, resulting in a meeting that lasted over two hours. *See* Bisno Decl. ¶¶ 16–19; Marzan Dec. ¶¶ 14–17; Armstrong Decl. ¶ 7.[15]

Finally, Garcia cannot show that he justifiably relied upon Bisno's alleged misrepresentations—he was not present during Bisno's presentation at the April 26, 2017 meeting. There is also no evidence that any of the 17 board members who voted in favor of trusteeship justifiably relied upon the misrepresentation that they had no choice but to request trusteeship. For instance, board members Armstrong and Marzan each voted in favor of requesting trusteeship for reasons independent of any alleged misrepresentations. *See* Armstrong Decl. ¶ 8; Marzan

---

[14] Defendants have not found any case law involving a negligent representation claim brought under section 301. Defendants therefore look to state law for guidance.

[15] To the extent Garcia's negligent-misrepresentation claim is based on Bisno's representation to the executive board that the 1107 Constitution did not address what would happen if *both* the president and vice president positions were vacant, his claim also must fail. *See* Bisno Decl. ¶ 14.

Decl. ¶¶ 6, 18–19; *see also supra*, section IV.A.1.b. *See* Liepins Depo. at 41–42 (“[n]o one [from SEIU] said that there was no choice” and agreeing there was no coercion on the part of SEIU).

Thus, Defendants request the court grant their motion for summary judgment on Garcia’s claim for negligent misrepresentation.

**d. Legal Malpractice.**[16]

The elements of a legal malpractice claim are: (1) an attorney-client relationship; (2) “a duty owed to the client by the attorney to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and performing the tasks which they undertake; (3) a breach of that duty; (4) the breach being the proximate cause of the client’s damages”; and (5) actual loss or damages. *Dunn v. Christensen*, No. 15-cv-01812 JCM (PAL), 2018 WL 615671, at *8 (D. Nev. Jan. 29, 2018) (citing *Mainor v. Nault*, 101 P.3d 308, 324 (Nev. 2004)).[17]

Here, Garcia cannot present evidence of an attorney-client relationship between himself and Ury, the only attorney identified in the FAC. As such, his claim fails as a matter of law. Even if an attorney-client relationship existed, there is no evidence that Ury failed to perform his duty as an attorney. Defendants therefore request that the court grant their motion for summary judgment as to the part of Garcia’s legal-malpractice claim that survived the motion to dismiss.

**e. Breach of Fiduciary Duty.**

Garcia alleges that SEIU “breached the fiduciary duty owed to Local 1107 by making misrepresentations of fact regarding the rights of the Board, and the members of Local 1107 under the [Affiliation Agreement] and Local 1107’s Constitution.” FAC ¶ 80.

Under Nevada law, a claim for breach of fiduciary duty has three elements: (1) existence of a fiduciary duty; (2) breach of the duty; and (3) the breach proximately caused the damages. *Wilson v. Nevada Affordable Hous. Assistance Corp.*, No. 15-cv-01387 APG (CWH), 2017 WL 1276055, at *3 (D. Nev. Mar. 30, 2017) (citing *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp.

/ / /

---

[16] The court dismissed only the part of this claim involving Ury’s representation to the executive board that an attorney-client relationship existed for lack of standing. ECF No. 78 at 8–9.

[17] Defendants have not found any case law involving a legal-malpractice claim brought under section 301. Defendants therefore look to state law for guidance.

2d 1234, 1245 (D. Nev. 2008)).[18]

Here, even assuming SEIU owed Local 1107 a fiduciary duty, there is no evidence that SEIU breached that duty by misrepresenting to the board that it had to vote in favor of trusteeship. No one from SEIU told the executive board it had to vote this way. *See* Liepins Depo. at 41–42 ("[n]o one [from SEIU] said that there was no choice" and agreeing there was no coercion on the part of SEIU to obtain yes votes on trusteeship); *id.* at 56 ("[SEIU representatives] said there was a vote, so, obviously, there is an alternative [to trusteeship]."; Armstrong Decl. ¶ 5; Marzan Decl. ¶ 13. What is more, there is no evidence that any alleged misrepresentation was the "but for" cause that led the 17 members of the executive board to vote for trusteeship. *Cf. Ackley*, 958 F.2d at 1472 ("Statements made by union representatives during the contract ratification process furnish insufficient justification for invalidating a collective bargaining agreement, unless a showing is made that but for those statements the ultimate outcome of the bargaining would have been different."). Each board member that voted for trusteeship did so for reasons independent of any alleged misrepresentations. *See* Armstrong Decl. ¶ 8; Marzan Decl. ¶¶ 6, 18–19.[19]

Because no reasonable fact finder could conclude that SEIU breached any fiduciary duty, Defendants request that the court grant their motion for summary judgment as to this claim.

### 2. Garcia Has Not Raised a Genuine Issue of Material Fact as to His State Law Claim for Breach of Contract (Claim 1).

Garcia alleges the local's executive board violated the local's own constitution by voting for the trusteeship without the authority to do so. *See* FAC ¶ 35. Furthermore, Garcia alleges that the executive board breached its duty under the 1107 Constitution to initiate a special election

/ / /

---

[18] Defendants have not found any case law involving a breach-of-fiduciary-duty claim brought under section 301. Defendants therefore look to state law for guidance.

[19] The evidence shows that SEIU gave the executive board members ample opportunity to express concerns and speak up. *See* Liepins Depo. at 36. Former plaintiff Liepins was an executive board member who expressed concern that so few people opposed the trusteeship. *See id.* at 40 ("I must say that I was concerned that there were so few people that were opposed."). Such testimony reveals that this lawsuit may be more about sour grapes than tortious misconduct—Garcia simply wants to undo a democratic vote that turned out differently than he wanted.

process to fill the vacancy of the executive vice president position. FAC ¶ 34.[20] In support of his argument that the executive board lacked the authority to request voluntary trusteeship, he points to the following sections of the 1107 Constitution: (1) Article 8 § 1 (defining "Executive Board"), (2) Article 27 ("International Constitution and Bylaws"), and (3) Article 13 § 8(D) ("Filling Vacancies") and Article 14 § 2(A)(7) ("Election Committee"). Garcia, however, has not raised a genuine dispute of material fact over whether the executive board breached any of these sections.

First, the relevant portion of Article 8 § 1 that Garcia cites to in the FAC states:

> The Executive Board . . . is authorized and empowered to take all lawful actions consistent with the Constitution and Bylaws of this Local Union. Actions of the Executive Board shall become effective immediately and shall be considered the action of the Local Union. The actions of the Executive Board shall be decided by a majority vote of those members present . . . .

1107 Constitution, Art. 8 § 1. To the extent Garcia argues that the executive board breached this section because its vote for trusteeship was not "consistent with the Constitution and Bylaws of this Local 1107," such a claim must fail. There is nothing in the rest of the 1107 Constitution that is inconsistent with the executive board's vote in favor of trusteeship. If anything, the executive board's actions are entirely consistent with Article 8 § 1, which authorized and empowered the executive board to take actions by majority vote, which "become effective immediately and shall be considered [an] action" by Local 1107. *See* 1107 Constitution, Art. 8 § 1.

Moreover, that the 1107 Constitution did not expressly articulate a process for voting in favor of trusteeship—something the Affiliation Agreement makes clear is within Local 1107's power—does not make the executive board's trusteeship decision unlawful. In fact, the executive board's vote falls within the purview of Article 8 § 2, which identifies a *non-exhaustive list* of actions the 1107 Constitution authorized the executive board to take, including "[t]he establishment of plans, policies and procedures that are required for the direction and operation of the Local Union. *See* 1107 Constitution, Art. 8 § 2 ("Authority of the Executive Board includes, but is not limited to . . . .). Article 8's expansive language demonstrates that the executive board

[20] Defendants limit discussion of this claim to allegations related only to the 1107 Constitution. ECF No. 78 at 6 (construing claim's essence as involving the 1107 Constitution).

did not breach the 1107 Constitution by holding a vote in favor of voluntary trusteeship. The board determined trusteeship was "required for the direction and operation of the Local Union," the result of which was binding on Local 1107 under Article 8 § 1. *See* Marzan ¶¶ 6 (explaining why she started looking into trusteeship as a possibility given problems within the local that affected union members' ability to operate and govern themselves), 18 (voted for trusteeship to help the local properly operate and go in the right direction); Armstrong Decl. ¶ 8 ("something drastic needed to happen in order to fix problems at the local and put it in the right direction").

Second, Garcia cites to Article 27, which states that Local 1107's constitution and bylaws are "subordinate" to the SEIU Constitution "except in the case of specific exemptions provided in the affiliation agreement between the parties." 1107 Constitution, Art. 27; FAC ¶ 30. From the FAC, Garcia alleges the 1107 Constitution is not "subordinate" to the "expressly exempted trusteeship provisions of the [SEIU] Constitution." *Id.* ¶¶ 30–31. As discussed previously, however, the Affiliation Agreement expressly permits the executive board to negate paragraph 18's waiver of the SEIU Constitution's trusteeship provisions. *See supra*, section IV.C.1.a. The 1107 Constitution cannot be read in a vacuum independent of the Affiliation Agreement. Doing something the Affiliation Agreement says the local can do (i.e., waive paragraph 18) is a "lawful action" the executive board is empowered to make—it would not make sense for the 1107 Constitution to forbid something expressly allowed in the Affiliation Agreement.

Finally, Garcia cites to Article 13 § 8(D) of the 1107 Constitution, which addresses what the local should do in the event of a vacancy in the executive vice president's position: "If the Executive Vice President's position is vacant, and if more than one hundred and eighty (180) calendar days remain on the term of office for Executive Vice President, then there shall be a special election for the office of Executive Vice President." 1107 Constitution, Art. 13 § 8(D). No party disputes that more than 180 calendar days were left in the position of executive vice president when Kisling was removed on April 26, 2017. However, this provision does not preclude the local from taking other action within its power that obviated the need, or even the possibility, of a special election. Indeed, the evening of that same day, a majority of the executive board voted to request that the International Union place the local under trusteeship. This board

action, under Article 8 § 1, "bec[a]me effective immediately." On April 28, 2017, two days after the board meeting, President Henry issued an order imposing an emergency trusteeship over Local 1107, which resulted in the suspension of the 1107 Constitution and dissolution of the executive board. *See* SEIU Constitution, Art. VIII § 7(a)–(b). This is exactly what SEIU told the executive board would happen if it voted in favor of trusteeship. *See* Bisno Decl. ¶ 15; Armstrong ¶ 6.

Simply put, without an executive board or local constitution, there was no breach of the 1107 Constitution when the executive board did not schedule a special election for the vacancy in the executive vice president position because (a) the executive board had no authority after trusteeship to hold a special election, and (b) there was no operative contract to breach. [21]

Accordingly, Defendants request that the court grant their motion for summary judgment on Garcia's state law breach-of-contract claim.

## V. CONCLUSION

In light of the foregoing, Defendants request that the court grant their motion for summary judgment in full based on the merits or dismiss the case based on Garcia's failure to establish Article III standing.

DATED: January 30, 2019

ROTHNER, SEGALL & GREENSTONE
GLENN ROTHNER (*pro hac vice*)
JONATHAN COHEN
ELI NADURIS-WEISSMAN (*pro hac vice*)

CHRISTENSEN JAMES & MARTIN
EVAN L. JAMES

By /s/ Eli Naduris-Weissman
Eli Naduris-Weissman
510 South Marengo Ave., Pasadena, CA 91101
Tel.: (626) 796-7555; Fax: (626) 577-0124
*Attorneys for Defendants*
*Service Employees International Union; Luisa Blue; Mary Kay Henry; and Nevada Service Employees Union*

---

[21] Garcia also cites to Article 14 § 2(A)(7) ("Election Committee"), which states that "[t]he Election Committee will assist the Executive Board in the conduct of Local Union elections through the recommendation of rules and procedures for such elections and the monitoring and conduct of elections." For the reasons already discussed, there is no genuine dispute of material fact over whether the executive board violated this provision.

## CERTIFICATE OF SERVICE

I am a member of Rothner, Segall & Greenstone. On this 30th day of January, 2019, I caused a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF CLAIMS; SUPPORTING POINTS AND AUTHORITIES** to be served in the following manner:

✓ ELECTRONIC SERVICE: Pursuant to LR IC 4-1 of the United States District Court for the District of Nevada, the above-referenced document was electronically filed and served through the Notice of Electronic Filing automatically generated by the Court.

ROTHNER, SEGALL & GREENSTONE

By: /s/ Eli Naduris-Weissman
Eli Naduris-Weissman