MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * * *

| | |
|---|---|
| RAYMOND GARCIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SERVICE EMPLOYEES SEIU, *et al.*,<br><br>Defendants. | CASE NO.: 2:17-cv-01340-APG-NJK<br><br>consolidated with |
| CHERIE MANCINI, *et al.*,<br><br>Plaintiffs,<br>vs.<br><br>SERVICE EMPLOYEES SEIU, *et al.*,<br><br>Defendants. | CASE NO.: 2:17-cv-02137-APG-NJK<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT *MANCINI* (ECF#271)** |

COME NOW Plaintiffs, by and through their attorney, MICHAEL J. MCAVOYAMAYA, ESQ., and hereby submit *Plaintiffs' Response to Defendants' Motion for Summary Judgment.*

Dated this 20th day of February, 2019.

/s/ Michael J. Mcavaoyamaya
MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 014082
4539 Paseo Del Ray
Las Vegas, Nevada 89121
Telephone: (702) 299-5083
Michael.mcavoyamaya@gmail.com
*Attorney for Plaintiffs*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF UNDESPUTED/UNDISPUTABLE MATERIAL FACTS

### A. The SEIU Constitution Authorizes SEIU's President To Assume Jurisdiction Over Local Union Disciplinary Charges If Certain Procedures Are Followed.

SEIU's President may assume original jurisdiction over internal disciplinary charges where 'a Local Union officer or a Local Union member under certain circumstances, if the charges are sufficiently specific and if certain procedures are followed. *See* ECF#271, at 4:6-13. The required specificity when filing charges against a member of SEIU, and the proper procedure for filing charges with SEIU International and requesting SEIU International President assume original jurisdiction over those charges was expressly outlined in an email between SEIU International General Counsel Alma Henderson to Local 1107 President Cherie Mancini on October 19, 2016, just prior to the October 2016 hearings on Internal Needs and Internal Charges. *See* SEIU Intl Communications RE: Charges and Jurisdiction, attached as **Ex. "1,"** at SEIU6513. To summarize, the "charges must 'specify the events or acts which the charging party believes constitute a basis for charges **and must state which subsection(s) of Section 1 of [Article XVII] the charging party believes has been violated**.' In addition, in order to comply with Article XVII, 2(a), the charges against Sisters Kisling and Greaux must be filed initially with the Local Union Secretary, not at the International Union." *Id.* Defendants initially rejected Mancini's charges against Kisling and Greaux because they failed "**to indicate the specific provisions of the SEIU Constitution (or the Local 1107 Constitution) that you believe have been violated**," and directed Mancini that she needed to "**file the amended charges with Local 1107's Secretary** and then **forward the amended charges to President Henry with a request that she assume original jurisdiction over the charges under Article XVII, Section 2(f)**." *Id.* at SEIU7866-67. According to Henry, adherence to this proper procedure was a matter of "due process requirements **imposed by the SEIU Constitution and federal law**." *Id.* Because this procedure was outlined by the SEIU International President and the SEIU General Counsel, it cannot be disputed. *Id.*

### B. The Local 1107 Constitution Authorizes The Local 1107 President To Designate A Spokesperson To Attend Bargaining Sessions.

The Local 1107 Constitution is clear and unambiguous in its terms regarding the Local 1107 President's duty to stay informed on the bargaining with local union employers. Article 7, Section 6, duties of the President, provides that the Local 1107 President shall "Serve as an ex-officio member of all bargaining committees of the Local Union and it is the very important duty and responsibility of the President to actively

take part in and stay informed of bargaining in all areas and to participate with the bargaining committees (see Article 16- Collective Bargaining, Section 6- Bargaining Committee)." *See* Local 1107 Constitution, attached as **Ex. "2,"** at SEIU932. Under Article 16, Section 6 of the Local 1107 Constitution, "Collective Bargaining," this duty is reiterated, stating that "The President of this Local Union shall serve as an ex-officio member of all bargaining committees of the Local Union and it is the very important duty and responsibility of the President to actively take part in and stay informed of bargaining in all areas and to participate with the Bargaining Committees." *Id.* at SEIU968. However, in the sentence just prior to this statement, the Local 1107 Constitution makes clear that "The Local President, or designee, shall be the chief spokesperson for this Local Union in all collective bargaining with any employer." *Id.* Plaintiff Mancini, as President of Local 1107, was an ex offico member of the UMC bargaining committee, and her, or her designee was the chief spokesperson for the committee. *Id.* It cannot be disputed that Mancini, as President of Local 1107, was not required to attend every bargaining session of every bargaining unit in Local 1107 and was permitted to appoint a Local 1107 staff member to attend at take notes of the sessions in her stead. *Id.*

**C. <u>The Local 1107 Constitution Requires Sufficient Notice To The Affected Membership, And Subsequent Approval By The Local 1107 President Before Ratification of A CBA.</u>**

It cannot be disputed that the Local 1107 Constitution requires sufficient notice of what has been bargained to the affected membership prior to ratification of any collective bargaining agreement ("CBA") "in accordance with other policies and procedures as determined by the Bargaining Committee, **<u>the Executive Board and the President of this Local Union</u>**." *Id.* at SEIU968. "If a contract is to be ratified at a meeting, that meeting should be scheduled as much in advance as possible under the circumstances. Affected members (of the Bargaining Unit) shall be given at least twenty-four (24) hours notice of such meeting." *Id.* Prior to a CBA becoming effected, the Local 1107 President must "Sign all Collective Bargaining Agreements as the Local Union's official representative after ratification by the membership and signatures of the appropriate negotiating committees and/or staff." *Id.* at 931. It cannot be disputed that prior to ratification, sufficient notice to the affected membership is required in accordance with the policies of the Local 1107 President, who must sign all CBAs before they become effective. *Id.* Nothing in the Local 1107 Constitution, the SEIU International Constitution, or federal labor law bars a local union President from canceling the ratification of a CBA that is believed to violate the law, union policy, or would harm the union's membership.

//

**D. <u>SEIU Holds Hearings on Internal Disciplinary Charges and the Internal Needs of Local 1107 Without A Request To Assume Jurisdiction Over The Mancini Charges.</u>**

In September of 2016, Local 1107 officers Brenda Marzan and Sharon Kisling filed charges against former Local 1107 President Cherie Mancini. *See* ECF#271-10, at SEIU34-39; *see also* ECF#271-11, at SEIU82-86. "On October 17, 2016, President Henry assumed jurisdiction over Plaintiff Mancini's charges, as well as the charges against the other Local 1107 officers, pursuant to Article XVII, § 2(f) of the SEIU Constitution, and issued a notice of hearing on all the charges." *See* ECF#271, at 4:14-28; *see also* ECF#271-10, at SEIU27-30. While there were numerous emails disclosed in discovery indicating that Sharon Kisling had requested that SEIU International take jurisdiction over the charges filed against her by Amelia Gayton, there has been no evidence disclosed in discovery that indicates that any Local 1107 officer or member specifically requested that Henry take jurisdiction over the charges against Plaintiff Mancini that were directed to SEIU International. *See generally* Emails RE: AOJ Charges, attached as **Ex. "3;"** *see also* ECF#271-10, ECF#271-11. Additionally, there is no evidence that the Kisling and Marzan charges were filed initially "with Local 1107's Secretary and then forward[ed]…to President Henry with a request that she assume original jurisdiction." *See* **Ex. 1,** at SEIU6513.

In fact, the majority of the discovery in this case indicates that no request to assume jurisdiction over the Mancini charges were ever properly directed to SEIU International in accordance with the SEIU Constitution, and that the Kisling and Marzan charges were filed with SEIU International first, without being filed with the Local 1107 Secretary. **Ex. "3,"** at SEIU10696-10702. Specifically, on September 10, 2016, Kisling sent numerous Local 1107 Executive Board members and SEIU International Representative Mary Grillo an email about the incident at the Local 1107 union hall where police were called, and the charges that had been filed against her by Local 1107 Executive Board member Amelia Gayton. *Id.* at SEIU82-83; *see also* ECF#271-11, at SEIU82-83. In this email, Kisling clearly states that "**<u>As to the charges against me by executive board member, Amelia Gayton I am requesting International take original jurisdiction</u>**, per Article XVII Trials and Appeals from International Constitution & Bylaws. I believe these charges are a violation of Section 1: Subsection 11. There appears to be basis for the International President to assume original jurisdiction under Section 2f (i)." *Id.*

Here, Kisling states she filed her charges against Mancini directly with SEIU International, and specifically requested that SEIU International assume jurisdiction over the charges filed against *her* by Local

1107 board member Amelia Gayton. *Id.* Nowhere in this email did Kisling request that Defendants assume original jurisdiction over the charges that Kisling filed against Plaintiff Mancini. *Id.* On September 13, 2016, Mancini wrote an email to Kisling, Grillo and other members of the Local 1107 Executive Board asking "what time/day we can set up this Informal meeting in attempt to resolve the charges brought forth from Amelia to Sharon" in accordance with the Local 1107 Constitution. *Id.* at SEIU6509. In response, Kisling wrote "As to the charges, **the matter has been forwarded to the International Secretary-Treasurer requesting Mary Kay Henry assume Original Jurisdiction** per Article XVII Trials and Appeals from International Constitution & Bylaws." *Id.* at SEIU6508. In response, SEIU International Representative Grillo wrote "[w]e have received the request for original jurisdiction. Was the actual charge sent to the International?" *Id.* Gayton responds to Grillo's inquiry that "[t]he actual charge was not sent to the International." *Id.* at SEIU6507. Upon Grillo's subsequent request, Gayton agreed to send the charges she filed against Kisling with the Local 1107 Secretary to Grillo. *Id* at SEIU6506.

On September 29, 2016, Grillo sent an email to Gayton informing her that SEIU International may take original jurisdiction over the charges she filed against Kisling citing Article XVII, Section 2(f)(i). *Id.* at SEIU10994. Gayton responded complaining that her charges should not have been directed to SEIU International, and that there was no bases for Henry to assume original jurisdiction. *Id.* at SEIU10993. Grillo then responded that "As I stated in my previous email, **Sharon Kisling requested that the International take original jurisdiction over the charges you filed against her**." *Id.* There was one other specific request directed to SEIU International for Henry to assume jurisdiction over charges filed at Local 1107. *Id.* at SEIU32; *see also* ECF#271-10, at 32. One set of charges that were addressed at the Internal Charges hearing were filed by "James Kirkpatrick filed internal charges against local member Richard Hodgson." *See* ECF#271-10, at SEIU27. Hodgson's letter states that "It is my request that the International President assumes original jurisdiction in accordance with SEIU, International Constitution and Bylaws Article: XVII over all proceedings, involving Richard Hodgson, and Michael Collins." *Id.*

These are the only two formal requests for Henry to take original jurisdiction over charges filed at Local 1107, as Henry's letter assumption of jurisdiction letter clearly indicates. *Id.* at SEIU27-28. According to Henry, with regards to the Kirkpatrick charges, "**On June 22,2016, Brother Hodgson asked me to assume original jurisdiction over the charges**, pursuant to my authority under Article XVII, Section 2(t) of the SEIU

Constitution and Bylaws." *Id.* Similarly, Henry also notes in regards to the Gayton charges against Kisling that "**<u>On September 10, 2016, Sister Kisling asked the International Union to assume original jurisdiction over the charges</u>**." *Id.* However, for the other charges that were addressed at the hearing, the notice from Henry does not indicate anywhere that someone from Local 1107 requested that Henry assume original jurisdiction over the charges against Plaintiff Mancini. *Id.* at SEIU27-28. The attachments to the document also clearly indicates that there was a "Hodgson jurisdiction request" and a "Kisling jurisdictional request," but no similar request made for charges by Kisling against Mancini, or by Marzan against Mancini. *Id.* Henry appointed Carol Nieters, and SEIU Executive Board Member, as a hearing officer to preside over a hearing and to make a report and recommendations to President Henry on the disciplinary charges. *See* ECF#271, at 4:25-5:1-16. A consolidated hearing on the charges and internal needs was held on October 29 and 30, 2016, in Las Vegas, Nevada. *Id.*

### E. <u>The Internal Needs And Charges Hearing Officer Reports.</u>

"On April 26, 2017, Nieters issued her report and recommendations related to the internal charges. Nieters dismissed some charges, sustained others, and recommended various discipline for both Mancini and Kisling, including their removal from office." *See* ECF#271, at 5:19-5:1-28. Nieters found that Mancini "had unilaterally cancelled a scheduled membership vote to ratify a tentative collective bargaining agreement between the union and University Medical Center ("UMC"), contrary to the desires of the union's UMC bargaining team," and "publicly broadcast to UMC and union members various allegations of wrongdoing by the UMC bargaining team, including '[v]iolation of fiduciary duty' and '[a]cting against the best interest of members.'" *Id.* Nieters also noted that UMC "objected to Mancini's cancellation notice, and threatened to bring a bad faith bargaining charge against the union," and after "Mancini's public broadcast of wrongdoing by the UMC bargaining committee, the UMC bargaining committee 'gathered 400 signatures for a petition to advise SEIU International President Mary Kay Henry that Sister Mancini had 'done great and unforgivable damage to the SEIU-UMC bargaining team by making false allegations' against them via official SEIU communications and social media.'" *Id.*

However, Nieters also concluded that "*As* a union leader, I am enormously sympathetic to Sister Mancini's concern. Access is a vital issue for unions. I can appreciate her strong reaction to the reduction in access her bargaining committee members accepted, even if they were well-intended and attempting to

accommodate their members' professed preference." *See* ECF#271-18, at SEIU18. Nieters' recommended that Mancini be disciplined because of her "precipitous cancelation of the ratification vote directly through the employer, without even communicating with the bargaining committee, effectively circumvented the democratic process set in place by the [Local 1107] Constitution, which vests the authority to negotiate in the bargaining committee . . . ." *Id.* at SEIU19. "Ultimately, Sister Mancini restored the ratification vote, and the agreement was approved by the members." *Id.* According to Nieters, Mancini's "rash unilateral action demonstrated a fundamental misunderstanding of the democratic process, jeopardized the interests of the members, caused at least temporary loss of faith in their leaders, and impaired the Local's relationship with the employer." *Id.*

Despite all these conclusions, and Nieters' assumption that "Mancini failed to perform her 'very important [constitutional] duty and responsibility' during the course of the negotiations, her eleventh-hour intervention could nonetheless be seen as a genuine, if misguided, effort to preserve the Local's access to the work site. **Her conduct is mitigated by her motivation and may not warrant the serious discipline sought by the Charging Parties**." *Id.* Nieters concluded that what warranted Mancini's discipline and removal from office was her "**very public announcement- without any explanation or evident justification**- that the bargaining committee had violated its fiduciary duty to the members. Her accusation impugned the integrity of the bargaining committee members and their loyalty to their members, and put the Local and its entire membership in a terrible light with the employer and the community." *Id.* at SEIU20. According to Nieters, "[d]espite the wide broadcast of those accusations, **there was no evidence presented that any investigation was ever undertaken or that any breach of duty by the bargaining team was found**." *Id.* "Generally, the negotiation of an arguably unwise contract term does not qualify as a breach of fiduciary duty. The resulting damage to the reputation of the Local, as well as the individual members of the bargaining unit, was self-inflicted and unnecessary." *Id.*

"Nieters also issued her report and recommendations related to the internal needs of Local 1107." *See* ECF#271, at 6:2-22; *see also* ECF#271-19 at SEIU2465-78. "Nieters found that there was a serious breakdown in internal governance at the union, citing evidence that Executive Board meetings "regularly deteriorate into chaotic, bitter confrontations" where "name calling and shouting matches appear to be commonplace." *Id.* Nieters cited testimony of individuals that had requested trusteeship well prior to the internal needs hearing in

support of her finding. *Id.* Nieters cited to the cancelation of the UMC ratification vote as evidence that Local 1107 was not able "to carry out its most basic collective bargaining responsibilities properly and effectively." *Id.* Nieters only made broad, unspecific allegations without citing a single example of a collective bargaining responsibility not being met. *Id.* Nieters gave broad accusations that inconsistent provision of the Local 1107 Constitution led to confusion around governance and democratic procedure, but again, did not cite to any specific examples of a breakdown in governance of democratic procedures that actually occurred. *Id.* Based on these broad, unspecific, unsupported allegations, she recommended Henry impose an emergency trusteeship. *Id.* Henry adopted Nieters' findings in full. *Id.* at 8:10-23.

## II. STATEMENT OF DISPUTED MATERIAL FACTS.

### A. Despite Conflict On The L1107 EBd L1107 Was Governing Itself.

During the period between November 2015 when Mancini took over as L1107 President, and April 26, 2017, all but one L1107 Executive Board ("EBd") meeting had a quorum and all or substantially all business was conducted. This Court can easily confirm this fact by comparing the meeting agenda with the minutes from the L1107 EBd meetings. *See generally* Agendas and Minutes, **Ex."4;"** *see also* Grillo Deposition, **Ex."5,"** at 50:1-51:1-22: 52:1-53:1-15; 71:9-78:1-25; 81:7-82:1-7; 89:23-92:1-25; 94:13-97:1-21; 151:6-156:1-17; 157:9-159:1-15; 194:1-197:1-25. Only the August 31, 2016 L1107 EBd meeting was intentionally denied a quorum by the Clark County ("CC") and UMC officers causing disruptions at L1107. *Id.* This further supported by numerous reports from SEIU Int'l Representative ("IR") Mary Grillo, who reported to SEIU Int'l on L1107. *See* Grillo Reports, **Ex."6,"** at SEIU12314 ("The Board did have a quorum…[at the] December meeting and was able to pass a budget"); SEIU5468 ("The [EBd] met that evening. It went relatively smoothly. Cherie is in the process of filling the vacant Board seats."); SEIU6465 ("There was a good turnout for the meeting last night, 28/37 showed up"); SEIU6466 ("the meeting was reasonably calm"); SEIU7517 ("The executive board meeting was well attended…most business had been concluded.").

Under the "Serious Breakdown in Internal Union Governance and Democratic Procedures" section of Internal Needs ("IN") Hearing Officer Carol Nieters' report, Nieters conclude that "[t]he hearing record indicates that Local 1107's Executive Board meetings regularly deteriorate into chaotic, bitter confrontations; indeed, name calling and shouting matches appear to be commonplace," and that EBd officers were intentionally trying to deny the L1107 EBd quorums. *See* ECF#271-19, at SEIU2466. According to Nieters,

"[t]his pattern not only hobbles the governance of the Local but also deprives Local 1107 members of meaningful participation in the business of their union." *Id.* Nieters based this conclusion on the testimony of Brenda Marzan, Sheila Grain, Pat Greaux and Cherie Mancini. *Id.* at SEIU2466-68. Nieters' conclusion was predicated on the testimony of three clearly biased witnesses, and a mischaracterization Mancini's testimony. Greaux, Grain, and Marzan each signed on to numerous letters both before and after the October 2016 hearings demanding that Defendants impose this trusteeship, and at times threatening to go to the media and to push drop and decertification. *See* CC/UMC Officer Letters RE: Req. Trust., **Ex."7,"** at SEIU6666-70, 6626-28, 12393-95. Marzan testified at deposition that she helped the UMCBT "with the language in the letter." *See* Marzan Depo, **Ex."8,"** at 227:5-14.

These witnesses were biased and intentionally disrupting L1107 EBd meetings at the direction of Defendants to lay the pretext for this trusteeship, and as such, their testimony was unreliable. Nieters' reliance on to Mancini's testimony also supports the fact that L1107 was still getting business done despite the intentional interruptions of the meetings by the CC and UMC officers. Nieters acknowledged that Mancini testified that at the hearing that the October 2016 EBd meeting still had a quorum despite the CC and UMC officers trying to deny the meeting a quorum. *See* ECF#271-19, at SEIU2468. Only one meeting, "the August 31, 2016 Meeting was not adjourned by motion…and collapsed due to" conflict. *Id.* Thus, the only evidence of a breakdown of democratic procedures was a single L1107 EBd meeting disbanding before business was conducted. Nieters' false conclusion was also parroted by Emergency Trusteeship Hearing Officer April Verrett who concluded that "serious breakdowns in union governance and basic democratic procedures in the local, resulting in the local's inability to conduct even routine union business, such as completing local Executive Board meetings." *See* ECF#271-29, at SEIU0022.

Verrett based this conclusion on Marzan's testimony, and the "Minutes of Local 1107 Executive Board meetings." *Id.* at SEIU11. Plaintiffs' counsel reviewed Marzan's cited testimony in the Verrett report and contrasted it to the minutes of L1107 EBd meetings with Verrett at her deposition. *See* Verrett Depo, **Ex."9,"** at 134:3-164:1-16. Though defense counsel would not allow Verrett to testify whether Marzan's testimony that "'[h]alf the time we couldn't even . . . approve the agenda to move forward [with meetings]" was truthful, Verrett did testify that the agenda was approved at every meeting, and only one, the August 31st meeting, disbanded prior to the business on the agenda being addressed. *Id.* at 143:20-144:1- 23. The conclusion that

L1107 was hobbled by dysfunction and could not get business done was objectively false, as was the notion that the board could not get through board meetings.

**B. <u>L1107 Met All Collective Bargaining Obligations.</u>**

Nieters' IN Report next concluded that "[t]he leadership conflicts in the Local are at the root of a pattern of instability and uncertainty that interferes with Local 1107's ability to carry out its most basic collective bargaining responsibilities properly and effectively." *See* ECF#271-19, at SEIU2468. Nieters based this conclusion entirely on "President Mancini's supervision of bargaining at UMC." *Id.* Nieters concluded that "[t]he testimony showed that in July 2016, when Local 1107 members working at UMC were preparing to ratify the renewal of their collective bargaining agreement, President Mancini, who had not actively participated in the months-long bargaining process in spite of her constitutional obligation to do so, nonetheless abruptly and unilaterally canceled the ratification vote," posting the cancelation on a public website without consulting the UMCBT "damaging their reputations" and delaying implementation of raises and bonuses for the UMC membership. *Id.* at SEIU7619-20. Every single part of Nieters conclusion was false, and contradicted by the evidence, which is why Nieters based this conclusion entirely on the testimony of the biased UMCBT officers. *Id.*

First, Mancini had repeatedly attempted to keep apprised of the UMC bargaining. The UMC bargaining began in late June or early July 2016, as the June 2016 L1107 EBd minutes indicate that the UMCBT was angry that "UMC-Management [did] not want to pay Bargaining Team" because recently passed Senate Bill 241 barred public employers from granting union "bank time" leave unless the union reimbursed the employer, or gave equally valuable concessions in bargaining. *See* **Ex. 4,** at 5952-53; *see also* SB241, **Ex. 10,** at 3. Initially, Mancini appointed the UMCBT's requested L1107 organizer as chief spokesperson for L1107 at the bargaining sessions. *See* Angel Emails, **Ex."11,"** at SEIU907, 6619, 3-4. The L1107 Constitution permits the L1107 President to designate a chief spokesperson for the bargaining sessions. *See* **Ex.2,** at SEIU968. When Mancini discovered that Angel was not keeping minutes or a bargaining book, she reassigned Angel and appointed L1107 organizer Lanita Troyano to be the chief spokesperson. *See* **Ex. 11,** at 3-4; *see also* UMC bargaining emails, **Ex."12,"** at SEIU775. Greaux refused to permit Lanita to attend the bargaining sessions. Mancini then demanded a copy of the UMC tentative agreement. *See* **Ex. 11,** at 3-4; *see also* **Ex. 12,** at SEIU905. Greaux refused to provide information on what had been bargained. *Id.* Mancini then attended the

UMC bargaining session unannounced, and Greaux again refused to give information on what had been bargained.

Greaux initially scheduled the UMC ratification vote without consulting Mancini or the L1107 staff. *See* **Ex. 12,** SEIU895-904. Mancini informed Greaux that the ratification vote needed to be supervised by L1107, and scheduled the vote for July 28, 2016. *Id.* at SEIU899. As soon as L1107 sent out the notification to the UMC membership of the ratification vote, the UMC members began emailing the union hall complaining that they were not told what was bargained, the UMCBT was not give them copies of the contract, and that wages and benefits were lower. *See* UMC Transparency Emails, attached as **Ex. "13,"** at 1-29. Mancini then personally went to UMC to get the tentative agreement, and when Mancini saw that the UMCBT had isolated the UMC membership from L1107, and gave up valuable concessions in members' wages and benefits to keep their union bank time leave, she canceled the ratification vote. *Id. see also* UMC Contract, **Ex. 14,** at SEIU1806-08. Mancini ultimately allowed the ratification vote to proceed due to pressure from Defendants, and a misleading member petition collected by the UMC officers. *See* ECF#271-19, at SEIU2469; *see also* **Ex. 7,** at SEIU6670. After Mancini canceled the UMC ratification vote, the UMCBT sent a letter to Defendants requesting trusteeship. *Id.* at SEIU6666-70. UMCBT member Michael Collins gave an official statement corroborating these facts. *See* Collins Statement, **Ex. 15,** at SEIU3993. The UMC nursing unit felt the brunt of the concession that UMCBT had negotiated, and collected a petition of hundreds of members requesting that they "have a separate collective bargaining agreement-from ancillary staff moving forward." *See* UMC Nurses' Petition, **Ex. 16,** at SEIU4002-09.[1]

The facts outlined above were also entirely corroborated by the testimony at the IN hearing. *See* ECF#271-14, at 1. Maria Diaz, a UMC nursing member and Steward, testified that the UMCBT was not representing the UMC nurses and engaged in misconduct during the bargaining. *Id.* at 8:1-11:1-10. UMC and CC officers that asked for trusteeship on July 31st testified against Mancini and/or in favor of trusteeship at the hearing: Sheila Grain (*Id.* at 1:20-14:1-19); Pat Greaux (*Id.* at 21:23-23:1-22); John Gutierrez (*Id.* at 19:12-21:1-21); Gwen Stevens (*Id.* at 23:23-25:1-26); Theresa McGowan (*Id.* at 25:27-27:1-4); Diane Gargano (*id.* at 27:5-14); Elizabeth Bolhouse (*Id.* at 27:15-28:1-17); Brenda Marzan (*Id.* at 35:11-37:1-24); and Clara Thomas. *Id.* at 37:25-40:1-21; *see also* **Ex. 7.** Kisling testified that she was not in favor of trusteeship, did not

[1] This petition was 32 pages long. Plaintiffs did not include all the signature pages to avoid unnecessary excessive pages.

think L1107 could not function, and noted that it appeared that other officers that attended the hearing were already "knowledgeable about trusteeship." 15:24-17:1-24.

The rest of the witnesses testified in favor of Mancini and against trusteeship, including Veronica Dunn-Jones, a nurse at UMC, who testified that the nursing unit at UMC was not being represented by UMCBT officers, expressed support for Mancini, and criticized the UMCBT over their lack of transparency, that the nurses were not given a copy of the contract until after Mancini cancelled the vote at their request. *Id.* at 40:22-46:1-28. Dunn-Jones ended her testimony by stating that the bargaining updates the UMCBT were putting in the UMC magazine did not inform members of what was negotiated, and that the bargaining sessions were "closed-door." *Id.* Collins testified against trusteeship and in favor of Mancini, that Mancini consistently tried to stay informed of the UMC bargaining but denied information and access by UMC Chief Steward Pat Greaux, and that Greaux and the other UMCBT members denied the UMC membership access to the contract. *Id.* at 50:21-54:1-9. Collins then testified that when the UMC CBA went before the CC Commissioner's for approval, Marzan, former L1107 President Bassick and the UMCBT members were wearing non-SEIU colors in protest of L1107. *Id.* Collins further testified that the UMC and CC officers were pushing drop and decertification campaigns at CC and UMC. *Id.* Alfredo Serrano, L1107 Trustee, testified in favor of Mancini, against trusteeship, and that UMC ratification vote cancelation was justified based reports of the UMC nurses. *Id.* at 55:14-58:1-12. The testimony at the IN and IC Hearings overwhelmingly demonstrated that L1107 was governing itself fine despite intentional disruptions of the CC and UMC officers. The testimony also supported the overwhelming evidence that demonstrates that the CC and UMC officers were engaging in egregious misconduct that was threatening L1107. The UMC CBA had an effective date in September 2016, meaning no benefits were delayed. *See* **Ex. 14,** at SEIU1798.

### C. <u>The Grillo Reports Clearly Demonstrate That SEIU Int'l Was Concerned Over Dues Revenue, Nevada Politics, And Controlling L1107 Operations.</u>

The Grillo reports to SEIU Int'l were remarkably consistent. Defendants were concerned over three primary issues: (1) having SEIU Int'l staff run the day to day operations of L1107; (2) having L1107 allocate the majority of its resources to organizing new members to increase SEIU Int'l's dues revenue and push its political program in Nevada; and (3) after the cancelation of the ratification vote, thwarting drop and decertification campaigns at CC and UMC. In her October 12, 2015 report, Grillo noted that Bassick was going to resign, that he had been working a full time job at CC while also serving as President, and that SEIU Int'l

Representatives ("IR") Brian Shepherd and Grace Vergara were running L1107's operations. *See* **Ex. 6,** at SEIU12318-20. This is further supported by an audit request from Mancini to Defendants that month because "Local 1107 was under the supervision of international staff who directed the day-to-day activities." *See* Mancini Audit Letter, **Ex. 17,** at 1-3. In her January 14, 2016 report, Grillo noted that Mancini and the L1107 EBd had requested that Vergara and Shepherd be expelled from L1107 but remained in in Nevada to run SEIU's political plan. *See* **Ex. 6,** at SEIU12314, 3579-80.

Grillo's reports also repeatedly referenced L1107's failure to allocate twenty (20) percent of its dues revenue to organizing to increase SEIU Int'l's dues revenue. *Id.* at SEIU12315, 3579-80, 6466, 7517. Grillo also repeatedly expressed concern that L1107 was focusing on "internal operation of the union" and providing services to existing members instead of organizing and growing the membership. *Id.* at SEIU12320, 12315. Grillo's reports also repeatedly discussed SEIU Int'l's political campaigns in Nevada. *Id.* at SEIU12320, 12315, 3579-80, 5514-16. After the UMC ratification, Grillo's reports began focusing on the drop and decertification campaigns in the CC and UMC units. *Id.* at SEIU3577-78, 5469-70, 5512-13, 7517. Not once did Grillo indicate any specific matter demonstrating that L1107 not governing itself. Rather, the reports simply state the local was having problems governing itself without any examples, then discuss Defendants' actual concern over organizing, politics, drop and decertification, and having SEIU Int'l officials run L1107. In her September 21, 2016 report, Grillo noted that the union was growing its membership, Mancini had a plan for the drop month, and was averaging three meetings a day. *Id.* at SEIU3577. Grillo also acknowledged the misconduct of the UMCBT denying L1107 staff access to UMC while they were pushing decertification. *Id.* at SEIU3577.

In her September 29th report Grillo states that EBd meeting went "smoothly," then focused on drop and decertification campaigns going on in the CC and UMC units. *Id.* at 5469-70. Grillo reported that it was very important to have Mancini agree to give SEIU Int'l staff "authority" to drive organizing, and that someone needed to "assess whether the board can govern the local." *Id.* Grillo recommended that someone have "serious conversation with Cherie" to "make it clear that as President, she is responsible for making the Local function, and that we do not view it as functioning." *Id.* Not once did Grillo mention any actual breakdown in union governance.

SEIU Executive Vice President ("EVP") Neal Bisno sent Mancini a letter in October 2016 that outlined Defendants' actual concerns. *See* Bisno Concerns Letter, **Ex. 18,** at SEIU5392-97. Bisno broadly references members expressing concerns "about the ability of the local to function democratically and to protect the bargaining rights," and then moved the urgent "reported decertification threat." *Id.* Bisno had that conversation with Mancini and the CC and UMC officers Grillo recommended. *Id.* at SEIU5387. Again, Defendants real concern was the "threat of drop/decert threat in public units," not governance. *Id.* at SEIU5387, 3567-68, 5648, 5666-68, 5520-21. Bisno also wanted Mancini to agree to allow SEIU Int'l personnel run L1107's organizing campaigns, which Mancini expressed concern over her prior bad experience with "Grace [Vergara] and Brian [Shepherd]." *Id.* at SEIU5388-89.

No evidence better exemplifies Defendants bad faith motive for imposing this trusteeship than the December 14, 2016, L1107 EBd meeting minutes. *See* **Ex. 4,** at SEIU6144. At this meeting Grillo chastised the L1107 EBd over their refusal to compromise L1107's financial condition to meet the requirement of having 20% of L1107's budget go to organizing. *Id.* Grillo recommended that L1107 fire staff, use old furniture, stop providing services to the membership, and stop trying to balance L1107's budget to "make sure we have money in Organizing to grow." *Id.* Grillo also informed the EBd that they could "forget about help from International, their looking at 30% cut in Budget." *Id.* When questioned about this comment, both Henry and Grillo testified that SEIU Int'l was concerned over the affect that *Janus v. AFLCIO*, No. 16-1466, 585 U.S. _(2018) was going to have on Defendants' dues revenue. *See* Henry Deposition, **Ex. 19,** at 209:9-22; **Ex. 5,** at 198:1-10. When questioned about her presentation to the EBd at the December 2016 meeting, Grillo testified that while the "the 20 percent for organizing…increases SEIU International's revenue," it also increases L1107's revenue, and that Defendants were pushing "a business model," rather than a service model, that was based on increasing dues revenue. *See* **Ex. 5,** at 199:1-17.

In Grillo's December 14, 2016, email report, she notes that she informed L1107 "how important it was to change the way they are doing things to grow the union" and meet the organizing requirement. *See* **Ex. 6,** at SEIU6466. In her last report to SEIU Int'l on January 26, 2017, Grillo discusses the decert campaigns and that "[t]here is no money set aside for Organizing," but that EBd meeting was "reasonably calm" and "most of the business had been concluded." *Id.* at SEIU7517. As indicated above, all the Grillo reports to SEIU demonstrate a singular concern, getting L1107 to focus its resources on organizing and thwarting drops to

increase Defendants' dues revenue, pushing SEIU"s political program, and allowing SEIU Int'l staff run L1107. Defendants were so concerned about the projected "30% cut in [SEIU Int'l's] Budget" from the *Janus* case that they were directing L1107 to terminate staff, stop trying to "balance out [the] Budget," and stop "maintenance of membership" in order to "to make their Organizing." *See* **Ex. 4,** at SEIU6144. L1107 had quorums and conducted union business at all the L1107 EBd meetings in 2017. *See generally id.*

**D. <u>SEIU Int'l Directed The CC/UMC L1107 Officers To File Charges Against Mancini.</u>**

There are two fact witnesses that state that Defendants were working with the CC/UMC officers to secure imposition of this trusteeship. In a text message between Kisling and Mancini after they were removed from office, Mancini asked Kisling if she knew if Marzan was assisting SEIU Int'l with securing the trusteeship. *See* Mancini Text Messages, **Ex. 20,** at RG16864. Kisling responded that she knew that Marzan "was in communication with Julie and Mary Grillo from day 1 because she would always disclose daily communication with them." *Id.* Kisling also stted that Marzan told her that Defendants were going to ask the EBd to vote for trusteeship at the April 26, 2017 EBd meeting prior to the meeting. *Id.* Kisling also told Mancini that Marzan "was telling me that Mary and Julie were telling her what charges to file and who to send stuff to at International." *Id.* at RG16865. Former L1107 President, Vicky Hedderman, attests that she was told similar things from the UMCBT officers prior to imposition of the trusteeship. *See* Hedderman Affidavit, **Ex."21,"** at 4-5. Hedderman was working for the UMC budget department in 2016. *Id.* at 1. According to Hedderman, UMC officers Greaux and Gwen Stevens "came to me and told me that they were working with SEIU International to secure a trusteeship." *Id.* at 5. The evidence disclosed in discovery overwhelmingly supports Kisling and Hedderman's accounts.

On September 1, 2016, the day after this August 2016 EBd meeting that disbanded without a quorum, Kisling sent an email to Grillo, the L1107 EBd, and L1107 counsel Michael Urban stating that Grillo recommended that Kisling bring her unfounded allegations presented to the EBd at the August EBd meeting to Urban to be investigated. *See* Urban Investigation Emails, attached as **Ex. 22,** at SEIU2502. In response, Urban states that he would only investigate "IF I am directed to do so by the EBd." *Id.* Urban also suggested that the CC and UMC officers "review the language in Articles 18-21 of the SEIU L1107 Constitution as they relate to the statements and **<u>charges you presented</u>**." *Id.* This is the first mention of "charges" related to the matters going on at L1107, as Clara Thomas indicates in her email response. *Id.* at SEIU2490. Urban's citation

to "Articles 18-21 of the L1107 Constitution" is also worth noting. Article 19 relates to the recalling of L1107 elected officers. *See* **Ex. 2,** at SEIU973-74. Article 21 relates to the filing of charges against members and officers of L1107. *Id.* at SEIU976. Kisling responded to Urban's email asking: "[s]o how do you suggest I get that direction from the EBd as I'm just following up on Ms. Grillo's recommendation." *See* Kisling Response to Urban Investigation, attached as **Ex. 23,** at 1. The CC and UMC officers repeatedly referenced that it was Grillo that recommended the investigation, and Grillo even admitted that she told Kisling to bring the "charges" to Urban for investigation. *See* **Ex. 22,** at SEIU2490-91, 2494-95.

On September 9, 2016, just eight (8) days after Grillo recommended that Kisling take her "concerns" to Urban for an investigation, and Urban recommended that they review Article 21 with regards to Kisling's "charges," Kisling and Thomas filed formal charges against Mancini and other L1107 EBd members directly with SEIU International. *See* ECF#271-10, at SEIU34. On September 13, 2016, just twelve (12) days after Grillo recommended that Kisling take her "concerns" to Urban, and Urban recommended they review Article 21 with regards to Kisling's "charges," Marzan filed formal charges against Mancini directly with SEIU International. *See* ECF#271-11, at SEIU84. At her deposition, Marzan testified that in October of 2016, her and Kisling were circulating a petition to recall Mancini pursuant to Article 19. *See* **Ex. 8,** at 106:12-107:1-23. In Grillo's September 29th report, one week after all the charges by the UMC and CC officers had been filed directly with SEIU Int'l at Grillo and Urban's direction, Grillo sent a report sent to Bisno stating that "[t]here are multiple charges that have been filed between various board members in which there has been a request for the IU to take original jurisdiction," that the L1107 EBd could not handle the charges, and SEIU Int'l should take original jurisdiction over the charges and schedule a hearing. *See* **Ex. 6,** at SEIU5468. Grillo noted, however, that there was no emergency, and that "the hearing doesn't have to take place immediately." *Id.* at SEIU5470-71. There was also no request for SEIU International to take jurisdiction over the Mancini charges.

Nieters' IC Report also demonstrates that Defendants were working with Marzan to secure imposition of this trusteeship. The IC Report states that it sustained two charges against Mancini: (1) Mancini's supposed failure to submit employment and services contracts to the L1107 EBd for approval in violation of Article 8, Section 2(C) of the L1107 Constitution; and (2) violation of Articles 7 and 16 of the L1107 Constitution and Article XVII of the SEIU Constitution because Mancini "widely disseminated unfounded, grossly disloyal, and disparaging allegations against the members of the [UMC bargaining] Committee." *See* ECF#271-18, at

RG30. Nieters' report states that the first charge sustained was brought by Kisling and Thomas, and the second charge sustained was brought by Marzan. *Id.* However, Kisling and Thomas never brought any changes against Mancini for a violation of Article 8, Section 2(C) of the L1107 Constitution. *See* **Ex. 27,** at SEIU9333-38. Rather, it was Marzan that brought the charge. *Id.* at SEIU9340.

Grillo recommended the investigation by Urban, Urban, whose contract was not renewed by Mancini, suggested that Kisling and the UMC and CC officers review the Articles 19 (recalls) and 21 (charges) regarding the "charges" Kisling made against Mancini. Shortly thereafter, Kisling and Marzan brought formal charges against Mancini filing them directly with SEIU International. Kisling and Marzan then circulated a recall petition in accordance with Article 21. Kisling and Hedderman stated that Marzan and the UMC officers were assisting Defendants with securing this trusteeship, and that Marzan was being coached by Grillo on what charges to bring. Grillo recommended that Henry take jurisdiction over the charges right after they were filed, circumventing the L1107 EBd. Both charges against Mancini that were sustained by Nieters were from the Marzan charges. Nieters concealed this fact in her report.

## III. RELEVANT PROCEDURAL HISTORY.

Given the Court's recent Order on Plaintiffs' last Motion for Preliminary Injunction, Plaintiffs feel it necessary to outline what the Court's previous rulings in this matter were, what claims related to Mancini's discipline remain so this Court does not once again mistake Plaintiff Mancini's free speech claim under 29 U.S.C. § 411(2), for her full and fair hearing claim under 29 U.S.C. § 411(5). In this Court's recent Order denying Plaintiff Mancini's request to enjoin and declare her discipline as unlawful this Court asserted that "I have already ruled, and the Ninth Circuit affirmed, that some evidence supported the discipline imposed on Mancini." *See* Order, (ECF#232), at 1:19-2:1-2.

The Court's prior ruling on Plaintiff Mancini's discipline was made in Court at the hearing on the Motion for Preliminary Injunction. *See* ECF#80, at 44:18-45:1-15. At the hearing, this Court ruled on Plaintiff Mancini's full and fair hearing claim under 29 U.S.C. § 411(a)(5) stating that "[t]here is some evidence that Mancini did not keep apprised of the status of negotiations, despite regular updates, **because, by her own testimony, she did not realize until late in the process that there was a provision in the agreement about limiting union access to UMC workers even though that provision was agreed to in the first days of bargaining**." *Id.* However, the Court did not have Plaintiff Mancini's testimony from the Internal Needs and

Internal Charges hearings because those transcripts had yet to be disclosed by Defendants. Thus, the Court's ruling on this matter was entirely based on the hearing officer's reports. *See generally* ECF#4; ECF#12. This Court cited to the Ninth Circuit Court's Order affirming its prior decision to deny the first *Mancini* Preliminary Injunction. *See* ECF#175, at 3-4. The Ninth Circuit Court ruled that this Court's ruling was not an "abuse its discretion in declining Mancini's request for reinstatement, because there was 'some evidence at the disciplinary hearing to support' the disciplinary action…. **Although Mancini contends that the SEIU hearing officer's report was insufficient evidence to support her removal, the district court did not err in basing its conclusion on that evidence**." *Id. citing Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman*, 401 U.S. 233, 246 (1971).

Plaintiffs' recent Motion for Preliminary Injunction did not request the Court's ruling on the full and fair hearing claim under 29 U.S.C. § 411(a)(5). *See* ECF#206, at 23:25-24:1-13. Rather, Plaintiffs requested the Court rule on Plaintiff Mancini's free speech claim under 29 U.S.C. § 411(a)(2) under the scheme to suppress dissent element, which this Court has already ruled applies to the free speech claim. *Id.* at 45:16-46:1-20. After the hearing, the Court issued an Order on Defendants Motion to Dismiss. *See* Order, 2:17-cv-2137, (ECF#32), at 1-7. Defendants moved to dismiss Mancini's discipline claim in Count One for denial of a full and fair hearing under 29 U.S.C. § 411(5). *Id.* at 1:18-4:1-20. The Court dismissed the parts of the claim that challenged the manner of service of the charges, and content of the charges notice. *Id.* However, the Court "read count one to also contain an allegation that Mancini did not receive a full and fair hearing because the charges and evidence were contradictory, she acted in good faith, and the UMC ratification vote took place after collective bargaining ended so she should not have been disciplined for interfering in collective bargaining. The defendants did not move to dismiss count one in relation to these allegations. Consequently, this portion of count one remains pending." *Id.* Thus, Plaintiff Mancini's remaining claims are for: (1) denial of a full and fair disciplinary hearing under 29 U.S.C. § 411(a)(5); and (2) for discipline for protected union speech under 29 U.S.C. § 411(a)(2).

### A. Plaintiff Mancini's Claims Are Not Moot.

Plaintiff Mancini initially sued for both injunctive and declaratory relief. *See Mancini* Complaint, (ECF#1), at 1. Plaintiff Mancini moved to her damages claims to these causes of action, however, this Court denied that request without addressing why her timely Motion to Amend to add monetary damages to her union

discipline claims was denied, which was within the time period to amend the *Mancini* Complaint as a matter of right. *See generally* ECF#266. In any event, regardless of whether the Court's ruling denying the timely request to add monetary damages is reconsidered by this Court or overturned on appeal, Plaintiff Mancini still has an interest in her discipline claims.

It is clear that this Court has not interested in reinstating Mancini to her position as Local 1107 President. However, Mancini still has a pecuniary interest in having her discipline declared unlawful under the LMRDA by this Court. At the present time, Plaintiff Mancini's union and employment rights are still affected by her unlawful discipline. *See* Decl. Mancini, at 1-4. Specifically, upon her removal from office and suspension from membership, Plaintiff Mancini had to reapply for her former job. *Id.* At that time, the position she previously held had been eliminated. *Id.* Because of this, upon her rehire she was demoted, had a fourteen (14) percent reduction in her pay, and that lower pay scale will affect her future raises, pension and retirement benefits under the collective bargaining agreement ("CBA"). *Id.* Had Plaintiff Mancini never been disciplined and removed from office, her compensation would have been guaranteed upon returning to work for her current employer, St. Rose Dominican Hospital. *Id.* For this reason, Plaintiff Mancini's claims are not moot, and an Order declaring her discipline unlawful and compelling SEIU to demand that she receive all benefits she would have if she had finished her term is necessary as a matter of equity, to make her whole. Plaintiff Mancini requests that this Court keep these issues in mind when it is ruling on this Motion for Partial Summary Judgment.

**IV. <u>STANDARD OF REVIEW.</u>**

A moving party is entitled to summary judgment when there are no genuine issues of material fact. Fed. R. Civ. P. 56(a). When a motion for summary judgment is properly made and supported, an opposing party must set out facts showing a genuine issue for trial. FRCP 56(c)(1)(A)-(B). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). The substantive law defines which facts are fundamental. Id. at 248. The party opposing summary judgment has the burden to come forward with specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986) (quoting FRCP 56(e)). There must be something more than some "metaphysical doubt" as to the material

facts for it to be a genuine issue. Id. at 587. If the factual context makes the non-moving party's claim or defense is implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Uncorroborated and self-serving testimony, without more, will not create a genuine issue of material fact precluding summary judgment. *Villiarimo v. Aloha Island Air Inc*., 281 F.3d 1054 1061 (9th Cir. 2002).

## V. <u>ARGUMENT.</u>

### A. <u>There Is An Issue Of Material Fact Regarding Whether Mancini Was Provided A Full And Fair Hearing.</u>

"The LMRDA's due process guarantee includes the right to a hearing before an unbiased committee" or finder of fact. *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 342 (3d Cir. 2006); *see also Savage v. Tweedy*, 2012 U.S. Dist. LEXIS 179191, *12, 2012 WL 6618184 (D. Or. Dec. 13, 2012); *Myers v. Affiliated Property Craftsmen Local No. 44*, 667 F.2d 817, 820 (9th Cir. 1982). "[A] union tribunal may be found to be biased only when the plaintiff has offered specific allegations demonstrating 'actual bias' or a 'significant risk of actual bias,'" and prejudice. *Johnson v. Holway*, 2005 U.S. Dist. LEXIS 34787, *41, 2005 WL 3307296 (2005) *citing Wildberger v. American Fed. of Gov't Employees*, AFL-CIO, 86 F.3d 1188, 1196 (D.C. Cir. 1996). Evidence of "the existence of a predetermined outcome" violates the fair hearing requirement. *Pape v. Local 390 of Intern. Broth. of Teamsters*, 315 F. Supp. 2d 1297, 1316 (S.D. Fla. 2004); *Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004). Where there is an "overlap of investigative, prosecutorial, and adjudicatory functions" vested in a single person who is the ultimate finder of fact, due process is held to be violated. *Wildberger*, 86 F.3d at 1195.

There are multiple issues of material fact regarding whether Plaintiff Mancini received a full and fair hearing. First, the Court's prior Order based on Nieters' Report that there was "some evidence that Mancini did not keep apprised of the status of negotiations, despite regular updates, **<u>because, by her own testimony</u>**, she did not realize until late in the process that there was a provision in the agreement about limiting union access to UMC workers even though that provision was agreed to in the first days of bargaining" is predicated on a clearly erroneous finding of fact, and a misrepresentation in the Nieters that Mancini admitted that she did not keep apprised of the UMC bargaining. *See* ECF#39, at 56:3-9. Mancini never gave this testimony. There is only one paragraph in either report that asserts that Mancini testified that she did not keep apprised of

the negotiations and that the access provision was negotiated early in the negotiation process, and it is found in the Internal Charges Report. *See* ECF#271-18, at RG19. The page cited where Mancini gave this testimony is transcript day two at page 83. *Id.* On page 83 of the Internal Needs portion of the hearing, Mancini is not testifying. *See* ECF#271-14, at SEIU206. At page 83 of the Internal Charges portion of the hearing, Mancini is cross-examining a UMC bargaining team member, not testifying, and she never states the provision was negotiated early in bargaining. *Id.* at SEIU473-77.

Thus, the Court's prior ruling is predicated on a misrepresentation of fact in Nieters' report, and now that the Court has the testimony, it is no longer permitted to rely on the report. The Court cited to *Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Hardeman*, 401 U.S. 233, 246 (1971) for the some evidence standard, which involved an admission by Hardeman that struck the first blow in the fight leading to the discipline. Here, there is no admission, thus some other evidence needs to exist to support Mancini's discipline. Further, as discussed in detail above, there is ample evidence of Defendants applying the rules differently the parties charging Mancini, than they did for the other charging parties. *See* **Ex. 1.** "[a] violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." *US v. International Broth. of Teamsters*, 247 F.3d 370, 387 (2d Cir. 2001). This was expressly stated in *Wellman*: "The LMRDA does not allow the recovery of damages for a union's violation of a technical internal rule that does not adversely affect a member's due process rights." 812 F. 2d at 1206. Title I of the LMRDA requires that union members be protected "**from arbitrary action by the union or its officers.**" *Finnegan*, 456 US at 442. Indeed, "[t]he LMRDA provides a 'bill of rights,' which gives union members the right to participate in union affairs, to speak freely, **and to be protected from arbitrary discipline**." *Motor Coach Employees v. Lockridge*, 403 US 274, 321 (1971). Defendants' arbitrary application of the union's rules to Mancini and not to those charging her creates an issue of material fact regarding due process.

*a. Defendants Planned To Trustee L1107 As Early As August 2016.*

There is also a wealth of evidence of a predetermined decision in this case, creating an issue of material fact. The reason Defendants did not request voluntary trusteeship prior to April 26th was because they knew the L1107 EBd would not vote for trusteeship while Mancini was still President. Thus, Defendants implement an elaborate, detailed, and methodical conspiracy to remove Mancini and trustee L1107. On

August 5, 2016, Grillo sent Ury and Fitzpatrick an email that "[t]hings are breaking down in 1107 again," and that the UMC/CC officers were circulating petitions requesting trusteeship. *See* SEIU Intl. Comm., attached as **Ex. 24,** at SEIU7661. In response to this email, Ury asks "whether there is a [redacted] angle to consider" at L1107. *Id.* This is a direct reference to the trusteeship over SEIU-UHW in 2009, which Plaintiffs argued was relevant at the October 18, 2017 hearing. *See* ECF#39, at 17:1-18:16. Grillo also recommended the CC/UMC officers file charges against Mancini, and coached Marzan on what charges to file.

On September 2, 2016, one day after Grillo and Urban recommended that the CC/UMC officers bring charges against Mancini, Fitzpatrick noted that she had already made a recommendation to Henry about how to deal with L1107. *See* **Ex. 24,** at SEIU13239. In this same email, Fitzpatrick discusses the trusteeship over "L73," which Plaintiffs also argued was relevant. *Id.* One day After the IN/C hearings, Fitzpatrick wrote Henry an email stating that "it was 'hard to get a sense just from the hearing of how the local's EBd would break on a question like voluntary trusteeship." *Id.* at SEIU6584. Bisno responded that they already made a recommendation on how to deal with L1107. *Id.* at SEIU13241. On January 30, 2017, Fitzpatrick sent the contingency planning summary to Bisno, which included the option of going to the March 1, 2017 meeting and requesting trusteeship. *Id.* at SEIU7552-54. In an updated version of that document sent to Bisno the next day, Fitzpatrick added "info received from Mary last night," which included a reference to the fact that "36/60 EBd seats are occupied, with almost all of the vacancies on the Health Care side," indicating that defendants were trying determine how the L1107 EBd would break on the voluntary trusteeship question. *Id.*

Before March 31, 2017, Henry was discussing whether Verrett could serve as trusteeship hearing officer, and Fitzpatrick was looking for trustees because Brian Shepherd was not available. *Id.* at SEIU12310; *see also* Henry Deposition, **Ex. 19,** at 117:20-118:1-120:1-11. On April 3, 2017, Fitzpatrick wrote Heather Conroy and email entitled "Mote Woes at SEIU Local 1107 that stated that "MK asking Laphonza for our trustee today, but deputy trustee Brian Shepherd" was not available," corroborating that Henry was talking with Laphonza Butler about trusteeing L1107. *See* **Ex. 24,** at SEIU13366. On April 14, 2017, Fitzpatrick wrote Henry an email on the "trusteeship logistics front," which told Henry to request Martin Manteca to be deputy trustee over L11107 "in the event the local requests trusteeship formally on the 26th at their meeting." *Id.* at SEIU13668. Fitzpatrick states they would start preparing Martin and Luisa Blue to be trustees "around

the 20th." *Id.* On April 19th SEIU EVP Kathy Eddy sent Bisno an email including his outline for the April 26th EBd meeting, and noted that "[t]he only pieces missing are the final decision (covering both. charges and internal needs) and **resolution the Board would need to adopt**. That is **getting finalized by Legal**." *Id.* at SEIU7531. The outline included the conclusions and recommendations in the Nieters reports that Henry would remove Mancini and Kisling from office, and present their simultaneous removal as a "constitutional crisis" making L1107 impossible to govern unless the EBd voted for trusteeship. *Id.* at SEIU7988-90.

On April 25, 2017, Eddy sent another email outlining the plan for Wednesday, April 26th. *Id.* at SEIU3754-56. At 12:30, the SEIU Int'l officials would reach out to L1107 EBd members "Armstrong, Grain, Greaux, Marzan, Serrano (TBD?), Springer." *Id.* By this time the decision letter from Henry would have "been sent. Neal coming to board mtg and is opportunity to talk through path forward" but the IRs would misrepresent that they 'know nothing more." *Id.* at SEIU3755. At 4:00 pm, they would arrive at L1107 and request voluntary trusteeship. *Id.* At 2:59 am on the morning of April 26th, Fitzpatrick sent Henry an email to give her "a **reminder**/overview of what our plan is today in NV." *Id.* at SEIU12095. Fitzpatrick states that Nieters would render her report recommending Mancini and Kisling's "removal from office and a bar on running for a period of time." *Id.* Henry's office would send out "the report and your decision" Mancini, Kisling and the L1107 EBd "around 3pm est, Noon pacific." *Id.* "**As we discussed**, your decision will announce your final ruling on the charges and will also address the recommendation on internal needs" and would appoint Ury and Eddy "as Monitors." *Id.* SEIU Int'l had the SEIU legal department standing by to file a TRO in the case of resistance from L1107 officers. *Id.* "At the meeting, Neal will make the case to the Board about why they should ask the IU to trustee the local, given the dire condition of its governance and collective bargaining functioning" and Defendants were "**prepared to implement a trusteeship Friday morning.**" *Id.* If the EBd refused, Defendants would request L1107 hold another vote at a later date. *Id.* at SEIU12095. Fitzpatrick responded to Eddy requesting to meet "about this (**and finalize our plan on turnout**, etc.) and do any adjustments we need to the plan for the eboard meeting," and meet with L1107 EBd members that would "lead on doing the right thing." *Id.* at SEIU7732.

Defendants executed this plan with remarkable precision. At 3:19 pm EST, 12:19 pm PDT, Henry sent Mancini an email entitled "Decision of the Int'l Union President," which included the Nieters' reports, and

Henry's letter to L1107. *See* Henry Email RE: Decision, **Ex. 25,** at SEIU9364. Henry's letter announced Henry's final ruling on the charges and but did not address the recommendation on internal needs. *Id.* at SEIU7586-87. In addition, the letter appointed Ury and Eddy as Monitors to L1107. *Id.* at SEIU7587. Henry's letter announced that she had sent Bisno and Fitzpatrick to L1107 to attend the EBd meeting to discuss the future of the local, not trusteeship. *Id.* At the meeting, Bisno made the case for voluntary trusteeship. However, before the L1107 EBd could actually hold a vote on voluntary trusteeship, it the issue needed to be on the agenda for the meeting. The L1107 Constitution requires agendas to be provided to L1107 officers fifteen days in advance, and issues not on the agenda cannot be addressed. *See* **Ex. 2,** at SEIU933; 938; *see also* **Ex. 4,** at SEIU6105.

The Verrett report states that two weeks prior to the Nieters reports being issued, Marzan "had already reserved time on the agenda of the meeting…to request a trusteeship." *See* ECF#271-29, at SEIU20. Marzan testified that she did, indeed, place on the agenda for the April 26th the voluntary trusteeship vote two weeks prior to the meeting where Defendants coerced the EBd to vote for emergency trusteeship. *See* **Ex. 8,** at 251:13-252:1-21. According to Marzan, while she placed the matter on the agenda knowing it was to be used to request voluntary trusteeship, the agenda item "wasn't stated as trusteeship," rather, Marzan labeled the agenda item "as something like health of the union or something to that effect….[i]t wasn't obvious…that I was going to ask for trusteeship." *Id.* Indeed, the April 26th meeting agenda includes an agenda item: "Union Affairs-Brenda Marzan." *See* **Ex. 4,** at SEIU6279.

Marzan putting the trusteeship vote on the agenda corroborates Kisling's account that Brenda told her SEIU Int'l coming to the April 26th meeting to push for trusteeship. *See* **Ex. 20,** at RG16864. Marzan maintained at the deposition that her placing the vote on the agenda the same day Defendants attended the meeting was just a coincidence. *See* **Ex. 8,** at 252:22-255:1-25. When Marzan was questioned if Defendants reached out to her prior to the meeting, Marzan testified that she did not recall meeting with Defendants prior to the meeting. *Id.* At the April 26th meeting Marzan and Thomas moved to hold the meeting in "Executive Session." *See* **Ex. 4,** at SEIU2. Thomas and Grian moved to have SEIU place L1107 in voluntary trusteeship, and the motion carried. *Id.* Defendants conspired with Marzan to execute their "plan for turnout….for the

eboard meeting," ensuring that all the officers that requested trusteeship before any charges were filed would attend. *See* **Ex. 24,** at SEIU7732, 3755; **Ex. 8,** at 251:13-252:1-21; **Ex. 20,** at RG16864; *see also* **Ex. 21**.

The is, without question, an issue of material fact regarding whether the SEIU Int'l top leadership, Marzan, Greaux and Stevens were working together to secure this emergency trusteeship over L1107 for improper purposes prior to the Nieters' reports being issued, which evidences a predetermined decision and thus a due process violation. This, combined with the arbitrary application of the rules to the charging parties at the internal charges hearing, and the numerous misrepresentations of fact in the Nieters' report creates and issue of material fact regarding whether the hearing was impartial. Other than pointing to this Court's prior ruling, which again is based on testimony that does not exist, Defendants do not point to any other evidence that supposedly supported Mancini's discipline other than the report that misrepresented Mancini's testimony. As such, the full and fair hearing claim must go to trial.

There is also an issue of the combination of investigatory, prosecutorial and adjudicative functions in a single person. IN *Wildberger*, the Court held that while it saw nothing wrong with the Int'l union's Constitution authorizing the IP "to determine probable cause, prefer the charge, appoint a trial committee, and then make the ultimate decision based on the committee's recommendations." 86 F.3d at 1195-96. However, because there was evidence that cast "doubt on the partiality of the President, the combination of prosecutorial and adjudicatory functions in a single person can present due process concerns." *Id.* Because there was evidence of bias on the part of the IP, the Court could "no longer assume" that the Constitutional procedures provided a full and fair hearing, and the Court reversed the decision.

The evidence in this case is well beyond what was present in *Wildberger*. The evidence demonstrates a clear pattern of Mancini ejecting and refusing to allow SEIU Int'l officials run L1107, disinterest in pushing the program of SEIU Int'l and to allocate L1107's resources to organizing, Defendants dissatisfaction with Mancini's defiance and dissent, and trusteeship swiftly followed. The SEIU Constitution vests investigatory, prosecutorial and adjudicative power in the SEIU IP Henry. *See* SEIU Int'l Const., attached as **Ex."26,"** at SEIU2409-12. Like in *Wildberger*, SEIU IP Henry was vested with authority to assume jurisdiction over the charges recommended by Grillo, appoint a hearing officer, and make "the decision upon the record taken at the hearing and the report of the hearing officer." *Id.* at SEIU2411. As discussed above, Henry exempted the

parties charging Mancini from the procedural requirements of the SEIU Constitution for charging members and requesting SEIU International assume jurisdiction. *Id. see also generally* **Ex. 1.** Similarly, the SEIU IP is permitted to impose the emergency trusteeship, appoint the trusteeship hearing officer, and make the final decision on the merits. *Id.* at SEIU2393. There is also evidence that the SEIU legal department and other SEIU Int'l officials actually wrote the Nieters and Verrett reports at the direction of Henry, not the hearing officers. *See* **Ex. 24,** at SEIU7531; *see also* Defendants' Privilege logs, **Ex. 27,** at 1-9. There is a wealth of evidence of bias and bad faith in this case, and in concert with the SEIU Constitution's overlap of investigatory, prosecutorial and adjudicative authority in the SEIU IP, and predetermined decision, the Constitutional procedures cannot be said to have accorded Mancini or L1107 due process.

Defendants will undoubtedly argue that they were just contingency planning, and there was no predetermined decision. However, in all the evidence and testimony in this case, the only contingencies that were supposedly kicked around were imposing trusteeship, splitting Local 1107 apart, or letting them fend for themselves after removing their two officers. *See* **Ex. 24,** at SEIU7553, 7988-98. There was no contingency discussed that involved assisting the Local 1107 Executive Board. *Id.*

**B. <u>There Is An Issue Of Material Fact Regarding Whether Mancini's Speech Impaired The Union's Interests Or Was Done To Protect The Union.</u>**

Defendants' argument for why Mancini's free speech claim should be dismissed is apparently rooted entirely in the Court's prior order in 2017 on the Motion for Preliminary Injunction. *See* ECF#271, at 15:16-17:1-12. To win on summary judgment on this claim, Defendants must demonstrate that there is no issue of material fact regarding whether the decision to discipline Mancini was done to protect Local 1107. *Id.* at 16:10-17 *citing Kofoed v. Int'l Bhd. of Elec. Workers, Local 48*, 237 F.3d 1001, 1005 (9th Cir. 2001); *see also Serv. Employees Int'l Union v. Nat'l Union of Healthcare Workers*, 718 F.3d 1036, 1048 (9th Cir. 2013).

Like the fair hearing claim, there is a wealth of evidence that Defendants' discipline was not only not done to protect the union, it was done for the express purpose of depriving the Local 1107 membership of the rights under the LMRDA, despite the clear misconduct of the UMC bargaining team members. First, the Grillo reports clearly establish that Defendants were aware of the UMC bargaining team's misconduct before and after the October 2016 hearings. *See* **Ex. 6,** at SEIU3577. As thoroughly outlined above, there is also a wealth of evidence that the UMC bargaining team was self-dealing to keep their union business leave (bank time), not

being transparent with the UMC membership, hiding what was negotiated from the union hall and Mancini, and then pushed drop and decertification campaigns at UMC after the isolation provision was ratified. *Id.* Defendants had all this evidence at the October 2016 hearings, and instead of disciplining the board members that were engaging in the actual, serious misconduct, the disciplined Mancini.

Defendants' are likely to argue, as they have in the recent appeal, that there is no evidence of a scheme to suppress dissent because: (1) SEIU did not file disciplinary charges against Mancini; (2) that Plaintiffs ignore that SEIU removed Kisling from office who was Mancini's political rival and thus fail to explain how an alleged scheme to suppress Mancini's dissent resulted in the removal of all elected officers at the union, including those opposing Mancini's leadership; and (3) that Plaintiffs fail to show any causal connection between such criticism and Henry's decision to adopt Nieters' well-reasoned report and recommendation regarding the internal charges. Plaintiffs will address each argument briefly.

First, there is ample evidence that Defendants were directing the filing of charges against Mancini and exempting the charging parties from the union rules. Second, both Mancini and Kisling testified and repeatedly represented that they were against trusteeship, which is why both were removed from office. Third, Defendants criticism was not just against Mancini, it was against the board, who was siding with Mancini's desire to return Local 1107 back to the model of servicing the members. Her removal was about suppressing the dissent of the entire local union leadership and impose trusteeship, not just Mancini. Defendants ignored the actual misconduct of the UMC bargaining team and disciplined Mancini, because those officers supported trusteeship and Mancini and Kisling did not. Defendants' also argue that UMC threatening to file a bad faith bargaining charge against the union as evidence that canceling the ratification vote was not in the best interests of the union. *See* ECF#271, at 17:1-11. However, after the ratification vote, Local 1107 sued and invalidated the provision the vote was canceled over, and UMC settled. *See* UMC Settlement documents, attached as **Ex. "28,"** at 1-10.Finally, because Defendants repeatedly cite to the Nieters' report as their only supporting evidence, it must be stressed that the Court is not permitted to rely on the report when the evidence is available for it to review, and there are clear misrepresentations in the report regarding that evidence.

//

//

**C. There Is An Issue Of Material Fact Regarding Whether The Internal Needs Hearing Was Held In Violation The SEIU Constitution.**

Plaintiffs argument of lack of notice is regarding the fact that SEIU International did not notice Local 1107 that trusteeship could result from the hearing. At the board meeting just prior to the October 29, 2016 internal needs hearing, SEIU International Representative Grillo told the Local 1107 Executive Board that trusteeship could not result from this hearing because SEIU "would have to have a Trusteeship hearing" first. *See* **Ex. 4,** at SEIU6105. This is an SEIU International official telling the Local 1107 Executive Board that trusteeship could not result from the Internal Needs Hearing. *Id.* Defendants then used the hearing to coerce the Local 1107 Executive Board, after removing its two officers, to allow trusteeship without having the proper hearing. *See* **Ex. 24,** at SEIU7988-98. This is evidence that Local 1107 was told one interpretation of the SEIU Constitution when Defendants were preparing to secure trusteeship over Local 1107, and another when the actually imposed it. This is an issue of material fact, which, like the arbitrary application of the charging procedural rules, indicates that Defendants breached the SEIU Constitution.

**D. There Is An Issue Of Material Fact Regarding Bad Faith Emergency, And Improper Purpose.**

"Emergency conditions" defined as the "necessity for immediate action" is a prerequisite to imposing an emergency trusteeship before a hearing can be held. *Higgins v. Harden*, 644 F.2d 1348, 1352 (9th Cir. 1981); *Retail Clerks*, 479 F.2d at 55; *Hotel & Rest. Emps. & Bartenders Int'l Union v. Rollison,* 615 F.2d 788, 792 (9th Cir. 1980).

As thoroughly outlined in the statement of disputed facts above, there is a wealth of evidence of bad faith, arbitrary application of union rules, improper discipline, and a predetermined decision to evidence bad faith and improper purpose in this case. There is also clear evidence that the emergency situation did not exist. This Court previously asserted that it was "somewhat in agreement" with Defendants' assertion that there was an emergency situation at L1107 but that there was not a "trigger pull" to impose this trusteeship until the Nieters' reports issued. *See* ECF#39, at 40:4-13. There is an overwhelming amount of evidence in this case that demonstrates that this excuse was false, and made in bad faith. Grillo's September 29th report, when discussing SEIU Int'l taking jurisdiction over the charges noted that the hearing did not "have to take place immediately," and the main concern was for SEIU Int'l to appear attentive to the issues. *See* **Ex. 6,** at SEIU5471. Defendants did not believe there was an emergency at L1107 when the majority of the conflict

supposedly supporting this trusteeship occurred. *Id.* at SEIU5468-69. Just one day after the IN and IC hearings, Defendants discussing "how the local's EBd would break on a question like voluntary trusteeship." *See* SEIU Int'l Comm., **Ex. 24,** at SEIU13240-41. On January 30, 2017 Fitzpatrick sent Bisno an email that included a "L1107 Contingency Planning Summary." *Id.* at SEIU7552-4. The summary stated that going "to L1107's March 1, 2017 E-Board meeting, surface[ing] the affiliation agreement, [and] mak[ing] the case for voluntary, emergency trusteeship" was an option. *Id.* at SEIU7553. If it was an option to go to L1107's EBd on January 30th to request voluntary trusteeship, Defendants cannot argue that there was emergency in April of 2017.

Defendants failed to attend any of the L1107 EBd meetings to request voluntary trusteeship from December 2016 to April 2017, despite clearly planning to do so as early as October 31, 2016. *Id.* at SEIU3280-84, 3272-78, SEIU13240. Defendants did not wait to impose this trusteeship over L1107 because of the Nieters reports. *See* ECF#39, at 40:9-11. Defendants waited for the reports because they knew L1107 would never vote for voluntary trusteeship while Mancini was still in office because she opposed the imposition of the trusteeship. Defendants' legal team needed time to come up with a believable excuse to remove Mancini from office to present to the L1107 EBd that their removal of L1107's "top two" officers was a [redacted] is" that made L1107 unable to function. *See* **Ex. 24,** at SEIU7989-10; 7996.

Bisno was the SEIU Int'l officer tasked with making "the case for voluntary, emergency trusteeship," and his presentation outline demonstrates Defendants bad faith. *Id.* at SEIU7553. On April 18, 2017, prior to the Nieters reports being issued, Bisno and other SEIU Int'l officials already knew that Nieters was going to recommend that Henry remove "Mancini and Sharon Kisling" from office for one year, and place L1107 "into an emergency trusteeship." *Id.* at SEIU7988-90. Bisno told the L1107 EBd that "[i]t is difficult to imagine how you can operate this local without the top two roles filled, and your constitution…does not provide for a clear path of governance." *Id.* Bisno then went over all the threats L1107 was facing and the resources SEIU Int'l expended in Nevada. *Id.* at SEIU7991-95. Bisno told the L1107 EBd that Mancini and Kisling's removal was a "[redacted]." *Id.* at SEIU7996. Bisno gave L1107 [redacted]." *Id.* Bisno stated that for SEIU Int'l to [redacted]" and that it was the EBd's "[redacted]" to vote for trusteeship. *Id.* at SEIU7996-98. The documents disclosed in discovery demonstrate that Defendants did not

believe there was an emergency at L1107, discussed over and over options for asking the L1107 EBd to vote for voluntary trusteeship prior to April 26th, and decided not to do so in order to create an "emergency situation" they could use to threaten and coerce the L1107 EBd. There was no emergency situation and this Court's Order was predicated on misrepresentations of Defendants. There is clearly an issue of material fact regarding whether Defendants' asserted "emergency situation" was made in good faith. As such, summary judgment must be denied.

**E. <u>There Is An Issue Of Material Fact On All Of Plaintiffs' Remaining Counts.</u>**

There is a presumption of validity of a trusteeship so long as the trusteeship is administered in accordance with the Int'l constitution and "authorized or ratified after a fair hearing," which is valid for eighteen (18) months. 29 U.S.C. 464(c). If the presumption of validity expires "[a] presumption of invalidity" attaches to the trusteeship, which may "be rebutted only by clear and convincing proof" that it must continue. *Hodgson v. UMW*, 473 F.2d 118, 122 (D.C. Cir. 1972); *Ross v. Hotel Employees and Restaurant Employees*, 266 F.3d 236, n.10 (3d Cir. 2001); *Thompson v. Opeiu*, 74 F.3d 1492 (6th Cir. 1996); *Tam v. Rutledge*, 475 F. Supp. 559 (D. Haw. 1979). On October 29, 2018, the presumption of validity of this trusteeship expired, and the presumption of invalidity attached to this trusteeship. *Id*.

This Court's prior ruling on the Motion for Preliminary Injunction was predicated on the presumption of validity, and it does not support summary dismissal of this case given the evidence. To be clear, just because Defendants state they imposed this trusteeship for a proper purpose does not make that a fact that is not in dispute, or indisputable. Defendants must present that there is no evidence to dispute Defendants' stated proper purpose(s). Defendants again rely on self-serving affidavits and the prior ruling of the Court on the injunction when it was not permitted to weigh the evidence because the presumption applied. The Nieters report is also not evidence, and this Court should not rely on it now that it has the actual evidence from the hearing. Finally, the Department of Labor's conclusion is also not evidence. Like the Court's prior ruling, it is based on the presumption of validity, and the fact that the DOL was not permitted to inquire into the facts. Now that the presumption is not applicable, accepting Defendants' word is not permissible. Here, Henry acted contrary to Local 1107's best interests by disciplining and removing their duly elected President who was doing her job, and allowing the Local 1107 officers that were engaging in misconduct against their union to get away with their misconduct. By disciplining Mancini and removing the Local 1107 Executive Board Defendants have

suppressed dissent and stripped the Local 1107 membership of its rights under the SEIU Constitution, the Local 1107 Constitution, and the LMRDA. There is a wealth of evidence that Henry's actions were politically and financially motivated, and thus not in the best interest of Local 1107. For this reason, there is an issue of material fact to proceed to trial on all counts.

Defendants argue there is no issue of material fact on whether Henry had good cause to extend the date of the trusteeship hearing, and thus Counts VI and VII must be dismissed. There is evidence that Verrett was available for the trusteeship hearing over a month before the date it was held. *See* Verrett Availability Emails, attached as **Ex. "29,"** at SEIU12525. Thus, Defendants need to present evidence why other individuals were necessary to attend the hearing in order to establish good cause. Allowing Defendants to extend the emergency trusteeship hearing date for any reason Defendants' assert defeats the purpose of the rule requiring the hearing to be held within thirty (30) days, as it makes the provision unenforceable. With regards to notice of the trusteeship hearing, the email that sent the notice, and the deposition testimony obtained in discovery, and text messages between officers all indicate that Defendants did not notice the entire executive board of the hearing. *See* Nolan Deposition, attached as **Ex. 30,** at 26:1-10; *see also* TH Notice Email, attached as **Ex. 31,** at SEIU3326; *see also* **Ex. 20,** at RG16879, 16883. It is not necessary that Plaintiffs be the members not noticed to have standing to sustain this claim. *See generally* ECF#289. There is still an issue of material fact regarding whether the timing of the notice gave the Local 1107 Executive Board sufficient time to select a spokesperson. The Court already rejected Defendants' argument in this regard on their Motion to Dismiss when it allowed the claim to proceed. Defendants do not make any different argument here. In fact, the evidence shows that the hearing was held during a period that many Local 1107 Board members, like Ray Liepins, could not attend because they were bargaining a new CBA. *See* **Ex. 20,** at RG16883. The fact that the board members spoke at the hearing, does not cure the due process violation. Further, evidence presented in discovery in this cases demonstrates clearly that the requirement of a spokesperson to have due process was a change in policy. *See* UHW Trusteeship Docs, attached as **Ex. 31,** at SEIU13383. Finally, as stated above, given the great weight of evidence that the entire process for imposition of this trusteeship was biased, that Verrett that ignored the actual evidence and simply relied on the biased testimony of Marzan despite contradicting evidence. The due process claim should thus proceed to trial.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court DENY Defendants' Motion for Summary Judgment.

DATED this 20th day of February 2018.

/s/ Michael J. Mcavoyamaya

MICHAEL J. MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, NV, 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of February, 2018, the undersigned served the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on all counsel herein by causing a true copy thereof to be filed with the Clerk of Court using the CM/ECF system, which was served via electronic transmission by the Clerk of Court pursuant to local order.

CHRISTENSEN JAMES & MARTIN
EVAN L. JAMES, ESQ. (7760)
KEVIN B. ARCHIBALD, ESQ.
(13817)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Facsimile: (702) 255-0871
Email: elj@cjmlv.com, kba@cjmlv.com
Attorneys for Defendants

BREDHOFF & KAISER
BRUCE R. LERNER
JACOB KARABEL
805 15TH Street N. W., Suite 1000
Washington D.C. 20005
Email: blerner@bredhoff.com,
jkarabel@bredhoff.com
Attorneys for Defendants

Dated this 20th day of February, 2019.

/s/ Michael J. Mcavoyamaya

MICHAEL MCAVOYAMAYA, ESQ.
Nevada Bar No.: 14082
4539 Paseo Del Ray
Las Vegas, NV, 89121
Telephone: (702) 299-5083
Mmcavoyamayalaw@gmail.com
*Attorney for Plaintiffs*